IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., a minor, by and through her parents, TERRY SNYDER and STEVEN SNYDER, individually and on behalf of their daughter, | ) ) ) ) ) | No: 3:07-cv-585 |
| Plaintiffs, | ) ) ) | **ELECTRONICALLY FILED** |
| v. | ) ) | |
| BLUE MOUNTAIN SCHOOL DISTRICT; DR. JOYCE E. ROMBERGER, Superintendent Blue Mountain School District; and JAMES S. MCGONIGLE, Principal Blue Mountain Middle School, both in their official and individual capacities, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

## <u>VERIFIED COMPLAINT</u>

### INTRODUCTION

1.    This First Amendment free-speech case presents two issues: (1) whether the

First Amendment permits a school district to exclude a student from classes

for two weeks for posting on the Internet, from her home computer, a non-

threatening, non-obscene parody profile making fun of the school principal;

1

and (2) whether the Fourteenth Amendment and Pennsylvania law permit a school district to discipline a student for out-of-school conduct that does not cause a disruption of classes or school administration.  Plaintiffs Terry and Steven Snyder, the parents of the student, J.S., by this Verified Complaint and accompanying Motion for Temporary Restraining Order, seek the immediate return of their daughter to her classes, damages, and an injunction against further retaliation against or punishment of J.S. based on her First Amendment protected actions or otherwise on her out-of-school conduct.  J.S.'s removal from classes on Friday, March 23 constitutes ongoing irreparable harm.

## JURISDICTION

2.  This action seeks to vindicate rights protected by the First and Fourteenth Amendments to the United States Constitution and is brought under 42 U.S.C. §1983.  The Court has jurisdiction over this civil rights action pursuant to 28 U.S.C. §1331(a) and §1343(a)(3) and (4).  This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a).  This Court has jurisdiction pursuant to 28 U.S.C. §§2201 and 2202 to declare the rights of the parties and to grant all further relief found

necessary and proper.

## PARTIES

3.  Plaintiff J.S. is a fourteen-year old eighth grader at Blue Mountain Middle School in Orwigsburg, Schuylkill County, Pennsylvania. J.S. lives with her parents and younger brother in Orwigsburg, Pennsylvania.

4.  Plaintiff Terry Snyder is J.S.'s mother. Ms. Snyder brings this action individually and on behalf of her minor daughter, J.S..

5.  Plaintiff Steven Snyder is J.S.'s father. Mr. Snyder brings this action individually and on behalf of his minor daughter, J.S..

6.  Defendant Blue Mountain School District ("District") is a political subdivision of the Commonwealth of Pennsylvania. The District maintains its administrative office at 685 Red Dale Road, P.O. Box 188, Orwigsburg, PA 17961.

7.  Defendant James McGonigle is, and at all relevant times hereafter mentioned was, the Principal at Blue Mountain Middle School, which is located within the Blue Mountain School District. Defendant McGonigle has at all times hereinafter mentioned acted under color of state law. In his capacity as Principal, Defendant McGonigle is obliged to act in conformity with the

United States Constitution and applicable federal and state laws.  He is sued in both his individual and official capacities.

8.    Defendant Dr. Joyce E. Romberger is, and at all relevant times hereafter mentioned was, the Superintendent of the Blue Mountain School District. Defendant Romberger has at all times hereinafter mentioned acted under color of state law.  In her capacity as Superintendent, Ms. Romberger is responsible for, *inter alia*, ensuring that the school district and its officials act in conformity with the United States Constitution and applicable federal and state laws.  She is sued in both her individual and official capacities.

## FACTS

9.    J.S. has been a good student in her 9 years in the Blue Mountain School District.  J.S. is in all honors and college preparatory classes and, until recently, consistently received excellent grades.  She plans to attend college.

10.    In fifth grade, J.S. scored so well on the standardized PSSA tests required under the No Child Left Behind Act that she received a special commendation from the office of the President of the United States.  She has consistently made the Honor Roll, sometimes receiving Distinguished Honors.

11.    J.S. never was the subject of school discipline until December 2006, when she was twice required to change clothes and serve detention because a teacher thought the camisole she had on under her sweater (which she had worn without objection before) was too low cut. On each occasion, Defendant McGonigle yelled at her, once telling her "You have to stop putting on those little shows."

