# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.S., a minor, by and through her parents, ) <br> TERRY SNYDER and STEVEN SNYDER, ) <br> Individually and on behalf of their daughter, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> BLUE MOUNTAIN SCHOOL DISTRICT; ) <br> DR. JOYCE E. ROMBERGER, ) <br> Superintendent Blue Mountain School ) <br> District; and JAMES S. MCGONIGLE, ) <br> Principal Blue Mountain School, both ) <br> in their official and individual capacities, ) <br> ) <br> Defendants. ) <br> _____) | NO: 3:07-cv-585 |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Plaintiffs J.S., a minor, and her parents, Terry Snyder and Steven Snyder identify the following undisputed material facts that warrant entry of summary judgment in their favor:

**THE PARTIES**

1.      At all times relevant to the issues involved in this lawsuit, Plaintiff J.S. was a fourteen year old eighth grade student at Blue Mountain Middle School in the Blue Mountain School District, who at the time lived with her

1

Dockets.Justia.com

mother Terry, her father Steven, and her brother in Orwigsburg, Pennsylvania. (Defendants Answer, ¶ 3).[1]

2.    Defendant Blue Mountain School District is a political subdivision of the Commonwealth of Pennsylvania. The District maintains its administrative office at 685 Red Dale Road, P.O. Box 188, Orwigsburg, PA 17961 (Defendants Answer, ¶ 6).

3.    Defendant James McGonigle is, and at all times relevant was, the Principal at Blue Mountain Middle School, which is located within the Blue Mountain School District. Defendant McGonigle has at all times hereinafter mentioned acted under color of state law. In his capacity as Principal, Defendant McGonigle is obliged to act in conformity with the United States Constitution and applicable federal and state laws. (Defendants Answer, ¶ 7).

4.    Defendant Dr. Joyce E. Romberger is, and at all relevant times hereafter mentioned was, the Superintendent of the Blue Mountain School District. Defendant Romberger has at all times hereinafter mentioned acted under color of state law. In her capacity as Superintended, Ms. Romberger is responsible for, *inter alia*, ensuring that the school district and its officials

_____

[1] Cited pages from the TRO Hearing Transcript and from deposition transcripts, as well as the cited exhibits, will be included in the Appendix to be filed with plaintiffs' supporting brief.

act in conformity with the United States Constitution and applicable federal and state laws. (Defendants Answer, ¶ 8).

5.      J.S. attended schools in the Blue Mountain School District for the nine years of her elementary academic career. (Defendants Answer ¶ 9). J.S. has consistently made the Honor Roll, sometimes receiving Distinguished Honors. (Defendants Answer ¶ 10).

6.      At all times relevant to the matters at issue in this lawsuit, Angela Werner was a teacher at Blue Mountain Middle School. (Werner Dep. 5-6). Ms. Werner is employed as a half day teacher of a course called Skills for Adolescents and a half day drug and alcohol coordinator for the school district. (Werner Dep. 5).

7.      At all times relevant to the matters at issue in this lawsuit, Timothy Nunemacher was a math teacher at Blue Mountain Middle School. (Nunemacher Dep. 6).

8.      At all times relevant to the matters at issue in this lawsuit, Susan Schneider-Morgan was the Director of Technology at the Blue Mountain Middle School (Morgan Dep. 7).

9.      At all times relevant to the matters at issue in this lawsuit, K.L. was an eighth grade student at Blue Mountain Middle School.

**THE MYSPACE WEBSITE**

10.       MySpace (www.myspace.com) is a private on-line community where computer users can create profiles of themselves to share photos, journals and interests with other people on the Internet.  Users can also communicate with each other online.

11.       MySpace is a social networking website offering an interactive, user-submitted network of friends, personal profiles, blogs, groups, photos, music and videos internationally. http://en.wikipedia.org/wiki/MySpace.

12.       MySpace is currently the world's sixth most popular English-language website and the sixth most popular website in any language, and the third most popular website in the United States, though it has topped the chart on various weeks. The service has gradually gained more popularity than similar websites to achieve nearly 80 percent of visits to online social networking websites.  http://en.wikipedia.org/wiki/MySpace.

