IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **J.S., et al.** | :   **CIVIL ACTION NO. 07-CV-585** |
| | : |
| **Plaintiffs,** | : |
| | :   **JUDGE: JAMES M. MUNLEY** |
| **v.** | : |
| | : |
| **BLUE MOUNTAIN SCHOOL DISTRICT;** | : |
| **DR. JOYCE E. ROMBERGER,** | :   **ELECTRONICALLY FILED** |
| **Superintendent Blue Mountain School** | : |
| **District; and JAMES S. MCGONIGLE,** | : |
| **Principal Blue Mountain Middle School, both** | : |
| **in their official and individual capacities,** | : |
| | : |
| **Defendants.** | : |

EXHIBIT LIST TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS

Exhibit A – J.S.'s Deposition Testimony

Exhibit B – Myspace.com Profile

Exhibit C – CIS Acknowledgment and Consent Form

Exhibit D – Acceptable Use Policy

Exhibit E – Terry Snyder's Deposition Testimony

Exhibit F – James McGonigle's Deposition Testimony

Exhibit G – Temporary Restraining Order Hearing Transcript

Exhibit H – Correspondence to Plaintiffs dated March 23, 2007

Exhibit I – Disciplinary Notice

Exhibit J – Blue Mountain Middle School Student/Parent Handbook

Exhibit K – Dr. Joyce Romberger's Deposition Testimony

Exhibit L – Angela Warner's Deposition Testimony

FILED
SCRANTON

NOV 23 2007

PER _____
DEPUTY CLERK

Exhibit M – K.L.'s Deposition Testimony

Exhibit N – Susan Snyder-Morgan's Deposition Testimony

Exhibit O – Randall Timothy Nunemacher's Deposition Testimony

# EXHIBIT A

# EXHIBIT A

## ORIGINAL

```
 1                IN THE UNITED STATES COURT FOR
              THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
      J.S., a minor, by and      : CIVIL ACTION NO.:
 3    through her parents, TERRY  : 07-CV-585
      SNYDER and STEVEN SNYDER,   :
 4    individually and on behalf  :
      of their daughter,          :
 5                                 :
              Plaintiffs,          :
 6                                 :
              vs.                  : JUDGE:  JAMES M.
 7                                 : MUNLEY
      BLUE MOUNTAIN SCHOOL         :
 8    DISTRICT; DR. JOYCE E.       :
      ROMBERGER, Superintendent,   :
 9    Blue Mountain School         :
      District; and JAMES S.       :
10    McGONIGLE, Principal, Blue   :
      Mountain School District,    :
11    both in their official and   :
      individual capacities,       :
12                                 :
              Defendants.          :
13
                      ---------------
14

15                    ORAL DEPOSITION OF

16                          J.S.

17                   September 13, 2007

                      ---------------
18

19          Taken at the Blue Mountain School
      District Board Room, 685 Red Dale Road, Orwigsburg,
20    Pennsylvania, on September 13, 2007, commencing at
      11:29 a.m. before Candis S. Bradshaw, Notary
21    Public-Court Reporter.

22          LOVE COURT REPORTING, INC.
                1500 Market Street
23            12th Floor, East Tower
         Philadelphia, Pennsylvania  19102
24               (215) 568-5599
```

**Page 2**

APPEARANCES:

AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
BY: MARY CATHERINE ROPER, ESQUIRE
  The Bourse Building, Suite 570
  111 S. Independence Mall East
  Philadelphia, Pennsylvania 19106
  (215) 592-1513 x116
  Representing the Plaintiffs

SWEET, STEVENS, KATZ & WILLIAMS, LLP
BY: JONATHAN P. RIBA, ESQUIRE
  331 East Butler Avenue
  P.O. Box 5069
  New Britain, Pennsylvania 18901
  (215) 345-9111
  Representing the Defendants

ALSO PRESENT:
  James S. McGonigle
  Joyce E. Romberger, Ed.D.
  Susan Schneider-Morgan

---

**Page 3**

### INDEX

WITNESS                    PAGE

J.S.

  By Mr. Riba            4

  By Ms. Roper           83

### EXHIBITS

NO.     DESCRIPTION              PAGE

D-1  MySpace page and enlarged copy of   10
     same

D-2  CIS Acknowledgement and Consent Form  53

D-3  Blue Mountain School District   53
     "Acceptable Use of the Computers,
     Network, Internet, Electronic
     Communications Systems, and
     Information"

D-4  Letter written by J.S. on Hershey  75
     Lodge letterhead

---

**Page 4**

J.S., called as a witness, was
administered the oath and testified as follows:

### EXAMINATION

BY MR. RIBA:

Q. Good morning, J. My name is John. I'm
going to take your deposition today. And I'm sure
your attorney has kind of briefed you about what's
going to happen today, but I just want to go over a
rephrase the question. I'll be happy to do so.

A. Okay.

Q. This is not a quiz or some type of test.
It's purely a fact-finding session for me to see
what you know about some issues that you raise in
your complaint.

You can consult with your attorney, if you
so desire. This is not an endurance session. If
you need to go to the bathroom, get a drink of
water, just tell me, and we'll be happy to take a
quick break.

Do you understand all the questions -- all
the instructions I --

A. Yes.

Q. -- just went over?

---

**Page 5**

A. Yeah.

Q. Okay. J., where do you currently live?

A. Orwigsburg.

Q. Okay. What is the address?

A. 209 Summer Valley Road.

Q. Okay. Who do you live with?

A. My parents.

Q. What are your parents' names?

A. Terry and Steve Snyder.

Q. Okay. Are you an only child?

A. No.

Q. Okay. Do you have any siblings?

A. A brother.

Q. How old is your brother?

A. I don't know. I think he's 12.

Q. Okay. He lives with you too?

A. Yes.

Q. Is he a student here at Blue Mountain?

A. Yes.

Q. Okay. What grade are you currently?

A. I'm in 9th grade.

Q. Okay. In the high school?

A. Yes.

Q. Here at Blue Mountain?

Page 6

1    A. Yes.
2    Q. Okay. Do you have a computer at your
3  house?
4    A. Yes.
5    Q. And what type?
6    A. I don't know.
7    Q. How long have you had the computer
8  in your house?
9    A. I'm not sure. For a while.
10    Q. Okay. Okay.
11      You know what this case is about,
12  obviously; correct?
13    A. Uh-huh.
14    Q. Okay. It's a creation of a MySpace account
15  page of Mr. McGonigle. This --
16      MS. ROPER: Excuse me. I just want
17    to remind the witness to answer out loud
18    instead of just nodding.
19      MR. RIBA: Right.
20      THE WITNESS: Okay.
21  BY MR. RIBA:
22    Q. That's one of the instructions I forgot.
23  Everything needs to be verbal.
24    A. Okay.

Page 7

1    Q. We can see what you're doing, but as she's
2  taking everything down, that doesn't translate onto
3  paper. Okay?
4    A. Okay.
5    Q. Okay. In March of 2007, did you have a
6  computer at your house?
7    A. Yes.
8    Q. Okay. Did you have -- this case involves
9  MySpace?
10    A. Yes.
11    Q. And MySpace is on the Internet?
12    A. Yes.
13    Q. Can you describe for me what that is, in
14  general.
15    A. It's, like, a page you can make about
16  yourself to keep in contact with your friends.
17    Q. Okay. And in March 2007, did you have your
18  own MySpace account?
19    A. Yes.
20    Q. Okay. Do you still have a MySpace account?
21    A. Yes.
22    Q. Okay. How would I find your home page or
23  your account?
24    A. You would need the URL link.

Page 8

1    Q. Okay. What is your personal URL link?
2    A. Myspace.com/XO[first name of J.S.]OX3.
3    Q. Okay. And you still visit that site and
4  update that site?
5    A. Yes.
6    Q. How long have you been an active MySpace
7  user?
8    A. I'm not sure.
9    Q. Okay. Did you use MySpace prior to March
10  of 2007?
11    A. Yes.
12    Q. How -- could you give us an approximation
13  as to how long, prior to March of 2007, you used
14  MySpace?
15    A. I don't know.
16    Q. Was it more than a -- was it more than a
17  week or two weeks or a month?
18    A. Possibly a year.
19    Q. Did you have your own MySpace account prior
20  to creating the MySpace account with
21  Mr. McGonigle's picture on it?
22    A. What?
23    Q. Did you have your own personal MySpace
24  account prior to --

Page 9

1    A. Yes.
2    Q. Just let me finish the question.
3    A. Okay. Sorry.
4    Q. -- prior to creating the MySpace account
5  with Mr. McGonigle's picture on it?
6    A. Yes.
7    Q. Okay. So you knew how to use it?
8    A. (Nodding head.) Yes.
9    Q. Okay. Let me show you what's already been
10  marked as an exhibit. I'll show you -- I'll give
11  you two of the same thing, but we'll -- can we mark
12  these both for -- as Defense 1. They're the same
13  thing. One's a little -- one's a close-up.
14      (Exhibit No. D-1 was marked.)
15      MS. ROPER: Do you have an extra
16    copy?
17      MR. RIBA: Sure, sure, sure. There
18    you go.
19      MS. ROPER: Thank you.
20      MR. RIBA: You're welcome.
21  BY MR. RIBA:
22    Q. All right. J., I've placed before you
23  what's been marked as -- tentatively as D-1. Can
24  you describe what you're looking at, for the

**Page 10**

1 record.
2    A. A profile of the MySpace me and my friend
3 made about Mr. McGonigle.
4    Q. Okay. Who is your friend?
5    A. Kristina Lehman.
6    Q. Kristina Lehman?
7    A. Yes.
8    Q. How do you spell her last name?
9    A. L-E-H-M-E-N [sic], I'm pretty sure.
10      MR. MCGONIGLE: (Inaudible whispering.)
11      MR. RIBA: Okay. It's -- we'll get
12    it.
13 BY MR. RIBA:
14    Q. And is she also in 9th grade currently?
15    A. Yes.
16    Q. Is she still your friend?
17    A. Yes.
18    Q. Okay. And you created this, what's been --
19 the MySpace account marked as D-1?
20    A. Yes.
21    Q. What part did Kristina Lehman create, if
22 anything?
23    A. We basically both created it together.
24    Q. Okay.

**Page 11**

1    A. So . . .
2    Q. And where did you create it?
3    A. Almost everything.
4    Q. Where? Where did you create it?
5    A. The section called the "About Me." And I
6 had some to do with the interests.
7    Q. My question -- my question, J., is: What
8 physical location did you create this? This --
9 obviously, you created this on a computer; correct?
10    A. At my house.
11    Q. At your house?
12    A. Yes.
13    Q. Okay. When? When did you create this?
14    A. I'm not sure. I don't remember the exact
15 date.
16    Q. Okay. Why did you create this?
17    A. Because me and my friend, at the time,
18 thought it would be comical.
19    Q. Okay. What's comical about it?
20    A. The fact that it's outrageous.
21    Q. Okay. Well, you thought it would be
22 comical. Is there any other reason why you created
23 this?
24    A. Not really. No.

**Page 12**

1    Q. Okay. You weren't concerned about a dress
2 code violation you received about a month before
3 this?
4    A. Well, yes. But this MySpace had nothing to
5 do with that.
6    Q. It had nothing to do with it?
7    A. (No audible answer.)
8      THE REPORTER: I did not hear an
9    answer. I'm sorry.
10      THE WITNESS: Hmm?
11      THE REPORTER: His question was:
12    "It had nothing to do with it?" I did not
13    hear a verbal response.
14      THE WITNESS: I said it didn't have
15    anything to do with it.
16      THE REPORTER: Okay. Thank you.
17      MS. ROPER: She's just asking you to
18    repeat herself -- to repeat yourself.
19      THE WITNESS: Okay.
20 BY MR. RIBA:
21    Q. This Web site that's -- the document that
22 I've placed before you has a date of 3/21/2007 on
23 the bottom of it.
24    Do you have any knowledge as to if that was

**Page 13**

1 around the time when you created this profile?
2    A. What day was the 21st?
3    Q. I don't know that.
4    Do you have a recollection of a day of the
5 week that you created it on?
6    A. I'm pretty sure it was Sunday night.
7    Q. You created it on a Sunday night?
8    A. Pretty sure.
9    Q. At what time?
10    A. I don't remember.
11    Q. Okay. How do you know it was night?
12    A. Because it was dark out.
13    Q. Okay. Any other timeframe that you could
14 testify to as to what time you created it?
15    A. No.
16    Q. Was anyone else in the room when you
17 created it?
18    A. No.
19    Q. Who did you create this site for?
20    A. Nobody in particular.
21    Q. Okay. So you and Kristina just got in your
22 house and decided it would be funny to create a
23 site about Mr. McGonigle?
24    A. She was at her house, and we were

4 (Pages 10 to 13)

```
 1   communicating over AIM.
 2       Q.  Okay.
 3       A.  And --
 4       Q.  What is "AIM"?
 5       A.  AOL Instant Messenger.
 6       Q.  Okay.  So she was not in your house when
 7   you created this?
 8       A.  No.
 9       Q.  Could she see what you were doing?
10       A.  We would send back and forth what we were
11   putting down.
12       Q.  Did you talk to anyone else besides
13   Kristina about what you were putting down on this
14   Web site?
15       A.  Do you mean when I was making it?
16       Q.  Yes.
17       A.  No.
18       Q.  Did your parents come in the room at all?
19       A.  No.
20       Q.  Did you call anyone else on the phone about
21   this?
22       A.  No.
23           After I made it?  Yes.
24       Q.  While you were making this, did you call
```

```
 1   anybody?
 2       A.  No.
 3       Q.  Was that Sunday night the first night that
 4   you thought it would be funny to create this Web
 5   site?
 6       A.  Yes.
 7       Q.  Where did you get that picture of
 8   Mr. McGonigle on this Web site?
 9       A.  My friend Kristina got it off of the school
10   Web site.
11       Q.  How do you know that?
12       A.  She told me.
13       Q.  How did Kristina add this picture to the
14   Web site if she's not at your house?
15       A.  She could -- there was an option to save
16   the picture under the computer in her -- at her
17   house, and then you can upload saved pictures on
18   MySpace.  And that's what she did.
19       Q.  Did she save the picture to her MySpace
20   account?
21       A.  No.
22       Q.  Okay.  She sent -- she just saved it under
23   her own file in her computer, and you -- and she
24   sent it to you via e-mail or something?
```

```
 1       How did the picture get from her house to
 2   your computer?
 3       A.  That picture would show up anywhere if the
 4   profile was pulled up.
 5       Q.  No, no, no.
 6       A.  Uh-huh.
 7       Q.  You said -- I want to -- I'm trying to
 8   figure out how this picture got on this Web site.
 9   And from my understanding of your testimony is that
10   Kristina went on the school district Web site and
11   used the "Save as" function on her computer, and
12   then somehow, it got from her computer to your
13   computer?
14       A.  No.  She saved it under her computer and
15   uploaded it on her computer --
16       Q.  Okay.
17       A.  -- on MySpace.
18       Q.  Okay.  So I'm just trying to figure out how
19   it got from Kristina's computer to this Web site.
20       A.  She uploaded it on MySpace.
21       Q.  Okay.  So she had access to this profile as
22   well?
23       A.  Yes.
24       Q.  Can you describe how you create -- how you
```

```
 1   start off -- if you decide you want to create a
 2   MySpace profile, what you need to do?
 3       A.  You go to MySpace.com, and there's a link
 4   to sign up for an account.
 5       Q.  Okay.
 6       A.  And then you fill out information that they
 7   ask, and then you create what's put on the Web
 8   site.
 9       Q.  And is there some type of, like, login and
10   password required to access this page?
11       A.  Yes.
12       Q.  So both you and Kristina had the login and
13   ac- -- and the password codes to get in to access
14   this page?
15       A.  Yes.
16       Q.  What does that say at the top, next to
17   Mr. McGonigle's picture, to the right?  The very
18   top line.
19       A.  "Fraintrain -- it's a slow ride, but you'll
20   get there eventually."
21       Q.  No.  Above that.
22       A.  "M-Ho"?
23       Q.  Yeah.  What is that?
24       A.  A name.
```

1    Q. What does that mean?
2    A. A name.
3    Q. You named him -- you named Mr. McGonigle
4  "M-Ho"?
5    A. Well, I'm pretty sure --
6    Q. Is that something you typed in?
7    A. No. I think Kristina did. I'm pretty
8  sure. I'm almost positive.
9    Q. Okay. But that's what you identified
10  this -- Mr. McGonigle as, as an "M-Ho"?
11    A. Yes.
12    Q. And why -- do you have any -- do you have
13  any knowledge as to why Kristina entered that?
14    A. No.
15    Q. Okay. The next line down says:
16  "Fraintrain -- it's a slow ride, but you'll get
17  there eventually." It's in quotes.
18    A. Yes.
19    Q. And did you type that?
20    A. Yes.
21    Q. And what does that mean?
22    A. I'm not exactly sure. People used to say
23  it at school about him.
24    Q. About who?

1    A. About Mr. McGonigle and Mrs. Frain.
2    Q. Mrs. Fran (phonetic)?
3    A. Frain.
4    Q. Frain?
5    A. Yes.
6    Q. Is that his wife?
7    A. I think.
8    Q. And you thought it was funny to put that on
9  there?
10    A. Yes.
11    Q. And did you type "male"?
12    A. I chose the option "male."
13    Q. Uh-huh. 40 years old?
14    A. Yes.
15    Q. Alabama?
16    A. Yes.
17    Q. United States?
18    A. Yes.
19    Q. Now, this says: "Last login: 3/21/2007."
20  Is that something that's updated each time on
21  MySpace automatically?
22    A. Yes.
23    Q. There's -- under his picture, there's a
24  "Pics" and a "Videos." Did you post any additional

1  pictures or videos?
2    A. No.
3    Q. Did you -- do you have any hard copies or
4  printouts of what you created, other than what
5  would be marked as D-1?
6    A. No.
7    Q. What is the box underneath the picture? Is
8  it just a blank box?
9    A. It had options where you can come in
10  contact with the profile owners. You could send
11  messages, add the profile to your friends account,
12  and other options like that.
13    Q. What do you mean you could add it to your
14  friends account? You could send -- automatically
15  send the site to one of your friends?
16    A. No. They could add him to be one of their
17  friends on MySpace.
18    Q. Okay. When you -- when you first created
19  this site, J., it was -- anyone in the world could
20  access it; isn't that correct?
21    A. Yes.
22    Q. And you could all -- people could search --
23  as part of MySpace, from what I understand, is
24  there's ways to search for people on there;

1  correct?
2    A. Yes.
3    Q. For instance, you could type in -- search
4  the database, the MySpace database, for all
5  40-year-olds?
6    A. Yes.
7    Q. And Mr. McGonigle's picture would pop up?
8    A. Yes.
9    Q. This Web site would pop up; correct?
10    A. Yes.
11    Q. And if a parent of Blue Mountain happened
12  to be searching MySpace right after you created
13  this and typed in that search, his picture would
14  have popped up; right?
15    A. Yes.
16    Q. And the rest of this Web site would have
17  popped up.
18    A. Yes.
19    Q. The third box down says "MySpace URL"?
20    A. Yes.
21    Q. And then it has
22  www.MySpace.com/kidsrockmybed. Correct?
23    A. Yes.
24    Q. And that was something that you came up

1  with?

2    A.  Well, I was a part of it. Kristina came up

3  with it.

4    Q.  Okay. And you agreed that it would be

5  funny to put that there?

6    A.  Yes.

7    Q.  And the implication behind "kids rock my

8  bed" is that -- well, you tell me what the

9  implication is of that end part of the URL address,

10  "kids rock my bed."

11    A.  If somebody took it seriously, they would

12  think he was a pedophile.

13    Q.  Okay. And there's nothing on this -- on

14  this site, J., to indicate that you shouldn't take

15  it seriously, is there? Is that correct?

16    A.  I don't know anybody who would take it

17  seriously.

18    Q.  Well, that's not my question.

19      My question is: There's nothing on this

20  site -- if I, a parent of Blue Ridge -- of Blue

21  Mountain School District pulled up this site right

22  after you created it and saw Mr. McGonigle's

23  picture there, there's nothing to indicate to me

24  that this is a joke or something -- or a joke

1  between friends. Isn't that correct?

2    A.  Yes.

3    Q.  And as you said, "kids rock my bed," you

4  would associate that with a pedophile; correct?

5    A.  Yes.

6    Q.  Underneath that box, it has "M-Ho's

7  interests." Is that part of the template for

8  MySpace? Interests -- a interests box?

9    A.  Yes.

10    Q.  And you have a series of things here:

11  "Detention; being a tight ass; riding the Frain

12  train; spending time with my child, who looks like

13  a gorilla; baseball; my golden pen; fucking in my

14  office; hitting on students and their parents."

15    Right?

16    A.  Uh-huh.

17    Q.  Is any of that true?

18    A.  I don't believe so.

19    Q.  You know that's not true; right?

20    A.  Right.

21    Q.  You knew that wasn't true when you both put

22  it there -- when you agreed to put it there?

23    A.  Yes.

24    Q.  "Hitting on students and their parents."

1  You have no knowledge of Mr. McGonigle ever hitting

2  on a student?

3    A.  No.

4    Q.  Again, that portrays him as some type of

5  pedophile.

6    A.  Yes.

7    Q.  As a principal, his job is to interact with

8  students on a daily basis; right?

9    A.  Yes.

10    Q.  And that would affect his reputation?

11      MS. ROPER: Objection. Calls for

12    speculation.

13  BY MR. RIBA:

14    Q.  Do you think that would affect his dealing

15  with students?

16    A.  If somebody took it seriously, yes.

17    Q.  Is there anything on here -- is there

18  anything on this Web site, anything at all, that

19  you think is truthful -- that is the truth?

20    A.  No.

21    Q.  In fact, this Web site, if you go over to

22  the main box that begins, "Hello, children," it's

23  specifically directed towards children and

24  students?

1    A.  Yes.

2    Q.  Do you find it offensive?

3    A.  Yes.

4    Q.  You find it lewd?

5    A.  Lewd?

6    Q.  Vulgar.

7    A.  Yes.

8    Q.  Distasteful?

9    A.  Yes.

10    Q.  Do you see how this could affect the

11  workings of a school?

12    A.  Yes.

13    Q.  Do you feel this could have caused

14  disruptions in schools?

15      MS. ROPER: Objection. Calls for

16    speculation.

17  BY MR. RIBA:

18    Q.  You can answer the question.

19    A.  What was the question again?

20    Q.  Do you feel that what you wrote here on

21  this Web site with Mr. McGonigle's picture could

22  cause a disruption for schools -- for this school,

23  for the middle school?

24    A.  Yes.

| | |
|---|---|
| **Page 26** | **Page 28** |

**Page 26**

1     Q. For . . .

2       The bottom section has a friends space?

3     A. Yes.

4     Q. And it has 22 friends?

5     A. Uh-huh. Yes.

6     Q. What does that mean?

7     A. Twenty-two people had access to this

8 profile.

9     Q. Okay. So at some point, you made it

10 private?

11     A. Yes.

12     Q. At what point did you make it private?

13     A. I don't remember.

14     Q. Okay. Can you offer an estimation as to

15 how long it was open to the entire world?

16     A. If I had to guess, almost exactly a day

17 after it was made, we set it to private.

18     Q. Okay. So for a day, you don't know how

19 many people accessed it? There's no way you can

20 tell who had access to this?

21     A. Well, we could see how many times it was

22 viewed.

23     Q. Is that indicated here on this printout

24 anywhere?

**Page 27**

1     A. Not on this printout.

2     Q. Okay. Where do you see that?

3     A. You would have to log in, and on this side,

4 it would say "Profile Views" and then a number.

5     Q. And is that something that would only be on

6 your computer, as you're the creator of this?

7     A. Whoever can log in can see it.

8     Q. Okay. So in this case, only you and

9 Kristina could —

10     A. Yes.

11     Q. — could see this?

12       And how many — and do you have a

13 recollection as to how many profile — or views of

14 this Web site there were prior to you making it

15 private?

16     A. No.

17     Q. What made you determine — what made you

18 decide to make it private?

19     A. I don't know.

20     Q. You just decided out of the blue, just for

21 the heck of it?

22       MS. ROPER: Objection.

23       Mischaracterizes the testimony.

24 BY MR. RIBA:

**Page 28**

1     Q. Okay. Could you offer any reason as to why

2 you decided to make it private?

3     A. No.

4     Q. Do you recall friends of yours coming up to

5 you and discussing this Web site you and your

6 friend created?

7     A. Yes.

8     Q. Okay. Right after you created it, when in

9 terms of — at what point after you created this

10 did people start coming up to you and talking to

11 you about it?

12     A. What?

13     Q. At what point after you created this Web

14 site did people start coming up to you and talking

15 to you about this Web site?

16     A. Whenever somebody saw it, they would ask

17 about it.

18     Q. And this happened on more than one

19 occasion?

20     A. Yes.

21     Q. Multiple people? Numerous friends of yours

22 came up to you and talked about it?

23     A. Yes.

24     Q. Okay. Can you offer an estimation as to

**Page 29**

1 how many of your friends came up to you and talked

2 about it prior to you making it private?

3     A. No.

4     Q. No estimation at all?

5     A. No.

6     Q. More than a handful?

7     A. I'm guessing. Probably.

8     Q. Okay. And what did your friends say about

9 it?

10     A. That it was funny.

11     Q. Okay. What friends were that — were

12 those?

13     A. I honestly don't remember. It was such a

14 long time ago.

15     Q. Okay. You don't remember anyone who came

16 up to you and told you it was funny?

17     A. No.

18     Q. Can you tell me any of your friends who

19 viewed this Web site?

20     A. I don't remember.

21     Q. Okay. Well, there's 22 of your friends on

22 here, is that correct, that viewed this?

23     A. Yes.

24     Q. And you don't remember one of them?

**Page 30**

1    A. Well, I remember some.

2    Q. Okay. Well, that's what I'm asking you.

3 I'm asking you: I want to know everyone who you

4 know saw this Web site.

5    A. First and last name?

6    Q. Sure.

7    A. Katrina Miller, Kyle Grube --

8    Q. Hold on a second. Katrina Miller.

9    A. Kyle Grube.

10   Q. Kyle Grove.

11   A. Grube.

12   Q. Groom?

13   A. Grube.

14   Q. Could you spell that?

15   A. G-R-U-B-E.

16   Q. Okay.

17   A. Kayla Cohan.

18   Q. How do you spell that?

19   A. C-O-H-A-N.

20   Q. Okay.

21   A. That's all I can remember exactly.

22   Q. Okay. Do you recall what Katrina told you

23 about this Web site?

24   A. She said it was hilarious.

**Page 31**

1    Q. Anything else?

2    A. Not that I remember.

3    Q. And when did she see the Web site?

4    A. I don't know.

5    Q. Okay. Does she have a MySpace account?

6    A. Yes.

7    Q. Okay. And what did Kyle Grube say about

8 this Web site?

9    A. I don't remember.

10   Q. You don't remember anything?

11   A. No.

12   Q. How about Kayla? Do you recall what she

13 said about the Web site?

14   A. She thought it was funny.

15   Q. Okay. These three individuals that you

16 identified that you recall viewing this Web site,

17 do you know if they saw it in the private setting

18 or when it was open to the entire world?

19   A. Kayla was the first one to see it. So she

20 saw it when it was not private. And I'm not sure

21 about Katrina or Kyle.

22   Q. Did you create this whole Web site on one

23 day? I mean, Sunday night in one sitting?

24   A. I'm pretty sure.

**Page 32**

1    Q. Okay. So the next day would have been

2 Monday --

3    A. Yes.

4    Q. -- as you recall?

5    A. Yes.

6    Q. Okay. And what did you do Monday? Did you

7 tell your friends about what you did, you and

8 Kristina did?

9    A. I didn't -- well, I don't think me and

10 Kristina -- I'm not sure about Kristina. But I

11 didn't really talk about it unless people

12 approached me.

13   Q. Okay. How did people know about it if you

14 didn't tell them?

15   A. A friend tells another friend.

16   Q. Okay. So Kristina would tell people about

17 it, you assume?

18   A. I'm guessing.

19   Q. Okay. Well, do you know -- do you know if

20 Kristina told -- had conversations with her friends

21 about what you guys did Sunday night?

22   A. No.

23   Q. Have you and Kristina talked about this at

24 all?

**Page 33**

1    A. Yes.

2    Q. Okay. When was the last time you and

3 Kristina talked about this?

4    A. I don't know.

5    Q. Okay. Recently or -- you said you're still

6 friends with her?

7    A. Well, yes. But it's not -- our friendship

8 isn't just about the MySpace.

9    Q. Sure. Sure. But this is a federal

10 lawsuit, you know, in a relatively small school

11 district.

12      You guys don't talk about what's going on,

13 the facts of this case?

14   A. No.

15   Q. Okay. Did you tell her that you're being

16 deposed today?

17   A. Yes.

18   Q. Okay. Did you talk about the case at all

19 at that point?

20   A. No.

21   Q. Did you have any conversations with people

22 at school on Monday when you came back about this

23 Web site?

24   A. If I was approached, yes.

Page 34

1    Q. Okay. So your testimony is you didn't seek
2 out anyone on your own to talk about it?
3    A. No.
4    Q. Okay. Why not?
5    A. Because I had other things to focus on
6 during school.
7    Q. Okay. Did you want this shared with your
8 other friends?
9    A. I didn't care.
10    Q. Why not?
11    A. I don't know. If people wanted to see it,
12 they can see it.
13    Q. When these three individuals you testified
14 to about — came up to you and said it was funny,
15 what did you say in response?
16    A. I don't remember.
17    Q. This — the friends space on the
18 bottom of this Web site — this exhibit, says
19 "Cassie." Do you know who Cassie is?
20    A. She's in 10th grade.
21    Q. Okay. Is she a friend of yours?
22    A. We met and spoke a couple times.
23    Q. And do you know her last name?
24    A. No.

Page 35

1    Q. "Billy bus move [sic]," do you know who
2 that is?
3    A. I know more than one Billy. And since I
4 can't see the picture, I'm not sure.
5    Q. Okay. How about "Tori"?
6    A. I know more than one Tori too.
7    Q. Okay. How about — let's go back to Billy.
8 What Billys do you know that might have had access
9 to this Web site?
10    A. I know Billy Geiger.
11    Q. Okay.
12    A. And Billy Griffin.
13    Q. Okay. Any other Billys?
14    A. No.
15    Q. How about Toris — the two — the Toris
16 that you think it might be?
17    A. I'm not sure of their last name. I know a
18 lot of Victorias and Toris.
19    Q. From my understanding of MySpace, this Web
20 page is actually — if you hit the down arrow, it
21 would actually go down farther? You would see all
22 22 friends?
23    A. No.
24    Q. Was it — you --

Page 36

1    A. We only set it to four top friends.
2    Q. Okay. So only four friends would show up
3 on this page?
4    A. Yes. But if you wanted to see the other
5 friends, there was a link to click, and then you
6 could see everybody who had access to it.
7    Q. Okay. So this Web page that I have in
8 front of you, we don't see that link on this
9 printout. But you're saying there is some type of
10 link that you could click and the whole — all
11 22 friends would show up; the pictures of all
12 22 people would show up.
13    A. Yes.
14    Q. And do you recall any of the other 22 —
15 other than Cassie, Billy, and Tori, any of the
16 other 22 people that were in the friends space?
17    A. Katrina, Kyle --
18    Q. Katrina, what's her last name?
19    A. Miller.
20    Q. Okay. You said her.
21    A. The three I said previously.
22    Q. Sure. The three that you said previously.
23    Anyone else?
24    A. My friend Dane. I don't know how to say

Page 37

1 his last name.
2    Q. Dane?
3    A. Yes.
4    Q. Is he a 9th grader?
5    A. Yes.
6    Q. Okay. Who else?
7    A. Brandon Watral.
8    Q. Watra?
9    A. Watral.
10    Q. Do you know how to spell it?
11    A. W-A-T-R-A-L.
12    Q. Okay.
13    A. I honestly can't remember anybody else.
14    Q. At what point in — well, at what point of
15 the day on Monday did you start hearing a buzz in
16 school that this was — that people were coming up
17 to you and your friend about this space?
18    A. In the morning when I first went to my
19 locker.
20    Q. Okay. So from Sunday night to Monday
21 morning, people in the school were already talking
22 about this.
23    A. Yes.
24    Q. And you said this was more than a handful

Page 38

1 of people?
2   A. Yes.
3   Q. Could you offer an estimate as to how many
4 people were talking about this?
5   A. No.
6   Q. And where were they talking about it? Were
7 they talking about it in class?
8   A. I don't know.
9   Q. Well, do you recall where people were
10 talking about this?
11   A. Well, people would come up to me in the
12 hallway between classes. Whatever they talk about
13 whenever is none of my business. I don't --
14   Q. And would you --
15   A. -- keep track of it.
16   Q. Would you talk about this with the people
17 that came up to you? Would you laugh --
18   A. I would --
19   Q. -- about it and say "It's funny" and "Look
20 what we did"?
21   A. Yes.
22   Q. Do you take pride in this?
23   A. No.
24   Q. At the time, did you take pride in it?

