IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., et al. | : | CIVIL ACTION NO. |
| | : | 07-CV-585 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | JUDGE: |
| BLUE MOUNTAIN SCHOOL | : | JAMES M.    MUNLEY |
| DISTRICT; | : | |
| DR. JOYCE E. ROMBERGER, | : | |
| Superintendent Blue Mountain School | : | |
| District; and JAMES S. | : | ELECTRONICALLY FILED |
| MCGONIGLE, Principal Blue | : | |
| Mountain Middle School, both in their | : | |
| official and individual capacities, | : | |
| | | |
| Defendants. | | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

Dockets.Justia.co

# TABLE OF CONTENTS

I.  PROCEDURAL HISTORY ........................................................................... 1

II.  BRIEF STATEMENT OF THE CASE ....................................................... 1

III.  STATEMENT OF QUESTIONS INVOLVED ......................................... 4

IV.  ARGUMENT ......................................................................................... 5

   A.  DEFENDANTS' ACT OF SUSPENDING J.S. DID NOT VIOLATE HER RIGHTS UNDER THE FIRST AMENDMENT ............................................... 5
     1.  *J.S.'s Speech Is Not Afforded First Amendment Protection* ....................... 5
     2.  *J.S.'s Speech Was Reasonably Foreseeable to Cause A Substantial Disruption At The Middle School* .............................................. 11
   B.  INDIVIDUAL DEFENDANT'S, MR. MCGONIGLE AND DR. ROMBERGER, ARE ENTITLED TO QUALIFIED IMMUNITY .......................................... 18
   C.  THE DISTRICT'S POLICIES ARE NOT UNCONSTITUTIONALLY VAGUE AND/OR OVERBROAD ............................................................................. 21
     1.  *Overbroad Legal Analysis* .......................................................... 21
     2.  *Vague Legal Analysis* ................................................................ 22
     3.  *Application Of Policies In Question* ............................................ 22
   D.  PLAINTIFFS' ULTRA VIRES CLAIM FAILS AS A MATTER OF LAW ............... 26
   E.  PLAINTIFF'S, STEVEN AND TERRY SNYDER'S, PARENTAL RIGHTS CLAIM FAILS AS A MATTER OF LAW ................................................................... 28
   F.  PLAINTIFFS' CLAIMS AGAINST DEFENDANT'S, MR. MCGONIGLE AND DR. ROMBERGER, IN THEIR OFFICIAL CAPACITY SHOULD BE DISMISSED .......... 30

V.  CONCLUSION ........................................................................................ 30

# TABLE OF CITATIONS

 Federal Cases

Axtell v. LaPenna, 323 F.Supp. 1077, 1079 (W.D.Pa. 1971) ................................ 26

Baker v. Downey City Board of Education, 307 F.Supp. 517 (C.D.Ca. 1969) ...... 16

Beauharnais v. Illinois, 343 U.S. 250, 255-257 (1952) ........................................... 5

Bethel School District No. 403 v. Fraser, 478 U.S. 675, 682 (1986) ............... 11, 22

Blau v. Fort Thomas Public Sch. Dist., 401 F.3d 381, 395-96 (6th Cir. 2005) ...... 28

Brandenburg v. Ohio, 395 U.S. 444 (1969) ............................................................ 5

Bystrom v. Findley High School, 686 F.Supp. 1387 (D.Minn. 1987) ................... 16

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005) ............................. 29

Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571-572 (1942) .............. 5, 6

City of Chicago v. Morales, 527 U.S. 41 (1999) ............................................. 21, 22

Curley v. Klein, 298 F.3d 271, 277 (3d Cir. 2002) ................................................ 19

D.B. v. Lafon, 217 Fed.Appx. 518, 524 (6th Cir. 2007) ........................................ 13

Donahue v. Gavin, 280 F.3d 371, 378 (3d Cir. 2002) ........................................... 19

Flaherty v. Keystone Oaks Sch. Dist., 247 F.Supp.2d 698 (W.D.Pa 2003) ..... 17, 24

Franklin Prescriptions, Inc. v. The New York Times Co.,
267 F.Supp.2d 425, 436 (E.D.Pa. 2003) ................................................................ 10

Hazelwood School District v. Kuhlemier, 484 U.S. 260, 266 (1988) ................... 11

Hooks v. Clark County Sch. Dist., 228 F.3d 1036, 1042 (9th Cir. 2000) ............. 28

Hope v. Peltzer, 536 U.S. 730, 739 (2002) ........................................................... 19

Hustler Magazine v. Falwell, 485 U.S. 46 (1988) ................................................... 9

Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) .............................................. 30

Killion v. Franklin Regional School Dist., 136 F.Supp. 2d 446 (W.D.Pa. 2001)...16

Latour v. Riverside Beaver School District, 2005 WL 2106562
(W.D.Pa. 2005)....................................................................................17

Lavine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001)..........................13

Layshock v. Hermitage School Dist.,
2007 WL 2022096 (W.D.Pa. July 10, 2004)..................................... 17, 20, 24, 25, 29

Los Angeles Police Dept. v. United Reporting Publ'g Chp.,
528 U.S. 32, 39 (1999) ............................................................................21

Lowery v. Euverard, 497 F.3d 584, 592-93 (6th Cir. 2007) .................................13

McLaughlin v. Watson, 271 F.3d 566, 570-571 (3d Cir. 2001)
cert. denied 535 U.S. 989 (2002) ...................................................... 19, 20

Mellott v. Heemer, 161 F.3d 117, 121 (3d Cir. 1988)
cert. denied 526 U.S. 1160 (1999) .........................................................19

Miller v. California, 413 U.S. 15 (1973) ...................................................5

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)...........................................18

Mitchell v. Hillsborough County, 468 F.3d 1276, 1286-87 (11th Cir. 2006).........10

Morse v. Frederick, __ U.S. __, 127 S.Ct. 2618, 2625 (2007)............................13

