IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., et al. | ) | |
| | ) | |
| v. | ) | No: 3:07-cv-585 |
| | ) | |
| BLUE MOUNTAIN SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | **ELECTRONICALLY FILED** |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
<u>SUMMARY JUDGMENT</u>**

i

Dockets.Justia.com

# TABLE OF CONTENTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

I.  INTRODUCTION .......................................................................1

II.  PROCEDURAL HISTORY .............................................................1

III.  STATEMENT OF FACTS .............................................................1

IV.  QUESTIONS PRESENTED............................................................3

V,  ARGUMENT .................................................................................4

    A.  Plaintiffs Are Entitled To Summary Judgment On Their Claim That Defendants Violated J.S.'S Right Under The First Amendment Because The MySpace Profile Was Protected Speech And Did Not Cause "Substantial And Material Disruption" ........................................................................5

        1.  The Burden of Proof And Persuasion With Respect To Plaintiffs' First Amendment Claims Is on The Defendants .....................................................................5

        2.  Defendants Are Required To Show That J.S.'s Speech Did Or Was Likely To Cause "Substantial And Material Disruption" ..............5

        3.  Defendants Have Failed To Identify Sufficient "Disruption" to Come Near The Tinker Standard. ..............................................12

        4.  Defendants' Argument That the MySpace Profile Is Unprotected Speech Is Meritless....................................................16

        5.  The Use Of The Photo Was Also Protected Speech. ....................19

    B.  Plaintiffs Are Entitled To Summary Judgment On Their Claim That The Blue Mountain School District Policies Are Unconstitutionally Vague And Overbroad .........................................21

C.    Plaintiffs Are Entitled To Summary Judgment On Their Claims
That Defendants Exceeded Their Authority Under State Law
And Violated The Snyders' Substantive Due Process Rights. ............24

    1.    Absent Substantial And Material Disruption Of School,
PA Law Forbids Discipline Of Student Conduct Outside
School And School-Related Functions. ......................................24

    2.    Absent Substantial And Material Disruption Of School,
Discipline Of Student For Conduct At Home Is Interference
With Parental Authority To Raise Children. ............................25

# TABLE OF AUTHORITIES

## CASES

*Bethel Sch. Dist.No. 403 v. Fraser,* 478 U.S. 675 (1986) ..............................11

*Brandenburg v. Ohio,* 395 U.S. 444 (1969).................................................27

*Burnett v. Twentieth Century Fox Film Corp.*,
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ......................................................18

*Buttons v. National Broadcasting Co.*,
    858 F. Supp. 1025 (C.D. Cal. 1994) .........................................................18

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)..........................................................................20, 21

*Cardtoons, L.C. v. Major League Baseball Players Association*,
    95 F.3d 959 (10th Cir. 1996) ....................................................................17

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989) .....................................................................18

*Country Floors, Inc. v. A P'ship Composed of Gepner and Ford*,
    930 F.2d 1056 (3d Cir. 1991) .....................................................................4

*D.O.F. v. Lewisburg Area Sch. Dist.*,
    868 A.2d 28 (Pa. Commw. Ct. 2004........................................................25

*DuPuis v. City of Hamtramck*,
    502 F. Supp. 2d 654 (E.D. Mich. 2007) ...................................................18

*Flaherty v. Keystone Oaks Sch. Dist.*
    247 F. Supp. 2d 698 (W.D. Pa. 2003)..................................... 4,8,10,21-24

*Flaherty v. Keystone Oaks Sch. Dist.*
    Civ. A. No. 01-586, TS (W.D. Pa. Apr. 13, 2001) ..................................10

*Ginsberg v. New York*,
    390 U.S. 629 (1968)..................................................................................26

*Hoke v. Elizabethtown Area Sch. Dist.*,
833 A.2d 304 (Pa. Commw. Ct. 2003), *appeal denied*, 847  A.2d 59
(Pa. 2004) ........................................................................................... 24-25

*Hustler Magazine v. Falwell*,
485 U.S. 46 (1988) ........................................................................17,18,21

*J.S. v. Bethlehem Area Sch. Dist.*
807 A.2d 847 (Pa. 2002) ....................................................................11,12

*J.S. v. Blue Mountain Sch. Dist.*,
No. 307cv585, 2007 WL 954245 (M.D. Pa. Mar. 29, 2007) ......................1

*Killion v. Franklin Regional Sch. Dist.,* 136 F. Supp. 2d 446
(W.D. Pa. 2001) ............................................................................. 8, 21-24

*Klein v. Smith,* 635 F. Supp. 1440, 1443 (D. Me. 1986) ...............................27

*Latour v. Riverside Beaver Sch. Dist.*,
No. C.A. 05-1076, 2005 WL 2106562 (W.D. Pa. Aug. 24, 2005) .......7, 10

*Layshock v. Hermitage Sch. Dist,* 496 F. Supp. 2d 587
(W.D. Pa. 2007) ...............................................................................passim

*Meyer v. Nebraska*,
262 U.S. 390 (1923) .................................................................................25

*Miller v. California*, 413 U.S. 15 (1973) .....................................................27

*Morse v Frederick,*
___ U.S. ___, 127 S. Ct. 2618 (2007) .......................................................6

*New Jersey Hosp. Ass'n v. Waldman*,
73 F.3d 509 (3d. Cir. 1995) .......................................................................4

