# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., et al. | ) | |
| | ) | |
| v. | ) | No: 3:07-cv-585 |
| | ) | |
| BLUE MOUNTAIN SCHOOL | ) | |
| DISTRICT, et al., | ) | |
| | ) | **ELECTRONICALLY FILED** |
| _____ | ) | |

## EXHIBIT LIST TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Exhibit A – Plaintiffs Statement of Undisputed Facts

Exhibit B – Deposition Transcript of J.S.

Exhibit C – Deposition Transcript of James S. McGonigle

Exhibit D – Deposition Transcript of Timothy Nunemacher

Exhibit E – Deposition Transcript of Angela Werner

Exhibit F – MySpace Profile

Exhibit G – Deposition Transcript of Joyce E. Romberger

Exhibit H – Correspondence dated March 23,2007 from Defendant McGonigle to Plaintiffs Terry and Steven Snyder regarding discipline of J.S.

Exhibit I – Disciplinary Notice

Exhibit J – Blue Mountain School District Student-Parent Handbook

Exhibit K – AUP Policy

Exhibit L – Deposition Transcript of Susan Schneider-Morgan

Exhibit M – Deposition Transcript of Terry Snyder

Exhibit N – Deposition Transcript of Steven Snyder


Respectfully submitted,

Dated:      December 10, 2007.    */s/ Meredith W. Nissen*
Mary Catherine Roper (ID No. 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215-592-1513 ext. 116
(F) 215-592-1343
mroper@aclupa.org

Mary E. Kohart (I.D. No. 37191)
Meredith W. Nissen (I.D. No. 93504)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

Deborah Gordon (I.D. No. 95071)
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA 19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs

## CERTIFICATION OF SERVICE

I, Meredith W. Nissen, hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:     December 10, 2007.     */s/ Meredith W. Nissen*
                                   Meredith W. Nissen

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

J.S., a minor, by and through her parents, )
TERRY SNYDER and STEVEN SNYDER, )
Individually and on behalf of their daughter, )          NO: 3:07-cv-585
                                              )
            Plaintiffs,                       )
                                              )
    v.                                        )
BLUE MOUNTAIN SCHOOL DISTRICT; )
DR. JOYCE E. ROMBERGER,                       )
Superintendent Blue Mountain School           )
District; and JAMES S. MCGONIGLE,             )
Principal Blue Mountain School, both          )
in their official and individual capacities,  )
                                              )
            Defendants.                       )
_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Plaintiffs J.S., a minor, and her parents, Terry Snyder and Steven Snyder

identify the following undisputed material facts that warrant entry of summary

judgment in their favor:

**THE PARTIES**

1.      At all times relevant to the issues involved in this lawsuit, Plaintiff

    J.S. was a fourteen year old eighth grade student at Blue Mountain Middle

    School in the Blue Mountain School District, who at the time lived with her

mother Terry, her father Steven, and her brother in Orwigsburg, Pennsylvania. (Defendants Answer, ¶ 3).[1]

2.       Defendant Blue Mountain School District is a political subdivision of the Commonwealth of Pennsylvania. The District maintains its administrative office at 685 Red Dale Road, P.O. Box 188, Orwigsburg, PA 17961 (Defendants Answer, ¶ 6).

3.       Defendant James McGonigle is, and at all times relevant was, the Principal at Blue Mountain Middle School, which is located within the Blue Mountain School District. Defendant McGonigle has at all times hereinafter mentioned acted under color of state law. In his capacity as Principal, Defendant McGonigle is obliged to act in conformity with the United States Constitution and applicable federal and state laws. (Defendants Answer, ¶ 7).

4.       Defendant Dr. Joyce E. Romberger is, and at all relevant times hereafter mentioned was, the Superintendent of the Blue Mountain School District. Defendant Romberger has at all times hereinafter mentioned acted under color of state law. In her capacity as Superintended, Ms. Romberger is responsible for, *inter alia*, ensuring that the school district and its officials

---

[1] Cited pages from the TRO Hearing Transcript and from deposition transcripts, as well as the cited exhibits, will be included in the Appendix to be filed with plaintiffs' supporting brief.

act in conformity with the United States Constitution and applicable federal and state laws. (Defendants Answer, ¶ 8).

5.      J.S. attended schools in the Blue Mountain School District for the nine years of her elementary academic career. (Defendants Answer ¶ 9). J.S. has consistently made the Honor Roll, sometimes receiving Distinguished Honors. (Defendants Answer ¶ 10).

6.      At all times relevant to the matters at issue in this lawsuit, Angela Werner was a teacher at Blue Mountain Middle School. (Werner Dep. 6). Ms. Werner is employed as a half day teacher of a course called Skills for Adolescents and a half day drug and alcohol coordinator for the school district. (Werner Dep. 6).

7.      At all times relevant to the matters at issue in this lawsuit, Timothy Nunemacher was a math teacher at Blue Mountain Middle School. (Nunemacher Dep. 6).

8.      At all times relevant to the matters at issue in this lawsuit, Susan Schneider-Morgan was the Director of Technology at the Blue Mountain Middle School (Morgan Dep. 7).

9.      At all times relevant to the matters at issue in this lawsuit, K.L. was an eighth grade student at Blue Mountain Middle School.

3

## THE MYSPACE WEBSITE

10.     MySpace (www.myspace.com) is a private on-line community where
        computer users can create profiles of themselves to share photos, journals
        and interests with other people on the Internet.  Users can also communicate
        with each other online.

11.     MySpace is a social networking website offering an interactive, user-
        submitted network of friends, personal profiles, blogs, groups, photos, music
        and videos internationally. http://en.wikipedia.org/wiki/MySpace.

12.     MySpace is currently the world's sixth most popular English-language
        website and the sixth most popular website in any language, and the third
        most popular website in the United States, though it has topped the chart on
        various weeks. The service has gradually gained more popularity than
        similar websites to achieve nearly 80 percent of visits to online social
        networking websites.  http://en.wikipedia.org/wiki/MySpace.

13.     Students are unable to access www.myspace.com from Blue Mountain
        Middle School computers because that website has been blocked.
        (McGonigle Dep. 64-65).

14.     During her nine years in the Blue Mountain Middle School, J.S. had
        never been disciplined until December 2006 and February 2007 when she

was twice disciplined for dress code violations by Mr. McGonigle.

(Defendants Answer, ¶ 11) (J.S. Dep. 40-41).

15.     On approximately Sunday March 18, 2007, J.S. and her friend K.L. created the parody profile of Mr. McGonigle on MySpace. (J.S. Dep. 13). When she made the profile, J.S. was trying to be funny. (J.S. Dep. 11).

16.     In creating the parody profile, J.S. used the MySpace template for profiles, which includes background information such as age and place of birth. (J.S. Dep. 17).

17.     The profile did not identify Defendant McGonigle by name, but did include a picture of Defendant McGonigle, which the other student had copied off the Blue Mountain School District Website. (J.S. Dep. 15-17). The name section of the profile was labeled "M-Ho." (J.S. Dep. 17-18).

18.     The profile was intended to be a parody of Defendant McGonigle. (J.S. Dep. 77). The profile was made "private" approximately a day after J.S. and her friend created it. (J.S. Dep. 26). When a MySpace profile is set on "private", an individual seeking to view it must request access from the creator of the profile before gaining access to the profile. (J.S. Dep. 26).

19.     After the profile was made private, J.S. and her friend granted access to twenty-two individuals to view the profile. (J.S. Dep. 26).

20.     The profile described the subject as a married man living in Alabama

with his wife and child, and identified him as bisexual. It listed as his

interests: detention, "being an ass," "being a principal", baseball, "my gold

pen", "my wife (who looks like a man)" and "my kid (who looks like a

gorilla)." The profile also featured a "personal statement," in which the

subject described himself as "expressionless", a "sex addict"; "dick-faced"

and as having a "small dick". It suggested that the subject was preoccupied

with sex, and stated "I love long walks on the beach, being a tight ass, my

wife, Frain train (who satisfies my every need) [Defendant McGonigle's

spouse is Debra Frain, a counselor at Blue Mountain Middle School], and

being a dick-face". The profile was located at the URL

www.MySpace.com/kidsrockmybed.

21.     J.S. created the site from her parents home computer during non-

school hours. (J.S. Dep. 11, 13). J.S. did not use school computers to create

the website.

22.     On the morning of Tuesday March 20, 2007, a student approached

Defendant McGonigle to report a bus incident and also indicated that "there

was something else that she needed to talk to [McGonigle] about . . . She

said, there's a MySpace account about you and it's not real nice."

(McGonigle Dep. 34).

6

23.    At the end of the Tuesday morning conversation with the student, Mr.
       McGonigle told the student "if you can find out who did it, I would
       appreciate it." (McGonigle Dep. 34-35).

24.    Later that morning on March 20, 2007, Defendant McGonigle
       attempted to locate the MySpace profile on his own. (McGonigle Dep. 35-
       36). Defendant McGonigle went onto www.MySpace.com and typed in his
       name and "nothing came up." *Id.* Defendant McGonigle then contacted
       MySpace and asked them to locate the profile. *Id.* Defendant McGonigle
       was told that MySpace could not pull up the profile unless he had the URL
       number. *Id.*

25.    When asked to describe all of the disruption caused by the MySpace
       profile created by J.S. and her friend, Mr. McGonigle identified: (a) two
       instances of teachers having to quiet their classes when students were talking
       about the profile (McGonigle Dep. 39, 141-144); (b) the need for a
       counselor to cancel a small number of student counseling appointments in
       order to free another counselor to sit in on Mr. McGonigle's meetings with
       J.S., K.L. and their parents (McGonigle Dep. 156-62); (c) the fact that two
       students decorated J.S.'s and K.L.'s lockers to welcome them back to school
       and a teacher had to tell students to stop congregating in the hall around the
       lockers (McGonigle Dep. 148-52); and (d) his suspicion that students

7

became more defiant as a result of the federal lawsuit filed by J.S. and her family (McGonigle Dep. 152-55).

26.     There was no other disruption associated with the MySpace profile. (McGonigle Dep. 163).

27.     During lunch time on March 20, 2007, Defendant McGonigle was approached by a teacher, Ms. Angela Werner, who said students were talking about the MySpace profile. (McGonigle Dep. 39-40). Ms. Werner told him that "the kids are talking about a MySpace account about you. Are you aware of it?" *Id.* Mr. McGonigle replied that "I am aware of it and I'm looking into it." *Id.*

28.     Ms. Werner explained that a group of eight grade girls in one of her skills and adolescents class approached her at the end of class. (Werner Dep. 11). The girls approached Ms. Werner when "class had wrapped up and there was a few minutes left over." (Werner Dep. 12). The girls told Ms. Werner that there was a web site which mentioned Mr. McGonigle and his family. (Werner Dep. 13). The girls who spoke to Ms. Werner said "they were upset by what was on the web site and things that it contained." (Werner Dep. 11).

29.     When the girls approached Ms. Werner the lesson plan had concluded and some students were sitting quietly waiting for the next class, some were

working on things for other classes and some were reading books. (Werner Dep. 19).

30.    When the girls approached Ms. Werner at the end of the class it was not disruptive of the class because it was the end of the class and because the lesson had already been concluded. (Werner Dep. 20).

31.    Ms. Werner explained that it is appropriate for students to approach her in that same way at the end of a class period after the lesson plan had concluded and that on other occasions, involving other issues, students have similarly approached her. *Id.*

32.    Mr. Nunemacher, another teacher, heard students talking about the profile during his second period eighth grade Algebra I class on Thursday, March 22, after J.S. and K.L. had already been called to Mr. McGonigle's office.[2] (Nunemacher Dep. 9). Mr. Nunemacher approximated that six or seven students were involved in the discussion. (Nunemacher Dep. 16).

33.    The students started talking during the classroom work phase of the class, approximately twenty-five minutes into the forty-three minute class period. (Nunemacher Dep. 12). Mr. Nunemacher's classes typically follow

---

[2]    Mr. McGonigle testified that Mr. Nunemacher approached him on Tuesday March 20, 2007 regarding the conversations in his eighth grade math class about the MySpace profile. (McGonigle Dep. 39-40). Mr. Nunemacher testified that the discussions in his eighth grade math class occurred on the day that J.S. was suspended, Thursday March 22, 2007. (Nunemacher, Dep. 9).

the same general format each day: give the students notes and then students do problems in class and then he gives out homework and he usually gives them some time in class to do the homework. (Nunemacher Dep. 10).

34. Mr. Nunemacher asked the students to stop talking. (Nunemacher Dep. 13).

35. The students ignored Mr. Nunemacher's request to stop talking. Mr. Nunemacher again told the students, "Guys we need to get back to work. We need to be working on the problems that I assigned." (Nunemacher Dep. 14).

36. The students continued talking and Mr. Nunemacher raised his voice and said "We need to get back to work right now." *Id.* In response, the students got back to work and that was the end of the discussion.

37. A total of five or six minutes elapsed from the time Mr. Nunemacher first told the students to stop until the last time he told the students to stop talking. *Id.*

38. Mr. Nunemacher has had to quiet down this particular algebra class on previous occasions. *Id.* at 15. Mr. Nunemacher approximated that he had to ask them to quiet down once a week. *Id.*

39. Mr. Nunemacher explained that when handling disruptions in his class room, he would tell the students to do their work and if necessary he will

10

raise his voice. (Nunemacher Dep. 21). Mr. Nunemacher indicated that on isolated occasions he would involve an outside person, such as a principal to stop a disruption. *Id*. Mr. Nunemacher stated that on two occasions since he began employment at Blue Mountain Middle School he has called the principal down to his classroom. *Id.* at 22. Under that scenario, the principal would take the student with him out of the classroom to his office. Also, Mr. Nunemacher has the option to send a student to the principal's office. He has done that "very infrequently." *Id.* at 22. Mr. Nunemacher approximated that he has sent a student to the principal less than 10 times in his career at Blue Mountain middle School. *Id.*

40.     Mr. Nunemacher also heard another discussion of the MySpace profile in one of his classes on the previous day, March 21, 2007. During his sixth period College Prep Algebra I class, he heard "at least two" students saying "I wonder if we'll get in trouble for being part of . . . it's friends on the website." (Nunemacher Dep. 17).

41.     Mr. Nunemacher requested that the students stop talking and they stopped talking. The entire exchange lasted one or two minutes. *Id.* During this sixth period college prep algebra class, the students talking did not have a copy of the MySpace profile. *Id.*

11

42.     Mr. Nunemacher did not tell anyone, including Mr. McGonigle, about the comments made by students in his college prep Algebra I class. *Id.* at 20-21.

43.     Mr. Nunemacher also heard "rumblings" during that same week in March 2007 that he believed to be related to the MySpace profile but could not say with certainty that the comments were or were not related to the profile. *Id.* at 18-19.

44.     At the end of the day on March 20, 2007, the student that initially told Mr. McGonigle about the MySpace profile approached him in the hallway in between classes and told him that J.S. created the MySpace profile about him. (McGonigle Dep. 43). During that conversation, Mr. McGonigle requested that the student bring in a printout of the profile for him. (McGonigle Dep. 33-34).

45.     The next morning on Wednesday March 21, 2007, pursuant to Mr. McGonigle's request, the student brought Mr. McGonigle a copy of a printout of the MySpace profile. (McGonigle Dep. 33, 46).

46.     Upon receiving the printout of the MySpace profile, at approximately 8:30 a.m. that morning, Defendant McGonigle brought the profile to show Superintendent Joyce Romberger and Director of Technology Susan Schneider-Morgan. (McGonigle Dep. 48). Defendant McGonigle met with

Ms. Schneider-Morgan and Defendant Romberger for approximately 10-15 minutes. (Schneider-Morgan Dep. 19).

47.    Defendant Romberger looked at the printout and read it. (Romberger Dep. 33). Defendant Romberger and Ms. Morgan recognized the photograph on the profile from the School District website. Neither of them asked Mr. McGonigle if the negative statement about him on the profile were true. (Romberger Dep. 33).

48.    Ms. Schneider Morgan believed the use of the photo on the MySpace profile was a violation of the District Acceptable Use Policy because "there is the violation of the copyright law including but not limited to the making of unauthorized copies of copyright material which include graphic images." (Schneider-Morgan Dep. 12).

49.    Ms. Schneider-Morgan has not taken any courses in copyright law and Ms. Schneider-Morgan does not hold any degrees in copyright law. (Schneider-Morgan Dep. 14).

50.    Ms. Schneider-Morgan eventually removed all of the administrative photos from the school website (www.bmsd.org). (Schneider-Morgan Dep. 16). Ms. Schneider-Morgan independently decided to take down these photos. (Schneider-Morgan Dep. 16). She took this action to prevent other students from using the photos. (Schneider-Morgan Dep. 16). It took Ms.

Schneider-Morgan approximately a half an hour to remove the photos from the website. (Schneider-Morgan Dep. 20).

51.     Defendant Romberger explained her initial reactions to the MySpace profile as containing "very inappropriate language" and as "lies" and "disgust." (Romberger Dep. 36-37). Defendant Romberger stated: "If a student had written those things, I thought it was very inappropriate for a student and I was disgusted that one of our students would do that." (Romberger Dep. 37).

52.     After that conversation with Defendant Romberger and Ms. Schneider-Morgan, Defendant McGonigle contacted MySpace and told them that he had the URL number and asked whether there would be a way to tell him what computer it came from. (McGonigle Dep. 50). MySpace told him they could not disclose that information without a court order. *Id.*

53.     On that same morning, Defendant McGonigle showed the MySpace profile to the two guidance counselors, Ms. Michelle Guers and Ms. Debra Frain. (McGonigle Dep. 52). Defendant McGonigle indicated to Ms. Guers and Ms. Frain, who is also Defendant McGonigle's wife, that he knew name of one student he believed to have created the profile but could not prove it. They asked the student's name and he indicated it was J.S. (McGonigle Dep. 53).

14

54.     After Defendant McGonigle showed the profile to Ms. Guers and Ms. Frain, he logged onto www.MySpace.com and using the URL on the printout was able to access the profile. (McGonigle Dep.54-55).

55.     Beside Defendant Romberger, Ms. Schneider-Morgan, Ms. Guers and Ms. Frain, Defendant McGonigle did not show the profile to any other person on Wednesday March 21, 2007. (McGonigle Dep. 56).

56.     By the end of the day on March 21, 2007, Defendant McGonigle had decided the discipline he would impose on the students responsible for creating the MySpace page. (McGonigle Dep. 58).

57.     Defendant McGonigle characterized the creation of the MySpace profile as a Level Four Infraction indicating that it was a "false accusation about a staff member." (McGonigle Dep. 59).

58.     When asked why the statements in the profile were characterized as a false accusation, Mr. McGonigle read certain statements from the profile as examples of false accusations: "I have come to MySpace to pervert the minds of other Principals to be just like me" "Those who want to be my friend and aren't in my school, I love children, sex, dogs, long walks on the beach, being a dick head . . . And how about the part about having sex in my office and hitting on parents." (McGonigle Dep. 59-60). While Defendant McGonigle initially characterized these statements as false accusations,

15

when asked "they were accusing you as opposed to saying things that were untrue about you?" Defendant McGonigle replied: "No. They weren't accusing me. They were pretending they were me." (McGonigle Dep. 60).

59.    Defendant McGonigle did not know of or hear about another physical copy of the MySpace profile on school property other than the copy that Defendant McGonigle requested that the student bring to him. (McGonigle Dep. 63-64).

60.    J.S. was absent from school on Wednesday March 21, 2007.

61.    On March 22, 2007, make-up standardized testing was being conducted for those students that had missed the regular testing days. (McGonigle Dep. 72).

62.    J.S. was not participating in the make-up standardized testing. *Id.*

**PUNISHMENT OF J.S.**

63.    On Thursday March 22, 2007, when J.S. returned to school, Defendant McGonigle called J.S.'s first period teacher and said that he needed to see J.S in his office. (McGonigle Dep. 71).

64.    In response, J.S. went to Defendant McGonigle's office. Both Defendant McGonigle and guidance counselor Ms. Guers were present in his office. (McGonigle Dep. 74-75). Defendant McGonigle requested that Ms. Guers be present because he usually has another individual sit in with him

when he is meeting with a student. Ms. Guers was originally supposed to be administering the make-up standardized test but Defendant McGonigle had to juggle things around and instead had the other guidance counselor, Ms. Frain, who is also Defendant McGonigle's wife, administer the standardized testing. *Id.*

65. When J.S. arrived at Defendant McGonigle's office, he said to her "do you have any idea why you're here?" (McGonigle Dep. 79). J.S. initially denied making the MySpace profile at first but then admitted it. (J.S. Dep. 50-51).

66. Defendant McGonigle told J.S. and K.L. that he "was very upset and very angry, hurt and didn't understand why you [J.S. and K.L.] did this to me and my family." (McGonigle Dep. 85). Mr. McGonigle also told the students that he would be looking to take legal action against them and their families. (McGonigle Dep. 85-86).

67. After Defendant McGonigle spoke with the two girls, Mrs. Guers took them out of the office to wait for their parents and put one in the waiting room and one in the "Eagle's nest" which is a room with a phone. (McGonigle Dep. 104).

68. Mr. McGonigle determined that it was best to keep the students in rooms rather send them back into class because of his experience that

17

students talk about discipline issues and that generates classroom disruption. (McGonigle Dep. 105).

69.        Defendant McGonigle contacted both of the students' mothers. When Defendant McGonigle called J.S.'s mother he told her that "we had a serious matter and I didn't want to discuss it over the phone and would she please come to school. She said, I'm at work in Harrisburg and it's going to take me about an hour to get there. I said, that's fine, and I told her that her daughter was safe and there wasn't anything physically wrong, but I need you to come into school." (McGonigle Dep. 106).

70.        Defendant McGonigle then contacted K.L.'s mother and conveyed the same message. The other student's mother worked in Pottsville which was much closer and only twenty-five minutes away. (McGonigle Dep. 106-07).

71.        Defendant McGonigle first met with K.L. and her mother and Mrs. Guers was present as well. He showed K.L.'s mother a copy of the MySpace profile. He remembers the mother being "mortified" "very apologetic" and "very sympathetic." (McGonigle Dep. 107-08).

72.        Defendant McGonigle stated that both students would receive 10 days out of school suspension, no school dances, and that their school work would be provided for them while on suspension. Defendant McGonigle indicated that he was considering taking legal action and K.L.'s mother was

concerned about a potential lawsuit. (McGonigle Dep. 108). Defendant
McGonigle noted that K.L. and her mother seemed very remorseful.
(McGonigle Dep. 112).

73.     Defendant McGonigle and Mrs. Guers next met with J.S. and her
mother Terry Snyder. (McGonigle Dep. 110-12). Defendant McGonigle
showed Mrs. Snyder the profile from MySpace. Defendant McGonigle told
J.S. and her mother that J.S. would receive a 10 day out of school
suspension, no school dances and that her work would be provided for her
and that he was considering taking legal action against her. *Id.* Defendant
McGonigle indicated that he did not believe J.S. or her mother was very
remorseful. (McGonigle Dep. 110-12). Terry Snyder testified that both she
and J.S. apologized to Defendant McGonigle. (Terry Snyder Dep. 18). J.S.
subsequently wrote a letter of apology to Mr. McGonigle and Mrs. Frain.

74.     Shortly after the meeting, Defendant McGonigle contacted MySpace,
provided the URL for the profile and requested that they take down the
profile. (McGonigle Dep. 168). Immediately after Defendant McGonigle
hung up the phone with MySpace he tried to access the profile again and
found it had already been taken down. (McGonigle Dep. 170-171).     J.S.
also tried to remove the profile on Thursday but by the time she attempted to
access the profile, it had already been removed.

19

75. Defendant McGonigle also contacted Defendant Romberger on Thursday March 22, 2007 to inform her of the decision to give J.S. and K.L. a ten-day out of school suspension for creating the MySpace profile.

76. Defendant Romberger concurred with Defendant McGonigle's decision to suspend J.S. and K.L. for ten days out of school and no school dances. (Romberger Dep. 39).

77. Defendant Romberger, as the Superintendent of the Blue Mountain School District had the authority to overrule a Principal's decision to discipline a student. (Romberger Dep. 12). Defendant Romberger could not recall a time where she has overruled a principal's discipline decision but in some cases has counseled a principal to pursue other avenues of discipline. (Romberger Dep. 12).

78. The profile did not contain Defendant McGonigle's name and it did not identify him with the Blue Mountain School District. (Romberger Dep. 42).

79. Defendant Romberger believed that the profile could jeopardize Defendant McGonigle's current position because he is responsible for enforcing discipline and "number 1, the children would see that somebody did not respect him enough that they would chose to put something like this out on MySpace regarding him, number 2, the fact that someone might view

20

him as not having discipline of his building enough . . . number 3, people
who might be considering him for employment, at some point, might find
this or might just be aware of it." (Romberger Dep. 44).

80.     Defendant Romberger explained that in her role as Superintendent
that if a parent reported an allegation of sexual conduct between a student
and a Principal or School Administrator, Defendant Romberger "would
investigate. I would probably contact the Guidance Department to see if the
student had given them any information. I would investigate with the
student or I would have an Assistant Principal investigate with the student, if
there's an Assistant in the Building. So, between the Guidance Counselor
and the Assistant Principal, I would investigate. Again, this is after I have
informed the Principal of the allegation." (Romberger Dep. 25-26).

81.     If Defendant Romberger received an allegation of sexual conduct
between a student and a Principal she would take whatever steps were
necessary to determine whether or not the allegation was credible.
(Romberger Dep. 23). If she determined that the allegation was credible
"there would likely be a disciplinary action in the school district."
(Romberger Dep. 24).

82.     Defendant Romberger immediately concluded that the statements
made in the MySpace profile about Mr. McGonigle were not credible.

(Romberger Dep. 63) Defendant Romberger never asked Defendant McGonigle whether he had been hitting on students or having sexual contact with students. Defendant Romberger stated, "when I saw this [MySpace profile], I did not ask him that question. I did not think it was true." (Romberger Dep. 63).

83.    Defendant McGonigle has not been investigated for child abuse or received any administrative discipline from the school district because of allegations that he hit on children or anything of that nature. (McGonigle at 165-66).

84.    Later that day after Defendant McGonigle had met with the students and their parents, Defendant McGonigle contacted the local police regarding the possibility of pressing criminal charges against J.S. and the other student. The local police referred him to the state police because the local police were not knowledgeable in the area of the Internet. (McGonigle Dep. 89-90).

85.    When Defendant McGonigle spoke with the state police, he requested that the police come to the school to take a look at the profile. (McGonigle Dep. 95-96). A state police officer arrived at the school and met with Defendant McGonigle for approximately twenty minutes. *Id.* Defendant McGonigle indicated that the police said that he could press harassment

charges but "knowing that these two children didn't have any further past serious disciplinary record, the chances that they would get thrown out in Court were pretty good and I thought the girls had gotten enough punishment and I elected not to file any criminal charges." (McGonigle Dep. 99). Defendant McGonigle expressed to the police officer that he did not intend to press criminal charges. (McGonigle Dep. 100).

86.     The police officer completed a formal report of the visit to Defendant McGonigle's office and the report indicated that Defendant McGonigle would not be pressing charges. The state police asked Mr. McGonigle if he would like for them to call the students and their parents down to the station to "just let them know how serious this was." (McGonigle Dep. 163). Defendant McGonigle told the police that he would like them to do that. *Id.*

87.     On Friday March 23, 2007, J.S. and K.L. and their mothers were summoned to the state police station to discuss the posting of the MySpace profile of Defendant McGonigle. (Terry Snyder Dep. 20-21). The police officer Rasmus informed J.S. and her mother that Defendant McGonigle would not press any charges and emphasized the consequences if this ever happened again. (J.S. Dep. 66).

88.     Also on Friday March 23, 2007, Defendant McGonigle drafted a letter to Mr. and Mrs. Snyder regarding the terms of J.S.'s ten-day suspension and

the rationale for the suspension. (McGonigle Dep. 130). The letter indicates that the "Pennsylvania State Police have been informed of this incident so that criminal charges may be filed." Defendant McGonigle had already determined, however, prior to sending this letter that he would not be pressing criminal charges against J.S. (McGonigle Dep. 132).

89. Terry Snyder also contacted Defendant Romberger on the telephone and requested that she change the ten day out of school suspension. (Romberger Dep. 55-56). Defendant Romberger said she would not change the ten-day suspension. *Id.* Later that week, either on March 26th or 27th, Terry Snyder met with Defendant Romberger and again requested that she overrule the ten-day suspension. Defendant Romberger again stated that she would not overrule it. *Id.*

90. No classes were canceled as a result of the MySpace profile of Mr. McGonigle.

91. No student other than J.S. and K.L. was disciplined, suspended, or expelled for a disruption caused by the MySpace profile of Defendant McGonigle.

92. Blue Mountain School District's policies (published in the Blue Mountain Middle School Code) do not restrict the school district's ability to

punish students for conduct outside of school or outside of school sponsored activities.

Respectfully submitted,

Dated:      November 25, 2007.      */s/ Meredith W. Nissen*
Mary Catherine Roper (ID No. 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215-592-1513 ext. 116
(F) 215-592-1343
mroper@aclupa.org

Mary E. Kohart (I.D. No. 37191)
Meredith W. Nissen  (I.D. No. 93504)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

Deborah Gordon (I.D. No. 95071)
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA  19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs

25

# **CERTIFICATION OF SERVICE**

I, Meredith W. Nissen , hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:  November 25, 2007.  */s/ Meredith W. Nissen*
Meredith W. Nissen

# EXHIBIT B

# CONDENSED COPY

```
 1              IN THE UNITED STATES COURT FOR
             THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
    J.S., a minor, by and      : CIVIL ACTION NO.:
 3  through her parents, TERRY : 07-CV-585
    SNYDER and STEVEN SNYDER,  :
 4  individually and on behalf :
    of their daughter,         :
 5                             :
              Plaintiffs,      :
 6                             :
              vs.              : JUDGE:  JAMES M.
 7                             : MUNLEY
    BLUE MOUNTAIN SCHOOL        :
 8  DISTRICT; DR. JOYCE E.     :
    ROMBERGER, Superintendent, :
 9  Blue Mountain School       :
    District; and JAMES S.     :
10  McGONIGLE, Principal, Blue :
    Mountain School District,  :
11  both in their official and :
    individual capacities,     :
12                             :
              Defendants.      :
13
                    ---------------
14
                 ORAL DEPOSITION OF
15
                        J.S.
16
                  September 13, 2007
17
                    ---------------
18
          Taken at the Blue Mountain School
19  District Board Room, 685 Red Dale Road, Orwigsburg,
    Pennsylvania, on September 13, 2007, commencing at
20  11:29 a.m. before Candis S. Bradshaw, Notary
    Public-Court Reporter.
21
22          LOVE COURT REPORTING, INC.
               1500 Market Street
23            12th Floor, East Tower
          Philadelphia, Pennsylvania  19102
24               (215) 568-5599
```

## Page 2

APPEARANCES:

AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
BY: MARY CATHERINE ROPER, ESQUIRE
The Bourse Building, Suite 570
111 S. Independence Mall East
Philadelphia, Pennsylvania 19106
(215) 592-1513 x116
Representing the Plaintiffs

SWEET, STEVENS, KATZ & WILLIAMS, LLP
BY: JONATHAN P. RIBA, ESQUIRE
331 East Butler Avenue
P.O. Box 5069
New Britain, Pennsylvania 18901
(215) 345-9111
Representing the Defendants

ALSO PRESENT:
   James S. McGonigle
   Joyce E. Romberger, Ed.D.
   Susan Schneider-Morgan

## Page 3

### INDEX

WITNESS             PAGE

J.S.