12.    J.S. was upset by the dress code detentions because she thought the objections to her clothing were arbitrary and unfair. She was even more upset because she felt Defendant McGonigle had overreacted and treated her inappropriately. Following these incidents, J.S. became more critical of the school administration and less engaged in her work. Her March 14 report card was the worst she had ever received.

13.    Ms. Snyder noted the change in J.S.'s attitude toward school and encouraged her to bring her focus back to her studies. When she saw J.S.'s report card, she grounded J.S. as punishment for the poor grades.

14.    On or about Sunday, March 18, 2007, J.S. and a fellow eighth grader created a parody profile of Defendant McGonigle on a website called "MySpace.com" (www.myspace.com). MySpace is a private on-line community where computer users can share photos, journals and interests

with other people on the Internet.  The web site has become especially popular among young people.

15.  In constructing the McGonigle profile, J.S. used the website's template for profiles, which in addition to background information includes a space to list the subject's interests, sexuality and marital status.

16.  The profile did not identify Defendant McGonigle by name.  It did, however, include a picture of Defendant McGonigle, which the other student had copied off the Blue Mountain School District website.  The photo can be copied from the website by simply placing a cursor over the picture and "right clicking" to bring up a menu of options regarding the image.

17.  The profile was intended to be a parody of Defendant McGonigle, and would be perceived as such by any reasonable person.  A few hours after they had created it, the girls made the profile into a "private" profile, meaning that it could not be viewed unless one asked the owner of the profile (in this case, J.S. and her friend) for permission to access the profile.  J.S. and her friend told a handful of their fellow students about the profile and granted them access to the profile.  Those students told other students, who also sought permission to view the profile.  J.S. and her friend granted permission to approximately 20 persons they could identify as students at Blue Mountain

Middle School and denied permission to approximately five persons whom they could not identify.

18. On Tuesday, March 20, J.S. decided to delete the profile because she had intended it only for a small group of friends, but news of the profile had gotten around to many more students. She attempted to follow the steps required by MySpace.com to delete a profile, but was not successful in removing it.

19. J.S. also attempted to remove the profile on Thursday, March 22, after she had been suspended from school, but found the website unresponsive. On Friday, she returned to the profile intending to make another attempt to delete it, but found it had already been deleted or otherwise made inaccessible to Internet users.

20. Plaintiffs were unable to obtain a paper copy of the profile because they did not have a printer set up at home at the time J.S. was suspended and because, by the time they contacted counsel, the profile had been removed. Their attempts to obtain a copy from the Defendants have been unsuccessful.

21. To the best of J.S.'s recollection, the profile described the subject as a married man living in Alabama with his wife and child, and identified him as bisexual. It listed as his interests: detention, "being an ass", "being a

principal", baseball, "my gold pen", "my wife (who looks like a man)" and "my kid (who looks like a gorilla)".  The profile also featured a "personal statement," in which the subject described himself as "expressionless", a "sex addict", "dick-faced" and as having a "small dick".  It suggested that the subject was preoccupied with sex, and stated "I love long walks on the beach, being a tight ass, my wife, Frain Train (who satisfies my every need) [Defendant McGonigle's spouse is Debra Frain, a counselor at Blue Mountain Middle School], and being a dick-face".  The profile was located at the URL www.MySpace.com/kidsrockmybed.

22. The profile contained no "true threats" or obscenity, as those terms are defined in the law.  Nothing on the site could reasonably be construed as threatening or violent.

23. Plaintiffs have been informed by Defendant McGonigle and therefore believe that the photograph of Defendant McGonigle is not property of the school, but is owned by the photographer, and that the District has a license to use the photo on its website.

24. Upon information and belief, the Blue Mountain School District website contains no warning or conditions of use forbidding the duplication of images or other content from the website.

25.     The students created the profile for their own amusement and the amusement of their friends.  The students did not, and did not intend, to use the profile for any other purpose, including any commercial purpose.

26.     The students used no school computers or resources to create the profile.

27.     Each student worked from her own home computer during non-school hours when creating the profile.

28.     J.S. never brought to school a printout of the profile, nor did she ever download it on a school computer.  In fact, upon information and belief, the school computers that are accessible to students block access to MySpace.com, so no student ever viewed the profile from school.