13.       Students are unable to access www.myspace.com from Blue Mountain Middle School computers because that website has been blocked. (McGonigle Dep. 64-65).

14.       During her nine years in the Blue Mountain Middle School, J.S. had never been disciplined until December 2006 and February 2007 when she

was twice disciplined for dress code violations by Mr. McGonigle. (Defendants Answer, ¶ 11) (J.S. Dep. 41).

15.      On approximately Sunday March 18, 2007, J.S. and her friend K.L. created the parody profile of Mr. McGonigle on MySpace. (J.S. Dep. 13). When she made the profile, J.S. was trying to be funny. (J.S. Dep. 11).

16.      In creating the parody profile, J.S. used the MySpace template for profiles, which includes background information such as age and place of birth. (J.S. Dep. 17).

17.      The profile did not identify Defendant McGonigle by name, but did include a picture of Defendant McGonigle, which the other student had copied off the Blue Mountain School District Website. (J.S. Dep. 15-17). The name section of the profile was labeled "M-Ho." (J.S. Dep. 17-18).

18.      The profile was intended to be a parody of Defendant McGonigle. (J.S. Dep. 77). The profile was made "private" approximately a day after J.S. and her friend created it. (J.S. Dep. 26). When a MySpace profile is set on "private", an individual seeking to view it must request access from the creator of the profile before gaining access to the profile. (J.S. Dep. 26).

19.      After the profile was made private, J.S. and her friend granted access to twenty-two individuals to view the profile. (J.S. Dep. 26).

20.    The profile described the subject as a married man living in Alabama with his wife and child, and identified him as bisexual. It listed as his interests: detention, "being an ass," "being a principal", baseball, "my gold pen", "my wife (who looks like a man)" and "my kid (who looks like a gorilla)."  The profile also featured a "personal statement," in which the subject described himself as "expressionless", a "sex addict"; "dick-faced" and as having a "small dick".  It suggested that the subject was preoccupied with sex, and stated "I love long walks on the beach, being a tight ass, my wife, Frain train (who satisfies my every need) [Defendant McGonigle's spouse is Debra Frain, a counselor at Blue Mountain Middle School], and being a dick-face".  The profile was located at the URL www.MySpace.com/kidsrockmybed.

21.    J.S. created the site from her parents home computer during non-school hours.  (J.S. Dep. 11, 13).  J.S. did not use school computers to create the website.

22.    On the morning of Tuesday March 20, 2007, a student approached Defendant McGonigle to report a bus incident and also indicated that "there was something else that she needed to talk to [McGonigle] about . . . She said, there's a MySpace account about you and it's not real nice." (McGonigle Dep. 34).

23.     At the end of the Tuesday morning conversation with the student, Mr.
McGonigle told the student "if you can find out who did it, I would
appreciate it."  (McGonigle Dep. 34-35).

24.     Later that morning on March 20, 2007, Defendant McGonigle
attempted to locate the MySpace profile on his own.  (McGonigle Dep. 35-
36).  Defendant McGonigle went onto www.MySpace.com and typed in his
name and "nothing came up."  *Id.*  Defendant McGonigle then contacted
MySpace and asked them to locate the profile.  *Id.* Defendant McGonigle
was told that MySpace could not pull up the profile unless he had the URL
number.  *Id.*

25.     When asked to describe all of the disruption caused by the MySpace
profile created by J.S. and her friend, Mr. McGonigle identified: (a) two
instances of teachers having to quiet their classes when students were talking
about the profile (McGonigle Dep. 39, 141-144); (b) the need for a
counselor to cancel a small number of student counseling appointments in
order to free another counselor to sit in on Mr. McGonigle's meetings with
J.S., K.L. and their parents (McGonigle Dep. 156-62); (c) the fact that two
students decorated J.S.'s and K.L.'s lockers to welcome them back to school
and a teacher had to tell students to stop congregating in the hall around the
lockers (McGonigle Dep. 148-52); and (d) his suspicion that students

became more defiant as a result of the federal lawsuit filed by J.S. and her family (McGonigle Dep. 152-55).