Page 39

1   A. No.
2   Q. Why not?
3   A. What's there to take pride of?
4   Q. Well, you thought it was funny. People
5 were coming up to you and saying it was funny.
6 Sometimes when people say it's -- that something's
7 funny, people take pride in that.
8   A. Well, I didn't.
9   Q. Okay. Why did you create it then?
10   A. Me and Kristina thought it would be funny
11 at the time.
12   Q. What was your opinion of Mr. McGonigle when
13 you created this?
14   A. I didn't really have an opinion of him.
15   Q. Well, why did you pick him to make fun of?
16   A. Well, I didn't like him in particular,
17 but --
18   Q. And why didn't you like him?
19   A. Because I thought he was rude.
20   Q. Why?
21   A. The way he handled situations about the
22 dress code.
23   Q. Okay. And what situations are those?
24   A. He would scream and yell. Even if it was a

Page 40

1 mistake, you didn't -- if you didn't know what you
2 were wearing was inappropriate.
3   Q. You were in 8th grade at the time?
4   A. Yes.
5   Q. And you were in middle school?
6   A. Yes.
7   Q. What grades are in middle school?
8   A. 6 through 8.
9   Q. Okay. And does the entire middle school
10 have a dress code policy?
11   A. What?
12   Q. Does the entire middle school have a dress
13 code policy?
14   A. Yes.
15   Q. Does that apply to grades 6 through 8?
16   A. Yes.
17   Q. And during your time 6 through 8, how many
18 times were you cited for a dress code violation?
19   A. Three times. I'm pretty sure.
20   Q. Okay. I've come across one time in
21 February 20th, 2007. And you received a detention
22 from that?
23   A. Yes.
24   Q. Do you recall that?

Page 41

1   A. Yes.
2   Q. Do you have a recollection of any other
3 time that you received a warning?
4   A. A warning?
5   Q. Or a detention or a disciplinary notice
6 because of inappropriate dress.
7   A. I had two detentions, but I don't remember
8 the dates.
9   Q. And you feel you were not dressed
10 inappropriately?
11   A. I thought my outfits were appropriate.
12   Q. Okay. Any other reason why you didn't like
13 Mr. McGonigle other than the fact that he enforced
14 a dress code policy?
15     MS. ROPER: Objection.
16     Mischaracterizes the testimony.
17     MR. RIBA: Okay. I'll rephrase it.
18 BY MR. RIBA:
19   Q. Did -- is there any -- any other reason why
20 you didn't like Mr. McGonigle other than the fact
21 that he cited you for inappropriate dress on a
22 couple of occasions?
23     MS. ROPER: And ag- -- I'll object
24     as it mischaracterizes the testimony.

Page 42

1  BY MR. RIBA:
2      Q.  Okay.  You can answer the question.
3      A.  No.
4      Q.  You said Mr. McGonigle raised his voice?
5      A.  Yes.
6      Q.  Did you tell your parents about that?
7      A.  Yes.
8      Q.  Okay.  Did you have a conference with
9  him -- did your parents take any action in regards
10 to Mr. McGonigle raising his voice?
11     A.  My mom would check my outfits, and then I
12 still got in trouble another time for dress code.
13     Q.  Okay.  Was anyone present when
14 Mr. McGonigle raised his voice with regards to the
15 dress code incident?
16     A.  I don't remember.
17     Q.  Where was it?
18     A.  In the office.
19     Q.  In his office?
20     A.  The main office.
21     Q.  Okay.  Were there secretaries or other
22 people around that would hear this?
23     A.  Yes.
24     Q.  Okay.  Do you know the names of anyone that

Page 43

1  would have heard this?
2      A.  No.
3      Q.  Have you heard Mr. McGonigle yell at
4  anybody else?
5      A.  I heard of him yelling at people.
6      Q.  Have you personally heard him yell at
7  anyone else besides you on this occasion with
8  regard to the dress code violation?
9      A.  Well, the one time when I got in trouble
10 and it was just a warning, there were about two or
11 three other girls who also got in trouble, and he
12 screamed at all of us.
13     Q.  Is there any other reason, besides what you
14 already testified to, as to why you picked
15 Mr. McGonigle -- his picture to be put up there?
16     A.  No.
17     Q.  Did you have any positive encouragement
18 from Mr. McGonigle in your time as -- at the middle
19 school?
20     A.  I don't remember.
21     Q.  Do you see him on a regular basis?
22     A.  No.
23     Q.  Have you ever had a conversation with him?
24     A.  I don't remember.

Page 44

1      Q.  You don't remember any conversations with
2  him prior to you placing his picture on this Web
3  site?
4      A.  Not really.
5      Q.  How about Kristina?  What was her opinion
6  of Mr. McGonigle?
7      A.  She didn't like him as well.
8      Q.  Okay.  And do you know why?
9      A.  No.
10     Q.  So we're at -- I'm going to go back to
11 the -- to when you came back to school on Monday
12 and there was some type of buzz in the school going
13 around about this Web site.
14     Did a -- were you approached the entire day
15 about this Web site?
16     A.  No.
17     Q.  What parts of the day were you approached?
18     A.  I don't remember.
19     Q.  You talked about that right in the morning
20 when you got into school, people starting coming up
21 to you and talking to you about this?
22     A.  Yes.
23     Q.  And did that continue throughout the day?
24     A.  Probably.  I'm not sure.

Page 45

1      Q.  Okay.  Did you tell people -- did you have
2  any conversations with people about telling them
3  where to go to see this Web site?
4      A.  I don't remember.
5      Q.  Did you tell anyone that his URL
6  address was www.MySpace.com/kidsrockmybed?
7      A.  Not that I can recall.
8      Q.  Did you have conversations in class with
9  anybody about this?
10     You testified that you had conversations in
11 the hall.  Did you have conversations in class?
12     A.  No.
13     Q.  Are you involved in extracurricular
14 activities?
15     A.  No.
16     Q.  Did you go home after school on that day,
17 Monday -- the Monday after you created this?
18     A.  Yes.
19     Q.  Okay.  And at that time, did -- what did
20 you do at that time with regards to this Web site?
21     (Ms. Schneider-Morgan leaves
22 proceedings.)
23     A.  That night, we set it to private.  And
24 Kristina could possibly have done something.  I

1 don't remember.
2 BY MR. RIBA:
3    Q. Do you recall who set it to private, you or
4 Kristina?
5    A. No.
6    Q. How do you go about setting it to private?
7    A. You have to go under the account settings.
8       (Ms. Schneider-Morgan enters
9 proceedings.)
10    A. And there's an option called "Privacy
11 Settings" where you can set it to where everybody
12 can see or just you can see it or people who add
13 the MySpace onto their MySpace can see it.
14 BY MR. RIBA:
15    Q. Do you know how many 8th grade students
16 there are at the time you created this in your —
17 8th grade students in your class?
18    A. What?
19    Q. Do you know how many total 8th grade
20 students there were?
21    A. No.
22    Q. Do you have a rough estimate?
23    A. No.
24    Q. So that night, Monday night, you said

1 you — you testified you set it to private?
2    A. Yes.
3    Q. Did someone tell you to set it to private,
4 or was it just a mutual decision?
5    A. It was just a mutual decision.
6    Q. No one told you to set it to private?
7    A. No.
8    Q. Where is the computer in your house? Is it
9 in your room, or is it in — do you have a separate
10 room for it?
11    A. At the time, there — it was one computer
12 in a family room.
13    Q. Okay. And when you were on that — on the
14 MySpace page that Monday night, was anyone else
15 around?
16    A. No.
17    Q. No one else was around?
18    A. No.
19    Q. Did you tell your parents about this site
20 you created?
21    A. No.
22    Q. Did you tell teachers about this Web site?
23    A. No.
24    Q. Did any administrator or teacher come up to

1 you and talk to you about this Web site?
2    A. No.
3    Q. What happened — what happened after you
4 set it to private?
5    A. What do you mean?
6    Q. Did you continue to — did people ask to be
7 your friend?
8    A. Yes.
9    Q. Okay. And these were the 22 of your
10 friends that you talked about?
11    A. Yes.
12    Q. Were there anybody — did you grant access
13 to anyone you didn't know?
14    A. No.
15    Q. And just so I understand, the record's
16 clear: Even though it's set to private, if you did
17 a search on MySpace, for instance, all 40-year-olds
18 in the database, Mr. McGonigle's picture would
19 still show up with the title "M-ho," the first —
20 basically, the first box here on the upper
21 left-hand corner of D-1 would still show up?
22    A. That, I am not sure of 'cause I don't do
23 searches on MySpace.
24    Q. Okay. But when you click on this — for

1 instance, if you clicked on a — if you didn't do a
2 search but if you just clicked on the profile, you
3 would still see his picture and the words
4 accompanying it to the right —
5    A. Yes.
6    Q. — even though it's set to private;
7 correct?
8    A. Yes.
9    Q. Do you know how the district got ahold of
10 this copy of this account?
11    A. I was told somebody approached
12 Mr. McGonigle. But —
13    Q. Okay. Do you know —
14    A. — I don't know —
15    Q. — who that was?
16    A. No.
17    Q. Was it one of your friends?
18    A. I don't know who it was.
19    Q. Was it one of your 22 friends?
20    A. Probably, because they had access to the
21 MySpace.
22    Q. Okay. Well, do you — they were your
23 friends. You said someone told you — you heard or
24 something that someone approached Mr. McGonigle

**Page 50**

1 with this.
2     Do you know anything else about who it was?
3 Can you tell me who it was?
4   A. No.
5   Q. You didn't inquire into who it was?
6   A. Well, I wondered and I asked around, but
7 nobody knows.
8   Q. No one knows?
9   A. Nobody knows, or they just wouldn't tell
10 me.
11   Q. At some point, were you called down to the
12 office?
13   A. Yes.
14   Q. And do you recall when that was?
15   A. The 22nd.
16   Q. At what time? The morning?
17   A. During 1st period.
18   Q. Okay. And what happened?
19   A. I was called down, and Mr. McGonigle told
20 me about how he knew about the MySpace.
21   Q. And what did he say?
22   A. At first, I didn't admit to making it. But
23 then after he said something -- I'm not sure -- I
24 admitted to it.

**Page 51**

1   Q. Okay. Why didn't you admit to it at first?
2   A. Because I didn't want to get in trouble.
3   Q. Okay. Why did you think you'd get in
4 trouble?
5   A. Because it's a MySpace made about him.
6   Q. Anything -- any other reason why?
7   A. Because it said all that stuff.
8   Q. You said you denied it at first. Then
9 Mr. McGonigle said something, and then you admitted
10 it. What did he say to -- before you admitted to
11 it?
12   A. I don't remember.
13   Q. Do you recall, J., signing a -- it's called
14 a CIS Acknowledgment and Consent Form about the use
15 of information and technology equipment and
16 associated property of the school, prior to the
17 beginning of the school year?
18   A. Yes.
19   Q. Okay. And has that happened every -- do
20 you sign that every year?
21   A. I'm pretty --
22   Q. Is that something you would sign every
23 year?
24   A. I'm pretty sure.

**Page 52**

1   Q. Okay. And your mother would sign it?
2   A. Yes.
3   Q. And as part of that, you would get a
4 policy. You would get a copy of the actual
5 Internet policy. The title is "Acceptable Use of
6 Computers, Network, Internet, Electronic
7 Communication Systems, and Information."
8     Do you recall ever -- I don't know if you
9 read it or not. But do you recall receiving this
10 information?
11   A. I don't remember reading it, but I guess I
12 got it.
13     MR. RIBA: Okay. I don't have
14   copies, Mary Catherine. But we can
15   mark -- maybe we can make copies
16   afterwards.
17     MS. ROPER: Sure.
18     MR. RIBA: And we'll just mark these
19   as exhibits, the next in line, D-2 and
20   D-3.
21 BY MR. RIBA:
22   Q. J., is that your signature on this, dated
23 8/29/06, and the title is a "CIS Acknowledgment and
24 Consent Form"?

**Page 53**

1   A. Yes.
2     MS. ROPER: Can I suggest that as a
3   temporary measure we use her sticky notes
4   to mark these.
5     MR. RIBA: Yeah. Sure.
6     (Exhibits D-2 and D-3 were marked.)
7 BY MR. RIBA:
8   Q. So D-2 is what you signed with regard to
9 the CIS Acknowledgement and Consent Form?
10   A. Yes.
11   Q. Okay. And your mom signed that too; right?
12   A. Yeah.
13   Q. Okay. And D-3 is the policy that's
14 referenced in D-2 with regards to the acceptable
15 use of computers?
16   A. Well, I never read it, so I don't know.
17   Q. Okay. But it's typical that the school
18 district would provide that to you and your parents
19 prior to the school year with regards to what the
20 policy is on the use of computers; correct?
21   A. Yes.
22   Q. Okay. So getting back to your conversation
23 with Mr. McGonigle on that Tuesday, what happened
24 after you admitted that you created this Web site?

Page 54

1    A.  Well, I'm not sure the exact order.  But he
2  informed me that he would be suing me and that --
3  he told me if I was a guy, he would -- I would
4  already be through the wall.
5    Q.  If you were a guy?
6    A.  Yes.
7    Q.  Okay.
8    A.  And then he called in Kristina and told her
9  the same threat he told me.
10    Q.  Okay.  And what did you say in response to
11  Mr. McGonigle's reaction?
12    A.  I don't remember.
13    Q.  You don't remember anything?
14    A.  No.
15    Q.  How long did this meeting take?
16    A.  I don't know.
17    Q.  Were you sent home, or what happened after
18  the meeting was over?
19    · A.  After he talked to both me and Kristina, he
20  put us in separate rooms, and I had to wait in
21  there until my mom showed up.
22    Q.  And in terms of what you told Mr. McGonigle
23  at that time, other than the fact to admitting to
24  this and to creating this site with Kristina, you

Page 55

1  don't recall anything else you said?
2    A.  No.
3    Q.  Did you feel at that time you did anything
4  wrong, J.?
5    A.  Well, I thought the MySpace was wrong, but
6  I didn't know he could punish me for it.
7    Q.  Why do you think the MySpace was wrong?
8    A.  Because even though it was funny, it was
9  wrong to say those things about him.
10    Q.  You said you didn't think he could punish
11  you?
12    A.  Yes.
13    Q.  Why do you say that?
14    A.  Because it was outside of school.
15    Q.  And you knew that prior -- you knew that
16  when you were making this, that you could -- that
17  you shouldn't get punished for this?
18    A.  That's what I thought.
19    Q.  How did you know that?
20    A.  I didn't know schools could suspend you for
21  things you can do out of school.
22    Q.  And you knew that prior to doing this?
23    A.  Yes.
24    Q.  Did you think about that?  Did you -- was

Page 56

1  it one of your thoughts, is that we can make this
2  comedy about Mr. McGonigle, and the school can't
3  punish us because we're doing it outside of school?
4    Was -- did that thought go through your
5  mind when you were doing this?
6    A.  Possibly.  It was -- I don't remember.
7    Q.  Did someone tell you that, or how did you
8  come to believe that?
9    A.  I just assumed.
10    Q.  And why did you assume that?
11    A.  I don't know.
12    Q.  Well, you said you thought -- you might
13  have thought about this when you were creating
14  this.  You just testified to me a moment ago that
15  you didn't think -- at the time of this conference
16  with Mr. McGonigle, you didn't think he could
17  punish you.
18    My question is:  Why did you -- why were
19  you thinking that when you created this?
20    A.  Thinking what again?  I'm sorry.
21    Q.  That the school could punish you for what
22  you wrote about Mr. McGonigle.
23    A.  Because it was not made in school.  It was
24  not accessed to in school by any student.  I didn't

Page 57

1  know I could get in trouble for something I did out
2  of school.
3    Q.  What do you parents do?
4    A.  What do you mean?
5    Q.  What is their occupation?
6    A.  My dad works at Reading Alloys, and I just
7  know that my mom works in Harrisburg.  I'm not sure
8  what she does.
9    Q.  How did you know this wasn't going to be
10  accessed in school when you created it?
11    A.  Because MySpace was blocked in the computer
12  labs at school.  So you couldn't get on MySpace.
13    Q.  How did you know that this wasn't going to
14  be printed out, like it was, and handed out at
15  school?
16    A.  I didn't know it was going to be printed
17  out.
18    Q.  How did you know that it wasn't going to be
19  viewed by parents in the community when it was set
20  to -- anyone could view it --
21    A.  I didn't --
22    Q.  -- when you created it?
23    A.  I didn't know parents would be looking at
24  it.

15 (Pages 54 to 57)

Page 58

1    Q.  You didn't know parents would be looking at
2  it, even though the whole world can access it?
3    A.  I guess.
4    Q.  J., did you come up with the rationale that
5  the school couldn't punish you because this was
6  done at your house, that the school -- that it
7  wasn't viewed at the school, that no school
8  computers were used, did you come up with that
9  rationale after this lawsuit started?
10    A.  What?
11        MR. RIBA:  Could you repeat the
12      question, please.
13        (Reporter read back requested portion.)
14    A.  I'm not understanding the question.
15  BY MR. RIBA:
16    Q.  Okay.  You went through a variety of
17  reasons why you thought the school couldn't punish
18  you --
19    A.  Uh-huh.
20    Q.  -- for the actions you took.  You said --
21  one of the things you said was that it was done at
22  your house; this was done on your home computer; it
23  was -- wasn't viewed in school because the MySpace
24  accounts are blocked.  I think you said that

Page 59

1  wasn't -- it might have been not talked about at
2  school.  I don't know if you testified to that.
3  But you offered a variety of reasons why you
4  thought that the school shouldn't punish you.
5        My question is:  Did you come up with that
6  rationale after this lawsuit started, or did you
7  actually think that when you created this Web site?
8    A.  I thought that when I created the Web site.
9    Q.  Okay.  So you were placed in detention --
10  or placed in a separate room, then Kristina, after
11  your conversation with Mr. McGonigle?
12        You said -- you testified you were placed
13  in separate rooms?
14    A.  Yes.
15    Q.  And did your mom come?
16    A.  Yes.
17    Q.  Okay.  And what happened after your mom
18  came?
19    A.  We went -- me and my mom went back to
20  Mr. McGonigle's office, and he told her that he was
21  going to sue me, and I would have a ten-day
22  suspension.
23    Q.  Okay.  And did you say anything at that
24  point?

Page 60

1    A.  Not that I remember.
2    Q.  Did you contest the ten-day suspension?
3    A.  Yes.
4    Q.  How did you contest it?
5    A.  Huh?
6    Q.  What did you do?  You said you contested
7  it.  How -- what did you do?
8    A.  I stayed home for ten days, and I was given
9  work that I was going to be missing.
10    Q.  Okay.  Did you do the work that was given
11  to you?
12    A.  Yes.
13    Q.  All the assignments that you had in your
14  classes were brought home to you?
15    A.  Yes.
16    Q.  On a daily basis?
17    A.  They were all given to me at, like, the
18  same time.
19    Q.  Okay.  And when was that?
20    A.  I don't know.
21    Q.  Okay.  You would do the work.  Would you do
22  homework each night, each of the ten days or -- you
23  know, not necessarily on the weekend.  But would
24  you do homework every night?

Page 61

1    A.  I would try and do as much as I can until I
2  got tired of it.
3    Q.  Okay.  How many classes were you taking in
4  the 8th grade?  What was your schedule?  Do you
5  have certain periods, or how did that work?
6    A.  I don't know my exact schedule.  But I was
7  taking eight classes including lunch.  But --
8    Q.  Okay.
9    A.  Yeah.
10    Q.  And during those ten days, you were able to
11  do the assignments that your fellow classmates were
12  given; right?
13    A.  Yes.
14    Q.  And when you came back after those ten
15  days, were you at the same point as your fellow
16  classmates?
17    A.  Well, I had to make up some tests that
18  were --
19    Q.  Sure.
20    A.  But yes.
21    Q.  Okay.  In terms of where you were in the
22  curriculum, in terms of where you were in your
23  textbooks --
24    A.  Yeah.

Page 62

1    Q. -- you were caught up to where they were?
2    A. Yes.
3    Q. Did you -- have you sought any professional
4  treatment, like doctors or psychologists, as a
5  result of this incident?
6    A. No.
7    Q. Did you suffer any emotional or physical
8  reactions to what happened, to your suspension?
9    A. I didn't much like school then. But
10  nothing major.
11    Q. Okay. You didn't go see any -- you didn't
12  seek treatment or --
13    A. No.
14    Q. -- anything like that?
15        Was it -- J., was it your decision to
16  initiate this lawsuit, or was it your parents'
17  decision?
18        MS. ROPER: Objection to the extent
19      that it calls for discussions that are
20      private because they are with an attorney.
21  BY MR. RIBA:
22    Q. Okay. I don't want to know any
23  conversations you had with your attorney. My
24  question -- I'll rephrase the question.

Page 63

1        What -- did you want to sue the school
2  district --
3    A. My --
4    Q. -- sue Mr. McGonigle and Superintendent --
5  the superintendent?
6    A. My mom decided to do that.
7    Q. So it wasn't your decision?
8    A. No.
9    Q. Why didn't you want to?
10        MS. ROPER: Objection.
11      Mischaracterizes the testimony.
12  BY MR. RIBA:
13    Q. Okay. Well, you said -- I thought you
14  testified that you didn't want to sue them.
15    A. I never said I didn't want to. I said it
16  was my mom's decision.
17    Q. Okay. Did you have a conversation with
18  your mom about it?
19    A. She informed me of what she was going to
20  do.
21    Q. And you were okay with that, obviously,
22  since we're here?
23    A. Uh-huh. Yes.
24    Q. Did your mom tell you why she wanted to sue

Page 64

1  the school district?
2    A. She probably did, but I don't know her
3  reasons. You can ask her.
4    Q. She never told you?
5    A. She probably did. I just don't remember.
6    Q. Okay. Did you talk to the Pennsylvania
7  State Police at all?
8    A. Yes.
9    Q. And what did -- when did you talk to them?
10    A. I'm not -- I'm not sure on the exact day.
11  But --
12    Q. Soon after the suspension?
13    A. Yes.
14    Q. Okay. And what did they ask you?
15    A. We -- me and my mom and Kristina and her
16  family were called down there because, at the time,
17  we thought -- we were told McGonigle was going to
18  press charges on us.
19    Q. Okay. And did the police ask you
20  questions?
21    A. Not that I remember.
22    Q. You were called down to the police
23  barracks; is that correct?
24    A. Yes.

Page 65

1    Q. And you don't recall them asking you
2  questions, though?
3    A. I don't -- I don't know.
4    Q. Do you know if a police report was
5  developed? Or were they taking notes? Or what
6  happened once you went down to the barracks?
7    A. I don't remember.
8    Q. And you went down there with your parents?
9    A. Yes.
10    Q. Your mom and your dad?
11    A. Yes.
12    Q. Were you called in to a room, or were you
13  asked questions at all by the detective or the
14  police officer?
15    A. No.
16    Q. What hap- --
17    A. Not that I'm sure of.
18    Q. Okay. Well, what -- I'm just trying to
19  figure out what happened. I'm not trying to be
20  tricky --
21    A. They --
22    Q. -- or anything. I'm just trying to figure
23  out what happened at the --
24    A. They --

17 (Pages 62 to 65)

**Page 66**

1 Q. -- police barracks.

2 A. -- informed us that the charges were

3 dropped and that -- they told us the consequences

4 of if this ever happened again.

5 Q. Do you know the charges that were brought?

6 A. I don't remember.

7 Q. What were the consequences if it happened

8 again? What do you recall them telling you?

9 A. I'm not exactly sure. But I remember them

10 saying if I did it again, I'd have a criminal

11 record. And then if I did it again, I can be put

12 up for foster care. I'm pretty sure that's what he

13 said.

14 Q. Was it -- is it your assumption -- or was

15 it your belief that what the officer was telling

16 you was that what you did was criminal?

17 A. I guess so, yes.

18 Q. Did they tell you why the charges were

19 dropped?

20 A. No.

21 Q. Do you know why the charges were dropped?

22 A. No.

23 Q. Have you had any other contact with the

24 state police other than that one time you went to

**Page 67**

1 the barracks?

2 A. No.

3 Q. What did your mom say when she was called

4 down to the principal's office, Mr. McGonigle's

5 office, and was showed this Web site?

6 A. What did she say to me afterward?

7 Q. Yeah. What did she -- what was her

8 reaction to this Web site?

9 A. She didn't expect me to do something like

10 this, and she told me she was disappointed in me.

11 Q. Were you -- did you receive any punishment

12 from your parents?

13 A. Yes.

14 Q. And what was that?

15 A. I was grounded for a very long time. I

16 wasn't allowed on the computer. I wasn't allowed

17 to do anything with my friends. And occasionally,

18 I was allowed on the phone if I had a phone call.

19 Q. You said you were grounded for a long time?

20 A. Yes.

21 Q. Can you give me a timeframe, like, months

22 or a year or -- are you still grounded?

23 A. No.

24 Q. Okay. At what point did -- this incident

**Page 68**

1 happened in March of 2007. Do you recall at what

2 point you regained your privileges to, you know, go

3 on the computer and talk to your friends and . . .

4 A. I'm guessing some time in May, I was

5 allowed to start hanging out with my friends again.

6 And I was allowed on the computer but only if it

7 was school related.

8 Q. When you went back to class, J., after the

9 ten-day suspension, did you talk to your friends

10 about the suspension and about this Web site

11 anymore?

12 A. Once again, if I was asked about it, I

13 would talk to my friends. And I'm pretty sure none

14 of my teachers talked to me about it.

15 Q. Did you hear about instances in the

16 classrooms in the school from teachers or, you

17 know, your friends about them having to deal with

18 disruptions as to this Web site picture -- this Web

19 site?

20 A. No.

21 Q. Was anyone else present when — besides

22 Mr. McGonigle, when your mom came down to have a

23 talk with him about this issue?

24 A. Mrs. Guers was in the room.

**Page 69**

1 Q. And who is Mrs. Guers?

2 A. She's one of the guidance counselors.

3 Q. Is she your guidance counselor or just one

4 of the many -- one of the guidance counselors in

5 the district?

6 A. There's two.

7 Q. There's two. Okay.

8 A. And she was just there, I guess.

9 Q. If you saw this -- if you saw this Web

10 site, J., if you just pulled it up and you've had

11 nothing to do with creating it, and you pull it up

12 and you realized it was Mr. McGonigle, as a student

13 of Blue Mountain, would you look at him

14 differently?

15 A. Not really.

16 Q. And when it says, "Hello, children . . .

17 It's your . . . sex addict, fag-ass . . .

18 principal," you wouldn't look at him differently

19 when you thought he typed this?

20 A. No, because I wouldn't have taken this

21 seriously.

22 Q. Really?

23 You don't think it would have affected his

24 ability to govern or oversee or administer

1  education --
2      MS. ROPER: Objection.
3  BY MR. RIBA:
4      Q. -- during the -- in the middle school?
5      MS. ROPER: Objection. Calls for
6  speculation.
7      Q. You can answer the question.
8      A. What was the question?
9      Q. You don't think this Web site would have
10 affected his ability to administer education and
11 oversee the school for fellow students --
12     MS. ROPER: I --
13     Q. -- based on this Web site?
14     MS. ROPER: I'm sorry. Same
15 objection.
16     A. If I was just overlooking it and I had
17 nothing to do with it?
18     Q. Well, I mean, we hear about -- when you
19 turn the news on, unfortunately, the reality of
20 society is that there's some sick people out there.
21 And you know, it seems like every other episode of
22 "Dateline NBC" is about some sexual predator trying
23 to lure students in some way or the other.
24     You testified that -- well, let me ask you

1  this question: Doesn't this Web site portray
2  Mr. McGonigle as a sexual predator of young
3  students?
4      A. Yes.
5      Q. Don't you think that would affect his
6  ability to administer education in the school?
7      MS. ROPER: Again, object as calling
8  for speculation.
9      A. If this would have been taken seriously by
10 anybody, I'm guessing yes, it would -- he would
11 have been affected by it.
12 BY MR. RIBA:
13     Q. Do you think that the school district
14 would -- the administrators, the superintendent,
15 the board of directors -- board of school directors
16 would want to employ a sexual predator as a
17 principal?
18     MS. ROPER: Objection. Calls for
19 speculation.
20     A. I'm guessing no.
21 BY MR. RIBA:
22     Q. Do you think anyone would want to employ a
23 sexual predator?
24     A. No.

1      Q. Did you have an informal hearing with
2  regard to your suspension?
3      A. Yes.
4      Q. And that happened a couple days after your
5  mom came down to the office?
6      A. Yes.
7      Q. Okay. What happened there?
8      A. Mr. McGonigle told me how I was going to be
9  at -- back in school. And if anybody, like, was
10 bothering me about it, I -- like, I shouldn't
11 answer anybody's questions. And then my mom asked
12 to talk with Mr. McGonigle and Mrs. Guers, who was
13 also present, in private without me there.
14     Q. Okay. Did you present your side of the
15 story again at the informal hearing at all? Did
16 you go through what -- kind of what we did here
17 this morning about the -- about why you created it
18 and what you were trying to do and so on and so
19 forth?
20     A. No.
21     Q. Okay. So it was basically a session to say
22 that "Don't talk about this with other kids in the
23 school"?
24     A. Yes.

1      Q. Do you recall if your mother said anything
2  at the meeting?
3      A. I don't remember.
4      Q. You said present was Ms. Guers,
5  Mr. McGonigle, yourself, and your mother?
6      A. Yes.
7      Q. Do you know if -- as a MySpace user, can
8  you -- can one of your friends -- say a friend
9  asks -- you know, a friend contacts you and wants
10 to see this even in private, okay? Do you
11 understand? They want to be your friend. You're
12 added to the friend list here. Okay?
13     A. Uh-huh.
14     Q. Can they send this Web site to other
15 people?
16     A. No.
17     Q. Can they direct other people to see this
18 Web site?
19     A. They can tell them the URL, but they would
20 only be able to see that box with the picture. And
21 then they would have to send a friend request to be
22 able to look at the whole profile.
23     Q. Do you know what Kristina did to get that
24 picture of Mr. McGonigle off the Web site?

## Page 74

1    A.  Didn't you ask me that already?
2    Q.  I asked you who got it.  I know I asked
3  you --
4    A.  I --
5    Q.  I know she -- I know you testified she used
6  the "Save as."  But do you know how she got the
7  actual picture to save on the -- from the -- how
8  did she get the picture from the Web site to her
9  computer?
10   A.  She saved it from the school Web site.
11       MR. RIBA:  I'm going to mark this
12   as D-4.
13       I'll give you a copy.  There you go.
14       MS. ROPER:  Thanks.
15       (Exhibit No. D-4 was marked.)
16  BY MR. RIBA:
17   Q.  J., placed before you is D-4, which is a --
18  well, you tell me what it is.
19   A.  It's an apology letter to Mr. McGonigle and
20  Mrs. Frain about the MySpace.
21   Q.  Okay.  And when was this written?
22   A.  During my suspension.
23   Q.  Do you know how soon -- how long into the
24  suspension it was written?

## Page 75

1    A.  No.
2    Q.  Is this your writing?
3    A.  Yes.
4    Q.  During the -- during your interactions with
5  Mr. McGonigle after you were called down to the
6  office with your mother there as well, did you tell
7  him that you didn't think that you should be
8  suspended for ten days?
9    A.  No.
10   Q.  Why not?
11   A.  I didn't think there was any point to talk
12  about it, because he already talked to the -- he
13  told me he already talked to the school board, I'm
14  pretty sure.  And they agreed to suspend me.  I
15  didn't think there was any reason why I should
16  object to it at the time.
17   Q.  Did you tell him your beliefs that you
18  testified to before, being that, you know, you used
19  your home computer, you didn't use a school
20  computer, that you didn't think the school had
21  authority to discipline you --
22   A.  No.
23   Q.  -- for something you did outside of school?
24   A.  No, I didn't.