New York Times v. Sullivan, 376 U.S. 254 (1964)....................................5

Prince v. Massachusetts, 321 U.S. 158, 166 (1944) .............................28

Ryan v. Burlington County, 860 F.2d 1199, 1204 n.9 (3d Cir. 1988)....................18

Saucier v. Katz, 533 U.S 194, 201 (2001)............................................19

Saxe v. State College Area School District, 240 F.3d 200, 214 (3d Cir. 2001)......21

Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992) ..................................20

Sypniewski v. Warren Hills Regional Bd. of Educ., 307 F.3d 243
(3d Cir. 2002) ........................................................................21, 22

Tinker v. Des Moines Independent Community School District,

393 U.S. 503, 513 (1969)..................................................................... 11, 12, 13, 22

Troxel v. Granville, 530 U.S. 57, 66 (2000)...........................................28

Watts v. United States, 394 U.S. 705 (1969)...........................................5

Wisniewski v. Board of Educ. of Weedsport Cent. School Dist.,
494 F.3d 34 (2nd Cir. 2007) ......................................... 12, 13, 14, 15, 16

State Cases

Birl v. Philadelphia Elec. Co., 167 A.2d 472, 475 (Pa. 1960) .............................6, 7

Commonwealth v. Hall, 455 A.2d 674, 676 (Pa.Super. 1983)..............................26

Cosgrove Studio & Camera Shop v. Pane, 182 A.2d 751, 754 (Pa. 1962)...............7

D.O.F. v. Lewisburg Area School District, 868 A.2d 28 (Pa.Cmwlth. 2004) .. 26, 27

Hoke v. Elizabethtown School District, 833 A.2d 304 (Pa.Cmwlth. 2003) ...........26

J.S. v. Bethlehem Area School District, 569 Pa. 638 (Pa. 2002) ...........................12

Schnabel v. Meredith, 107 A.2d 860, 862 (Pa. 1954)..............................................6

Thomas Merton Center v. Rockwell International Corp., 442 A.2d 213, 215 (Pa.
1981) ..........................................................................................................6

Federal Statutes

U.S.Const. amend I...................................................................................5

State Statutes

23 P.S. § 6352(a) ...................................................................................17

24 P.S. § 13-1317 ...................................................................................26

24 P.S. § 1317 ........................................................................................25

24 P.S. §§ 1-111 ....................................................................................17

24 P.S. Section 11-1122(a) .....................................................................8

State Regulations

PA Code Title 22 ....................................................................................................23

## I.    PROCEDURAL HISTORY

On March 28, 2007, J.S. and her parents, Terry and Steven Snyder (hereafter collectively referred to as "Plaintiffs"), filed a Complaint (Dkt. #1) and a Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #2). A hearing on the Temporary Restraining Order and Preliminary Injunction was held on March 29, 2007. At the conclusion of the hearing, the Temporary Restraining Order and Preliminary Injunction requests were denied for the reasons set forth on the record and in a written memorandum (Dkt. #7). Discovery has concluded and both the Defendants and the Plaintiffs filed Motions for Summary Judgment on November 21, 2007 (Dkt. #33; #34).

## II.    BRIEF STATEMENT OF THE CASE[1]

On Sunday, March 18, 2007, J.S. and her friend and classmate, K.L., created an unauthorized profile of Defendant McGonigle, at their respective homes, on the popular website MySpace.com ("MySpace")(UMF 10; Ex. "B"). The profile portrayed McGonigle, the Middle School Principal, as a sexual pedophile or predator of young students and as a disturbed individual (UMF 68-69). For example, among other things, the profile, which was specifically directed towards "children," described McGonigle as a "sex addict" that "loved children and sex of any kind" (Ex. "B"). The website had a URL address of

---

[1] The Defendants also incorporate their Statement of Uncontested Facts (hereafter referred to in this Brief as "UMF") as though fully set forth herein (Dkt. #33).

www.MySpace.com/kidsrockmybed.com (UMF 19). In addition, the profile stated that McGonigle liked "fucking in [his] office," "hitting on students and parents," and enjoyed watching "the Playboy channel on directv" (Ex. "B"). The profile contained McGonigle's actual picture which was taken, without permission, from the District's website (UMF 13). There was absolutely no indication on the profile that the information or contents of the profile was intended to be a joke or parody or that somebody other than McGonigle himself created the website (UMF 20; Ex. "B").

The profile of McGonigle was available for the entire world to view for at least a day before it was set to "private" (UMF 23). After J.S. set the website to "private," twenty-two (22) "friends" were granted access to the website. The profile of McGonigle immediately created a "buzz" in school as numerous students became aware of the profile the day after it was created (UMF 27, 32). As a result of the profile, Randy Nunemacher, a Middle School math teacher, experienced a disruption in his class when six or seven students continued talking and discussing the MySpace profile of McGonigle despite repeated warnings to get back to work (UMF 78). In addition, Angela Warner, a seventh and eighth grade teacher at the Middle School, was approached by a group of students who were concerned about the MySpace profile (UMF 82). In short, there were continued "rumblings" throughout the school regarding the MySpace profile (UMF 80).

On Tuesday, March 20, 2007, McGonigle, himself, was approached by a student and was informed that a MySpace website contained some very disturbing comments about him (UMF 34). Later that same day, McGonigle was approached by Mr. Nunemacher and Ms. Warner and was informed about the disruptions/discussions that occurred the prior day during their respective classes (UMF 35). The next day, upon his request, McGonigle was provided with an actual printout of the website by the concerned student (UMF 37).

Upon being called down to McGonigle's office, after initially denying any involvement in the creation of the MySpace profile, J.S. admitted that she and K.L. created the website (UMF 41).[2] Thereafter, McGonigle contacted J.S.'s parents to inform them about the situation and contacted MySpace to have them remove or take down the profile (UMF 43-44). McGonigle subsequently imposed a ten (10) day out of school suspension on J.S. for violating two District policies (UMF 54-55; Ex. "H"). Superintendent Romberger supported McGonigle's punishment (UMF 61). As a result of her actions, Terry and Steven Snyder grounded J.S. "for a very long time." (UMF 84).