*Parham v. J.R.*,
442 U.S. 584 (1979) .................................................................................26

iv

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925)...................................................................26

*Prince v. Massachusetts,*
    321 U.S. 158 (1944)...................................................................26

*Saxe v. State  College Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) .....................................................6, 7

*Sypniewski v. Warren Hills Regional Bd of Educ.*
    307 F.3d 243 (3d Cir. 2002) .........................................................7

*Thomas v. Board of Ed. of Granville Central School Dist.,* 607 F.2d 1043
    (2d Cir. 1979).................................................................... 26-27

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) ..................................... 5-8, 11-12, 15, 23

*Troxel v. Granville,*
    530 U.S. 57 (2000) ..........................................................25, 26

*United States v. Playboy Entm't Group, Inc.,*
    529 U.S. 803 (2000) ....................................................................5

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981) ...................................................................4

*Warrick v. Snider,*
    2 F. Supp. 2d 720 (W.D. Pa. 1997) ) *aff'd w/o opinion,* 191 F.3d 446
    (3d Cir. 1999) ............................................................................5

*Watts v. United States,* 394 U.S. 705 (1969)...............................27

## STATUTES

17 U.S.C. §107 ..................................................................... 20-21

24 P.S. § 5-510................................................................... 24-25

## I.       INTRODUCTION

This is not the first case involving off-campus Internet speech by public school students and is unlikely to be the last.  In a series of cases, the courts of this Circuit have consistently rejected the efforts of school districts to extend their control of students beyond the school gates.  This Court should do the same.

## II.      PROCEDURAL HISTORY

Plaintiffs filed their Verified Complaint and Motion for Temporary Restraining Order on March 28, 2007.  A half-day hearing was held on March 29, 2007, at the conclusion of which the Court denied the motion, stating that: "Questions exist as to the extent that the internet posting disrupted school operations … [and]… issues are present as to whether the speech at issue is protected under the First Amendment."  *J.S. v. Blue Mountain School District,* No. 307-cv-585, 2007 WL 954245 (M.D. Pa. Mar. 29, 2007).  Discovery was completed on October 19, 2007.  Plaintiffs and Defendants filed cross motions for summary judgment on November 21, 2007.

## III.     STATEMENT OF FACTS[1]

In March 2007,  J.S. was an eighth grader at Blue Mountain Middle School, where Defendant McGonigle is principal.  (Facts ¶ 3, 5).   On or about Sunday,

---

1  A more detailed discussion of the facts is set forth in Plaintiffs Statement of Undisputed Material Facts ("Facts") (Ex. A).

March 18, 2007, J.S. and a fellow eighth grader created a parody profile of

McGonigle on a website called MySpace.com (www.myspace.com).  *Id.* at ¶ 15; *see*

*also* J.S. Dep. (Ex. B).  The profile purported to be a self-description by a school

principal.  (Facts ¶ 58).  It did not identify McGonigle by name or mention Blue

Mountain School District, but did include a picture of McGonigle, which the other

student had copied from the District website.  *Id.* at ¶ 17.  The profile was vulgar and

profane and described the subject as a man preoccupied with sex who has sexual

relationships with students.  (Ex. F).

     The profile was intended to be a parody of McGonigle, that is, a comical

imitation of McGonigle that could not reasonably be understood as describing actual

facts about him or actual events.   Facts ¶¶ 15, 18.

     And, indeed, discovery has revealed that no one who saw the MySpace profile

of McGonigle took it as a serious description of him or his conduct. The School

District Superintendent testified that she immediately assumed the information to be

untrue.  (Facts ¶ 82).  McGonigle conceded that he was not asked about the

accusations in the profile by a single person.  *Id.* at 83.

     J.S. and her friend told some of their friends about the profile and how to find

it, but they never brought a copy to school.  Students could not view MySpace from

school computers.  *Id.* at ¶ 13.  After the first day, J.S. and her friend made the

profile "private" so that it could only be viewed by those they permitted to register as

"friends" of the subject. *Id.* at ¶ 18-19. After the profile was made private they granted 22 persons – all of whom they knew as Blue Mountain School District students – permission to be "friends". *Id.*

During the several days that it was posted, students talked about the profile in school, and two teachers reported hearing about it. One teacher had to tell his class to stop talking and get back to work. That classroom disruption – which came during the independent work portion of the class – lasted less than ten minutes. *Id.* at ¶ 37. The only other "disruption" caused by the posting of the profile was that McGonigle, who was then serving double duty as the school disciplinarian, spent perhaps half an hour meeting with the girls and their parents (McGonigle Dep. 104, 107, 114) (Ex. C), and one of the school counselors had to reschedule a few student appointments so that she could monitor standardized tests while the other guidance counselor sat in on McGonigle's meetings with the girls and their parents. *Id.* at 157-63.

## IV.   QUESTIONS PRESENTED

This First Amendment free-speech case presents two issues: (1) whether the First Amendment permits a school district to exclude a student from classes for non-obscene and non-threatening speech posted on the Internet from her home computer; and (2) whether the Fourteenth Amendment and Pennsylvania law permit a school district to discipline a student for out-of-school conduct that does not cause a disruption of classes or school administration.