   By Mr. Riba         4

   By Ms. Roper      83

### EXHIBITS

NO.    DESCRIPTION      PAGE

D-1  MySpace page and enlarged copy of   10
     same

D-2  CIS Acknowledgement and Consent Form  53

D-3  Blue Mountain School Disrict    53
     "Acceptable Use of the Computers,
     Network, Internet, Electronic
     Communications Systems, and
     Information"

D-4  Letter written by J.S. on Hershey  75
     Lodge letterhead

## Page 4

J.S., called as a witness, was
administered the oath and testified as follows:
====================

### EXAMINATION

BY MR. RIBA:

Q. Good morning, J. My name is John. I'm
going to take your deposition today. And I'm sure
your attorney has kind of briefed you about what's
going to happen today, but I just want to go over a
rephrase the question. I'll be happy to do so.

A. Okay.

Q. This is not a quiz or some type of test.
It's purely a fact-finding session for me to see
what you know about some issues that you raise in
your complaint.

You can consult with your attorney, if you
so desire. This is not an endurance session. If
you need to go to the bathroom, get a drink of
water, just tell me, and we'll be happy to take a
quick break.

Do you understand all the questions -- all
the instructions I --

A. Yes.

Q. -- just went over?

## Page 5

A. Yeah.

Q. Okay. J., where do you currently live?

A. Orwigsburg.

Q. Okay. What is the address?

A. 209 Summer Valley Road.

Q. Okay. Who do you live with?

A. My parents.

Q. What are your parents' names?

A. Terry and Steve Snyder.

Q. Okay. Are you an only child?

A. No.

Q. Okay. Do you have any siblings?

A. A brother.

Q. How old is your brother?

A. I don't know. I think he's 12.

Q. Okay. He lives with you too?

A. Yes.

Q. Is he a student here at Blue Mountain?

A. Yes.

Q. Okay. What grade are you currently?

A. I'm in 9th grade.

Q. Okay. In the high school?

A. Yes.

Q. Here at Blue Mountain?

1    A.  Yes.

2    Q.  Okay.  Do you have a computer at your

3  house?

4    A.  Yes.

5    Q.  And what type?

6    A.  I don't know.

7    Q.  Okay.  How long have you had the computer

8  in your house?

9    A.  I'm not sure.  For a while.

10    Q.  Okay.  Okay.

11       You know what this case is about,

12  obviously; correct?

13    A.  Uh-huh.

14    Q.  Okay.  It's a creation of a MySpace account

15  page of Mr. McGonigle.  This --

16       MS. ROPER:  Excuse me.  I just want

17    to remind the witness to answer out loud

18    instead of just nodding.

19       MR. RIBA:  Right.

20       THE WITNESS:  Okay.

21  BY MR. RIBA:

22    Q.  That's one of the instructions I forgot.

23  Everything needs to be verbal.

24    A.  Okay.

1    Q.  We can see what you're doing, but as she's

2  taking everything down, that doesn't translate onto

3  paper.  Okay?

4    A.  Okay.

5    Q.  Okay.  In March of 2007, did you have a

6  computer at your house?

7    A.  Yes.

8    Q.  Okay.  Did you have -- this case involves

9  MySpace?

10    A.  Yes.

11    Q.  And MySpace is on the Internet?

12    A.  Yes.

13    Q.  Can you describe for me what that is, in

14  general.

15    A.  It's, like, a page you can make about

16  yourself to keep in contact with your friends.

17    Q.  Okay.  And in March 2007, did you have your

18  own MySpace account?

19    A.  Yes.

20    Q.  Okay.  Do you still have a MySpace account?

21    A.  Yes.

22    Q.  Okay.  How would I find your home page or

23  your account?

24    A.  You would need the URL link.

1    Q.  Okay.  What is your personal URL link?

2    A.  Myspace.com/XO[first name of J.S.]OX3.

3    Q.  Okay.  And you still visit that site and

4  update that site?

5    A.  Yes.

6    Q.  How long have you been an active MySpace

7  user?

8    A.  I'm not sure.

9    Q.  Okay.  Did you use MySpace prior to March

10  of 2007?

11    A.  Yes.

12    Q.  How -- could you give us an approximation

13  as to how long, prior to March of 2007, you used

14  MySpace?

15    A.  I don't know.

16    Q.  Was it more than a -- was it more than a

17  week or two weeks or a month?

18    A.  Possibly a year.

19    Q.  Did you have your own MySpace account prior

20  to creating the MySpace account with

21  Mr. McGonigle's picture on it?

22    A.  What?

23    Q.  Did you have your own personal MySpace

24  account prior to --

1    A.  Yes.

2    Q.  Just let me finish the question.

3    A.  Okay.  Sorry.

4    Q.  -- prior to creating the MySpace account

5  with Mr. McGonigle's picture on it?

6    A.  Yes.

7    Q.  Okay.  So you knew how to use it?

8    A.  (Nodding head.)  Yes.

9    Q.  Okay.  Let me show you what's already been

10  marked as an exhibit.  I'll show you -- I'll give

11  you two of the same thing, but we'll -- can we mark

12  these both for -- as Defense 1.  They're the same

13  thing.  One's a little -- one's a close-up.

14       (Exhibit No. D-1 was marked.)

15       MS. ROPER:  Do you have an extra

16    copy?

17       MR. RIBA:  Sure, sure, sure.  There

18    you go.

19       MS. ROPER:  Thank you.

20       MR. RIBA:  You're welcome.

21  BY MR. RIBA:

22    Q.  All right.  J., I've placed before you

23  what's been marked as -- tentatively as D-1.  Can

24  you describe what you're looking at, for the

1 record.
2   A. A profile of the MySpace me and my friend
3 made about Mr. McGonigle.
4   **Q. Okay. Who is your friend?**
5   A. Kristina Lehman.
6   **Q. Kristina Lehman?**
7   A. Yes.
8   **Q. How do you spell her last name?**
9   A. L-E-H-M-E-N [sic], I'm pretty sure.
10     MR. MCGONIGLE: (Inaudible whispering.)
11     MR. RIBA: Okay. It's -- we'll get
12 it.
13 BY MR. RIBA:
14   **Q. And is she also in 9th grade currently?**
15   A. Yes.
16   **Q. Is she still your friend?**
17   A. Yes.
18   **Q. Okay. And you created this, what's been --**
19 **the MySpace account marked as D-1?**
20   A. Yes.
21   **Q. What part did Kristina Lehman create, if**
22 **anything?**
23   A. We basically both created it together.
24   **Q. Okay.**

1   A. So . . .
2   **Q. And where did you create it?**
3   A. Almost everything.
4   **Q. Where? Where did you create it?**
5   A. The section called the "About Me." And I
6 had some to do with the interests.
7   **Q. My question -- my question, J., is: What**
8 **physical location did you create this? This --**
9 **obviously, you created this on a computer; correct?**
10   A. At my house.
11   **Q. At your house?**
12   A. Yes.
13   **Q. Okay. When? When did you create this?**
14   A. I'm not sure. I don't remember the exact
15 date.
16   **Q. Okay. Why did you create this?**
17   A. Because me and my friend, at the time,
18 thought it would be comical.
19   **Q. Okay. What's comical about it?**
20   A. The fact that it's outrageous.
21   **Q. Okay. Well, you thought it would be**
22 **comical. Is there any other reason why you created**
23 **this?**
24   A. Not really. No.

1   **Q. Okay. You weren't concerned about a dress**
2 **code violation you received about a month before**
3 **this?**
4   A. Well, yes. But this MySpace had nothing to
5 do with that.
6   **Q. It had nothing to do with it?**
7   A. (No audible answer.)
8     THE REPORTER: I did not hear an
9 answer. I'm sorry.
10     THE WITNESS: Hmm?
11     THE REPORTER: His question was:
12 "It had nothing to do with it?" I did not
13 hear a verbal response.
14     THE WITNESS: I said it didn't have
15 anything to do with it.
16     THE REPORTER: Okay. Thank you.
17     MS. ROPER: She's just asking you to
18 repeat herself -- to repeat yourself.
19     THE WITNESS: Okay.
20 BY MR. RIBA:
21   **Q. This Web site that's -- the document that**
22 **I've placed before you has a date of 3/21/2007 on**
23 **the bottom of it.**
24     **Do you have any knowledge as to if that was**

1 around the time when you created this profile?
2   A. What day was the 21st?
3   **Q. I don't know that.**
4     **Do you have a recollection of a day of the**
5 **week that you created it on?**
6   A. I'm pretty sure it was Sunday night.
7   **Q. You created it on a Sunday night?**
8   A. Pretty sure.
9   **Q. At what time?**
10   A. I don't remember.
11   **Q. Okay. How do you know it was night?**
12   A. Because it was dark out.
13   **Q. Okay. Any other timeframe that you could**
14 **testify to as to what time you created it?**
15   A. No.
16   **Q. Was anyone else in the room when you**
17 **created it?**
18   A. No.
19   **Q. Who did you create this site for?**
20   A. Nobody in particular.
21   **Q. Okay. So you and Kristina just got in your**
22 **house and decided it would be funny to create a**
23 **site about Mr. McGonigle?**
24   A. She was at her house, and we were

1  communicating over AIM.
2     **Q. Okay.**
3     A. And --
4     **Q. What is "AIM"?**
5     A. AOL Instant Messenger.
6     **Q. Okay. So she was not in your house when**
7  **you created this?**
8     A. No.
9     **Q. Could she see what you were doing?**
10    A. We would send back and forth what we were
11 putting down.
12    **Q. Did you talk to anyone else besides**
13 **Kristina about what you were putting down on this**
14 **Web site?**
15    A. Do you mean when I was making it?
16    **Q. Yes.**
17    A. No.
18    **Q. Did your parents come in the room at all?**
19    A. No.
20    **Q. Did you call anyone else on the phone about**
21 **this?**
22    A. No.
23      After I made it? Yes.
24    **Q. While you were making this, did you call**

1  anybody?
2     A. No.
3     **Q. Was that Sunday night the first night that**
4  **you thought it would be funny to create this Web**
5  **site?**
6     A. Yes.
7     **Q. Where did you get that picture of**
8  **Mr. McGonigle on this Web site?**
9     A. My friend Kristina got it off of the school
10 Web site.
11    **Q. How do you know that?**
12    A. She told me.
13    **Q. How did Kristina add this picture to the**
14 **Web site if she's not at your house?**
15    A. She could -- there was an option to save
16 the picture under the computer in her -- at her
17 house, and then you can upload saved pictures on
18 MySpace. And that's what she did.
19    **Q. Did she save the picture to her MySpace**
20 **account?**
21    A. No.
22    **Q. Okay. She sent -- she just saved it under**
23 **her own file in her computer, and you -- and she**
24 **sent it to you via e-mail or something?**

1     **How did the picture get from her house to**
2  **your computer?**
3     A. That picture would show up anywhere if the
4  profile was pulled up.
5     **Q. No, no, no.**
6     A. Uh-huh.
7     **Q. You said -- I want to -- I'm trying to**
8  **figure out how this picture got on this Web site.**
9  **And from my understanding of your testimony is that**
10 **Kristina went on the school district Web site and**
11 **used the "Save as" function on her computer, and**
12 **then somehow, it got from her computer to your**
13 **computer?**
14    A. No. She saved it under her computer and
15 uploaded it on her computer --
16    **Q. Okay.**
17    A. -- on MySpace.
18    **Q. Okay. So I'm just trying to figure out how**
19 **it got from Kristina's computer to this Web site.**
20    A. She uploaded it on MySpace.
21    **Q. Okay. So she had access to this profile as**
22 **well?**
23    A. Yes.
24    **Q. Can you describe how you create -- how you**

1  start off -- if you decide you want to create a
2  MySpace profile, what you need to do?
3     A. You go to MySpace.com, and there's a link
4  to sign up for an account.
5     **Q. Okay.**
6     A. And then you fill out information that they
7  ask, and then you create what's put on the Web
8  site.
9     **Q. And is there some type of, like, login and**
10 **password required to access this page?**
11    A. Yes.
12    **Q. So both you and Kristina had the login and**
13 **ac- -- and the password codes to get in to access**
14 **this page?**
15    A. Yes.
16    **Q. What does that say at the top, next to**
17 **Mr. McGonigle's picture, to the right? The very**
18 **top line.**
19    A. "Fraintrain -- it's a slow ride, but you'll
20 get there eventually."
21    **Q. No. Above that.**
22    A. "M-Ho"?
23    **Q. Yeah. What is that?**
24    A. A name.

Page 18

1 Q. What does that mean?
2 A. A name.
3 Q. You named him -- you named Mr. McGonigle
4 "M-Ho"?
5 A. Well, I'm pretty sure --
6 Q. Is that something you typed in?
7 A. No. I think Kristina did. I'm pretty
8 sure. I'm almost positive.
9 Q. Okay. But that's what you identified
10 this -- Mr. McGonigle as, as an "M-Ho"?
11 A. Yes.
12 Q. And why -- do you have any -- do you have
13 any knowledge as to why Kristina entered that?
14 A. No.
15 Q. Okay. The next line down says:
16 "Fraintrain -- it's a slow ride, but you'll get
17 there eventually." It's in quotes.
18 A. Yes.
19 Q. And did you type that?
20 A. Yes.
21 Q. And what does that mean?
22 A. I'm not exactly sure. People used to say
23 it at school about him.
24 Q. About who?

Page 19

1 A. About Mr. McGonigle and Mrs. Frain.
2 Q. Mrs. Fran (phonetic)?
3 A. Frain.
4 Q. Frain?
5 A. Yes.
6 Q. Is that his wife?
7 A. I think.
8 Q. And you thought it was funny to put that on
9 there?
10 A. Yes.
11 Q. And did you type "male"?
12 A. I chose the option "male."
13 Q. Uh-huh. 40 years old?
14 A. Yes.
15 Q. Alabama?
16 A. Yes.
17 Q. United States?
18 A. Yes.
19 Q. Now, this says: "Last login: 3/21/2007."
20 Is that something that's updated each time on
21 MySpace automatically?
22 A. Yes.
23 Q. There's -- under his picture, there's a
24 "Pics" and a "Videos." Did you post any additional

Page 20

1 pictures or videos?
2 A. No.
3 Q. Did you -- do you have any hard copies or
4 printouts of what you created, other than what
5 would be marked as D-1?
6 A. No.
7 Q. What is the box underneath the picture? Is
8 it just a blank box?
9 A. It had options where you can come in
10 contact with the profile owners. You could send
11 messages, add the profile to your friends account,
12 and other options like that.
13 Q. What do you mean you could add it to your
14 friends account? You could send -- automatically
15 send the site to one of your friends?
16 A. No. They could add him to be one of their
17 friends on MySpace.
18 Q. Okay. When you -- when you first created
19 this site, J., it was -- anyone in the world could
20 access it; isn't that correct?
21 A. Yes.
22 Q. And you could all -- people could search --
23 as part of MySpace, from what I understand, is
24 there's ways to search for people on there;

Page 21

1 correct?
2 A. Yes.
3 Q. For instance, you could type in -- search
4 the database, the MySpace database, for all
5 40-year-olds?
6 A. Yes.
7 Q. And Mr. McGonigle's picture would pop up?
8 A. Yes.
9 Q. This Web site would pop up; correct?
10 A. Yes.
11 Q. And if a parent of Blue Mountain happened
12 to be searching MySpace right after you created
13 this and typed in that search, his picture would
14 have popped up; right?
15 A. Yes.
16 Q. And the rest of this Web site would have
17 popped up.
18 A. Yes.
19 Q. The third box down says "MySpace URL"?
20 A. Yes.
21 Q. And then it has
22 www.MySpace.com/kidsrockmybed. Correct?
23 A. Yes.
24 Q. And that was something that you came up

Page 22

1  with?
2     A.  Well, I was a part of it.  Kristina came up
3  with it.
4     Q.  Okay.  And you agreed that it would be
5  funny to put that there?
6     A.  Yes.
7     Q.  And the implication behind "kids rock my
8  bed" is that -- well, you tell me what the
9  implication is of that end part of the URL address,
10  "kids rock my bed."
11     A.  If somebody took it seriously, they would
12  think he was a pedophile.
13     Q.  Okay.  And there's nothing on this -- on
14  this site, J., to indicate that you shouldn't take
15  it seriously, is there?  Is that correct?
16     A.  I don't know anybody who would take it
17  seriously.
18     Q.  Well, that's not my question.
19        My question is:  There's nothing on this
20  site -- if I, a parent of Blue Ridge -- of Blue
21  Mountain School District pulled up this site right
22  after you created it and saw Mr. McGonigle's
23  picture there, there's nothing to indicate to me
24  that this is a joke or something -- or a joke

Page 23

1  between friends.  Isn't that correct?
2     A.  Yes.
3     Q.  And as you said, "kids rock my bed," you
4  would associate that with a pedophile; correct?
5     A.  Yes.
6     Q.  Underneath that box, it has "M-Ho's
7  interests."  Is that part of the template for
8  MySpace?  Interests -- a interests box?
9     A.  Yes.
10     Q.  And you have a series of things here:
11  "Detention; being a tight ass; riding the Frain
12  train; spending time with my child, who looks like
13  a gorilla; baseball; my golden pen; fucking in my
14  office; hitting on students and their parents."
15        Right?
16     A.  Uh-huh.
17     Q.  Is any of that true?
18     A.  I don't believe so.
19     Q.  You know that's not true; right?
20     A.  Right.
21     Q.  You knew that wasn't true when you both put
22  it there -- when you agreed to put it there?
23     A.  Yes.
24     Q.  "Hitting on students and their parents."

Page 24

1  You have no knowledge of Mr. McGonigle ever hitting
2  on a student?
3     A.  No.
4     Q.  Again, that portrays him as some type of
5  pedophile.
6     A.  Yes.
7     Q.  As a principal, his job is to interact with
8  students on a daily basis; right?
9     A.  Yes.
10     Q.  And that would affect his reputation?
11        MS. ROPER:  Objection.  Calls for
12        speculation.
13  BY MR. RIBA:
14     Q.  Do you think that would affect his dealing
15  with students?
16     A.  If somebody took it seriously, yes.
17     Q.  Is there anything on here -- is there
18  anything on this Web site, anything at all, that
19  you think is truthful -- that is the truth?
20     A.  No.
21     Q.  In fact, this Web site, if you go over to
22  the main box that begins, "Hello, children," it's
23  specifically directed towards children and
24  students?

Page 25

1     A.  Yes.
2     Q.  Do you find it offensive?
3     A.  Yes.
4     Q.  You find it lewd?
5     A.  Lewd?
6     Q.  Vulgar.
7     A.  Yes.
8     Q.  Distasteful?
9     A.  Yes.
10     Q.  Do you see how this could affect the
11  workings of a school?
12     A.  Yes.
13     Q.  Do you feel this could have caused
14  disruptions in schools?
15        MS. ROPER:  Objection.  Calls for
16        speculation.
17  BY MR. RIBA:
18     Q.  You can answer the question.
19     A.  What was the question again?
20     Q.  Do you feel that what you wrote here on
21  this Web site with Mr. McGonigle's picture could
22  cause a disruption for schools -- for this school,
23  for the middle school?
24     A.  Yes.

7 (Pages 22 to 25)

Page 26

1    Q. For ...
2       The bottom section has a friends space?
3    A. Yes.
4    Q. And it has 22 friends?
5    A. Uh-huh. Yes.
6    Q. What does that mean?
7    A. Twenty-two people had access to this
8 profile.
9    Q. Okay. So at some point, you made it
10 private?
11   A. Yes.
12   Q. At what point did you make it private?
13   A. I don't remember.
14   Q. Okay. Can you offer an estimation as to
15 how long it was open to the entire world?
16   A. If I had to guess, almost exactly a day
17 after it was made, we set it to private.
18   Q. Okay. So for a day, you don't know how
19 many people accessed it? There's no way you can
20 tell who had access to this?
21   A. Well, we could see how many times it was
22 viewed.
23   Q. Is that indicated here on this printout
24 anywhere?

Page 27

1    A. Not on this printout.
2    Q. Okay. Where do you see that?
3    A. You would have to log in, and on this side,
4 it would say "Profile Views" and then a number.
5    Q. And is that something that would only be on
6 your computer, as you're the creator of this?
7    A. Whoever can log in can see it.
8    Q. Okay. So in this case, only you and
9 Kristina could --
10   A. Yes.
11   Q. -- could see this?
12      And how many -- and do you have a
13 recollection as to how many profile -- or views of
14 this Web site there were prior to you making it
15 private?
16   A. No.
17   Q. What made you determine -- what made you
18 decide to make it private?
19   A. I don't know.
20   Q. You just decided out of the blue, just for
21 the heck of it?
22      MS. ROPER: Objection.
23      Mischaracterizes the testimony.
24 BY MR. RIBA:

Page 28

1    Q. Okay. Could you offer any reason as to why
2 you decided to make it private?
3    A. No.
4    Q. Do you recall friends of yours coming up to
5 you and discussing this Web site you and your
6 friend created?
7    A. Yes.
8    Q. Okay. Right after you created it, when in
9 terms of -- at what point after you created this
10 did people start coming up to you and talking to
11 you about it?
12   A. What?
13   Q. At what point after you created this Web
14 site did people start coming up to you and talking
15 to you about this Web site?
16   A. Whenever somebody saw it, they would ask
17 about it.
18   Q. And this happened on more than one
19 occasion?
20   A. Yes.
21   Q. Multiple people? Numerous friends of yours
22 came up to you and talked about it?
23   A. Yes.
24   Q. Okay. Can you offer an estimation as to

Page 29

1 how many of your friends came up to you and talked
2 about it prior to you making it private?
3    A. No.
4    Q. No estimation at all?
5    A. No.
6    Q. More than a handful?
7    A. I'm guessing. Probably.
8    Q. Okay. And what did your friends say about
9 it?
10   A. That it was funny.
11   Q. Okay. What friends were that -- were
12 those?
13   A. I honestly don't remember. It was such a
14 long time ago.
15   Q. Okay. You don't remember anyone who came
16 up to you and told you it was funny?
17   A. No.
18   Q. Can you tell me any of your friends who
19 viewed this Web site?
20   A. I don't remember.
21   Q. Okay. Well, there's 22 of your friends on
22 here, is that correct, that viewed this?
23   A. Yes.
24   Q. And you don't remember one of them?

8 (Pages 26 to 29)

1     A. Well, I remember some.

2     Q. Okay. Well, that's what I'm asking you.

3     I'm asking you: I want to know everyone who you

4     know saw this Web site.

5     A. First and last name?

6     Q. Sure.

7     A. Katrina Miller, Kyle Grube --

8     Q. Hold on a second. Katrina Miller.

9     A. Kyle Grube.

10    Q. Kyle Grove.

11    A. Grube.

12    Q. Groom?

13    A. Grube.

14    Q. Could you spell that?

15    A. G-R-U-B-E.

16    Q. Okay.

17    A. Kayla Cohan.

18    Q. How do you spell that?

19    A. C-O-H-A-N.

20    Q. Okay.

21    A. That's all I can remember exactly.

22    Q. Okay. Do you recall what Katrina told you

23    about this Web site?

24    A. She said it was hilarious.

1     Q. Anything else?

2     A. Not that I remember.

3     Q. And when did she see the Web site?

4     A. I don't know.

5     Q. Okay. Does she have a MySpace account?

6     A. Yes.

7     Q. Okay. And what did Kyle Grube say about

8     this Web site?

9     A. I don't remember.

10    Q. You don't remember anything?

11    A. No.

12    Q. How about Kayla? Do you recall what she

13    said about the Web site?

14    A. She thought it was funny.

15    Q. Okay. These three individuals that you

16    identified that you recall viewing this Web site,

17    do you know if they saw it in the private setting

18    or when it was open to the entire world?

19    A. Kayla was the first one to see it. So she

20    saw it when it was not private. And I'm not sure

21    about Katrina or Kyle.

22    Q. Did you create this whole Web site on one

23    day? I mean, Sunday night in one sitting?

24    A. I'm pretty sure.

1     Q. Okay. So the next day would have been

2     Monday --

3     A. Yes.

4     Q. -- as you recall?

5     A. Yes.

6     Q. Okay. And what did you do Monday? Did you

7     tell your friends about what you did, you and

8     Kristina did?

9     A. I didn't -- well, I don't think me and

10    Kristina -- I'm not sure about Kristina. But I

11    didn't really talk about it unless people

12    approached me.

13    Q. Okay. How did people know about it if you

14    didn't tell them?

15    A. A friend tells another friend.

16    Q. Okay. So Kristina would tell people about

17    it, you assume?

18    A. I'm guessing.

19    Q. Okay. Well, do you know -- do you know if

20    Kristina told -- had conversations with her friends

21    about what you guys did Sunday night?

22    A. No.

23    Q. Have you and Kristina talked about this at

24    all?

1     A. Yes.

2     Q. Okay. When was the last time you and

3     Kristina talked about this?

4     A. I don't know.

5     Q. Okay. Recently or -- you said you're still

6     friends with her?

7     A. Well, yes. But it's not -- our friendship

8     isn't just about the MySpace.

9     Q. Sure. Sure. But this is a federal

10    lawsuit, you know, in a relatively small school

11    district.

12         You guys don't talk about what's going on,

13    the facts of this case?

14    A. No.

15    Q. Okay. Did you tell her that you're being

16    deposed today?

17    A. Yes.

18    Q. Okay. Did you talk about the case at all

19    at that point?

20    A. No.

21    Q. Did you have any conversations with people

22    at school on Monday when you came back about this

23    Web site?

24    A. If I was approached, yes.

1    Q. Okay. So your testimony is you didn't seek
2  out anyone on your own to talk about it?
3    A. No.
4    Q. Okay. Why not?
5    A. Because I had other things to focus on
6  during school.
7    Q. Okay. Did you want this shared with your
8  other friends?
9    A. I didn't care.
10   Q. Why not?
11   A. I don't know. If people wanted to see it,
12  they can see it.
13   Q. When these three individuals you testified
14  to about -- came up to you and said it was funny,
15  what did you say in response?
16   A. I don't remember.
17   Q. Okay. This -- the friends space on the
18  bottom of this Web site -- this exhibit, says
19  "Cassie." Do you know who Cassie is?
20   A. She's in 10th grade.
21   Q. Okay. Is she a friend of yours?
22   A. We met and spoke a couple times.
23   Q. And do you know her last name?
24   A. No.

1    Q. "Billy bus move [sic]," do you know who
2  that is?
3    A. I know more than one Billy. And since I
4  can't see the picture, I'm not sure.
5    Q. Okay. How about "Tori"?
6    A. I know more than one Tori too.
7    Q. Okay. How about -- let's go back to Billy.
8  What Billys do you know that might have had access
9  to this Web site?
10   A. I know Billy Geiger.
11   Q. Okay.
12   A. And Billy Griffin.
13   Q. Okay. Any other Billys?
14   A. No.
15   Q. How about Toris -- the two -- the Toris
16  that you think it might be?
17   A. I'm not sure of their last name. I know a
18  lot of Victorias and Toris.
19   Q. From my understanding of MySpace, this Web
20  page is actually -- if you hit the down arrow, it
21  would actually go down farther? You would see all
22  22 friends?
23   A. No.
24   Q. Was it -- you --

1    A. We only set it to four top friends.
2    Q. Okay. So only four friends would show up
3  on this page?
4    A. Yes. But if you wanted to see the other
5  friends, there was a link to click, and then you
6  could see everybody who had access to it.
7    Q. Okay. So this Web page that I have in
8  front of you, we don't see that link on this
9  printout. But you're saying there is some type of
10  link that you could click and the whole -- all
11  22 friends would show up; the pictures of all
12  22 people would show up.
13   A. Yes.
14   Q. And do you recall any of the other 22 --
15  other than Cassie, Billy, and Tori, any of the
16  other 22 people that were in the friends space?
17   A. Katrina, Kyle --
18   Q. Katrina, what's her last name?
19   A. Miller.
20   Q. Okay. You said her.
21   A. The three I said previously.
22   Q. Sure. The three that you said previously.
23      Anyone else?
24   A. My friend Dane. I don't know how to say

1  his last name.
2    Q. Dane?
3    A. Yes.
4    Q. Is he a 9th grader?
5    A. Yes.
6    Q. Okay. Who else?
7    A. Brandon Watral.
8    Q. Watra?
9    A. Watral.
10   Q. Do you know how to spell it?
11   A. W-A-T-R-A-L.
12   Q. Okay.
13   A. I honestly can't remember anybody else.
14   Q. At what point in -- well, at what point of
15  the day on Monday did you start hearing a buzz in
16  school that this was -- that people were coming up
17  to you and your friend about this space?
18   A. In the morning when I first went to my
19  locker.
20   Q. Okay. So from Sunday night to Monday
21  morning, people in the school were already talking
22  about this.
23   A. Yes.
24   Q. And you said this was more than a handful

1  of people?
2      A.  Yes.
3      Q.  Could you offer an estimate as to how many
4  people were talking about this?
5      A.  No.
6      Q.  And where were they talking about it?  Were
7  they talking about it in class?
8      A.  I don't know.
9      Q.  Well, do you recall where people were
10  talking about this?
11      A.  Well, people would come up to me in the
12  hallway between classes.  Whatever they talk about
13  whenever is none of my business.  I don't --
14      Q.  And would you --
15      A.  -- keep track of it.
16      Q.  Would you talk about this with the people
17  that came up to you?  Would you laugh --
18      A.  I would --
19      Q.  -- about it and say "It's funny" and "Look
20  what we did"?
21      A.  Yes.
22      Q.  Do you take pride in this?
23      A.  No.
24      Q.  At the time, did you take pride in it?