29.     J.S. did tell some of her friends about the profile, and some students discussed the profile during lunch and between classes.  Upon information and belief, there was no disruption of classes or otherwise in the school as a result of the posting of the profile, which was up for less than a week.

30.     At the beginning of the school day on Thursday, March 22, J.S. was summoned to a meeting with Defendant McGonigle and Mrs. Guers, a guidance counselor, to discuss the profile.  At approximately the same time, Ms. Snyder received a call from the school requesting her immediate attendance at the meeting.  Ms. Snyder was at work in Harrisburg when she

received the call, and it took her approximately an hour to drive back to Orwigsburg.

31. Before Ms. Snyder arrived, Defendant McGonigle questioned J.S. about the parody profile. J.S. immediately admitted that she had helped create the profile. J.S.'s friend was then summoned to the meeting, as well.

32. Defendant McGonigle told the students that he was very angry about the profile, and particularly about the involvement of his family. He told them that they had "screwed up" by using the picture. He also told them that if they were boys he would have thrown them against the wall. He stated that he would sue the students and their families and stated that although he knew the students didn't have money, their families do. The girls were terrified. Defendant McGonigle concluded by telling the guidance counselor to remove the girls "before I lose my temper". J.S. and her friend were then locked in separate rooms to await the arrival of their parents.

33. When Ms. Snyder arrived to meet with Defendant McGonigle, he removed a key from his pocket and unlocked the room where J.S. had been waiting, then took J.S. and her mother into his office. He showed Ms. Snyder the profile, then told Ms. Snyder that he planned to file a police report and sue the family. He also announced that J.S. would receive a ten-day out-of-school

suspension, which is the longest period that a student may be suspended without being expelled. He also stated that she would not be permitted to attend school dances for the rest of the term and that she probably would not be permitted to join the eighth grade field trip to Washington, D.C. at the end of the term.

34. When he had finished, he asked Ms. Snyder if she had any questions, then berated her for not apologizing to him immediately. Ms. Snyder did apologize. J.S. also apologized to Defendant McGonigle and, when he offered her the opportunity, to his wife. After her suspension, J.S. prepared a written apology to Defendant McGonigle, which was delivered to Defendant McGonigle on March 26. The Snyders have punished J.S. for her conduct by grounding her and restricting her telephone and computer privileges.

35. Defendant McGonigle told Ms. Snyder there would be a follow-up meeting to discuss J.S.'s transition back to school, which he and Ms. Snyder scheduled for Wednesday, March 28.

36. On March 24, the Snyders received a letter from the school along with a Disciplinary Notice (attached hereto as Exhibit "A"). The letter and notice confirmed the ten-day suspension and stated there would be an "informal hearing" on the charges on Wednesday, March 28. On March 27, however,

11

the District Solicitor called counsel for Plaintiffs to say that there would only be a meeting to discuss J.S.'s school work and not a hearing on the suspension on the 28th.

37.    Neither the notice nor the letter identified any school rule J.S. was supposed to have broken.   Instead, each stated that she was being suspended for "making false accusations" against Defendant McGonigle and "copyright laws".   The Notice stated that J.S. had committed a "Level 4" infraction.

38.    The District's discipline code creates four categories of infraction, level I through Level IV.  Suspension is listed as an appropriate discipline only for Level III and Level IV infractions.

39.    Level I infractions are described as "acts of misconduct which interfere with orderly classroom procedures, school functions, extracurricular programs, approved transportation, or a student's own learning process," and include:

    1. Hall pass violation.
    2. Lunchroom infractions.
    3. Cheating.
    4. Classroom/school disruption.
    5. Disorderly conduct/classroom disruption.
    6. Dress code violation.
    7. Harassment/Intimidation
    8. Playground violation.
    9. Late to class.
    10. Electronic devices.
    11. Failure to follow classroom management rules.
    12. Failure to bring in notes/excuses.

13. Public affection.
14. Out of assigned area.
15. Eating, drinking or chewing gum.

40.    Level II infractions are described as "acts of misconduct previously

identified, which require administrative intervention. It may also include

repeated acts of misconduct and acts directed against persons or property but

which do not seriously endanger the health and safety of others," and include:

1. Repeated Level I Offenses.
2. Insubordination.
3. Inappropriate behavior.
4. Deceiving school personnel.
5. Truancy.
6. Failure to follow driver/rider procedure.
7. Destruction of property.
8. Disruptive behavior.
9. Cheating, plagiarism
10. Forgery.
11. Gambling.
12. Misconduct on school bus or at bus stop.
13. Stealing/theft (less than $20).
14. Unauthorized assembly, publication, etc.
15. Unsafe acts/actions.
16. Cutting classes.
17. Tardy to school.
18. Computer misuse.
19. Cutting detention.
20. Merit work pass, work-study or work release violation.
21. Written derogatory comments about students/ teachers/ staff.