26.     There was no other disruption associated with the MySpace profile. (McGonigle Dep. 163).

27.     During lunch time on March 20, 2007, Defendant McGonigle was approached by a teacher, Ms. Angela Werner, who said students were talking about the MySpace profile. (McGonigle Dep. 39-40). Ms. Werner told him that "the kids are talking about a MySpace account about you. Are you aware of it?" *Id.* Mr. McGonigle replied that "I am aware of it and I'm looking into it." *Id.*

28.     Ms. Werner explained that a group of eight grade girls in one of her skills and adolescents class approached her at the end of class. (Werner Dep. 11). The girls approached Ms. Werner when "class had wrapped up and there was a few minutes left over." (Werner Dep. 12). The girls told Ms. Werner that there was a web site which mentioned Mr. McGonigle and his family. *Id.* The girls who spoke to Ms. Werner said "they were upset by what was on the web site and things that it contained." (Werner Dep. 11).

29.     When the girls approached Ms. Werner the lesson plan had concluded and some students were sitting quietly waiting for the next class, some were

working on things for other classes and some were reading books. (Werner Dep. 16).

30. When the girls approached Ms. Werner at the end of the class it was not disruptive of the class because it was the end of the class and because the lesson had already been concluded. (Werner Dep. 20).

31. Ms. Werner explained that it is appropriate for students to approach her in that same way at the end of a class period after the lesson plan had concluded and that on other occasions, involving other issues, students have similarly approached her. *Id.*

32. Mr. Nunemacher, another teacher, heard students talking about the profile during his second period eighth grade Algebra I class on Thursday, March 22, after J.S. and K.L. had already been called to Mr. McGonigle's office. [2] (Nunemacher Dep. 9). Mr. Nunemacher approximated that six or seven students were involved in the discussion. (Nunemacher Dep. 16).

33. The students started talking during the classroom work phase of the class, approximately twenty-five minutes into the forty-three minute class period. (Nunemacher Dep. 12). Mr. Nunemacher's classes typically follow

---

[2] Mr. McGonigle testified that Mr. Nunemacher approached him on Tuesday March 20, 2007 regarding the conversations in his eighth grade math class about the MySpace profile. (McGonigle Dep. 39-40). Mr. Nunemacher testified that the discussions in his eighth grade math class occurred on the day that J.S. was suspended, Thursday March 22, 2007. (Nunemacher, Dep. 9).

the same general format each day: give the students notes and then students do problems in class and then he gives out homework and he usually gives them some time in class to do the homework.  (Nunemacher Dep. 10).

34.      Mr. Nunemacher asked the students to stop talking.  (Nunemacher Dep. 13).

35.      The students ignored Mr. Nunemacher's request to stop talking.  Mr. Nunemacher again told the students, "Guys we need to get back to work. We need to be working on the problems that I assigned."  (Nunemacher Dep. 14).

36.      The students continued talking and Mr. Nunemacher raised his voice and said "We need to get back to work right now."  *Id.*  In response, the students got back to work and that was the end of the discussion.

37.      A total of five or six minutes elapsed from the time Mr. Nunemacher first told the students to stop until the last time he told the students to stop talking.  *Id.*

38.      Mr. Nunemacher has had to quiet down this particular algebra class on previous occasions.  *Id.* at 15.  Mr. Nunemacher approximated that he had to ask them to quiet down once a week.  *Id.*

39.      Mr. Nunemacher explained that when handling disruptions in his class room, he would tell the students to do their work and if necessary he will

raise his voice. (Nunemacher Dep. 21). Mr. Nunemacher indicated that on isolated occasions he would involve an outside person, such as a principal to stop a disruption. *Id*. Mr. Nunemacher stated that on two occasions since he began employment at Blue Mountain Middle School he has called the principal down to his classroom. *Id.* at 22. Under that scenario, the principal would take the student with him out of the classroom to his office. Also, Mr. Nunemacher has the option to send a student to the principal's office. He has done that "very infrequently." *Id.* at 22. Mr. Nunemacher approximated that he has sent a student to the principal less than 10 times in his career at Blue Mountain middle School. *Id.*

40.      Mr. Nunemacher also heard another discussion of the MySpace profile in one of his classes on the previous day, March 21, 2007. During his sixth period College Prep Algebra I class, he heard "at least two" students saying "I wonder if we'll get in trouble for being part of . . . it's friends on the website." (Nunemacher Dep. 17).