## Page 76

1    Q.  Did your mother say that at that time?
2    A.  I don't know.
3    Q.  You don't recall that?
4    A.  No.
5    Q.  Has your studies been affected at all as a
6  result of this incident?
7    A.  No.
8    Q.  I reviewed your academic record, and it
9  appears that you're an excellent student.  You
10  still -- are you still receiving good grades?
11   A.  I don't know, at the time being, what I
12  have right now.
13   Q.  Right.  You just started right now.
14   A.  Yes.
15   Q.  But you finished up the 2007 school year on
16  a good note?
17   A.  Yes.
18   Q.  Do you know what a parody is?
19   A.  Yes.
20   Q.  Can you describe it for me.
21   A.  It's like a mockery of something.
22   Q.  Okay.  Your complaint talks about -- and
23  you know what a complaint is; right?
24   A.  Yes.

## Page 77

1    Q.  It's what started this lawsuit.  It's what
2  you and your mother filed against the defendants
3  here.
4    A.  Yes.
5    Q.  Your complaint talks about this being a
6  parody?
7    A.  Yes.
8    Q.  What was it trying to parody?  What was it
9  trying to mock or whatever?
10   A.  Mr. McGonigle.
11   Q.  I never knew Mr. McGonigle until about a
12  month ago, maybe, when I started to work on this
13  case.  And I'm sure a lot of people don't know who
14  Mr. McGonigle is.
15       Who was this directed towards?  I mean, you
16  would agree that he isn't someone that is
17  well-known in Pennsylvania?  Would you agree with
18  that?
19   A.  Yes.
20   Q.  Okay.  He is well-known in the -- in that
21  middle school.
22   A.  Yes.
23   Q.  But in the overall community, no one
24  probably knows Mr. McGonigle.

20 (Pages 74 to 77)

Love Court Reporting, Inc.

Page 78

1    A.  I guess not.
2         MR. RIBA:  I'd just like to take a
3    quick break, consult with my clients, and
4    then wrap up.
5         MS. ROPER:  Okay.
6         MR. RIBA:  Okay?
7         MS. ROPER:  Do you want us to leave
8    the room?
9         MR. RIBA:  We can head out.  We
10   can -- yeah.  We'll be back in a couple
11   minutes.  And feel free to go to the
12   bathroom, or if you need some water, we
13   can get you some water.
14        (Break from 12:50 p.m. to 12:57 p.m.)
15   BY MR. RIBA:
16   Q.  J., in the 8th grade, did you have a
17   Mr. Nunemacher as a teacher?
18   A.  For homeroom, yes.
19   Q.  And in math class?
20   A.  No.
21   Q.  You don't recall having him for math?
22   A.  In 8th grade?
23   Q.  Well, I guess he also teaches math.  You
24   didn't have him for math; you just had him for

Page 79

1    homeroom?
2    A.  Yes.
3    Q.  Okay.  And do you recall that Monday when
4    you -- after you -- the Monday after you created
5    the profile when you came back to class, do you
6    recall disruptions in Mr. Nunemacher's class --
7    A.  No.
8    Q.  -- with regards to this Web site?
9    A.  Not that I remember, no.
10   Q.  What do you remember happening --
11   A.  I don't --
12   Q.  -- in his class on Monday?
13   A.  I don't remember anything.  I didn't . . .
14   Q.  Nothing at all?
15   A.  No.
16   Q.  Would it be fair to state that if
17   Mr. Nunemacher came in and testified -- or provided
18   testimony to indicate there was disruptions in his
19   class, could you either affirm or deny that those
20   happened?
21   A.  I don't remember.
22   Q.  You don't remember one way or the other?
23   A.  No.
24   Q.  It could have happened, and it could not

Page 80

1    have happened?
2    A.  Yeah.
3    Q.  Okay.  I want to go back to your
4    relationship with Mr. McGonigle for a second.
5         In 7th grade, did you ask him -- well, let
6    me ask:  In 7th grade, did you want to dress up as
7    him for Halloween?
8    A.  Yeah.
9    Q.  Why is that?
10   A.  I don't know.  Because my friend was going
11   to be Mr. Ketner.
12   Q.  Is he another teacher?
13   A.  He was the assistant principal at the time.
14   Q.  Okay.  And you asked for -- Mr. McGonigle
15   for his ID?  Do you recall that?
16   A.  Yeah.
17   Q.  So you're -- obviously, you're -- had a
18   good relationship if you wanted to dress like him
19   on Halloween?
20        MS. ROPER:  Objection.
21        Argumentative.
22   BY MR. RIBA:
23   Q.  Okay.  Well, did you have a good
24   relationship with him in 7th grade?

Page 81

1    A.  Not really.  It's just my friend wanted me
2    to be a principal with her.
3    Q.  Okay.  Was there some type of, like, school
4    function that you get dressed up for, or is this
5    when you go-out-in-the-community type thing for
6    Halloween?
7    A.  For Halloween?
8    Q.  Yeah.
9    A.  Yeah.
10   Q.  Okay.  Which one?  Was it a school
11   function, or was it something you go out in the
12   community?
13   A.  When I went out.
14   Q.  When you went out --
15   A.  Yes.
16   Q.  -- with your friends and around your house?
17   A.  Yes.
18   Q.  Okay.  Did Mr. McGonigle also teach your
19   guidance class for a period of time?
20   A.  Yeah.
21   Q.  Was that in 6th grade?
22   A.  I guess.
23   Q.  And how did you -- how was your
24   relationship with him in -- when he was your

Page 82

1 teacher?

2   A. There wasn't really a relationship.

3   Q. I mean, did you feel like he was a good

4 teacher?

5   A. I didn't really like the class, I guess. I

6 don't know.

7   Q. Okay. Just a clarification question. When

8 you were -- you talked about, back at the beginning

9 of this, when you were talking with Kristina via

10 instant messaging --

11   A. Yeah.

12   Q. -- right?

13     So you were instant messaging each other on

14 the AOL?

15   A. Yes.

16   Q. Could you both look at the screen at the

17 same -- could you both log in at the same time and

18 look at the MySpace account you guys were creating

19 at the same time?

20   A. Yes.

21   Q. Okay. And during that creation period,

22 sometime during Sunday night, did you call anyone?

23 Did you call Kayla or anybody that you recall for

24 input on -- as to what to put on the MySpace page?

Page 83

1   A. Not that I remember.

2     MR. RIBA: That's all the questions

3   I have.

4       EXAMINATION

5 BY MS. ROPER:

6   Q. I just have one question I wanted to follow

7 up on.

8     J., in front of you, the paper marked D-4

9 that you identified as your letter of apology, was

10 this the only time you apologized to Mr. McGonigle

11 or Mrs. Frain?

12   A. I apologized to Mrs. Frain before, either

13 the day of my suspension or in the informal

14 hearing. I'm not sure which one.

15   Q. Okay.

16     MS. ROPER: All right. Thank you.

17   That's all I wanted to ask.

18     THE WITNESS: Okay.

19     MR. RIBA: All right. Thank you.

20     (Deposition concluded at 1:02 p.m.)

21

22

23

24

Page 84

1       CERTIFICATION

2

3 COMMONWEALTH OF PENNSYLVANIA   :

4                   : §

5 COUNTY OF DAUPHIN       :

6     I, Candis S. Bradshaw, the undersigned, a

7 Commissioner to Take Depositions within and for

8 said County of Dauphin and Commonwealth of

9 Pennsylvania, the officer before whom the foregoing

10 depositions were taken, do hereby certify:

11     That J.S., the witness whose deposition is

12 hereinbefore set forth, was administered the oath

13 by me and that such deposition is a true and

14 correct record of the testimony given by such

15 witness.

16     I further certify that I am not related to

17 any party to this action by blood or marriage and

18 that I am in no way interested in the outcome of

19 this matter.

20     IN WITNESS WHEREOF, I have hereunto set my

21 hand this 25th day of September, 2007.

22     *Candis S. Bradshaw*

23     Candis S. Bradshaw

24     Notary Public-Court Reporter

Page 85

1     CERTIFICATE OF DEPONENT

2     I, J.S., certify that I have the foregoing

3 transcript of my deposition given on September 13,

4 2007, and find it to be a true, correct, and

5 complete transcript of the answers given by me to

6 the questions therein propounded, except for

7 corrections or changes in form or substance, if

8 any, noted in the attached Errata Sheet.

9

10     _____

11     J.S.

12

13     DATED: _____

14

15

16 Subscribed and sworn to me this _____ day of

17 _____, 2007.

18 My Commission Expires: _____

19

20

21     _____

22 NOTARY PUBLIC

23

24

22 (Pages 82 to 85)

ERRATA SHEET

Page 86

| PAGE | LINE | CORRECTION | REASON FOR |
|------|------|------------|------------|
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |
| ___ | - ___ | - _____ | |

# EXHIBIT B

**EXHIBIT B**



**University of Phoenix**
Thinking about

**Associate's Degrees**
Your foundation for the future. Earn an Associate of Arts in:

- Accounting
- Business
- Criminal Justice
- General Studies
- Health Administration
- Information Technology
- IT/Networking
- IT/Visual Communication
- Paraprofessional Education

MySpace    [Search]

Home | Browse | Search | Invite | Film | Mail | Blog | Favorites | Forum | Groups | Events | Videos | Music | Comedy | Classifieds

**m-hoe=]**

"traintrain- it's a slow ride but you'll got there eventually"

Male
40 years old
Alabama
United States

Last Login: 3/21/2007

View My: Pics | Videos

MySpace URL:
http://www.myspace.com/kidsrockmybed

| | **m-hoe=]'s Interests** |
|---|---|
| General | detention, being a tight ass, riding the hotrrods, spending time with my child (who looks like a gorilla), baseball,my golden pen, fucking in my office, hitting on students and their parents. |
| Music | I love all kinds, favorite is techno. |
| Television | almost anything, I mainly watch the playboy channel on directv, OH YEAH BITCH! |
| Heroes | myself, ofcourse. |

| | **m-hoe=]'s Details** |
|---|---|
| Status: | Married |
| Orientation: | Bi |
| Zodiac Sign: | Virgo |
| Children: | Proud parent |

**m-hoe=]'s Latest Blog Entry**

[Subscribe to this Blog]

[View All Blog Entries]

**m-hoe=]'s Blurbs!**
About me:

**HELLO CHILDREN**
yes, it's your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick
**PRINCIPAL**
I have come to myspace so I can pervert the minds of other principal's to be just like me. I know, I know, you're all thrilled
Another reason I came to myspace is because- I am keeping an eye on you students
(who I care for so much)
For those who want to be my friend, and aren't in my school
I love children, sex (any kind), dogs, long walks on the beach, tv, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs)
**MY FRAINTRAIN**
so please, feel free to add me, message me whatever
Layout made by Lost in a Jungle at CreateBlog.com.

Who I'd like to meet:

**m-hoe=]'s Friend Space**

Tom

m-hoe=] has 22 friends.

Cassie    billy[bust' a move']    tori [is back]



# EXHIBIT C

# EXHIBIT C

**BLUE MOUNTAIN MIDDLE SCHOOL**
685 Red Dale Road
Orwigsburg, PA 17961

# CIS Acknowledgment and Consent Form

**Students**

I have received, read, and understand this policy and will comply with it. Someone from Blue Mountain School District has reviewed this policy with me and my parents have reviewed it with me. In addition, I have been given the opportunity to obtain information from the Blue Mountain School District and my parent(s) about information I requested. Additionally, I understand that if I violate the policy, I am subject to Blue Mountain School District's discipline and could be subject to ISP, as well as local, state and federal legal recourse.

**Parent(s)**

As the parent of a student of Blue Mountain School District, I have received, read, and understand the Acceptable Use of the Computers, Network, Internet, Electronic Communications, and Information Policy. In addition, I reviewed this policy with my child and answered questions he or she asked. I agree to have my child abide by the rules of the policy.

_Jill Snyder_
Name of Student

_Jill Snyder_
Signature of Student

_8/29/06_
Date of Signature

_Terry Snyder_
Name of Parent

_Terry Snyder_
Signature of Parent

_8/29/06_
Date of Signature

## Please keep the policy information and return the signed form to the student's Homeroom teacher.



# EXHIBIT D

# EXHIBIT D

No. 815.1

SECTION: OPERATIONS

TITLE: ACCEPTABLE USE OF THE
COMPUTERS, NETWORK,
INTERNET, ELECTRONIC
COMMUNICATIONS SYSTEMS
AND INFORMATION

ADOPTED: September 23, 2004

REVISED:

# BLUE MOUNTAIN SCHOOL DISTRICT

## 815.1. ACCEPTABLE USE OF THE COMPUTERS, NETWORK, INTERNET, ELECTRONIC COMMUNICATIONS SYSTEMS AND INFORMATION

**1. Purpose**

Blue Mountain School District provides employees, students and guests ("users") with access to the school district's electronic communication systems and network, which includes Internet access, whether wired or wireless, or by any other means.

Computers, network, Internet, electronic communications and information systems (collectively "CIS systems") provide vast, diverse and unique resources. The Board will provide access to the school district's CIS systems in order to access information, research, to facilitate learning and teaching, and to foster the educational purpose and mission of the school district.

For users, the school district's CIS systems must be used primarily for education-related purposes and performance of school district job duties. Incidental personal use of school computers is permitted for employees so long as such use does not interfere with the employee's job duties and performance, with system operations or with other system users. Personal use must comply with this policy and all other applicable school district policies, procedures and rules contained in this policy, as well as Internet Service Provider ("ISP") terms, local, state and federal laws and must not damage the school district's CIS systems. Students may only use the CIS systems for educational purposes. At the same time, employees' and students' personal technology devices brought onto the school district's property or suspected to contain school district information may be legally accessed to ensure compliance with this policy and other school district policies to protect the school district's resources, and to comply with the law. Users may not use their personal computers to access the school district's intranet, Internet or any other CIS systems unless approved by the Director of Technology.

The school district intends to strictly protect its CIS systems against numerous outside and internal risks and vulnerabilities. Users are important and critical players in protecting these school district assets and in lessening the risks that can destroy these important and critical assets. Consequently, employees and students are required to fully comply with this policy, and to immediately report any violations or suspicious activities to the Superintendent or Director of Technology. Conduct

otherwise will result in actions further described under Consequences for Inappropriate, Unauthorized and Illegal Use, found in this policy, and provided in relevant school district policies.

|  |  |
|---|---|
| 2. Definitions<br>20 U.S.C.<br>Sec. 6777(e)(2) | **Access to the Internet** - A computer shall be considered to have access to the Internet if the computer is equipped with a modem or is connected to a network that has access to the Internet, whether by wire, wireless, cable or any other means. |
| 18 U.S.C.<br>Sec. 2256(8) | **Child Pornography** - Any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where:<br><br>1. The production of such visual depiction involves the use of a minor engaging in sexually explicit conduct.<br><br>2. Such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct.<br><br>3. Such visual depiction has been created, adapted or modified to appear that an identifiable minor is engaging in sexually explicit conduct. |
| 20 U.S.C.<br>Sec. 6777(e)(1) | **Computer** - Includes any school district owned, leased or licensed or employee, student and guest owned personal hardware, software or other technology used on school district premises or at school district events, or connected to the school district network, containing school district programs or school district or student data (including images, files and other information) attached or connected to, installed in, or otherwise used in connection with a computer. Computer includes, but is not limited to, school district, employee, students and guest: desktop, notebook, powerbook, tablet PC or laptop computers, printers, cables, modems and other peripherals; specialized electronic equipment used for students' special educational purposes; Global Positioning Systems (GPS) equipment; Personal Digital Assistants (PDAs); cell phones, with or without Internet access and/or recording and/or camera and other capabilities, mobile phones or wireless devices and two-way radios/ telephones; beepers; paging devices; laser pointers and attachments; and any other such technology developed.<br><br>**Electronic Communications Systems** - Any messaging, collaboration, publishing, broadcast or distribution system that depends on electronic communications resources to create, send, forward, reply to, transmit, store, hold, copy, download, display, view, read or print electronic records for purposes of communication across electronic communications network systems between or among individuals or |

groups, that is either explicitly denoted as a system for electronic communications or is implicitly used for such purposes. Further, an electronic communications system means any wire, radio, electromagnetic, photo optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. Examples include, but are not limited to, the Internet, intranet, electronic mail services, Global Positioning Systems, Personal Digital Assistants, facsimile machines, cell phones with or without Internet access and/or electronic mail and/or recording devices, cameras and other capabilities.

**Educational Purpose** - Includes use of the CIS systems for classroom activities, professional or career development, and to support the school district's curriculum, policy and mission statement.

**20 U.S.C.**
**Sec. 6777(e)(6),**
**9134(f)**
**47 U.S.C.**
**Sec. 254(h)**

**Harmful to Minors** - Any picture, image, graphic image file or other visual depictions that:

1. Taken as a whole, with respect to minors, appeals to the prurient interest in nudity, sex or excretion.

2. Depicts, describes or represents in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual content, actual or simulated normal or perverted sexual acts, or lewd exhibition of the genitals.

3. Taken as a whole lacks serious literary, artistic, political or scientific value as to minors.

**Incidental Personal Use** - Use of school district CIS systems by an individual employee for occasional personal communications. Personal use must comply with this policy and all other school district policies, procedures and rules, as well as ISP, local, state and federal laws and may not interfere with the employee's job duties and performance, with the system operations, or with other system users, and must not damage the school district's CIS systems. Under no circumstances should the employee believe his/her use is private. The school district reserves the right to monitor, track, access and log the use of its CIS systems at any time.

**20 U.S.C.**
**Sec. 6777(e)(4)**
**47 U.S.C.**
**Sec. 254(h)**

**Minor** - For purposes of compliance with the Children's Internet Protection Act ("CIPA"), an individual who has not yet attained the age of seventeen (17). For other purposes, minor shall mean the age of minority as defined in the relevant law.

**Network** - A system that links two (2) or more computer systems, including all components necessary to effect the operation, including, but not limited to: computers, copper and fiber cabling, wireless communications and links, equipment

| | |
|---|---|
| | closets and enclosures, network electronics, telephone lines, printers and other peripherals, storage media, software and other computers and/or networks to which the network may be connected, such as the Internet, Internet 2 or those of other institutions. |
| 18 U.S.C. Sec. 1460 | **Obscene** - Analysis of the material meets the following elements: |
| | 1. Whether the average person, applying contemporary community standards, would find that the material, taken as a whole, appeals to the prurient interest. |
| | 2. Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically designed by the applicable state or federal law to be obscene. |
| | 3. Whether the work taken as a whole lacks serious literary, artistic, political or scientific value. |
| 18 U.S.C. Sec. 2246(2),(3) 18 Pa. C.S.A. Sec. 5903 | **Sexual Act and Sexual Contact** - As defined at 18 U.S.C. § 2246(2), and at 18 U.S.C. § 2246(3), 18 Pa. C.S.A. § 5903. |
| 20 U.S.C. Sec. 9134(f) 47 U.S.C. Sec. 254 | **Technology Protection Measure(s)** - A specific technology that blocks or filters Internet access to visual depictions that are obscene, child pornography or harmful to minors. |
| 18 U.S.C. Sec. 1460(b), 2256 | **Visual Depictions** - Undeveloped film and videotape and data stored on computer disk or by electronic means which is capable of conversion into a visual image but does not include mere words. |
| 3. Authority | Access to the school district's CIS systems through school resources is a privilege, not a right. These, as well as the user accounts and information, are the property of the school district, which reserves the right to deny access to prevent further unauthorized, inappropriate or illegal activity, and may revoke those privileges and/ or administer appropriate disciplinary action. The school district will cooperate to the extent legally required with the ISP, local, state and federal officials in any investigation concerning or related to the misuse of the CIS systems. |
| | It is often necessary to access user accounts in order to perform routine maintenance and security tasks; system administrators have the right to access by interception, and the stored communication of user accounts for any reason in order to uphold the policy and to maintain the system. Users have no privacy expectation in the contents |

of their personal files or any of their use of the school district's CIS systems. The school district reserves the right to monitor, track, log and access CIS systems use and to monitor and allocate fileserver space.

**P.L. 106-554**
**Sec. 1711, 1721**

The school district reserves the right to restrict access to any Internet sites or functions it may deem inappropriate through software blocking or general policy. Specifically, the school district operates and enforces technology protection measure(s) that block or filter online activities of minors on its computers used and accessible to adults and students so as to filter or block inappropriate matter on the Internet. **Inappropriate matter** includes, but is not limited to, visual, graphic, text and any other form of obscene, sexually explicit, child pornographic or other material that is harmful to minors, hateful, illegal, defamatory, lewd, vulgar, profane, rude, inflammatory, threatening, harassing, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation, political beliefs, receipt of financial aid or disability), violent, bullying, terroristic and advocates the destruction of property. Measures designed to restrict adults' and minors' access to material harmful to minors may be disabled to enable an adult to access bona fide research or for another lawful purpose.

The school district has the right, but not the duty, to monitor, track, log, access and report all aspects of its computer information technology and related systems of all users and of any employee's, student's and guest's personal computers, network, Internet, electronic communication systems and media brought onto school district premises or at school district events, connected to the school district network, containing school district programs or school district or student data (including images, files and other information) to ensure compliance with this policy and other school district policies, to protect the school district's resources and to comply with the law.

The school district reserves the right to restrict or limit usage of lower priority CIS systems and computer uses when network and computing requirements exceed available capacity according to the following priorities:

1. Highest - uses that directly support the education of the students.

2. Medium - uses that indirectly benefit the education of the student.

3. Lowest - uses that include reasonable and limited educationally-related interpersonal communications and incidental personal communications.

4. Forbidden - all activities in violation of this policy.

|  | The school district additionally reserves the right to:<br><br>1. Determine which CIS systems services will be provided through school district resources.<br><br>2. View and monitor network traffic, fileserver space, processor and system utilization, and all applications provided through the network and communications systems, including e-mail.<br><br>3. Remove excess e-mail or files taking up an inordinate amount of fileserver disk space after a reasonable time.<br><br>4. Revoke user privileges, remove user accounts or refer to legal authorities when violation of this and any other applicable school district policies occur or state or federal law is violated, including, but not limited to, those governing network use, copyright, security, privacy, employment and destruction of school district resources and equipment.<br><br>Due to the nature of the Internet as a global network connecting thousands of computers around the world, inappropriate materials, including those which may be defamatory, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation, political beliefs, receipt of financial aid or disability), inaccurate, obscene, sexually explicit, lewd, vulgar, rude, harassing, violent, inflammatory, threatening, terroristic, hateful, bullying, profane, pornographic, offensive and illegal, can be accessed through the network and electronic communications systems. Because of the nature of the technology that allows the Internet to operate, the school district cannot completely block access to these resources. Accessing these and similar types of resources may be considered an unacceptable use of school resources and will result in actions explained further in Consequences for Inappropriate, Unauthorized and Illegal Use, found in this policy, and as provided in relevant school district policies.<br><br>Employees must become proficient in the use of the school district's CIS systems and software relevant to the employee's responsibilities, and practice proper etiquette, school district ethics, and agree to the requirements of this policy. |
|---|---|
| 4. Delegation of Responsibility | The Director of Technology and/or designee will serve as the coordinator to oversee the school district's CIS systems and will work with other regional or state organizations as necessary, to educate employees, approve activities, provide leadership for proper training for all users in the use of the CIS systems and the requirements of this policy, establish a system to ensure adequate supervision of the CIS systems, maintain executed user agreements and interpret and enforce this policy. |

The Director of Technology and/or designee will establish a process for setting up individual and class accounts, set quotas for disk usage on the system, establish a retention schedule and establish the school district virus protection process.

Unless otherwise denied for cause, student access to the CIS systems resources shall be through supervision by the professional staff. Administrators, teachers and staff have the responsibility to work together to help students develop the skills and judgment required to make effective and appropriate use of the resources. All users have the responsibility to respect the rights of all other users within the school district and school district CIS systems, and to abide by the rules established by the school district, its ISP, local, state and federal laws.

| 5. Guidelines | |
|---|---|

**Access to the CIS Systems**

CIS systems user accounts will be used only by authorized owners of the accounts for authorized purposes.

An account will be made available according to a procedure developed by appropriate school district authorities.

**CIS Systems –**

The school district's Acceptable Use of the Computers, Network, Internet, Electronic Communications Systems and Information Policy, as well as other relevant school district policies, will govern use of the school district's CIS systems for students, employees and guests. Use of the CIS systems will also be governed by other relevant school district policies.

Types of services include, but are not limited to:

1. **World Wide Web** – School district employees, students and guests will have access to the web through the school district's CIS systems as needed.

2. **E-Mail** – School district employees may be provided assigned individual e-mail accounts for work-related and incidental personal use, as needed.

3. **Guest Accounts** – Guests, which include but are not limited to, volunteers, independent contractors and adult education instructors, may receive an individual account with the approval of the Director of Technology and/or designee if there is a specific, school district-related purpose requiring such access. Use of the CIS systems by a guest must be specifically limited to the school district-related purpose. An agreement will be required and parental signature will be required if the guest is a minor.

Access to all data on, taken from or compiled using school district computers is subject to inspection and discipline. Users have no right to expect that school district information placed on users' personal computers, networks, Internet and electronic communications systems is beyond the access of the school district. The school district reserves the right to legally access users' personal equipment for school district information.

## Parental Notification and Responsibility

The school district will notify the parents/guardians about the school district CIS systems and the policies governing their use. This policy contains restrictions on accessing inappropriate material. There is a wide range of material available on the Internet, some of which may not be fitting with the particular values of the families of the students. It is not practically possible for the school district to monitor and enforce a wide range of social values in student use of the Internet. Further, the school district recognizes that parents/guardians bear primary responsibility for transmitting their particular set of family values to their children. The school district will encourage parents/guardians to specify to their child(ren) what material is and is not acceptable for their child(ren) to access through the school district's CIS system. Parents/Guardians are responsible for monitoring their children's use of the school district's CIS systems when they are accessing the systems.

## School District Limitation of Liability

The school district makes no warranties of any kind, either expressed or implied, that the functions or the services provided by or through the school district's CIS systems will be error-free or without defect. The school district does not warrant the effectiveness of Internet filtering. The electronic information available to users does not imply endorsement of the content by the school district, nor is the school district responsible for the accuracy or quality of the information obtained through or stored on the CIS systems. The school district shall not be responsible for any damage users may suffer, including, but not limited to, information that may be lost, damaged, delayed, misdelivered or unavailable when using the computers, network and electronic communications systems. The school district will not be responsible for stolen, damaged or lost personal devices of students, employees, contractors/vendors and guests. The school district shall not be responsible for material that is retrieved through the Internet, or the consequences that may result from them. The school district shall not be responsible for any unauthorized financial obligations, charges or fees resulting from access to the school district's CIS systems. In no event shall the school district be liable to the user for any damages whether direct, indirect, special or consequential, arising out of the use of the CIS systems.

## Prohibitions

The use of the school district's CIS systems for illegal, inappropriate, unacceptable or unethical purposes by users is prohibited. Such activities engaged in by users are strictly prohibited and illustrated below. The school district reserves the right to determine if any activity not appearing in the list below constitutes an acceptable or unacceptable use of the CIS systems.

These prohibitions are in effect any time school district resources are accessed whether on school district property, when using mobile commuting equipment, telecommunication facilities in unprotected areas or environments, directly from home, or indirectly through another ISP, and if relevant, when an employee, student or guest uses their own equipment.

**SC 1317.1**
**Pol. 237**

Students are prohibited from visibly possessing and using their personal computers, as defined in this policy, on school district premises and property (including, but not limited to, buses and other vehicles), at school district events, or through connection to the school district CIS systems, unless expressed permission has been granted by the school administrator, who will then assume the responsibility to supervise the student in its use, or unless an IEP team determines such use is necessary, in which case, an employee will supervise the student in its use. Students who are performing volunteer fire company, ambulance or rescue squad functions, or need such a computer due to their medical condition, or the medical condition of a member of their family, with notice and the approval of the school administrator may qualify for an exemption of this prohibition.

**General Prohibitions –**

Users are prohibited from using school district CIS systems to:

1. Communicate about non-work or non-school related communications unless the employees' use comports with this policy's definition of incidental personal use.

2. Access or transmit material that is harmful to minors, indecent, obscene, pornographic, child pornographic, terroristic or advocates the destruction of property.

3. Access or transmit material likely to be offensive or objectionable to recipients including, but not limited to, that which may be defamatory, inaccurate, obscene, sexually explicit, lewd, hateful, harassing, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation,

political beliefs, receipt of financial aid or disability), violent, vulgar, rude, inflammatory, threatening, profane, pornographic, offensive, terroristic and/or illegal.

4. Cyberbullying another individual.

5. Access or transmit gambling, pools for money, including, but not limited to, basketball and football, or any other betting or games of chance.

6. Participate in discussion or news groups that cover inappropriate and/or objectionable topics or materials, including those that conform to the definition of inappropriate matter in this policy.

7. Send terroristic threats, hateful mail, harassing communications, discriminatory remarks and offensive or inflammatory communications.

8. Participate in unauthorized Internet Relay Chats, instant messaging communications and Internet voice communications (on-line, real-time conversations) that are not for school-related purposes or required for employees to perform their job duties.

9. Facilitate any illegal activity.

10. Communicate through e-mail for non-educational purposes or activities, unless it is for an incidental personal use as defined in this policy. The use of e-mail to mass mail non-educational or non-work related information is expressly prohibited (for example, the use of the "everyone" distribution list, building level distribution lists or other e-mail distribution lists to offer personal items for sale is prohibited).

11. Engage in commercial, for-profit or any business purposes (except where such activities are otherwise permitted or authorized under applicable school district policies); conduct unauthorized fundraising or advertising on behalf of the school district and non-school school district organizations; resell school district computer resources to individuals or organizations who are not related to the school district; or use the school district's name in any unauthorized manner that would reflect negatively on the school district, its employees or students. **Commercial purposes** is defined as offering or providing goods or services or purchasing goods or services for personal use. School district acquisition policies will be followed for school district purchase of goods or supplies through the school district system.

12. Political lobbying.

| | |
|---|---|
| Pol. 814 | 13. Install, distribute, reproduce or use copyrighted software on school district computers, or copy school district software to unauthorized computer systems, intentionally infringing upon the intellectual property rights of others or violating a copyright. See Copyright Infringement in this policy and the school district's copyright policy for additional information. |
| | 14. Install computer hardware, peripheral devices, network hardware or system hardware. The authority to install hardware or devices on school district computers is restricted to the Director of Technology or designee. |
| | 15. Encrypt messages using encryption software that is not authorized by the school district from any access point on school district equipment or school district property. Employees and students must use school district approved encryption to protect the confidentiality of sensitive or critical information in the school district's approved manner. |
| | 16. Access, interfere, possess or distribute confidential or private information, without permission of the school district administration. An example includes accessing other students' accounts to obtain their grades. |
| 18 Pa. C.S.A. Sec. 5703 | 17. Violate the privacy or security of electronic information. |
| | 18. Use the systems to send any school district information to another party, except in the ordinary course of business as necessary or appropriate for the advancement of the school district's business or educational interest. |
| | 19. Sending unsolicited commercial electronic mail messages, also known as spam. |
| | 20. Posting personal or professional web pages without administrative approval. |
| | 21. Posting anonymous messages. |
| | **Access and Security Prohibitions –** |
| | Users must immediately notify the Director of Technology and/or designee if they have identified a possible security problem. Students, employees and guests must read, understand, provide a signed acknowledgement form and comply with this policy that includes network, Internet usage, electronic communications, |

telecommunications, non-disclosure and physical information security policies. The following activities related to access to the school district's CIS systems and information are prohibited:

1. Misrepresentation (including forgery) of the identity of a sender or source of communication.

2. Acquiring or attempting to acquire passwords of others or giving your password to another. Users will be held responsible for the result of any misuse of the users' user name or password while the users' systems access were left unattended and accessible to others, whether intentional or through negligence.

3. Using or attempting to use computer accounts of others; these actions are illegal, even with consent, or if only for the purposes of "browsing."

4. Altering a communication originally received from another person or computer with the intent to deceive.

5. Using school district resources to engage in any illegal act, which may threaten the health, safety or welfare of any person or persons, such as arranging for the promotion of or the sale of drugs, weapons or alcohol; engaging in criminal activity; or being involved in a terroristic threat against any person or property.

6. Disabling or circumventing any school district security, program or device, for example, but not limited to, anti-spyware, anti-spam software and virus protection software or procedures.