---

[2] K.L.'s involvement in the creation of the MySpace website was limited to "copying and pasting" McGonigle's official school picture onto the MySpace profile (UMF 13, 15)

# III.   STATEMENT OF QUESTIONS INVOLVED

1.    Did the District violate J.S.'s First Amendment right when they suspended her for ten days?  Suggested Answer:  No

2.    Are Principal McGonigle and Superintendent Romberger entitled to qualified immunity:  Suggested Answer:  Yes

3.    Are the applicable policies and rules of the District vague and/or overbroad?  Suggested Answer:  No

4.    Did the Defendants exceed its statutory authority when they disciplined J.S.?  Suggested Answer:  No

5.    Do Steven and Terry Snyder have a valid Fourteenth Amendment claim?  Suggested Answer:  No

6.    Should Plaintiffs' claims brought against Mr. McGonigle and Dr. Romberger in their official capacities be dismissed?   Suggested Answer:  Yes

## IV.  ARGUMENT

### A.  Defendants' Act of Suspending J.S. Did Not Violate Her Rights Under the First Amendment

In Count I of the Complaint, the Plaintiffs allege that the ten (10) day suspension issued by the Defendants violated J.S.'s First Amendment right to free speech.

### 1.  J.S.'s Speech Is Not Afforded First Amendment Protection

The First Amendment in relevant part protects the freedom of speech. U.S.Const. amend I.  However, the right to free speech is not absolute at all times and under all circumstances.  Certain types of speech are recognized as unprotected and thus subject to regulation or punishment by the government without violating the Constitution.  Brandenburg v. Ohio, 395 U.S. 444 (1969)(speech that incites); Miller v. California, 413 U.S. 15 (1973)(obscenity); New York Times v. Sullivan, 376 U.S. 254 (1964)(defamatory speech); Beauharnais v. Illinois, 343 U.S. 250, 255-257 (1952)(libelous speech); Watts v. United States, 394 U.S. 705 (1969)("true threats").  In Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571-572 (1942), the U.S. Supreme Court explained as follows:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional

problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting words…It is has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that my be derived from them is clearly outweighed by the social interest in order and morality. Resort to epithets for personal abuse is not in any proper sense communication of information or opinions safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument. Id.

As stated above, defamatory material is not protected speech under the First Amendment. Under Pennsylvania law, in considering whether a statement is defamatory, courts must consider whether the statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." Birl v. Philadelphia Elec. Co., 167 A.2d 472, 475 (Pa. 1960). "Libel is the malicious publication of printed or written matter which tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule." Schnabel v. Meredith, 107 A.2d 860, 862 (Pa. 1954). "It is the function of court to determine whether the challenged publication is capable of defamatory meaning." Thomas Merton Center v. Rockwell International Corp., 442 A.2d 213, 215 (Pa. 1981).

In Birl v. Philadelphia Elec. Co., supra at 476, the Pennsylvania Supreme Court held that a statement that an employee quit without notice was capable of a defamatory meaning because recipients could conclude that the employee lacked

honor and integrity "and was not a person to be relied upon insofar as his business dealings were concerned."  Likewise, in <u>Cosgrove Studio & Camera Shop v. Pane, 182 A.2d 751, 754 (Pa. 1962)</u>, the Pennsylvania Supreme Court  held that an advertisement was capable of a defamatory meaning because it implied that a competitor had bad business practices and might lead a recipient to question the competitor's integrity.

Here, even more so than in <u>Birl</u> and <u>Cosgrove</u>, the contents of the MySpace profile are clearly defamatory and libelous.  J.S. admits that the unauthorized MySpace profile portrays McGonigle as a pedophile and sexual predator of young students (UMF 68-69).  The MySpace profile is especially defamatory as it is directed specifically towards "children" and states that McGonigle has come to MySpace to "pervert the minds of other principals to be just like me" (Ex.  "B").  The unauthorized profile goes on to describe McGonigle's interests as "fucking in my office" and "hitting on students and their parents (Ex. "B").  These knowingly false accusations are particularly egregious as McGonigle's job demands that he be around and interact with students on a daily basis.[3]  In fact, the Pennsylvania

---

[3] Section 573 of the Restatement (Second) of Torts provides that "[o]ne who publishes a slander that ascribes to another conduct, characteristics, or a condition that would adversely affect his fitness for the proper conduct of his lawful profession, trade or profession, or his public or private office, whether honorary or for profit, is subject to liability without proof of special harm."  Such is the case here.

School Code, 24 P.S. Section 11-1122(a), provides for discipline, including termination, for such immorality.

It cannot be argued that publishing knowingly false accusations about McGonigle would not harm his reputation in the community. It simply cannot be calculated how many people viewed the website when the profile was available to the entire world. Anybody performing a search of MySpace would have had complete access to the profile of McGonigle and would undoubtedly find the information contained on the website extremely alarming (UMF 18). Even J.S. and Terry Snyder admit that the false accusations regarding McGonigle would adversely affect his reputation (UMF 70, 72). Simply put, the forged profile has absolutely no social value nor is the information entitled to the protections of the First Amendment as it falsely accuses McGonigle of engaging in serious sexual misconduct.[4]

The fact that McGonigle was not investigated for sexual abuse by any agency or law enforcement should not serve to protect J.S.'s defamatory speech. Simply because Romberger and Susan Schneider-Morgan, the District's Director

---

[4] One who publishes a matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other: (a) a criminal offense; (b) a loathsome disease; (c) a matter incompatible with his business, trade, profession or office; or, (d) a serious sexual misconduct. Restatement (Second) of Torts, Section 570. Such is the case here.

of Technology, did not believe the accusations contained in the MySpace profile, does not mean that another reasonable community member or parent viewing the MySpace profile would believe the accusations and contact law enforcement to investigate.  At that point, J.S.'s defamatory accusations could have had very serious consequences for McGonigle.