## V.   ARGUMENT

"Rule 56 . . . mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Flaherty v. Keystone Oaks School Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Pa. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In ruling on summary judgment, this Court is not bound by the factual determinations made or legal conclusions reached in ruling on Plaintiffs' motion for a temporary restraining order. *University of Texas v. Camenish,* 451 U.S. 390, 395 (1981) ("the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); *New Jersey Hosp. Ass'n. v. Waldman,* 73 F.3d 509, 519 (3d. Cir. 1995) (same). *See also Country Floors, Inc. v. A P'ship Composed of Gepner and Ford,* 930 F.2d 1056, 1062 (3d Cir. 1991) (holding that district court erred when it relied on preliminary injunction findings rather than considering full record on summary judgment).

In a similar case decided after the preliminary injunction proceedings in this case, Judge Terrance McVerry of the U. S. District Court for the Western District of Pennsylvania granted summary judgment for a student who created an unflattering MySpace profile of his principal despite having denied a preliminary injunction motion in the case.  As in this case, the defendant had claimed that the MySpace

profile significantly disrupted school administration, but "[t]he more fully developed summary judgment record now before the Court demonstrates that the disruption of school operations was not substantial." *Layshock*, 496 F. Supp. 2d 587, 594 (W.D. Pa. 2007). *See also Warrick v. Snider,* 2 F. Supp. 2d 720, 722 (W.D. Pa. 1998) *aff'd without opinion*, 191 F.3d 446 (3d Cir. 1999).

### A. Plaintiffs Are Entitled To Summary Judgment On Their Claim That Defendants Violated J.S.'S Right Under The First Amendment Because The MySpace Profile Was Protected Speech And Did Not Cause "Substantial And Material Disruption"

#### 1. The Burden of Proof And Persuasion With Respect To Plaintiffs' First Amendment Claims Is on The Defendants.

In a First Amendment case, the burden of proof and persuasion rests on the government. *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816-17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted). This burden applies with equal force to regulation of student expression in the school context. *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 509 (1969).

#### 2. Defendants Are Required To Show That J.S.'s Speech Did Or Was Likely To Cause "Substantial And Material Disruption"

In *Tinker*, the Supreme Court set forth the standard that governs discipline of student speech *in* schools.[2] For school officials to punish student speech, the

---

2 "'[C]ourts considering speech that occurs off school grounds have concluded

officials must demonstrate that the speech caused a "substantial and material disruption" in the school. 393 U.S. at 509. School administrators may act to preempt problems if they have a "specific and significant fear of disruption." *Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 211 (3d Cir. 2001). But that does not mean that a school may punish or censor student speech merely to avoid discomfort or unpleasantness. *Id.*, 240 F.3d at 209. Rather, a school must point to a "well-founded expectation of disruption," perhaps based upon past incidents arising out of similar speech. *Id.* at 212.

In *Tinker*, students wore black armbands on their sleeves to school to exhibit their disapproval of the Vietnam War. The Court held that the "substantial and

---

(relying on Supreme Court decisions) that school officials' authority over off-campus expression is much more limited than expression on school grounds,' but have declined to apply a heightened standard of review because '[t]he overwhelming weight of authority has analyzed student speech (whether on or off campus) in accordance with *Tinker*.'" *Layshock*, 496 F. Supp. 2d at 596; *cf, Morse v Frederick,* ___ U.S. ___, ___, 127 S. Ct. 2618, 2624 (2007) (recognizing "uncertainty" in law about standard applicable to out-of-school-student speech). Plaintiffs do not concede that the *Tinker* standard is the correct one to apply in this case, but the Court need not decide that question because Defendants here cannot satisfy the more deferential *Tinker* standard, and therefore necessarily cannot justify their punishment of J.S. under the First Amendment principles generally applied outside the school context. If, however, this Court were to determine that defendants have satisfied their burden under *Tinker*, then the Court must decide whether *Tinker* or a more onerous standard in fact applies in this context. *See, e.g., Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 216, n.11 (3d Cir. 2001) (application of restrictions on student speech "to cover conduct occurring outside of school premises . . . would raise additional constitutional concerns").

material disruption" standard was not met by student commentary or ephemeral classroom interruptions:

> [T]heir armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, non-protesting students had better let them alone. There is also evidence that a teacher of mathematics had his lesson period practically 'wrecked' chiefly by disputes with Mary Beth Tinker, who wore her armband for her 'demonstration.'

*Tinker*, 393 U.S. at 517-18 (Black, J., dissenting).

The Third Circuit has reinforced *Tinker's* admonition that "a mere desire to avoid . . . discomfort" is not enough to justify discipline of speech. *See Saxe,* 240 F.3d at 212. Moreover, *Saxe* makes clear that an "undifferentiated fear or apprehension of disturbance" will not suffice. *Id.* at 217. Instead, school officials must demonstrate a "particularized reason as to why it anticipates substantial disruption." *Id.* In *Sypniewski v. Warren Hills Reg'l Board of Educ.,* the Third Circuit applied this standard, performing a searching review of the history of racial violence at a school before concluding that discipline against a student who wore a t-shirt about "rednecks" was unjustified. 307 F.3d 243, 273-74 (3d Cir. 2002).

District courts in the Third Circuit have applied rigorously *Tinker's* high standard in several First Amendment cases challenging school discipline of students for material posted on the Internet from a home computer. *See, e.g., Layshock,* 496 F. Supp. 2d 587; *Latour v. Riverside Beaver School District*, No. CA 05-1076, 2005

WL 2106562 (W.D. Pa., Aug. 24, 2005); *Flaherty,* 247 F. Supp. 2d 689; *Killion v. Franklin Reg'l School Dist.*, 136 F. Supp. 2d 446 (W.D. Pa. 2001). These decisions, all of which sided with the students, establish that Defendants have an extremely high hurdle to show the requisite level of disruption.