1      A.  No.
2      Q.  Why not?
3      A.  What's there to take pride of?
4      Q.  Well, you thought it was funny.  People
5  were coming up to you and saying it was funny.
6  Sometimes when people say it's -- that something's
7  funny, people take pride in that.
8      A.  Well, I didn't.
9      Q.  Okay.  Why did you create it then?
10      A.  Me and Kristina thought it would be funny
11  at the time.
12      Q.  What was your opinion of Mr. McGonigle when
13  you created this?
14      A.  I didn't really have an opinion of him.
15      Q.  Well, why did you pick him to make fun of?
16      A.  Well, I didn't like him in particular,
17  but --
18      Q.  And why didn't you like him?
19      A.  Because I thought he was rude.
20      Q.  Why?
21      A.  The way he handled situations about the
22  dress code.
23      Q.  Okay.  And what situations are those?
24      A.  He would scream and yell.  Even if it was a

1  mistake, you didn't -- if you didn't know what you
2  were wearing was inappropriate.
3      Q.  You were in 8th grade at the time?
4      A.  Yes.
5      Q.  And you were in middle school?
6      A.  Yes.
7      Q.  What grades are in middle school?
8      A.  6 through 8.
9      Q.  Okay.  And does the entire middle school
10  have a dress code policy?
11      A.  What?
12      Q.  Does the entire middle school have a dress
13  code policy?
14      A.  Yes.
15      Q.  Does that apply to grades 6 through 8?
16      A.  Yes.
17      Q.  And during your time 6 through 8, how many
18  times were you cited for a dress code violation?
19      A.  Three times.  I'm pretty sure.
20      Q.  Okay.  I've come across one time in
21  February 20th, 2007.  And you received a detention
22  from that?
23      A.  Yes.
24      Q.  Do you recall that?

1      A.  Yes.
2      Q.  Do you have a recollection of any other
3  time that you received a warning?
4      A.  A warning?
5      Q.  Or a detention or a disciplinary notice
6  because of inappropriate dress.
7      A.  I had two detentions, but I don't remember
8  the dates.
9      Q.  And you feel you were not dressed
10  inappropriately?
11      A.  I thought my outfits were appropriate.
12      Q.  Okay.  Any other reason why you didn't like
13  Mr. McGonigle other than the fact that he enforced
14  a dress code policy?
15          MS. ROPER:  Objection.
16          Mischaracterizes the testimony.
17          MR. RIBA:  Okay.  I'll rephrase it.
18  BY MR. RIBA:
19      Q.  Did -- is there any -- any other reason why
20  you didn't like Mr. McGonigle other than the fact
21  that he cited you for inappropriate dress on a
22  couple of occasions?
23          MS. ROPER:  And ag- -- I'll object
24          as it mischaracterizes the testimony.

11 (Pages 38 to 41)

Page 42

1  BY MR. RIBA:
2    Q.  Okay.  You can answer the question.
3    A.  No.
4    Q.  You said Mr. McGonigle raised his voice?
5    A.  Yes.
6    Q.  Did you tell your parents about that?
7    A.  Yes.
8    Q.  Okay.  Did you have a conference with
9  him -- did your parents take any action in regards
10  to Mr. McGonigle raising his voice?
11   A.  My mom would check my outfits, and then I
12  still got in trouble another time for dress code.
13   Q.  Okay.  Was anyone present when
14  Mr. McGonigle raised his voice with regards to the
15  dress code incident?
16   A.  I don't remember.
17   Q.  Where was it?
18   A.  In the office.
19   Q.  In his office?
20   A.  The main office.
21   Q.  Okay.  Were there secretaries or other
22  people around that would hear this?
23   A.  Yes.
24   Q.  Okay.  Do you know the names of anyone that

Page 43

1  would have heard this?
2    A.  No.
3    Q.  Have you heard Mr. McGonigle yell at
4  anybody else?
5    A.  I heard of him yelling at people.
6    Q.  Have you personally heard him yell at
7  anyone else besides you on this occasion with
8  regard to the dress code violation?
9    A.  Well, the one time when I got in trouble
10  and it was just a warning, there were about two or
11  three other girls who also got in trouble, and he
12  screamed at all of us.
13   Q.  Is there any other reason, besides what you
14  already testified to, as to why you picked
15  Mr. McGonigle -- his picture to be put up there?
16   A.  No.
17   Q.  Did you have any positive encouragement
18  from Mr. McGonigle in your time as -- at the middle
19  school?
20   A.  I don't remember.
21   Q.  Do you see him on a regular basis?
22   A.  No.
23   Q.  Have you ever had a conversation with him?
24   A.  I don't remember.

Page 44

1    Q.  You don't remember any conversations with
2  him prior to you placing his picture on this Web
3  site?
4    A.  Not really.
5    Q.  How about Kristina?  What was her opinion
6  of Mr. McGonigle?
7    A.  She didn't like him as well.
8    Q.  Okay.  And do you know why?
9    A.  No.
10   Q.  So we're at -- I'm going to go back to
11  the -- to when you came back to school on Monday
12  and there was some type of buzz in the school going
13  around about this Web site.
14       Did a -- were you approached the entire day
15  about this Web site?
16   A.  No.
17   Q.  What parts of the day were you approached?
18   A.  I don't remember.
19   Q.  You talked about that right in the morning
20  when you got into school, people starting coming up
21  to you and talking to you about this?
22   A.  Yes.
23   Q.  And did that continue throughout the day?
24   A.  Probably.  I'm not sure.

Page 45

1    Q.  Okay.  Did you tell people -- did you have
2  any conversations with people about telling them
3  where to go to see this Web site?
4    A.  I don't remember.
5    Q.  Okay.  Did you tell anyone that his URL
6  address was www.MySpace.com/kidsrockmybed?
7    A.  Not that I can recall.
8    Q.  Did you have conversations in class with
9  anybody about this?
10       You testified that you had conversations in
11  the hall.  Did you have conversations in class?
12   A.  No.
13   Q.  Are you involved in extracurricular
14  activities?
15   A.  No.
16   Q.  Did you go home after school on that day,
17  Monday -- the Monday after you created this?
18   A.  Yes.
19   Q.  Okay.  And at that time, did -- what did
20  you do at that time with regards to this Web site?
21       (Ms. Schneider-Morgan leaves
22  proceedings.)
23   A.  That night, we set it to private.  And
24  Kristina could possibly have done something.  I

1  don't remember.
2  BY MR. RIBA:
3    Q.  Do you recall who set it to private, you or
4  Kristina?
5    A.  No.
6    Q.  How do you go about setting it to private?
7    A.  You have to go under the account settings.
8        (Ms. Schneider-Morgan enters
9  proceedings.)
10    A.  And there's an option called "Privacy
11  Settings" where you can set it to where everybody
12  can see or just you can see it or people who add
13  the MySpace onto their MySpace can see it.
14  BY MR. RIBA:
15    Q.  Do you know how many 8th grade students
16  there are at the time you created this in your --
17  8th grade students in your class?
18    A.  What?
19    Q.  Do you know how many total 8th grade
20  students there were?
21    A.  No.
22    Q.  Do you have a rough estimate?
23    A.  No.
24    Q.  So that night, Monday night, you said

1  you -- you testified you set it to private?
2    A.  Yes.
3    Q.  Did someone tell you to set it to private,
4  or was it just a mutual decision?
5    A.  It was just a mutual decision.
6    Q.  No one told you to set it to private?
7    A.  No.
8    Q.  Where is the computer in your house?  Is it
9  in your room, or is it in -- do you have a separate
10  room for it?
11    A.  At the time, there -- it was one computer
12  in a family room.
13    Q.  Okay.  And when you were on that -- on the
14  MySpace page that Monday night, was anyone else
15  around?
16    A.  No.
17    Q.  No one else was around?
18    A.  No.
19    Q.  Did you tell your parents about this site
20  you created?
21    A.  No.
22    Q.  Did you tell teachers about this Web site?
23    A.  No.
24    Q.  Did any administrator or teacher come up to

1  you and talk to you about this Web site?
2    A.  No.
3    Q.  What happened -- what happened after you
4  set it to private?
5    A.  What do you mean?
6    Q.  Did you continue to -- did people ask to be
7  your friend?
8    A.  Yes.
9    Q.  Okay.  And these were the 22 of your
10  friends that you talked about?
11    A.  Yes.
12    Q.  Were there anybody -- did you grant access
13  to anyone you didn't know?
14    A.  No.
15    Q.  And just so I understand, the record's
16  clear:  Even though it's set to private, if you did
17  a search on MySpace, for instance, all 40-year-olds
18  in the database, Mr. McGonigle's picture would
19  still show up with the title "M-ho," the first --
20  basically, the first box here on the upper
21  left-hand corner of D-1 would still show up?
22    A.  That, I am not sure of 'cause I don't do
23  searches on MySpace.
24    Q.  Okay.  But when you click on this -- for

1  instance, if you clicked on a -- if you didn't do a
2  search but if you just clicked on the profile, you
3  would still see his picture and the words
4  accompanying it to the right --
5    A.  Yes.
6    Q.  -- even though it's set to private;
7  correct?
8    A.  Yes.
9    Q.  Do you know how the district got ahold of
10  this copy of this account?
11    A.  I was told somebody approached
12  Mr. McGonigle.  But --
13    Q.  Okay.  Do you know --
14    A.  -- I don't know --
15    Q.  -- who that was?
16    A.  No.
17    Q.  Was it one of your friends?
18    A.  I don't know who it was.
19    Q.  Was it one of your 22 friends?
20    A.  Probably, because they had access to the
21  MySpace.
22    Q.  Okay.  Well, do you -- they were your
23  friends.  You said someone told you -- you heard or
24  something that someone approached Mr. McGonigle

Page 50

1 with this.
2    Do you know anything else about who it was?
3 Can you tell me who it was?
4    A.  No.
5    Q.  You didn't inquire into who it was?
6    A.  Well, I wondered and I asked around, but
7 nobody knows.
8    Q.  No one knows?
9    A.  Nobody knows, or they just wouldn't tell
10 me.
11    Q.  At some point, were you called down to the
12 office?
13    A.  Yes.
14    Q.  And do you recall when that was?
15    A.  The 22nd.
16    Q.  At what time?  The morning?
17    A.  During 1st period.
18    Q.  Okay.  And what happened?
19    A.  I was called down, and Mr. McGonigle told
20 me about how he knew about the MySpace.
21    Q.  And what did he say?
22    A.  At first, I didn't admit to making it.  But
23 then after he said something -- I'm not sure -- I
24 admitted to it.

Page 51

1    Q.  Okay.  Why didn't you admit to it at first?
2    A.  Because I didn't want to get in trouble.
3    Q.  Okay.  Why did you think you'd get in
4 trouble?
5    A.  Because it's a MySpace made about him.
6    Q.  Anything -- any other reason why?
7    A.  Because it said all that stuff.
8    Q.  You said you denied it at first.  Then
9 Mr. McGonigle said something, and then you admitted
10 it.  What did he say to -- before you admitted to
11 it?
12    A.  I don't remember.
13    Q.  Do you recall, J., signing a -- it's called
14 a CIS Acknowledgment and Consent Form about the use
15 of information and technology equipment and
16 associated property of the school, prior to the
17 beginning of the school year?
18    A.  Yes.
19    Q.  Okay.  And has that happened every -- do
20 you sign that every year?
21    A.  I'm pretty --
22    Q.  Is that something you would sign every
23 year?
24    A.  I'm pretty sure.

Page 52

1    Q.  Okay.  And your mother would sign it?
2    A.  Yes.
3    Q.  And as part of that, you would get a
4 policy.  You would get a copy of the actual
5 Internet policy.  The title is "Acceptable Use of
6 Computers, Network, Internet, Electronic
7 Communication Systems, and Information."
8    Do you recall ever -- I don't know if you
9 read it or not.  But do you recall receiving this
10 information?
11    A.  I don't remember reading it, but I guess I
12 got it.
13    MR. RIBA:  Okay.  I don't have
14 copies, Mary Catherine.  But we can
15 mark -- maybe we can make copies
16 afterwards.
17    MS. ROPER:  Sure.
18    MR. RIBA:  And we'll just mark these
19 as exhibits, the next in line, D-2 and
20 D-3.
21 BY MR. RIBA:
22    Q.  J., is that your signature on this, dated
23 8/29/06, and the title is a "CIS Acknowledgment and
24 Consent Form"?

Page 53

1    A.  Yes.
2    MS. ROPER:  Can I suggest that as a
3 temporary measure we use her sticky notes
4 to mark these.
5    MR. RIBA:  Yeah.  Sure.
6    (Exhibits D-2 and D-3 were marked.)
7 BY MR. RIBA:
8    Q.  So D-2 is what you signed with regard to
9 the CIS Acknowledgement and Consent Form?
10    A.  Yes.
11    Q.  Okay.  And your mom signed that too; right?
12    A.  Yeah.
13    Q.  Okay.  And D-3 is the policy that's
14 referenced in D-2 with regards to the acceptable
15 use of computers?
16    A.  Well, I never read it, so I don't know.
17    Q.  Okay.  But it's typical that the school
18 district would provide that to you and your parents
19 prior to the school year with regards to what the
20 policy is on the use of computers; correct?
21    A.  Yes.
22    Q.  Okay.  So getting back to your conversation
23 with Mr. McGonigle on that Tuesday, what happened
24 after you admitted that you created this Web site?

Page 54

1    A. Well, I'm not sure the exact order. But he
2 informed me that he would be suing me and that --
3 he told me if I was a guy, he would -- I would
4 already be through the wall.
5    Q. If you were a guy?
6    A. Yes.
7    Q. Okay.
8    A. And then he called in Kristina and told her
9 the same threat he told me.
10    Q. Okay. And what did you say in response to
11 Mr. McGonigle's reaction?
12    A. I don't remember.
13    Q. You don't remember anything?
14    A. No.
15    Q. How long did this meeting take?
16    A. I don't know.
17    Q. Were you sent home, or what happened after
18 the meeting was over?
19    A. After he talked to both me and Kristina, he
20 put us in separate rooms, and I had to wait in
21 there until my mom showed up.
22    Q. And in terms of what you told Mr. McGonigle
23 at that time, other than the fact to admitting to
24 this and to creating this site with Kristina, you

Page 55

1 don't recall anything else you said?
2    A. No.
3    Q. Did you feel at that time you did anything
4 wrong, J.?
5    A. Well, I thought the MySpace was wrong, but
6 I didn't know he could punish me for it.
7    Q. Why do you think the MySpace was wrong?
8    A. Because even though it was funny, it was
9 wrong to say those things about him.
10    Q. You said you didn't think he could punish
11 you?
12    A. Yes.
13    Q. Why do you say that?
14    A. Because it was outside of school.
15    Q. And you knew that prior -- you knew that
16 when you were making this, that you could -- that
17 you shouldn't get punished for this?
18    A. That's what I thought.
19    Q. How did you know that?
20    A. I didn't know schools could suspend you for
21 things you can do out of school.
22    Q. And you knew that prior to doing this?
23    A. Yes.
24    Q. Did you think about that? Did you -- was

Page 56

1 it one of your thoughts, is that we can make this
2 comedy about Mr. McGonigle, and the school can't
3 punish us because we're doing it outside of school?
4    Was -- did that thought go through your
5 mind when you were doing this?
6    A. Possibly. It was -- I don't remember.
7    Q. Did someone tell you that, or how did you
8 come to believe that?
9    A. I just assumed.
10    Q. And why did you assume that?
11    A. I don't know.
12    Q. Well, you said you thought -- you might
13 have thought about this when you were creating
14 this. You just testified to me a moment ago that
15 you didn't think -- at the time of this conference
16 with Mr. McGonigle, you didn't think he could
17 punish you.
18    My question is: Why did you -- why were
19 you thinking that when you created this?
20    A. Thinking what again? I'm sorry.
21    Q. That the school could punish you for what
22 you wrote about Mr. McGonigle.
23    A. Because it was not made in school. It was
24 not accessed to in school by any student. I didn't

Page 57

1 know I could get in trouble for something I did out
2 of school.
3    Q. What do you parents do?
4    A. What do you mean?
5    Q. What is their occupation?
6    A. My dad works at Reading Alloys, and I just
7 know that my mom works in Harrisburg. I'm not sure
8 what she does.
9    Q. How did you know this wasn't going to be
10 accessed in school when you created it?
11    A. Because MySpace was blocked in the computer
12 labs at school. So you couldn't get on MySpace.
13    Q. How did you know that this wasn't going to
14 be printed out, like it was, and handed out at
15 school?
16    A. I didn't know it was going to be printed
17 out.
18    Q. How did you know that it wasn't going to be
19 viewed by parents in the community when it was set
20 to -- anyone could view it --
21    A. I didn't --
22    Q. -- when you created it?
23    A. I didn't know parents would be looking at
24 it.

Page 58

1    Q. You didn't know parents would be looking at
2  it, even though the whole world can access it?
3    A. I guess.
4    Q. J., did you come up with the rationale that
5  the school couldn't punish you because this was
6  done at your house, that the school — that it
7  wasn't viewed at the school, that no school
8  computers were used, did you come up with that
9  rationale after this lawsuit started?
10   A. What?
11      MR. RIBA: Could you repeat the
12      question, please.
13      (Reporter read back requested portion.)
14   A. I'm not understanding the question.
15 BY MR. RIBA:
16   Q. Okay. You went through a variety of
17 reasons why you thought the school couldn't punish
18 you —
19   A. Uh-huh.
20   Q. — for the actions you took. You said —
21 one of the things you said was that it was done at
22 your house; this was done on your home computer; it
23 was — wasn't viewed in school because the MySpace
24 accounts are blocked. I think you said that it

Page 59

1  wasn't — it might have been not talked about at
2  school. I don't know if you testified to that.
3  But you offered a variety of reasons why you
4  thought that the school shouldn't punish you.
5      My question is: Did you come up with that
6  rationale after this lawsuit started, or did you
7  actually think that when you created this Web site?
8    A. I thought that when I created the Web site.
9    Q. Okay. So you were placed in detention —
10 or placed in a separate room, then Kristina, after
11 your conversation with Mr. McGonigle?
12     You said — you testified you were placed
13 in separate rooms?
14   A. Yes.
15   Q. And did your mom come?
16   A. Yes.
17   Q. Okay. And what happened after your mom
18 came?
19   A. We went — me and my mom went back to
20 Mr. McGonigle's office, and he told her that he was
21 going to sue me, and I would have a ten-day
22 suspension.
23   Q. Okay. And did you say anything at that
24 point?

Page 60

1    A. Not that I remember.
2    Q. Did you contest the ten-day suspension?
3    A. Yes.
4    Q. How did you contest it?
5    A. Huh?
6    Q. What did you do? You said you contested
7  it. How — what did you do?
8    A. I stayed home for ten days, and I was given
9  work that I was going to be missing.
10   Q. Okay. Did you do the work that was given
11 to you?
12   A. Yes.
13   Q. All the assignments that you had in your
14 classes were brought home to you?
15   A. Yes.
16   Q. On a daily basis?
17   A. They were all given to me at, like, the
18 same time.
19   Q. Okay. And when was that?
20   A. I don't know.
21   Q. Okay. You would do the work. Would you do
22 homework each night, each of the ten days or — you
23 know, not necessarily on the weekend. But would
24 you do homework every night?

Page 61

1    A. I would try and do as much as I can until I
2  got tired of it.
3    Q. Okay. How many classes were you taking in
4  the 8th grade? What was your schedule? Do you
5  have certain periods, or how did that work?
6    A. I don't know my exact schedule. But I was
7  taking eight classes including lunch. But --
8    Q. Okay.
9    A. Yeah.
10   Q. And during those ten days, you were able to
11 do the assignments that your fellow classmates were
12 given; right?
13   A. Yes.
14   Q. And when you came back after those ten
15 days, were you at the same point as your fellow
16 classmates?
17   A. Well, I had to make up some tests that
18 were --
19   Q. Sure.
20   A. But yes.
21   Q. Okay. In terms of where you were in the
22 curriculum, in terms of where you were in your
23 textbooks --
24   A. Yeah.

Page 62

1  Q. -- you were caught up to where they were?
2  A. Yes.
3  Q. Did you -- have you sought any professional
4  treatment, like doctors or psychologists, as a
5  result of this incident?
6  A. No.
7  Q. Did you suffer any emotional or physical
8  reactions to what happened, to your suspension?
9  A. I didn't much like school then. But
10  nothing major.
11  Q. Okay. You didn't go see any -- you didn't
12  seek treatment or --
13  A. No.
14  Q. -- anything like that?
15     Was it -- J., was it your decision to
16  initiate this lawsuit, or was it your parents'
17  decision?
18     MS. ROPER: Objection to the extent
19     that it calls for discussions that are
20     private because they are with an attorney.
21  BY MR. RIBA:
22  Q. Okay. I don't want to know any
23  conversations you had with your attorney. My
24  question -- I'll rephrase the question.

Page 63

1     What -- did you want to sue the school
2  district --
3  A. My --
4  Q. -- sue Mr. McGonigle and Superintendent --
5  the superintendent?
6  A. My mom decided to do that.
7  Q. So it wasn't your decision?
8  A. No.
9  Q. Why didn't you want to?
10     MS. ROPER: Objection.
11     Mischaracterizes the testimony.
12  BY MR. RIBA:
13  Q. Okay. Well, you said -- I thought you
14  testified that you didn't want to sue them.
15  A. I never said I didn't want to. I said it
16  was my mom's decision.
17  Q. Okay. Did you have a conversation with
18  your mom about it?
19  A. She informed me of what she was going to
20  do.
21  Q. And you were okay with that, obviously,
22  since we're here?
23  A. Uh-huh. Yes.
24  Q. Did your mom tell you why she wanted to sue

Page 64

1  the school district?
2  A. She probably did, but I don't know her
3  reasons. You can ask her.
4  Q. She never told you?
5  A. She probably did. I just don't remember.
6  Q. Okay. Did you talk to the Pennsylvania
7  State Police at all?
8  A. Yes.
9  Q. And what did -- when did you talk to them?
10  A. I'm not -- I'm not sure on the exact day.
11  But --
12  Q. Soon after the suspension?
13  A. Yes.
14  Q. Okay. And what did they ask you?
15  A. We -- me and my mom and Kristina and her
16  family were called down there because, at the time,
17  we thought -- we were told McGonigle was going to
18  press charges on us.
19  Q. Okay. And did the police ask you
20  questions?
21  A. Not that I remember.
22  Q. You were called down to the police
23  barracks; is that correct?
24  A. Yes.

Page 65

1  Q. And you don't recall them asking you
2  questions, though?
3  A. I don't -- I don't know.
4  Q. Do you know if a police report was
5  developed? Or were they taking notes? Or what
6  happened once you went down to the barracks?
7  A. I don't remember.
8  Q. And you went down there with your parents?
9  A. Yes.
10  Q. Your mom and your dad?
11  A. Yes.
12  Q. Were you called in to a room, or were you
13  asked questions at all by the detective or the
14  police officer?
15  A. No.
16  Q. What hap- --
17  A. Not that I'm sure of.
18  Q. Okay. Well, what -- I'm just trying to
19  figure out what happened. I'm not trying to be
20  tricky --
21  A. They --
22  Q. -- or anything. I'm just trying to figure
23  out what happened at the --
24  A. They --

17 (Pages 62 to 65)

1    Q. -- police barracks.

2    A. -- informed us that the charges were

3    dropped and that -- they told us the consequences

4    of if this ever happened again.

5    Q. Do you know the charges that were brought?

6    A. I don't remember.

7    Q. What were the consequences if it happened

8    again? What do you recall them telling you?

9    A. I'm not exactly sure. But I remember them

10   saying if I did it again, I'd have a criminal

11   record. And then if I did it again, I can be put

12   up for foster care. I'm pretty sure that's what he

13   said.

14   Q. Was it -- is it your assumption -- or was

15   it your belief that what the officer was telling

16   you was that what you did was criminal?

17   A. I guess so, yes.

18   Q. Did they tell you why the charges were

19   dropped?

20   A. No.

21   Q. Do you know why the charges were dropped?

22   A. No.

23   Q. Have you had any other contact with the

24   state police other than that one time you went to

1    the barracks?

2    A. No.

3    Q. What did your mom say when she was called

4    down to the principal's office, Mr. McGonigle's

5    office, and was showed this Web site?

6    A. What did she say to me afterward?

7    Q. Yeah. What did she -- what was her

8    reaction to this Web site?

9    A. She didn't expect me to do something like

10   this, and she told me she was disappointed in me.

11   Q. Were you -- did you receive any punishment

12   from your parents?

13   A. Yes.

14   Q. And what was that?

15   A. I was grounded for a very long time. I

16   wasn't allowed on the computer. I wasn't allowed

17   to do anything with my friends. And occasionally,

18   I was allowed on the phone if I had a phone call.

19   Q. You said you were grounded for a long time?

20   A. Yes.

21   Q. Can you give me a timeframe, like, months

22   or a year or -- are you still grounded?

23   A. No.

24   Q. Okay. At what point did -- this incident

1    happened in March of 2007. Do you recall at what

2    point you regained your privileges to, you know, go

3    on the computer and talk to your friends and . . .

4    A. I'm guessing some time in May, I was

5    allowed to start hanging out with my friends again.

6    And I was allowed on the computer but only if it

7    was school related.

8    Q. When you went back to class, J., after the

9    ten-day suspension, did you talk to your friends

10   about the suspension and about this Web site

11   anymore?

12   A. Once again, if I was asked about it, I

13   would talk to my friends. And I'm pretty sure none

14   of my teachers talked to me about it.

15   Q. Did you hear about instances in the

16   classrooms in the school from teachers or, you

17   know, your friends about them having to deal with

18   disruptions as to this Web site picture -- this Web

19   site?

20   A. No.

21   Q. Was anyone else present when -- besides

22   Mr. McGonigle, when your mom came down to have a

23   talk with him about this issue?

24   A. Mrs. Guers was in the room.

1    Q. And who is Mrs. Guers?

2    A. She's one of the guidance counselors.

3    Q. Is she your guidance counselor or just one

4    of the many -- one of the guidance counselors in

5    the district?

6    A. There's two.

7    Q. There's two. Okay.

8    A. And she was just there, I guess.

9    Q. If you saw this -- if you saw this Web

10   site, J., if you just pulled it up and you've had

11   nothing to do with creating it, and you pull it up

12   and you realized it was Mr. McGonigle, as a student

13   of Blue Mountain, would you look at him

14   differently?

15   A. Not really.

16   Q. And when it says, "Hello, children . . .

17   It's your . . . sex addict, fag-ass . . .

18   principal," you wouldn't look at him differently

19   when you thought he typed this?

20   A. No, because I wouldn't have taken this

21   seriously.

22   Q. Really?

23       You don't think it would have affected his

24   ability to govern or oversee or administer

1 education --
2         MS. ROPER: Objection.
3 BY MR. RIBA:
4     Q. -- during the -- in the middle school?
5         MS. ROPER: Objection. Calls for
6     speculation.
7     Q. You can answer the question.
8     A. What was the question?
9     Q. You don't think this Web site would have
10 affected his ability to administer education and
11 oversee the school for fellow students --
12         MS. ROPER: I --
13     Q. -- based on this Web site?
14         MS. ROPER: I'm sorry. Same
15     objection.
16     A. If I was just overlooking it and I had
17 nothing to do with it?
18     Q. Well, I mean, we hear about -- when you
19 turn the news on, unfortunately, the reality of
20 society is that there's some sick people out there.
21 And you know, it seems like every other episode of
22 "Dateline NBC" is about some sexual predator trying
23 to lure students in some way or the other.
24         You testified that -- well, let me ask you

1 this question: Doesn't this Web site portray
2 Mr. McGonigle as a sexual predator of young
3 students?
4     A. Yes.
5     Q. Don't you think that would affect his
6 ability to administer education in the school?
7         MS. ROPER: Again, object as calling
8     for speculation.
9     A. If this would have been taken seriously by
10 anybody, I'm guessing yes, it would -- he would
11 have been affected by it.
12 BY MR. RIBA:
13     Q. Do you think that the school district
14 would -- the administrators, the superintendent,
15 the board of directors -- board of school directors
16 would want to employ a sexual predator as a
17 principal?
18         MS. ROPER: Objection. Calls for
19     speculation.
20     A. I'm guessing no.
21 BY MR. RIBA:
22     Q. Do you think anyone would want to employ a
23 sexual predator?
24     A. No.

1     Q. Did you have an informal hearing with
2 regard to your suspension?
3     A. Yes.
4     Q. And that happened a couple days after your
5 mom came down to the office?
6     A. Yes.
7     Q. Okay. What happened there?
8     A. Mr. McGonigle told me how I was going to be
9 at -- back in school. And if anybody, like, was
10 bothering me about it, I -- like, I shouldn't
11 answer anybody's questions. And then my mom asked
12 to talk with Mr. McGonigle and Mrs. Guers, who was
13 also present, in private without me there.
14     Q. Okay. Did you present your side of the
15 story again at the informal hearing at all? Did
16 you go through what -- kind of what we did here
17 this morning about the -- about why you created it
18 and what you were trying to do and so on and so
19 forth?
20     A. No.
21     Q. Okay. So it was basically a session to say
22 that "Don't talk about this with other kids in the
23 school"?
24     A. Yes.

1     Q. Do you recall if your mother said anything
2 at the meeting?
3     A. I don't remember.
4     Q. You said present was Ms. Guers,
5 Mr. McGonigle, yourself, and your mother?
6     A. Yes.
7     Q. Do you know if -- as a MySpace user, can
8 you -- can one of your friends -- say a friend
9 asks -- you know, a friend contacts you and wants
10 to see this even in private, okay? Do you
11 understand? They want to be your friend. You're
12 added to the friend list here. Okay?
13     A. Uh-huh.
14     Q. Can they send this Web site to other
15 people?
16     A. No.
17     Q. Can they direct other people to see this
18 Web site?
19     A. They can tell them the URL, but they would
20 only be able to see that box with the picture. And
21 then they would have to send a friend request to be
22 able to look at the whole profile.
23     Q. Do you know what Kristina did to get that
24 picture of Mr. McGonigle off the Web site?

19 (Pages 70 to 73)

1    A.  Didn't you ask me that already?

2    Q.  I asked you who got it.  I know I asked

3  you --

4    A.  I --

5    Q.  I know she -- I know you testified she used

6  the "Save as."  But do you know how she got the

7  actual picture to save on the -- from the -- how

8  did she get the picture from the Web site to her

9  computer?

10    A.  She saved it from the school Web site.

11    MR. RIBA:  I'm going to mark this

12  as D-4.

13    I'll give you a copy.  There you go.

14    MS. ROPER:  Thanks.

15    (Exhibit No. D-4 was marked.)

16  BY MR. RIBA:

17    Q.  J., placed before you is D-4, which is a --

18  well, you tell me what it is.

19    A.  It's an apology letter to Mr. McGonigle and

20  Mrs. Frain about the MySpace.

21    Q.  Okay.  And when was this written?

22    A.  During my suspension.

23    Q.  Do you know how soon -- how long into the

24  suspension it was written?

1    A.  No.

2    Q.  Is this your writing?

3    A.  Yes.

4    Q.  During the -- during your interactions with

5  Mr. McGonigle after you were called down to the

6  office with your mother there as well, did you tell

7  him that do you didn't think that you should be

8  suspended for ten days?