41.    Level III infractions are "serious acts of misconduct. They include but are not

limited to: repeated acts of misconduct, those acts with prior warning of

referral to Level III action, serious disruptions of the orderly conduct of school, threats to the health, safety, and property of self or others, and other acts of serious misconduct." The list of Level III offenses includes: Abusive or obscene language/gestures; Student hazing; Unsafe Driving Acts; Abusive language to school personnel; Assault; Breaking and entering; Defiance; Disorderly conduct; Destruction of property/vandalism; Extortion/threats; Fighting; Harassment/Intimidation; Sexual Harassment; Smoking; Theft (more than $20); Trespassing; Leaving school without permission; and Severe computer misuse.

42.     The section on Level IV infractions begins with Notices regarding physical assaults on school personnel, weapons, alcohol and drugs, and sexual harassment and indecent exposure. The listed Level IV infractions are:

> 1. Repeated Level III Offenses.
> 2. Aggravated battery.
> 3. Alcohol.
> 4. Arson.
> 5. Assault.
> 6. Battery.
> 7. Breaking and entering.
> 8. Drugs.
> 9. Firearms/explosive.
> 10. Homicide.
> 11. Inciting, leading, or participating in acts that substantially disrupts orderly conduct at a school or school function.
> 12. Kidnapping.
> 13. Making false accusations about school staff member/another

14

student.
14. Robbery.
15. Serious breach of conduct.
16. Serious misconduct on school bus or at bus stop.
17. Sex offenses.
18. Sexual battery.
19. Sexual harassment.
20. Stolen property: possession, use, distribution, or sale.
21. Grand larceny.
22. Unsafe act/actions.
23. Weapons (other than firearms).
24. Bomb threat.
25. Fire Alarms.

43.     J.S.'s creation of the profile – if it had been created on school property using school resources and, thereby, potentially punishable by the school – and the allegedly unauthorized use of the photograph would appear to be Level II infractions, for which the appropriate punishments include: Verbal reprimand; Behavioral contract; Withdrawal of privileges; Confiscation of unauthorized material; Return of property or restitution for damages; Referral to student services; School Service Work; Suspension from extra-curricular activities; Detention; Fines/ Citations; and Warning of referral to Level III.

44.     On the evening of March 23, J.S. and her mother were called to the Reedsville, Pennsylvania State Police station.  A trooper advised them that Defendant McGonigle had filed a complaint for harassment, but had agreed not to press charges.  To date no criminal charges have been filed against

J.S..

45.     On March 23, Ms. Snyder called Blue Mountain School District
        Superintendent Joyce E. Romberger to protest the suspension.  She was told
        the School District would stand behind the discipline.

46.     Defendants' sanctions against J.S. have already resulted in profound
        consequences.  She has been deprived of five days of class-room instruction,
        discussion and participation, and faces an additional loss of five days, during
        which time her classes will be reviewing for and taking several important
        tests.

47.     Furthermore, upon information and belief, Defendant McGonigle informed
        all of the Blue Mountain Middle School teachers of J.S.'s suspension, despite
        the fact that Blue Mountain is required by federal law to keep J.S.'s
        disciplinary records confidential.  Also upon information and belief, certain
        teachers at the Middle School thereafter told their classes about the incident
        and the punishment, again despite the fact that such information is private.

48.     The provisions in the District's disciplinary code under which J.S. is being
        punished are unconstitutionally overbroad and vague, on their face and as
        applied to J.S., in that they, *inter alia*, fail to distinguish out-of-school speech
        from in-school expression and they are not limited to student speech that

causes a material and substantial disruption to the school day.

49. The District's vague and overbroad policies prohibit and chill speech that is protected by the First Amendment.

50. Defendants' punishment of J.S. for creating a parody profile of Defendant McGonigle amounts to retaliation for constitutionally protected activity.