41.      Mr. Nunemacher requested that the students stop talking and they stopped talking. The entire exchange lasted one or two minutes. *Id.* During this sixth period college prep algebra class, the students talking did not have a copy of the MySpace profile. *Id.*

42.     Mr. Nunemacher did not tell anyone, including Mr. McGonigle, about the comments made by students in his college prep Algebra I class. *Id.* at 20.

43.     Mr. Nunemacher also heard "rumblings" during that same week in March 2007 that he believed to be related to the MySpace profile but could not say with certainty that the comments were or were not related to the profile. *Id.* at 18-19.

44.     At the end of the day on March 20, 2007, the student that initially told Mr. McGonigle about the MySpace profile approached him in the hallway in between classes and told him that J.S. created the MySpace profile about him. (McGonigle Dep. 43).  During that conversation, Mr. McGonigle requested that the student bring in a printout of the profile for him. (McGonigle Dep. 33-34).

45.     The next morning on Wednesday March 21, 2007,  pursuant to Mr. McGonigle's request, the student brought Mr. McGonigle a copy of a printout of the MySpace profile.  (McGonigle Dep. 33, 46).

46.     Upon receiving the printout of the MySpace profile, at approximately 8:30 a.m. that morning, Defendant McGonigle brought the profile to show Superintendent Joyce Romberger and Director of Technology Susan Schneider-Morgan.  (McGonigle Dep. 48).  Defendant McGonigle met with

Ms. Schneider-Morgan and Defendant Romberger for approximately 10-15 minutes. (Schneider-Morgan Dep. 19).

47.    Defendant Romberger looked at the printout and read it. (Romberger Dep. 33). Defendant Romberger and Ms. Morgan recognized the photograph on the profile from the School District website. Neither of them asked Mr. McGonigle if the negative statement about him on the profile were true. (Romberger Dep. 33).

48.    Ms. Schneider Morgan believed the use of the photo on the MySpace profile was a violation of the District Acceptable Use Policy because "there is the violation of the copyright law including but not limited to the making of unauthorized copies of copyright material which include graphic images." (Schneider-Morgan Dep. 12).

49.    Ms. Schneider-Morgan has not taken any courses in copyright law and Ms. Schneider-Morgan does not hold any degrees in copyright law. (Schneider-Morgan Dep. 14).

50.    Ms. Schneider-Morgan eventually removed all of the administrative photos from the school website (www.bmsd.org). (Schneider-Morgan Dep. 16). Ms. Schneider-Morgan independently decided to take down these photos. (Schneider-Morgan Dep. 16). She took this action to prevent other students from using the photos. (Schneider-Morgan Dep. 16). It took Ms.

Schneider-Morgan approximately a half an hour to remove the photos from the website. (Schneider-Morgan Dep. 20).

51.    Defendant Romberger explained her initial reactions to the MySpace profile as containing "very inappropriate language" and as "lies" and "disgust." (Romberger Dep. 36-37). Defendant Romberger stated: "If a student had written those things, I thought it was very inappropriate for a student and I was disgusted that one of our students would do that." (Romberger Dep. 37).

52.    After that conversation with Defendant Romberger and Ms. Schneider-Morgan, Defendant McGonigle contacted MySpace and told them that he had the URL number and asked whether there would be a way to tell him what computer it came from. (McGonigle Dep. 50). MySpace told him they could not disclose that information without a court order. *Id.*

53.    On that same morning, Defendant McGonigle showed the MySpace profile to the two guidance counselors, Ms. Michelle Guers and Ms. Debra Frain. (McGonigle Dep. 52). Defendant McGonigle indicated to Ms. Guers and Ms. Frain, who is also Defendant McGonigle's wife, that he knew name of one student he believed to have created the profile but could not prove it. They asked the student's name and he indicated it was J.S. (McGonigle Dep. 53).

54.    After Defendant McGonigle showed the profile to Ms. Guers and Ms. Frain, he logged onto www.MySpace.com and using the URL on the printout was able to access the profile.  (McGonigle Dep.54-55).

55.    Beside Defendant Romberger, Ms. Schneider-Morgan, Ms. Guers and Ms. Frain, Defendant McGonigle did not show the profile to any other person on Wednesday March 21, 2007.  (McGonigle Dep. 56).

56.    By the end of the day on March 21, 2007, Defendant McGonigle had decided the discipline he would impose on the students responsible for creating the MySpace page. (McGonigle Dep. 58).

57.    Defendant McGonigle characterized the creation of the MySpace profile as a Level Four Infraction indicating that it was a "false accusation about a staff member."  (McGonigle Dep. 59).

58.    When asked why the statements in the profile were characterized as a false accusation, Mr. McGonigle read certain statements from the profile as examples of false accusations: "I have come to MySpace to pervert the minds of other Principals to be just like me" "Those who want to be my friend and aren't in my school, I love children, sex, dogs, long walks on the beach, being a dick head . . . And how about the part about having sex in my office and hitting on parents."  (McGonigle Dep. 59-60).  While Defendant McGonigle initially characterized these statements as false accusations,

when asked "they were accusing you as opposed to saying things that were untrue about you?" Defendant McGonigle replied: "No. They weren't accusing me. They were pretending they were me." (McGonigle Dep. 60).

59.     Defendant McGonigle did not know of or hear about another physical copy of the MySpace profile on school property other than the copy that Defendant McGonigle requested that the student bring to him. (McGonigle Dep. 63).

60.     J.S. was absent from school on Wednesday March 21, 2007.

61.     On March 22, 2007, make-up standardized testing was being conducted for those students that had missed the regular testing days. (McGonigle Dep. 72).

62.     J.S. was not participating in the make-up standardized testing. *Id.*

**PUNISHMENT OF J.S.**

63.     On Thursday March 22, 2007, when J.S. returned to school, Defendant McGonigle called J.S.'s first period teacher and said that he needed to see J.S in his office. (McGonigle Dep. 71).

64.     In response, J.S. went to Defendant McGonigle's office. Both Defendant McGonigle and guidance counselor Ms. Guers were present in his office. (McGonigle Dep. 74-75). Defendant McGonigle requested that Ms. Guers be present because he usually has another individual sit in with him

when he is meeting with a student. Ms. Guers was originally supposed to be administering the make-up standardized test but Defendant McGonigle had to juggle things around and instead had the other guidance counselor, Ms. Frain, who is also Defendant McGonigle's wife, administer the standardized testing. *Id.*

65.     When J.S. arrived at Defendant McGonigle's office, he said to her "do you have any idea why you're here?" (McGonigle Dep. 79). J.S. initially denied making the MySpace profile at first but then admitted it. (J.S. Dep. 50-51).

66.     Defendant McGonigle told J.S. and K.L. that he "was very upset and very angry, hurt and didn't understand why you [J.S. and K.L.] did this to me and my family." (McGonigle Dep. 85). Mr. McGonigle also told the students that he would be looking to take legal action against them and their families. (McGonigle Dep. 85-86).

67.     After Defendant McGonigle spoke with the two girls, Mrs. Guers took them out of the office to wait for their parents and put one in the waiting room and one in the "Eagle's nest" which is a room with a phone. (McGonigle Dep. 104).

68.     Mr. McGonigle determined that it was best to keep the students in rooms rather send them back into class because of his experience that

students talk about discipline issues and that generates classroom disruption. (McGonigle Dep. 104).

69.     Defendant McGonigle contacted both of the students' mothers. When Defendant McGonigle called J.S.'s mother he told her that "we had a serious matter and I didn't want to discuss it over the phone and would she please come to school. She said, I'm at work in Harrisburg and it's going to take me about an hour to get there. I said, that's fine, and I told her that her daughter was safe and there wasn't anything physically wrong, but I need you to come into school." (McGonigle Dep. 106).

70.     Defendant McGonigle then contacted K.L.'s mother and conveyed the same message. The other student's mother worked in Pottsville which was much closer and only twenty-five minutes away. *Id*.

71.     Defendant McGonigle first met with K.L. and her mother and Mrs. Guers was present as well. He showed K.L.'s mother a copy of the MySpace profile. He remembers the mother being "mortified" "very apologetic" and "very sympathetic." (McGonigle Dep. 107-08).

72.     Defendant McGonigle stated that both students would receive 10 days out of school suspension, no school dances, and that their school work would be provided for them while on suspension. Defendant McGonigle indicated that he was considering taking legal action and K.L.'s mother was

concerned about a potential lawsuit. (McGonigle Dep. 108). Defendant McGonigle noted that K.L. and her mother seemed very remorseful. (McGonigle Dep. 112).

73.     Defendant McGonigle and Mrs. Guers next met with J.S. and her mother Terry Snyder. (McGonigle Dep. 110-12). Defendant McGonigle showed Mrs. Snyder the profile from MySpace. Defendant McGonigle told J.S. and her mother that J.S. would receive a 10 day out of school suspension, no school dances and that her work would be provided for her and that he was considering taking legal action against her. *Id*. Defendant McGonigle indicated that he did not believe J.S. or her mother was very remorseful. (McGonigle Dep. 110-12). Terry Snyder testified that both she and J.S. apologized to Defendant McGonigle. (Terry Snyder Dep. 18). J.S. subsequently wrote a letter of apology to Mr. McGonigle and Mrs. Frain.

74.     Shortly after the meeting, Defendant McGonigle contacted MySpace, provided the URL for the profile and requested that they take down the profile. (McGonigle Dep. 168). Immediately after Defendant McGonigle hung up the phone with MySpace he tried to access the profile again and found it had already been taken down. (McGonigle Dep. 170-171). J.S. also tried to remove the profile on Thursday but by the time she attempted to access the profile, it had already been removed.

75.     Defendant McGonigle also contacted Defendant Romberger on Thursday March 22, 2007 to inform her of the decision to give J.S. and K.L. a ten-day out of school suspension for creating the MySpace profile.

76.     Defendant Romberger concurred with Defendant McGonigle's decision to suspend J.S. and K.L. for ten days out of school and no school dances.  (Romberger Dep. 39).

77.     Defendant Romberger, as the Superintendent of the Blue Mountain School District had the authority to overrule a Principal's decision to discipline a student. (Romberger Dep. 12).  Defendant Romberger could not recall a time where she has overruled a principal's discipline decision but in some cases has counseled a principal to pursue other avenues of discipline. (Romberger Dep. 12).

78.     The profile did not contain Defendant McGonigle's name and it did not identify him with the Blue Mountain School District.  (Romberger Dep. 42).

79.     Defendant Romberger believed that the profile could jeopardize Defendant McGonigle's current position because he is responsible for enforcing discipline and "number 1, the children would see that somebody did not respect him enough that they would chose to put something like this out on MySpace regarding him, number 2, the fact that someone might view

him as not having discipline of his building enough . . . number 3, people who might be considering him for employment, at some point, might find this or might just be aware of it." (Romberger Dep. 44-45).

80.     Defendant Romberger explained that in her role as Superintendent that if a parent reported an allegation of sexual conduct between a student and a Principal or School Administrator, Defendant Romberger "would investigate. I would probably contact the Guidance Department to see if the student had given them any information. I would investigate with the student or I would have an Assistant Principal investigate with the student, if there's an Assistant in the Building. So, between the Guidance Counselor and the Assistant Principal, I would investigate. Again, this is after I have informed the Principal of the allegation." (Romberger Dep. 25-26).

81.     If Defendant Romberger received an allegation of sexual conduct between a student and a Principal she would take whatever steps were necessary to determine whether or not the allegation was credible. (Romberger Dep. 23). If she determined that the allegation was credible "there would likely be a disciplinary action in the school district." (Romberger Dep. 24).

82.     Defendant Romberger immediately concluded that the statements made in the MySpace profile about Mr. McGonigle were not credible.

(Romberger Dep. 63)  Defendant Romberger never asked Defendant

McGonigle whether he had been hitting on students or having sexual contact

with students.  Defendant Romberger stated, "when I saw this [MySpace

profile], I did not ask him that question.  I did not think it was true."

(Romberger Dep. 63).

83.     Defendant McGonigle has not been investigated for child abuse or

received any administrative discipline from the school district because of

allegations that he hit on children or anything of that nature.  (McGonigle at

165-66).

84.     Later that day after Defendant McGonigle had met with the students

and their parents, Defendant McGonigle contacted the local police regarding

the possibility of pressing criminal charges against J.S. and the other student.

The local police referred him to the state police because the local police

were not knowledgeable in the area of the Internet.  (McGonigle Dep. 89-

90).

85.     When Defendant McGonigle spoke with the state police, he requested

that the police come to the school to take a look at the profile.  (McGonigle

Dep. 95-96).  A state police officer arrived at the school and met with

Defendant McGonigle for approximately twenty minutes.  *Id*.  Defendant

McGonigle indicated that the police said that he could press harassment

charges but "knowing that these two children didn't have any further past serious disciplinary record, the chances that they would get thrown out in Court were pretty good and I thought the girls had gotten enough punishment and I elected not to file any criminal charges." (McGonigle Dep. 99). Defendant McGonigle expressed to the police officer that he did not intend to press criminal charges. *Id.*

86.     The police officer completed a formal report of the visit to Defendant McGonigle's office and the report indicated that Defendant McGonigle would not be pressing charges. The state police asked Mr. McGonigle if he would like for them to call the students and their parents down to the station to "just let them know how serious this was." (McGonigle Dep. 163). Defendant McGonigle told the police that he would like them to do that. *Id.*

87.     On Friday March 23, 2007, J.S. and K.L. and their mothers were summoned to the state police station to discuss the posting of the MySpace profile of Defendant McGonigle. (Terry Snyder Dep. 20). The police officer Rasmus informed J.S. and her mother that Defendant McGonigle would not press any charges and emphasized the consequences if this ever happened again. (J.S. Dep. 66).

88.     Also on Friday March 23, 2007, Defendant McGonigle drafted a letter to Mr. and Mrs. Snyder regarding the terms of J.S.'s ten-day suspension and

the rationale for the suspension.  (McGonigle Dep. 130).  The letter indicates that the "Pennsylvania State Police have been informed of this incident so that criminal charges may be filed."  Defendant McGonigle had already determined, however, prior to sending this letter that he would not be pressing criminal charges against J.S.  (McGonigle Dep. 132).

89.     Terry Snyder also contacted Defendant Romberger on the telephone and requested that she change the ten day out of school suspension. (Romberger Dep. 55-56).   Defendant Romberger said she would not change the ten-day suspension.  *Id.*  Later that week, either on March 26th or 27th, Terry Snyder met with Defendant Romberger and again requested that she overrule the ten-day suspension.  Defendant Romberger again stated that she would not overrule it.  *Id.*

90.     No classes were canceled as a result of the MySpace profile of Mr. McGonigle.

91.     No student other than J.S. and K.L. was disciplined, suspended, or expelled for a disruption caused by the MySpace profile of Defendant McGonigle.

92.     Blue Mountain School District's policies (published in the Blue Mountain Middle School Code) do not restrict the school district's ability to

punish students for conduct outside of school or outside of school sponsored activities.

Respectfully submitted,

Dated:          November 21, 2007.          */s/ Mary Catherine Roper*
                                            Mary Catherine Roper (ID No. 71107)
                                            AMERICAN CIVIL LIBERTIES
                                            FOUNDATION OF PA
                                            P.O. Box 40008
                                            Philadelphia, PA 19106
                                            (T) 215-592-1513 ext. 116
                                            (F) 215-592-1343
                                            mroper@aclupa.org

                                            Mary E. Kohart (I.D. No. 37191)
                                            Meredith W. Nissen (I.D. No. 93504)
                                            DRINKER BIDDLE & REATH LLP
                                            One Logan Square
                                            18th and Cherry Streets
                                            Philadelphia, PA  19103-6996
                                            (215) 988-2700

                                            Deborah Gordon (I.D. No. 95071)
                                            EDUCATION LAW CENTER-PA
                                            1315 Walnut St., Suite 400
                                            Philadelphia, PA  19107
                                            (T) (215) 238-6970, ext. 313
                                            (F) (215) 772-3125
                                            dgordon@elc-pa.org

                                            Attorneys for Plaintiffs

## CERTIFICATION OF SERVICE

I, Mary Catherine Roper , hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:        November 21, 2007.        */s/ Mary Catherine Roper*
                                Mary Catherine Roper