7. Transmitting electronic communications anonymously or under an alias unless authorized by the school district.

**Operational Prohibitions –**

The following operational activities and behaviors are prohibited:

1. Interference with or disruption of the CIS systems, network accounts, services or equipment of others, including, but not limited to, the propagation of computer "worms" and "viruses," Trojan Horse and trapdoor program code, the sending of electronic chain mail, distasteful jokes and the inappropriate sending of "broadcast" messages to large numbers of individuals or hosts. The user may not hack or crack the network or others' computers, whether by parasiteware or spyware designed to steal information, or viruses and worms or other hardware

or software designed to damage the CIS systems, or any component of the network, or strip or harvest information, or completely take over a person's computer, or "looking around."

2.  Altering or attempting to alter files, system security software or the systems without authorization.

3.  Unauthorized scanning of the CIS systems for security vulnerabilities.

4.  Attempting to alter any school district computing or networking components (including, but not limited to, fileservers, bridges, routers or hubs) without authorization or beyond one's level of authorization.

5.  Unauthorized wiring, including attempts to create unauthorized network connections, or any unauthorized extension or re-transmission of any computer, electronic communications systems or network services, whether wired, wireless, cable or by other means.

6.  Connecting unauthorized hardware and devices to the CIS systems.

7.  Loading, downloading or use of unauthorized games, programs, files or other electronic media, including, but not limited to, downloading music files.

8.  Intentionally damaging or destroying the integrity of the school district's electronic information.

9.  Intentionally destroying the school district's computer hardware or software.

10. Intentionally disrupting the use of the CIS systems.

11. Damaging the school district's CIS systems/networking equipment through the users' negligence or deliberate act.

12. Failing to comply with requests from appropriate teachers or school district administrators to discontinue activities that threaten the operation or integrity of the CIS systems.

Pol. 814

### Content Guidelines

Information electronically published on the school district's CIS systems shall be subject to the following guidelines:

1. Published documents, including, but not limited to, audio and video clips or conferences, may not include a child's phone number, street address, or box number, name (other than first name) or the names of other family members without parental consent.

2. Documents, web pages, electronic communications or videoconferences may not include personally identifiable information that indicates the physical location of a student at a given time without parental consent.

3. Documents, web pages, electronic communications or videoconferences may not contain objectionable materials or point directly or indirectly to objectionable materials.

4. Documents, web pages and electronic communications must conform to all school district policies and guidelines, including the copyright policy.

5. Documents to be published on the Internet must be edited and approved according to school district procedures before publication.

### Due Process

The school district will cooperate with the school district's ISP, local, state and federal officials to the extent legally required in investigations concerning or relating to any illegal activities conducted through the school district's CIS systems.

If students or employees possess due process rights for discipline resulting from the violation of this policy, they will be provided such rights.

The school district may terminate the account privileges by providing notice to the user.

### Search and Seizure

Users' violations of this policy, any other school district policy or the law may be discovered by routine maintenance and monitoring of the school district system, or any method stated in this policy, or pursuant to any legal means.

The school district reserves the right to monitor, track, log and access any electronic communications, including, but not limited to, Internet access and e-mails at any time for any reason. Users should not have the expectation of privacy in their use of the school district's CIS systems, and other school district technology, even when used for personal reasons. Further, the school district reserves the right, but not the obligation, to access any personal technology device of users brought onto the school district's premises or at school district events, or connected to the school district network, containing school district programs or school district or student data (including images, files and other information) to ensure compliance with this policy and other school district policies, to protect the school district's resources and to comply with the law.

Everything that users place in their personal files should be written as if a third party will review it.

Copyright Infringement and Plagiarism

Federal laws, cases and guidelines pertaining to copyright will govern the use of material accessed through the school district resources. Users will make a standard practice of requesting permission from the holder of the work and complying with license agreements. Employees will instruct students to respect copyrights, request permission when appropriate, and comply with license agreements, and employees will respect and comply as well.

Pol. 814

Violations of copyright law can be a felony and the law allows a court to hold individuals personally responsible for infringing the law. The school district does not permit illegal acts pertaining to the copyright law. Therefore, any user violating the copyright law does so at his/her own risk and assumes all liability.

P.L. 94-553
Sec. 107
Pol. 814

Violations of copyright law include, but are not limited to, the making of unauthorized copies of any copyrighted material (such as commercial software, text, graphic images, audio and video recording), distributing copyrighted materials over computer networks and deep-linking and framing into the content of others' web sites. Further, the illegal installation of copyrighted software or files for use on the school district's computers is expressly prohibited. This includes all forms of licensed software – shrink-wrap, clickwrap, browsewrap and electronic software downloaded from the Internet.

School district guidelines on plagiarism will govern use of material accessed through the school district's CIS systems. Users will not plagiarize works that they find. Teachers will instruct students in appropriate research and citation practices.

## Selection of Material

Board policies on the selection of materials will govern use of the school district's CIS systems.

When using the Internet for class activities, teachers will select material that is appropriate in light of the age of the students and that is relevant to the course objectives. Teachers will preview the materials and web sites they require or recommend students access to determine the appropriateness of the material contained on or accessed through the web site. Teachers will provide guidelines and lists of resources to assist their students in channeling their research activities effectively and properly. Teachers will assist their students in developing the critical thinking skills necessary to ascertain the truthfulness of information, distinguish fact from opinion and engage in discussions about controversial issues while demonstrating tolerance and respect for those who hold divergent views.

## School District Web Site

The school district will establish and maintain a web site and will develop and modify its web pages that will present information about the school district under direction of the Director of Technology.

## Safety and Privacy

To the extent legally required, users of the school district's CIS systems will be protected from harassment or commercially unsolicited electronic communication. Any user who receives threatening or unwelcome communications must immediately take them to the Director of Technology and/or designee.

18 Pa. C.S.A.
Sec. 5703

Users will not post personal contact information about themselves or other people on the CIS systems. The user may not steal another's identity in any way, may not use spyware, parasiteware, cookies, or use school district or personal employee technology or resources in any way to invade one's privacy. Additionally, the user may not disclose, use or disseminate confidential and personal information about students or employees (examples include, but are not limited to, using a cell phone with camera and Internet access to take pictures of anything, including, but not limited to, persons, places and documents relevant to the school district; saving, storing and sending the image with or without text or disclosing them by any means, including, but not limited to, print and electronic matter; revealing student grades, social security numbers, home addresses, telephone numbers, school addresses, work addresses, credit card numbers, health and financial information, evaluations,

psychological reports, educational records, reports and resumes or other information relevant to seeking employment at the school district unless legitimately authorized to do so).

Student users will agree not to meet with someone they have met online unless they have parental consent.

Consequences for Inappropriate, Unauthorized and Illegal Use

General rules for behavior, ethics and communications apply when using the CIS systems and information, in addition to the stipulations of this policy. Users must be aware that violations of this policy or other policies, or unlawful use of the CIS systems, may result in loss of CIS access and a variety of other disciplinary actions, including, but not limited to, warnings, usage restrictions, loss of privileges, position reassignment, oral or written reprimands, suspensions (with or without pay for employees), dismissal, expulsions and/or legal proceedings on a case-by-case basis. This policy incorporates all other relevant school district policies, such as, but not limited to, the student and professional employee discipline policies, copyright policy, property policy, curriculum policies, terroristic threat policy and harassment policies.

The user is responsible for damages to the network, equipment, electronic communications systems and software resulting from deliberate and willful acts. The user will also be responsible for incidental or unintended damage resulting from willful or deliberate violations of this policy.

Violations as described in this policy may be reported to the school district, appropriate legal authorities, whether the ISP, local, state or federal law enforcement. The school district will cooperate to the extent legally required with authorities in all such investigations.

Vandalism will result in cancellation of access to the school district's CIS systems and resources and is subject to discipline.

P.L. 94-553
Sec. 107
P.L. 106-554
Sec. 1711, 1721, 1732

20 U.S.C.
Sec. 6777

PA Code
Title 22
Sec. 403.1

Board Policy
237, 814

# EXHIBIT E

# EXHIBIT E

1            IN THE UNITED STATES COURT FOR
            THE MIDDLE DISTRICT OF PENNSYLVANIA

2

    J.S., a minor, by and       : CIVIL ACTION NO.:

3    through her parents, TERRY  : 07-CV-585
    SNYDER and STEVEN SNYDER,     :

4    individually and on behalf  :
    of their daughter,          :

5                         :
         Plaintiffs,          :

6                         :
        vs.             : JUDGE:  JAMES M.

7                       : MUNLEY
    BLUE MOUNTAIN SCHOOL       :

8    DISTRICT; DR. JOYCE E.     :
    ROMBERGER, Superintendent,  :

9    Blue Mountain School       :
    District; and JAMES S.      :

10   McGONIGLE, Principal, Blue   :
    Mountain School District,   :

11   both in their official and  :
    individual capacities,     :

12                        :
        Defendants.         :

13

14              - - - - - - - - - - - - - - -

15              ORAL DEPOSITION OF

16                TERRY SNYDER

17             September 13, 2007

18             - - - - - - - - - - - - - - -

19          Taken at the Blue Mountain School
    District Board Room, 685 Red Dale Road, Orwigsburg,

20   Pennsylvania, on September 13, 2007, commencing at
    1:13 p.m. before Candis S. Bradshaw, Notary

21   Public-Court Reporter.

22          LOVE COURT REPORTING, INC.
            1500 Market Street

23         12th Floor, East Tower
      Philadelphia, Pennsylvania  19102

24           (215) 568-5599

Page 2

1 APPEARANCES:
2
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
3 BY: MARY CATHERINE ROPER, ESQUIRE
The Bourse Building, Suite 570
4 111 S. Independence Mall East
Philadelphia, Pennsylvania 19106
5 (215) 592-1513 x 116
6 Representing the Plaintiffs
7
SWEET, STEVENS, KATZ & WILLIAMS, LLP
8 BY: JONATHAN P. RIBA, ESQUIRE
331 East Butler Avenue
9 P.O. Box 5069
New Britain, Pennsylvania 18901
10 (215) 345-9111
11 Representing the Defendants
12
13 ALSO PRESENT:
James S. McGonigle
14 Joyce E. Romberger, Ed.D.
15 Susan Schneider-Morgan
16
17
18
19
20
21
22
23
24

Page 3

1            INDEX
2 WITNESS                    PAGE
3 TERRY SNYDER
4    By Mr. Riba           3, 43
5    By Ms. Roper            42
6
7
8
         EXHIBITS MARKED
9
10 NO. DESCRIPTION          PAGE
11 D-5  Blue Mountain Middle School      36
        Student-Parent Handbook, 2006-2007
12
13
14
15   EXHIBITS PREVIOUSLY MARKED AND REFERENCED
16 NO. DESCRIPTION          PAGE
17 D-1  MySpace page and enlarged copy of    29
        same
18
     D-2  CIS Acknowledgment and Consent Form   35
19
     D-3  Blue Mountain School District    35
20        "Acceptable Use of the Computers,
          Network, Internet, Electronic
21        Communications Systems, and
          Information"
22
     D-4  Letter written by J.S. on Hershey    35
23        Lodge letterhead
24

Page 4

1          TERRY SNYDER, called as a witness, was
2 administered the oath and testified as follows:
3          ===========
4            EXAMINATION
5 BY MR. RIBA:
6      Q.  Good afternoon, Mrs. Snyder.  Is it okay if
7 I call you Terry?
8      A.  Sure.
9      Q.  Okay.  You can call me John.
10          We met briefly before this began, and I
11 just want to go over a few instructions with you.
12 I'm sure your counsel has already told you
13 basically why you're here today and what to expect,
14 but I just want to put it on the record.  Okay?
15          I'll be asking you a series of questions
16 about what -- about your knowledge of some of the
17 facts in this case, and it's a time for me to find
18 out what you know.  And that's all I really am
19 interested in.  I'm not trying to trick you or play
20 games or, you know, create undue hardship for you.
21 I'm just trying to get the facts as you know so I
22 know them.
23          That being said, I don't want you to just
24 guess at an answer to a question I pose to you.  If

Page 5

1 I ask you a question and you don't know the answer,
2 it's fine to say "I don't know" or "I don't
3 recall."
4          If you do offer an answer, I'm going to
5 assume that you've understood my question, and
6 you're testifying to the best of your recollection.
7 Okay?
8          All your answers need to be verbal.  This
9 lady right here -- this woman right here is taking
10 down your -- all your testimony today.  Everything
11 that's said in this room is being transcribed onto
12 paper which can be used at a later date.  And
13 although everyone here sees what you're doing with
14 your head or your hands, all your answers need to
15 be verbal.
16          Also, try to avoid the "uh-huhs" and the
17 "uh-uhs" because that gets confusing on the
18 transcript.  So if you want to say "yes" or "no,"
19 try to remember to say "yes" or "no."  And you
20 won't be the first witness to do that, and we'll
21 try to catch you and clarify the record for you.
22 Okay?
23          If you'd like to take a break or consult
24 with your attorney, that is fine.  As I told your

2 (Pages 2 to 5)

Page 6

1　daughter, this is not an endurance session. I
2　don't anticipate us being here longer than an hour,
3　maybe a little bit over. But if you'd like to take
4　a break and go to the bathroom, just tell us, and
5　we'll be happy to take a break. Okay?
6　　A. Sure.
7　　Q. Okay. Could you please state and spell
8　your whole name for the record.
9　　A. My name is Terry Lynn Snyder. T-E-R-R-Y,
10　L-Y-N-N, S-N-Y-D-E-R.
11　　Q. And Terry, where do you live?
12　　A. 209 Summer Valley Road, Orwigsburg,
13　Pennsylvania.
14　　Q. And were you living there in March of 2007?
15　　A. Yes.
16　　Q. And you're married?
17　　A. Yes.
18　　Q. How long have you been married?
19　　A. Seventeen plus years.
20　　Q. Congratulations.
21　　　And you have two children, I understand?
22　　A. Yes, I do.
23　　Q. And I've met J.
24　　　And what's the name of your other child?

Page 7

1　　A. Scott.
2　　Q. Okay. And how old's Scott?
3　　A. Scotty is 12.
4　　Q. And he's a student here at Blue Mountain?
5　　A. Yes.
6　　Q. And what grade is he in?
7　　A. Seventh.
8　　Q. Okay. Terry, did — does your house — in
9　March of 2007, did your house have a computer?
10　　A. Yes.
11　　Q. And where is the computer located?
12　　A. In the rec room downstairs, at the time.
13　　Q. Okay. And J., would she use the computer
14　on a frequent basis?
15　　A. Yes.
16　　Q. Okay. Could you give us an estimate or a
17　timeframe of how many hours a day she would go on
18　the computer.
19　　A. Well, not every day. One or two hours at a
20　time.
21　　Q. Per day?
22　　A. Every other day.
23　　Q. Okay. Did you monitor her computer use?
24　　A. I have -- I had -- well, not that I stood

Page 8

1　over her shoulder. But I had both of my children
2　give me their passwords for anything. If they
3　change their password without my knowledge, they
4　lose their privilege. So --
5　　Q. Okay.
6　　A. -- I could search their histories, things
7　like that.
8　　Q. Passwords to get on the computer or
9　passwords to particular sites or —
10　　A. Passwords to their AIM . . .
11　　Q. The AOL account?
12　　A. Yes.
13　　Q. Okay. Did you know your daughter had a
14　MySpace profile in March of 2007?
15　　A. Yes.
16　　Q. Do you know when she first created that
17　profile?
18　　A. About -- I'm guessing six months before
19　that, maybe.
20　　Q. Okay. Did you know the password to your
21　daughter's MySpace account?
22　　A. I did. I -- at the time.
23　　Q. Okay.
24　　A. I believe.

Page 9

1　　Q. Okay. Did you ever go on there and see
2　what -- see what was going on?
3　　A. Yes.
4　　Q. Okay. How often would you do that?
5　　A. Not very often.
6　　Q. Okay. Did you have your own MySpace
7　account?
8　　A. No.
9　　Q. Do you know how the -- did you know how the
10　program or the site worked? Do you know about
11　MySpace?
12　　A. Yes.
13　　Q. I mean, it's been — it's in the news, I
14　guess, a lot.
15　　A. Yes.
16　　Q. And it's — I guess it's a way to meet some
17　people and interact with other individuals. Would
18　you agree with that?
19　　　I mean, what's your definition of MySpace?
20　Do you have one?
21　　A. It's --
22　　Q. Of the site. How would you describe the
23　site?
24　　A. It's a communication network.

3 (Pages 6 to 9)

Page 10

1    Q.  Used for social reasons or meeting other
2  people and so on and so forth.  Right?
3    A.  Could be.  Right.
4    Q.  Yeah.  Okay.
5    A.  Sure.
6    Q.  And it shares information about your
7  interests and hobbies, and you can share pictures
8  on it and stuff like that; right?
9    A.  Yes.
10    Q.  Okay.  Do you know a Kristina Lehman?
11    A.  Yes.
12    Q.  Who's Kristina Lehman?
13    A.  She's one of J.'s classmates.
14    Q.  How long have -- are they friends?
15    A.  Yes.
16    Q.  How long have Kristina and J. been friends?
17    A.  I'm not certain.
18    Q.  Okay.  Well, were they friends in -- prior
19  to 8th grade?
20    A.  Yes.
21    Q.  Okay.  They were friends during the middle
22  school years, 6 through 8?  You don't know?
23    A.  I don't know.
24    Q.  Okay.  Did Kristina ever come over to your

Page 11

1  house to play or to hang out with --
2    A.  No.
3    Q.  -- J.?
4      Okay.  Did you ever meet Kristina in
5  person?
6    A.  Yes.
7    Q.  Okay.  Did you meet her prior to March
8  of 2007?
9    A.  Yes.
10    Q.  Okay.  And where did you meet her?  Just at
11  school or run into her?
12    A.  Activities: football games, dance.
13    Q.  How would you -- did you ever hear -- did
14  you ever hear J. describe Kristina as her best
15  friend?
16    A.  No.
17    Q.  Okay.  Who was J.'s best friend, to your
18  knowledge, in March of 2007?
19    A.  Kristin.
20    Q.  Okay.  What's Kristin's last name?
21    A.  Abernathy.
22    Q.  Okay.  Do you know if Kristin Abernathy
23  viewed this site that we're here for today?
24    A.  Do I know?

Page 12

1    Q.  Yeah.
2    A.  No.
3    Q.  Okay.  Terry, why did you sue the school
4  district?
5    A.  Pardon me?
6    Q.  Why did you sue the school district?
7    A.  Because although what J. did was offensive,
8  she did not do anything in school to be punished by
9  the school.  She did not do anything on school
10  property to be punished by the school.  I'm her
11  mother; Steve is her father.  The punishment should
12  have been left to us.
13    Q.  Did you consult your daughter, J., before
14  filing suit against the school district and the
15  superintendent and principal?
16    A.  Did I consult her?
17    Q.  Yeah.
18    A.  No.
19    Q.  You didn't take into account what she
20  wanted?
21    A.  I -- no.  I don't know.
22    Q.  Why is that?
23    A.  I was more concerned about my son, his
24  feelings, because J. would be leaving the middle

Page 13

1  school and going on to the high school.
2    Q.  Okay.
3    A.  I wanted to make sure my son was okay with
4  it.
5    Q.  Well, I'm just a little confused as to
6  how -- why filing suit against the school district,
7  the superintendent, and the principal deals with
8  your son.  That -- could you elaborate on that or
9  clarify that for me.  I don't understand that.
10    A.  Because persons told me that Mr. McGonigle
11  would be retaliatory towards my son.
12    Q.  What grade is your son in now?
13    A.  Seventh.
14    Q.  He was in 6th grade when this incident
15  happened?
16    A.  Yes.
17    Q.  Okay.  From the time of this incident up
18  until, I guess, today, has Mr. McGonigle retaliated
19  in any way against your son?
20    A.  No.
21    Q.  Is there any other reason why you sued the
22  school district other than what you testified to?
23      Any other reason why you sued the school
24  district?

4 (Pages 10 to 13)

1   A.  No.

2   Q.  You admit, ma'am, that the -- that this Web

3  site is offensive, the MySpace account?

4   A.  Yes.

5   Q.  Let me hand you a copy of it.  This is --

6  it's already been marked during your daughter's

7  deposition as Defense Exhibit No. 1.  There's two

8  pages.

9   You said it was -- what was the question I

10  asked?  Offensive.  You said it was offensive --

11   A.  Yes.

12   Q.  -- right?  Okay.

13   Do you think it was vulgar?

14   A.  Yes.

15   Q.  Lewd?

16   A.  Yes.

17   Q.  Did you feel this -- your daughter

18  testified previously that an individual -- a

19  reasonable person or an individual pulling this

20  site up, reading this with no knowledge of the

21  background, would view this -- would view

22  Mr. McGonigle as a sexual predator.  Would you

23  agree with that?

24   MS. ROPER:  Objection.

1   Mischaracterizes the testimony.

2  BY MR. RIBA:

3   Q.  Okay.  Let me ask you:  In regards to what

4  your daughter testified to, reading this Web site

5  and what's contained on this Web site, do you think

6  this portrays Mr. McGonigle as a sexual predator of

7  young students?

8   A.  If anyone would take it seriously.  I can't

9  see how anyone would take this seriously.

10   Q.  Ma'am, how can you -- how can you say that

11  no one could take this seriously?  Why do you feel

12  that way?

13   A.  Because it looks like a juvenile attempt at

14  humor.

15   Q.  Can you show me on here anything that would

16  indicate that it's an attempt at humor or a parody?

17   A.  Where does it say he loves his . . .

18   It's just -- this is not something someone

19  would write about themselves.  I . . .

20   Q.  Ma'am, do you watch the news?  Do you --

21   A.  Yes.

22   Q.  -- do you watch the news?

23   A.  Mostly.

24   Q.  Do you --

1   A.  Most days.

2   Q.  Do you keep up with -- do you keep up with

3  you know, the headlines of the day, so to speak?

4   A.  Yes.

5   Q.  Okay.  Would you agree with me that

6  recently, with the advent of the -- you know, the

7  advent of the Internet, that a major issue nowadays

8  is sexual predators on the Internet?

9   A.  Yes.

10   Q.  People luring -- adults luring young

11  children to certain places and trying to pick up

12  students or young individuals over the Internet?

13   A.  Yes.

14   Q.  That's a common problem today?

15   A.  Yes.

16   Q.  Do you think this is representative of that

17  problem?

18   MS. ROPER:  Objection.

19  BY MR. RIBA:

20   Q.  Do you understand the question?

21   MS. ROPER:  Calls for speculation.

22   Q.  Do you understand the question?

23   A.  I understand the -- I believe I understand

24  the question.

1   But I would not think that this would be

2  luring children to this person's Web site.  It's --

3  I don't believe it's a solicitation for contact.

4  BY MR. RIBA:

5   Q.  Well, do you see the section under URL

6  where it says "www.MySpace.com/kidsrockmybed"?

7   Does that -- as a parent of two young

8  children --

9   A.  I know --

10   Q.  -- does that bother you?

11   A.  -- it's on here, but -- pardon me?

12   Q.  And as parent to two young children, does

13  that bother you that there's a URL site from a

14  supposed principal that says "kids rock my bed"?

15   A.  It bothers me as a parent that J. would

16  write that.  But I would not think -- I don't -- I

17  could not imagine either one of my children

18  thinking that this was someone who was looking for

19  a relationship.

20   Q.  When was the first time that you found out

21  about this Web site?

22   A.  When Mr. McGonigle -- when I was in

23  Mr. McGonigle's office.

24   Q.  And what was your reaction when he

1  presented you with this Web site?
2      A.  I was stunned.  I asked J. did she do this.
3      Q.  And what was her answer?
4      A.  She said yes.
5      Q.  And what was your reaction?
6      A.  I was still a little stunned, to say the
7  least.
8      Q.  Okay.  Did you say anything to
9  Mr. McGonigle at that time?
10     A.  I don't remember.
11     Q.  Okay.  Do you recall if J. apologized?
12     A.  Yes.
13     Q.  Okay.  Do you recall if you apologized?
14     A.  Yes.
15     Q.  Okay.  Do you recall if there was a --
16  discipline handed out at that time?
17     A.  Yes.
18     Q.  Okay.  What was that?
19     A.  A ten-day suspension from school, and J.
20  was not allowed to participate in any activities.
21     Q.  Now, did you voice objection to the
22  suspension at that time?
23     A.  No.
24     Q.  Okay.  Why not?

1      A.  I was still kind of shocked.
2      Q.  Do you think it was appropriate?
3      A.  No.
4      Q.  Okay.  Why not?
5      A.  Because she did not do anything in school.
6      Q.  Okay.  Well, when was the first time you
7  voiced your objections to the suspension?
8      A.  The next day, I called Dr. Romberger.
9      Q.  Okay.  And what happened during that
10  conversation?  What was said?
11     A.  That they were standing by the suspension.
12  I don't remember exactly what was said.
13     Q.  Did you call anyone else besides
14  Dr. Romberger?
15         MS. ROPER:  And let me just
16     interpose an objection to the extent that
17     it would ask her to reveal any
18     conversations with attorneys.
19  BY MR. RIBA:
20     Q.  Yeah.  Don't tell me any -- don't tell me
21  any conversations you had with any of your
22  attorneys.  I don't want to know that.
23         I want to know any conversations you had
24  with my clients, that being anyone that works at

1  the district, with regards to your objections to
2  the suspension given to J.
3      A.  No.  No one else.
4      Q.  Okay.  And I don't want to know what you
5  said, but I do want to know:  When was the first
6  time you contacted an attorney with regards to your
7  worries about -- or concerns about the suspension?
8      A.  I may have inquired later that same day.
9  I'm not sure.
10     Q.  When you say "that same day," is that --
11  you just testified it was a couple days later that
12  you called Dr. Romberger, or was it the day after?
13     A.  The following day.
14     Q.  The next day.
15     A.  Yes.
16     Q.  And to your recollection, you might have
17  contacted counsel at that time?
18     A.  I may have sent an inquiry.  I'm not
19  certain.  It could have been two days later.
20         I know it was the day I got the phone call
21  from the state police, whichever day that was.
22     Q.  Okay.  Tell me about that.  What did the
23  state police say?
24     A.  They asked me to report to the state police

1  barracks with J. that evening.
2      Q.  Okay.  And what happened when you reported
3  to the state barracks?
4      A.  They basically scared J. --
5      Q.  Uh-huh.
6      A.  -- basically, is what happened.
7      Q.  Were you present for when they talked
8  to J.?
9      A.  Yes.
10     Q.  Okay.  And what did they say?  Do you
11  recall?
12         Do you mind if we -- let me back up one
13  second.  Did you -- do you remember the name of the
14  officer that spoke to J.?
15     A.  RAS-mooth (phonetic) or RAS-muth
16  (phonetic), something like that.
17     Q.  Okay.  And what -- do you recall what he
18  said?
19     A.  Just -- I -- he talked about the attire
20  kids wear in school these days.  He talked about
21  that -- a progression of discipline kind of thing.
22  I don't remember.
23     Q.  Uh-huh.
24     A.  You know, that things could become quite

1 serious. He did say that Mr. McGonigle was not
2 pressing charges.
3    Q. Have you ever had any other contact with
4 the state police other than that one time you went
5 to the barracks?
6    A. I called to ask if I could have a copy of
7 the MySpace page.
8    Q. And did they give it to you?
9    A. No.
10    Q. Do you know if there's any other paperwork
11 that was prepared by the state police?
12    A. Do I know -- no.
13    Q. Do you know if there was a file opened on
14 this matter or incident -- a number from this
15 matter?
16    A. He said he had a file, but I don't know if
17 there's a file.
18    Q. Okay. Do you recall when he was talking
19 to J. or -- did he ask J. what happened? Did --
20 when -- in his conversations with J., did he ask J.
21 for her side of the story, what she did and --
22    A. No.
23    Q. -- in the creation of this MySpace?
24    A. Not that I remember, no.

1    Q. Okay. Do you recall if he was taking
2 notes?
3    A. He had notes, but I don't think he was
4 taking notes.
5      I don't know. I don't know. I can't
6 remember.
7    Q. Okay. What barracks was this?
8    A. Reedsville.
9    Q. Reedsville?
10      And this was the state police; correct?
11    A. Yes.
12    Q. Okay. Have you seen any other copies of
13 this MySpace page other than what's before you?
14    A. In Mr. McGonigle's office.
15    Q. Right. It's the same -- it's the same
16 handout or the same printout.
17      Did you see any other -- different
18 printouts than this one?
19    A. No.
20    Q. Okay. Did you see the actual MySpace
21 account on the computer at any time?
22    A. This?
23    Q. Yes.
24    A. No.

1    Q. You never saw it on the computer?
2    A. No.
3    Q. Do you know when it was removed?
4    A. Thursday -- no. Not exactly. I think it
5 was Thursday, because J. tried to remove it herself
6 and couldn't.
7    Q. Okay. Do you know who ended up removing
8 it?
9    A. No --
10    Q. Okay.
11    A. -- really. MySpace, I assumed.
12    Q. You said that one of the reasons you
13 brought this lawsuit was because you thought you
14 should be the one disciplining your daughter.
15    A. Yes.
16    Q. Isn't it true that you did discipline your
17 daughter?
18    A. Yes.
19    Q. Okay. What did -- how did you discipline
20 her?
21    A. She was grounded. She was restricted from
22 the phone and the computer.
23    Q. How long was she grounded for?
24    A. She was grounded indefinitely at the time.

1 I don't know how long she ended up being grounded
2 for. I know -- more than a month. But I don't
3 remember.
4    Q. Okay. How long was her phone restrictions
5 in place for?
6    A. I don't remember.
7    Q. How about her computer privileges?
8    A. I don't remember that either. She was
9 allowed to use the computer for school work only at
10 that time. And I just don't remember.
11    Q. Okay. Do you know if your daughter still
12 has a MySpace account?
13    A. Yes, she does.
14    Q. Your daughter received a ten-day
15 suspension?
16    A. Yes.
17    Q. During that time, your daughter received
18 work at school -- her homework at school? I mean,
19 the work assigned at school was brought home?
20    A. Yes.
21    Q. Right?
22      Did you observe her doing it?
23    A. Yes.
24    Q. Okay. Did she do it every day?

1    A.  Yes.

2    Q.  Okay.  Was work brought home with her every

3  day, or was it given to her at the beginning of the

4  suspension?  Or how did it work?

5    A.  She got the majority of it at the beginning

6  of her suspension.

7    Q.  Okay.  And your daughter testified that

8  when she returned to school throughout the end of

9  the year, there was no drop-off in her performance

10  at school in terms of grades.  Would you agree with

11  that?

12    A.  Yes.

13    Q.  And your daughter testified that as a

14  result of this suspension, she suffered no

15  emotional damages -- emotional injuries, that she

16  didn't seek professional help from anybody?

17      MS. ROPER:  Objection of it being

18      compound and mischaracterizing the

19      testimony.

20  BY MR. RIBA:

21    Q.  Okay.  Did your daughter receive any

22  professional help as a result of the suspension?

23    A.  No.

24    Q.  Okay.  Did your daughter complain about any

1  emotional feelings she was having as a result of

2  the suspension?

3    A.  At the time, yes.

4    Q.  Okay.  She was upset about it?

5    A.  Yes.

6    Q.  Did you ask your daughter if she felt she

7  should be suspended?

8    A.  Not exactly that.  I asked her what she

9  thought her punishment should be, although I don't

10  recall what she said.

11    Q.  You don't recall what she said?

12    A.  No.

13    Q.  Did -- do you recall that -- J. saying that

14  she shouldn't be punished at all by the school for

15  what she did?

16    A.  No, I don't . . .

17    Q.  Do you recall -- I recall you testifying

18  when you first started this that one of the reasons

19  you felt that you brought this lawsuit was because

20  everything happened off school grounds.  In other

21  words, the Web site was created at your house on

22  the -- on your own computer --

23    A.  Not during school hours.

24    Q.  -- not during school hours.

1      Did you ever hear -- did J. ever say that?

2    A.  Pardon me?

3    Q.  Did J. ever say that?

4    A.  Did she ever say what?

5    Q.  That she shouldn't be disciplined because

6  of the reasons you just articulated.

7    A.  No.  J. never said that she shouldn't be

8  disciplined.

9    Q.  Your husband is a plaintiff in this

10  lawsuit; correct?

11    A.  Yes.

12    Q.  Was he involved at all in this incident?

13    A.  No.

14    Q.  Did he participate in any meetings you

15  might have had with any of the defendants or any

16  employee of the district?

17    A.  No.

18    Q.  Okay.  Did he have any conversations

19  with J. regarding her actions that you know of?

20    A.  Yes.

21    Q.  Okay.  And what did -- what was his

22  reaction to this Web site?

23    A.  What was his reaction?

24    Q.  Yeah.

1    A.  Other than that he was disappointed, I'm

2  not sure exactly what his reaction was.

3    Q.  Did you consult with your husband in

4  bringing this lawsuit?

5    A.  Yes.

6    Q.  Okay.  And what was his -- what was his

7  ration- -- to your knowledge, what was his

8  rationale as to why this lawsuit should be brought?

9    A.  Because we're her parents.

10    Q.  Okay.

11    A.  We're responsible for her when she's not in

12  school.

13    Q.  Okay.  Ma'am, do you have any knowledge as

14  to the effect that this had -- this Web site had on

15  the inner workings of the school?

16    A.  No.

17    Q.  Do you have any knowledge as to disruptions

18  it caused in class?

19    A.  No.

20    Q.  Okay.

21    A.  Other than I know kids were talking about

22  it with their teachers once J. was suspended.  I

23  don't -- other than that, I don't --

24    Q.  Talk to me a little bit about that.  Who

Terry Snyder

Page 30

1 was -- tell me more about the kid talking to his
2 teacher about it?
3     A.  I just know that they were because my son
4 came home and told me.
5     Q.  Okay.  What did your son tell you?
6     A.  That everybody in the school was talking
7 about J. and Kristina.
8     Q.  And at the time, your son was in 6th grade?
9     A.  Yes.
10     Q.  Okay.  And this was -- was this -- when was
11 this that your son came back and told you everyone
12 in the school was talking about it?
13     A.  The day J. was suspended.
14     Q.  Did you talk to any of her friends about
15 the suspension?
16     A.  I inquired from a few of her friends what
17 they had heard.
18     Q.  Okay.  Do you know if people were talking
19 about this before she was suspended?  This Web
20 site --
21     A.  The --
22     Q.  This Web site right here, D-1?
23        Do you know if people were talking about it
24 in school prior to her being called down to the

Page 31

1 office?
2     A.  Just from what J. told me, because J. tried
3 to take it down because people were asking her
4 about it.
5     Q.  A lot of people?
6     A.  I don't know.
7     Q.  Well, did she tell you what they were
8 asking about it?
9     A.  No.
10     Q.  Did J. come to you before she was called
11 down to the office and she received her discipline
12 about this Web site?
13     A.  No.
14     Q.  You do recall her, though, telling
15 her [sic] at some point thereafter, after she was
16 disciplined, that people were coming up to her and
17 telling her about this Web site, and she tried
18 taking it down?
19     A.  Yes.
20     Q.  Did you talk to her teachers about this Web
21 site at all?
22     A.  No.
23     Q.  Okay.  Other than Mr. McGonigle and the
24 phone call to the superintendent, did you have any

Page 32

1 other conversations with anyone from the district
2 with regards to this incident?
3     A.  Dr. Romberger.  And I . . .
4     Q.  Right.  That one time, the day after you
5 called --
6     A.  No.  I came in to talk to her --
7     Q.  Okay.
8     A.  -- after that.
9     Q.  Okay.  It's -- after you had the phone
10 call, you came in?
11     A.  Yes.
12     Q.  Okay.  How many days after the phone call
13 did you come in?
14     A.  I don't know.
15     Q.  Okay.  What happened at the -- what
16 happened at the meeting?
17     A.  I again tried to see if I could get J. back
18 into school while -- maybe it could be resolved
19 without her spending -- she was already out of
20 school a few days at that point in time.
21     Q.  J. didn't -- did she participate in any
22 extracurricular activities at that time in March
23 of 2007?
24     A.  Did she participate in any --

Page 33

1     Q.  Yeah.  In 8th grade -- I mean, I don't
2 know.  In 8th grade, is there, like, sports teams
3 or anything that meet after school?
4     A.  In March, she was not in any sports.  She
5 had no organized activities like that.
6     Q.  Okay.  It wasn't like in the -- some type
7 of club or -- you know, like, a drama club or a --
8 whatever clubs are out there.  She wasn't
9 participating in any of that?
10     A.  No.
11     Q.  Okay.  So it was the -- the suspension,
12 what she missed was the classroom -- the regular
13 classroom activities.  She didn't miss any
14 extracurricular activities because of the
15 suspension.
16     A.  Well, her class trip.
17     Q.  Okay.  And when was the class trip?
18     A.  I don't remember.  It was after the
19 suspension was over.
20     Q.  She wasn't allowed to participate in the
21 class trip?
22     A.  (Nodding head.)
23     Q.  Do you know where the class trip went or --
24     A.  Washington.

9 (Pages 30 to 33)

1  She was also not allowed to go to her --
2  the 8th grade dance.
3  Q. Okay. Is the class trip a school function,
4  to your knowledge?
5  A. I'm told it's not a school function.
6  Q. Okay. It's something provided by a private
7  entity or donations or -- you know, donations are
8  made or it's funded through fundraising? Is that
9  how it works?
10  A. I don't know. I paid money for it.
11  Q. Okay. You paid, though, for her to go?
12  A. Yes.
13  Q. Okay.
14  A. Although, when the school is in supervision
15  of my child, then I think it's still a school
16  function.
17  Q. When is the class trip? Is it after school
18  ends?
19  A. No.
20  Q. Okay. It's during school?
21  A. Yes.
22  Q. As a result of the meeting with the
23  superintendent, everything still stayed the same in
24  terms of the suspension?

1  A. Yes.
2  Q. Okay. Any other conversations with any
3  district representatives after that meeting with
4  the superintendent?
5  A. No.
6  Q. Did you know Mr. McGonigle prior to this
7  encounter, this incident?
8  A. Personally, no.
9  Q. Okay. Did you hear anything about him
10  prior to -- prior to this?
11  A. Did I hear anything about --
12  Q. Yeah. Did you have an opinion about him as
13  a principal? I mean, your daughter went there for
14  two years prior to this incident. Did you think
15  you -- did you have any opinion of him?
16  A. I thought he was okay.
17  Q. Okay. Did you know your daughter wanted to
18  dress like him during Halloween in --
19  A. I took her --
20  Q. -- the 7th grade?
21  A. -- trick-or-treating, yes.
22  Q. Okay. Were you present when your daughter
23  wrote the apology statement?
24  A. Was I present when she wrote it?

1  Q. Yeah.
2  A. I was in the house, but I didn't stand over
3  her while she --
4  Q. Okay.
5  A. -- wrote it.
6  Q. Just for the record, it's D-4.
7  Terry, do you recall signing a -- what's
8  called a CIS Acknowledgement and Consent form?
9  It's about the computer policy of the school
10  district.
11  A. Yes.
12  Q. Okay. We marked this at your daughter's
13  deposition as D-2. Is that your signature on it?
14  A. Yes.
15  Q. Okay. And that's at the beginning of the
16  2006/2007 school year, August of 2006?
17  A. Yes.
18  Q. Okay. And associated with that is the
19  actual policy of the school district regarding the
20  use of computers; correct?
21  A. Yes.
22  Q. Okay. And we marked this as D-3. Do you
23  recall seeing a copy of that?
24  A. We receive something like this --

1  Q. Yeah.
2  A. -- every year.
3  Q. Yeah.
4  And, likewise, you also received a copy of
5  the Blue Mountain Middle School Student/Parent
6  Handbook?
7  A. Yes.
8  MR. RIBA: Okay. And we can mark
9  this as D-5.
10  (Exhibit No. D-5 was marked.)
11  BY MR. RIBA:
12  Q. Terry, you testified you received a copy of
13  that?
14  A. Yes.
15  Q. Okay. And that's the -- one of the middle
16  school disciplinary policy manuals, I guess, Blue
17  Mountain Middle School -- for Blue Mountain Middle
18  School?
19  A. Yeah. It has all kinds of things in there.
20  Q. Right. Right.
21  A. Yes.
22  Q. Right.
23  One of your allegations in your complaint
24  is that the policy of the school district was

1  overbroad or vague with regard to the punishment
2  handed out to J. Correct?
3      You've seen a copy of your complaint;
4  right?
5      A.  Yes.
6      Q.  Okay. Well, one of the claims that you
7  made against the district and the other defendants
8  is that the policy against -- the policy which was
9  enforced against your daughter was either overly
10  broad or vague.
11      Have you had a chance to look at that --
12  that policy manual, the handbook that's been marked
13  as D-5?
14      A.  Yes.
15      Q.  Okay. Could you -- can you tell me what
16  policy you believe is overbroad or vague?
17      MS. ROPER:  Objection to the extent
18      it calls for a legal conclusion.
19  BY MR. RIBA:
20      Q.  Well, just -- there's something that you
21  believe is vague or overbroad which you allege in
22  your complaint. And I'd like you to tell me what
23  that policy or language in the policy is, if you
24  could.

1      MS. ROPER:  Same objection.
2  BY MR. RIBA:
3      Q.  Can you do that? You can answer the
4  question.
5      A.  I looked at the handbook when J. was
6  suspended to see what infraction she could have
7  received a ten-day suspension for. And to be
8  honest, it didn't jump out at me from this book.
9      Q.  Okay. So you don't see anything in there
10  that relates to this incident?
11      A.  Not really.
12      Q.  Would you agree, ma'am, that the
13  information contained on this Web site, on D-1,
14  contains false accusations against Mr. McGonigle?
15      A.  I don't think the Web site is accusing him
16  of any -- I don't know.
17      Q.  Okay. You don't know if it contains false
18  accusations against Mr. McGonigle?
19      A.  It's fiction, whatever this is. But I
20  guess it's false. I don't -- I don't know.
21      I guess you could say it's accusing him of
22  something, but I don't . . .
23      Q.  You don't what?
24      A.  I don't think it's making an accusation.

1      Q.  "I have come to MySpace so I can pervert
2  the minds of other principals to be just like me."
3  You don't think that's a false accusation?
4      A.  Well, I guess it's false because he didn't
5  write it.
6      Q.  He didn't do anything on this Web site;
7  right?
8      A.  Right.
9      Q.  That's his picture, though.
10      There's a couple things that are true on
11  this Web site; right? That's his picture from the
12  school Web site.
13      A.  Yes.
14      Q.  And he is a principal.
15      A.  Yes.
16      Q.  Would you want your daughter or son going
17  to a school with a principal that comes to MySpace
18  so he can pervert the minds of other principals,
19  who likes to have sex with kids in his bed -- sex
20  of any kind?
21      A.  Would I want my kids going to a school with
22  a principal like that?
23      Q.  Yeah.
24      A.  No.

1      Q.  Right.
2      You think something like this could cause
3  disruptions in the school, the way a school
4  functions?
5      MS. ROPER:  Objection. It calls for
6      speculation.
7  BY MR. RIBA:
8      Q.  You can answer the question.
9      A.  I would imagine it could get out of
10  control.
11      Q.  How so?
12      A.  Just because kids are kids.
13      Q.  Is it possible that with this Web site
14  being out there available to the whole world
15  that -- and especially, you know, parents and
16  students of Blue Mountain, that people will look at
17  Mr. McGonigle as a sexual predator and not --
18      A.  I don't think so.
19      Q.  -- not do anything -- not do anything --
20  not listen to him as the administrator of a middle
21  school?
22      MS. ROPER:  Objection. Calls for
23      speculation and lacks of foundation.
24      Q.  You can answer the question.

A. I would not think that any reasonable person would believe that this was any valid article.

Q. But my question, though, is: This Web site, as it appears in D-1 -- with no mention of any, you know, parody disclaimer or notice to anybody that this is anything other than true -- this could affect Mr. McGonigle's ability to administer education at the middle school. Isn't that true?

MS. ROPER: Objection. Calls for speculation.

Go ahead.

A. It was not out there for everybody to see, for one.

BY MR. RIBA:

Q. Okay. Well, your daughter testified it was available for at least 24 hours to the entire world. You disagree with that?

A. To my knowledge, it was not.

Q. Okay. And what knowledge is that?

A. J. could not say specifically how long it was not password protected. It was not password protected while they collaborated on it.

MR. RIBA: I'd just like a minute to talk to my clients.

MS. ROPER: Okay.

(Break from 1:59 p.m. to 2:06 p.m.)

MR. RIBA: No further questions.

EXAMINATION

BY MS. ROPER:

Q. I just have a couple things I wanted to clarify.

Mrs. Snyder, I believe you testified that you believed the MySpace was removed on Thursday. And what I wanted to ask you was: What did you mean by "Thursday"?

A. The day J. was suspended.

Q. Okay. And you testified that your son told you people were talking in school. What did he tell you they were talking about?

A. They were talking about J. and Kristina being suspended. There were classrooms having discussions about it.

Q. When you say "classrooms having discussions," who in the classrooms were involved in the discussions?

A. The teachers and the children.

Q. Okay. Did he tell you about any discussions about the Web site apart -- that -- other than discussions about the suspension?

A. No.

MS. ROPER: Those are all the questions I have.

EXAMINATION

BY MR. RIBA:

Q. Did you ask your son if there were conversations about the Web site prior to the suspensions?

A. Did I ask him?

Q. Yes.

A. No.

MR. RIBA: That's all the question I have.

MS. ROPER: Okay. Thank you. So we're off the record?

MR. RIBA: Yup.

(Deposition concluded at 2:07 p.m.)

CERTIFICATION

COMMONWEALTH OF PENNSYLVANIA :
: §
COUNTY OF DAUPHIN :

I, Candis S. Bradshaw, the undersigned, a Commissioner to Take Depositions within and for said County of Dauphin and Commonwealth of Pennsylvania, the officer before whom the foregoing depositions were taken, do hereby certify:

That TERRY SNYDER, the witness whose deposition is hereinbefore set forth, was administered the oath by me and that such deposition is a true and correct record of the testimony given by such witness.

I further certify that I am not related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of September, 2007.

Candis S. Bradshaw

Candis S. Bradshaw
Notary Public, Court Reporter

1  CERTIFICATE OF DEPONENT
2     I, Terry Snyder, certify that I have the
3  foregoing transcript of my deposition given on
4  September 13, 2007, and find it to be a true,
5  correct, and complete transcript of the answers
6  given by me to the questions therein propounded,
7  except for corrections or changes in form or
8  substance, if any, noted in the attached Errata
9  Sheet.
10
11
12     _____
13     Terry Snyder
14
       DATED: _____
15
16
17  Subscribed and sworn to me this _____ day of
18  _____, 2007.
19  My Commission Expires: _____
20
21
22  _____
23  NOTARY PUBLIC
24

1     ERRATA SHEET
2  PAGE LINE     CORRECTION     REASON FOR
3  ___ - ___ - _____
4  ___ - ___ - _____
5  ___ - ___ - _____
6  ___ - ___ - _____
7  ___ - ___ - _____
8  ___ - ___ - _____
9  ___ - ___ - _____
10  ___ - ___ - _____
11  ___ - ___ - _____
12  ___ - ___ - _____
13  ___ - ___ - _____
14  ___ - ___ - _____
15  ___ - ___ - _____
16  ___ - ___ - _____
17  ___ - ___ - _____
18  ___ - ___ - _____
19  ___ - ___ - _____
20  ___ - ___ - _____
21  ___ - ___ - _____
22  ___ - ___ - _____
23  ___ - ___ - _____
24  ___ - ___ - _____

**EXHIBIT F**

**EXHIBIT F**

# CONDENSED COPY

```
 1              IN THE UNITED STATES COURT FOR
           THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
    J.S., a minor, by and through   :
 3  her parents, TERRY SNYDER and    :
    STEVEN SNYDER, individually      :
 4  and on behalf of their daughter,:
                    Plaintiffs,      : CIVIL ACTION - LAW
 5                                   : NO.: 07-CV-585
                 -vs-                :
 6                                   :
    BLUE MOUNTAIN SCHOOL DISTRICT;   :
 7  DR. JOYCE E. ROMBERGER,          :
    Superintendent Blue Mountain     :
 8  School District; and JAMES S.    :
    MCGONIGLE, Principal Blue        :
 9  Mountain Middle School, both in  :
    their official and individual    :
10  capacities,                      :
                                     :
11                  Defendants.      :
12
13          Oral deposition of JAMES S. MCGONIGLE,
14       held at Blue Mountain School District
15       Administration Offices, Red Dale Road, Box
16       188, Orwigsburg, Pennsylvania, on Friday,
17       October 12, 2007, commencing at 11:10 a.m.,
18       before Lynn Greene, Court Reporter and
19       Notary Public in the Commonwealth of
20       Pennsylvania.
21
22            LOVE COURT REPORTING, INC.
                 1500 Market Street
23            12th Floor, East Tower
           Philadelphia, Pennsylvania  19102
24                (215) 568-5599
```

Page 2

1  A P P E A R A N C E S :
2
3  DRINKER, BIDDLE & REATH, LLP
   BY: MARY E. KOHART, ESQUIRE
4  One Logan Square
   18th and Cherry Streets
5  Philadelphia, Pennsylvania 19103-6996
   (215) 988-2827
6  Attorneys for Plaintiffs
7
8  SWEET, STEVENS, KATZ & WILLIAMS, LLP
   BY: JONATHAN P. RIBA, ESQUIRE
9  331 East Butler Avenue
   P.O. Box 5069
10 New Britain, Pennsylvania 18901
   (215) 345-9111
11 Attorneys for Defendants
12
13 ALSO PRESENT:
14    Mary Catherine Roper, Esquire
      Deborah Gordon Kiehr, Esquire
15    Meredith W. Nissen, Esquire
      Terry Snyder
16
17             * * *
18
19
20
21
22
23
24

Page 4

1
2              I N D E X
3  WITNESS:
4  James S. McGonigle
5
6  EXAMINATION              PAGE
7  By Ms. Kohart            5
8  By Mr. Riba              171
9              * * *
10
11      I N D E X   T O   E X H I B I T S
12
13 NUMBER      DESCRIPTION        PAGE
14    1     Blue Mountain Middle School   129
15          letter dated 3/23/07
16
17
18
19
20
21
22
23
24

Page 3

1        DEPOSITION SUPPORT INDEX
2
3
4  DIRECTIONS NOT TO ANSWER:
5  PAGES:    None
6
7
8  REQUESTS FOR DOCUMENTS OR INFORMATION
9  PAGES:    None
10
11
12 STIPULATIONS AND/OR STATEMENTS:
13 PAGE:     5
14
15
16 MARKED QUESTIONS:
17 PAGES:    None
18
19
20
21
22
23
24

Page 5

1       (By agreement of Counsel, all
2  objections, except to the form of the
3  question, are reserved to the time of
4  trial.)
5          ___
6       JAMES S. McGONIGLE, after having been
7  first duly sworn, was examined and
8  testified as follows:
9          ___
10      E X A M I N A T I O N
11          ___
12 BY MS. KOHART:
13      Q.  Mr. McGonigle, my name is Mary Kohart.
14 I am representing the Plaintiffs in this matter,
15 along with the A-C-L-U.
16          Can you give me a brief description of
17 your educational background, just a summary of your
18 college?
19      A.  Undergraduate, Elizabethtown College.
20      Q.  Did you get a graduate degree?
21      A.  Yes.  A masters in secondary school
22 counseling and my administrative certification is
23 from Kutztown University and the University of
24 Scranton.

2 (Pages 2 to 5)

Page 6

1    Q.  And what year did you get the graduate
2  degree?
3      A.  The graduate degree was '96 in
4  secondary school counseling and the Principal
5  certification would have been in '99.
6      Q.  Can you tell me your job history since
7  you graduated from college?
8      A.  Undergrad or graduate?
9      Q.  Undergrad.
10     A.  When I first got out of college, I was
11 working for the State of Pennsylvania counseling
12 juvenile delinquents around the State at different
13 lockup facilities.  At the same time, I was going
14 to graduate school and I was also coaching high
15 school baseball and American Legion baseball for
16 six years.
17     Q.  What year did you graduate?
18     A.  '93.  And then, in '95, '96, I did an
19 internship here at Blue Mountain Middle School in
20 the guidance department.  Luckily, somebody retired
21 the following year and I got employed as a Guidance
22 Counselor the following year.  I remained the
23 Guidance Counselor for two years, two months and 13
24 days and then I got thrown to the wolves and I

Page 7

1  became the Dean of Students in Blue Mountain Middle
2  School.
3      Q.  And what are the job duties of Dean of
4  Students?
5      A.  Discipline and attendance, basically,
6  and the day-to-day operations of the school.
7      Q.  And then after that?
8      A.  After that, I became Acting Assistant
9  Principal for, approximately, two years and then I
10 became an Assistant Principal, approximately, one
11 year.  I can't give you the exact dates.
12     Q.  Not a problem.
13     A.  And then Acting Principal and then,
14 finally, Principal three years ago.
15     Q.  Is it the practice of this school
16 district to promote people in this job as an Acting
17 Assistant Principal, an Acting Principal and then
18 deciding, based on their job performance, whether
19 to promote them to the Principal or Assistant
20 Principal?
21     A.  Yes.  That would be so, from my
22 experience.
23     Q.  All right.  Now, how many students
24 attend the middle school here?

Page 8

1      A.  Exactly?
2      Q.  You can give me an estimate?
3      A.  About 720.
4      Q.  And has that been consistent throughout
5  your time here?
6      A.  We fluctuate between 700 and 750.
7      Q.  What kind of kids are they?
8      A.  Can you be more specific; what do you
9  mean?
10     Q.  What kind of children are coming to the
11 schools in this area; the middle class, the lower
12 middle class?
13     A.  All of the above.
14     Q.  How many students ultimately go to
15 college from this school district?
16     A.  I have no idea.
17     Q.  What is the student to teacher ratio?
18     A.  In the middle school?
19     Q.  Right.
20     A.  One to twenty-five.
21     Q.  When people are Guidance Counselors in
22 the middle school, what's their job; what kind of
23 Guidance Counseling do you need in the middle
24 school?

Page 9

1      A.  Well, scheduling is a big issue.  The
2  other thing is the day-to-day problems of the kids.
3  The Guidance Counselors also teach two periods a
4  day, study skills and career development.
5      Q.  All of them teach study skills and
6  career development?
7      A.  Yes.
8      Q.  Are those mandatory classes?
9      A.  Yes; in sixth grade.
10     Q.  And your spouse in employed in the
11 middle school?
12     A.  That's correct.
13     Q.  What's her position?
14     A.  She's a Guidance Counselor.
15     Q.  How long has she been a Guidance
16 Counselor here?
17     A.  I think this is her fourth year.
18     Q.  Did she have any prior position with
19 the school?
20     A.  Yes.  She was a math teacher.
21     Q.  What grade?
22     A.  Eighth.
23     Q.  How many years was she in that job?
24     A.  Eight.

3 (Pages 6 to 9)

1  Q.  Did you meet her when you moved to this
2  area?
3    A.  I had known her in college.
4  Q.  And are you from this part of the
5  State?
6    A.  Yes.
7  Q.  Still coach baseball?
8    A.  No.  I'm retired.
9  Q.  Did you know Jill before this incident
10  where she was suspended?
11    A.  Yes.
12  Q.  How did you know her?
13    A.  As a student in my guidance class and
14  the day-to-day operations of the building.  I still
15  teach classes to get to know all the students.  So
16  I did have her in classes.
17  Q.  Were you then Assistant Acting
18  Principal?
19    A.  No.  At that point, I was just -- that
20  was my first year as Principal.
21  Q.  Tell me what you teach -- well, tell me
22  what you remember teaching the year that Jill was
23  in it?
24    A.  I teach the same thing every year.

1  Memorization skills, listening skills, following
2  directions, I dabble in school law, I talk about
3  different school law cases, I have speakers come in
4  from the high school, the SADD organization, they
5  come down and talk to the kids.
6  Q.  What is SADD?
7    A.  Students Against Drunk Driving.
8  Q.  Are there any students in favor of
9  drunk driving organizations in the area or just
10  against it?
11    A.  Just against.
12  Q.  We're from Philadelphia and we have a
13  group that's in favor of it.
14    A.  And I also have a County agency come in
15  and talk about drugs and alcohol.  I'm only
16  teaching for 12 weeks.  So that pretty much covers
17  my 12 weeks.
18  Q.  What do you remember about Jill from
19  when she was your student?
20    A.  Never a problem.  I remember her in
21  sixth grade, nothing as far as discipline in class.
22  Seventh grade, the only thing I really remember is
23  when she wanted to dress up as me for Halloween.
24  Q.  And was she prohibited from doing

1  that?
2    A.  No.  I gave her my school I-D and
3  everything.
4  Q.  Do you have a copy of your school I-D?
5    A.  Not with me.
6  Q.  What does it look like?
7    A.  It's square.
8  Q.  Does it have a picture on it?
9    A.  Yes.
10  Q.  Where is the picture from?
11    A.  It's from, I guess, from Life Touch.
12  Q.  Is it the same picture that's --
13    A.  No.  It's a different picture.
14  Q.  Life Touch is what; your authorized
15  photograph?
16    A.  Yes.
17  Q.  You gave her the school I-D and then
18  what did she do to dress up like you?
19    A.  That I don't know.  She said she was
20  going to comb her hair to the side and that was it.
21  That's all I know.
22  Q.  Was she coming to a school dance?
23    A.  No.
24  Q.  She was going trick or treating?

1    A.  Trick or treating.
2  Q.  So you gave her identification, your
3  identification?
4    A.  Yes.
5  Q.  To take out to her neighborhood trick
6  or treating?
7    A.  Yes.
8  Q.  What did you think she was going to do
9  with it?
10    A.  She was just pretending to dress up as
11  me for Halloween.  That's it.
12  Q.  Did she give it back to you?
13    A.  Yes.  The next day.
14  Q.  Did you ask her about her experience
15  trick or treating?
16    A.  No.
17  Q.  Anything else in 6th or 7th grade that
18  you can remember about Jill?
19    A.  No.
20  Q.  Now, in 8th grade, up until March, any
21  issues with the students?
22    A.  I do know that she was sent down to the
23  office on two occasions for dress code violations.
24  Q.  What was the nature of those

Page 14

1  violations?
2      A.  That I don't know.  I wasn't the one
3  that sent her down.
4      Q.  Did you speak to her about them?
5      A.  I spoke to her about the second one.
6      Q.  How did you speak with her without
7  knowing the violation?
8      A.  I walked out into the office and I knew
9  it was her second offense and I said, Jill, how
10  long is this going to go on?  You know what the
11  rules are.
12      Q.  I'm sorry.  I'm trying to find out
13  exactly what her violation was.
14      A.  I don't -- it was a dress code
15  violation.  It was a short skirt or a low top.  I
16  do not know.
17      Q.  Did she say anything about that back to
18  you?
19      A.  I don't recall.
20      Q.  What is the normal sanction for the
21  first dress code violation?
22      A.  Normal sanction is for the student to
23  call home and the parent brings in another pair of
24  clothes.

Page 15

1      Q.  And was that sanction given to Jill in
2  the first violation?
3      A.  Yes.
4      Q.  And what about the second one?
5      A.  The second one, the same thing, except
6  a detention is then attached.
7      Q.  And detention is after school?
8      A.  Yes.
9      Q.  How long is it?
10      A.  An hour and a half.
11      Q.  Was that Jill's sanction, an hour and a
12  half after school?
13      A.  Yes.
14      Q.  Did she saying anything to you after
15  the second discipline, complaining about, this
16  isn't fair, I wore this all the time last year and
17  no one complained, anything like that?
18      A.  I do not recall.
19      Q.  Are students given an opportunity to
20  sort of stand up for themselves if they think
21  they're being disciplined unfairly?
22      A.  Yes.
23      Q.  What are they given an opportunity to
24  do?

Page 16

1      A.  They're given an opportunity to plead
2  their case.
3      Q.  Is it just verbally?
4      A.  No.  There's a formal process in
5  writing.  It's never occurred to me, but there is a
6  process in the handbook, I believe.
7      Q.  That they can appeal to a Disciplinary
8  Board?
9      A.  Not a Disciplinary Board.  The appeal
10  would be to me first and then, if they weren't
11  satisfy with that, it would be to the
12  Superintendent and, if they weren't satisfied with
13  that, then it would be to the School Board.
14      Q.  So there's no sense of going to you,
15  you gave them the discipline?
16      A.  Yeah.  At the time I was acting as both
17  Assistant Principal and as Principal.
18      Q.  So if she was concerned about whether
19  she was being treated fairly, she had the appeal
20  process in the student handbook to use; she could
21  go to the Superintendent and complain and then she
22  could go above the Superintendent?
23      A.  Well, if she was of knowledge of that,
24  yes.

Page 17

1      Q.  And you said that no one has ever done
2  that, to your knowledge?
3      A.  Regarding dress code?
4      Q.  Right.
5      A.  Yes.
6      Q.  How about other issues?
7      A.  One.
8      Q.  What was the other issue?
9      A.  Cheating.
10      Q.  What year was that?
11      A.  I believe that was three years ago.
12      Q.  Can you tell me, since you've been at
13  the school district entirely, do you remember every
14  other time that you've given a 10 day suspension?
15      A.  Every other time?
16      Q.  Yes.
17      A.  No, ma'am.
18      Q.  Can you give me a top five in your
19  memory, besides this one?
20      A.  No.  I cannot.
21      Q.  You can't remember any of them?
22      A.  I can remember others, but I can't give
23  you an exact number.
24      Q.  I'm not asking for a number.  Just give

Page 18

1  me some examples of when you remember 10 day
2  suspensions and what the student did?
3      A.  What the infraction was?
4      Q.  Yes.
5      A.  Knife --
6      Q.  Knives or knife?
7      A.  Knife, razor blade, alcohol.
8      Q.  This was alcohol, knives and razor
9  blades in the school?
10     A.  Yes.
11     Q.  Keep going.
12     A.  Marijuana.
13     Q.  In school?
14     A.  Yes. I don't have any others.
15     Q.  Were these all in the last four or five
16 years?
17     A.  No. I'm only recalling from the time
18 that I started as Dean of Students.
19     Q.  And does the school system track
20 discipline in any way to see whether you're getting
21 an abnormal number of marijuana disciplines or -- I
22 mean, is there some tracking down of the discipline
23 here?
24     A.  Throughout the district or just in the

Page 19

1  middle school?
2      Q.  Either one.
3      A.  I can't answer throughout the district.
4  I can answer in the middle school. The Assistant
5  Principal kept a monthly report on the infractions
6  of students.
7      Q.  Does he ever -- first of all, is it a
8  man or a woman?
9      A.  He's a man.
10     Q.  Does he ever compile or keep track,
11 like, gee whiz, our marijuana convictions are going
12 down or anything like that?
13     A.  No.
14     Q.  Have you had any problems, other than
15 the case we're here about today, with student use
16 of the Internet?
17     A.  In school or out of school?
18     Q.  Either one.
19     A.  Out of school, yes.
20     Q.  What were the out of school uses that
21 were issues?
22     A.  Parents would call occasionally
23 regarding things going on, instant messaging
24 through MySpace, and our policy has been if it's

Page 20

1  brought into the school, we will handle it, but if
2  it's done at home, we recommend that they contact
3  the local authorities.
4      Q.  So parents would call and say the other
5  kids are being mean to my kid on MySpace?
6      A.  If it's brought into school, we will
7  deal with it.
8      Q.  What do you mean brought into school;
9  printed on a printout?
10     A.  A printed printout, yes.
11     Q.  How many occasions have you had --
12 let's focus on the people are being mean to my kid
13 on MySpace and You-Tube. How often does that come
14 up?
15     A.  Weekly.
16     Q.  Have there ever been any situations
17 where the material was brought into the school and
18 you've acted?
19     A.  No.
20     Q.  You hesitated there. Is there
21 something close to it.
22     A.  There is something close to it. A
23 student had written curse words on there and he had
24 a copy of it in school. It was not directed

Page 21

1  towards any person or anybody.
2      Q.  Just a bunch of swear words?
3      A.  Yes.
4      Q.  Was he disciplined?
5      A.  Yes.
6      Q.  What happened to him?
7      A.  I do not recall.
8      Q.  And what kind of swear words were on
9  it?
10     A.  I was not in the role of an Assistant
11 Principal at the time.
12     Q.  Was this prior to the time when you
13 were a Guidance Counselor?
14     A.  When I was a Guidance Counselor.
15     Q.  Anything else that you can think of
16 where this sort of thing has been brought into the
17 school and the school has acted?
18     A.  No.
19     Q.  Have you ever heard of any stories of
20 similar situations from the high school or your
21 other schools in the district, dealing with older
22 children?
23     A.  Nothing specific.
24     Q.  You just heard general talk that this

6 (Pages 18 to 21)

1 may be a problem for this generation?

2     A. Yes.

3     Q. How about this cheater; was this

4 cheater ultimately convicted?

5     A. Yes, he was.

6     Q. And what happened to him?

7     A. He received Saturday detention, a

8 Wednesday detention and was removed from Student

9 Counsel.

10     Q. And what was the nature of the

11 cheating?

12     A. Copying.

13     Q. During a test?

14     A. Yeah.

15     Q. And what about the people who brought

16 weapons, like, knives or razor blades, to school,

17 can you remember what their discipline was?

18     A. Ten days out-of-school suspension.

19     Q. Anything else?

20     A. And loss of dance privileges, in

21 addition to a police report.

22     Q. So the school reported them to the

23 police?

24     A. Yes. We file what's called an incident

1 report.

2     Q. Now, did they threaten people with the

3 knives and the razor blades or did they just have

4 them?

5     A. Just had them. There's been no threats

6 in my 10 years as the Principal and Assistant

7 Principal.

8     Q. Okay. Did the police take any juvenile

9 action against those children?

10     A. They filed a petition with the Juvenile

11 Court, but, in every case thus far, it was the

12 child's first offense, and one child, I know,

13 received probation.

14     Q. How about the person with alcohol, tell

15 me what happened there.

16     A. This was actually last year. The

17 student brought in VitaWater and they're not

18 allowed to bring containers in the building. He

19 did not have alcohol on his breath, but somebody

20 had informed us that it was in his locker. I asked

21 the child to open the locker, open the contents,

22 smelled it, I had a Guidance Counselor present at

23 the time, and there was definitely traces of

24 alcohol in that, the smell of alcohol.

1     Q. And what happened with that child?

2     A. That child received 10 day

3 out-of-school suspension, was not allowed to attend

4 further dances and was referred to a County agency

5 for alcohol.

6     Q. And how about the child with marijuana?

7     A. The same thing --

8     Q. Referred for drug and alcohol

9 treatment?

10     A. Yeah; through our student systems

11 program.

12     Q. When you make that kind of referral, do

13 they have to come back to school with a certificate

14 that they completed the program?

15     A. No. They do not. We offer it to the

16 parents. It is up to the parents to follow-up.

17     Q. Now, there was one other student

18 involved in the MySpace incident; is that right?

19     A. Yes.

20     MS. KOHART: And can we use her name

21 here?

22     MS. ROPER: Yes. We'll redact it.

23     Q. How about Kristina, any discipline

24 problems with her that you recall, prior to the

1 MySpace?

2     A. I believe she did have one dress code

3 violation.

4     Q. Do you remember the nature of it?

5     A. No. I do not. Again, I was not the

6 person who sent her down.

7     Q. What was her discipline as a result of

8 the MySpace?

9     A. Ten days out-of-school suspension and

10 no school dances for the remainder of the year.

11     Q. Was Jill allowed to go on the end of

12 the year field trip to Washington?

13     A. To my knowledge, no.

14     Q. And what is the basis of your

15 knowledge?

16     A. That I was told that she didn't go.

17     Q. By whom?

18     A. Well, it came up during the Court

19 proceeding and it also was said upstairs.

20     Q. Would you have had authority to prevent

21 her from going?

22     A. Absolutely not.

23     Q. That was entirely up to the teacher?

24     A. Entirely up to the teacher.

1   Q.  And is that a written policy or is that
2   just your practice?
3       A.  That I do not know. I'm sorry. Can
4   you clarify the question? Is it their written
5   policy or my written policy?
6       Q.  Is there a written policy about who
7   gets to pick the kids to go on field trips?
8       A.  That I don't know.
9       Q.  But in your practice, only the teachers
10  decide that?
11      A.  Yes.
12      Q.  If the teacher had wanted somebody on a
13  10 day suspension to come on a field trip, they
14  could do that?
15      A.  Yes. Can you clarify that, please? A
16  field trip versus the Washington trip.
17      Q.  The Washington trip.
18      A.  A field trip is different. That's a
19  school function. We don't have field trips in the
20  middle school. So it's not really an issue.
21      Q.  So there are no field trips here
22  essentially?
23      A.  Not for 8th grade.
24      Q.  Any other grade?

1       A.  The 6th grade.
2       Q.  Can a teacher bring a child on a field
3   trip in the 6th grade even if that child is on
4   suspension?
5       A.  It never occurred.
6       Q.  Can they? If you don't know the
7   answer, that's fine.
8       A.  I don't know the answer and it would be
9   very difficult for a child to get a 10 day
10  out-of-school suspension the second week of school,
11  when that trip is.
12      Q.  What trip is that?
13      A.  It's to Hawk Mountain.
14      Q.  Let's pretend it happened.
15      A.  Okay.
16      Q.  Who gets to decide if the kid gets to
17  go on the field trip?
18      A.  That would be me.
19      Q.  And that's in the 6th grade?
20      A.  Yes.
21      Q.  But by the time of 8th grade, you lose
22  that authority?
23      A.  No. There's no field trip.
24      Q.  How do you distinguish between a field

1   trip and the trip to Washington; one is overnight?
2       A.  One is during the school day and one is
3   on the weekend.
4       Q.  Which one is on the weekend?
5       A.  The Washington trip.
6       Q.  So it is a school function?
7       A.  No.
8       Q.  What is it?
9       A.  It's a class trip.
10      Q.  So in other words, the school takes no
11  responsibility for the trip whatsoever?
12      A.  None.
13      Q.  Who chaperones the children?
14      A.  Parents and teachers.
15      Q.  Who arranges the trip?
16      A.  Teachers.
17      Q.  Do they do it while they're on the
18  clock at the school?
19      A.  Not during school hours.
20      Q.  So it's not part of their job to do
21  that?
22      A.  That's correct.
23      Q.  They just do it on their own?
24      A.  Correct.

1       Q.  How many years has that gone on?
2       A.  I don't have any idea to that
3   question -- before I got here.
4       Q.  Is it an expectation of the parents
5   whose children are here that there will be an 8th
6   grade trip?
7           MR. RIBA:  Objection.
8       A.  I can't answer for the parents.
9       Q.  Did the parents ever talk to you about
10  it, when they're at parent teacher night, as if
11  it's a standard thing that they expect to see their
12  child enjoy?
13      A.  No.
14      Q.  All Right. Are there any written
15  documents relating to that trip that you've ever
16  seen?
17      A.  No.
18      Q.  Does the school get permission forms
19  from the parents?
20      A.  Does the school?
21      Q.  Yes.
22      A.  No.
23      Q.  Who gets the permission forms?
24      A.  I don't know if there are permission

1 forms.

2 Q. Really. Your teachers just take

3 children without their parent's permission forms to

4 Washington D-C?

5 A. It's not a school sponsored trip.

6 Q. Are buses used?

7 A. Yes.

8 Q. Whose buses?

9 A. I have no idea.

10 Q. They don't arrange them through the

11 school district?

12 A. No.

13 Q. Where do they go?

14 A. Where do they go when?

15 Q. When they go to Washington.

16 A. Friday night they go to the Lincoln

17 Memorial, they go to the Vietnam Memorial and then

18 they go back to the hotel. They are given half an

19 hour before bed and they are then put into the

20 room, a piece of tape is place on the outside of

21 the room so nobody can leave the room until the

22 next morning. There's also a security person in

23 the hallway.

24 Q. Who's the security person?

1 A. A hired contractor.

2 Q. And who arranges for that person?

3 A. The teachers.

4 Q. And who decides that the children

5 should be kept in their room with tape?

6 A. Well, it's not that they can't get out.

7 It's a piece of masking tape. If it breaks, we

8 know they've escaped.

9 Q. But that's something that you and a

10 teacher would decide is appropriate?

11 MR. RIBA: Objection. He said he

12 doesn't have any role in this.

13 Q. Who decides that that ought to be on

14 the rooms?

15 MR. RIBA: Objection. He has no

16 knowledge. Go ahead. You can answer.

17 Q. Do you know?

18 A. No.

19 Q. But you know it's done, right?

20 A. I know it had been done. I don't know

21 if it's still done.

22 Q. Who told you it had been done?

23 A. I had been on the 8th grade trip.

24 Q. Who usually takes the kids?

1 A. Takes the kids where?

2 Q. Who takes the kids to Washington, which

3 teacher; is it the history teacher?

4 A. It varies from year to year.

5 Q. Is it a volunteer?

6 A. Yes.

7 Q. How are the volunteers solicited?

8 A. That I do not don't know.

9 Q. Who solicits the volunteers?

10 A. That I do not know.

11 Q. What day of the week did you learn

12 about this MySpace page?

13 A. Initially, it was Monday.

14 Q. At that point, you didn't know that

15 Jill and her buddy were involved?

16 A. No. I did not.

17 Q. When did you learn that Jill and her

18 friend were involved?

19 A. Wednesday.

20 Q. What time of the day?

21 A. In the morning.

22 Q. Who brought it to your attention?

23 A. A student.

24 Q. Which one?

1 MR. RIBA: You can say.

2 A. Brianna Schaffer.

3 Q. Tell me the circumstances in which

4 Brianna brought it to your attention.

5 A. Can you be more specific?

6 Q. Did she bring you a copy of it?

7 A. Yes.

8 Q. What time of day was this?

9 A. Morning.

10 Q. The first thing?

11 A. Yeah; eight, 8:15ish.

12 Q. This was Wednesday?

13 A. Yes.

14 Q. And what did she say to you?

15 A. Initially or on Wednesday?

16 Q. On Wednesday?

17 A. She gave me the copy.

18 Q. Did you ask her to bring it in?

19 A. Did I ask her to bring what in?

20 Q. The copy of the MySpace page.

21 A. Yes.

22 Q. What day did you ask her to do that;

23 what day did you make the request, bring me a copy

24 of the MySpace page?

1    A.  It was Tuesday.

2    Q.  What time on Tuesday; do you remember?

3    A.  She said -- let me just recall -- late

4  in the day.

5    Q.  And what time does school end around

6  here?

7    A.  2-51.

8    Q.  Do you remember whether it was an

9  after-school situation?

10    A.  No.  It was during the school day.  It

11  was in the hallway.

12    Q.  Tell me what she told you on Tuesday,

13  Brianna.

14    A.  On Tuesday she came down first thing in

15  the morning, her and two other girls, came to

16  report a bus incident, and Brianna had told me that

17  there was something else that she needed to talk to

18  me about and I said, what's that.  She said,

19  there's a MySpace account about you and it's not

20  real nice.  I said, well, that's a tough thing.

21  Anybody can create a MySpace account about anybody.

22  All they need is to make up a password.  I said,

23  there's not too much I can do about that.  She

24  said, Mr. McGonigle, you don't understand.  There's

1  some really, really bad things in there.  So I

2  said, well, if you can, if you can find out who did

3  it, I would appreciate it.

4    Q.  So you asked her that before you saw

5  the MySpace page?

6    A.  Yes.

7    Q.  So you asked her to find out who did

8  it?

9    A.  Yes.

10    Q.  In that conversation, did she indicate

11  to you she already knew who did it?

12    A.  No.  She did not.

13    Q.  Did she tell you what she was going to

14  do to conduct this investigation for you?

15    A.  No, she didn't.

16    Q.  Did you make any effort to go on

17  MySpace and find the page that was concerning

18  Brianna?

19    A.  Yes, I did.

20    Q.  What did you do?

21    A.  I typed my name in and nothing came up.

22  I then contacted MySpace on the 20th and I asked

23  them to pull it up and they told me I could not

24  unless I had the U-R-L number and then that was

1  it.

2    Q.  Now, let me make sure I understand.

3  You called MySpace on the 20th, sometime after,

4  probably, 2:15 in the afternoon?

5    A.  No.  It have would been in the morning.

6    Q.  I thought you said that Brianna told

7  you about sometime at the end of the school day on

8  Tuesday the 20th?

9    A.  No.  I told you, I said at the

10  beginning of the day they came down about a bus

11  incident.  That's when she told me --

12    Q.  But I thought --

13    MR. RIBA:  Would you let him finish his

14    answer before you interrupt him?

15    Q.  I'm still on the Tuesday.  You did not

16  call MySpace on Tuesday, right?

17    A.  Yes.  I did call MySpace on Tuesday.

18    Q.  Is Tuesday the day Brianna brought you

19  the copy in?

20    A.  No.

21    Q.  So on Tuesday, after Brianna said, it's

22  really bad Mr. McGonigle and you sent her off to

23  investigate who did it --

24    A.  I wouldn't say I sent her off to

1  investigate.  I just asked her if she could find

2  out who did it, I would appreciate it.

3    Q.  On the 20th you called MySpace?

4    A.  That's correct.

5    Q.  As well as ran your name to see if

6  anything came up that way?

7    A.  That's correct.

8    Q.  You called MySpace on the 20th and they

9  told you that you could not -- what did they tell

10  you?

11    A.  They told me I could not access it

12  unless I had the U-R-L number.

13    Q.  Did you talk to them about how you can

14  search for it?

15    A.  No.

16    Q.  But even if you knew what to search

17  for, you couldn't get on that page without the

18  U-R-L?

19    A.  That was my understanding, yes.

20    Q.  And what is your understanding of what

21  is a U-R-L?

22    A.  I had no idea.  I had to ask.

23    Q.  Who do you ask?

24    A.  One of the Guidance Counselors.

Page 38

1  Q. And what did you learn?
2  A. I learned that it was a code to get you
3  in there.
4  Q. To get into MySpace?
5  A. To get you into a certain page, yes.
6  Q. And which Guidance Counselor did you
7  ask?
8  A. My wife.
9  Q. That's what I figured. So you weren't
10  able to go any farther on the search?
11  A. No.
12  Q. How long did you spend looking on
13  MySpace?
14  A. Ten minutes.
15  Q. Were you on a school computer?
16  A. Yes.
17  Q. In your office?
18  A. Yes.
19  Q. Any other conversations with anybody on
20  the 20th about this MySpace page?
21  A. No.
22  Q. Did you hear about it from any other
23  students on the 20th?
24  A. On the 20th, no, I did not.

Page 39

1  Q. How about from teachers?
2  A. On the 20th, yes.
3  Q. What did you hear from teachers about
4  it?
5  A. I heard -- two teachers approached me
6  and said, the kids are talking about there being a
7  MySpace account about you. One teacher approached
8  me during lunch and the other teacher approached me
9  at the end of the day, 9th period.
10  Q. So the second teacher -- give me the
11  names of the teachers first.
12  A. The first teacher was Mrs. Werner.
13  Q. Do you guys call each other Mr. and
14  Mrs.?
15  A. Only around here.
16  Q. Do you know the first name?
17  A. Angela.
18  Q. Is she still here?
19  A. Yes, she is.
20  Q. What does she teach?
21  A. She teaches skills for adolescents and
22  writing skills for adolescents and she is also a
23  students assistance coordinator.
24  Q. Okay. She approached you at lunch or

Page 40

1  at the end of the day?
2  A. She approached me during my lunch.
3  Q. Did she indicated the details of what
4  the students were saying?
5  A. I can't recall. She had said, what I
6  do recall her saying exactly is, kids are talking
7  about a MySpace account about you. Are you aware
8  of it? I said, I am aware of it and I'm looking
9  into it. That was the extent of it.
10  Q. This was lunch on the 20th?
11  A. Yes.
12  Q. I thought you told me that Brianna
13  didn't tell you about -- I'm sorry.
14  Who told you after school?
15  A. It wasn't after school. It was during
16  9th period. Mr. Andy Nunemacher.
17  Q. And what does he teach?
18  A. He teaches math.
19  Q. What did he say to you?
20  A. He said the kids, during his 8th period
21  class, I believe, I strike that, it was during one
22  of his afternoon classes, that the kids were
23  talking about it and he had to redirect them during
24  class time.

Page 41

1  Q. And what were they saying?
2  A. About the MySpace account. Specific
3  things, I do not know.
4  Q. Is Mr. Nunemacher still here?
5  A. Yes.
6  Q. Now, did either Ms. Werner or
7  Mr. Nunemacher tell you the names of the students
8  that they heard talking about the MySpace page?
9  A. Yes.
10  Q. Who did Ms. Werner identify?
11  A. I do not recall.
12  Q. How about Mr. Nunemacher?
13  A. I do not recall.
14  Q. Did either of them indicate that the
15  students they heard talking were the students
16  involved in the creation of the MySpace page?
17  A. At that point in time, nobody knew who
18  it was.
19  Q. Even these students that were talking?
20  A. He had no indication -- no names ever
21  came to me from a teacher.
22  Q. Now, when you learned about this during
23  your lunch on the 20th, did you, at that time, try
24  to find anything out on MySpace?

11 (Pages 38 to 41)

Page 42

1    A.  No, because I was teaching in 10
2  minutes.
3    Q.  And how about at 9th period, at that
4  point.
5    A.  No.  I was just walking in the halls.
6  I was doing double duty at that time.
7    Q.  Double duty as what?
8    A.  The Assistant Principal and Principal.
9    Q.  And then Brianna comes to you --
10    A.  In the hallway.
11    Q.  Is she actually in the hallway?
12    A.  Yes.
13    Q.  In front of other people?
14    A.  No.
15    Q.  Did she speak in a low voice?
16    A.  Yes.
17    Q.  And she goes, I want to tell you about
18  this bad MySpace page?
19    A.  No, no.  That's not what she said.
20    Q.  Was there any other topic of
21  conversation between the two of you or just the
22  MySpace?
23    A.  Which time?
24    Q.  In the hallway on the 20th.

Page 43

1    A.  The word MySpace wasn't even mentioned.
2    Q.  In the hallway.
3    A.  It wasn't mentioned.  She just told me
4  the child's name.
5    Q.  So this is on the 20th?
6    A.  This is on the 20th.
7    Q.  She conducted her investigation?
8    MR. RIBA:  Objection.  He never said
9    investigation.  You keep saying that.  He
10    never asked her to investigate.
11    Q.  She had come back to you after your
12  conversation in the morning with the names of the
13  students?
14    A.  We just happened to be passing each
15  other.  She was on her way down to my office and we
16  happened to be passing by the music room at the
17  same time.
18    Q.  And she gave you the name of?
19    A.  Jill Snyder.
20    Q.  No other name?
21    A.  No other name.
22    Q.  Did she tell you how she got that name?
23    A.  She did not.
24    Q.  So after you had the name Jill Snyder,

Page 44

1  what did you do?
2    A.  What did I do then?
3    Q.  Right.
4    A.  I didn't do anything.  I was waiting
5  until the end of the day or near the end of the
6  day.  I wanted to look into it a little bit more
7  and then, the next morning, I would talk to my
8  Superintendent regarding the seriousness of the
9  incident and then, on the 21st, I would have
10  brought Jill in to question her.
11    Q.  So we're now on the 20th, Tuesday the
12  20th?
13    A.  No.  I just moved to the 21st.
14    Q.  I want you to stick on the 20th and
15  then we'll go to the 21st.
16    Still on the 20th, you have Jill's
17  name?
18    A.  Correct.
19    Q.  At the end of the school day?
20    A.  Correct.
21    Q.  And you don't go back to MySpace and
22  try to, again, search for the entry?
23    A.  No, because I still don't have the
24  U-R-L number.

Page 45

1    Q.  But you did talk to the Superintendent?
2    A.  No.  I did not.
3    Q.  Not until the next day.  Did you talk
4  to anybody else after you had Jill's name?
5    A.  My wife.
6    Q.  Anybody else?
7    A.  No.
8    Q.  Did you speak to your wife in her
9  capacity as your wife or in her capacity as the
10  school Guidance Counselor?
11    A.  In her capacity as my wife.
12    Q.  Was it at home or at school?
13    A.  At home.
14    Q.  Did you call Jill's home that evening?
15    A.  No.
16    Q.  Do you have the phone numbers -- is
17  there a booklet with everyone's phone number in it
18  for all of your students?
19    A.  No.
20    Q.  And then, the next morning, you didn't
21  talk to the Superintendent on Tuesday?
22    A.  No.  I had to pick up my son.
23    Q.  The next morning, what time does school
24  start?

12 (Pages 42 to 45)

Page 46

1    A.  The first bell or what time are we
2 required to be here?
3    Q.  What time do you have to get here?
4    A.  7-30, 7-45.
5    Q.  What time do the kids get here?
6    A.  Right around 7:30.
7    Q.  Tell me what happened with regard to
8 the MySpace page first thing in the morning, if
9 anything, before lunch.
10    A.  A hard copy was given to me on the
11 21st.
12    Q.  By whom?
13    A.  Brianna.
14    Q.  She brought it in from home?
15    A.  That I don't know.
16    Q.  And did you ask her where she got it
17 from?
18    A.  No. I did not.
19    Q.  Do you know whether she showed it to
20 anybody before she gave it to you?
21    A.  I do not know.
22    Q.  Was anyone with Brianna?
23    A.  No.
24    Q.  And then what happened?

Page 47

1    A.  I read it. I had the name of the
2 person. I went to go question Jill, however, she
3 was absent that day.
4    Q.  Did you call her home?
5    A.  No. I did not.
6    Q.  Did you call her mother?
7    A.  No. I did not. I didn't have any
8 evidence, at that point in time, that it was her,
9 except for her name.
10    Q.  And except that Brianna told you?
11    A.  That's it. That's all I had.
12    Q.  And do you know why she was absent that
13 day?
14    A.  No.
15    Q.  Parents don't have to call the school
16 and say if their kid is sick or anything?
17    A.  Some do and some don't, if not, we
18 follow-up.
19    Q.  Did anyone follow-up with Jill?
20    A.  That day, believe it or not, the lady
21 that follows up was not here.
22    Q.  So Jill was absent?
23    A.  Yes.
24    Q.  Did you have any further conversations

Page 48

1 with Brianna about the MySpace page on Wednesday
2 the 21st?
3    A.  No. I did not.
4    Q.  How about with anybody else at the
5 school?
6    A.  Dr. Romberger and Susan Snyder Morgan.
7    Q.  What's Dr. Romberger's first name?
8    A.  Joyce.
9    Q.  And Susan Snyder Morgan?
10    A.  Yes.
11    Q.  And what time of day did you have
12 conversations with Ms. Morgan?
13    A.  It was together. It was,
14 approximately, 8:30.
15    Q.  What are their jobs, by the way?
16    A.  Dr. Romberger is Superintendent and
17 Susan Snyder Morgan is Director of Technology.
18    Q.  Where is Dr. Romberger's office in
19 relationship to your's?
20    A.  It's downstairs.
21    Q.  So the middle school is here and she's
22 right here in the district office?
23    A.  Yes.
24    Q.  And how about the Director of

Page 49

1 Technology, where is her office?
2    A.  Right up the hall from Dr. Romberger.
3    Q.  Did you ask them to come to your office
4 so you could talk to them together?
5    A.  No, I didn't. I tried to call Dr.
6 Romberger and she wasn't there. So I came
7 downstairs because she's not always in her office.
8    Q.  Did you have them summon the Director
9 of Technology to join you?
10    A.  No. They were together.
11    Q.  Did you intend to communicate this
12 information to both of them together or was it just
13 that they were both together?
14    A.  I would have talked to them both, but
15 it just so happened that they were together.
16    Q.  Tell me what you told them.
17    A.  I didn't tell them anything. I said, I
18 have something I have to show you and I let them
19 read it.
20    Q.  And what did they say?
21    A.  They were shocked, appalled and wanted
22 to know where it came from. I said, at the time, I
23 have one name, but I need to investigate it
24 further.

Page 50

1  Q. So they only said, where did it come
2  from?
3  A. To my knowledge, that's the only thing
4  I remember.
5  Q. Did anybody comment on the photograph
6  at that time?
7  A. I don't recall.
8  Q. Did the Director of Technology talk to
9  you at all about how MySpace works?
10  A. I didn't ask.
11  Q. What else did you do on Wednesday to
12  investigate?
13  A. I contacted MySpace and I told them I
14  had the U-R-L number and would there be any way
15  that you could tell me what computer it came from,
16  and their response to me was, not without a Court
17  Order.
18  Q. Does the U-R-L number appear on the
19  printout?
20  A. Somewhere on there.
21  Q. I'm going to show you, I have two
22  copies of it. I'm going to show you Plaintiffs'
23  Exhibit 3 and this is Defendants' Exhibit 1.
24  Can you show me where you found it --

Page 51

1  it may not even be on that one. I don't know.
2  MR. RIBA: Are you looking for the
3  U-R-L?
4  MS. KOHART: Yes.
5  MR. RIBA: Do you see it on there?
6  BY MS. KOHART:
7  A. There it is.
8  Q. It's underneath the block underneath
9  your picture?
10  A. Yes.
11  Q. And you gave that U-R-L number to
12  MySpace?
13  A. No. I didn't give it to them. I told
14  them I had the U-R-L, would that be enough for me
15  to find out whose computer it was from and they
16  said, no, that I would need a Court Order.
17  Q. Okay. Do you know who you spoke to
18  there?
19  A. No. It was a woman.
20  Q. You don't remember her name?
21  A. I don't want to guess.
22  Q. Did you ask them to take the entry
23  down?
24  A. No.

Page 52

1  Q. Did you have any other conversation
2  with them at all?
3  A. No.
4  Q. Did you tell them you were a school
5  Principal and this was something you didn't
6  consider very funny?
7  A. No.
8  Q. Did you show it to your wife?
9  A. Yes.
10  Q. Let's stick with Wednesday. Who else
11  did you show it to on Wednesday?
12  A. The other Guidance Counselor.
13  Q. Who is the other Guidance Counselor?
14  A. Mrs. Guers, Michelle Guers.
15  Q. Did you show it to your wife in her
16  capacity as the Guidance Counselor or in the
17  capacity as your wife?
18  A. Sometimes it's hard to separate the
19  two.
20  Q. Sure. So you showed it to her while
21  she was working at the school?
22  A. Yes.
23  Q. What name does your wife use in her
24  job?

Page 53

1  A. Frain, F-R-A-I-N.
2  Q. Do you remember the time of day you
3  showed it Mrs. Guers?
4  A. I showed it to them together.
5  Q. Do you know the time of day?
6  A. I believe about 8-15, 8-20, right
7  before I came down the stairs.
8  Q. And did they have anything to say about
9  this?
10  A. They wanted to know who it was from and
11  I said, I only have one name at this point, but I
12  can't prove anything.
13  Q. Did you tell the name to them?
14  A. Yes.
15  Q. You told them Jill's name?
16  A. Yes.
17  Q. By the way, when you spoke to Dr.
18  Romberger and to the Director of Technology, did
19  you give them Jill's name too?
20  A. Yes. You're jumping around on me.
21  Q. I'm sorry. Forgive me.
22  So you gave them Jill's name. Did they
23  say anything else about the MySpace page?
24  A. No.

**Page 54**

1    Q. By the way, this exhibit I just showed
2 you, which is marked as Plaintiff's Exhibit 3, is
3 this exactly what Brianna brought into school for
4 you?
5    A. No.
6    Q. Where is that document?
7    A. It's in my file.
8    MS. KOHART: We make a request for
9 that. Maybe it's the same, maybe it's not.
10    MR. RIBA: Okay.
11 BY MS. KOHART:
12    Q. Did she print it out in color?
13    A. Yes.
14    Q. From her home computer?
15    A. Again, I don't know.
16    Q. Once you had the U-R-L, did you, again,
17 access MySpace?
18    A. Yes.
19    Q. On the computer?
20    A. Yes.
21    Q. A school computer?
22    A. Yes.
23    Q. And I assume your computers in your
24 office don't have any shields on them?

**Page 55**

1    A. That's correct.
2    Q. And were you able to find this on
3 MySpace?
4    A. Yes.
5    Q. So it popped up on your screen and you
6 looked at it?
7    A. Yes.
8    Q. Did you click on any links while you
9 had it in front of you?
10    A. No.
11    Q. Did it contain any clues as to who
12 might be the creator?
13    A. No, ma'am.
14    Q. So you showed it to Ms. Guers and
15 Ms. Frain. Did you have any other conversations
16 with them – did you have any conversations with
17 them about what they thought regarding the contents
18 of the MySpace page?
19    A. No.
20    Q. Did any of them laugh?
21    A. No.
22    Q. Crack a smile, nothing?
23    A. No.
24    Q. Did they offer you any advice as to how

**Page 56**

1 to prove who was responsible?
2    A. No.
3    Q. Who else did you show this to during
4 Wednesday the 21st?
5    A. That would have been it.
6    Q. At that point, did you call Jill's
7 home?
8    A. No.
9    Q. You didn't call her parents at work or
10 anything like that?
11    A. No.
12    Q. Did you talk to any of the teachers at
13 the school about, anything about Jill or about the
14 MySpace page?
15    A. No.
16    Q. Did you speak again to Brianna?
17    A. No.
18    Q. Have you ever asked Brianna how she
19 went about finding out who was the culprit behind
20 this MySpace page?
21    A. No.
22    Q. Do you know whether anyone else has?
23    A. No.
24    Q. Was Brianna friendly with Jill?

**Page 57**

1    A. That I don't know.
2    Q. What grade was Brianna in?
3    A. Eighth.
4    Q. By the way, when Brianna first came to
5 you on Tuesday morning, what was the bus incident
6 she was worried about?
7    A. That her and another girl weren't
8 getting along.
9    Q. On the bus?
10    A. Yes.
11    Q. Who was the other girl?
12    A. I do not know.
13    Q. Was there any investigation or
14 discipline as a result of this bus incident?
15    A. Their seats were separated.
16    Q. So people have assigned seats on the
17 bus?
18    A. No. Each bus driver runs it
19 differently. Some have assigned seats and some
20 don't.
21    Q. And was that a resolution that you were
22 able to accomplish on the 20th?
23    A. No. They had a different dismissal in
24 the afternoon. So I actually referred it down to

1   the Director of Transportation to take care of it
2   the following day.
3       Q.  So it was really just an incident that
4   Brianna had while travelling in the morning?
5       A.  Yes.
6       Q.  How did Jill get to school?
7       A.  I don't know.
8       Q.  Now, when you were shown this
9   MySpace — when you saw this MySpace page on
10  the 21st, did you start to formulate, in your mind,
11  what you thought might be the appropriate response?
12      A.  Clarify response.
13      Q.  In the event that you were able to
14  prove that Jill had done this, did you decide what
15  you thought might be the appropriate discipline as
16  the consequence of a student participating in the
17  creation of this page?
18      A.  Yes.
19      Q.  And that was on the 21st?
20      A.  Correct.
21      Q.  Tell me your thought process.
22      A.  It's a level four infraction of our
23  school discipline code.
24      Q.  Because?

1       A.  Because that's the way the policy is.
2   We have levels one through four.
3       Q.  I understand, but why is it a level
4   four; why is it the same as a knife in school?
5   What is in a level four that makes the MySpace
6   page —
7       A.  Making false accusations against the
8   staff.
9       Q.  And you think that these are
10  accusations?
11      A.  Absolutely.
12      Q.  What are the accusations in here?
13      A.  May I see a copy?
14      Q.  Sure.
15      A.  I have come to MySpace so I can pervert
16  the minds of other Principals to be just like me.
17      Q.  You interpret that as --
18      A.  I'm not finished.  That's an
19  accusation.  Those who want to be my friend and
20  aren't in my school, I love children, sex, dogs,
21  long walks on the beach, being a dick head and
22  last, but not least, my darling wife that looks
23  like a man -- actually, you can scratch that last
24  part.  And how about the part about having sex in

1   my office and hitting on parents.
2       Q.  And you think those are all
3   accusations, as opposed to false things that were
4   said about you that aren't true?
5       A.  They're false accusations.
6       Q.  In other words, they were accusing you
7   as opposed to saying things that were untrue about
8   you?
9       A.  No.  They weren't accusing me.  They
10  were pretending they were me.
11      Q.  Now, since you've been at the school,
12  have other students been given discipline for
13  making false accusations against other students or
14  staff?
15      A.  In my role as Assistant Principal or
16  Principal or in my role since I've been at the
17  school?
18      Q.  Let's start since you've been at the
19  school and then we'll chop it up between your
20  jobs.
21      A.  No.
22      Q.  Not once?
23      A.  Not to my knowledge.
24      Q.  Have you ever heard about students,

1   outside of school, accusing other students of
2   things that are not true?
3       A.  No.
4       Q.  Calling each other liars or stuff like
5   that?
6       A.  No.
7       Q.  How about saying things outside of
8   school about teachers that are not true, telling
9   their mom that they got a bad grade because the
10  teacher is a dick head or something?
11      A.  I'm sure it happens, but I don't live
12  in the area so I don't hear it.
13      Q.  No one has ever been disciplined for
14  telling their mom that?
15      A.  No.
16      Q.  But your understanding is that the
17  policy would allow you to give them a level four
18  sanction if they went home and falsely told their
19  parents that they got a D on a history exam because
20  their teacher is a creep?
21      MR. RIBA:  Objection.
22      Q.  Do you understand the policy to apply
23  to that?
24      MR. RIBA:  Objection.

1    **Q.  You can answer unless he tells you not**
2  **to.**
3    A.  Well -- would you repeat the question,
4  please?
5    **Q.  Sure.  Let's say Jill went home and**
6  **told her mother that she got a D on a math test**
7  **because her teacher is a dick head, would that**
8  **allow you to discipline her under level four?**
9    MR. RIBA:  Objection.
10    A.  No.
11    **Q.  Why not?**
12    A.  First, I would have to prove that.
13    **Q.  Well, suppose her mother videotaped it.**
14    A.  No.  It was off school grounds and it
15  was not brought into the school.  If it was brought
16  into the school by just the mother and you're
17  telling me just dick head, no.
18    **Q.  So if it was dick head and a bunch of**
19  **other things, then you could?**
20    A.  It depends on what the bunch of other
21  things are.
22    **Q.  But why wouldn't you be able to**
23  **discipline her for doing that; just because it was**
24  **only one bad word?**

1    A.  No.  It's not really a false
2  accusation.
3    **Q.  By the way, did anybody bring this**
4  **MySpace page into school, other than at your**
5  **request?**
6    A.  Not to my knowledge.
7    **Q.  So the only reason the page was in the**
8  **school was because you asked Brianna to bring it**
9  **in?**
10    A.  I had heard it was in the school, but I
11  had never seen it.
12    **Q.  I thought you told me that you heard**
13  **that people were talking about it?**
14    A.  Yes.  You asked me if they were talking
15  about it.
16    **Q.  And you also heard it physically was in**
17  **the school?**
18    A.  I heard it was physically in the
19  school, yes.
20    **Q.  Who told you that?**
21    A.  I just heard it.
22    **Q.  From?**
23    A.  Nobody specifically; no students
24  specifically.

1    **Q.  How about teachers?**
2    A.  Yes.  A teacher told me.
3    **Q.  And which teacher told you?**
4    A.  Mr. Nunemacher.
5    **Q.  Did he tell you he saw it on --**
6    A.  He just overheard kids talking about it
7  and the kids, I cannot give you who they were.
8    **Q.  Talking about having the piece of paper**
9  **or talking about the existence of the web page?**
10    A.  Talking about the existence.
11    **Q.  Maybe I'm not clear.  I want to know,**
12  **besides your request to Brianna to bring you a**
13  **copy, do you have any information that there was**
14  **another eight and a half by eleven piece of paper**
15  **like this in school with a copy of the MySpace**
16  **page?**
17    A.  I do not, no.
18    **Q.  And of course, other than your own**
19  **accessing it from your desk in school, you're not**
20  **aware of any other computer, owned by the school**
21  **district, that accessed this MySpace page?**
22    A.  No.
23    **Q.  Am I correct that the students cannot**
24  **get on MySpace from the school computer?**

1    A.  That's correct.
2    **Q.  Can they get on it from the high**
3  **school?**
4    A.  No.
5    **Q.  Let me make sure we're all finished up**
6  **with Wednesday.**
7    **So on Wednesday you concluded that this**
8  **merited a level four discipline?**
9    A.  Yes.
10    **Q.  And did you speak about that with**
11  **anybody?**
12    A.  The Superintendent.
13    **Q.  Anybody else?**
14    A.  No.
15    **Q.  Did anybody question whether level four**
16  **was the appropriate level of discipline, and this**
17  **is on Wednesday?**
18    A.  No.
19    **Q.  Did you look at the other disciplinary**
20  **levels to determine whether maybe one of those**
21  **other levels was more appropriate?**
22    A.  No.
23    **Q.  Just level four?**
24    A.  Yes.

Page 66

 1    Q.  By the way, has anyone brought into the
 2 school a MySpace page where one child has done
 3 something unkind to another child on MySpace?
 4    A.  Not to my knowledge.
 5    Q.  Now, I'm trying to figure out exactly
 6 why the extent to which level four can be used
 7 against a student who does something like this off
 8 school grounds.
 9       Is it your view that Jill could have
10 been disciplined if she stood up, let's say, at a
11 Philly's game and said these things about you over
12 a bullhorn?
13       MR. RIBA: Objection.
14    A.  No.
15    Q.  Why not if she did it at a Philly's
16 game?
17    A.  If she did it at a Philly's game?
18    Q.  Right.  Let's say she grabbed the
19 microphone and — I'm just trying to figure out why
20 MySpace makes -- do you think the school can
21 discipline her for doing that?
22    A.  Repeat the question.
23    Q.  Let's suppose she was at a Philly's
24 game and maybe other kids were there, maybe not,

Page 67

 1 and she said things like, hello children, I'm
 2 pretending to be -- and she did hold up your
 3 picture, but she didn't say your name, yes, I'm so
 4 wonderful, hairy, expressionless, sex addict, fag
 5 ass and all the other things that are on this
 6 MySpace, if she said these things about you in a
 7 public forum, like at a Philly's game, could the
 8 school discipline her under level four?
 9       MR. RIBA: Objection.
10    A.  You said pretending.  You didn't say
11 she actually said it.
12    Q.  Let's say she had your I-D from
13 Halloween and she said she was you.  If she did all
14 those things at a Philly game, could the school
15 discipline her?
16       MR. RIBA: Objection.
17    A.  Yes.
18    Q.  And how about if she said these things
19 in the middle of a public park in the middle of
20 Philadelphia, stood up on a soapbox and said these
21 things pretending to you, could the school
22 discipline her?
23       MR. RIBA: Objection.
24    A.  It depends who was there.

Page 68

 1    Q.  If nobody from the school was there,
 2 they could not discipline her?
 3    A.  If it got brought back into the school,
 4 yes.
 5    Q.  By how?
 6    A.  Word of mouth.
 7    Q.  Suppose the Philadelphia Inquirer
 8 covered it and people saw the newspaper at school,
 9 then the school could discipline her?
10       MR. RIBA: Objection.
11    A.  Yes.
12    Q.  So as long as nobody in the school
13 finds out about it, it's okay for her to do this;
14 it's really just you can't get caught, basically?
15       MR. RIBA: Objection.
16    Q.  Right?
17       MR. RIBA: Objection.
18    Q.  Right?
19       MR. RIBA: Objection.
20    A.  I'm confused by your --
21    Q.  Whenever there's an objection —
22    A.  I understand that part, but your
23 question --
24    Q.  Well, what I'm saying, in other words,

Page 69

 1 she is free to express her opinions about you, even
 2 pretend to be you, as long as nobody reports it
 3 back at school or comes in and talks about it in
 4 math class or anything like that?
 5    A.  Yes.
 6    Q.  And how about — are the children told
 7 that they need to be careful about expressing
 8 opinions regarding either each other or the staff
 9 outside the school?
10    A.  Yes.
11    Q.  And where are they told to be careful
12 about expressing their opinions?
13    A.  At the assembly the first day of school
14 every year.
15    Q.  And what do you tell them?
16    A.  Exactly, I can't tell you exactly what
17 I tell them.
18    Q.  You don't tell them the same thing
19 every year?
20    A.  No.
21    Q.  Do you remember what you told Jill on
22 the first day of school?
23    A.  No.
24    Q.  And what did you say to them about

18 (Pages 66 to 69)

1  that?

2      A.  It's not necessarily opinions.  It's

3  about being careful about what you say and where

4  you say it.  In other words, I'll use a specific

5  example, if you're going to say to somebody, I'm

6  going to kill you, you might get away with that a

7  hundred times, but on the 100th person, somebody

8  might report it and then you're going to be

9  disciplined for it.

10      Q.  How about saying something that --

11  telling them about being careful about expressing

12  their opinion about saying someone is a dick wad or

13  something like that, did you tell them that they

14  can be sanctioned for doing that off school

15  grounds?

16      A.  I don't use the word dick wad.

17      Q.  Well, another nasty word like that.  Do

18  you tell them that --

19      A.  I don't use any nasty words.

20      Q.  Did you talk to them about the sort of

21  opinions they should not express off school

22  grounds?

23      A.  No.

24      Q.  Do they have any costume dances at

1  school?

2      A.  No.

3      Q.  What year in middle school do they

4  learn about parody; do they do anything where they

5  talk about Shakespearian parody as a form of

6  literature?

7      A.  I don't know.

8      Q.  Did you ever try to access this MySpace

9  from your home computer?

10      A.  No.

11      Q.  Just in school?

12      A.  Yes.

13      Q.  How many times?

14      A.  Just that once.

15      Q.  I assume, Thursday, Jill was back at

16  school?

17      A.  Yes.

18      Q.  How did you get in touch with her when

19  she got back to school?

20      A.  I called her classroom and the teacher,

21  I said, I need to see Jill Snyder.

22      Q.  Was this her homeroom?

23      A.  It was the very beginning of first

24  period?

1      Q.  And am I correct that that was the day

2  that standardized testing was taking place in the

3  school?

4      A.  It was one of the days that makeup

5  standardized testing was taking place.

6      Q.  Was Jill doing standardized makeup

7  tests?

8      A.  No.  She was not.

9      Q.  What grades were doing standardized

10  makeup testing?

11      A.  All; 6th, 7th and 8th.

12      Q.  How many faculty were involved in

13  supervising the testing?

14      A.  One.

15      Q.  And who is that?

16      A.  Mrs. Guers.

17      Q.  Is that the person who had to bring

18  Jill to you?

19      A.  No.  Jill came down by herself.

20      Q.  Did she seem nervous when she came into

21  your office?

22      A.  Jill -- yes.

23      Q.  Was she dressed okay?

24      A.  Yes.

1      Q.  No violation on that day?

2      A.  No.

3      Q.  And why do you say that she seemed

4  nervous?

5      A.  I've been in this business a long time.

6  I can read facial expressions pretty well of

7  students.

8      Q.  Had you ever had to summon her to your

9  office before?

10      A.  No.

11      Q.  The other times she was sent down for

12  the dress code violations?

13      A.  Yes.

14      Q.  So she came in and you shut the door?

15      A.  No.

16      Q.  How is your office setup, can you

17  describe it for me physically; are there people

18  sitting, receptionists and stuff, outside the door?

19      A.  No.  They're way down the hallway.  I'm

20  at the far end of the hallway.

21      Q.  And you're by yourself, nobody walks

22  past a secretary to get into your office?

23      A.  No; not to get into -- no, no.

24      Q.  Was your door open or closed when she

James S. McGonigle

**Page 74**
1  go there?
2  A. I think I just said it was open.
3  Q. Okay. Sorry. So she walked in?
4  A. Yes.
5  Q. Were you sitting or standing?
6  A. Sitting behind my desk.
7  Q. And did you ask her to sit?
8  A. Yes.
9  Q. Where?
10 A. In front of me.
11 Q. Tell me what you said to her.
12 A. I said, do you have any idea why you're
13 here and her immediate response was, I didn't
14 create the MySpace account.
15 Q. What else was said?
16 A. Well, I also had somebody else present
17 in the room as well.
18 Q. Who was that?
19 A. Mrs. Michelle Guers.
20 Q. Oh, she wasn't doing the testing.
21 A. She had to be removed from the testing
22 because I didn't think it was a very good idea to
23 have my wife in on the situation. So then my wife
24 had to move over from her guidance duties to take

**Page 75**
1  on the standardized testing.
2  Q. So you had to juggle people around?
3  A. Yes.
4  Q. Why didn't you just wait until the end
5  of the school day to have this conversation with
6  Jill so you wouldn't have to inconvenience the
7  students or the faculty?
8  A. This was serious enough that it had to
9  be dealt with right away.
10 Q. So why didn't you call Jill's parents
11 and have her brought in to school a half hour
12 early?
13 A. There was no need to until I could
14 prove that it was her. I still only had her name.
15 I had no proof.
16 Q. So the need to prove it was her was
17 immediate?
18 A. I had to prove it was her or dismiss
19 her.
20 Q. So you juggled teachers around for the
21 testing?
22 A. Yes.
23 Q. Did you talk to your wife the night
24 before and say, tomorrow morning I want you to do

**Page 76**
1  the testing because I'm going to have Mrs. Guers --
2  A. No. I did not.
3  Q. Did you take any steps to ascertain
4  whether Jill would be back the next day?
5  A. No. I did not.
6  Q. How old was Jill?
7  A. I don't know, fourteen.
8  Q. Thirteen?
9  A. Thirteen or fourteen.
10 Q. How would you describe her personally,
11 in terms of a 13 year old?
12 A. Now or then?
13 Q. Then. She's not 13 anymore, right?
14 A. Right. A good student, not a
15 discipline problem.
16 Q. How about personally, was she, like, a
17 tough street-wise kid or just a regular kid in the
18 area; how would you describe her?
19 A. Define tough street-wise for me.
20 Q. She was never one of those kids with
21 the knives; was she?
22 A. No.
23 Q. She was not somebody known to be
24 running around saying swear words?

**Page 77**
1  A. Not to my knowledge.
2  Q. Any incidents where she picked on other
3  children?
4  A. Not to my knowledge.
5  Q. Rude to teachers?
6  A. Not to my knowledge.
7  Q. Did she say yes, ma'am and yes, sir to
8  people when they spoke to her?
9  A. No.
10 Q. Do the kids here normally do that?
11 A. Some do.
12 Q. Did she get to school on time usually?
13 A. As far as I know, yes.
14 Q. And no problems with her getting to
15 class on time?
16 A. No.
17 Q. No problems with her cheating, you
18 know, in gym or on tests or anything of that
19 nature?
20 A. Cheating in gym?
21 Q. Yeah. I don't know, just pushing over
22 kids on the other side of the soccer field or doing
23 anything bad like that?
24 A. No.

Page 78

1      MR. RIBA: That's a foul, not cheating.
2    Q. Did she wear makeup?
3    A. I don't know. I can't tell if somebody
4  is wearing makeup or not.
5    Q. Is wearing makeup a dress code
6  violation in the middle school?
7    A. It would be if it was obscene.
8    Q. Okay. But she looked like a kid who
9  would be any one of your friend's daughters; is
10  that right?
11    A. Yeah.
12    Q. So she comes in your office and you can
13  tell she's nervous?
14    A. Yeah.
15    Q. Scared or nervous?
16    A. Nervous.
17    Q. How tall was she, by the way?
18    A. I don't know.
19    Q. So is the Guidance Counselor already in
20  there?
21    A. Yes.
22    Q. Was the Guidance Counselor seated?
23    A. Yes.
24    Q. Did the Guidance Counselor say anything

Page 79

1  to Jill?
2    A. No.
3    Q. So you sit this kid down and you say
4  what; tell me again what you said?
5    A. I didn't say anything -- well, I first
6  said to her, do you know why you're here, and she
7  immediately replied, I didn't create the MySpace
8  account.
9    Q. Did she indicate to you that she had
10  information before your meeting that somebody had
11  ratted her out to you?
12    A. No. She did not.
13    Q. Tell me about the rest of the
14  conversation.
15    A. The rest of the conversation was, I
16  then told her, we can contact MySpace right now and
17  they can tell me if it came from your computer. I
18  bluffed, because I couldn't do it without a Court
19  Order, and she admitted it, she said, that won't be
20  necessary. I did it.
21    Q. Do you know why you couldn't do that
22  without a Court Order?
23    A. No.
24    Q. So you bluffed her, right?

Page 80

1    A. Yep. That's when she admitted to it.
2  She said, it won't be necessary. And then she
3  said, I didn't do this alone and that's when she
4  gave me Kristina's name.
5    Q. Now, she had started the conversation
6  by telling you she knew about the MySpace page,
7  right?
8    A. No. She started the conversation by
9  saying that she didn't create the MySpace page.
10    Q. All Right. So then you bluffed her and
11  she said it won't be necessary -- tell me again
12  what she said.
13    A. She said, it won't be necessary. I did
14  it.
15    Q. Okay. And did you probe into further
16  details about what she meant by I did it?
17    A. No. I did it, I think, is pretty
18  clear.
19    Q. Did you talk to her about the specifics
20  of the page?
21    A. Yes.
22    Q. What did you say to her?
23    A. I said, what is the reason that you did
24  this and she mentioned that it was because of the

Page 81

1  dress code.
2    Q. Anything else?
3    A. No.
4    Q. Do you know what she meant when she
5  said it was because of the dress code?
6    A. Yes.
7    Q. What did you think she meant?
8    A. That she had been cited on dress code
9  violations.
10    Q. What was the date of the dress code
11  violation?
12    A. No idea.
13    Q. Do you know if she had to miss
14  something fun after school because she had
15  detention?
16    A. No. I do not know that.
17    Q. Did she have braces, by the way?
18      MR. RIBA: If you don't know.
19    Q. It's okay if you don't know. I'm just
20  trying to picture the child in my mind.
21    A. I don't know.
22    Q. Did the Guidance Counselor pitch in and
23  say anything?
24    A. No.

1     **Q. She just sat there smiling?**
2     A. Yes.
3     **Q. Did Jill start to cry?**
4     A. No.
5     **Q. Did you get the names of any other**
6 **children that were involved in MySpace?**
7     A. Yes. Kristina Lehman.
8     **Q. And Jill gave you that name?**
9     A. Yes.
10     THE WITNESS: Can I have a break?
11     MS. KOHART: Yes.
12     (At this point, a recess was taken.)
13 BY MS. KOHART:
14     **Q. I just want to go back. The day**
15 **before, when there are two teachers, one at your**
16 **lunch break and one at the end of the day that said**
17 **they heard students talking about MySpace --**
18     A. Uh-huh.
19     **Q. -- this was after your conversation**
20 **with Brianna in the morning, correct?**
21     A. Yes.
22     **Q. And in the morning, Brianna said,**
23 **there's a MySpace page out, right, on you?**
24     A. Yes.

1     **Q. And at that point, you said, oh, gee,**
2 **can you find out who did it?**
3     A. Yes.
4     **Q. Now, the teachers, did they report to**
5 **you exactly what they heard the students saying in**
6 **their classes?**
7     A. I don't remember.
8     **Q. Could it have been Brianna talking to**
9 **people about how she was on this mission to help**
10 **you get rid of this MySpace page?**
11     A. No. I do not believe so because
12 Brianna didn't have either of those teachers on
13 that particular day.
14     **Q. Well, she could have talked to other**
15 **friends who then talked about it in class, right?**
16     A. But you asked if it was Brianna.
17     **Q. Right. But we have no idea what those**
18 **kids were talking about, right, other than MySpace?**
19     A. We or --
20     **Q. You have no idea what they were talking**
21 **about, other than the fact that there was a MySpace**
22 **page?**
23     A. And it was about me.
24     **Q. And you don't know whether they got**

1 **that information from Brianna or Santa Claus or**
2 **anybody else?**
3     A. I know they didn't get it from Brianna.
4     **Q. Why do you know that?**
5     A. Because they didn't mention Brianna's
6 name or any other name.
7     **Q. That's the only basis?**
8     A. That's the only one I've got, yes.
9     **Q. Well, they also didn't mention Jill's**
10 **name; is that right?**
11     A. No. They did not.
12     **Q. Did they mention the name of the other**
13 **student who was involved in the MySpace page?**
14     A. No.
15     **Q. So there were no students' names that**
16 **were reported to you?**
17     A. If there were, I do not remember.
18     **Q. So my original statement, is it fair to**
19 **say none of us in this room sitting here have any**
20 **idea how that information got to the students who**
21 **talked about it and were overheard by their**
22 **teachers on Tuesday; is that right?**
23     A. Can you repeat that question?
24     **Q. Yes. You and I have no idea how the**

1 **information got to those students who were talking**
2 **about it in school on the 20th and overheard by**
3 **their teachers?**
4     A. Yes.
5     **Q. So we're in your office?**
6     A. Which day?
7     **Q. We are on Wednesday now. We have Jill**
8 **and the Guidance Counselor --**
9     A. No. That wasn't Wednesday, ma'am.
10 That was Thursday.
11     **Q. So we're up to Thursday. On Thursday,**
12 **there's Jill and the Guidance Counselor and, up**
13 **until the time Jill gave you the name of the friend**
14 **that she worked with on the MySpace page, was there**
15 **any other part of the conversation that you can**
16 **remember?**
17     A. From them or from me?
18     **Q. Anybody in the room.**
19     A. Yes.
20     **Q. Tell me the rest of the things you**
21 **remember.**
22     A. I was very upset and very angry, hurt,
23 and I can't understand why you did this to me and
24 my family.

**Page 86**

1    In addition, I told them that I would
2  be looking to take legal action against them and
3  their family.
4    Q. And did you specify what kind of legal
5  action you wanted to take?
6    A. Yes. I was looking to -- a legal
7  action to sue your families.
8    Q. Your families?
9    A. Yeah. There were two people in the
10  room.
11    Q. How about before the other girl came
12  in?
13    A. No; nothing else.
14    Q. Did the other girl start to cry?
15    A. When?
16    Q. During any of this.
17    A. During when I was with them alone with
18  the Guidance Counselor?
19    Q. Right.
20    A. No.
21    Q. One Guidance Counselor, you and the two
22  girls?
23    A. That was it.
24    Q. So you tell them you're upset and

**Page 87**

1  angry, correct, and how could you do this to me and
2  my family --
3    A. And also hurt.
4    Q. And hurt. Did Jill offer up any
5  statement, other than what you've already told us?
6    A. No.
7    Q. How about the other child?
8    A. No.
9    Q. Were they looking at you when you
10  talked or looking down; tell me what their
11  expressions were?
12    A. I don't recall.
13    Q. Was your voice raised?
14    A. Stern.
15    Q. Raised?
16    A. Stern.
17    Q. Like that, just the way you're talking
18  to me?
19    A. Yes.
20    Q. That's slightly raised. Were you
21  standing or sitting while you spoke to them?
22    A. Sitting.
23    Q. Did you show them the MySpace page?
24    A. No. I believe I waved it. I didn't

**Page 88**

1  actually give it to them.
2    Q. Okay. And that's the one that's in
3  your file back in your office?
4    A. Yes.
5    Q. Is it under lock and key?
6    A. Yes.
7    Q. Was your door open while you talked to
8  them?
9    A. I already answered that, yes. Yes, it
10  was.
11    Q. So it remained open as you tried to --
12    MR. RIBA: Objection.
13    A. My door always remains open any time I
14  have a child in there, especially a female.
15    Q. How many chairs are in there?
16    A. That day I don't remember.
17    Q. Did anybody bring a chair in?
18    A. I don't remember.
19    Q. So you're talking to the kids and you
20  told them you were going to sue their families?
21    A. Yes.
22    Q. And do you describe the nature of the
23  suit you were going to file?
24    A. No.

**Page 89**

1    Q. Had you consulted with anybody about
2  the legal action at that point?
3    A. No.
4    Q. Were you planning to?
5    A. No.
6    Q. Was that just a bluff?
7    A. Yes.
8    Q. Why did you make that bluff?
9    A. I wanted to let them know how serious
10  what they did was.
11    Q. You don't think they would have gotten
12  that from your stern tone?
13    A. No.
14    Q. You don't think they already
15  appreciated that, having gotten caught, that it was
16  pretty serious?
17    A. No.
18    Q. By the way, did you ever do anything
19  besides make this threat regarding legal action?
20    A. No.
21    Q. Did you ever go to the police?
22    A. Please be more specific -- did I say
23  anything, did I do anything?
24    Q. Besides this statement to these

23 (Pages 86 to 89)

Page 90

1  children, that you were going to sue their
2  families --
3     A.  Not that I recall.
4     Q.  -- did you then do anything?
5     A.  Yes.
6     Q.  What did you do?
7     A.  I contacted the State Police.
8     Q.  And when did you make that contact?
9     A.  I have to check my notes.  It would
10  have been that day.
11    Q.  Are there local police here?
12    A.  Yes.
13    Q.  So why did you call the State Police?
14    A.  Because the local police did not have
15  -- were not knowledgeable in the area of the
16  Internet.
17    Q.  Did you call them first?
18    A.  Yes, and they referred me to the State
19  Police.
20    Q.  And what day did you call the local
21  police?
22    A.  It would have been that day, the 22nd,
23  Thursday.
24    Q.  So this was after your conversation

Page 91

1  with the children?
2     A.  This was after my conversation and
3  after my meeting with the parents.
4     Q.  So it really wasn't a bluff; you were
5  actually taking some steps?
6     A.  Legal action is not calling the State
7  Police.  You're not going to call the State Police
8  to sue somebody.
9     Q.  So you wanted to bring both a criminal
10  and civil action against them?
11    A.  I never said that.
12    Q.  You wanted to bring a criminal action
13  against them?
14    A.  I wanted to look into a criminal action
15  against them.
16    Q.  And did you think what they did was
17  criminal?
18    A.  I needed to find that out.
19    Q.  Did you -- putting aside what the
20  police thought, did you feel like you'd been the
21  victim of a crime?
22    A.  I'm not knowledgeable in that area so
23  I'm not going to entertain a guess.
24    Q.  Okay.  Even though you were not sure

Page 92

1  whether you were a victim of a crime, you ca.
2  the local police first?
3     A.  Yes.
4     Q.  By the way, who did you speak to?
5     A.  It would have been Chief Brozana.
6     Q.  Can you spell that?
7     A.  No, I can't.
8     Q.  Is he still the Chief?
9     A.  Yes.
10    Q.  Is he the guy that you call when the
11  people come in with the knives and the marijuana?
12    A.  It depends on who's on duty.
13    Q.  You spoke to Chief Brozana.  What did
14  you tell him?
15    A.  I told him that I had an Internet
16  situation and he then referred me to the State
17  Police.
18    Q.  What details did you provide to him?
19    A.  I just read him the page.
20    Q.  Did you tell him that the page had a
21  picture of you on it?
22    A.  I don't recall.
23    Q.  So he might have just thought that it
24  was any person that they were saying this about?

Page 93

1     A.  No.  It said Principal.
2     Q.  So you knew, in that conversation, that
3  it was clear to Chief Brozana that the MySpace page
4  related to you?
5     A.  Yes.
6     Q.  Did he think anything in there was true
7  when you told him this, when you read the page to
8  him?
9     A.  I can't answer for him.
10    Q.  But he didn't launch any investigation
11  into your conduct with the students; did he?
12    A.  No.
13    Q.  And he told you to contact the State
14  Police?
15    A.  Yes.
16    Q.  Did you do that immediately?
17    A.  Define immediately.
18    Q.  Well, right after you hung up the phone
19  with Chief Brozana.
20    A.  Well, are you talking about seconds,
21  minutes?
22    Q.  Let's say minutes?
23    A.  A couple of minutes.
24    Q.  Do you remember what time the call was

**Page 94**

1  to the Chief?
2  A. No. I don't.
3  Q. Did you take notes?
4  A. Not on the times I called.
5  Q. How about of your conversation?
6  A. No; just that I called.
7  Q. You took a note saying that you called?
8  A. Uh-huh.
9  Q. Where is that note?
10  A. In my file.
11  Q. You have a whole file on this
12  situation?
13  A. Yes, I do.
14  Q. And there's a piece of paper in there
15  that says called Chief Brozana?
16  A. Yes.
17  Q. Did he give you a phone number to call
18  or did he just say, call the State Police?
19  A. No. I have the State Police phone
20  number posted on my board.
21  Q. When did you need to call the State
22  Police; are there certain disciplinary matters that
23  you know that prefer the State Police as opposed to
24  the local police?

**Page 95**

1  A. No.
2  Q. You just have both numbers?
3  A. Uh-huh.
4  Q. So you called the basic number that's
5  on your bulletin board?
6  A. For which person?
7  Q. Are there different numbers for the
8  State Police?
9  A. No. Are you talking local or --
10  Q. State Police.
11  A. Yes.
12  Q. With whom were you connected?
13  A. I have no idea.
14  Q. A man or a woman?
15  A. It was a man.
16  Q. This was during the school day?
17  A. Yes.
18  Q. And did you write down anything
19  regarding your conversation with the man at the
20  State Police?
21  A. No.
22  Q. What did you tell that man?
23  A. I told him that I had an Internet
24  situation and I'd like him to come over and take a

**Page 96**

1  look at it.
2  Q. And did they?
3  A. Yes.
4  Q. When they came to look at it, did they
5  give you their card?
6  A. No.
7  Q. Did they give you any identification?
8  A. Yeah. He was wearing his uniform.
9  Q. But he didn't show you a badge or
10  anything like that?
11  A. They usually have the badge on their
12  uniform.
13  Q. Did he take a copy of this?
14  A. That I don't recall.
15  Q. Did he write down the U-R-L so he could
16  get his own copy on the Internet?
17  A. No. I did not.
18  Q. No; did he?
19  A. Did he? I wasn't looking at his notes.
20  He was writing stuff down.
21  Q. Okay. Was this still during the school
22  day on Thursday?
23  A. Yes.
24  Q. Did he come right over?

**Page 97**

1  A. Define right over.
2  Q. Within an hour of your call.
3  A. I can't recall.
4  Q. Was this before or after you had spoken
5  to Jill's mother?
6  A. After.
7  Q. The State Police come -- one guy, two
8  guys?
9  A. I'm sorry, one.
10  Q. Did he pull up to the school in, like,
11  a State Police car?
12  A. I'm assuming he did.
13  Q. You didn't see it?
14  A. No.
15  Q. You don't know whether he had his
16  flashing lights on or anything?
17  A. No.
18  Q. Was Jill still physically on the school
19  grounds when he arrived?
20  A. No.
21  Q. He took notes and he looked at the
22  MySpace page. Did he ask you any questions?
23  A. I'm sure he did.
24  Q. You don't remember?

Page 98

1  A.  No.  I do not remember.
2  Q.  How long was he visiting with you?
3  A.  Twenty minutes.
4  Q.  Door open or shut?
5  A.  Always open.
6  Q.  So I don't have to keep asking that
7  question; it's always open?
8  A.  It's always open.
9  Q.  Were classes letting out and students
10  walking past your office as the State Police
11  Officer is there?
12  A.  My office is not visible from the
13  hallway.
14  Q.  So students would never be in that
15  vicinity?
16  A.  No.
17  Q.  No lockers or anything there?
18  A.  No.
19  Q.  So you talked to the police and what do
20  you recall being in your file regarding this
21  conversation, if anything?
22  A.  I can recall, not necessarily in my
23  file, but he had said, we can go for harassment
24  charges.

Page 99

1  Q.  Against the child?
2  A.  Against the child, but knowing that
3  these two children didn't have any further past
4  serious disciplinary record, the chances that they
5  would get thrown out in Court were pretty good and
6  I thought the girls had gotten enough punishment
7  and I elected not to file any criminal charges.
8  Q.  Did he discuss with you what you needed
9  to do to file the criminal charges?
10  A.  I don't recall.
11  Q.  And what did he tell you about what
12  made this MySpace page harassment?
13  A.  I don't recall.
14  Q.  When did you decide you weren't going
15  to pursue the criminal charges?
16  A.  When he was in my office.
17  Q.  So he got all the way out here -- where
18  is the State Police barracks?
19  A.  Friedensburg.
20  Q.  How many miles away is that?
21  A.  I don't know.
22  Q.  More than 10?
23  A.  About 10.
24  Q.  So he drives all the way over here and

Page 100

1  takes notes and then you say, aw, never mind; is
2  that basically how it went?
3  MR. RIBA:  Objection.  How could you
4  characterize his testimony that way?  His
5  testimony is that he came out and told him
6  about it and it is what it is.  I mean,
7  let's just move on.  I don't see how any of
8  this last half hour is relevant, but let's
9  go.
10  BY MS. KOHART:
11  Q.  Did you make the decision not to press
12  charges after he told you it would likely be thrown
13  out in Court?
14  A.  No.
15  Q.  So that was before he even told you
16  that?
17  A.  No.
18  Q.  When did you make that decision?
19  A.  After thinking about it for a couple of
20  minutes with the fact that it might be thrown out
21  and the girls were punished enough, enough was
22  enough.
23  Q.  Did you express that to him?
24  A.  Yeah.

Page 101

1  Q.  Was he pissed off that he went all the
2  way out there and you weren't pressing charges?
3  A.  I can't answer for him.
4  Q.  Is his name in your file?
5  A.  Yes.
6  Q.  Did you ever get a written copy of what
7  he wrote down?
8  A.  No.
9  Q.  Did he ever get back in touch with you?
10  A.  No.
11  Q.  Did you pursue any other legal action
12  against Jill and her family?
13  A.  No.  I have not.
14  Q.  Have you made plans to do so?
15  A.  No.  I have not.
16  Q.  Did you consult at all with private
17  Counsel?
18  A.  Yes, I have.
19  Q.  Not somebody representing the school,
20  but somebody that just represents you?
21  A.  Yes.
22  Q.  Who is that person?
23  A.  Do I need to answer that question?
24  Q.  You can give me his name.  You just

26 (Pages 98 to 101)

1    can't tell me anything else.

2        MR. RIBA: What his motives are,

3    actually, has nothing to do with the facts

4    of this case, the lawsuit brought. How does

5    that lead to discoverable information?

6        MS. KOHART: Well, I think there's a

7    suggestion in all of this that the reaction

8    of the school is based more on the fact that

9    it was the Principal -- it's sort of like

10   Judge and Jury. It's the Principal who was

11   -- allegedly who was parodied and the

12   Principal who was upset and the Principal

13   meting out the punishment and I think the

14   fact that he may have consulted with private

15   counsel about suing the family of this 13

16   year old kid is more evidence that she was

17   treated more like a knife wielding 8th

18   grader than she was like a kid that parodied

19   somebody on MySpace and I think the fact

20   that he went through these steps, A, is

21   evidence of how upset he was, and, B,

22   evidence that maybe he wasn't the right guy

23   to be picking punishment.

24       MR. RIBA: So I understand your

1    position, someone is defamed and their

2    rights are invaded, they can't seek legal

3    advice. Is that your position, ma'am?

4        MS. KOHART: No. That is not my

5    position.

6        MR. RIBA: Well, I think it's totally

7    irrelevant whether he consulted with Counsel

8    about this or not. I know it's not a reason

9    to tell him not to testify, but we're

10   wasting so much time going over stuff that

11   has absolutely nothing to do with the facts

12   of this case.

13       MS. KOHART: Are you instructing him

14   not to answer?

15       MR. RIBA: What's the question?

16       MS. KOHART: I asked him the name of

17   his lawyer.

18   BY MS. KOHART:

19       A. Malcolm Gross.

20       Q. And how soon after this conversation

21   with the State Police Officer did you consult with

22   Mr. Gross?

23       A. Three weeks.

24       Q. Let's go back into the room with Jill

1    and her friend. How long would you say you were

2    talking to Jill and the other child with the

3    Guidance Counselor in the room?

4        A. Five minutes.

5        Q. What happened after you finished that

6    conversation?

7        A. Mrs. Guers took them out of the office,

8    put one in the waiting room and one in our Eagle's

9    Nest.

10       Q. And what is the Eagle's Nest?

11       A. It's just a room with a phone in it.

12       Q. Were they shut into those rooms; were

13   the doors shut?

14       A. The doors were shut.

15       Q. Were the doors locked?

16       A. No. There's no lock on that door.

17       Q. Which door?

18       A. On the Eagle's Nest door.

19       Q. How about the other door?

20       A. The other girl was sitting outside by

21   the water cooler.

22       Q. And did you talk to the Guidance

23   Counselor after the two girls were in their

24   respective rooms?

1        A. I don't recall.

2        Q. Why weren't the girls sent back to

3    class?

4        A. Because I was calling their parents.

5        Q. Did you tell them they were going to be

6    suspended?

7        A. Not at that time.

8        Q. You wanted to keep them in the room

9    while you called their parents?

10       A. Not in the room. In the office area

11   while I called their parents.

12       Q. Why is that?

13       A. Because middle school kids tend to go

14   back to class and tend to talk about things causing

15   an even further disruption, which I was trying to

16   prevent.

17       Q. So you called the parents. Who did you

18   call?

19       A. Both.

20       Q. Both parents?

21       A. No.

22       Q. Which parents?

23       A. Both mothers.

24       Q. Tell me about your conversation with

1 Jill's mother.
2    A. I told her that we had a serious matter
3 that I didn't want to discuss on the phone and
4 could she please come to school. She said, I'm at
5 work in Harrisburg and it's going to take me about
6 an hour to get there. I said, that's fine, and I
7 told her that her daughter was safe and there
8 wasn't anything physically wrong, but I need you to
9 come into school.
10    Q. Did she ask you what happened?
11    A. Yes.
12    Q. What did you tell her?
13    A. I just repeated that. I just said
14 that, I told her I'm not going to discussion it
15 over the phone.
16    Q. Why not?
17    A. Because it's a serious matter and I
18 wanted to talk face-to-face.
19    Q. What did you tell the other mother?
20    A. The same thing.
21    Q. And where was the other mother
22 physically located?
23    A. Pottsville.
24    Q. How long did it take her to get here?

1    A. Twenty-five minutes.
2    Q. Did you talk to the parents with their
3 children in the room or without the children in the
4 room?
5    A. With their child only.
6    Q. So it would be one mother and one
7 daughter and nobody else?
8    A. And the Guidance Counselor was there as
9 well.
10    Q. So I'm assuming that Jill's friend and
11 her mother were spoken to first?
12    A. Say that again.
13    Q. Who did you meet with first?
14    A. The Lehmans.
15    Q. And how long was that meeting?
16    A. Roughly, 10 minutes.
17    Q. Did you show Mrs. Lehman the MySpace
18 page?
19    A. Yes, I did.
20    Q. And did she take a copy with her?
21    A. She refused a copy of it.
22    Q. And what do you remember being said in
23 that meeting?
24    A. I remember her mom being mortified, her

1 mom being very apologetic, very sympathetic, was
2 concerned about me taking legal action against
3 them.
4    Q. What did she say?
5    A. Just what I said, she was concerned
6 about --
7    Q. She just said this on her own?
8    A. No. I had told her.
9    Q. So even to the mother you said that?
10    A. Yes. And that was about it.
11    Q. What did she say to you about the legal
12 action?
13    A. She didn't say anything.
14    Q. She said, I'm concerned?
15    A. Yes.
16    Q. Had the State Police been there by
17 then?
18    A. No.
19    Q. At that point, had you called anybody,
20 the State Police or the local police?
21    A. No.
22    Q. Why didn't you call the police the day
23 before about this MySpace page?
24    A. I think I answered this already. I

1 didn't have any proof of who it was at that time.
2    Q. So does it matter who it was?
3    A. Yes, it does.
4    Q. Why?
5    A. I don't know the answer to that
6 question, but it does matter.
7    Q. It didn't seem to you to be a crime
8 unless a student had done it?
9    A. Yes.
10    Q. So if it was your next door neighbor or
11 something, that would not be something you'd want
12 to take action about?
13    A. Obviously, I can't suspend my next door
14 neighbor.
15    Q. I'm talking about the call to the
16 police, not the suspension.
17    A. I would have done the same thing if it
18 was a neighbor.
19    Q. But you wanted to find out the identity
20 of who did it before you called the police?
21    A. I was quite certain it was a student.
22    Q. You didn't think the police could help
23 ascertain the identity of the offender?
24    A. No.

1     Q.  So then Jill's mother showed up?

2     A.  Yes.

3     Q.  Do you remember the time of day?

4     A.  Approximately, 10:00.

5     Q.  So Jill had been called out of class at

6 about eight you said?

7     A.  Yeah.

8     Q.  So she'd been there about two hours in

9 the Eagle's Nest?

10     A.  Yes.

11     Q.  Any bathroom breaks or anything?

12     A.  She was asked by the secretary if she

13 needed to go.

14     Q.  Where are the secretaries in relation

15 to the Eagle's Nest?

16     A.  Next to it.

17     Q.  They asked her -- did they tell you

18 they were asking her; how do you know that?

19     A.  I've always told them that it's part of

20 their responsibilities.

21     Q.  Taking the kids to the bathroom?

22     A.  That if I ever have a kid in there,

23 periodically check. There's a little timer on

24 their desk that beeps.

1     Q.  Did you talk to the mom before you

2 talked to Jill?

3     A.  I don't recall. I believe it was both

4 at the same time.

5     Q.  Tell me about that conversation.

6     A.  I told her what the incident was and

7 showed her the profile.

8     Q.  From MySpace?

9     A.  The MySpace page. Mom had a little

10 shocked look on her face. I don't think she quite

11 understood what MySpace was all about. I told her

12 what the consequences would be and did mention the

13 possibility of taking legal action. One thing I

14 did leave out of the previous conversation, I did

15 also tell them that their work would be provided

16 for them, their school work.

17     Q.  Most kids would think that's not

18 punishment, getting off 10 days, right?

19     MR. RIBA: Objection.

20     A.  I can't answer for anybody.

21     Q.  So they'll get their school work so

22 they don't lose any educational value?

23     A.  Correct.

24     Q.  Do you recollect anything else in that

1 meeting?

2     A.  I recollect that neither mother or

3 child seemed very remorseful.

4     Q.  Did that affect the level of the

5 punishment?

6     A.  No, ma'am.

7     Q.  You already selected the punishment?

8     A.  The punishment was already given.

9     Q.  Was that different from your

10 conversation with Jill in the morning; did you

11 think Jill showed a lack of remorse when you talked

12 to her earlier in the day?

13     A.  Yes.

14     Q.  So you didn't think she had sufficient

15 remorse, right?

16     A.  That's correct.

17     Q.  What about the other child, did she

18 seem remorseful?

19     A.  Yes.

20     Q.  How about that mother, did she seem

21 remorseful?

22     A.  Yes.

23     Q.  But they still got the same punishment?

24     MR. RIBA: Slow down.

1     THE WITNESS: Sorry.

2 BY MS. KOHART:

3     Q.  They still got the same punishment?

4     A.  Yes.

5     Q.  Does the Lehman child also not go on

6 the end of the year field trip?

7     A.  I have no knowledge of that.

8     Q.  Did Jill's mother ask you any questions

9 about your threat of legal action?

10     A.  Not that I recall.

11     Q.  And the Guidance Counselor was in the

12 office throughout this?

13     A.  In which office?

14     Q.  In your office with Jill and her

15 mother?

16     A.  Yes.

17     Q.  Did the Guidance Counselor say anything

18 to you about these threats of legal action?

19     A.  No.

20     Q.  What time was your meeting with Jill

21 and her mother over?

22     A.  Over?

23     Q.  What time did you finish speaking with

24 Jill and her mother that morning?

Page 114

1     A.  Ten or fifteen minutes later.
2     Q.  And what happened next?
3     A.  I went to the bathroom. I recall that
4  because I wasn't feeling that well and, after that,
5  I contacted their teachers to get their work and
6  told them to make sure they did it.
7     Q.  And when was your call to law
8  enforcement; after the meetings with the mothers
9  and daughters?
10    A.  I don't remember the exact time.
11    Q.  It could have been between or before
12  the mothers got there?
13    A.  No. It was definitely after the
14  mothers and the children had left.
15    Q.  And were the mothers instructed to take
16  their children home immediately?
17    A.  Yes.
18    Q.  What is the process, if you can
19  describe for me briefly, in the school, if your kid
20  is accused of having a knife, a level four
21  discipline, what is the process; is there a hearing
22  or what happens?
23    A.  We have an initial meeting with the
24  parents, explain the situation and -- are you

Page 115

1  specifically talking about a knife?
2    Q.  Any level four infraction. Is it
3  varied?
4    A.  It would vary. If it was a knife,
5  obviously, the police need to be involved.
6    Q.  What happens with the kid; do the kids
7  have to go home right away on a level four?
8    A.  Yes. And that day counts as a day of
9  suspension.
10    Q.  Is that true of all the other levels of
11  discipline?
12    A.  Ever since I've been here, yes.
13    Q.  So even a level one -- anything you're
14  suspended for, you're out the door as soon as the
15  suspension is issued?
16    A.  No.
17    Q.  What are some of the other options you
18  have here?
19    A.  In-school suspension is usually held
20  the next day.
21    Q.  What does that mean?
22    A.  That means they're sent to the high
23  school. They have an in-school suspension monitor.
24  They're in a room. They eat lunch in that room.

Page 116

1  They are required to do work all day. That's the
2  only difference. Once the school day starts,
3  they're already set in their schedule. We have no
4  transportation to get them to the high school.
5     In the case of out-of-school
6  suspension, the parents are already there so they
7  can take them home.
8    Q.  Is in-school suspension an allowable
9  discipline for a level four infraction?
10    A.  I believe so.
11    Q.  And then an out-of-school suspension
12  you're home for the duration?
13    A.  Yes.
14    Q.  What are the other options for a level
15  four violation?
16    A.  Those are pretty much the only two that
17  have ever come up.
18    Q.  Are you allowed to expel students?
19    A.  There's really no such thing as
20  expelling students anymore.
21    Q.  Right. Can you send them to the school
22  for bad kids that the State runs?
23    A.  If we had one in this County, we could,
24  but we don't.

Page 117

1    Q.  What's the longest suspension that
2  you're aware of being given to a child in this
3  district?
4    A.  I don't know.
5    Q.  How about by you; what's the longest?
6    A.  Well, I only can give 10 days, but if
7  you're asking what the longest suspension I'm aware
8  of in the middle school, that gets imposed by the
9  School Board.
10    Q.  What's the longest you're aware of?
11    A.  I'm aware of 10 days plus 60.
12    Q.  And during that 60 days -- what was the
13  offense that that happened?
14    A.  Marijuana.
15    Q.  So Jill and her mother leave and you've
16  already told me about the conversations. Did you
17  talk to anybody else on Thursday about this
18  incident?
19    A.  Not that I know, but I believe I came
20  down and talked to Dr. Romberger, but, besides
21  that, no one.
22    Q.  Do you remember that conversation?
23    A.  No.
24    Q.  Did you report to your wife what

1  happened?
2      A.  She already knew.
3      Q.  She didn't know about your
4  conversations with the children and the mothers,
5  right?
6      A.  No.
7      Q.  Did you talk to her during the school
8  day?
9      A.  Sure.
10     Q.  Did you tell her that you sent the
11 children home?
12     A.  No.
13     Q.  What do you remember talking to her
14 about with regard to the MySpace page?
15     A.  I don't remember.
16     Q.  What do you remember reporting to Dr.
17 Romberger?
18     A.  I don't remember.
19     Q.  Did you give instructions to the
20 Guidance Counselor not to discuss the MySpace event
21 after her meeting with you that morning?
22     A.  Yes.
23     Q.  What did you discuss?
24     A.  I told here that it's not to be talked

1  about with anybody.
2      Q.  The Guidance Counselors?
3      A.  The Guidance Counselors.
4      Q.  All of them?
5      A.  There's only two.
6      Q.  So you told that to your wife and you
7  told that to the one that was in the office with
8  you?
9      A.  Yes.
10     Q.  Why did you tell them that?
11     A.  Because it's a confidential issue
12 regarding students discipline -- not their
13 discipline, but what they've been disciplined for.
14 I can inform teachers and Guidance Counselors that
15 there has been a suspension, I just can't tell them
16 why.
17     Q.  Did you personally contact the teachers
18 about Jill's work?
19     A.  No.
20     Q.  Who did?
21     A.  I did through e-mail.
22     Q.  Do you have a copy of that e-mail?
23     A.  Probably.
24     MS. KOHART:  We'll make a request for

1  that.
2      THE WITNESS:  I wouldn't have a hard
3  copy.
4      MS. KOHART:  If you have it.
5      Q.  Did you pull up a list of the teachers
6  before you sent that e-mail?
7      A.  Which teachers?
8      Q.  Did you have to figure out who Jill's
9  teachers were and the Lehman child's teachers were?
10     A.  No.
11     Q.  Did you do that off the top of your
12 head?
13     A.  No.
14     Q.  What did you do; sent it to everybody?
15     A.  Sent it to everybody.
16     Q.  How long was the e-mail?
17     A.  One line.
18     Q.  What was it?
19     A.  I don't know exactly.
20     Q.  Something along the lines of, the
21 Lehman child and Jill have been suspended for 10
22 days?
23     A.  Please get all work to the office no
24 later than such and such a date.

1      Q.  Did anybody ask you what happened?
2      A.  No, but in the middle school, kids
3  know.  Word of mouth travels fast.
4      Q.  How about the teachers; did any of the
5  teachers say, gee, that Jill is such a sweet kid,
6  what happened?
7      A.  No.
8      Q.  How about with the Lehman child?
9      A.  No.
10     Q.  So none of the teachers asked you at
11 all?
12     A.  Asked me what?
13     Q.  About anything regarding Jill or the
14 Lehman girl?
15     A.  Yes.
16     Q.  What did they ask you?
17     A.  Just exactly what you said.
18     Q.  And what did you say?
19     A.  I said, I can't discussion it right
20 now.
21     Q.  Did any of them come to you and say, I
22 hear it's about the MySpace page?
23     A.  Yes.
24     Q.  And what did you say?

1    A.  I can't discuss it right now.
2    Q.  When you first latched onto this
3  MySpace page, before you were able to prove that it
4  was from Jill's computer, did you give the U-R-L to
5  anybody?
6    A.  No.
7    Q.  So you don't know whether any of the
8  other faculty members at the school were able to
9  access this page and look at it?
10    A.  They wouldn't be able to access it in
11  the school.
12    Q.  Okay.  If they had the U-R-L they could
13  do it from their house or something?
14    A.  I don't know.
15    Q.  And the teachers, by the way, they
16  don't have computers that can access more broadly
17  on the Internet than the student?
18    A.  No.  The only people in the building
19  that have that capability are the Counselors and
20  Principal and Assistant Principal and the
21  secretarial staff.
22    Q.  All right.  Do you know if any of the
23  secretaries somehow got this U-R-L and accessed
24  it?

1    A.  No.  They did not.
2    Q.  Do you know if Brianna gave other
3  copies, to you knowledge, whether she was giving
4  other copies to other people?
5    A.  No.  I don't know.
6    Q.  Do you guys have a mascot -- what is
7  your mascot?
8    A.  It's an Eagle.
9    Q.  And what's the name of your football
10  team?
11    A.  The Blue Mountain Eagles.
12    Q.  I'm trying to find out what you talk to
13  your kids about with regard to copyright.  Do you
14  know whether your school mascot is copyrighted?
15    A.  I don't know.
16    Q.  And on the web pages of the school,
17  where there are photographs, are there copyright
18  symbols by the photographs to mark them as
19  copyrighted?
20    A.  I don't know.
21    Q.  And are you aware, do you license the
22  pictures?
23    A.  I don't know.
24    Q.  You first indicated that what these

1  children had done was a violation of copyright,
2  right?
3    A.  Susan Snyder Morgan did.
4    Q.  And when did she first say this to you?
5    A.  When I met with her and Dr. Romberger
6  in the office.
7    Q.  And that was Wednesday?
8    A.  That was Wednesday, right.
9    Q.  Tell me what she told you about the
10  copyright.
11    A.  I don't recall.
12    Q.  She just said, this is a copyright
13  violation?
14    A.  I don't recall exactly what she said.
15    Q.  Have you ever seen the kids use the
16  photographs off the website for anything else,
17  like, Valentine's Day cards or collages of their
18  favorite teachers or the yearbook or anything of
19  that nature?
20    A.  No.
21    Q.  Have any children ever gotten in
22  trouble for using the pictures?
23    A.  I don't believe anybody has ever used
24  the pictures.

1    Q.  Are there any school sports in the
2  middle school?
3    A.  Yes.
4    Q.  And do the kids ever draw pictures of
5  your school mascot for banners or anything like
6  that?
7    A.  No.
8    Q.  They don't use the eagle for, like,
9  cheerleading and stuff, like, when they make their
10  pep posters?
11    A.  No.
12    Q.  Nobody writes it on posters when
13  they're running for student counsel?
14    A.  That I don't know.  We don't allow a
15  lot of posters to be hung.
16    Q.  Do you allow any?
17    A.  Yes.
18    Q.  What kind do you allow?
19    A.  I don't know.
20    Q.  When you spoke to Jill and the Lehman
21  child, without their parents, did you talk
22  about copyright?
23    A.  No.
24    Q.  Did you talk about the use of the

1  photograph at all?
2      A.  I don't recall.
3      Q.  How about with their parents?
4      A.  I don't recall.
5      Q.  However, you did talk about copyright
6  in the written description of the reasons for the
7  discipline?
8      A.  Yes.
9      Q.  Why wouldn't you have made a point of
10 making sure you informed the children and the
11 parents that one of the basis for this punishment
12 was what you believe to be a violation of the
13 copyright law?
14     A.  I didn't say that I didn't.  I said
15 that I can't recall.
16     Q.  You can't recall.  You might have.  Did
17 you have some paper in front of you that you have
18 to check to make sure you hit certain bullet points
19 in your conversation with them?
20     A.  No.
21     Q.  Did you try to say the same things in
22 both meetings, with Jill and her mother and with
23 the other child and her mother?
24     A.  Yes.

1      Q.  But you just did it by memory?
2      A.  I've been doing this a long time.
3      Q.  Okay.  You don't know -- you said the
4  head of technology told you what the basis of
5  the copyright violation was?
6      A.  No.  I don't know.
7      Q.  Any other conversations on the 22nd,
8  Thursday the 22nd, other than the ones you've
9  reported to me?
10     A.  Not that I remember.
11     Q.  Okay.  Did you speak with Brianna that
12 day?
13     A.  No.  I did not.
14     Q.  Have you ever spoken to Brianna
15 following March 20th regarding the MySpace?
16     A.  No.
17     Q.  Do you know whether anybody else on
18 your behalf did?
19     A.  No.
20     Q.  No, you don't know, or no, they have
21 not?
22     A.  No.  I don't know.
23     Q.  Has Brianna ever attempted to talk to
24 you?

1      A.  No.
2      Q.  Now, under the school's disciplinary
3  policy, do you have to give something in writing to
4  the child and the parents?
5      A.  Yes.
6      Q.  Who else gets that written material;
7  are you required to give it to the Superintendent?
8      A.  It stays in the office.
9      Q.  You're not required to give a copy to
10 Dr. Romberger?
11     A.  No.
12     Q.  What's the nature of the writing that
13 you are required to prepared?
14     A.  I don't understand.
15     Q.  Do you have to send out a letter, do
16 you have to fill out a form; what do you have to
17 do?
18     A.  About the discipline?
19     Q.  Right.
20     A.  A letter goes home.  It's a brief
21 letter saying, I understand the rules and
22 regulations of the school -- I'm paraphrasing -- I
23 don't have it memorized -- and the student and the
24 parent sign it.

1          MS. KOHART:  I'm going to mark this as
2  M-1.
3          (Plaintiffs Exhibit M-1, Blue
4  Mountain Middle School letter dated
5  3/23/07, was marked for identification.)
6      Q.  I'm showing you a copy of what I just
7  marked as M-1.  It's on Blue Mountain Middle School
8  letterhead and it's dated March 23rd, '07.  Do you
9  recognize that, sir?
10     A.  Yes.
11     Q.  Who typed that up?
12     A.  My secretary.
13     Q.  Did you dictate it?
14     A.  No.
15     Q.  How did it get prepared?
16     A.  I handwrote it.
17     Q.  So you handed her a handwritten copy to
18 type up?
19     A.  Correct.
20     Q.  Where is that handwritten copy?
21     A.  Shredded.
22     Q.  When did you shred it?
23     A.  After I proofread this letter.
24     Q.  As soon as you get the typed letter you

1 throw the draft out?

2    A. Yes.

3    Q. You prepared this letter. On what date

4 did you prepare it?

5    A. On Friday.

6    Q. You both prepared it and mailed it on

7 the 23rd?

8    A. Correct.

9    Q. Is that a form, is a portion of that

10 letter a form that you use every time there's a

11 discipline or is it all written afresh each time?

12    A. The last paragraph is pretty much form.

13 Probably the first two sentences are form.

14 Everything else is case by case.

15    Q. Now, before you sent this letter to

16 anybody, did you have it approved by anybody else

17 in the school district?

18    A. I shared it with Dr. Romberger.

19    Q. Before it was sent?

20    A. Yes.

21    Q. In draft form?

22    A. In this form.

23    Q. And she approved it?

24    A. Yes.

1    Q. Did she ask you at all about

2 the copyright law violations in there?

3    A. No.

4    Q. Did she talk to you at all, setting

5 aside whether you believe the statements in the

6 MySpace page were false, whether those statements

7 were false accusations?

8    A. I don't understand the question.

9    Q. You understand when somebody accuses

10 you of something that means you are a liar, it's an

11 accusation, correct?

12    A. Correct.

13    Q. Did she talk to you about whether

14 there's a difference between a false accusation and

15 the MySpace page?

16    A. No.

17    Q. Did you show it to anybody else besides

18 the Superintendent?

19    A. No.

20    Q. Was there any discussion with anybody

21 else in the school district about this letter

22 before it went out?

23    A. No.

24    Q. At this point, I'm assuming you had

1 met, indeed, with the Pennsylvania State Police,

2 correct?

3    A. Yes.

4    Q. Why didn't you tell the parents that

5 you had already decided that you were not going to

6 pursue criminal charges as of March 23rd?

7    A. I just didn't.

8    Q. Why not?

9    A. I just didn't.

10    Q. But, in fact, you had met with them

11 Thursday and decided not to pursue it, right?

12    A. Yes.

13    Q. And, in fact, they had told you it

14 probably would get thrown out of Court, right?

15    A. If you read this carefully, it says, as

16 you're aware the Pennsylvania State Police have

17 been informed of this incident so criminal charges

18 may be filed. It doesn't say will be.

19    Q. I understand. I'm not saying that you

20 said that. I'm just asking why you chose to tell

21 the parents certain things and not others.

22    Did you think about that before you put

23 that in or what was your intent of putting it in;

24 do you know?

1    A. No.

2    Q. Did you put it in both letters, both to

3 the Lehmans and to the Snyders?

4    A. Yes.

5    Q. So the fact that the Lehman child

6 showed more remorse did not mitigate, in your mind,

7 whether they should be thinking about their own

8 personal exposures?

9    A. The only difference in the two letters

10 is the names. I'm sorry, the names, obviously, the

11 addresses and the time for the informal, the

12 meeting.

13    Q. What's the difference between a hearing

14 and an informal hearing at the school?

15    A. An informal hearing -- initially, the

16 informal hearing is with the parent and the child

17 and then we have to meet, by law, with a 10 day

18 suspension, between day three and five.

19    Q. For the informal hearing?

20    A. Yes.

21    Q. Who participates in that hearing?

22    A. That was myself and the two parents

23 along with the Guidance Counselor.

24    Q. The same Guidance Counselor?

Page 134

1  A.  Yes.
2  Q.  No decision maker other than you and
3  the Guidance Counselor were present?
4  A.  That's correct.
5  Q.  Are there any policies in the school
6  regarding whether people ought to not participate
7  in disciplinary actions when they are, arguably,
8  the victim of the student's wrongdoing?
9  A.  No.
10  Q.  And did this informal hearing take
11  place?
12  A.  Yes.
13  Q.  Where was it?
14  A.  In my office.
15  Q.  And was it on March 28, as was
16  scheduled?
17  A.  Yes.
18  Q.  Who was present; you, the Guidance
19  Counselor, Mrs. Snyder -- was Mr. Snyder there?
20  A.  No.
21  Q.  Was Jill there?
22  A.  Yes.
23  Q.  Tell me what you remember about that
24  informal hearing?

Page 135

1  A.  I was making sure that they got all
2  their work.  I told them that when they came back
3  to school, you know, kids are going to be asking
4  questions and the best thing to do is respond to
5  them by saying, I did something wrong, I was
6  punished and then drop it.  That way it will go
7  away.
8  Q.  So the informal hearing was sort of a
9  status conference, is that right, just to make sure
10  that she was getting her work?
11  A.  Yes.
12  Q.  It wasn't intended to allow them to
13  challenge the discipline or discuss whether it was
14  appropriate?
15  A.  Yes.  It is allowable.
16  Q.  Did you tell them that?
17  A.  No.  Mrs. Snyder excused her daughter
18  and asked to talk to me alone, telling me that I
19  couldn't do this because it happened outside of the
20  school.
21  Q.  And what did you say?
22  A.  Unfortunately, it was brought into the
23  school and, therefore, I do have jurisdiction.
24  Q.  Because Brianna brought it into the

Page 136

1  school?
2  A.  Not just Brianna.  Because the kids
3  were talking about it in classes and because it was
4  brought into the school.
5  Q.  You and I discussed earlier that, other
6  than the fact that Brianna brought it in at your
7  request, we don't know what the kids were saying,
8  correct?
9  A.  No; not specifically.
10  Q.  Did she ask to take that issue further
11  up the chain in the school district, the issue
12  about whether this was an appropriate discipline?
13  A.  I don't recall.  I know that she did
14  contact Dr. Romberger, but I don't know.
15  Q.  Is there an appeal from the informal
16  hearing?
17  A.  There's an appeal at the beginning of
18  the suspension.
19  Q.  What's that appeal process?
20  A.  The same one that I said before.  It
21  goes to the Superintendent, if the Superintendent
22  upholds the decision, then you can take it to the
23  School Board.
24  Q.  Do you know whether the Snyders took

Page 137

1  advantage of that?
2  A.  I know she talked to Dr. Romberger.
3  That's all I know.
4  Q.  How long was this informal hearing?
5  A.  With everyone in the room present?
6  Q.  Yes.
7  A.  Five to seven minutes.
8  Q.  How long did you meet privately with
9  Mrs. Snyder?
10  A.  Five minutes, maybe ten.
11  Q.  When you met with Mrs. Snyder
12  privately, did you have the Guidance Counselor
13  present?
14  A.  I don't recall.
15  Q.  So there was a five to ten minute
16  meeting with a group of you and you just talked
17  about whether Jill was getting her work home and
18  that when she comes back to school she shouldn't
19  tell anybody what she did?
20  A.  No, no.  I didn't say that.  I said
21  that she should say, if she wants it to go away and
22  doesn't want to be bothered by it, just tell the
23  kids, I did something wrong.  I didn't say she
24  couldn't talk about it.  I was just offering

Page 138

1  advice.
2    Q. Did she ask you for that advice or did
3  you just offer it?
4    A. No. I offered it to her.
5    Q. Any problem with the work getting home
6  to Jill?
7    A. No.
8    Q. Anything else in that meeting?
9    A. Not to my knowledge.
10   Q. Did you have a similar meeting with the
11 Lehman family?
12   A. Yes.
13   Q. Do you remember the date of that?
14   A. No. I do not.
15   Q. Right. Can you tell me what happened
16 at that meeting?
17   A. The same thing, with the exception of
18 the mother accepting the punishment.
19   Q. Now, the disciplinary notice that's
20 attached to the letter that I have marked as
21 Exhibit M-1, I don't think it's attached to your
22 copy -- it's March 22nd. Is that the date of its
23 preparation?
24   A. Yes.

Page 139

1    Q. And are those your initials down at the
2  bottom?
3    A. That's my signature.
4    Q. Am I correct, all of Jill's violations,
5  there was no pre-existing block to check, you had
6  to write them in?
7    A. Yes.
8    Q. By the way, has anyone else ever been
9  sanctioned at the school for copyright violations?
10   A. At which school?
11   Q. At this school -- other than
12 plagiarism?
13   A. Not to my knowledge.
14   Q. Are there any other papers in your file
15 relating to Jill's discipline, other than what
16 we've already discussed, your notes of the
17 conversation with the State Police, you may have an
18 electronic copy of your e-mail to the teachers,
19 correct?
20   A. Yes. I may have that. I do not have
21 any notes regarding what I said to the State
22 Police.
23   Q. I understand, yes. You may have
24 something relating to those conversations,

Page 140

1  correct?
2    A. Yes.
3    Q. Then, of course, we have the March 23rd
4  letter and the March 22nd handwritten form?
5    A. Yes.
6    Q. And you have a copy of the MySpace
7  pages?
8    A. No. I have the one that was brought to
9  me.
10   Q. So only the one that was brought to
11 you?
12   A. You know, I may have something in some
13 of the other documents that came from the
14 transcript.
15   Q. Something from the Court proceedings?
16   A. Yeah.
17   Q. Pre the Court proceedings; any other
18 documents, that you think of, that were created at
19 this time?
20   A. No.
21   Q. Did anybody make notes after your
22 meeting with Jill and her parents, her mother?
23   A. No.
24   Q. How about after the meeting between the

Page 141

1  Lehmans and you?
2    A. No.
3      MS. KOHART: I may be done. Let's take
4  a break for me to check over my notes.
5      (At this point, a recess was taken.)
6  BY MS. KOHART:
7    Q. We talked earlier about the fact that
8  you got reports from two teachers on, I guess, it
9  was Wednesday, the 21st, is that right, the day
10 before you spoke to Jill?
11   A. No. It was the 20th.
12   Q. Let's start with that. There were two
13 reports. One teacher came up to you on your lunch?
14   A. Yes.
15   Q. And said she heard kids talking about
16 it?
17   A. Yes.
18   Q. Did she say -- what did she report to
19 you regarding where she heard that conversation
20 between the students?
21   A. Near her desk.
22   Q. Was it while class was going on?
23   A. It was towards the end of class.
24   Q. What class was she teaching?

36 (Pages 138 to 141)