Any attempt by the Plaintiffs to argue that the MySpace profile was some sort of parody, or constitutionally protected speech, is without merit.  Plaintiffs have previously compared the MySpace profile of McGonigle to the parody published by Hustler Magazine of the Reverend Jerry Falwell which was the subject of the United States Supreme Court case <u>Hustler Magazine v. Falwell, 485 U.S. 46 (1988)</u>(Dkt. #16, p. 10-11).  In that case, Hustler Magazine published a parody interview with the Reverend Falwell, a nationally known minister and commentator on politics and political affairs, regarding his "first times."  The Hustler parody portrays Reverend Falwell and his mother as drunk and immoral, and suggests that Reverend Falwell is a hypocrite who preaches only when he is drunk.  The parody interview listed the ad as "Fiction; Ad and Personality Parody" and the parody had a disclaimer at the bottom of the page that read, "ad parody-not to be taken seriously."  485 U.S. at 48

Contrary to the facts in <u>Hustler</u>, McGonigle was not a public figure like Revered Falwell and there was absolutely no indication on the profile that it was

intended to be parody.  The court in <u>Franklin Prescriptions, Inc. v. The New York</u> <u>Times Co., 267 F.Supp.2d 425, 436 (E.D.Pa. 2003)</u>, articulated the standard for determining a "public figure" as a person who "assumed a role of special prominence in society or placed themselves in the forefront of a particular issue."

Here, as opposed to Reverend Falwell, McGonigle did not assume a role of special prominence in society or willingly place himself in the forefront of a particular issue.  He did not run for elected office nor did he advance any particular point of view in public.  McGonigle was an unfortunate victim whose rights were invaded and simply cannot be considered a public figure for First Amendment purposes.  The uncontested record reflects the profile J.S. created is not a parody, but rather it is a defamatory and slanderous profile of McGonigle which is not protected speech under the First Amendment.[5]

---

[5] J.S.'s own testimony at the preliminary injunction hearing demonstrates that the profile was not a parody.  J.S. testified at the preliminary hearing that she made the profile because she was "mad" at McGonigle for enforcing a dress code policy (Ex. "G," p. 12, ln. 8).  It is clear that J.S. wrote the profile not to mock McGonigle but to inflict harm and injury.  Such tasteless, vulgar, and ad hominem attacks is not protected speech.  <u>See</u>, <u>Mitchell v. Hillsborough County, 468 F.3d 1276, 1286-87 (11th Cir. 2006)</u>("While [Plaintiff] did testify that he set out to be funny and to satirize Commissioner Storms position, Mitchell also admitted that he was angry at Commissioner Storms for raising the issue of de-funding Public Access and he further conceded that his speech was, at least in part, actuated by a desire to ridicule Storms personally.  Taken together, these admissions give [Plaintiff's] satirical motivation argument a sheen of post-hoc rationalization.  Dubious, after-the-fact, subjective justification cannot, on their own, trump objective content.")

### 2.    J.S.'s Speech Was Reasonably Foreseeable to Cause A Substantial Disruption At The Middle School

Even if Plaintiff's profile is considered protected speech under the First Amendment, Plaintiff's First Amendment Claim must be dismissed as it was reasonably foreseeable the MySpace profile would create a material, substantial disruption at the Middle School.

The United States Supreme Court has long recognized that schools could regulate and punish students for "on campus speech."  Hazelwood School District v. Kuhlemier, 484 U.S. 260, 266 (1988)("[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school."); Bethel School District No. 403 v. Fraser, 478 U.S. 675, 682 (1986)(First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings.")

However, schools can also regulate and punish students for speech that originates "off campus" or "out-of-school speech" in certain circumstances. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513 (1969)("But conduct by the student, in class or out of it, which for any reason-whether it stems from time, place or type of behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not

immunized by the constitutional guarantee of freedom of speech."); J.S. v. Bethlehem Area School District, 569 Pa. 638 (Pa. 2002)(speech expressed by student on a website from his home computer was "on-campus" speech for which the school district could rightfully expel the student and not violate his First Amendment rights.)

In cases in which a school district attempts to regulate or punish students for speech that originates "off campus," the school district "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Tinker v. Des Moines Independent Community School District, 393 U.S. at 509. The Tinker Court used several formulations to describe student conduct that would properly merit school discipline: conduct that (1) "would substantially interfere with the work of the school," Id., or (2) would cause "material and substantial interference with schoolwork or discipline," Id. at 511, or (3) "would materially and substantially disrupt the work and discipline of the school," Id. at 513, or (4) might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." Id. at 514; Wisniewski v. Board of Educ. of Weedsport Cent. School Dist., 494 F.3d 34 (2nd Cir. 2007). In its most recent consideration of a First Amendment challenge to school discipline in response to a student's allegedly protected speech, the Supreme Court stated that

"<u>Tinker</u> held that student expression may not be suppressed <u>unless school officials</u> <u>reasonably conclude that it will 'materially and substantially disrupt the work and</u> <u>discipline of the school.</u>" <u>Morse v. Frederick, __ U.S. __, 127 S.Ct. 2618, 2625</u> <u>(2007)</u>(emphasis added).

Contrary to any assertion Plaintiffs may make that a school can only discipline student conduct for events that caused "actual" disruptions, school administrators need only have a reasonable forecast that substantial disruption will occur to punish students for "off-campus" speech. <u>Lowery v. Euverard, 497 F.3d</u> <u>584, 592-93 (6th Cir. 2007)</u>("<u>Tinker</u> does not require certainty, only that the forecast of substantial disruption be reasonable…<u>Tinker</u> does not require disruption to have actually occurred."); <u>Lavine v. Blaine Sch. Dist., 257 F.3d 981,</u> <u>989 (9th Cir. 2001)</u>("Tinker does not require certainty that disruption will occur."); <u>D.B. v. Lafon, 217 Fed.Appx. 518, 524 (6th Cir. 2007)</u>("The district court nonetheless reasonably could conclude that displays of the Confederate flag would be likely to lead to unrest in the future. Such a determination is not erroneous as either a factual finding or a legal conclusion.")

The facts in <u>Wisniewski,</u> 494 F.3d 34, are very similar to the facts in this case. There, an eighth grade middle school student was using his America OnLine ("AOL") Instant Messaging ("IM") software on his home computer. The AOL IM program permits the sender of the IM message to display an icon on the computer

screen which serves as an identifier of the sender. The student's icon was a small drawing of a pistol firing a bullet at a person's head, above which were dots representing splattered blood. Beneath the drawing were the words "Kill Mr. VanderMolen" (the student's English teacher). The student sent IM messages, which displayed the violent icon, to 15 members of his IM "buddy list." The icon was not sent to anybody associated with the school district. After about three weeks in which the icon was available to view, a classmate of the student brought the icon to Mr. VanderMolen's attention and supplied him with a copy of the icon. Upon questioning by the school principal, the student admitted that he created and sent the icon. The student was subsequently suspended for five days. 494 F.3d at 35-36.

The suspended student's parents brought suit against the school district alleging that the defendants violated their son's First Amendment rights. In granting defendants' motion for summary judgment, the Second Circuit stated the following:

> We are in agreement, that, on the undisputed facts, it was reasonably foreseeable that the IM [Instant Message] icon would come to the attention of school authorities and the teacher whom the icon depicted being shot. The potentially threatening content of the icon and the extensive distribution of it, which encompassed 15 recipients, including some of [Plaintiff's] classmates, during a three-week circulation period, made this risk at least foreseeable to a reasonable person, if not inevitable.

> And there can be no doubt that the icon, once made
> known to the teacher and other school officials, would
> foreseeably create a risk of substantial disruption within
> the school environment… 494 F.3d at 39-40.

The facts in this case are strikingly similar to those in <u>Wisniewski</u>. Here, just like the student that case, J.S. created the MySpace profile at her home and not on school property (UMF 10). She permitted a selected amount of "friends" to view the profile (UMF 26). The profile was not sent to anybody associated with the District. A concerned student brought the MySpace profile to the attention of McGonigle (UMF 37). After admitting to creating to profile, J.S. was suspended for conduct that originated off campus (UMF 54).

However, as compared to <u>Wisniewski</u>, the "off campus" speech in this case actually disrupted the educational mission of the District. It is uncontested that a general "buzz" existed in the Middle School regarding the profile the day after it was created (UMF 32). Numerous students knew about the profile which caused concern and actual disruptions in the school (UMF 30-31, 78-82). Of particular note, a large group of students refused to follow a teacher's instructions and continued to discuss the MySpace profile during class (UMF 78).

As the Defendants were experiencing disruptions in its classrooms in the immediate days following the creation of the MySpace profile, the Defendants submit that it is reasonably foreseeable that future, substantial disruptions would

occur as a result of the profile had the Defendants not taken the action they did. The Defendants can not say it better than Terry Snyder did herself when she declared that the MySpace profile could cause disruptions at school because things "could get out of control" (UMF ¶ 75).[6]  As the above case law demonstrates, the Defendants need not wait until chaos develops to take action.  Like in Wisniewski, based on the serious, sexual accusations against McGonigle and given his leadership position within the District, it is clear that further, substantial disruptions would have occurred had the Defendants not acted as they did.[7]

The Defendants are aware of several district court cases that found that the defendant school district violated a student's First Amendment rights for improperly punishing "off-campus" speech.  However, in each of those cases, the factual scenario is far different than in this case.  Compare, Killion v. Franklin Regional School Dist., 136 F.Supp. 2d 446 (W.D.Pa. 2001)(Student circulated e-mails with a David-Letterman-type Top-Ten list making fun of the athletic

_____

[6] Defendants also note that math teacher, Randy Nunemacher, formed the belief that the students thought the teachers could not impose discipline on them as a result of the MySpace profile seeping into the District classrooms (UMF 81).

[7] Even if one solely examines the actual disruptions that took place which are articulated in Defendants' Statement of Facts (UMF 74-83), the Defendants submit that they were material and substantial based on prior case law.  Bystrom v. Findley High School, 686 F.Supp. 1387 (D.Minn. 1987)(substantial disruption established by students reading unofficial newspaper in classroom); Baker v. Downey City Board of Education, 307 F.Supp. 517 (C.D.Ca. 1969)(disruption to class room study and student's failure of attention due to reading of unofficial newspaper meets requirement of Tinker).

director's size); <u>Flaherty v. Keystone Oaks Sch. Dist., 247 F.Supp.2d 698 (W.D.Pa 2003)</u>(Student posted from his home computer inappropriate remarks about an upcoming volleyball game); <u>Latour v. Riverside Beaver School District, 2005 WL 2106562 (W.D.Pa. 2005)</u>(Student posted violent rap lyrics from his home on the internet); <u>Layshock, 2007 WL 2002096</u>, at *1 (Student created a MySpace profile of his principal which included "nonsensical answers to silly questions on one hand, to crude juvenile language on the other").

Unlike any of the above cases, the facts in this case deal with knowingly untrue language that admittedly portrays a Principal as a pedophile or sexual predator (UMF 68-69). Such allegations have extreme consequences in a school setting.[8] This is not a case where the profile uses crude or immature language which makes fun of or exaggerates certain characteristics of an individual. Rather, this is a case where the accusations about McGonigle made him a direct threat to the community and especially the children he oversaw everyday. The profile also could affect McGonigle's ability to obtain future employment (UMF 65).

---

[8] Under 23 P.S. § 6352(a), any school employee who has reasonable cause to suspect on the basis of training or experience that an employee is or was having an improper sexual relationship with a minor student is obligated to contact law enforcement and the district attorney. In addition, a school employee would be immediately terminated if convicted of a number of crimes as outlined under the Pennsylvania Crime Code and Pennsylvania School Code. See, 24 P.S. §§ 1-111; 3121 (relating to rape); 3122.1 (relating to statutory sexual assault); 3123 (relating to involuntary deviate sexual intercourse); 3124.1 (relating to sexual assault); 4304 (relating to endangering welfare of children).

In sum, the Defendants did not punish J.S. for the mere fact that she created the MySpace profile. Rather, it is uncontested that McGonigle suspended J.S. because she violated two distinct District policies, which were applicable because the defamatory profile came into the Middle School and cased actual disruptions to the educational mission of the District (UMF 51). However, even if the District did not have said policies, McGonigle would have acted appropriately, and would not have violated J.S.'s First Amendment rights, as it was reasonably foreseeable to conclude that the MySpace profile would cause further, substantive disruptions in the District's educational mission.

**B.    Individual Defendant's, Mr. McGonigle and Dr. Romberger, Are Entitled To Qualified Immunity**

The Defendants respectfully submit that all claims against the individual Defendant's, Mr. McGonigle and Dr. Romberger, should be dismissed as a matter of law because they is entitled to qualified immunity.

It is the Defendants' burden to establish that they are entitled to qualified immunity. Ryan v. Burlington County, 860 F.2d 1199, 1204 n.9 (3d Cir. 1988). Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

In reviewing the merits of a claim of qualified immunity, a court must conduct a two-step inquiry. First, it must determine whether "the facts show the

officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S 194, 201 (2001); Donahue v. Gavin, 280 F.3d 371, 378 (3d Cir. 2002) (explaining that a court must determine first whether the plaintiff has alleged a deprivation of a constitutional right at all when a government official raises qualified immunity as a defense to an action under Section 1983. If the facts, when viewed in the light most favorable to the plaintiff, do not show that the officer violated a constitutional right, then plaintiffs' Section 1983 claim fails). Once a court determines that there is sufficient evidence to conclude that the officer did commit a constitutional violation, then it must assess whether the right was clearly established at the time he acted. Saucier, 535 U.S. at 201, Mellott v. Heemer, 161 F.3d 117, 121 (3d Cir. 1988) cert. denied 526 U.S. 1160 (1999). The inquiry as to whether a constitutional deprivation was clearly established is undertaken in light of the specific context of the case, not as a broad proposition. Curley v. Klein, 298 F.3d 271, 277 (3d Cir. 2002). The state of the law must give the defendants fair warning that their actions were unconstitutional. Hope v. Peltzer, 536 U.S. 730, 739 (2002).

"[C]learly established rights" are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right. McLaughlin v. Watson, 271 F.3d 566, 570-571 (3d Cir. 2001) cert. denied 535 U.S. 989 (2002). A plaintiff need not show that the very action in question has

previously been held unlawful, but needs to show that in light of preexisting law the unlawfulness was apparent." Id. citing Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992) (citations omitted).

In regard to whether J.S.'s First Amendment right was clearly established at the time that the relevant facts took place in this case, the Defendants refer this Court to Layshock v. Hermitage School Dist., 2007 WL 2022096 at *14 which found that the individual defendants were entitled to qualified immunity as no Supreme Court or Third Circuit case have ruled on this specific issue or setting.

Here, the events giving rise to this lawsuit occurred between March 18 – 22, 2007. The Layshock decision, a case dealing with the same legal issues involved in this case, was issued approximately four (4) months after the events of this case (July 10, 2007). Accordingly, as no Supreme Court or Third Circuit cases have addressed the specific issue involved in this case as of March 2007, any First Amendment right J.S. might enjoy was not clearly established at that time. Accordingly, Defendant's McGonigle and Romberger are therefore entitled to qualified immunity.[9]

---

[9] In the alternative, even if this Court determines that J.S.'s First Amendment right was clearly established, the Defendants submit that McGonigle and Romberger are still entitled to qualified immunity as they acted "reasonably in good faith fulfillment of their responsibilities" for all the reasons previously advanced above. See, McLaughlin v. Watson, 271 F.3d 566, 570-71 (3d Cir. 2001).

## C. The District's Policies Are Not Unconstitutionally Vague And/Or Overbroad

The Plaintiffs allege in Count II of their Complaint that the District's policies were unconstitutionally vague and/or overbroad.

Imprecise laws operating in the area of First Amendment freedoms may properly be attacked as being unconstitutionally vague and/or overbroad. <u>City of Chicago v. Morales, 527 U.S. 41 (1999)</u>. A school district policy can be found unconstitutionally overbroad if "there is a 'likelihood that the policy's very existence will inhibit free expression'" to a substantial extent. <u>Saxe v. State College Area School District, 240 F.3d 200, 214 (3d Cir. 2001)</u>. A school district policy can be found unconstitutionally vague if it fails to establish standards to guard against arbitrary enforcement. <u>Sypniewski v. Warren Hills Regional Bd. of Educ., 307 F.3d 243 (3d Cir. 2002)</u>.

### 1. Overbroad Legal Analysis

The overbreath analysis is not casually employed by the courts to strike down policies that have any effect of the First Amendment. <u>Los Angeles Police Dept. v. United Reporting Publ'g Chp., 528 U.S. 32, 39 (1999)</u>("Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, the courts have employed it as only a last resort.") In the school context, as discussed above, the United States Supreme Court has recognized that speech that disrupts education,

causes disorder, or inappropriately interferes with others' rights may be regulated. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. at 513.

### 2.    Vague Legal Analysis

A vague regulation will cause one to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Sypniewski, 307 F.3d at 266. The vagueness doctrine aims to insure that arbitrary enforcement is not done. Morales, 527 U.S. at 56. "When addressing school disciplinary rules, courts have been less demanding of specificity than they have of criminal statutes. Schools need the authority to control such a wide range of disruptive behavior, 'school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanction.'" Bethel Sch. Dist., No. 403 v. Fraser, 478 U.S. at 686. "A school rule will only be struck down when the vagueness is especially problematic." Sypniewski, 307 F.3d at 266.

### 3.    Application Of Policies In Question

Here, the policies apparently at issue are the Blue Mountain Student/Parent Handbook ("Handbook")(Ex. "J") and the Acceptable Use Of The Computers,

Network, Internet, Electronic Communications Systems And Information Policy (Policy 815.1)(Ex. "D"), both of which J.S. is charged with violating.[10]

First, in regard to the Handbook, the Defendants submit that it is neither overbroad or vague. At the outset of the Handbook, which provides students with clear notice about the expectations for Student Behavior and the consequences for breaking the established rules, it specifically states the following:

> Principals and teachers are directed to maintain order in the schools so that learning can occur. <u>Maintenance of order applies during those times when students are under the direct control and supervision of school district officials</u>. The authority is granted in Section 1317 of the Pennsylvania Public School Code… (Ex. "J," p. 39)(emphasis added).

Moreover, the Handbook was specially developed in conjunction with "the Public School Code of 1949, as amended or PA Code Title 22, PDE Regulations, school district policy, administrative procedures, or any other applicable constitutional, statutory or regulatory provision" (Ex. "D," p. 40). It is clear the District recognizes and provides notice to its students that the discipline policies are subject to the appropriate limits of state and federal law.

However, the Plaintiffs allege in their Complaint that the Handbook "fails to distinguish out-of-school speech from in-school expression" (Complaint, ¶ 48).

---

[10] Defendants note that Plaintiffs' Complaint does not allege that Policy 815.1 was unconstitutionally overbroad or vague. However, the Defendants address the constitutionality of this policy nonetheless.

This is clearly not the case. As the above paragraphs demonstrate, this policy cannot be considered overbroad because there is a distinct "geographic limitation" on the limit of the school's authority to discipline student expression.[11]  Moreover, with regard to one of the specific reasons J.S. was disciplined, the Handbook clearly states that "making false accusations about school staff members/another student" is a level IV violation of the discipline code which is punishable by "out-of-school suspension and/or consideration of expulsion" (Ex. "J," pp. 53-55).  The Handbook contains numerous, specific examples of conduct which, if performed on school grounds, warrants an appropriate punishment.  No good faith argument can be made that discipline outlined in the Handbook was somehow vague or that J.S. had no idea or "fair notice" that she could be disciplined for making false accusations about a school staff member.

Second, with regard to Policy 815.1 (Ex. "D"), it states the following:

> Consequences for Inappropriate, Unauthorized and Illegal Use
>
> …This policy incorporates all other relevant School District policies, such as, but not limited to, the student and professional employee discipline policies, copyright policy, property policy, curriculum policies, terroristic

---

[11] In cases in which school policies were found to be overbroad, the primary basis was the lack of a "geographical limitation."  "In other words, the policies at issue in those cases lacked language to limit the school's authority 'to discipline expressions that occur on school premises or at school related activities, thus providing unrestricted power to school officials.  Layshock, 2007 WL 2022096, at 15, citing, Flaherty, 247 F.Supp.2d at 705.

threat policy, and harassment policies…(Ex. "D," p. 17)(emphasis added).

As Policy 815.1 incorporates by reference the geographic limitation contained in the Handbook (24 P.S. § 1317), this policy is not overbroad on its face. In other words, the District is limited to only those situations in which they have direct control and supervision of students. In no way does Policy 815.1 attempt to regulate, control, or punish activities that do not involve the use of either District computers, network, internet, electronic communications or information systems. Nor is Policy 815.1 vague on its face in any way as the Policy has specific definitions for "computer," "electronic communication system," and "network" (Ex. "D," pp. 2-4).

In sum, the plain language of the Defendants' policies are not overbroad or vague. The respective policies give students fair notice that they are subject to discipline for actions that disrupt the educational process of the District. Even if this Court concludes that the Defendants misapplied the policies to the facts of this case, it is irrelevant in determining the whether the respective policies were unconstitutional.[12] Accordingly, Count II of Plaintiffs' Complaint should be dismissed.

_____

[12] See, Layshock, 2007 WL 2022096, at *16("The court concludes that the policies themselves are not vague nor overbroad, even though the administration misapplied them in this case. Accordingly, summary judgment will be granted to Defendants on Count II.")

**D.     Plaintiffs' Ultra Vires Claim Fails As A Matter Of Law**

The Plaintiffs allege in Count III of their Complaint that the Defendants exceeded their disciplinary authority permitted by Pennsylvania law for the punishment handed down to J.S.

It is well settled that a school principal has the right to discipline students during the time the students are in attendance at school.  24 P.S. § 13-1317; <u>Axtell v. LaPenna, 323 F.Supp. 1077, 1079 (W.D.Pa. 1971)</u>(school authorities stand in the position of loco parentis over children while they are in attendance at school). Schools have broad discretion in determining the applicable policies and procedures regarding the discipline of students.  <u>Commonwealth v. Hall, 455 A.2d 674, 676 (Pa.Super. 1983)</u>. "A court is not to act as a 'super' school board and substitute its own judgment for that of the school district."  <u>D.O.F. v. Lewisburg Area School District, 868 A.2d 28 (Pa.Cmwlth. 2004)</u>.  However, schools cannot act outside their statutory authority to punish students for conduct that is completely unrelated to school.  <u>Id.</u>; <u>Hoke v. Elizabethtown School District, 833 A.2d 304 (Pa.Cmwlth. 2003)</u>.

Here, it is uncontested that the District did not discipline J.S. until the MySpace profile was brought into the Middle School and until J.S. admitted her involvement.  At the time J.S. was disciplined, several disruptions had already taken place in the Middle School and, as argued above, it was reasonably

foreseeable to conclude that further, substantial disruptions would take place because of the profile.

This is not a case where the Defendants disciplined J.S. for conduct that solely occurred outside of school, after school hours, or had no relationship with the school. Such a scenario was the case in <u>D.O.F.</u> In that case, the court found that although the plaintiff student smoked marijuana on a school playground, the school district acted outside its statutory authority in expelling the student because the act occurred at night, outside school supervision, after school was over, and the act had no connection to the school. 868 A.2d 28.

As opposed to <u>D.O.F.</u>, the MySpace profile in this case entered the school, both verbally and in writing during the school day, during a time of school supervision, and had a material connection to the school and its employee. Although the Defendants may have arguably exercised "mistaken judgment" in handing down the punishment they did for J.S., they were authorized to do both by way of District policy as well as statutory law. Accordingly, Count III of Plaintiffs' Complaint should be dismissed.

**E.  Plaintiff's, Steven and Terry Snyder's, Parental Rights Claim Fails As A Matter Of Law**

The Plaintiffs allege that in Count IV of their Complaint that the Defendants' punishment of J.S. violated the constitutional rights of Terry and Steven Snyder.

It is well settled by the United States Supreme Court that parents have a fundamental liberty interest which is protected by the Due Process Clause of the Fourteenth Amendment to make decisions concerning the care, custody and control of their children.  Troxel v. Granville, 530 U.S. 57, 66 (2000)("It cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")  However, the right of parents to make decisions concerning the care, custody and control of their children is not without limitations.  Prince v. Massachusetts, 321 U.S. 158, 166 (1944)(Parents rights are not "beyond regulation in the public interest.");  Hooks v. Clark County Sch. Dist., 228 F.3d 1036, 1042 (9th Cir. 2000)(right to educate children at home is subject to reasonable regulation by the state); Blau v. Fort Thomas Public Sch. Dist., 401 F.3d 381, 395-96 (6th Cir. 2005)(discipline of students is committed to state and local authorities).

Likewise, the United States Court of Appeals for the Third Circuit has recognized that in the public school context, parental rights are not absolute and can be subject to reasonable regulation. In <u>C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005)</u>, the Court noted that "Courts have held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." <u>Id. at 182</u>. Notably, the district court in <u>Layshock v. Hermitage, 2007 WL 2022096</u> at *16, found against the parents because they in fact did discipline their son.

Here, based on the relevant and controlling law, Steven and Terry Snyder do not have a valid constitutional claim. Just like in <u>Layshock</u>, the Defendants did not interfere with the Snyder's discipline of J.S. It is uncontested that the Snyder's <u>did</u> discipline J.S. "for a very long time" by restricting her phone and computer usage (UMF 84-85). There is simply no fundamental due process right of parents to be the exclusive disciplinarian of their children, either independent of their right to direct the upbringing and education of their children or encompassed by it. Accordingly, Count IV of Plaintiffs' Complaint should be dismissed.

**F.** **Plaintiffs' Claims Against Defendant's, Mr. McGonigle and Dr. Romberger, In Their Official Capacity Should Be Dismissed**

Plaintiffs have sued McGonigle and Romberger in their official and individual capacities, in addition to the suing the District. The United States Supreme Court has dismissed official capacity suits against individuals, holding that such suits represent only another way of pleading an action against an entity of which an officer is an agent – in essence those suits against the entity. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). As the Plaintiffs already have claims pending against the District, naming McGonigle and Romberger in their official capacities is redundant. Therefore, said claims should be dismissed.

**V.** **CONCLUSION**

For all the forgoing reasons, the Defendants submit that Summary Judgment should be entered in their favor.

Respectfully submitted,

SWEET, STEVENS, KATZ & WILLIAMS LLP

Date: December 10, 2007    By:    /s/ Jonathan P. Riba
Jonathan P. Riba, Esquire, PA 88095
331 Butler Avenue, P.O. Box 5069
New Britain, Pennsylvania  18901
Telephone:  (215) 345-9111
Facsimile:  (215) 348-1147
e-mail:  jriba@sweetstevens.com

Attorney for Defendant,
Blue Mountain School District,
Dr. Joyce Romberger and James McGonigle

# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **J.S., et al.** | : | **CIVIL ACTION NO.** |
| | : | **07-CV-585** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **JUDGE:** |
| **BLUE MOUNTAIN SCHOOL** | : | **JAMES M.   MUNLEY** |
| **DISTRICT;** | : | |
| **DR. JOYCE E. ROMBERGER,** | : | |
| **Superintendent Blue Mountain School** | : | |
| **District; and JAMES S.** | : | **ELECTRONICALLY FILED** |
| **MCGONIGLE, Principal Blue** | : | |
| **Mountain Middle School, both in their** | : | |
| **official and individual capacities,** | : | |
| | : | |
| **Defendants.** | | |

## CERTIFICATE OF SERVICE

I, Jonathan P. Riba, Esquire, counsel for Defendants Blue Mountain School District, Dr. Joyce Romberger and James McGonigle, hereby certify that a true and correct copy of the foregoing Brief in Support of Defendants' Motion for Summary Judgment is available through the Court's ECF filing system and was also served by U.S. First Class Mail this day upon:

Mary Kohart, Esquire
Meredith Nissen, Esquire
Drinker Biddle & Reath LLP
One Logan Square
Philadelphia, PA  19103

MaryCatherine Roper, Esquire
American Civil Liberties Union of PA
P.O. Box 40008
Philadelphia, PA  19106

Respectfully submitted,

SWEET, STEVENS, KATZ & WILLIAMS LLP

Date: <u>December 10, 2007</u>    By: <u>/s/ Jonathan P. Riba</u>

                                         Jonathan P. Riba, Esquire, PA 88095
                                         331 Butler Avenue, P.O. Box 5069
                                         New Britain, Pennsylvania  18901
                                         Telephone:  (215) 345-9111
                                         Facsimile:  (215) 348-1147
                                         e-mail:  jriba@sweetstevens.com

                                         Attorney for Defendant,
                                         Blue Mountain School District,
                                         Dr. Joyce Romberger and James McGonigle