In the most recent – and analogous – case, Judge McVerry initially denied a TRO but ultimately granted summary judgment for a student who had created a parody profile of his high school principal on www.MySpace.com. 496 F. Supp. 2d at 591. The "disruption" confirmed during discovery (as opposed to that claimed at the TRO hearing) was that students viewed the profile from a school computer during class and were discussing it. *Id.* at 592. One co-principal testified that five teachers told him that the students were talking about the profile in class and that same co-principal spent an entire morning talking to approximately twenty students that were referred to the office because "they had made conversation, made a joke, made a disruption in class, that the teacher had to redirect." *Id.* Student use of computers was limited to classroom assignments for a few days and some teachers elected to modify their lesson plans to avoid the need for computers. *Id.* at 593

Ultimately, the Court found that these alleged "disruptions" did not meet the substantial threshold set forth in *Tinker*:

> [A] reasonable jury could not conclude that the 'substantial disruption'
> standard could be met on this record. The actual disruption was rather

minimal – no classes were cancelled, no widespread disorder occurred, there was no violence or student disciplinary action.

*Id.* at 599-600. [3]  The court also noted that the profiles were accessible for less than one week before being disabled.  *Id*. at 600.

The other federal student speech cases involving the Internet have reached the same conclusion.  In *Killian*, the student circulated an e-mail with a "Top Ten List" making fun of the athletic director's size.  School officials suspended the student and removed him from the track team.  The court held that the school violated the student's First Amendment rights, rejecting the argument that speech that is demeaning to a school official is disruptive merely because it "could impair the administration's ability to appropriately discipline students."  136 F. Supp. 2d 455-59.  *Killian* reaffirms that a school district bears a heavy and significant burden to show that the student's speech in fact materially and substantially interfered with school discipline – by showing, for instance, that "teachers were incapable of teaching or controlling their classes."  *Id*. at 455.

---

3 The lack of disruption was expressed by the court as an independent reason for granting summary judgment.  The court also noted "gaps in the causation link" between the student's conduct and any disruption, in part, because there were three other profiles of the principal available on myspace.com during the same timeframe.  In addition, it appeared that the 'buzz' or discussions some teachers heard were caused by the reaction of administrators rather than the profiles themselves.  *Layshock*, 496 F. Supp. 2d at 599-600.

Similarly, in *Flaherty v. Keystone Oaks School Dist.*, 274 F. Supp. 2d 698 (W.D. Pa. 2003), the court granted summary judgment after issuing a preliminary injunction to stop disciplinary action against a student who posted from his home computer crude and profane comments on a website, including some about a district art teacher. As the *Flaherty* court explained in ruling on the preliminary injunction, the alleged disruption relied upon by school officials to justify the punishment must be significant and must be caused by the student's speech:

> There have been some conversations about fear and need for security, the fact that he is mad at the principals, the volleyball team is being made fun of, people might worry what might happen; but these are not the specific and significant kind of disruption that the case law requires. Worries about what might happen simply don't cut the mustard when you read the cases on these kinds of issues. We have to have more than what the cases say appears to be undifferentiated fear or apprehension of disturbance. . . . The Defendant must show that Mr. Flaherty's conduct would materially and substantially interfere with the operation of the school, the work of the school, the rights of other students . . . .

*Flaherty v. Keystone Oakes Sch. Dist.*, Civ. A. No. 01-586, TS at 124-25 (W.D. Pa. Apr. 13, 2001).

In a different but still relevant scenario, a Western District court enjoined the expulsion of a student who posted rap lyrics containing violent imagery on the Internet from his home computer. *Latour*, 2005 WL 2106562. The school district contended that the student had threatened violence against other students and the school. Because the speech did not rise to the level of a "true threat" and the school

10

could not prove that the speech had caused substantial disruption in the school, the court ordered the student reinstated. *Id.* at *2.

There is only one Internet speech case in which sufficient disruption has been found to justify student discipline. In *J.S. v. Bethlehem Area Sch. Dist.*, the student posted a website that contained threatening and derogatory comments about a teacher and a principal. 807 A.2d 847 (2002). The most disturbing part of the website was a page that asked "Why Should [the teacher] die?" and requested contributions for a hitman. 807 A.2d at 851. The Pennsylvania Supreme Court upheld the suspension of the student, holding that the website, although created out of school, should be treated as in-school speech, and therefore subject to discipline for its lewdness and profanity under *Bethel Sch. Dist. 403 v. Fraser*, 478 U.S. 675 (1986), as well as for any disruption it caused. The Pennsylvania Supreme Court applied a hybrid analysis of *Fraser* and *Tinker* because it acknowledged that the website, unlike the lewd speech at issue in *Fraser*, was not broadcast at a school event. The court found substantial disruption of the school because the targeted teacher was so upset by the website that she did not return for the remaining weeks of the school year, and because both students and parents expressed fears of violence at the school as a result of the website. *J.S. v. Bethlehem*, 807 A.2d at 869.

As Judge McVerry noted in *Layshock*, the First Amendment analysis used by the Pennsylvania Supreme Court strikes a "different balance" between student rights

and school authority than that applied by the federal courts. *Layshock,* 496 F. Supp. 2d at 602. Moreover, *J.S. v. Bethlehem* involved far more disruption than any of the Internet speech cases addressed by the federal courts, and certainly far more than can be shown by Defendants here. This Court should apply the standards and reasoning of the Third Circuit courts that have addressed off-campus student speech.

### 3. Defendants Have Failed To Identify Sufficient "Disruption" to Come Near The Tinker Standard.

The record in this case reveals nothing like the disruption in *J.S. v. Bethelem* and, indeed, suggest less "disruption" than was found insufficient to justify student discipline in *Tinker*, *Layshock*, and the other Internet speech cases. Defendants have identified six types of "disruption" from the MySpace profile created by J.S.:

- Mr. Nunemacher, a math teacher, reported that he had to tell some students to stop talking and return to their work three times because they were discussing the profile (Def. Statement of Material Facts at ¶78); *see also* Nunemacher Dep. (Ex. D);

- the same teacher overheard two students discussing the profile in class and later heard "rumblings" from students (*Id.* at ¶¶79, 80);

- several students approached Ms. Werner, another teacher, to report the profile to her (*Id.* at ¶82);

- a school counselor was required to cancel a small number of student appointments so she could supervise testing while the other counselor sat in on brief conferences with the students and their parents (*Id.* at ¶76);

- after J.S. and her friend returned to school, McGonigle reports there was a general decline in discipline in the school (*Id.* at ¶83); and

- McGonigle reports significant changes in his health as a result of the incident (*Id.* at ¶77).

The first is the only actual "disruption" of any class identified by Defendants, and it lasted less than ten minutes. Mr. Nunemacher testified that during his second period eighth grade Algebra I class on the day J.S. was disciplined, a group of six or seven students were talking during the unstructured classroom work portion of the class. (Facts ¶¶ 31-34). Mr. Nunemacher was able to quiet the students by telling them three times to stop talking and by raising his voice on the third occasion. The entire exchange between Mr. Nunemacher and the talking students lasted no more than five or six minutes. (Facts ¶ 37).

Mr. Nunemacher also testified that he heard two students talking about the profile in his class on another day, but they stopped as soon as he told them to get back to work. That experience is not unique: Mr. Nunemacher testified that he usually has to tell his students in this particular class to stop talking on a weekly basis (Facts ¶ 38). Mr. Nunemacher did report "rumblings" at other points during the week, but could not tell whether those "rumblings" in fact involved the MySpace profile. (Facts ¶ 43).

Ms. Werner testified that a group of eighth grade girls approached her at the end of one of her Skills for Adolescents courses, after class instruction had ended, to report the MySpace profile. (Facts ¶ 28); *see also* Werner Dep. (Ex. E). The girls

spoke with her during the portion of the class when students were permitted to work independently at their desks on other things, such as reading or homework, and Ms. Werner stated explicitly that this did not disrupt her class. *Id.* at ¶ 30-31.

The "disruption" of school counselors' schedules identified by Defendants is similarly overblown. McGonigle always requires a second administrator to be present when he speaks with students or their parents about discipline. (McGonigle Dep. 156-57). McGonigle chose to speak with J.S. first thing in the morning, when one counselor, Ms. Guers, was supervising make-up testing and the other counselor, Ms. Frain, was scheduled to meet with students about their class schedules. McGonigle chose to have Ms. Guers leave the testing and attend the disciplinary meetings, requiring Ms. Frain to cancel several student appointments in order to supervise testing. There is no evidence that Ms. Frain was unable to make up the student appointments at another time. The students who were to meet with her merely remained in their regular classes. (McGonigle Dep. 161). McGonigle testified that his meetings with the girls and their parents took a total of 25-30 minutes. (McGonigle Dep. 104, 107, 114).

McGonigle testified that there was a general decline in student discipline after J.S. and her friend were punished, but attributed that decline to the fact that J.S. filed suit against him and the school district, so that students felt they could misbehave at will, because they could file suit and get out of trouble if they were disciplined.

(McGonigle Dep. 153-155).  McGonigle acknowledged that these were just his suspicions, which he could not support with any evidence.

Finally, McGonigle testified that he has suffered stress-related health problems since the incident, but, contrary to Defendants' contentions, did not attribute those symptoms to the publication of the profile, but, again, to the fact that J.S. and her family filed suit.  (McGonigle Dep. 166, 177).  Indeed, he testified that the website did not bother him much until the suit was filed.  *Id.* at 166 ("chest pains after the Court case in Scranton"); *Id.* at 177 ("[Health is] always in the back of my mind. Sleep has been a problem ever since March 28th, whenever the Court case was, and its not going away."); *Id.* at 177-78 ("Q. How about when you first saw this website, it must not have made you feel pretty good? A.  No.  I was more upset for my family than I was for myself.  As a Principal, you don't make it until you get your name on the bathroom wall.  I'm used to things like that.  My family's not.").

Thus, the only "disruption" that *Defendants* attribute to the MySpace profile (as opposed to the lawsuit that resulted from the imposition of discipline) was five or six minutes of student inattention during the independent work portion of Mr. Nunemacher's math class, plus the fact that the school counselors had to rearrange their schedules for a brief period of time one morning.  That testimony does not come close to the "substantial and material" disruption required under *Tinker*. Indeed, it does not rise to the level of the disruption identified in *Tinker*, in *Layshock*,

or in any other case involving student speech. Plaintiffs are therefore entitled to summary judgment on their claim that the suspension of J.S. violated her rights under the First Amendment.

### 4. Defendants' Argument That the MySpace Profile Is Unprotected Speech Is Meritless.

Defendants argue that the MySpace profile was defamatory and therefore outside the protection of the First Amendment. As an initial matter, whether or not the speech was defamatory is irrelevant to the question whether the school had any authority to punish conduct that occurred entirely outside of school, as Judge McVerry explained in *Layshock*. 496 F. Supp. 2d at 603 ("Plaintiffs contend that the profile is a parody and thus cannot constitute defamation. The Court does not resolve this dispute because it is irrelevant to the decision. . . . even assuming arguendo that the profile was slanderous, the dispositive question here is whether the School District had authority to impose its own punishment on [student].").

Should the Court feel it necessary to address the Defendants' contention, however, the inquiry is a brief one. The MySpace profile is written in the first person, purporting to be a self-description by McGonigle. McGonigle Dep. 60. J.S. intended it to be funny. Facts, ¶ 15. The statements on the website are very clearly not something any person, much less a school principal, would write about himself. It is, in fact, quite apparently a parody.

Parody – defined as statements about a person that cannot reasonably be understood as describing actual facts – is not defamation specifically because it is not an assertion of truth. In *Hustler Magazine v. Falwell*, Jerry Falwell, a nationally known minister, sued Hustler Magazine after the publication of an advertisement that purported to be an interview with Falwell in which he described a drunken incestuous rendezvous with his mother in an outhouse. 485 U.S. 46, 48-49 (1988). The Court held that there could be no libel where there was no "false statement of fact . . . made with actual malice" and determined that the advertisement was a parody protected by the First Amendment because it could not reasonably be understood "as describing actual facts about [Falwell] or actual events in which [he] participated." *Id.* at 876, 878. In reaching this conclusion, the Court emphasized that "graphic depictions and satirical cartoons have played a prominent role in public and political debate." *Id.* at 881. Indeed, the Court noted that the ad parody was protected even though it was "offensive to him, and doubtless gross and repugnant in the eyes of most." *Id.* at 879.

The Courts of Appeals have steadfastly held that parody of a public figure or public official is not defamation and is protected by the First Amendment. *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 969 (10th Cir. 1996) (holding that depictions of prominent baseball players provided "social commentary on public figures, major league baseball players who are involved in a

significant commercial enterprise, major league baseball," and that "[t]he cards are no less protected because they provide humorous rather than serious commentary."); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 493 (2d Cir. 1989) ("parody is a form of artistic expression, protected by the First Amendment . . . 'parody and satire are deserving of substantial freedom-both as entertainment and as a form of social and literary criticism.'") (citation omitted).

The defining question in a case involving parody is whether the statements would reasonably be read as assertions of truth, not whether they are "funny". *Buttons v. National Broadcasting Co.,* 858 F. Supp. 1025, 1028 (C.D. Cal. 1994) ("It is not for the court to evaluate the parody as to whether it went 'too far.' As long as it is recognizable to the average reader as a joke, it must be protected or [] parody [] must cease to exist."). *See also Burnett v. Twentieth Century Fox Film Corp.,* 491 F. Supp. 2d 962, 969 (C.D. Cal. 2007); *DuPuis v. City of Hamtramck*, 502 F. Supp. 2d 654, 658 (E.D. Mich. 2007) ("If an illustration is not 'reasonably believable' and is clearly exaggerated to enhance the humor or contribute to the parody, there is no defamation.")(citation omitted).

The falsity of the statements made about McGonigle in the MySpace profile are irrelevant to the discussion here. As the Court pointed out in *Hustler*, the relevant inquiry is not whether the statements are true but instead whether a reasonable person would believe the statements to be true. A reasonable person

would not believe that Jerry Falwell gave an interview about an incestuous encounter with his mother in an outhouse and likewise a reasonable person would not believe that McGonigle created the MySpace profile and described his hobbies as "detention, being a tight ass . . . hitting on students and their parents."  (Ex. F).

The Defendants' own testimony establishes that the MySpace profile was not "reasonably believable."  Defendant Romberger testified that she is obligated under state law to investigate and report any credible allegations of sexual contact between a school official and a student.  Romberger Dep. 22-26 (Ex. H); Facts 80-81.  Upon reading the MySpace profile, she conducted no investigation, but instantly dismissed the statements in the profile as "lies".  Romberger Dep. 37; Facts ¶ 82.   Moreover, McGonigle confirmed that he was not the subject of any disciplinary action or investigation and that no one ever asked him if the statements in the profile were true.  Facts ¶ 83.  Indeed, there is no evidence that *any* student, parent, school official or other person believed that McGonigle actually created the profile or that the statements in the profile were intended to be taken seriously.

### 5.  The Use Of The Photo Was Also Protected Speech.

Defendants have argued that they may discipline J.S. for the parody profile because it included a copy of McGonigle's picture, which had been taken from the District website.  Defendants contend that the use of the photo is theft of school

property or a violation of the copyright laws and therefore is subject to discipline, regardless of any First Amendment protections for the profile itself. [4]

The use of the photograph does not, in fact, somehow sweep away all constitutional protection for the profile because its use is neither "theft" nor a violation of the copyright laws. Pursuant to section 107 of the U.S. Copyright Act, "the fair use of a copyrighted work . . . for purposes such as *criticism, comment*, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright." 17 U.S.C. §107 (emphasis added). Whether a particular use if "fair" depends on (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount of the work used; and (4) the effect of the use on the potential market for or value of the copyrighted work. *Id. See also Campbell* v. *Acuff-Rose Music, Inc.,* 510 U.S. 569, 588 (1994) (discussing parody in context of copyright infringement action; finding rap music group's version of the song "Pretty Woman" was constitutionally protected parody speech).

The important factors here are, first, that the parody profile falls within the types of works listed in the preamble of section 107 itself, in that the profile uses the

---

4 Ms. Schneider-Morgan, Director of Technology at Blue Mountain Middle School, made the sole determination that the use of McGonigle's photograph from the website was a violation of copyright law. (Facts ¶ 48); *see also* Schneider-Morgan Dep. (Ex. M). Ms. Morgan is not an expert in copyright law, has not taken any courses in copyright law and does not hold any degrees in copyright law. Facts ¶ 49.

photograph solely in the context of <u>criticism and comment</u>. *See* 17 U.S.C. §107. It is also important that the girls did not just reproduce the photograph, but incorporated it into a larger project, the parody profile. This distinction between a mere reproduction and the creation of a new, transformative work is of critical significance. *Campbell*, 510 U.S. at 580. By using the photograph as part of an overall comment on the character of McGonigle, the girls added significant new expression to the photo, altering the original to such an extent that the new work is clearly transformative, and therefore not an infringing use. In addition, the parody profile does not make any attempt to replace or diminish the original photograph in the marketplace.

Although not sophisticated, the girls' parody profile was a criticism of a public official, similar – for First Amendment purposes – to the Hustler parody of Reverend Falwell. That type of speech – even when offensive and mean-spirited – is protected by the First Amendment specifically because it is part of our long-standing commitment to open discussion and criticism of public officials. In the absence of any economic harm to the copyright holder, that use cannot be prohibited.

### B. Plaintiffs Are Entitled To Summary Judgment On Their Claim That The Blue Mountain School District Policies Are Unconstitutionally Vague And Overbroad.

Like the policies declared unconstitutional in *Killion* and *Flaherty*, the school district's policies here are unconstitutionally overbroad because they do not contain

limiting language (1) confining the policy to school grounds and school-related activities; or (2) confining punishment to speech creating a substantial and material disruption. And, as in *Killion* and *Flaherty*, the school district here did in fact invoke its policies to punish off-campus speech that caused no disruption, much less substantial and material disruption.

J.S. was punished under the most serious level of infractions for her out-of-school speech. McGonigle testified that he could have disciplined J.S. under the school's disciplinary code if she had made the same statements as appeared on the MySpace profile to a crowd at a Philly's game. (McGonigle Dep. 66-67). McGonigle further testified that if the newspaper reported that a student said those things in a public park and someone saw the newspaper at school, then the school could discipline her. (McGonigle Dep. 67-69). In essence, McGonigle believes that the discipline code permits him to punish any off-campus student speech that is reported or even discussed at school by other students. (McGonigle Dep. 68-69) (agreeing that J.S. could "express her opinions about [McGonigle], even pretend to be [McGonigle], as long as nobody reports it back at school or comes in and talks about it in math class….").

Defendants also justified J.S.'s suspension on the ground that the profile's inclusion of McGonigle's picture violated the Acceptable Use Policy (AUP). (Ex. K). Like the Discipline Code, the AUP does not distinguish between in-school and

out of school speech, and is applied to out-of-school speech.  When Dr. Romberger was asked if the AUP governs what students may do from their home computers, she responded in the affirmative.  (Romberger Dep. 69-70).

McGonigle's testimony makes clear that the Blue Mountain Discipline Code punishes speech that occurs off of school grounds or away from school-sponsored events.  Dr. Romberger's testimony also makes clear that the School's AUP punishes both in-school and out-of school speech.  That is unconstitutional.

In *Flaherty*, the court struck down school policies that "allow[ed] for punishment of speech that school officials deem to be 'inappropriate, harassing, offensive or abusive' without defining those terms or limiting them in relation to geographic boundaries (at school or school sponsored events) or to speech that causes a material and substantial disruption to the school day in violation of *Tinker*[.]" *Flaherty*, 247 F. Supp. 2d at 702.  Likewise, in *Killion*, the Court held facially unconstitutional a policy that prohibited "verbal/written abuse of a staff member" because there was no geographic limitation to the policy and was overbroad because it could be interpreted to prohibit protected speech.  136 F. Supp. 2d at 449.

The *Layshock* court declined to make such a finding in that case specifically because there was a sufficient "geographic limitation" to the disciplinary code which was not found in *Killion* or *Flaherty*.  *Layshock*, 496 F. Supp. 2d at 605.  Here, as in

*Killion* and *Flaherty*, there is no such geographic limitation to the school policies at issue and the deposition testimony of Romberger and McGonigle makes clear that the policies are applied to out-of-school speech, as they were to J.S.'s creation of the MySpace Profile. Thus, the Blue Mountain Discipline Code and the AUP Policy should be declared unconstitutionally overbroad on their face.

### C. Plaintiffs Are Entitled To Summary Judgment On Their Claims That Defendants Exceeded Their Authority Under State Law And Violated The Snyders' Substantive Due Process Rights.

#### 1. Absent Substantial And Material Disruption Of School, PA Law Forbids Discipline Of Student Conduct Outside School And School-Related Functions.

When a school seeks to reach off campus to enforce its view of what constitutes good behavior, rather than acting to protect the educational process, the school exceeds its disciplinary authority granted to the School District by Pennsylvania law and is ultra vires and void. Under Pennsylvania statute, school districts only have the authority to punish students "during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school." 24 P.S. § 5-510. The Commonwealth Court of Pennsylvania has interpreted this statute to mean that school districts do not have the authority to discipline students in cases involving purely off-grounds, outside-school-hours activities. *See Hoke v. Elizabethtown Area*

*Sch. Dist.,* 833 A.2d 304 (Pa. Commw. Ct. 2003), *appeal denied*, 847 A.2d 59 (Pa. 2004); and *see D.O.F. v. Lewisburg Area Sch. Dist.,* 868 A.2d 28 (Pa. Commw. Ct. 2004). In *D.O.F.,* the Court relied on *Hoke* and 24 P.S. § 5-510 to find that a student smoking marijuana on a school playground at night was not under supervision of the school district and therefore could not be punished by the school district for his misconduct. 868 A.2d at 35-36. It is simply beyond the power of a school district to punish student conduct that occurs off school grounds and/or outside of school hours absent a substantial impact on the school program. *See, e.g., D.O.F.,* 868 A.2d at 28.

As in *D.O.F.* and *Hoke,* J.S. was not under the supervision of the school district when she created a MySpace page at home on a Sunday. Therefore, as in *D.O.F.* and *Hoke,* the District does not have the power to discipline her for the creation of the MySpace parody. Plaintiffs are entitled to summary judgment on their claim that the Defendants' actions were ultra vires and void.

### 2. Absent Substantial And Material Disruption Of School, Discipline Of Students For Conduct At Home Is Interference With Parental Authority To Raise Children.

When school officials insert themselves into a student's home or personal life, the action intrudes on the fundamental right of parents to direct the upbringing of their children. *See Troxel v. Granville,* 530 U.S. 57, 66 (2000).[5] In *Troxel,* the

---

[5] *See also Meyer v. Nebraska*, 262 U.S. 390, 401(1923) (the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring

Supreme Court stated: "[i]n light of ... extensive precedent, it cannot be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children." *Id.*

That fundamental right means that it is the parents, not the school, that are entitled to decide how a minor spends her time out of school, and whether and to what extent the minor should be punished for her conduct. As the Second Circuit observed in holding that a school had no authority to discipline students for publishing a sexually explicit magazine outside of school:

> It is not difficult to imagine the lengths to which school authorities could take the power they have exercised in the case before us. If they possessed this power, it would be within their discretion to suspend a student who purchases an issue of National Lampoon, the inspiration for Hard Times, at a neighborhood newsstand and lends it to a school friend. And, it is conceivable that school officials could consign a student to a segregated study hall because he and a classmate watched an X-rated film on his living room cable television. While these activities are certainly the proper subjects of parental discipline, the First Amendment forbids public school administrators and teachers from regulating the material to which a child is exposed after he leaves school each afternoon. Parents still have a role to play in bringing up their children, and school officials, in such instances, are not empowered to assume the character of *parens patriae*.

---

up children" and "to control the education of their own*"); Pierce v. Society of Sisters,* 268 U.S. 510, 534-535 (1925) ("liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"). *See also Ginsburg v. New York,* 390 U.S. 629, 639 (1968); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

*Thomas v. Board of Ed. of Granville Central School Dist.,* 607 F.2d 1043, 1051 (2d

Cir. 1979). *Accord Klein v. Smith,* 635 F. Supp. 1440, 1443 (D. Me. 1986) ("The

First Amendment protection for freedom of expression may not be made a casualty

of the effort to force-feed good manners to the ruffians among us.").

Defendants certainly would have been within their rights to summon J.S.'s

parents to discuss the MySpace profile of McGonigle. From that point, the matter of

appropriate discipline, if any, should have rested with the parents. It was the

Snyders' right as parents to determine the appropriate punishment for J.S. and they

did not agree with the school district's decision to suspend J.S. for what she did.

(Facts ¶ 89); *see also* T. Snyder Dep. (Ex. N); S. Snyder Dep. (Ex. O).

Moreover, to hold that school officials cannot regulate students out-of-school

speech is not to say that such speech is unregulable. True threats directed at school

officials, incitement to imminent unlawful conduct, and obscenity can all be

proscribed by other government officials. *Watts v. United States*, 394 U.S. 705

(1969); *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969) ("clear and present danger"

test"); *Miller v. California*, 413 U.S. 15 (1973). And decisions regulating or

punishing speech by those officials are subject to appropriate judicial safeguards.

Terry and Steven Snyder have established a violation of their Due Process

rights to direct the upbringing of their own children.

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

Respectfully submitted,

Dated:      December 10, 2007.      */s/ Mary Catherine Roper*
Mary Catherine Roper (ID No. 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215-592-1513 ext. 116
(F) 215-592-1343
mroper@aclupa.org

Mary E. Kohart (I.D. No. 37191)
Meredith W. Nissen  (I.D. No. 93504)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

Deborah Gordon (I.D. No. 95071)
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA  19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs

## <u>CERTIFICATION OF SERVICE</u>

I, Mary Catherine Roper , hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:      December 10, 2007.     */s/ Mary Catherine Roper*
                                      Mary Catherine Roper