9    A.  No.

10    Q.  Why not?

11    A.  I didn't think there was any point to talk

12  about it, because he already talked to the -- he

13  told me he already talked to the school board, I'm

14  pretty sure.  And they agreed to suspend me.  I

15  didn't think there was any reason why I should

16  object to it at the time.

17    Q.  Did you tell him your beliefs that you

18  testified to before, being that, you know, you used

19  your home computer, you didn't use a school

20  computer, that you didn't think the school had

21  authority to discipline you --

22    A.  No.

23    Q.  -- for something you did outside of school?

24    A.  No, I didn't.

1    Q.  Did your mother say that at that time?

2    A.  I don't know.

3    Q.  You don't recall that?

4    A.  No.

5    Q.  Has your studies been affected at all as a

6  result of this incident?

7    A.  No.

8    Q.  I reviewed your academic record, and it

9  appears that you're an excellent student.  You

10  still -- are you still receiving good grades?

11    A.  I don't know, at the time being, what I

12  have right now.

13    Q.  Right.  You just started right now.

14    A.  Yes.

15    Q.  But you finished up the 2007 school year on

16  a good note?

17    A.  Yes.

18    Q.  Do you know what a parody is?

19    A.  Yes.

20    Q.  Can you describe it for me.

21    A.  It's like a mockery of something.

22    Q.  Okay.  Your complaint talks about -- and

23  you know what a complaint is; right?

24    A.  Yes.

1    Q.  It's what started this lawsuit.  It's what

2  you and your mother filed against the defendants

3  here.

4    A.  Yes.

5    Q.  Your complaint talks about this being a

6  parody?

7    A.  Yes.

8    Q.  What was it trying to parody?  What was it

9  trying to mock or whatever?

10    A.  Mr. McGonigle.

11    Q.  I never knew Mr. McGonigle until about a

12  month ago, maybe, when I started to work on this

13  case.  And I'm sure a lot of people don't know who

14  Mr. McGonigle is.

15    Who was this directed towards?  I mean, you

16  would agree that he isn't someone that is

17  well-known in Pennsylvania?  Would you agree with

18  that?

19    A.  Yes.

20    Q.  Okay.  He is well-known in the -- in that

21  middle school.

22    A.  Yes.

23    Q.  But in the overall community, no one

24  probably knows Mr. McGonigle.

Page 78

1  A. I guess not.
2  MR. RIBA: I'd just like to take a
3  quick break, consult with my clients, and
4  then wrap up.
5  MS. ROPER: Okay.
6  MR. RIBA: Okay?
7  MS. ROPER: Do you want us to leave
8  the room?
9  MR. RIBA: We can head out. We
10  can -- yeah. We'll be back in a couple
11  minutes. And feel free to go to the
12  bathroom, or if you need some water, we
13  can get you some water.
14  (Break from 12:50 p.m. to 12:57 p.m.)
15  BY MR. RIBA:
16  Q. J., in the 8th grade, did you have a
17  Mr. Nunemacher as a teacher?
18  A. For homeroom, yes.
19  Q. And in math class?
20  A. No.
21  Q. You don't recall having him for math?
22  A. In 8th grade?
23  Q. Well, I guess he also teaches math. You
24  didn't have him for math; you just had him for

Page 79

1  homeroom?
2  A. Yes.
3  Q. Okay. And do you recall that Monday when
4  you -- after you -- the Monday after you created
5  the profile when you came back to class, do you
6  recall disruptions in Mr. Nunemacher's class --
7  A. No.
8  Q. -- with regards to this Web site?
9  A. Not that I remember, no.
10  Q. What do you remember happening --
11  A. I don't --
12  Q. -- in his class on Monday?
13  A. I don't remember anything. I didn't . . .
14  Q. Nothing at all?
15  A. No.
16  Q. Would it be fair to state that if
17  Mr. Nunemacher came in and testified -- or provided
18  testimony to indicate there was disruptions in his
19  class, could you either affirm or deny that those
20  happened?
21  A. I don't remember.
22  Q. You don't remember one way or the other?
23  A. No.
24  Q. It could have happened, and it could not

Page 80

1  have happened?
2  A. Yeah.
3  Q. Okay. I want to go back to your
4  relationship with Mr. McGonigle for a second.
5  In 7th grade, did you ask him -- well, let
6  me ask: In 7th grade, did you want to dress up as
7  him for Halloween?
8  A. Yeah.
9  Q. Why is that?
10  A. I don't know. Because my friend was going
11  to be Mr. Ketner.
12  Q. Is he another teacher?
13  A. He was the assistant principal at the time.
14  Q. Okay. And you asked for -- Mr. McGonigle
15  for his ID? Do you recall that?
16  A. Yeah.
17  Q. So you're -- obviously, you're -- had a
18  good relationship if you wanted to dress like him
19  on Halloween?
20  MS. ROPER: Objection.
21  Argumentative.
22  BY MR. RIBA:
23  Q. Okay. Well, did you have a good
24  relationship with him in 7th grade?

Page 81

1  A. Not really. It's just my friend wanted me
2  to be a principal with her.
3  Q. Was there some type of, like, school
4  function that you get dressed up for, or is this
5  when you go-out-in-the-community type thing for
6  Halloween?
7  A. For Halloween?
8  Q. Yeah.
9  A. Yeah.
10  Q. Okay. Which one? Was it a school
11  function, or was it something you go out in the
12  community?
13  A. When I went out.
14  Q. When you went out --
15  A. Yes.
16  Q. -- with your friends and around your house?
17  A. Yes.
18  Q. Okay. Did Mr. McGonigle also teach your
19  guidance class for a period of time?
20  A. Yeah.
21  Q. Was that in 6th grade?
22  A. I guess.
23  Q. And how did you -- how was your
24  relationship with him in -- when he was your

21 (Pages 78 to 81)

**Page 82**

1 teacher?

2    A. There wasn't really a relationship.

3    Q. I mean, did you feel like he was a good

4 teacher?

5    A. I didn't really like the class, I guess. I

6 don't know.

7    Q. Okay. Just a clarification question. When

8 you were -- you talked about, back at the beginning

9 of this, when you were talking with Kristina via

10 instant messaging --

11    A. Yeah.

12    Q. -- right?

13       So you were instant messaging each other on

14 the AOL?

15    A. Yes.

16    Q. Could you both look at the screen at the

17 same -- could you both log in at the same time and

18 look at the MySpace account you guys were creating

19 at the same time?

20    A. Yes.

21    Q. Okay. And during that creation period,

22 sometime during Sunday night, did you call anyone?

23 Did you call Kayla or anybody that you recall for

24 input on -- as to what to put on the MySpace page?

**Page 83**

1    A. Not that I remember.

2       MR. RIBA: That's all the questions

3    I have.

4          EXAMINATION

5 BY MS. ROPER:

6    Q. I just have one question I wanted to follow

7 up on.

8       J., in front of you, the paper marked D-4

9 that you identified as your letter of apology, was

10 this the only time you apologized to Mr. McGonigle

11 or Mrs. Frain?

12    A. I apologized to Mrs. Frain before, either

13 the day of my suspension or in the informal

14 hearing. I'm not sure which one.

15    Q. Okay.

16       MS. ROPER: All right. Thank you.

17    That's all I wanted to ask.

18       THE WITNESS: Okay.

19       MR. RIBA: All right. Thank you.

20       (Deposition concluded at 1:02 p.m.)

21

22

23

24

**Page 84**

1          CERTIFICATION

2

3 COMMONWEALTH OF PENNSYLVANIA   :

4                                : §

5 COUNTY OF DAUPHIN              :

6       I, Candis S. Bradshaw, the undersigned, a

7 Commissioner to Take Depositions within and for

8 said County of Dauphin and Commonwealth of

9 Pennsylvania, the officer before whom the foregoing

10 depositions were taken, do hereby certify:

11       That J.S., the witness whose deposition is

12 hereinbefore set forth, was administered the oath

13 by me and that such deposition is a true and

14 correct record of the testimony given by such

15 witness.

16       I further certify that I am not related to

17 any party to this action by blood or marriage and

18 that I am in no way interested in the outcome of

19 this matter.

20       IN WITNESS WHEREOF, I have hereunto set my

21 hand this 25th day of September, 2007,

22          *Candis S. Bradshaw*

23          Candis S. Bradshaw

24          Notary Public-Court Reporter

**Page 85**

1       CERTIFICATE OF DEPONENT

2       I, J.S., certify that I have the foregoing

3 transcript of my deposition given on September 13,

4 2007, and find it to be a true, correct, and

5 complete transcript of the answers given by me to

6 the questions therein propounded, except for

7 corrections or changes in form or substance, if

8 any, noted in the attached Errata Sheet.

9

10    _____

11          J.S.

12

13    DATED: _____

14

15

16 Subscribed and sworn to me this _____ day of

17 _____, 2007.

18 My Commission Expires: _____

19

20

21    _____

22 NOTARY PUBLIC

23

24

# EXHIBIT C

# CONDENSED COPY

2

J.S., a minor, by and through    :
3   her parents, TERRY SNYDER and   :
    STEVEN SNYDER, individually     :
4   and on behalf of their daughter,:
                    Plaintiffs,     : CIVIL ACTION - LAW
5                                   : NO.: 07-CV-585
                -vs-               :
6                                   :
    BLUE MOUNTAIN SCHOOL DISTRICT;  :
7   DR. JOYCE E. ROMBERGER,         :
    Superintendent Blue Mountain    :
8   School District; and JAMES S.   :
    MCGONIGLE, Principal Blue       :
9   Mountain Middle School, both in :
    their official and individual   :
10  capacities,                     :
                                    :
11                  Defendants.     :

12

13          Oral deposition of JAMES S. MCGONIGLE,
14      held at Blue Mountain School District
15      Administration Offices, Red Dale Road, Box
16      188, Orwigsburg, Pennsylvania, on Friday,
17      October 12, 2007, commencing at 11:10 a.m.,
18      before Lynn Greene, Court Reporter and
19      Notary Public in the Commonwealth of
20      Pennsylvania.

21

22          LOVE COURT REPORTING, INC.
               1500 Market Street
23           12th Floor, East Tower
          Philadelphia, Pennsylvania  19102
24                (215) 568-5599

Page 2

APPEARANCES:

DRINKER, BIDDLE & REATH, LLP
BY: MARY E. KOHART, ESQUIRE
One Logan Square
18th and Cherry Streets
Philadelphia, Pennsylvania 19103-6996
(215) 988-2827
Attorneys for Plaintiffs

SWEET, STEVENS, KATZ & WILLIAMS, LLP
BY: JONATHAN P. RIBA, ESQUIRE
331 East Butler Avenue
P.O. Box 5069
New Britain, Pennsylvania 18901
(215) 345-9111
Attorneys for Defendants

ALSO PRESENT:
Mary Catherine Roper, Esquire
Deborah Gordon Kiehr, Esquire
Meredith W. Nissen, Esquire
Terry Snyder

* * *

Page 4

INDEX

WITNESS:
James S. McGonigle

EXAMINATION                    PAGE
By Ms. Kohart                      5
By Mr. Riba                        171
* * *

INDEX TO EXHIBITS

NUMBER     DESCRIPTION              PAGE
1          Blue Mountain Middle School    129
           letter dated 3/23/07

Page 3

DEPOSITION SUPPORT INDEX

DIRECTIONS NOT TO ANSWER:

PAGES:    None

REQUESTS FOR DOCUMENTS OR INFORMATION

PAGES:    None

STIPULATIONS AND/OR STATEMENTS:

PAGE:     5

MARKED QUESTIONS:

PAGES:    None

Page 5

(By agreement of Counsel, all
objections, except to the form of the
question, are reserved to the time of
trial.)
___
JAMES S. McGONIGLE, after having been
first duly sworn, was examined and
testified as follows:
___
EXAMINATION
___
BY MS. KOHART:
Q. Mr. McGonigle, my name is Mary Kohart.
I am representing the Plaintiffs in this matter,
along with the A-C-L-U.
Can you give me a brief description of
your educational background, just a summary of your
college?
A. Undergraduate, Elizabethtown College.
Q. Did you get a graduate degree?
A. Yes. A masters in secondary school
counseling and my administrative certification is
from Kutztown University and the University of
Scranton.

2 (Pages 2 to 5)

Page 6

1   Q. And what year did you get the graduate
2   degree?
3       A. The graduate degree was '96 in
4   secondary school counseling and the Principal
5   certification would have been in '99.
6       Q. Can you tell my your job history since
7   you graduated from college?
8       A. Undergrad or graduate?
9       Q. Undergrad.
10      A. When I first got out of college, I was
11  working for the State of Pennsylvania counseling
12  juvenile delinquents around the State at different
13  lockup facilities. At the same time, I was going
14  to graduate school and I was also coaching high
15  school baseball and American Legion baseball for
16  six years.
17      Q. What year did you graduate?
18      A. '93. And then, in '95, '96, I did an
19  internship here at Blue Mountain Middle School in
20  the guidance department. Luckily, somebody retired
21  the following year and I got employed as a Guidance
22  Counselor the following year. I remained the
23  Guidance Counselor for two years, two months and 13
24  days and then I got thrown to the wolves and I

Page 7

1   became the Dean of Students in Blue Mountain Middle
2   School.
3       Q. And what are the job duties of Dean of
4   Students?
5       A. Discipline and attendance, basically,
6   and the day-to-day operations of the school.
7       Q. And then after that?
8       A. After that, I became Acting Assistant
9   Principal for, approximately, two years and then I
10  became an Assistant Principal, approximately, one
11  year. I can't give you the exact dates.
12      Q. Not a problem.
13      A. And then Acting Principal and then,
14  finally, Principal three years ago.
15      Q. Is it the practice of this school
16  district to promote people in this job as an Acting
17  Assistant Principal, an Acting Principal and then
18  deciding, based on their job performance, whether
19  to promote them to the Principal or Assistant
20  Principal?
21      A. Yes. That would be so, from my
22  experience.
23      Q. All right. Now, how many students
24  attend the middle school here?

Page 8

1       A. Exactly?
2       Q. You can give me an estimate?
3       A. About 720.
4       Q. And has that been consistent throughout
5   your time here?
6       A. We fluctuate between 700 and 750.
7       Q. What kind of kids are they?
8       A. Can you be more specific; what do you
9   mean?
10      Q. What kind of children are coming to the
11  schools in this area; the middle class, the lower
12  middle class?
13      A. All of the above.
14      Q. How many students ultimately go to
15  college from this school district?
16      A. I have no idea.
17      Q. What is the student to teacher ratio?
18      A. In the middle school?
19      Q. Right.
20      A. One to twenty-five.
21      Q. When people are Guidance Counselors in
22  the middle school, what's their job; what kind of
23  Guidance Counseling do you need in the middle
24  school?

Page 9

1       A. Well, scheduling is a big issue. The
2   other thing is the day-to-day problems of the kids.
3   The Guidance Counselors also teach two periods a
4   day, study skills and career development.
5       Q. All of them teach study skills and
6   career development?
7       A. Yes.
8       Q. Are those mandatory classes?
9       A. Yes; in sixth grade.
10      Q. And your spouse in employed in the
11  middle school?
12      A. That's correct.
13      Q. What's her position?
14      A. She's a Guidance Counselor.
15      Q. How long has she been a Guidance
16  Counselor here?
17      A. I think this is her fourth year.
18      Q. Did she have any prior position with
19  the school?
20      A. Yes. She was a math teacher.
21      Q. What grade?
22      A. Eighth.
23      Q. How many years was she in that job?
24      A. Eight.

3 (Pages 6 to 9)

1  Q. Did you meet her when you moved to this
2  area?
3      A. I had known her in college.
4  Q. And are you from this part of the
5  State?
6      A. Yes.
7  Q. Still coach baseball?
8      A. No. I'm retired.
9  Q. Did you know Jill before this incident
10  where she was suspended?
11      A. Yes.
12  Q. How did you know her?
13      A. As a student in my guidance class and
14  the day-to-day operations of the building. I still
15  teach classes to get to know all the students. So
16  I did have her in classes.
17  Q. Were you then Assistant Acting
18  Principal?
19      A. No. At that point, I was just -- that
20  was my first year as Principal.
21  Q. Tell me what you teach -- well, tell me
22  what you remember teaching the year that Jill was
23  in it?
24      A. I teach the same thing every year.

1  Memorization skills, listening skills, following
2  directions, I dabble in school law, I talk about
3  different school law cases, I have speakers come in
4  from the high school, the SADD organization, they
5  come down and talk to the kids.
6  Q. What is SADD?
7      A. Students Against Drunk Driving.
8  Q. Are there any students in favor of
9  drunk driving organizations in the area or just
10  against it?
11      A. Just against.
12  Q. We're from Philadelphia and we have a
13  group that's in favor of it.
14      A. And I also have a County agency come in
15  and talk about drugs and alcohol. I'm only
16  teaching for 12 weeks. So that pretty much covers
17  my 12 weeks.
18  Q. What do you remember about Jill from
19  when she was your student?
20      A. Never a problem. I remember her in
21  sixth grade, nothing as far as discipline in class.
22  Seventh grade, the only thing I really remember is
23  when she wanted to dress up as me for Halloween.
24  Q. And was she prohibited from doing

1  that?
2      A. No. I gave her my school I-D and
3  everything.
4  Q. Do you have a copy of your school I-D?
5      A. Not with me.
6  Q. What does it look like?
7      A. It's square.
8  Q. Does it have a picture on it?
9      A. Yes.
10  Q. Where is the picture from?
11      A. It's from, I guess, from Life Touch.
12  Q. Is it the same picture that's --
13      A. No. It's a different picture.
14  Q. Life Touch is what; your authorized
15  photograph?
16      A. Yes.
17  Q. You gave her the school I-D and then
18  what did she do to dress up like you?
19      A. That I don't know. She said she was
20  going to comb her hair to the side and that was it.
21  That's all I know.
22  Q. Was she coming to a school dance?
23      A. No.
24  Q. She was going trick or treating?

1      A. Trick or treating.
2  Q. So you gave her identification, your
3  identification?
4      A. Yes.
5  Q. To take out to her neighborhood trick
6  or treating?
7      A. Yes.
8  Q. What did you think she was going to do
9  with it?
10      A. She was just pretending to dress up as
11  me for Halloween. That's it.
12  Q. Did she give it back to you?
13      A. Yes. The next day.
14  Q. Did you ask her about her experience
15  trick or treating?
16      A. No.
17  Q. Anything else in 6th or 7th grade that
18  you can remember about Jill?
19      A. No.
20  Q. Now, in 8th grade, up until March, any
21  issues with the students?
22      A. I do know that she was sent down to the
23  office on two occasions for dress code violations.
24  Q. What was the nature of those

1  violations?
2      A.  That I don't know.  I wasn't the one
3  that sent her down.
4      Q.  Did you speak to her about them?
5      A.  I spoke to her about the second one.
6      Q.  How did you speak with her without
7  knowing the violation?
8      A.  I walked out into the office and I knew
9  it was her second offense and I said, Jill, how
10 long is this going to go on?  You know what the
11 rules are.
12     Q.  I'm sorry.  I'm trying to find out
13 exactly what her violation was.
14     A.  I don't -- it was a dress code
15 violation.  It was a short skirt or a low top.  I
16 do not know.
17     Q.  Did she say anything about that back to
18 you?
19     A.  I don't recall.
20     Q.  What is the normal sanction for the
21 first dress code violation?
22     A.  Normal sanction is for the student to
23 call home and the parent brings in another pair of
24 clothes.

1      Q.  And was that sanction given to Jill in
2  the first violation?
3      A.  Yes.
4      Q.  And what about the second one?
5      A.  The second one, the same thing, except
6  a detention is then attached.
7      Q.  And detention is after school?
8      A.  Yes.
9      Q.  How long is it?
10     A.  An hour and a half.
11     Q.  Was that Jill's sanction, an hour and a
12 half after school?
13     A.  Yes.
14     Q.  Did she saying anything to you after
15 the second discipline, complaining about, this
16 isn't fair, I wore this all the time last year and
17 no one complained, anything like that?
18     A.  I do not recall.
19     Q.  Are students given an opportunity to
20 sort of stand up for themselves if they think
21 they're being disciplined unfairly?
22     A.  Yes.
23     Q.  What are they given an opportunity to
24 do?

1      A.  They're given an opportunity to plead
2  their case.
3      Q.  Is it just verbally?
4      A.  No.  There's a formal process in
5  writing.  It's never occurred to me, but there is a
6  process in the handbook, I believe.
7      Q.  That they can appeal to a Disciplinary
8  Board?
9      A.  Not a Disciplinary Board.  The appeal
10 would be to me first and then, if they weren't
11 satisfy with that, it would be to the
12 Superintendent and, if they weren't satisfied with
13 that, then it would be to the School Board.
14     Q.  So if she was concerned about whether
15 you gave them the discipline?
16     A.  Yeah.  At the time I was acting as both
17 Assistant Principal and as Principal.
18     Q.  So if she was concerned about whether
19 she was being treated fairly, she had the appeal
20 process in the student handbook to use; she could
21 go to the Superintendent and complain and then she
22 could go above the Superintendent?
23     A.  Well, if she was of knowledge of that,
24 yes.

1      Q.  And you said that no one has ever done
2  that, to your knowledge?
3      A.  Regarding dress code?
4      Q.  Right.
5      A.  Yes.
6      Q.  How about other issues?
7      A.  One.
8      Q.  What was the other issue?
9      A.  Cheating.
10     Q.  What year was that?
11     A.  I believe that was three years ago.
12     Q.  Can you tell me, since you've been at
13 the school district entirely, do you remember every
14 other time that you've given a 10 day suspension?
15     A.  Every other time?
16     Q.  Yes.
17     A.  No, ma'am.
18     Q.  Can you give me a top five in your
19 memory, besides this one?
20     A.  No.  I cannot.
21     Q.  You can't remember any of them?
22     A.  I can remember others, but I can't give
23 you an exact number.
24     Q.  I'm not asking for a number.  Just give

Page 18

1  me some examples of when you remember 10 day
2  suspensions and what the student did?
3      A.  What the infraction was?
4      Q.  Yes.
5      A.  Knife --
6      Q.  Knives or knife?
7      A.  Knife, razor blade, alcohol.
8      Q.  This was alcohol, knives and razor
9  blades in the school?
10     A.  Yes.
11     Q.  Keep going.
12     A.  Marijuana.
13     Q.  In school?
14     A.  Yes.  I don't have any others.
15     Q.  Were these all in the last four or five
16 years?
17     A.  No.  I'm only recalling from the time
18 that I started as Dean of Students.
19     Q.  And does the school system track
20 discipline in any way to see whether you're getting
21 an abnormal number of marijuana disciplines or -- I
22 mean, is there some tracking down of the discipline
23 here?
24     A.  Throughout the district or just in the

Page 19

1  middle school?
2      Q.  Either one.
3      A.  I can't answer throughout the district.
4  I can answer in the middle school.  The Assistant
5  Principal kept a monthly report on the infractions
6  of students.
7      Q.  Does he ever -- first of all, is it a
8  man or a woman?
9      A.  He's a man.
10     Q.  Does he ever compile or keep track,
11 like, gee whiz, our marijuana convictions are going
12 down or anything like that?
13     A.  No.
14     Q.  Have you had any problems, other than
15 the case we're here about today, with student use
16 of the Internet?
17     A.  In school or out of school?
18     Q.  Either one.
19     A.  Out of school, yes.
20     Q.  What were the out of school uses that
21 were issues?
22     A.  Parents would call occasionally
23 regarding things going on, instant messaging
24 through MySpace, and our policy has been if it's

Page 20

1  brought into the school, we will handle it, but if
2  it's done at home, we recommend that they contact
3  the local authorities.
4      Q.  So parents would call and say the other
5  kids are being mean to my kid on MySpace?
6      A.  If it's brought into school, we will
7  deal with it.
8      Q.  What do you mean brought into school;
9  printed on a printout?
10     A.  A printed printout, yes.
11     Q.  How many occasions have you had --
12 let's focus on the people are being mean to my kid
13 on MySpace and You-Tube.  How often does that come
14 up?
15     A.  Weekly.
16     Q.  Have there ever been any situations
17 where the material was brought into the school and
18 you've acted?
19     A.  No.
20     Q.  You hesitated there.  Is there
21 something close to it.
22     A.  There is something close to it.  A
23 student had written curse words on there and he had
24 a copy of it in school.  It was not directed

Page 21

1  towards any person or anybody.
2      Q.  Just a bunch of swear words?
3      A.  Yes.
4      Q.  Was he disciplined?
5      A.  Yes.
6      Q.  What happened to him?
7      A.  I do not recall.
8      Q.  And what kind of swear words were on
9  it?
10     A.  I was not in the role of an Assistant
11 Principal at the time.
12     Q.  Was this prior to the time when you
13 were a Guidance Counselor?
14     A.  When I was a Guidance Counselor.
15     Q.  Anything else that you can think of
16 where this sort of thing has been brought into the
17 school and the school has acted?
18     A.  No.
19     Q.  Have you ever heard of any stories of
20 similar situations from the high school or your
21 other schools in the district, dealing with older
22 children?
23     A.  Nothing specific.
24     Q.  You just heard general talk that this

1   may be a problem for this generation?

2       A.  Yes.

3       Q.  How about this cheater; was this

4   cheater ultimately convicted?

5       A.  Yes, he was.

6       Q.  And what happened to him?

7       A.  He received Saturday detention, a

8   Wednesday detention and was removed from Student

9   Counsel.

10      Q.  And what was the nature of the

11  cheating?

12      A.  Copying.

13      Q.  During a test?

14      A.  Yeah.

15      Q.  And what about the people who brought

16  weapons, like, knives or razor blades, to school,

17  can you remember what their discipline was?

18      A.  Ten days out-of-school suspension.

19      Q.  Anything else?

20      A.  And loss of dance privileges, in

21  addition to a police report.

22      Q.  So the school reported them to the

23  police?

24      A.  Yes.  We file what's called an incident

1   report.

2       Q.  Now, did they threaten people with the

3   knives and the razor blades or did they just have

4   them?

5       A.  Just had them.  There's been no threats

6   in my 10 years as the Principal and Assistant

7   Principal.

8       Q.  Okay.  Did the police take any juvenile

9   action against those children?

10      A.  They filed a petition with the Juvenile

11  Court, but, in every case thus far, it was the

12  child's first offense, and one child, I know,

13  received probation.

14      Q.  How about the person with alcohol, tell

15  me what happened there.

16      A.  This was actually last year.  The

17  student brought in VitaWater and they're not

18  allowed to bring containers in the building.  He

19  did not have alcohol on his breath, but somebody

20  had informed us that it was in his locker.  I asked

21  the child to open the locker, open the contents,

22  smelled it, I had a Guidance Counselor present at

23  the time, and there was definitely traces of

24  alcohol in that, the smell of alcohol.

1       Q.  And what happened with that child?

2       A.  That child received 10 day

3   out-of-school suspension, was not allowed to attend

4   further dances and was referred to a County agency

5   for alcohol.

6       Q.  And how about the child with marijuana?

7       A.  The same thing --

8       Q.  Referred for drug and alcohol

9   treatment?

10      A.  Yeah; through our student systems

11  program.

12      Q.  When you make that kind of referral, do

13  they have to come back to school with a certificate

14  that they completed the program?

15      A.  No.  They do not.  We offer it to the

16  parents.  It is up to the parents to follow-up.

17      Q.  Now, there was one other student

18  involved in the MySpace incident; is that right?

19      A.  Yes.

20          MS. KOHART:  And can we use her name

21  here?

22          MS. ROPER:  Yes.  We'll redact it.

23      Q.  How about Kristina, any discipline

24  problems with her that you recall, prior to the

1   MySpace?

2       A.  I believe she did have one dress code

3   violation.

4       Q.  Do you remember the nature of it?

5       A.  No.  I do not.  Again, I was not the

6   person who sent her down.

7       Q.  What was her discipline as a result of

8   the MySpace?

9       A.  Ten days out-of-school suspension and

10  no school dances for the remainder of the year.

11      Q.  Was Jill allowed to go on the end of

12  the year field trip to Washington?

13      A.  To my knowledge, no.

14      Q.  And what is the basis of your

15  knowledge?

16      A.  That I was told that she didn't go.

17      Q.  By whom?

18      A.  Well, it came up during the Court

19  proceeding and it also was said upstairs.

20      Q.  Would you have had authority to prevent

21  her from going?

22      A.  Absolutely not.

23      Q.  That was entirely up to the teacher?

24      A.  Entirely up to the teacher.

## Page 26

1   Q. And is that a written policy or is that
2 just your practice?
3   A. That I do not know. I'm sorry. Can
4 you clarify the question? Is it their written
5 policy or my written policy?
6   Q. Is there a written policy about who
7 gets to pick the kids to go on field trips?
8   A. That I don't know.
9   Q. But in your practice, only the teachers
10 decide that?
11   A. Yes.
12   Q. If the teacher had wanted somebody on a
13 10 day suspension to come on a field trip, they
14 could do that?
15   A. Yes. Can you clarify that, please? A
16 field trip versus the Washington trip.
17   Q. The Washington trip.
18   A. A field trip is different. That's a
19 school function. We don't have field trips in the
20 middle school. So it's not really an issue.
21   Q. So there are no field trips here
22 essentially?
23   A. Not for 8th grade.
24   Q. Any other grade?

## Page 27

1   A. The 6th grade.
2   Q. Can a teacher bring a child on a field
3 trip in the 6th grade even if that child is on
4 suspension?
5   A. It never occurred.
6   Q. Can they? If you don't know the
7 answer, that's fine.
8   A. I don't know the answer and it would be
9 very difficult for a child to get a 10 day
10 out-of-school suspension the second week of school,
11 when that trip is.
12   Q. What trip is that?
13   A. It's to Hawk Mountain.
14   Q. Let's pretend it happened.
15   A. Okay.
16   Q. Who gets to decide if the kid gets to
17 go on the field trip?
18   A. That would be me.
19   Q. And that's in the 6th grade?
20   A. Yes.
21   Q. But by the time of 8th grade, you lose
22 that authority?
23   A. No. There's no field trip.
24   Q. How do you distinguish between a field

## Page 28

1 trip and the trip to Washington; one is overnight?
2   A. One is during the school day and one is
3 on the weekend.
4   Q. Which one is on the weekend?
5   A. The Washington trip.
6   Q. So it is a school function?
7   A. No.
8   Q. What is it?
9   A. It's a class trip.
10   Q. So in other words, the school takes no
11 responsibility for the trip whatsoever?
12   A. None.
13   Q. Who chaperones the children?
14   A. Parents and teachers.
15   Q. Who arranges the trip?
16   A. Teachers.
17   Q. Do they do it while they're on the
18 clock at the school?
19   A. Not during school hours.
20   Q. So it's not part of their job to do
21 that?
22   A. That's correct.
23   Q. They just do it on their own?
24   A. Correct.

## Page 29

1   Q. How many years has that gone on?
2   A. I don't have any idea to that
3 question -- before I got here.
4   Q. Is it an expectation of the parents
5 whose children are here that there will be an 8th
6 grade trip?
7       MR. RIBA: Objection.
8   A. I can't answer for the parents.
9   Q. Did the parents ever talk to you about
10 it, when they're at parent teacher night, as if
11 it's a standard thing that they expect to see their
12 child enjoy?
13   A. No.
14   Q. All Right. Are there any written
15 documents relating to that trip that you've ever
16 seen?
17   A. No.
18   Q. Does the school get permission forms
19 from the parents?
20   A. Does the school?
21   Q. Yes.
22   A. No.
23   Q. Who gets the permission forms?
24   A. I don't know if there are permission

1    forms.

2        Q.  Really.  Your teachers just take

3    children without their parent's permission forms to

4    Washington D-C?

5        A.  It's not a school sponsored trip.

6        Q.  Are buses used?

7        A.  Yes.

8        Q.  Whose buses?

9        A.  I have no idea.

10       Q.  They don't arrange them through the

11   school district?

12       A.  No.

13       Q.  Where do they go?

14       Q.  Where do they go when?

15       Q.  When they go to Washington.

16       A.  Friday night they go to the Lincoln

17   Memorial, they go to the Vietnam Memorial and then

18   they go back to the hotel.  They are given half an

19   hour before bed and they are then put into the

20   room, a piece of tape is place on the outside of

21   the room so nobody can leave the room until the

22   next morning.  There's also a security person in

23   the hallway.

24       Q.  Who's the security person?

1        A.  A hired contractor.

2        Q.  And who arranges for that person?

3        A.  The teachers.

4        Q.  And who decides that the children

5    should be kept in their room with tape?

6        A.  Well, it's not that they can't get out.

7    It's a piece of masking tape.  If it breaks, we

8    know they've escaped.

9        Q.  But that's something that you and a

10   teacher would decide is appropriate?

11       MR. RIBA:  Objection.  He said he

12   doesn't have any role in this.

13       Q.  Who decides that that ought to be on

14   the rooms?

15       MR. RIBA:  Objection.  He has no

16   knowledge.  Go ahead.  You can answer.

17       Q.  Do you know?

18       A.  No.

19       Q.  But you know it's done, right?

20       A.  I know it had been done.  I don't know

21   if it's still done.

22       Q.  Who told you it had been done?

23       A.  I had been on the 8th grade trip.

24       Q.  Who usually takes the kids?

1        A.  Takes the kids where?

2        Q.  Who takes the kids to Washington, which

3    teacher; is it the history teacher?

4        A.  It varies from year to year.

5        Q.  Is it a volunteer?

6        A.  Yes.

7        Q.  How are the volunteers solicited?

8        A.  That I do not don't know.

9        Q.  Who solicits the volunteers?

10       A.  That I do not know.

11       Q.  What day of the week did you learn

12   about this MySpace page?

13       A.  Initially, it was Monday.

14       Q.  At that point, you didn't know that

15   Jill and her buddy were involved?

16       A.  No.  I did not.

17       Q.  When did you learn that Jill and her

18   friend were involved?

19       A.  Wednesday.

20       Q.  What time of the day?

21       A.  In the morning.

22       Q.  Who brought it to your attention?

23       A.  A student.

24       Q.  Which one?

1        MR. RIBA:  You can say.

2        A.  Brianna Schaffer.

3        Q.  Tell me the circumstances in which

4    Brianna brought it to your attention.

5        A.  Can you be more specific?

6        Q.  Did she bring you a copy of it?

7        A.  Yes.

8        Q.  What time of day was this?

9        A.  Morning.

10       Q.  The first thing?

11       A.  Yeah; eight, 8:15ish.

12       Q.  This was Wednesday?

13       A.  Yes.

14       Q.  And what did she say to you?

15       A.  Initially or on Wednesday?

16       Q.  On Wednesday?

17       A.  She gave me the copy.

18       Q.  Did you ask her to bring it in?

19       A.  Did I ask her to bring what in?

20       Q.  The copy of the MySpace page.

21       A.  Yes.

22       Q.  What day did you ask her to do that;

23   what day did you make the request, bring me a copy

24   of the MySpace page?

Page 34

1    A.  It was Tuesday.

2    Q.  What time on Tuesday; do you remember?

3    A.  She said -- let me just recall -- late

4  in the day.

5    Q.  And what time does school end around

6  here?

7    A.  2-51.

8    Q.  Do you remember whether it was an

9  after-school situation?

10    A.  No.  It was during the school day.  It

11  was in the hallway.

12    Q.  Tell me what she told you on Tuesday,

13  Brianna.

14    A.  On Tuesday she came down first thing in

15  the morning, her and two other girls, came to

16  report a bus incident, and Brianna had told me that

17  there was something else that she needed to talk to

18  me about and I said, what's that.  She said,

19  there's a MySpace account about you and it's not

20  real nice.  I said, well, that's a tough thing.

21  Anybody can create a MySpace account about anybody.

22  All they need is to make up a password.  I said,

23  there's not too much I can do about that.  She

24  said, Mr. McGonigle, you don't understand.  There's

Page 35

1  some really, really bad things in there.  So I

2  said, well, if you can, if you can find out who did

3  it, I would appreciate it.

4    Q.  So you asked her that before you saw

5  the MySpace page?

6    A.  Yes.

7    Q.  So you asked her to find out who did

8  it?

9    A.  Yes.

10    Q.  In that conversation, did she indicate

11  to you she already knew who did it?

12    A.  No.  She did not.

13    Q.  Did she tell you what she was going to

14  do to conduct this investigation for you?

15    A.  No, she didn't.

16    Q.  Did you make any effort to go on

17  MySpace and find the page that was concerning

18  Brianna?

19    A.  Yes, I did.

20    Q.  What did you do?

21    A.  I typed my name in and nothing came up.

22  I then contacted MySpace on the 20th and I asked

23  them to pull it up and they told me I could not

24  unless I had the U-R-L number and then that was

Page 36

1  it.

2    Q.  Now, let me make sure I understand.

3  You called MySpace on the 20th, sometime after,

4  probably, 2:15 in the afternoon?

5    A.  No.  It have would been in the morning.

6    Q.  I thought you said that Brianna told

7  you about sometime at the end of the school day on

8  Tuesday the 20th?

9    A.  No.  I told you, I said at the

10  beginning of the day they came down about a bus

11  incident.  That's when she told me --

12    Q.  But I thought --

13    MR. RIBA:  Would you let him finish his

14    answer before you interrupt him?

15    Q.  I'm still on the Tuesday.  You did not

16  call MySpace on Tuesday, right?

17    A.  Yes.  I did call MySpace on Tuesday.

18    Q.  Is Tuesday the day Brianna brought you

19  the copy in?

20    A.  No.

21    Q.  So on Tuesday, after Brianna said, it's

22  really bad Mr. McGonigle and you sent her off to

23  investigate who did it --

24    A.  I wouldn't say I sent her off to

Page 37

1  investigate.  I just asked her if she could find

2  out who did it, I would appreciate it.

3    Q.  On the 20th you called MySpace?

4    A.  That's correct.

5    Q.  As well as ran your name to see if

6  anything came up that way?

7    A.  That's correct.

8    Q.  You called MySpace on the 20th and they

9  told you that you could not -- what did they tell

10  you?

11    A.  They told me I could not access it

12  unless I had the U-R-L number.

13    Q.  Did you talk to them about how you can

14  search for it?

15    A.  No.

16    Q.  But even if you knew what to search

17  for, you couldn't get on that page without the

18  U-R-L?

19    A.  That was my understanding, yes.

20    Q.  And what is your understanding of what

21  is a U-R-L?

22    A.  I had no idea.  I had to ask.

23    Q.  Who do you ask?

24    A.  One of the Guidance Counselors.

10 (Pages 34 to 37)

1    Q.  And what did you learn?
2    A.  I learned that it was a code to get you
3  in there.
4    Q.  To get into MySpace?
5    A.  To get you into a certain page, yes.
6    Q.  And which Guidance Counselor did you
7  ask?
8    A.  My wife.
9    Q.  That's what I figured.  So you weren't
10  able to go any farther on the search?
11    A.  No.
12    Q.  How long did you spend looking on
13  MySpace?
14    A.  Ten minutes.
15    Q.  Were you on a school computer?
16    A.  Yes.
17    Q.  In your office?
18    A.  Yes.
19    Q.  Any other conversations with anybody on
20  the 20th about this MySpace page?
21    A.  No.
22    Q.  Did you hear about it from any other
23  students on the 20th?
24    A.  On the 20th, no, I did not.

1    Q.  How about from teachers?
2    A.  On the 20th, yes.
3    Q.  What did you hear from teachers about
4  it?
5    A.  I heard -- two teachers approached me
6  and said, the kids are talking about there being a
7  MySpace account about you.  One teacher approached
8  me during lunch and the other teacher approached me
9  at the end of the day, 9th period.
10    Q.  So the second teacher -- give me the
11  names of the teachers first.
12    A.  The first teacher was Mrs. Werner.
13    Q.  Do you guys call each other Mr. and
14  Mrs.?
15    A.  Only around here.
16    Q.  Do you know the first name?
17    A.  Angela.
18    Q.  Is she still here?
19    A.  Yes, she is.
20    Q.  What does she teach?
21    A.  She teaches skills for adolescents and
22  writing skills for adolescents and she is also a
23  students assistance coordinator.
24    Q.  Okay.  She approached you at lunch or

1  at the end of the day?
2    A.  She approached me during my lunch.
3    Q.  Did she indicated the details of what
4  the students were saying?
5    A.  I can't recall.  She had said, what I
6  do recall her saying exactly is, kids are talking
7  about a MySpace account about you.  Are you aware
8  of it?  I said, I am aware of it and I'm looking
9  into it.  That was the extent of it.
10    Q.  This was lunch on the 20th?
11    A.  Yes.
12    Q.  I thought you told me that Brianna
13  didn't tell you about -- I'm sorry.
14        Who told you after school?
15    A.  It wasn't after school.  It was during
16  9th period.  Mr. Andy Nunemacher.
17    Q.  And what does he teach?
18    A.  He teaches math.
19    Q.  What did he say to you?
20    A.  He said the kids, during his 8th period
21  class, I believe, I strike that, it was during one
22  of his afternoon classes, that the kids were
23  talking about it and he had to redirect them during
24  class time.

1    Q.  And what were they saying?
2    A.  About the MySpace account.  Specific
3  things, I do not know.
4    Q.  Is Mr. Nunemacher still here?
5    A.  Yes.
6    Q.  Now, did either Ms. Werner or
7  Mr. Nunemacher tell you the names of the students
8  that they heard talking about the MySpace page?
9    A.  Yes.
10    Q.  Who did Ms. Werner identify?
11    A.  I do not recall.
12    Q.  How about Mr. Nunemacher?
13    A.  I do not recall.
14    Q.  Did either of them indicate that the
15  students they heard talking were the students
16  involved in the creation of the MySpace page?
17    A.  At that point in time, nobody knew who
18  it was.
19    Q.  Even these students that were talking?
20    A.  He had no indication -- no names ever
21  came to me from a teacher.
22    Q.  Now, when you learned about this during
23  your lunch on the 20th, did you, at that time, try
24  to find anything out on MySpace?

1      A.  No, because I was teaching in 10
2   minutes.
3      Q.  And how about at 9th period, at that
4   point.
5      A.  No.  I was just walking in the halls.
6   I was doing double duty at that time.
7      Q.  Double duty as what?
8      A.  The Assistant Principal and Principal.
9      Q.  And then Brianna comes to you —
10     A.  In the hallway.
11     Q.  Is she actually in the hallway?
12     A.  Yes.
13     Q.  In front of other people?
14     A.  No.
15     Q.  Did she speak in a low voice?
16     A.  Yes.
17     Q.  And she goes, I want to tell you about
18  this bad MySpace page?
19     A.  No, no.  That's not what she said.
20     Q.  Was there any other topic of
21  conversation between the two of you or just the
22  MySpace?
23     A.  Which time?
24     Q.  In the hallway on the 20th.

1      A.  The word MySpace wasn't even mentioned.
2      Q.  In the hallway.
3      A.  It wasn't mentioned.  She just told me
4   the child's name.
5      Q.  So this is on the 20th?
6      A.  This is on the 20th.
7      Q.  She conducted her investigation?
8      MR. RIBA:  Objection.  He never said
9      investigation.  You keep saying that.  He
10     never asked her to investigate.
11     Q.  She had come back to you after your
12  conversation in the morning with the names of the
13  students?
14     A.  We just happened to be passing each
15  other.  She was on her way down to my office and we
16  happened to be passing by the music room at the
17  same time.
18     Q.  And she gave you the name of?
19     A.  Jill Snyder.
20     Q.  No other name?
21     A.  No other name.
22     Q.  Did she tell you how she got that name?
23     A.  She did not.
24     Q.  So after you had the name Jill Snyder,

1   what did you do?
2      A.  What did I do then?
3      Q.  Right.
4      A.  I didn't do anything.  I was waiting
5   until the end of the day or near the end of the
6   day.  I wanted to look into it a little bit more
7   and then, the next morning, I would talk to my
8   Superintendent regarding the seriousness of the
9   incident and then, on the 21st, I would have
10  brought Jill in to question her.
11     Q.  So we're now on the 20th, Tuesday the
12  20th?
13     A.  No.  I just moved to the 21st.
14     Q.  I want you to stick on the 20th and
15  then we'll go to the 21st.
16        Still on the 20th, you have Jill's
17  name?
18     A.  Correct.
19     Q.  At the end of the school day?
20     A.  Correct.
21     Q.  And you don't go back to MySpace and
22  try to, again, search for the entry?
23     A.  No, because I still don't have the
24  U-R-L number.

1      Q.  But you did talk to the Superintendent?
2      A.  No.  I did not.
3      Q.  Not until the next day.  Did you talk
4   to anybody else after you had Jill's name?
5      A.  My wife.
6      Q.  Anybody else?
7      A.  No.
8      Q.  Did you speak to your wife in her
9   capacity as your wife or in her capacity as the
10  school Guidance Counselor?
11     A.  In her capacity as my wife.
12     Q.  Was it at home or at school?
13     A.  At home.
14     Q.  Did you call Jill's home that evening?
15     A.  No.
16     Q.  Do you have the phone numbers — is
17  there a booklet with everyone's phone number in it
18  for all of your students?
19     A.  No.
20     Q.  And then, the next morning, you didn't
21  talk to the Superintendent on Tuesday?
22     A.  No.  I had to pick up my son.
23     Q.  The next morning, what time does school
24  start?

1    A. The first bell or what time are we
2 required to be here?
3    Q. What time do you have to get here?
4    A. 7-30, 7-45.
5    Q. What time do the kids get here?
6    A. Right around 7:30.
7    Q. Tell me what happened with regard to
8 the MySpace page first thing in the morning, if
9 anything, before lunch.
10    A. A hard copy was given to me on the
11 21st.
12    Q. By whom?
13    A. Brianna.
14    Q. She brought it in from home?
15    A. That I don't know.
16    Q. And did you ask her where she got it
17 from?
18    A. No. I did not.
19    Q. Do you know whether she showed it to
20 anybody before she gave it to you?
21    A. I do not know.
22    Q. Was anyone with Brianna?
23    A. No.
24    Q. And then what happened?

1    A. I read it. I had the name of the
2 person. I went to go question Jill, however, she
3 was absent that day.
4    Q. Did you call her home?
5    A. No. I did not.
6    Q. Did you call her mother?
7    A. No. I did not. I didn't have any
8 evidence, at that point in time, that it was her,
9 except for her name.
10    Q. And except that Brianna told you?
11    A. That's it. That's all I had.
12    Q. And do you know why she was absent that
13 day?
14    A. No.
15    Q. Parents don't have to call the school
16 and say if their kid is sick or anything?
17    A. Some do and some don't, if not, we
18 follow-up.
19    Q. Did anyone follow-up with Jill?
20    A. That day, believe it or not, the lady
21 that follows up was not here.
22    Q. So Jill was absent?
23    A. Yes.
24    Q. Did you have any further conversations

1 with Brianna about the MySpace page on Wednesday
2 the 21st?
3    A. No. I did not.
4    Q. How about with anybody else at the
5 school?
6    A. Dr. Romberger and Susan Snyder Morgan.
7    Q. What's Dr. Romberger's first name?
8    A. Joyce.
9    Q. And Susan Snyder Morgan?
10    A. Yes.
11    Q. And what time of day did you have
12 conversations with Ms. Morgan?
13    A. It was together. It was,
14 approximately, 8:30.
15    Q. What are their jobs, by the way?
16    A. Dr. Romberger is Superintendent and
17 Susan Snyder Morgan is Director of Technology.
18    Q. Where is Dr. Romberger's office in
19 relationship to your's?
20    A. It's downstairs.
21    Q. So the middle school is here and she's
22 right here in the district office?
23    A. Yes.
24    Q. And how about the Director of

1 Technology, where is her office?
2    A. Right up the hall from Dr. Romberger.
3    Q. Did you ask them to come to your office
4 so you could talk to them together?
5    A. No, I didn't. I tried to call Dr.
6 Romberger and she wasn't there. So I came
7 downstairs because she's not always in her office.
8    Q. Did you have them summon the Director
9 of Technology to join you?
10    A. No. They were together.
11    Q. Did you intend to communicate this
12 information to both of them together or was it just
13 that they were both together?
14    A. I would have talked to them both, but
15 it just so happened that they were together.
16    Q. Tell me what you told them.
17    A. I didn't tell them anything. I said, I
18 have something I have to show you and I let them
19 read it.
20    Q. And what did you say?
21    A. They were shocked, appalled and wanted
22 to know where it came from. I said, at the time, I
23 have one name, but I need to investigate it
24 further.

Page 50

1    Q.  So they only said, where did it come
2    from?
3    A.  To my knowledge, that's the only thing
4    I remember.
5    Q.  Did anybody comment on the photograph
6    at that time?
7    A.  I don't recall.
8    Q.  Did the Director of Technology talk to
9    you at all about how MySpace works?
10    A.  I didn't ask.
11    Q.  What else did you do on Wednesday to
12    investigate?
13    A.  I contacted MySpace and I told them I
14    had the U-R-L number and would there be any way
15    that you could tell me what computer it came from,
16    and their response to me was, not without a Court
17    Order.
18    Q.  Does the U-R-L number appear on the
19    printout?
20    A.  Somewhere on there.
21    Q.  I'm going to show you, I have two
22    copies of it.  I'm going to show you Plaintiffs'
23    Exhibit 3 and this is Defendants' Exhibit 1.
24         Can you show me where you found it --

Page 51

1    it may not even be on that one.  I don't know.
2         MR. RIBA:  Are you looking for the
3    U-R-L?
4         MS. KOHART:  Yes.
5         MR. RIBA:  Do you see it on there?
6    BY MS. KOHART:
7    A.  There it is.
8    Q.  It's underneath the block underneath
9    your picture?
10    A.  Yes.
11    Q.  And you gave that U-R-L number to
12    MySpace?
13    A.  No.  I didn't give it to them.  I told
14    them I had the U-R-L, would that be enough for me
15    to find out whose computer it was from and they
16    said, no, that I would need a Court Order.
17    Q.  Okay.  Do you know who you spoke to
18    there?
19    A.  No.  It was a woman.
20    Q.  You don't remember her name?
21    A.  I don't want to guess.
22    Q.  Did you ask them to take the entry
23    down?
24    A.  No.

Page 52

1    Q.  Did you have any other conversation
2    with them at all?
3    A.  No.
4    Q.  Did you tell them you were a school
5    Principal and this was something you didn't
6    consider very funny?
7    A.  No.
8    Q.  Did you show it to your wife?
9    A.  Yes.
10    Q.  Let's stick with Wednesday.  Who else
11    did you show it to on Wednesday?
12    A.  The other Guidance Counselor.
13    Q.  Who is the other Guidance Counselor?
14    A.  Mrs. Guers, Michelle Guers.
15    Q.  Did you show it to your wife in her
16    capacity as the Guidance Counselor or in the
17    capacity as your wife?
18    A.  Sometimes it's hard to separate the
19    two.
20    Q.  Sure.  So you showed it to her while
21    she was working at the school?
22    A.  Yes.
23    Q.  What name does your wife use in her
24    job?

Page 53

1    A.  Frain, F-R-A-I-N.
2    Q.  Do you remember the time of day you
3    showed it Mrs. Guers?
4    A.  I showed it to them together.
5    Q.  Do you know the time of day?
6    A.  I believe about 8-15, 8-20, right
7    before I came down the stairs.
8    Q.  And did they have anything to say about
9    this?
10    A.  They wanted to know who it was from and
11    I said, I only have one name at this point, but I
12    can't prove anything.
13    Q.  Did you tell the name to them?
14    A.  Yes.
15    Q.  You told them Jill's name?
16    A.  Yes.
17    Q.  By the way, when you spoke to Dr.
18    Romberger and to the Director of Technology, did
19    you give them Jill's name too?
20    A.  Yes.  You're jumping around on me.
21    Q.  I'm sorry.  Forgive me.
22         So you gave them Jill's name.  Did they
23    say anything else about the MySpace page?
24    A.  No.

14 (Pages 50 to 53)

Page 54

1    Q. By the way, this exhibit I just showed
2  you, which is marked as Plaintiff's Exhibit 3, is
3  this exactly what Brianna brought into school for
4  you?
5    A. No.
6    Q. Where is that document?
7    A. It's in my file.
8      MS. KOHART: We make a request for
9  that. Maybe it's the same, maybe it's not.
10      MR. RIBA: Okay.
11 BY MS. KOHART:
12   Q. Did she print it out in color?
13   A. Yes.
14   Q. From her home computer?
15   A. Again, I don't know.
16   Q. Once you had the U-R-L, did you, again,
17 access MySpace?
18   A. Yes.
19   Q. On the computer?
20   A. Yes.
21   Q. A school computer?
22   A. Yes.
23   Q. And I assume your computers in your
24 office don't have any shields on them?

Page 55

1    A. That's correct.
2    Q. And were you able to find this on
3  MySpace?
4    A. Yes.
5    Q. So it popped up on your screen and you
6  looked at it?
7    A. Yes.
8    Q. Did you click on any links while you
9  had it in front of you?
10   A. No.
11   Q. Did it contain any clues as to who
12 might be the creator?
13   A. No, ma'am.
14   Q. So you showed it to Ms. Guers and
15 Ms. Frain. Did you have any other conversations
16 with them — did you have any conversations with
17 them about what they thought regarding the contents
18 of the MySpace page?
19   A. No.
20   Q. Did any of them laugh?
21   A. No.
22   Q. Crack a smile, nothing?
23   A. No.
24   Q. Did they offer you any advice as to how

Page 56

1  to prove who was responsible?
2    A. No.
3    Q. Who else did you show this to during
4  Wednesday the 21st?
5    A. That would have been it.
6    Q. At that point, did you call Jill's
7  home?
8    A. No.
9    Q. You didn't call her parents at work or
10 anything like that?
11   A. No.
12   Q. Did you talk to any of the teachers at
13 the school about, anything about Jill or about the
14 MySpace page?
15   A. No.
16   Q. Did you speak again to Brianna?
17   A. No.
18   Q. Have you ever asked Brianna how she
19 went about finding out who was the culprit behind
20 this MySpace page?
21   A. No.
22   Q. Do you know whether anyone else has?
23   A. No.
24   Q. Was Brianna friendly with Jill?

Page 57

1    A. That I don't know.
2    Q. What grade was Brianna in?
3    A. Eighth.
4    Q. By the way, when Brianna first came to
5  you on Tuesday morning, what was the bus incident
6  she was worried about?
7    A. That her and another girl weren't
8  getting along.
9    Q. On the bus?
10   A. Yes.
11   Q. Who was the other girl?
12   A. I do not know.
13   Q. Was there any investigation or
14 discipline as a result of this bus incident?
15   A. Their seats were separated.
16   Q. So people have assigned seats on the
17 bus?
18   A. No. Each bus driver runs it
19 differently. Some have assigned seats and some
20 don't.
21   Q. And was that a resolution that you were
22 able to accomplish on the 20th?
23   A. No. They had a different dismissal in
24 the afternoon. So I actually referred it down to

1 the Director of Transportation to take care of it
2 the following day.
3     **Q. So it was really just an incident that**
4 **Brianna had while travelling in the morning?**
5     A. Yes.
6     **Q. How did Jill get to school?**
7     A. I don't know.
8     **Q. Now, when you were shown this**
9 **MySpace -- when you saw this MySpace page on**
10 **the 21st, did you start to formulate, in your mind,**
11 **what you thought might be the appropriate response?**
12     A. Clarify response.
13     **Q. In the event that you were able to**
14 **prove that Jill had done this, did you decide what**
15 **you thought might be the appropriate discipline as**
16 **the consequence of a student participating in the**
17 **creation of this page?**
18     A. Yes.
19     **Q. And that was on the 21st?**
20     A. Correct.
21     **Q. Tell me your thought process.**
22     A. It's a level four infraction of our
23 school discipline code.
24     **Q. Because?**

1     A. Because that's the way the policy is.
2 We have levels one through four.
3     **Q. I understand, but why is it a level**
4 **four; why is it the same as a knife in school?**
5 **What is in a level four that makes the MySpace**
6 **page --**
7     A. Making false accusations against the
8 staff.
9     **Q. And you think that these are**
10 **accusations?**
11     A. Absolutely.
12     **Q. What are the accusations in here?**
13     A. May I see a copy?
14     **Q. Sure.**
15     A. I have come to MySpace so I can pervert
16 the minds of other Principals to be just like me.
17     **Q. You interpret that as --**
18     A. I'm not finished. That's an
19 accusation. Those who want to be my friend and
20 aren't in my school, I love children, sex, dogs,
21 long walks on the beach, being a dick head and
22 last, but not least, my darling wife that looks
23 like a man -- actually, you can scratch that last
24 part. And how about the part about having sex in

1 my office and hitting on parents.
2     **Q. And you think those are all**
3 **accusations, as opposed to false things that were**
4 **said about you that aren't true?**
5     A. They're false accusations.
6     **Q. In other words, they were accusing you**
7 **as opposed to saying things that were untrue about**
8 **you?**
9     A. No. They weren't accusing me. They
10 were pretending they were me.
11     **Q. Now, since you've been at the school,**
12 **have other students been given discipline for**
13 **making false accusations against other students or**
14 **staff?**
15     A. In my role as Assistant Principal or
16 Principal or in my role since I've been at the
17 school?
18     **Q. Let's start since you've been at the**
19 **school and then we'll chop it up between your**
20 **jobs.**
21     A. No.
22     **Q. Not once?**
23     A. Not to my knowledge.
24     **Q. Have you ever heard about students,**

1 outside of school, accusing other students of
2 things that are not true?
3     A. No.
4     **Q. Calling each other liars or stuff like**
5 **that?**
6     A. No.
7     **Q. How about saying things outside of**
8 **school about teachers that are not true, telling**
9 **their mom that they got a bad grade because the**
10 **teacher is a dick head or something?**
11     A. I'm sure it happens, but I don't live
12 in the area so I don't hear it.
13     **Q. No one has ever been disciplined for**
14 **telling their mom that?**
15     A. No.
16     **Q. But your understanding is that the**
17 **policy would allow you to give them a level four**
18 **sanction if they went home and falsely told their**
19 **parents that they got a D on a history exam because**
20 **their teacher is a creep?**
21     MR. RIBA: Objection.
22     **Q. Do you understand the policy to apply**
23 **to that?**
24     MR. RIBA: Objection.

Page 62

1    Q.  You can answer unless he tells you not
2  to.
3    A.  Well -- would you repeat the question,
4  please?
5    Q.  Sure.  Let's say Jill went home and
6  told her mother that she got a D on a math test
7  because her teacher is a dick head, would that
8  allow you to discipline her under level four?
9        MR. RIBA:  Objection.
10    A.  No.
11    Q.  Why not?
12    A.  First, I would have to prove that.
13    Q.  Well, suppose her mother videotaped it.
14    A.  No.  It was off school grounds and it
15  was not brought into the school.  If it was brought
16  into the school by just the mother and you're
17  telling me just dick head, no.
18    Q.  So if it was dick head and a bunch of
19  other things, then you could?
20    A.  It depends on what the bunch of other
21  things are.
22    Q.  But why wouldn't you be able to
23  discipline her for doing that; just because it was
24  only one bad word?

Page 63

1    A.  No.  It's not really a false
2  accusation.
3    Q.  By the way, did anybody bring this
4  MySpace page into school, other than at your
5  request?
6    A.  Not to my knowledge.
7    Q.  So the only reason the page was in the
8  school was because you asked Brianna to bring it
9  in?
10    A.  I had heard it was in the school, but I
11  had never seen it.
12    Q.  I thought you told me that you heard
13  that people were talking about it?
14    A.  Yes.  You asked me if they were talking
15  about it.
16    Q.  And you also heard it physically was in
17  the school?
18    A.  I heard it was physically in the
19  school, yes.
20    Q.  Who told you that?
21    A.  I just heard it.
22    Q.  From?
23    A.  Nobody specifically; no students
24  specifically.

Page 64

1    Q.  How about teachers?
2    A.  Yes.  A teacher told me.
3    Q.  And which teacher told you?
4    A.  Mr. Nunemacher.
5    Q.  Did he tell you he saw it on --
6    A.  He just overheard kids talking about it
7  and the kids, I cannot give you who they were.
8    Q.  Talking about having the piece of paper
9  or talking about the existence of the web page?
10    A.  Talking about the existence.
11    Q.  Maybe I'm not clear.  I want to know,
12  besides your request to Brianna to bring you a
13  copy, do you have any information that there was
14  another eight and a half by eleven piece of paper
15  like this in school with a copy of the MySpace
16  page?
17    A.  I do not, no.
18    Q.  And of course, other than your own
19  accessing it from your desk in school, you're not
20  aware of any other computer, owned by the school
21  district, that accessed this MySpace page?
22    A.  No.
23    Q.  Am I correct that the students cannot
24  get on MySpace from the school computer?

Page 65

1    A.  That's correct.
2    Q.  Can they get on it from the high
3  school?
4    A.  No.
5    Q.  Let me make sure we're all finished up
6  with Wednesday.
7        So on Wednesday you concluded that this
8  merited a level four discipline?
9    A.  Yes.
10    Q.  And did you speak about that with
11  anybody?
12    A.  The Superintendent.
13    Q.  Anybody else?
14    A.  No.
15    Q.  Did anybody question whether level four
16  was the appropriate level of discipline, and this
17  is on Wednesday?
18    A.  No.
19    Q.  Did you look at the other disciplinary
20  levels to determine whether maybe one of those
21  other levels was more appropriate?
22    A.  No.
23    Q.  Just level four?
24    A.  Yes.

17 (Pages 62 to 65)

Page 66

1      Q. By the way, has anyone brought into the
2 school a MySpace page where one child has done
3 something unkind to another child on MySpace?
4      A. Not to my knowledge.
5      Q. Now, I'm trying to figure out exactly
6 why the extent to which level four can be used
7 against a student who does something like this off
8 school grounds.
9       Is it your view that Jill could have
10 been disciplined if she stood up, let's say, at a
11 Philly's game and said these things about you over
12 a bullhorn?
13      MR. RIBA: Objection.
14      A. No.
15      Q. Why not if she did it at a Philly's
16 game?
17      A. If she did it at a Philly's game?
18      Q. Right. Let's say she grabbed the
19 microphone and -- I'm just trying to figure out why
20 MySpace makes -- do you think the school can
21 discipline her for doing that?
22      A. Repeat the question.
23      Q. Let's suppose she was at a Philly's
24 game and maybe other kids were there, maybe not,

Page 67

1 and she said things like, hello children, I'm
2 pretending to be -- and she did hold up your
3 picture, but she didn't say your name, yes, I'm so
4 wonderful, hairy, expressionless, sex addict, fag
5 ass and all the other things that are on this
6 MySpace, if she said these things about you in a
7 public forum, like at a Philly's game, could the
8 school discipline her under level four?
9      MR. RIBA: Objection.
10      A. You said pretending. You didn't say
11 she actually said it.
12      Q. Let's say she had your I-D from
13 Halloween and she said she was you. If she did all
14 those things at a Philly game, could the school
15 discipline her?
16      MR. RIBA: Objection.
17      A. Yes.
18      Q. And how about if she said these things
19 in the middle of a public park in the middle of
20 Philadelphia, stood up on a soapbox and said these
21 things pretending to you, could the school
22 discipline her?
23      MR. RIBA: Objection.
24      A. It depends who was there.

Page 68

1      Q. If nobody from the school was there,
2 they could not discipline her?
3      A. If it got brought back into the school,
4 yes.
5      Q. By how?
6      A. Word of mouth.
7      Q. Suppose the Philadelphia Inquirer
8 covered it and people saw the newspaper at school,
9 then the school could discipline her?
10      MR. RIBA: Objection.
11      A. Yes.
12      Q. So as long as nobody in the school
13 finds out about it, it's okay for her to do this;
14 it's really just you can't get caught, basically?
15      MR. RIBA: Objection.
16      Q. Right?
17      MR. RIBA: Objection.
18      Q. Right?
19      MR. RIBA: Objection.
20      A. I'm confused by your --
21      Q. Whenever there's an objection --
22      A. I understand that part, but your
23 question --
24      Q. Well, what I'm saying, in other words,

Page 69

1 she is free to express her opinions about you, even
2 pretend to be you, as long as nobody reports it
3 back at school or comes in and talks about it in
4 math class or anything like that?
5      A. Yes.
6      Q. And how about -- are the children told
7 that they need to be careful about expressing
8 opinions regarding either each other or the staff
9 outside the school?
10      A. Yes.
11      Q. And where are they told to be careful
12 about expressing their opinions?
13      A. At the assembly the first day of school
14 every year.
15      Q. And what do you tell them?
16      A. Exactly, I can't tell you exactly what
17 I tell them.
18      Q. You don't tell them the same thing
19 every year?
20      A. No.
21      Q. Do you remember what you told Jill on
22 the first day of school?
23      A. No.
24      Q. And what did you say to them about

Page 70

1 that?
2 A. It's not necessarily opinions. It's
3 about being careful about what you say and where
4 you say it. In other words, I'll use a specific
5 example, if you're going to say to somebody, I'm
6 going to kill you, you might get away with that a
7 hundred times, but on the 100th person, somebody
8 might report it and then you're going to be
9 disciplined for it.
10    Q. How about saying something that --
11 telling them about being careful about expressing
12 their opinion about saying someone is a dick wad or
13 something like that, did you tell them that they
14 can be sanctioned for doing that off school
15 grounds?
16    A. I don't use the word dick wad.
17    Q. Well, another nasty word like that. Do
18 you tell them that --
19    A. I don't use any nasty words.
20    Q. Did you talk to them about the sort of
21 opinions they should not express off school
22 grounds?
23    A. No.
24    Q. Do they have any costume dances at

Page 71

1 school?
2    A. No.
3    Q. What year in middle school do they
4 learn about parody; do they do anything where they
5 talk about Shakespearian parody as a form of
6 literature?
7    A. I don't know.
8    Q. Did you ever try to access this MySpace
9 from your home computer?
10    A. No.
11    Q. Just in school?
12    A. Yes.
13    Q. How many times?
14    A. Just that once.
15    Q. I assume, Thursday, Jill was back at
16 school?
17    A. Yes.
18    Q. How did you get in touch with her when
19 she got back to school?
20    A. I called her classroom and the teacher,
21 I said, I need to see Jill Snyder.
22    Q. Was this her homeroom?
23    A. It was the very beginning of first
24 period?

Page 72

1    Q. And am I correct that that was the day
2 that standardized testing was taking place in the
3 school?
4    A. It was one of the days that makeup
5 standardized testing was taking place.
6    Q. Was Jill doing standardized makeup
7 tests?
8    A. No. She was not.
9    Q. What grades were doing standardized
10 makeup testing?
11    A. All; 6th, 7th and 8th.
12    Q. How many faculty were involved in
13 supervising the testing?
14    A. One.
15    Q. And who is that?
16    A. Mrs. Guers.
17    Q. Is that the person who had to bring
18 Jill to you?
19    A. No. Jill came down by herself.
20    Q. Did she seem nervous when she came into
21 your office?
22    A. Jill -- yes.
23    Q. Was she dressed okay?
24    A. Yes.

Page 73

1    Q. No violation on that day?
2    A. No.
3    Q. And why do you say that she seemed
4 nervous?
5    A. I've been in this business a long time.
6 I can read facial expressions pretty well of
7 students.
8    Q. Had you ever had to summon her to your
9 office before?
10    A. No.
11    Q. The other times she was sent down for
12 the dress code violations?
13    A. Yes.
14    Q. So she came in and you shut the door?
15    A. No.
16    Q. How is your office setup, can you
17 describe it for me physically; are there people
18 sitting, receptionists and stuff, outside the door?
19    A. No. They're way down the hallway. I'm
20 at the far end of the hallway.
21    Q. And you're by yourself, nobody walks
22 past a secretary to get into your office?
23    A. No; not to get into -- no, no.
24    Q. Was your door open or closed when she

1 go there?

2     A.  I think I just said it was open.

3     Q.  Okay.  Sorry.  So she walked in?

4     A.  Yes.

5     Q.  Were you sitting or standing?

6     A.  Sitting behind my desk.

7     Q.  And did you ask her to sit?

8     A.  Yes.

9     Q.  Where?

10     A.  In front of me.

11     Q.  Tell me what you said to her.

12     A.  I said, do you have any idea why you're

13 here and her immediate response was, I didn't

14 create the MySpace account.

15     Q.  What else was said?

16     A.  Well, I also had somebody else present

17 in the room as well.

18     Q.  Who was that?

19     A.  Mrs. Michelle Guers.

20     Q.  Oh, she wasn't doing the testing.

21     A.  She had to be removed from the testing

22 because I didn't think it was a very good idea to

23 have my wife in on the situation.  So then my wife

24 had to move over from her guidance duties to take

1 on the standardized testing.

2     Q.  So you had to juggle people around?

3     A.  Yes.

4     Q.  Why didn't you just wait until the end

5 of the school day to have this conversation with

6 Jill so you wouldn't have to inconvenience the

7 students or the faculty?

8     A.  This was serious enough that it had to

9 be dealt with right away.

10     Q.  So why didn't you call Jill's parents

11 and have her brought in to school a half hour

12 early?

13     A.  There was no need to until I could

14 prove that it was her.  I still only had her name.

15 I had no proof.

16     Q.  So the need to prove it was her was

17 immediate?

18     A.  I had to prove it was her or dismiss

19 her.

20     Q.  So you juggled teachers around for the

21 testing?

22     A.  Yes.

23     Q.  Did you talk to your wife the night

24 before and say, tomorrow morning I want you to do

1 the testing because I'm going to have Mrs. Guers --

2     A.  No.  I did not.

3     Q.  Did you take any steps to ascertain

4 whether Jill would be back the next day?

5     A.  No.  I did not.

6     Q.  How old was Jill?

7     A.  I don't know, fourteen.

8     Q.  Thirteen?

9     A.  Thirteen or fourteen.

10     Q.  How would you describe her personally,

11 in terms of a 13 year old?

12     A.  Now or then?

13     Q.  Then.  She's not 13 anymore, right?

14     A.  Right.  A good student, not a

15 discipline problem.

16     Q.  How about personally, was she, like, a

17 tough street-wise kid or just a regular kid in the

18 area; how would you describe her?

19     A.  Define tough street-wise for me.

20     Q.  She was never one of those kids with

21 the knives; was she?

22     A.  No.

23     Q.  She was not somebody known to be

24 running around saying swear words?

1     A.  Not to my knowledge.

2     Q.  Any incidents where she picked on other

3 children?

4     A.  Not to my knowledge.

5     Q.  Rude to teachers?

6     A.  Not to my knowledge.

7     Q.  Did she say yes, ma'am and yes, sir to

8 people when they spoke to her?

9     A.  No.

10     Q.  Do the kids here normally do that?

11     A.  Some do.

12     Q.  Did she get to school on time usually?

13     A.  As far as I know, yes.

14     Q.  And no problems with her getting to

15 class on time?

16     A.  No.

17     Q.  No problems with her cheating, you

18 know, in gym or on tests or anything of that

19 nature?

20     A.  Cheating in gym?

21     Q.  Yeah.  I don't know, just pushing over

22 kids on the other side of the soccer field or doing

23 anything bad like that?

24     A.  No.

**Page 78**

1      MR. RIBA: That's a foul, not cheating.
2      Q. Did she wear makeup?
3      A. I don't know. I can't tell if somebody
4   is wearing makeup or not.
5      Q. Is wearing makeup a dress code
6   violation in the middle school?
7      A. It would be if it was obscene.
8      Q. Okay. But she looked like a kid who
9   would be any one of your friend's daughters; is
10   that right?
11      A. Yeah.
12      Q. So she comes in your office and you can
13   tell she's nervous?
14      A. Yeah.
15      Q. Scared or nervous?
16      A. Nervous.
17      Q. How tall was she, by the way?
18      A. I don't know.
19      Q. So is the Guidance Counselor already in
20   there?
21      A. Yes.
22      Q. Was the Guidance Counselor seated?
23      A. Yes.
24      Q. Did the Guidance Counselor say anything

**Page 79**

1   to Jill?
2      A. No.
3      Q. So you sit this kid down and you say
4   what; tell me again what you said?
5      A. I didn't say anything -- well, I first
6   said to her, do you know why you're here, and she
7   immediately replied, I didn't create the MySpace
8   account.
9      Q. Did she indicate to you that she had
10   information before your meeting that somebody had
11   ratted her out to you?
12      A. No. She did not.
13      Q. Tell me about the rest of the
14   conversation.
15      A. The rest of the conversation was, I
16   then told her, we can contact MySpace right now and
17   they can tell me if it came from your computer. I
18   bluffed, because I couldn't do it without a Court
19   Order, and she admitted it, she said, that won't be
20   necessary. I did it.
21      Q. Do you know why you couldn't do that
22   without a Court Order?
23      A. No.
24      Q. So you bluffed her, right?

**Page 80**

1      A. Yep. That's when she admitted to it.
2   She said, it won't be necessary. And then she
3   said, I didn't do this alone and that's when she
4   gave me Kristina's name.
5      Q. Now, she had started the conversation
6   by telling you she knew about the MySpace page,
7   right?
8      A. No. She started the conversation by
9   saying that she didn't create the MySpace page.
10      Q. All Right. So then you bluffed her and
11   she said it won't be necessary — tell me again
12   what she said.
13      A. She said, it won't be necessary. I did
14   it.
15      Q. Okay. And did you probe into further
16   details about what she meant by I did it?
17      A. No. I did it, I think, is pretty
18   clear.
19      Q. Did you talk to her about the specifics
20   of the page?
21      A. Yes.
22      Q. What did you say to her?
23      A. I said, what is the reason that you did
24   this and she mentioned that it was because of the

**Page 81**

1   dress code.
2      Q. Anything else?
3      A. No.
4      Q. Do you know what she meant when she
5   said it was because of the dress code?
6      A. Yes.
7      Q. What did you think she meant?
8      A. That she had been cited on dress code
9   violations.
10      Q. What was the date of the dress code
11   violation?
12      A. No idea.
13      Q. Do you know if she had to miss
14   something fun after school because she had
15   detention?
16      A. No. I do not know that.
17      Q. Did she have braces, by the way?
18      MR. RIBA: If you don't know.
19      Q. It's okay if you don't know. I'm just
20   trying to picture the child in my mind.
21      A. I don't know.
22      Q. Did the Guidance Counselor pitch in and
23   say anything?
24      A. No.

Page 82

1    Q.  She just sat there smiling?
2    A.  Yes.
3    Q.  Did Jill start to cry?
4    A.  No.
5    Q.  Did you get the names of any other
6  children that were involved in MySpace?
7    A.  Yes.  Kristina Lehman.
8    Q.  And Jill gave you that name?
9    A.  Yes.
10    THE WITNESS:  Can I have a break?
11    MS. KOHART:  Yes.
12    (At this point, a recess was taken.)
13  BY MS. KOHART:
14    Q.  I just want to go back.  The day
15  before, when there are two teachers, one at your
16  lunch break and one at the end of the day that said
17  they heard students talking about MySpace --
18    A.  Uh-huh.
19    Q.  -- this was after your conversation
20  with Brianna in the morning, correct?
21    A.  Yes.
22    Q.  And in the morning, Brianna said,
23  there's a MySpace page out, right, on you?
24    A.  Yes.

Page 83

1    Q.  And at that point, you said, oh, gee,
2  can you find out who did it?
3    A.  Yes.
4    Q.  Now, the teachers, did they report to
5  you exactly what they heard the students saying in
6  their classes?
7    A.  I don't remember.
8    Q.  Could it have been Brianna talking to
9  people about how she was on this mission to help
10  you get rid of this MySpace page?
11    A.  No.  I do not believe so because
12  Brianna didn't have either of those teachers on
13  that particular day.
14    Q.  Well, she could have talked to other
15  friends who then talked about it in class, right?
16    A.  But you asked if it was Brianna.
17    Q.  Right.  But we have no idea what those
18  kids were talking about, right, other than MySpace?
19    A.  We or --
20    Q.  You have no idea what they were talking
21  about, other than the fact that there was a MySpace
22  page?
23    A.  And it was about me.
24    Q.  And you don't know whether they got

Page 84

1  that information from Brianna or Santa Claus or
2  anybody else?
3    A.  I know they didn't get it from Brianna.
4    Q.  Why do you know that?
5    A.  Because they didn't mention Brianna's
6  name or any other name.
7    Q.  That's the only basis?
8    A.  That's the only one I've got, yes.
9    Q.  Well, they also didn't mention Jill's
10  name; is that right?
11    A.  No.  They did not.
12    Q.  Did they mention the name of the other
13  student who was involved in the MySpace page?
14    A.  No.
15    Q.  So there were no students' names that
16  were reported to you?
17    A.  If there were, I do not remember.
18    Q.  So my original statement, is it fair to
19  say none of us in this room sitting here have any
20  idea how that information got to the students who
21  talked about it and were overheard by their
22  teachers on Tuesday; is that right?
23    A.  Can you repeat that question?
24    Q.  Yes.  You and I have no idea how the

Page 85

1  information got to those students who were talking
2  about it in school on the 20th and overheard by
3  their teachers?
4    A.  Yes.
5    Q.  So we're in your office?
6    A.  Which day?
7    Q.  We are on Wednesday now.  We have Jill
8  and the Guidance Counselor --
9    A.  No.  That wasn't Wednesday, ma'am.
10  That was Thursday.
11    Q.  So we're up to Thursday.  On Thursday,
12  there's Jill and the Guidance Counselor and, up
13  until the time Jill gave you the name of the friend
14  that she worked with on the MySpace page, was there
15  any other part of the conversation that you can
16  remember?
17    A.  From them or from me?
18    Q.  Anybody in the room.
19    A.  Yes.
20    Q.  Tell me the rest of the things you
21  remember.
22    A.  I was very upset and very angry, hurt,
23  and I can't understand why you did this to me and
24  my family.

22 (Pages 82 to 85)

1     In addition, I told them that I would
2 be looking to take legal action against them and
3 their family.
4     **Q. And did you specify what kind of legal**
5 **action you wanted to take?**
6     A. Yes. I was looking to -- a legal
7 action to sue your families.
8     **Q. Your families?**
9     A. Yeah. There were two people in the
10 room.
11     **Q. How about before the other girl came**
12 **in?**
13     A. No; nothing else.
14     **Q. Did the other girl start to cry?**
15     A. When?
16     **Q. During any of this.**
17     A. During when I was with them alone with
18 the Guidance Counselor?
19     **Q. Right.**
20     A. No.
21     **Q. One Guidance Counselor, you and the two**
22 **girls?**
23     A. That was it.
24     **Q. So you tell them you're upset and**

1 angry, correct, and how could you do this to me and
2 my family --
3     A. And also hurt.
4     **Q. And hurt. Did Jill offer up any**
5 **statement, other than what you've already told us?**
6     A. No.
7     **Q. How about the other child?**
8     A. No.
9     **Q. Were they looking at you when you**
10 **talked or looking down; tell me what their**
11 **expressions were?**
12     A. I don't recall.
13     **Q. Was your voice raised?**
14     A. Stern.
15     **Q. Raised?**
16     A. Stern.
17     **Q. Like that, just the way you're talking**
18 **to me?**
19     A. Yes.
20     **Q. That's slightly raised. Were you**
21 **standing or sitting while you spoke to them?**
22     A. Sitting.
23     **Q. Did you show them the MySpace page?**
24     A. No. I believe I waved it. I didn't

1 actually give it to them.
2     **Q. Okay. And that's the one that's in**
3 **your file back in your office?**
4     A. Yes.
5     **Q. Is it under lock and key?**
6     A. Yes.
7     **Q. Was your door open while you talked to**
8 **them?**
9     A. I already answered that, yes. Yes, it
10 was.
11     **Q. So it remained open as you tried to --**
12     MR. RIBA: Objection.
13     A. My door always remains open any time I
14 have a child in there, especially a female.
15     **Q. How many chairs are in there?**
16     A. That day I don't remember.
17     **Q. Did anybody bring a chair in?**
18     A. I don't remember.
19     **Q. So you're talking to the kids and you**
20 **told them you were going to sue their families?**
21     A. Yes.
22     **Q. And do you describe the nature of the**
23 **suit you were going to file?**
24     A. No.

1     **Q. Had you consulted with anybody about**
2 **the legal action at that point?**
3     A. No.
4     **Q. Were you planning to?**
5     A. No.
6     **Q. Was that just a bluff?**
7     A. Yes.
8     **Q. Why did you make that bluff?**
9     A. I wanted to let them know how serious
10 what they did was.
11     **Q. You don't think they would have gotten**
12 **that from your stern tone?**
13     A. No.
14     **Q. You don't think they already**
15 **appreciated that, having gotten caught, that it was**
16 **pretty serious?**
17     A. No.
18     **Q. By the way, did you ever do anything**
19 **besides make this threat regarding legal action?**
20     A. No.
21     **Q. Did you ever go to the police?**
22     A. Please be more specific -- did I say
23 anything, did I do anything?
24     **Q. Besides this statement to these**

1  children, that you were going to sue their
2  families --
3      A. Not that I recall.
4      Q. -- did you then do anything?
5      A. Yes.
6      Q. What did you do?
7      A. I contacted the State Police.
8      Q. And when did you make that contact?
9      A. I have to check my notes. It would
10 have been that day.
11     Q. Are there local police here?
12     A. Yes.
13     Q. So why did you call the State Police?
14     A. Because the local police did not have
15 -- were not knowledgeable in the area of the
16 Internet.
17     Q. Did you call them first?
18     A. Yes, and they referred me to the State
19 Police.
20     Q. And what day did you call the local
21 police?
22     A. It would have been that day, the 22nd,
23 Thursday.
24     Q. So this was after your conversation

1  with the children?
2      A. This was after my conversation and
3  after my meeting with the parents.
4      Q. So it really wasn't a bluff; you were
5  actually taking some steps?
6      A. Legal action is not calling the State
7  Police. You're not going to call the State Police
8  to sue somebody.
9      Q. So you wanted to bring both a criminal
10 and civil action against them?
11     A. I never said that.
12     Q. You wanted to bring a criminal action
13 against them?
14     A. I wanted to look into a criminal action
15 against them.
16     Q. And did you think what they did was
17 criminal?
18     A. I needed to find that out.
19     Q. Did you -- putting aside what the
20 police thought, did you feel like you'd been the
21 victim of a crime?
22     A. I'm not knowledgeable in that area so
23 I'm not going to entertain a guess.
24     Q. Okay. Even though you were not sure

1  whether you were a victim of a crime, you called
2  the local police first?
3      A. Yes.
4      Q. By the way, who did you speak to?
5      A. It would have been Chief Brozana.
6      Q. Can you spell that?
7      A. No, I can't.
8      Q. Is he still the Chief?
9      A. Yes.
10     Q. Is he the guy that you call when the
11 people come in with the knives and the marijuana?
12     A. It depends on who's on duty.
13     Q. You spoke to Chief Brozana. What did
14 you tell him?
15     A. I told him that I had an Internet
16 situation and he then referred me to the State
17 Police.
18     Q. What details did you provide to him?
19     A. I just read him the page.
20     Q. Did you tell him that the page had a
21 picture of you on it?
22     A. I don't recall.
23     Q. So he might have just thought that it
24 was any person that they were saying this about?

1      A. No. It said Principal.
2      Q. So you knew, in that conversation, that
3  it was clear to Chief Brozana that the MySpace page
4  related to you?
5      A. Yes.
6      Q. Did he think anything in there was true
7  when you told him this, when you read the page to
8  him?
9      A. I can't answer for him.
10     Q. But he didn't launch any investigation
11 into your conduct with the students; did he?
12     A. No.
13     Q. And he told you to contact the State
14 Police?
15     A. Yes.
16     Q. Did you do that immediately?
17     A. Define immediately.
18     Q. Well, right after you hung up the phone
19 with Chief Brozana.
20     A. Well, are you talking about seconds,
21 minutes?
22     Q. Let's say minutes?
23     A. A couple of minutes.
24     Q. Do you remember what time the call was

Page 94

1  to the Chief?
2      A.  No. I don't.
3      Q.  Did you take notes?
4      A.  Not on the times I called.
5      Q.  How about of your conversation?
6      A.  No; just that I called.
7      Q.  You took a note saying that you called?
8      A.  Uh-huh.
9      Q.  Where is that note?
10     A.  In my file.
11     Q.  You have a whole file on this
12  situation?
13     A.  Yes, I do.
14     Q.  And there's a piece of paper in there
15  that says called Chief Brozana?
16     A.  Yes.
17     Q.  Did he give you a phone number to call
18  or did he just say, call the State Police?
19     A.  No. I have the State Police phone
20  number posted on my board.
21     Q.  When did you need to call the State
22  Police; are there certain disciplinary matters that
23  you know that prefer the State Police as opposed to
24  the local police?

Page 95

1      A.  No.
2      Q.  You just have both numbers?
3      A.  Uh-huh.
4      Q.  So you called the basic number that's
5  on your bulletin board?
6      A.  For which person?
7      Q.  Are there different numbers for the
8  State Police?
9      A.  No. Are you talking local or --
10     Q.  State Police.
11     A.  Yes.
12     Q.  With whom were you connected?
13     A.  I have no idea.
14     Q.  A man or a woman?
15     A.  It was a man.
16     Q.  This was during the school day?
17     A.  Yes.
18     Q.  And did you write down anything
19  regarding your conversation with the man at the
20  State Police?
21     A.  No.
22     Q.  What did you tell that man?
23     A.  I told him that I had an Internet
24  situation and I'd like him to come over and take a

Page 96

1  look at it.
2      Q.  And did they?
3      A.  Yes.
4      Q.  When they came to look at it, did they
5  give you their card?
6      A.  No.
7      Q.  Did they give you any identification?
8      A.  Yeah. He was wearing his uniform.
9      Q.  But he didn't show you a badge or
10  anything like that?
11     A.  They usually have the badge on their
12  uniform.
13     Q.  Did he take a copy of this?
14     A.  That I don't recall.
15     Q.  Did he write down the U-R-L so he could
16  get his own copy on the Internet?
17     A.  No. I did not.
18     Q.  No; did he?
19     A.  Did he? I wasn't looking at his notes.
20  He was writing stuff down.
21     Q.  Okay. Was this still during the school
22  day on Thursday?
23     A.  Yes.
24     Q.  Did he come right over?

Page 97

1      A.  Define right over.
2      Q.  Within an hour of your call.
3      A.  I can't recall.
4      Q.  Was this before or after you had spoken
5  to Jill's mother?
6      A.  After.
7      Q.  The State Police come -- one guy, two
8  guys?
9      A.  I'm sorry, one.
10     Q.  Did he pull up to the school in, like,
11  a State Police car?
12     A.  I'm assuming he did.
13     Q.  You didn't see it?
14     A.  No.
15     Q.  You don't know whether he had his
16  flashing lights on or anything?
17     A.  No.
18     Q.  Was Jill still physically on the school
19  grounds when he arrived?
20     A.  No.
21     Q.  He took notes and he looked at the
22  MySpace page. Did he ask you any questions?
23     A.  I'm sure he did.
24     Q.  You don't remember?

1    A.  No.  I do not remember.

2    Q.  How long was he visiting with you?

3    A.  Twenty minutes.

4    Q.  Door open or shut?

5    A.  Always open.

6    Q.  So I don't have to keep asking that

7    question; it's always open?

8    A.  It's always open.

9    Q.  Were classes letting out and students

10   walking past your office as the State Police

11   Officer is there?

12   A.  My office is not visible from the

13   hallway.

14   Q.  So students would never be in that

15   vicinity?

16   A.  No.

17   Q.  No lockers or anything there?

18   A.  No.

19   Q.  So you talked to the police and what do

20   you recall being in your file regarding this

21   conversation, if anything?

22   A.  I can recall, not necessarily in my

23   file, but he had said, we can go for harassment

24   charges.

1    Q.  Against the child?

2    A.  Against the child, but knowing that

3    these two children didn't have any further past

4    serious disciplinary record, the chances that they

5    would get thrown out in Court were pretty good and

6    I thought the girls had gotten enough punishment

7    and I elected not to file any criminal charges.

8    Q.  Did he discuss with you what you needed

9    to do to file the criminal charges?

10   A.  I don't recall.

11   Q.  And what did he tell you about what

12   made this MySpace page harassment?

13   A.  I don't recall.

14   Q.  When did you decide you weren't going

15   to pursue the criminal charges?

16   A.  When he was in my office.

17   Q.  So he got all the way out here -- where

18   is the State Police barracks?

19   A.  Friedensburg.

20   Q.  How many miles away is that?

21   A.  I don't know.

22   Q.  More than 10?

23   A.  About 10.

24   Q.  So he drives all the way over here and

1    takes notes and then you say, aw, never mind; is

2    that basically how it went?

3        MR. RIBA:  Objection.  How could you

4    characterize his testimony that way?  His

5    testimony is that he came out and told him

6    about it and it is what it is.  I mean,

7    let's just move on.  I don't see how any of

8    this last half hour is relevant, but let's

9    go.

10   BY MS. KOHART:

11   Q.  Did you make the decision not to press

12   charges after he told you it would likely be thrown

13   out in Court?

14   A.  No.

15   Q.  So that was before he even told you

16   that?

17   A.  No.

18   Q.  When did you make that decision?

19   A.  After thinking about it for a couple of

20   minutes with the fact that it might be thrown out

21   and the girls were punished enough, enough was

22   enough.

23   Q.  Did you express that to him?

24   A.  Yeah.

1    Q.  Was he pissed off that he went all the

2    way out there and you weren't pressing charges?

3    A.  I can't answer for him.

4    Q.  Is his name in your file?

5    A.  Yes.

6    Q.  Did you ever get a written copy of what

7    he wrote down?

8    A.  No.

9    Q.  Did he ever get back in touch with you?

10   A.  No.

11   Q.  Did you pursue any other legal action

12   against Jill and her family?

13   A.  No.  I have not.

14   Q.  Have you made plans to do so?

15   A.  No.  I have not.

16   Q.  Did you consult at all with private

17   Counsel?

18   A.  Yes, I have.

19   Q.  Not somebody representing the school,

20   but somebody that just represents you?

21   A.  Yes.

22   Q.  Who is that person?

23   A.  Do I need to answer that question?

24   Q.  You can give me his name.  You just

Page 102

1　can't tell me anything else.
2　　　MR. RIBA: What his motives are,
3　actually, has nothing to do with the facts
4　of this case, the lawsuit brought. How does
5　that lead to discoverable information?
6　　　MS. KOHART: Well, I think there's a
7　suggestion in all of this that the reaction
8　of the school is based more on the fact that
9　it was the Principal -- it's sort of like
10　Judge and Jury. It's the Principal who was
11　-- allegedly who was parodied and the
12　Principal who was upset and the Principal
13　meting out the punishment and I think the
14　fact that he may have consulted with private
15　counsel about suing the family of this 13
16　year old kid is more evidence that she was
17　treated more like a knife wielding 8th
18　grader than she was like a kid that parodied
19　somebody on MySpace and I think the fact
20　that he went through these steps, A, is
21　evidence of how upset he was, and, B,
22　evidence that maybe he wasn't the right guy
23　to be picking punishment.
24　　　MR. RIBA: So I understand your

Page 103

1　position, someone is defamed and their
2　rights are invaded, they can't seek legal
3　advice. Is that your position, ma'am?
4　　　MS. KOHART: No. That is not my
5　position.
6　　　MR. RIBA: Well, I think it's totally
7　irrelevant whether he consulted with Counsel
8　about this or not. I know it's not a reason
9　to tell him not to testify, but we're
10　wasting so much time going over stuff that
11　has absolutely nothing to do with the facts
12　of this case.
13　　　MS. KOHART: Are you instructing him
14　not to answer?
15　　　MR. RIBA: What's the question?
16　　　MS. KOHART: I asked him the name of
17　his lawyer.
18　BY MS. KOHART:
19　　　A. Malcolm Gross.
20　　　Q. And how soon after this conversation
21　with the State Police Officer did you consult with
22　Mr. Gross?
23　　　A. Three weeks.
24　　　Q. Let's go back into the room with Jill

Page 104

1　and her friend. How long would you say you were
2　talking to Jill and the other child with the
3　Guidance Counselor in the room?
4　　　A. Five minutes.
5　　　Q. What happened after you finished that
6　conversation?
7　　　A. Mrs. Guers took them out of the office,
8　put one in the waiting room and one in our Eagle's
9　Nest.
10　　　Q. And what is the Eagle's Nest?
11　　　A. It's just a room with a phone in it.
12　　　Q. Were they shut into those rooms; were
13　the doors shut?
14　　　A. The doors were shut.
15　　　Q. Were the doors locked?
16　　　A. No. There's no lock on that door.
17　　　Q. Which door?
18　　　A. On the Eagle's Nest door.
19　　　Q. How about the other door?
20　　　A. The other girl was sitting outside by
21　the water cooler.
22　　　Q. And did you talk to the Guidance
23　Counselor after the two girls were in their
24　respective rooms?

Page 105

1　　　A. I don't recall.
2　　　Q. Why weren't the girls sent back to
3　class?
4　　　A. Because I was calling their parents.
5　　　Q. Did you tell them they were going to be
6　suspended?
7　　　A. Not at that time.
8　　　Q. You wanted to keep them in the room
9　while you called their parents?
10　　　A. Not in the room. In the office area
11　while I called their parents.
12　　　Q. Why is that?
13　　　A. Because middle school kids tend to go
14　back to class and tend to talk about things causing
15　an even further disruption, which I was trying to
16　prevent.
17　　　Q. So you called the parents. Who did you
18　call?
19　　　A. Both.
20　　　Q. Both parents?
21　　　A. No.
22　　　Q. Which parents?
23　　　A. Both mothers.
24　　　Q. Tell me about your conversation with

27 (Pages 102 to 105)

1 Jill's mother.

2    A. I told her that we had a serious matter

3 that I didn't want to discuss on the phone and

4 could she please come to school. She said, I'm at

5 work in Harrisburg and it's going to take me about

6 an hour to get there. I said, that's fine, and I

7 told her that her daughter was safe and there

8 wasn't anything physically wrong, but I need you to

9 come into school.

10    Q. Did she ask you what happened?

11    A. Yes.

12    Q. What did you tell her?

13    A. I just repeated that. I just said

14 that, I told her I'm not going to discussion it

15 over the phone.

16    Q. Why not?

17    A. Because it's a serious matter and I

18 wanted to talk face-to-face.

19    Q. What did you tell the other mother?

20    A. The same thing.

21    Q. And where was the other mother

22 physically located?

23    A. Pottsville.

24    Q. How long did it take her to get here?

1    A. Twenty-five minutes.

2    Q. Did you talk to the parents with their

3 children in the room or without the children in the

4 room?

5    A. With their child only.

6    Q. So it would be one mother and one

7 daughter and nobody else?

8    A. And the Guidance Counselor was there as

9 well.

10    Q. So I'm assuming that Jill's friend and

11 her mother were spoken to first?

12    A. Say that again.

13    Q. Who did you meet with first?

14    A. The Lehmans.

15    Q. And how long was that meeting?

16    A. Roughly, 10 minutes.

17    Q. Did you show Mrs. Lehman the MySpace

18 page?

19    A. Yes, I did.

20    Q. And did she take a copy with her?

21    A. She refused a copy of it.

22    Q. And what do you remember being said in

23 that meeting?

24    A. I remember her mom being mortified, her

1 mom being very apologetic, very sympathetic, was

2 concerned about me taking legal action against

3 them.

4    Q. What did she say?

5    A. Just what I said, she was concerned

6 about --

7    Q. She just said this on her own?

8    A. No. I had told her.

9    Q. So even to the mother you said that?

10    A. Yes. And that was about it.

11    Q. What did she say to you about the legal

12 action?

13    A. She didn't say anything.

14    Q. She said, I'm concerned?

15    A. Yes.

16    Q. Had the State Police been there by

17 then?

18    A. No.

19    Q. At that point, had you called anybody,

20 the State Police or the local police?

21    A. No.

22    Q. Why didn't you call the police the day

23 before about this MySpace page?

24    A. I think I answered this already. I

1 didn't have any proof of who it was at that time.

2    Q. So does it matter who it was?

3    A. Yes, it does.

4    Q. Why?

5    A. I don't know the answer to that

6 question, but it does matter.

7    Q. It didn't seem to you to be a crime

8 unless a student had done it?

9    A. Yes.

10    Q. So if it was your next door neighbor or

11 something, that would not be something you'd want

12 to take action about?

13    A. Obviously, I can't suspend my next door

14 neighbor.

15    Q. I'm talking about the call to the

16 police, not the suspension.

17    A. I would have done the same thing if it

18 was a neighbor.

19    Q. But you wanted to find out the identity

20 of who did it before you called the police?

21    A. I was quite certain it was a student.

22    Q. You didn't think the police could help

23 ascertain the identity of the offender?

24    A. No.

1    Q.  So then Jill's mother showed up?
2    A.  Yes.
3    Q.  Do you remember the time of day?
4    A.  Approximately, 10:00.
5    Q.  So Jill had been called out of class at
6    about eight you said?
7    A.  Yeah.
8    Q.  So she'd been there about two hours in
9    the Eagle's Nest?
10    A.  Yes.
11    Q.  Any bathroom breaks or anything?
12    A.  She was asked by the secretary if she
13    needed to go.
14    Q.  Where are the secretaries in relation
15    to the Eagle's Nest?
16    A.  Next to it.
17    Q.  They asked her -- did they tell you
18    they were asking her; how do you know that?
19    A.  I've always told them that it's part of
20    their responsibilities.
21    Q.  Taking the kids to the bathroom?
22    A.  That if I ever have a kid in there,
23    periodically check.  There's a little timer on
24    their desk that beeps.

1    Q.  Did you talk to the mom before you
2    talked to Jill?
3    A.  I don't recall.  I believe it was both
4    at the same time.
5    Q.  Tell me about that conversation.
6    A.  I told her what the incident was and
7    showed her her profile.
8    Q.  From MySpace?
9    A.  The MySpace page.  Mom had a little
10    shocked look on her face.  I don't think she quite
11    understood what MySpace was all about.  I told her
12    what the consequences would be and did mention the
13    possibility of taking legal action.  One thing I
14    did leave out of the previous conversation, I did
15    also tell them that their work would be provided
16    for them, their school work.
17    Q.  Most kids would think that's not
18    punishment, getting off 10 days, right?
19        MR. RIBA:  Objection.
20    A.  I can't answer for anybody.
21    Q.  So they'll get their school work so
22    they don't lose any educational value?
23    A.  Correct.
24    Q.  Do you recollect anything else in that

1    meeting?
2    A.  I recollect that neither mother or
3    child seemed very remorseful.
4    Q.  Did that affect the level of the
5    punishment?
6    A.  No, ma'am.
7    Q.  You already selected the punishment?
8    A.  The punishment was already given.
9    Q.  Was that different from your
10    conversation with Jill in the morning; did you
11    think Jill showed a lack of remorse when you talked
12    to her earlier in the day?
13    A.  Yes.
14    Q.  So you didn't think she had sufficient
15    remorse, right?
16    A.  That's correct.
17    Q.  What about the other child, did she
18    seem remorseful?
19    A.  Yes.
20    Q.  How about that mother, did she seem
21    remorseful?
22    A.  Yes.
23    Q.  But they still got the same punishment?
24        MR. RIBA:  Slow down.

1        THE WITNESS:  Sorry.
2    BY MS. KOHART:
3    Q.  They still got the same punishment?
4    A.  Yes.
5    Q.  Does the Lehman child also not go on
6    the end of the year field trip?
7    A.  I have no knowledge of that.
8    Q.  Did Jill's mother ask you any questions
9    about your threat of legal action?
10    A.  Not that I recall.
11    Q.  And the Guidance Counselor was in the
12    office throughout this?
13    A.  In which office?
14    Q.  In your office with Jill and her
15    mother?
16    A.  Yes.
17    Q.  Did the Guidance Counselor say anything
18    to you about these threats of legal action?
19    A.  No.
20    Q.  What time was your meeting with Jill
21    and her mother over?
22    A.  Over?
23    Q.  What time did you finish speaking with
24    Jill and her mother that morning?

29 (Pages 110 to 113)

1   A. Ten or fifteen minutes later.

2   Q. And what happened next?

3   A. I went to the bathroom. I recall that

4   because I wasn't feeling that well and, after that,

5   I contacted their teachers to get their work and

6   told them to make sure they did it.

7   Q. And when was your call to law

8   enforcement; after the meetings with the mothers

9   and daughters?

10  A. I don't remember the exact time.

11  Q. It could have been between or before

12  the mothers got there?

13  A. No. It was definitely after the

14  mothers and the children had left.

15  Q. And were the mothers instructed to take

16  their children home immediately?

17  A. Yes.

18  Q. What is the process, if you can

19  describe for me briefly, in the school, if your kid

20  is accused of having a knife, a level four

21  discipline, what is the process; is there a hearing

22  or what happens?

23  A. We have an initial meeting with the

24  parents, explain the situation and -- are you

1   specifically talking about a knife?

2   Q. Any level four infraction. Is it

3   varied?

4   A. It would vary. If it was a knife,

5   obviously, the police need to be involved.

6   Q. What happens with the kid; do the kids

7   have to go home right away on a level four?

8   A. Yes. And that day counts as a day of

9   suspension.

10  Q. Is that true of all the other levels of

11  discipline?

12  A. Ever since I've been here, yes.

13  Q. So even a level one -- anything you're

14  suspended for, you're out the door as soon as the

15  suspension is issued?

16  A. No.

17  Q. What are some of the other options you

18  have here?

19  A. In-school suspension is usually held

20  the next day.

21  Q. What does that mean?

22  A. That means they're sent to the high

23  school. They have an in-school suspension monitor.

24  They're in a room. They eat lunch in that room.

1   They are required to do work all day. That's the

2   only difference. Once the school day starts,

3   they're already set in their schedule. We have no

4   transportation to get them to the high school.

5       In the case of out-of-school

6   suspension, the parents are already there so they

7   can take them home.

8   Q. Is in-school suspension an allowable

9   discipline for a level four infraction?

10  A. I believe so.

11  Q. And then an out-of-school suspension

12  you're home for the duration?

13  A. Yes.

14  Q. What are the other options for a level

15  four violation?

16  A. Those are pretty much the only two that

17  have ever come up.

18  Q. Are you allowed to expel students?

19  A. There's really no such thing as

20  expelling students anymore.

21  Q. Right. Can you send them to the school

22  for bad kids that the State runs?

23  A. If we had one in this County, we could,

24  but we don't.

1   Q. What's the longest suspension that

2   you're aware of being given to a child in this

3   district?

4   A. I don't know.

5   Q. How about by you; what's the longest?

6   A. Well, I only can give 10 days, but if

7   you're asking what the longest suspension I'm aware

8   of in the middle school, that gets imposed by the

9   School Board.

10  Q. What's the longest you're aware of?

11  A. I'm aware of 10 days plus 60.

12  Q. And during that 60 days -- what was the

13  offense that that happened?

14  A. Marijuana.

15  Q. So Jill and her mother leave and you've

16  already told me about the conversations. Did you

17  talk to anybody else on Thursday about this

18  incident?

19  A. Not that I know, but I believe I came

20  down and talked to Dr. Romberger, but, besides

21  that, no one.

22  Q. Do you remember that conversation?

23  A. No.

24  Q. Did you report to your wife what

Page 118

1 happened?
2    A. She already knew.
3    Q. She didn't know about your
4 conversations with the children and the mothers,
5 right?
6    A. No.
7    Q. Did you talk to her during the school
8 day?
9    A. Sure.
10    Q. Did you tell her that you sent the
11 children home?
12    A. No.
13    Q. What do you remember talking to her
14 about with regard to the MySpace page?
15    A. I don't remember.
16    Q. What do you remember reporting to Dr.
17 Romberger?
18    A. I don't remember.
19    Q. Did you give instructions to the
20 Guidance Counselor not to discuss the MySpace event
21 after her meeting with you that morning?
22    A. Yes.
23    Q. What did you discuss?
24    A. I told here that it's not to be talked

Page 119

1 about with anybody.
2    Q. The Guidance Counselors?
3    A. The Guidance Counselors.
4    Q. All of them?
5    A. There's only two.
6    Q. So you told that to your wife and you
7 told that to the one that was in the office with
8 you?
9    A. Yes.
10    Q. Why did you tell them that?
11    A. Because it's a confidential issue
12 regarding students discipline -- not their
13 discipline, but what they've been disciplined for.
14 I can inform teachers and Guidance Counselors that
15 there has been a suspension, I just can't tell them
16 why.
17    Q. Did you personally contact the teachers
18 about Jill's work?
19    A. No.
20    Q. Who did?
21    A. I did through e-mail.
22    Q. Do you have a copy of that e-mail?
23    A. Probably.
24    MS. KOHART: We'll make a request for

Page 120

1 that.
2    THE WITNESS: I wouldn't have a hard
3 copy.
4    MS. KOHART: If you have it.
5    Q. Did you pull up a list of the teachers
6 before you sent that e-mail?
7    A. Which teachers?
8    Q. Did you have to figure out who Jill's
9 teachers were and the Lehman child's teachers were?
10    A. No.
11    Q. Did you do that off the top of your
12 head?
13    A. No.
14    Q. What did you do; sent it to everybody?
15    A. Sent it to everybody.
16    Q. How long was the e-mail?
17    A. One line.
18    Q. What was it?
19    A. I don't know exactly.
20    Q. Something along the lines of, the
21 Lehman child and Jill have been suspended for 10
22 days?
23    A. Please get all work to the office no
24 later than such and such a date.

Page 121

1    Q. Did anybody ask you what happened?
2    A. No, but in the middle school, kids
3 know. Word of mouth travels fast.
4    Q. How about the teachers; did any of the
5 teachers say, gee, that Jill is such a sweet kid,
6 what happened?
7    A. No.
8    Q. How about with the Lehman child?
9    A. No.
10    Q. So none of the teachers asked you at
11 all?
12    A. Asked me what?
13    Q. About anything regarding Jill or the
14 Lehman girl?
15    A. Yes.
16    Q. What did they ask you?
17    A. Just exactly what you said.
18    Q. And what did you say?
19    A. I said, I can't discussion it right
20 now.
21    Q. Did any of them come to you and say, I
22 hear it's about the MySpace page?
23    A. Yes.
24    Q. And what did you say?

31 (Pages 118 to 121)

Page 122

1    A. I can't discuss it right now.

2    Q. When you first latched onto this

3 MySpace page, before you were able to prove that it

4 was from Jill's computer, did you give the U-R-L to

5 anybody?

6    A. No.

7    Q. So you don't know whether any of the

8 other faculty members at the school were able to

9 access this page and look at it?

10    A. They wouldn't be able to access it in

11 the school.

12    Q. Okay. If they had the U-R-L they could

13 do it from their house or something?

14    A. I don't know.

15    Q. And the teachers, by the way, they

16 don't have computers that can access more broadly

17 on the Internet than the student?

18    A. No. The only people in the building

19 that have that capability are the Counselors and

20 Principal and Assistant Principal and the

21 secretarial staff.

22    Q. All right. Do you know if any of the

23 secretaries somehow got this U-R-L and accessed

24 it?

Page 123

1    A. No. They did not.

2    Q. Do you know if Brianna gave other

3 copies, to you knowledge, whether she was giving

4 other copies to other people?

5    A. No. I don't know.

6    Q. Do you guys have a mascot -- what is

7 your mascot?

8    A. It's an Eagle.

9    Q. And what's the name of your football

10 team?

11    A. The Blue Mountain Eagles.

12    Q. I'm trying to find out what you talk to

13 your kids about with regard to copyright. Do you

14 know whether your school mascot is copyrighted?

15    A. I don't know.

16    Q. And on the web pages of the school,

17 where there are photographs, are there copyright

18 symbols by the photographs to mark them as

19 copyrighted?

20    A. I don't know.

21    Q. And are you aware, do you license the

22 pictures?

23    A. I don't know.

24    Q. You first indicated that what these

Page 124

1 children had done was a violation of copyright,

2 right?

3    A. Susan Snyder Morgan did.

4    Q. And when did she first say this to you?

5    A. When I met with her and Dr. Romberger

6 in the office.

7    Q. And that was Wednesday?

8    A. That was Wednesday, right.

9    Q. Tell me what she told you about the

10 copyright.

11    A. I don't recall.

12    Q. She just said, this is a copyright

13 violation?

14    A. I don't recall exactly what she said.

15    Q. Have you ever seen the kids use the

16 photographs off the website for anything else,

17 like, Valentine's Day cards or collages of their

18 favorite teachers or the yearbook or anything of

19 that nature?

20    A. No.

21    Q. Have any children ever gotten in

22 trouble for using the pictures?

23    A. I don't believe anybody has ever used

24 the pictures.

Page 125

1    Q. Are there any school sports in the

2 middle school?

3    A. Yes.

4    Q. And do the kids ever draw pictures of

5 your school mascot for banners or anything like

6 that?

7    A. No.

8    Q. They don't use the eagle for, like,

9 cheerleading and stuff, like, when they make their

10 pep posters?

11    A. No.

12    Q. Nobody writes it on posters when

13 they're running for student counsel?

14    A. That I don't know. We don't allow a

15 lot of posters to be hung.

16    Q. Do you allow any?

17    A. Yes.

18    Q. What kind do you allow?

19    A. I don't know.

20    Q. When you spoke to Jill and the Lehman

21 child, without their parents, did you talk

22 about copyright?

23    A. No.

24    Q. Did you talk about the use of the

32 (Pages 122 to 125)

Page 126

1 photograph at all?
2     A. I don't recall.
3     Q. How about with their parents?
4     A. I don't recall.
5     Q. However, you did talk about copyright
6 in the written description of the reasons for the
7 discipline?
8     A. Yes.
9     Q. Why wouldn't you have made a point of
10 making sure you informed the children and the
11 parents that one of the basis for this punishment
12 was what you believe to be a violation of the
13 copyright law?
14     A. I didn't say that I didn't. I said
15 that I can't recall.
16     Q. You can't recall. You might have. Did
17 you have some paper in front of you that you have
18 to check to make sure you hit certain bullet points
19 in your conversation with them?
20     A. No.
21     Q. Did you try to say the same things in
22 both meetings, with Jill and her mother and with
23 the other child and her mother?
24     A. Yes.

Page 127

1     Q. But you just did it by memory?
2     A. I've been doing this a long time.
3     Q. Okay. You don't know -- you said the
4 head of technology told you what the basis of
5 the copyright violation was?
6     A. No. I don't know.
7     Q. Any other conversations on the 22nd,
8 Thursday the 22nd, other than the ones you've
9 reported to me?
10     A. Not that I remember.
11     Q. Okay. Did you speak with Brianna that
12 day?
13     A. No. I did not.
14     Q. Have you ever spoken to Brianna
15 following March 20th regarding the MySpace?
16     A. No.
17     Q. Do you know whether anybody else on
18 your behalf did?
19     A. No.
20     Q. No, you don't know, or no, they have
21 not?
22     A. No. I don't know.
23     Q. Has Brianna ever attempted to talk to
24 you?

Page 128

1     A. No.
2     Q. Now, under the school's disciplinary
3 policy, do you have to give something in writing to
4 the child and the parents?
5     A. Yes.
6     Q. Who else gets that written material;
7 are you required to give it to the Superintendent?
8     A. It stays in the office.
9     Q. You're not required to give a copy to
10 Dr. Romberger?
11     A. No.
12     Q. What's the nature of the writing that
13 you are required to prepared?
14     A. I don't understand.
15     Q. Do you have to send out a letter, do
16 you have to fill out a form; what do you have to
17 do?
18     A. About the discipline?
19     Q. Right.
20     A. A letter goes home. It's a brief
21 letter saying, I understand the rules and
22 regulations of the school -- I'm paraphrasing -- I
23 don't have it memorized -- and the student and the
24 parent sign it.

Page 129

1     MS. KOHART: I'm going to mark this as
2 M-1.
3     (Plaintiffs Exhibit M-1, Blue
4 Mountain Middle School letter dated
5 3/23/07, was marked for identification.)
6     Q. I'm showing you a copy of what I just
7 marked as M-1. It's on Blue Mountain Middle School
8 letterhead and it's dated March 23rd, '07. Do you
9 recognize that, sir?
10     A. Yes.
11     Q. Who typed that up?
12     A. My secretary.
13     Q. Did you dictate it?
14     A. No.
15     Q. How did it get prepared?
16     A. I handwrote it.
17     Q. So you handed her a handwritten copy to
18 type up?
19     A. Correct.
20     Q. Where is that handwritten copy?
21     A. Shredded.
22     Q. When did you shred it?
23     A. After I proofread this letter.
24     Q. As soon as you get the typed letter you

1  throw the draft out?
2      A. Yes.
3      Q. You prepared this letter. On what date
4  did you prepare it?
5      A. On Friday.
6      Q. You both prepared it and mailed it on
7  the 23rd?
8      A. Correct.
9      Q. Is that a form, is a portion of that
10 letter a form that you use every time there's a
11 discipline or is it all written afresh each time?
12     A. The last paragraph is pretty much form.
13 Probably the first two sentences are form.
14 Everything else is case by case.
15     Q. Now, before you sent this letter to
16 anybody, did you have it approved by anybody else
17 in the school district?
18     A. I shared it with Dr. Romberger.
19     Q. Before it was sent?
20     A. Yes.
21     Q. In draft form?
22     A. In this form.
23     Q. And she approved it?
24     A. Yes.

1      Q. Did she ask you at all about
2  the copyright law violations in there?
3      A. No.
4      Q. Did she talk to you at all, setting
5  aside whether you believe the statements in the
6  MySpace page were false, whether those statements
7  were false accusations?
8      A. I don't understand the question.
9      Q. You understand when somebody accuses
10 you of something that means you are a liar, it's an
11 accusation, correct?
12     A. Correct.
13     Q. Did she talk to you about whether
14 there's a difference between a false accusation and
15 the MySpace page?
16     A. No.
17     Q. Did you show it to anybody else besides
18 the Superintendent?
19     A. No.
20     Q. Was there any discussion with anybody
21 else in the school district about this letter
22 before it went out?
23     A. No.
24     Q. At this point, I'm assuming you had

1  met, indeed, with the Pennsylvania State Police,
2  correct?
3      A. Yes.
4      Q. Why didn't you tell the parents that
5  you had already decided that you were not going to
6  pursue criminal charges as of March 23rd?
7      A. I just didn't.
8      Q. Why not?
9      A. I just didn't.
10     Q. But, in fact, you had met with them
11 Thursday and decided not to pursue it, right?
12     A. Yes.
13     Q. And, in fact, they had told you it
14 probably would get thrown out of Court, right?
15     A. If you read this carefully, it says, as
16 you're aware the Pennsylvania State Police have
17 been informed of this incident so criminal charges
18 may be filed. It doesn't say will be.
19     Q. I understand. I'm not saying that you
20 said that. I'm just asking why you chose to tell
21 the parents certain things and not others.
22         Did you think about that before you put
23 that in or what was your intent of putting it in;
24 do you know?

1      A. No.
2      Q. Did you put it in both letters, both to
3  the Lehmans and to the Snyders?
4      A. Yes.
5      Q. So the fact that the Lehman child
6  showed more remorse did not mitigate, in your mind,
7  whether they should be thinking about their own
8  personal exposures?
9      A. The only difference in the two letters
10 is the names. I'm sorry, the names, obviously, the
11 addresses and the time for the informal, the
12 meeting.
13     Q. What's the difference between a hearing
14 and an informal hearing at the school?
15     A. An informal hearing -- initially, the
16 informal hearing is with the parent and the child
17 and then we have to meet, by law, with a 10 day
18 suspension, between day three and five.
19     Q. For the informal hearing?
20     A. Yes.
21     Q. Who participates in that hearing?
22     A. That was myself and the two parents
23 along with the Guidance Counselor.
24     Q. The same Guidance Counselor?

1    A.  Yes.

2    Q.  No decision maker other than you and

3 the Guidance Counselor were present?

4    A.  That's correct.

5    Q.  Are there any policies in the school

6 regarding whether people ought to not participate

7 in disciplinary actions when they are, arguably,

8 the victim of the student's wrongdoing?

9    A.  No.

10    Q.  And did this informal hearing take

11 place?

12    A.  Yes.

13    Q.  Where was it?

14    A.  In my office.

15    Q.  And was it on March 28, as was

16 scheduled?

17    A.  Yes.

18    Q.  Who was present; you, the Guidance

19 Counselor, Mrs. Snyder -- was Mr. Snyder there?

20    A.  No.

21    Q.  Was Jill there?

22    A.  Yes.

23    Q.  Tell me what you remember about that

24 informal hearing?

1    A.  I was making sure that they got all

2 their work.  I told them that when they came back

3 to school, you know, kids are going to be asking

4 questions and the best thing to do is respond to

5 them by saying, I did something wrong, I was

6 punished and then drop it.  That way it will go

7 away.

8    Q.  So the informal hearing was sort of a

9 status conference, is that right, just to make sure

10 that she was getting her work?

11    A.  Yes.

12    Q.  It wasn't intended to allow them to

13 challenge the discipline or discuss whether it was

14 appropriate?

15    A.  Yes.  It is allowable.

16    Q.  Did you tell them that?

17    A.  No.  Mrs. Snyder excused her daughter

18 and asked to talk to me alone, telling me that I

19 couldn't do this because it happened outside of the

20 school.

21    Q.  And what did you say?

22    A.  Unfortunately, it was brought into the

23 school and, therefore, I do have jurisdiction.

24    Q.  Because Brianna brought it into the

1 school?

2    A.  Not just Brianna.  Because the kids

3 were talking about it in classes and because it was

4 brought into the school.

5    Q.  You and I discussed earlier that, other

6 than the fact that Brianna brought it in at your

7 request, we don't know what the kids were saying,

8 correct?

9    A.  No; not specifically.

10    Q.  Did she ask to take that issue further

11 up the chain in the school district, the issue

12 about whether this was an appropriate discipline?

13    A.  I don't recall.  I know that she did

14 contact Dr. Romberger, but I don't know.

15    Q.  Is there an appeal from the informal

16 hearing?

17    A.  There's an appeal at the beginning of

18 the suspension.

19    Q.  What's that appeal process?

20    A.  The same one that I said before.  It

21 goes to the Superintendent, if the Superintendent

22 upholds the decision, then you can take it to the

23 School Board.

24    Q.  Do you know whether the Snyders took

1 advantage of that?

2    A.  I know she talked to Dr. Romberger.

3 That's all I know.

4    Q.  How long was this informal hearing?

5    A.  With everyone in the room present?

6    Q.  Yes.

7    A.  Five to seven minutes.

8    Q.  How long did you meet privately with

9 Mrs. Snyder?

10    A.  Five minutes, maybe ten.

11    Q.  When you met with Mrs. Snyder

12 privately, did you have the Guidance Counselor

13 present?

14    A.  I don't recall.

15    Q.  So there was a five to ten minute

16 meeting with a group of you and you just talked

17 about whether Jill was getting her work home and

18 that when she comes back to school she shouldn't

19 tell anybody what she did?

20    A.  No, no.  I didn't say that.  I said

21 that she should say, if she wants it to go away and

22 doesn't want to be bothered by it, just tell the

23 kids, I did something wrong.  I didn't say she

24 couldn't talk about it.  I was just offering

Page 138

1 advice.
2     Q. Did she ask you for that advice or did
3 you just offer it?
4     A. No. I offered it to her.
5     Q. Any problem with the work getting home
6 to Jill?
7     A. No.
8     Q. Anything else in that meeting?
9     A. Not to my knowledge.
10     Q. Did you have a similar meeting with the
11 Lehman family?
12     A. Yes.
13     Q. Do you remember the date of that?
14     A. No. I do not.
15     Q. Right. Can you tell me what happened
16 at that meeting?
17     A. The same thing, with the exception of
18 the mother accepting the punishment.
19     Q. Now, the disciplinary notice that's
20 attached to the letter that I have marked as
21 Exhibit M-1, I don't think it's attached to your
22 copy -- it's March 22nd. Is that the date of its
23 preparation?
24     A. Yes.

Page 139

1     Q. And are those your initials down at the
2 bottom?
3     A. That's my signature.
4     Q. Am I correct, all of Jill's violations,
5 there was no pre-existing block to check, you had
6 to write them in?
7     A. Yes.
8     Q. By the way, has anyone else ever been
9 sanctioned at the school for copyright violations?
10     A. At which school?
11     Q. At this school -- other than
12 plagiarism?
13     A. Not to my knowledge.
14     Q. Are there any other papers in your file
15 relating to Jill's discipline, other than what
16 we've already discussed, your notes of the
17 conversation with the State Police, you may have an
18 electronic copy of your e-mail to the teachers,
19 correct?
20     A. Yes. I may have that. I do not have
21 any notes regarding what I said to the State
22 Police.
23     Q. I understand, yes. You may have
24 something relating to those conversations,

Page 140

1 correct?
2     A. Yes.
3     Q. Then, of course, we have the March 23rd
4 letter and the March 22nd handwritten form?
5     A. Yes.
6     Q. And you have a copy of the MySpace
7 pages?
8     A. No. I have the one that was brought to
9 me.
10     Q. So only the one that was brought to
11 you?
12     A. You know, I may have something in some
13 of the other documents that came from the
14 transcript.
15     Q. Something from the Court proceedings?
16     A. Yeah.
17     Q. Pre the Court proceedings; any other
18 documents, that you think of, that were created at
19 this time?
20     A. No.
21     Q. Did anybody make notes after your
22 meeting with Jill and her parents, her mother?
23     A. No.
24     Q. How about after the meeting between the

Page 141

1 Lehmans and you?
2     A. No.
3     MS. KOHART: I may be done. Let's take
4 a break for me to check over my notes.
5     (At this point, a recess was taken.)
6 BY MS. KOHART:
7     Q. We talked earlier about the fact that
8 you got reports from two teachers on, I guess, it
9 was Wednesday, the 21st, is that right, the day
10 before you spoke to Jill?
11     A. No. It was the 20th.
12     Q. Let's start with that. There were two
13 reports. One teacher came up to you on your lunch?
14     A. Yes.
15     Q. And said she heard kids talking about
16 it?
17     A. Yes.
18     Q. Did she say -- what did she report to
19 you regarding where she heard that conversation
20 between the students?
21     A. Near her desk.
22     Q. Was it while class was going on?
23     A. It was towards the end of class.
24     Q. What class was she teaching?

Page 142

1    A. I don't know.

2    Q. And did she describe it as something

3 that was disruptive?

4    A. That she had to redirect the children,

5 yes.

6    Q. That she needed to redirect the

7 children to what?

8    A. To stop.

9    Q. That she had to tell them to stop

10 talking?

11    A. Yes.

12    Q. And what was her class?

13    A. I don't recall. It was adolescent

14 skills, skills for adolescents or writing skills

15 for adolescents.

16    Q. Okay. Did they stop when she told them

17 to?

18    A. Not the first time.

19    Q. She had to tell them twice?

20    A. Yes.

21    Q. So she came up to you and said, I had

22 to tell these kids two times to stop talking about

23 this?

24    A. I don't think she used the words two

Page 143

1 times. I think she said more than once.

2    Q. Okay. And had it just occurred?

3    A. I'm sorry.

4    Q. Had it just occurred; had the incident

5 just occurred where she had to ask them two times

6 to stop talking?

7    A. I don't understand your question.

8    Q. Did you have the impression that she

9 was reporting this incident to you immediately

10 after it had occurred?

11    A. No. She did not because she would be

12 teaching for the first four periods and could not

13 get to me until period five, when I had my lunch.

14    Q. So it could have been the first period

15 or the fourth period, we just don't know?

16    A. Yes. I don't know.

17    Q. Okay. She didn't identify the

18 students?

19    A. Not to my recollection.

20    Q. However, she did see them and can

21 identify them today, if we asked her?

22    A. I don't know.

23    Q. And then the second incident that you

24 told me about was with Mr. Nunemacher and he told

Page 144

1 you about students talking about the incident

2 in 9th period?

3    A. No. I'm not sure if it was 9th period.

4 It was towards the end of the day.

5    Q. That's what he told you?

6    A. It was during a class where the kids

7 were working and he told me that several times kids

8 were disruptive, they had to be told to be quiet

9 more than, he said, a couple of times, I don't

10 remember the exact number, and they wouldn't stop

11 until he finally yelled.

12    Q. So he had to yell at them to get them

13 to stop talking?

14    A. Yes.

15    Q. Is he typically somebody nobody listens

16 to?

17    A. No.

18    Q. And did he identify the students?

19    A. He identified them, but I do not

20 remember their names.

21    Q. Do you remember if they were men or

22 women?

23    A. They were both.

24    Q. And do you know, if kids don't listen

Page 145

1 to their teachers when they tell them to be quiet

2 in class, do they get detention; what happens

3 usually?

4    A. It depends. Each situation is

5 different.

6    Q. Were these children sanctioned

7 for their failure to listen to their teachers?

8    A. No.

9    Q. Why not?

10    A. That's an individual teacher's

11 decision.

12    Q. And when do teachers normally make a

13 decision to discipline students who don't listen to

14 them?

15    A. It depends on the teacher.

16    Q. How about Mr. Nunemacher?

17    A. Mr. Nunemacher handles things very well

18 in his class.

19    Q. Which means?

20    A. Which means he has very little

21 discipline problems.

22    Q. But this is one where he actually told

23 you that he had to, like, yell?

24    A. Yes.

Page 146

1    Q.  But he chose not to discipline these
2   children?
3    A.  I can't speak for Mr. Nunemacher.
4    Q.  How about the other teacher?
5    A.  I can't speak for her either.
6    Q.  Did she discipline anybody?
7    A.  To my knowledge, I don't know.
8    Q.  How would you find out?
9    A.  I would ask her.
10    Q.  There's no list of who had detention at
11   school or anything like that?
12    A.  From this year?
13    Q.  Would they maintain a list of who's
14   getting detention?
15    A.  No.  The Assistant Principal would have
16   that list.
17    Q.  And did he maintain it and still have
18   the list from the prior school year?
19    A.  No.
20    Q.  What does he do; does he throw it out?
21    A.  I don't know what he does with it.
22    Q.  So you don't know; he might have it?
23    A.  I know he doesn't have it.
24    Q.  Let me ask you a question, did anybody

Page 147

1   instruct the school or did you instruct your staff
2   that they were to hold onto documents once this
3   litigation was filed?
4    A.  Hold onto what specific documents?
5    Q.  Any documents relating to Jill or to
6   this MySpace or to any activities or any alleged
7   disruptions in the school?
8    A.  No.
9    Q.  No instruction like that was given to
10   the staff?
11    A.  No.
12    Q.  So everybody continued with whatever
13   their personal document retention practices were in
14   terms of what they kept and what they threw out?
15    A.  I can't speak for anybody else.
16    Q.  Okay.  Now, other than those two
17   instances, were there any other instances, before
18   you suspended Jill, relating to this MySpace page?
19    A.  Not to my knowledge.
20    Q.  Any that came to you through hearsay,
21   that you didn't see or didn't witness, other than
22   the two instances that you just told me about?
23    A.  Not to my knowledge.
24    Q.  How about after you disciplined her,

Page 148

1   starting with that day, were there any disruptions,
2   what you consider to be disruptions after that?
3    A.  Yes.
4    Q.  And what were they?
5    A.  Well, the day that both Kristina and
6   Jill came back to school, their lockers were
7   decorated congratulating them, which created quite
8   a buzz and a stir in the eighth grade hallway with
9   about 20 to 30 students in a circle that had to be
10   broken up by teachers.
11    Q.  And what were they being congratulated
12   for; did they say for what?
13    A.  Yes.
14    Q.  For coming back to school or what was
15   it for?
16    A.  No.  They were being congratulated for
17   what they did to me.
18    Q.  Okay.  And did you discipline the
19   students who had done that to their lockers?
20    A.  Yes.
21    Q.  Who were the students?
22    A.  I don't recall -- yes, I do.
23    Q.  Who were they?
24    A.  Sarah Bambrick (phonetic), Kelsey -- I

Page 149

1   can't think of Kelsey's last name off the top of my
2   head.
3    Q.  Was it just two kids?
4    A.  Yes.
5    Q.  And what was their discipline?
6    A.  They were severely reprimanded and
7   their parents were called, contacted.
8    Q.  Any suspension?
9    A.  No.
10    Q.  And that was for congratulating Jill
11   for doing this MySpace page?
12    A.  Jill and Kristina.
13    Q.  Because they were congratulating both
14   of them, they were severely reprimanded and their
15   parents were called to school?
16    A.  Not to school.  They were called from
17   school.
18    Q.  You called them on the phone?
19    A.  I don't know how else you would call
20   them.
21    Q.  And that's the only discipline?
22    A.  Yes.
23    Q.  What exactly -- do you remember the
24   words that were on the lockers?

38 (Pages 146 to 149)

Page 150

1    A. No. I do not.
2    Q. Did anyone take a picture?
3    A. No.
4    Q. How did it come to your attention?
5    A. The teachers told me.
6    Q. Which teachers?
7    A. Mrs. Kerstetter and Mr. Ebling.
8    Q. And are they still employed?
9    A. Yes, they are.
10   Q. And was the stuff removed from the
11   locker?
12   A. Yes.
13   Q. Who removed it?
14   A. The teachers.
15   Q. How long was it on the lockers before
16   it was removed?
17   A. I don't know.
18   Q. Do you know whether Jill ever saw it?
19   A. Yes.
20   Q. How do you know?
21   A. They were in the middle of the huddle
22   where their lockers were.
23   Q. Were they big signs, little signs?
24   A. They were, they looked like

Page 151

1    construction paper with confetti and ribbons and
2    bows and stuff like that.
3    Q. But you don't remember the words
4    though?
5    A. Yeah; congratulations.
6    Q. Just congratulations?
7    A. Congratulations is the only one I
8    remember off the top of my head, and their names.
9    Q. Congratulations, love Sarah and Kelsey,
10   or congratulations Jill and Lehman girl?
11   A. Yes.
12   Q. Could it have been that they were
13   congratulating them for surviving their detention
14   and --
15   A. No. They didn't have detention. They
16   were suspended.
17   Q. Could it have been they were
18   congratulating them for surviving their suspension
19   then?
20       MR. RIBA: Objection.
21   A. No.
22   Q. Did you ask what the congratulations
23   were for?
24   A. Yes.

Page 152

1    Q. Who did you ask?
2    A. Both the kids.
3    Q. Which kids?
4    A. The ones who put up the signs.
5    Q. And they told you that -- tell me what
6    they told you.
7    A. They told me that -- I asked them what
8    the reason they did it was and they said they were
9    congratulating them on what they did. They didn't
10   mean to hurt me, but they didn't think it was
11   right, the fact that I suspended them.
12   Q. Okay. But the only thing that was
13   visible to the other students was congratulations
14   and the names of the girls?
15   A. I don't know what else it said.
16   Q. But that's all you saw?
17   A. Right.
18   Q. Any other post suspension disruptions?
19   A. Directly related to this?
20   Q. Well, I guess, if you can parse it that
21   way?
22   A. Nothing that I can prove.
23   Q. What are things that you suspect might
24   be related to this?

Page 153

1        MR. McGONIGLE: Can I meet with my
2    lawyer?
3        MS. KOHART: Of course.
4        (At this point, a recess was taken and
5    Mr. Riba and the witness conferred outside
6    the deposition room.)
7    BY MS. KOHART:
8    A. Some of the things that I suspected --
9    you have to remember that I was doing two jobs at
10   one time, being the Assistant Principal and the
11   Principal. What I saw, after the suspension came,
12   after the students got wind of the Court case in
13   Scranton, was that discipline in the middle school,
14   especially in the 8th grade class, deteriorated
15   severely.
16   Q. And that was the after the Court case
17   was filed?
18   A. Yes. That was after the Court case.
19   It went to -- as a matter of fact, I lost my
20   Assistant Principal -- I didn't lose him. He took
21   another job in the District. For the last 60 days
22   of the school year, I focused on saying, I'm going
23   to do both these jobs myself and bring somebody in
24   fresh and new at the end of the year. The

Page 154

1  discipline had gotten that bad that I finally went
2  to the Superintendent and the School Board and
3  said, I need help.
4      Q.  Was the lawsuit publicized in the
5  newspaper?
6      A.  Absolutely.
7      Q.  And is it your view that that sort of
8  got the students rallied against the administration
9  for some reason?
10     A.  Are you asking my opinion?
11     Q.  Yes.
12     A.  In my opinion, there's no question in
13  my mind.
14     Q.  But they were supportive of Jill and
15  felt she'd been treated unfairly or -- what did you
16  think they were thinking, what your view is?
17         MR. RIBA:  Objection.
18     A.  I don't think everybody was in favor of
19  it, especially, since somebody came and told me
20  about it.  A lot of people and a lot of parents
21  called and supported what I did and couldn't
22  believe the actions that were being taken and how
23  parents could do something like this and teach
24  their child such a lesson.

Page 155

1      Q.  But how about the kids that were being
2  disruptive, what is your view of what was going
3  through their heads?
4      A.  My view was that no matter what they
5  did, they would say, we can do what we want.  I'm
6  taking you to Court.
7      Q.  That's what you thought the kids were
8  doing?
9      A.  There's no question that's what I
10  thought they were doing.
11     Q.  Okay.  The kids thought, because of
12  their ability to file a lawsuit, they could stop
13  obeying the rules of the school?
14     A.  Yes; especially the 8th grade.
15     Q.  And they're graduated now?
16     A.  They're in 9th grade.
17     Q.  Does the high school start in 9th
18  grade?
19     A.  Yes; 9th grade.
20     Q.  They're across the green here; is that
21  right?
22     A.  Actually.  They're about four miles up
23  the road?
24     Q.  Is that the elementary school here?

Page 156

1      A.  Right.
2      Q.  Okay.  Anything else that you suspected
3  was related to the MySpace page?
4      A.  Regarding me?
5      Q.  No.  I'll talk to you about that.  I'm
6  just asking in terms of your ability to fairly
7  administer the school after the suspension?
8      A.  Just what I just testified to.
9      Q.  Nothing else?
10     A.  No.
11     Q.  Now, let's talk a little bit about the
12  -- by the way, did it come to your attention that
13  -- let me just go back one moment to the Guidance
14  Counselor that had to come in and sit with you
15  while you were disciplining Jill and the Lehman
16  child.
17         You swapped out her for your wife so
18  your wife wasn't the person witnessing the
19  discipline?
20     A.  Right.
21     Q.  Is it normally your practice to have a
22  Guidance Counselor come to your office whenever
23  discipline has to be meted out to a child?
24     A.  In this case, with no Assistant

Page 157

1  Principal, yes.
2      Q.  So otherwise it would be the Assistant
3  Principal or, in this case, he wasn't there, so
4  it's a Guidance Counselor?
5      A.  It also depends on -- every situation
6  is different, but I always have somebody else
7  present if it's a serious discipline matter.
8      Q.  And what students -- did the Guidance
9  Counselor have to change appointments in her
10  office?
11     A.  Yes.
12     Q.  What appointments were changed?
13     A.  It was 8th grade scheduling for the 9th
14  grade.
15     Q.  And was that class cancelled?
16     A.  It's not a class.
17     Q.  What is it?
18     A.  It's when students come in and meet
19  with the Guidance Counselor to go over their 8th
20  grade schedule.
21     Q.  And which students were meeting with
22  the Guidance Counselor at that time?
23     A.  I have no idea.
24     Q.  Did they tell you that they had to

1 cancel a meeting?
2   A.   I knew they had to.
3   Q.   Did they tell you?
4   A.   That day?
5   Q.   Right.
6   A.   No.
7   Q.   So they had on their calendar, how many
8 students do you think were coming in for
9 scheduling?
10   A.   During that brief amount of time, I
11 don't know, two.
12   Q.   All right. So already one of them was
13 slated to be out of the office supervising testing
14 and the other one was in the office and she had
15 probably expected to be meeting with two students
16 and she had to cancel those meetings to meet with
17 you and the children?
18   A.   No.
19   Q.   What happened?
20   A.   She had to cancel those meetings to
21 administer the makeup test and then the makeup
22 tests were over and that's when I brought
23 Mrs. Frain in and Jill apologized to her?
24   Q.   I'm sorry. I'm talking about when you

1 disciplined Jill on Thursday morning?
2   A.   Okay.
3   Q.   You had Mrs. Guers?
4   A.   Yes.
5   Q.   And Mrs. Guers was supposed to
6 administer the testing, correct, and you swapped
7 her out with your wife?
8   A.   No. She was already administering the
9 testing.
10   Q.   So you pulled her out of that?
11   A.   Yes.
12   Q.   And sent your wife in?
13   A.   Yes. The students were called down in
14 the beginning of the day.
15   Q.   Now, did your wife have to cancel
16 appointments because she needed to go supervise the
17 testing?
18   A.   Yes.
19   Q.   Which appointment did she cancel?
20   A.   Who in particular, I don't know.
21   Q.   But do you think it might have been
22 two?
23   A.   My guess would be two.
24   Q.   Now, Mrs. Guers, she had no

1 appointments on her calendar?
2   A.   No. Her job was to administer the
3 test.
4   Q.   All right. Do you know whether they
5 have records of which student meetings they
6 cancelled?
7   A.   I don't know.
8   Q.   Are the students' meetings published on
9 a written document so that you know that Jones or
10 Adams is supposed to meet with you on a certain
11 morning?
12   A.   No.
13   Q.   Is it always a one-on-one meeting?
14   A.   Is what one-on-one?
15   Q.   Do the students meet one-on-one with
16 the Guidance Counselors to discuss their schedules?
17   A.   Well, the parents come in as well.
18   Q.   What parents were at the school that
19 morning?
20   A.   There's twofold meetings. One is an
21 initial with the student to get an idea of what
22 they want to take.
23       The second one is with the parent and
24 the student to actually finalize the schedule.

1   Q.   And which meetings were cancelled that
2 morning?
3   A.   The student counselor meetings.
4   Q.   So it was just with students, no
5 parents?
6   A.   Correct.
7   Q.   And it's a one-on-one meeting, Guidance
8 Counselor and student?
9   A.   Yes.
10   Q.   How would I find out which students
11 were cancelled?
12   A.   I have no idea.
13   Q.   Do you know whether there's any records
14 in the Guidance Counselor's office that would tell
15 us that?
16   A.   I would highly doubt it.
17   Q.   Where do the students go if their
18 meeting is cancelled?
19   A.   Back to class.
20   Q.   So they're being pulled out of class to
21 meet with a Guidance Counselor for how long?
22   A.   It varies. It depends on who you have.
23   Q.   So the meetings aren't a set, like, 30
24 minutes, I have to sit with this child for 30

Page 162

1 minutes; it could a 10 minute meeting, depending on
2 the kid?
3     A. It could be from 10 to 30. Some kids
4 like to talk more than that.
5     Q. And presumably, the Guidance Counselors
6 would have records about whose meeting had to get
7 cancelled that morning?
8     A. For this year, I know they would, but I
9 don't know if they keep their logs.
10     Q. And as far as you know, nobody
11 instructed people to maintain records relating to
12 this incident, right?
13     A. No.
14     Q. How do they maintain these meetings; do
15 they have written logs in the office about who's
16 coming in when?
17     A. They have it on their calendar of who's
18 coming in. They send out passes in the morning to
19 the kids.
20     Q. So the kids, would they, for example,
21 if you're going to meet with five children and one
22 kid is only 10 minutes, would the second child then
23 be called out of class right then or does the pass
24 tell them what time to come?

Page 163

1     A. The pass.
2     Q. Was there any other disruption of
3 anyone's schedule, other than what you've told me
4 now about the Guidance Counselors?
5     A. No.
6     Q. Any other disruptions in the school,
7 other than the things we've already gone through?
8     A. No.
9     Q. By the way, did you ask the State
10 Police to place calls to the parents of the Lehmans
11 and the Snyders and have the children brought down
12 to the police barracks for an interview?
13     A. Did I ask them?
14     Q. Yes.
15     A. No. They asked me.
16     Q. What did they ask you -- who is the
17 they?
18     A. One police officer.
19     Q. What did he ask you?
20     A. Would you like for us to call them down
21 and just let them know how serious this was and
22 their parents, and I said yes.
23     Q. And you don't think they already knew
24 that?

Page 164

1     A. No.
2     Q. This was after you said, the Lehmans,
3 at least, were very remorseful; is that right?
4     A. Yes.
5     Q. But you still didn't think the
6 seriousness had been impressed upon the Lehmans?
7     A. The mother, yes. The child, no.
8     Q. And did you think the seriousness had
9 been impressed upon the Snyders?
10     A. No.
11     Q. So you wanted the State Police to make
12 sure that happened, right?
13     A. Yes.
14     Q. This was the same conversation you
15 already told me about, right; in other words, this
16 is all part of that one meeting with the State
17 Police Officer?
18     A. No.
19     Q. He didn't suggest to you that you move
20 this heavy handed?
21     A. No; not at all.
22     Q. Had you already told him -- had he
23 already told you, you know, it's going to get
24 thrown out of Court, this isn't really something

Page 165

1 you could bring criminal charges about?
2     A. I don't remember.
3     Q. Did he report back to you?
4     A. I answered that before, no. He didn't.
5     Q. Did you know he was going to do it?
6     A. I just took him at his word.
7     Q. And did you hear that he did do it?
8     A. No. Eventually, I did hear. I don't
9 remember when I heard it. It might have been
10 through depositions or through the Court case. I'm
11 not sure.
12     Q. Now, since the exposure of this MySpace
13 page, has anybody suggested to you that they think
14 that any of these allegations on here against you,
15 which you claim to be allegations against you, are
16 true; have they suggested that you ought to be
17 investigated or that anything on here is an
18 accurate statement about you?
19     A. Not to my knowledge.
20     Q. Have you had, other than the events
21 we've already discussed, have there been any
22 consequences to you as a result of this MySpace
23 page?
24     A. Define consequences.

1  Q. Well, have they started investigating
2  you under State law because there's been
3  allegations of child abuse or have you gotten any
4  discipline, administratively, from the school
5  district because of accusations that you hit
6  children or anything of that nature?
7  A. No.
8  Q. Anything else that you would call a
9  repercussion as a result of this MySpace page?
10  A. Besides from my health?
11  Q. Aside from your health, yes. We'll
12  talk about your health.
13  A. No; nothing else.
14  Q. And you say your health has suffered as
15  a result of the MySpace page?
16  A. Absolutely.
17  Q. What has happened to your health?
18  A. Sleep, lack of sleep, chest pains after
19  the Court case in Scranton.
20  Q. Anything else?
21  A. No.
22  Q. Do you know about when the web page was
23  taken down off of MySpace?
24  A. I had to take it down.

1  Q. You had to?
2  A. Yes.
3  Q. Why did you have to?
4  A. I didn't have to. I just did. After I
5  found out who did it, I called.
6  Q. And you don't know whether if you'd
7  asked Jill to take it down, that she would have
8  accommodated you?
9  A. Well, I think the damage was already
10  done.
11  Q. That wasn't my question, sir.
12  A. I took it down.
13  Q. You took it down because you took it
14  down, correct?
15  A. Correct.
16  Q. And you hadn't already asked somebody
17  else, other than MySpace, to take it off, correct?
18  A. Repeat the question, please.
19  Q. You hadn't asked Jill to take it down,
20  right?
21  A. No.
22  Q. You hadn't asked the Lehman girl to
23  take it down, right?
24  A. No.

1  Q. You just asked MySpace to take it down?
2  A. Right.
3  Q. And they said no, correct?
4  A. No. They said yes, after I had the
5  information.
6  Q. Okay. Once they had the information,
7  they took it down, at your request, even without a
8  Court Order?
9  A. The Court Order had to do with whose
10  computer it came from, not whether to take it down.
11  Q. Okay. So now that you knew the
12  computer, all you had to do was give them the
13  U-R-L, right?
14  A. Right.
15  Q. Once you had that U-R-L number, they
16  took it down?
17  A. Yes.
18  Q. When did you make that call?
19  A. It was shortly after the Snyders left
20  my office.
21  Q. Why didn't you call the previous day
22  when Brianna gave you the MySpace page?
23  A. Because I had to find out who it was
24  and if I needed a Court Order, I was going to try

1  to get one. I needed to find out whose computer it
2  came from.
3  Q. They needed a U-R-L and the identity of
4  the computer?
5  A. Yes. The U-R-L is only going to give
6  you the site. The identity of the computer has to
7  come through a Court Order.
8  Q. How did you get the identity of
9  Jill's computer?
10  A. I didn't.
11  Q. You said it was Jill Snyder's computer.
12  A. No, I didn't. I never said any of
13  that. I asked Jill if we should call MySpace, and
14  I bluffed, because I needed a Court Order, and
15  that's when she admitted to it.
16  Q. I'm sorry. You're misunderstanding.
17  You called MySpace and said, Mr. MySpace, take this
18  web page down, right?
19  A. Which day are we talking about?
20  Q. On Thursday?
21  A. Yes.
22  Q. And they accommodated you?
23  A. Yes, they did.
24  Q. And what information did you give them;

Page 170

1  you gave them the U-R-L, right?
2  A. Yes. That was it.
3  Q. On Thursday?
4  A. On Thursday.
5  Q. But you had the U-R-L the day before,
6  right?
7  A. Correct.
8  Q. Why couldn't they take it down before
9  that?
10  A. Because they needed to leave the page
11  up there in case I got the Court Order to trace
12  back which computer it came from.
13  Q. I see. You didn't want them to take it
14  down?
15  A. Not at that time because I needed to
16  find out who did it.
17  Q. Now, I understand.
18  So the next day you said, go ahead,
19  take it down, I found the culprit?
20  A. Yes.
21  Q. And was it taken down promptly?
22  A. Yes.
23  Q. How do you know that?
24  A. I checked.

Page 171

1  Q. How long after your call did you check?
2  A. How long it would take me to log on,
3  maybe a minute.
4  Q. And it was already gone?
5  A. Yes.
6  MS. KOHART: I think I have nothing
7  further.
8  - - -
9  EXAMINATION
10  - - -
11  BY MR. RIBA:
12  Q. Jim, Counsel, during her questioning of
13  you, made a statement that she was concerned
14  because Jill received the same 10 day suspension as
15  a quote, "knife wielding kid", end quote.
16  My first question is, was there ever a
17  knife wielding kid in Blue Mountain School
18  District?
19  A. Define wielding?
20  Q. I don't know, a kid with a knife
21  attacking someone.
22  A. No. In Blue Mountain School District,
23  I can't answer that question. In Blue Mountain
24  Middle School, there has not been.

Page 172

1  Q. There's never been a kid wielding a
2  knife at someone?
3  A. No.
4  Q. So, in essence, there's never been a 10
5  day suspension for a kid wielding a knife in Blue
6  Mountain Middle School?
7  A. That's correct.
8  Q. The suspension for the knife was merely
9  possession of the knife; is that correct?
10  A. Yes.
11  Q. The 10 day suspension?
12  A. Yes.
13  Q. So a kid brought a knife to school,
14  didn't harm anybody, maybe he never brought it out
15  of his bag, you found out about it and he gets a 10
16  day suspension; is that correct?
17  A. Yes.
18  Q. He never uses it on anybody and he
19  still gets the 10 day suspension?
20  A. Correct.
21  Q. How about the alcohol, is the 10 day
22  suspension merely for possession in the cases that
23  you talked about?
24  A. Yes.

Page 173

1  Q. Didn't consume it on the school
2  property, just had it present and you found out
3  about it and the kid got a 10 day suspension?
4  A. Yes.
5  Q. Did it harm anybody else?
6  A. No.
7  Q. He just had it?
8  A. Yes.
9  Q. It didn't invade someone's privacy?
10  A. Yes. It did not.
11  Q. Counsel, during her questioning, had a
12  concern about you being a Judge and Jury in this
13  case and you had testified that, in fact, there's
14  two Judges above you, two appeal Judges; is that
15  correct?
16  A. Yes.
17  Q. There's a Superintendent, who's the
18  appeal Judge, and then there's the Board, who's the
19  appeal Judge; isn't that correct?
20  A. Yes.
21  Q. And, in fact, you were here during
22  Mrs. Snyder's deposition; were you not?
23  A. Yes, I was.
24  Q. And do you recall her testifying that

44 (Pages 170 to 173)

Page 174

1  she, in fact, appealed your sentence to Dr.
2  Romberger and Dr. Romberger indicated that she was
3  standing by your suspension?
4     A.  Yes.
5        Q.  Counsel, during her questioning, made a
6  point to say that she was concerned about how angry
7  you were and the fact that you might pursue a civil
8  case against the Snyders and the Lehmans; do you
9  recall that?
10    A.  Yes.
11       Q.  Jim, did your anger play any role in
12 the suspension that you handed down to the Snyders
13 and Lehmans?
14    A.  No.
15       Q.  You got the approval of your
16 Superintendent for the 10 day suspension?
17    A.  Yes.
18       Q.  The kids admitted they did this, didn't
19 they, that they created the website?
20    A.  Yes.
21       Q.  And you were here for Jill Snyder's
22 deposition?
23    A.  Yes.
24       Q.  And you were here when she admitted,

Page 175

1  under oath, that she knew what she was putting on
2  there about you was not true?
3     A.  Yes.
4        Q.  You were here when she admitted that
5  the information contained on this website was false
6  about you?
7     A.  Yes.
8        Q.  And you testified as to what you
9  believe were accusations made about you?
10    A.  Yes.
11       Q.  How many years have you been an
12 Administrator, Jim?
13    A.  Exact days or roughly?
14       Q.  Just years.
15    A.  Ten.
16       Q.  How long have you been Principal here
17 at the middle school?
18    A.  Acting or Principal.
19    Q.  Just combined.
20    A.  Combined, five years.
21       Q.  Do you feel that -- well, the timeline
22 we went through with Counsel indicated that action
23 was a taken within two or three days of the
24 creation of the website, correct?

Page 176

1     A.  Yes.
2        Q.  And you were here when both Kristina
3  and Jill testified that both of them told other
4  students at school about the creation of the
5  website?
6     A.  Yes.
7        Q.  And you were here when both of them
8  testified that students came up to them to talk
9  about the website, correct?
10    A.  Yes.
11       Q.  Now, in your opinion, as the
12 Administrator of this school for, approximately,
13 five years, do you feel that the proactive action
14 that you took served to prevent more disruptions
15 than what you testified to in response to
16 Plaintiff's questioning?
17       MS. KOHART:  Objection to form, but you
18 can answer.
19    A.  Yes.
20    Q.  Why so?
21    A.  Repeat the question.
22    Q.  Sure.  Why do you believe that the
23 actions you took in suspending Jill and calling
24 MySpace and taking the account down and suspending

Page 177

1  her within a few days of the creation of the
2  website, why, in your professional opinion, did
3  that serve to limit future disruptions in the
4  school?
5     A.  If they would have been able to get
6  away with it with me, they could have done it to
7  any teacher, any Administrator in the district
8  causing further disruption in the school day.
9        Q.  And you were here when the kids were
10 talking about the buzz in the school about the
11 website?
12    A.  Yes.
13       Q.  How has this -- you briefly mentioned
14 about your health.  How has this -- Counselor asked
15 you one quick question -- how has this affected
16 your health?
17    A.  It's always in the back of my mind.
18 Sleep has been a problem ever since March 28th,
19 whenever the Court case was, and it's not going
20 away.
21       Q.  How about when you first saw this
22 website, it must not have made you feel pretty
23 good?
24    A.  No.  I was more upset for my family

45 (Pages 174 to 177)

Page 178

1 than I was for myself. As a Principal, you don't
2 make it until you get your name on the bathroom
3 wall. I'm used to things like that. My family's
4 not.
5 MR. RIBA: That's all the questions I
6 have.
7 MS. KOHART: I have nothing further.
8 (The deposition concluded at 1:49 p.m.)
9 * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 179

1 CERTIFICATE OF DEPONENT
2
3
4 I, JAMES J. McGONIGLE, have read the
5 foregoing transcript of my testimony taken on
6 October 12, 2007, contained within pages 1 to 178,
7 and it is true, correct and complete to the best of
8 my knowledge, recollection and belief, except for
9 the list of corrections, if any, attached on a
10 separate sheet herewith.
11
12
13 _____
14 DATE          JAMES J. McGONIGLE
15
16
17
18
19
20
21
22
23
24

Page 180

1 ERRATA SHEET
2 Page  Line     Correction
3 ___  ___   _____
4 ___  ___   _____
5 ___  ___   _____
6 ___  ___   _____
7 ___  ___   _____
8 ___  ___   _____
9 ___  ___   _____
10 ___  ___   _____
11 ___  ___   _____
12 ___  ___   _____
13 ___  ___   _____
14 ___  ___   _____
15 ___  ___   _____
16 ___  ___   _____
17 ___  ___   _____
18 ___  ___   _____
19 ___  ___   _____
20 ___  ___   _____
21 ___  ___   _____
22 ___  ___   _____
23 ___  ___   _____
24 ___  ___   _____

Page 181

1 C E R T I F I C A T I O N
2
3 I HEREBY CERTIFY that I am a Court
4 Reporter and Notary Public.
5 I FURTHER CERTIFY that the witness was
6 sworn to testify to the truth.
7 I FURTHER CERTIFY that the foregoing
8 is, to the best of my ability, a true and accurate
9 transcript of the testimony taken stenographically
10 by me at the time, place and date hereinbefore set
11 forth.
12 I FURTHER CERTIFY that I am neither a
13 relative, employee, attorney nor counsel to any of
14 the parties to the action, and that I am neither a
15 relative nor employee of such attorney or counsel
16 and that I am not financially interested in the
17 action.
18
19 _____
20 LYNN GREENE
21
22 (The foregoing certification of this transcript
   does not apply to any production of the same by any
23 means, unless under the direction, control and/or
24 supervision of the certifying reporter.)

46 (Pages 178 to 181)