51. Defendants' actions are producing ongoing irreparable harm for which there is no adequate remedy at law.

52. Defendants' punishment of J.S. for speech and expressive activities that took place inside the Snyders' home interferes with and usurps the Snyders' constitutional rights as parents to direct the upbringing of their children.

53. The Snyders have suffered injury as a result of the School District's actions, including, but not limited to, emotional pain and suffering and injury to J.S.'s reputation.

## CLAIMS

### Count I: First Amendment to the United States Constitution
### J.S.'s Punishment

54. Defendants' punishment of J.S. for her parody profile of Principal McGonigle violates her rights under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, and 42 U.S.C. §1983.

## Count II: First Amendment to the Constitution
## District's Disciplinary Policies

55.     Defendants' policies and rules are unconstitutionally vague and/or overbroad, both on their face and as applied to J.S., because, inter alia, they do not distinguish between conduct at school or school-related events and conduct away from school, and thus violate the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, and 42 U.S.C. §1983.

## Count III:  *Ultra Vires* Governmental Action
## J.S.'s Discipline

56.     Blue Mountain School District has the authority to regulate conduct of students "during such time as they are under the supervision of the board of school directors," 24 P.S. § 5-510, and "during the time they are in attendance", 24 P.S. § 13-1317.

57.     The District does not have the authority to regulate student conduct while at home.

58.     Defendants' disciplinary action against J.S. for conduct that occurred off of school grounds exceeds the disciplinary authority granted the School District by Pennsylvania law and is therefore ultra vires and void.

## Count IV:  Fourteenth Amendment Due Process
### The Snyders' Parental Rights

59.     Defendants' punishment of J.S. for constitutionally protected speech in her own home interfered with, and continues to interfere with, Terry and Steven Snyder's rights as parents to determine how best to raise, nurture, discipline and educate their children in violation of their rights under the Fourteenth Amendment to the U. S. Constitution and 42 U.S.C. §1983.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Court provide the following relief:

(a)     Declare that the Defendants' disciplinary action against J.S. for posting on the Internet the parody profile of Defendant McGonigle violates her rights under the First and Fourteenth Amendments to the Constitution;

(b)     Declare that the Defendants' disciplinary action against J.S. for posting on the Internet the parody profile of Defendant McGonigle, which was activity performed within the Snyder home, violates the Snyders' parental rights under the Fourteenth Amendment to the United States Constitution;

(c)     Declare that the Blue Mountain School District's policies that have been and may be used to punish speech which takes place at a student's home and off of school grounds and outside of school-sponsored events are excessively vague and overbroad, and thereby violate the First and Fourteenth Amendments to the Constitution of the United States and violate the Snyders' rights under the Fourteenth Amendment to the Constitution of the United States;

(d)      Declare that Defendants' disciplinary action against J.S. for conduct that occurred off of school grounds exceeds the disciplinary authority granted the School District by Pennsylvania law and is therefore *ultra vires* and void;

(e)     Declare that the Blue Mountain School District's policies that have been and may be used to punish speech which takes place at a student's home and off of school grounds and outside of school-sponsored events exceed the disciplinary authority granted the School District by Pennsylvania law and are therefore *ultra vires* and void;

 (f)    Enjoin the defendants from any continuing punishment or sanction against J.S. on account of her constitutionally protected speech, including:

  (i)     reinstating J.S. to the classes in which she was enrolled prior to March 23, 2007;

(ii) reinstating to J.S. all privileges to which she was and may be entitled as if no disciplinary infraction had occurred;

(iii) expunging from J.S.'s school records all references to the incident in question;

(g) Enjoin defendants from enforcing the school disciplinary code against students for expression that takes place outside of the school or school-sponsored activities;

(h) Award all reasonable damages in favor of the plaintiffs and against the defendants in an amount to be determined at trial;

(i) Award Plaintiffs' costs and attorney's fees pursuant to 42 U.S.C. §1988; and

(j) Grant such other relief as this Court deems just and appropriate.

Respectfully submitted,

Date: March 28, 2007.      */s/ Mary Catherine Roper*
Mary Catherine Roper
Attorney ID 71107
AMERICAN CIVIL LIBERTIES FOUNDATION
OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215.592.1513 ext. 116
(F) 215.592-1343
mroper@aclupa.org

Deborah Gordon
Attorney No. 95071
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA  19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs