## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

J.S., et al.                                    )
                                                )
v.                                              )  No: 3:07-cv-585
                                                )
BLUE MOUNTAIN SCHOOL                            )
DISTRICT, et al.,                               )
                                                )  **ELECTRONICALLY FILED**
_____                 )

## EXHIBIT LIST TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Exhibit A – Plaintiffs Statement of Undisputed Facts

Exhibit B – Deposition Transcript of J.S.

Exhibit C – Deposition Transcript of James S. McGonigle

Exhibit D – Deposition Transcript of Timothy Nunemacher

Exhibit E – Deposition Transcript of Angela Werner

Exhibit F – MySpace Profile

Exhibit G – Deposition Transcript of Joyce E. Romberger

Exhibit H – Correspondence dated March 23,2007 from Defendant McGonigle to
            Plaintiffs Terry and Steven Snyder regarding discipline of J.S.


Exhibit I – Disciplinary Notice

Exhibit J – Blue Mountain School District Student-Parent Handbook

Exhibit K – AUP Policy

Exhibit L – Deposition Transcript of Susan Schneider-Morgan

Exhibit M – Deposition Transcript of Terry Snyder

Exhibit N – Deposition Transcript of Steven Snyder


Respectfully submitted,

Dated:     December 10, 2007.    */s/ Meredith W. Nissen*
Mary Catherine Roper (ID No. 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215-592-1513 ext. 116
(F) 215-592-1343
mroper@aclupa.org

Mary E. Kohart (I.D. No. 37191)
Meredith W. Nissen  (I.D. No. 93504)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

Deborah Gordon (I.D. No. 95071)
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA  19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs

## CERTIFICATION OF SERVICE

I, Meredith W. Nissen, hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:     December 10, 2007.     */s/ Meredith W. Nissen*
Meredith W. Nissen

**EXHIBIT D**

# IN THE UNITED STATES COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

J.S., a minor, by and through her   :    CIVIL ACTION NO.: 07-CV-585
parents, TERRY SNYDER and
STEVEN SNYDER, individually   :
and on behalf of their daughter,

           :

         Plaintiff

           :

       vs.
BLUE MOUNTAIN SCHOOL   :    JUDGE:   JAMES M. MUNLEY
DISTRICT; DR. JOYCE E.
ROMBERGER, Superintendent,   :
Blue Mountain School District;
and JAMES S. McGONIGLE,   :
Principal, Blue Mountain School
District, both in their official and   :
individual capacities,

           :

         Defendant

           :

## ORAL DEPOSITION OF RANDALL TIMOTHY NUNEMACHER

Taken at Blue Mountain School District, 685 Red Dale Road,

Orwigsburg, Pennsylvania on October 17, 2007, before Lillian M. Freiler,

Registered Merit Reporter.

**LILLIAN FREILER COURT REPORTING**
**1733 Breckenridge Road**
**Orwigsburg, PA 17961**
**570.366.3804**
**FAX 570.366.0380**
**CrtRptr@aol.com**

 COPY

**APPEARANCES:**

                    Meredith W. Nissen, Esquire
                    **DRINKER BIDDLE & REATH, LLP**
                    18th and Cherry Streets
                    One Logan Square
                    Philadelphia, PA  19103
               For the Plaintiff


                    Jonathan P. Riba
                    **Sweet, Stevens, Katz & Williams, LLP**
                    331 East Butler Avenue
                    P.O. Box 5069
                    New Britain, PA  18901
               For the Defendants


Also present:  Thomas J. Nickels, Esquire
               James McGonigle
               Dr. Joyce Romberger

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| Randall Nunemacher | Ms. Nissen | 4 |
| | Mr. Riba | 29 |
| | Ms. Nissen | 31 |

E X H I B I T S

(None marked)

1          (It was stipulated and agreed by and between

2     counsel for all parties that all objections except

3     to the form of the question shall be waived until

4     the time of trial and that the reading, signing,

5     sealing and inspection of the deposition to be

6     taken shall be waived until the time of trial.)

7

8     **RANDALL TIMOTHY NUNEMACHER**, called as a witness,

9     was duly sworn and testified as follows:

10                    **EXAMINATION**

11    **BY MS. NISSEN:**

12         Q.   Good afternoon, Mr. Nunemacher.

13         A.   Yes.

14         Q.   My name is Meredith Nissen.  I'm one of the

15    attorneys representing the plaintiffs in this

16    matter.  I just wanted to go over first a few, just

17    sort of ground rules for the deposition.

18              Have you ever been deposed before?

19         A.   No.

20         Q.   You were just sworn in, and as you know,

21    your testimony is under oath which has the same

22    force and effect of testifying as in a court of

23    law.  Do you understand that?

24         A.   Yes.

25         Q.   Just to help the court reporter out, I just

1   ask that only one of us speak at a time and that

2   when you answer a question to answer orally and

3   don't use gestures or say uh-huh.  Do you

4   understand?

5       A.   Yes.

6       Q.   If you don't understand a question that I'm

7   asking you, just let me know and I will try and

8   clarify or rephrase that.  Is that all right?

9       A.   Yes.

10      Q.   And if you want to take a break at any

11  time, just let me know.  The only thing that I

12  would ask is that if I have already posed a

13  question to you that you'd answer the question

14  first.  Is that all right?

15      A.   I understand.

16      Q.   Okay.  And is there anything that would

17  impair your ability to testify truthfully here

18  today?

19      A.   No.

20      Q.   Could you please state your full name for

21  the record?

22      A.   Randall Timothy Nunemacher.

23      Q.   Mr. Nunemacher, could you explain your

24  educational background after high school, please.

25      A.   I went to King's College in Wilkes-Barre.

1    I was a major in mathematics with a secondary

2    education certificate.

3       Q.   Great.  After you graduated from college,

4    could you go through just briefly your employment

5    history with sort of approximate dates of your

6    employment?

7       A.   I did a substitute teaching at Tamaqua in

8    Spring of 2002.  From 2002 to 2003, I worked at

9    Exeter school district, and from 2003 until now

10    I've worked at Blue Mountain school district.

11       Q.   And what do you do at Blue Mountain school

12    district?

13       A.   I'm a math teacher.

14       Q.   And what types of math do you teach?

15       A.   I teach algebra I, algebra II, 8th-grade

16    math/algebra I and 6th and 7th-grade math.

17       Q.   How many classes do you teach in a day, and

18    if it varies for the particular day --

19       A.   I teach six.

20       Q.   That sounds like one of each that you just

21    described?

22       A.   No that's incorrect.  For this year I teach

23    two honors algebra I, one basic algebra I and then

24    a 6, 7 and honors algebra II.

25       Q.   And at the middle school is that grades 6,

1    7 and 8?

2        A.    Yes.

3        Q.    And do you teach all grades?

4        A.    Currently, yes.

5        Q.    Are you the only math teacher here?

6        A.    No.

7        Q.    How many other math teachers are there?

8        A.    I couldn't tell you exactly.

9        Q.    Okay.  More than five?

10       A.    Yes.

11       Q.    Is J.S. one of your students?

12       A.    She was a student I had previously.

13       Q.    When did you have her?

14       A.    When she was in 7th grade.

15       Q.    And what class was that?  Do you remember?

16       A.    Seventh-grade math.

17       Q.    Now, how is your classroom set up.  Do you

18   have everybody sits at an individual desk or

19   tables, people sit at groups?  How is it set up?

20               MR. RIBA:  Now or back when the

21           incident back?

22       Q.    I'm ask back when the incident happened?

23       A.    Individual desks.

24       Q.    Is that the way it's set up right now?

25       A.    Yes.

1    Q.   How many students, approximately, are in

2  your class at one time?

3    A.   It varies.

4    Q.   Could you give me sort of a rough

5  approximation of how it varies?  Is it huge

6  variation?

7    A.   I have from seven students to about 28 to

8  30.

9    Q.   Do you know -- let's talk about the time

10  period when the incident happened.  During that

11  time period, do you know approximately how many

12  students you were teaching overall?

13    A.   I cannot recall exactly how many students.

14    Q.   Is it more than a hundred?

15    A.   Yes.

16    Q.   More than two hundred?

17    A.   No.

18    Q.   Going back to the incident, I'm going to

19  ask you more specific questions about that later,

20  how many students were -- well, sorry, let me back

21  up.  I'll get to that later.

22       When did you first learn of the MySpace

23  profile of Mr. McGonigle?

24    A.   I first learned exactly of the MySpace

25  profile the day after that.  Well, excuse me, it's

1    the day that she was suspended. It was the day

2    after that -- how can I say this? It was the day

3    after the kids were really talking about it that I

4    understood exactly what it was.

5        Q.   All right. Now, you said the day that "the

6    kids were really talking about it." Could you

7    explain what you mean by that?

8        A.   The day she was suspended was when the

9    incident happened. I didn't fully understand what

10   was the problem, what happened. And that -- you

11   asked -- the question you asked me is when I

12   understood the MySpace profile. I understood

13   exactly what was going on the day after that.

14       Q.   I see. Okay.

15           Now you said -- you referred to "the

16   incident." Could you explain what you mean by

17   that?

18       A.   It was when some kids in my room were being

19   disruptive about the whole situation.

20       Q.   What day was that?

21       A.   That was the day she was suspended.

22       Q.   And what class was that?

23       A.   It was second period. It was what we call

24   eighth-grade math algebra I.

25       Q.   Was that the class that J. Was a student

1   in?

2       A.   No.

3       Q.   How many students are in that class?

4       A.   I can't tell you exactly because there

5   was -- there may have been students absent, but I

6   would say it was less than twenty.

7       Q.   All right. For this particular -- well,

8   starting in general, do you prepare a lesson plan

9   in advance for each class?

10       A.   We have to have a lesson plan the week

11   before given to the office.

12       Q.   And so you turn in your lesson plan for all

13   the classes that you teach the week before?

14       A.   Yes.

15       Q.   Generally speaking, is there a particular

16   format you generally follow when you teach math

17   classes?

18       A.   Yes.

19       Q.   What is the format?

20       A.   I usually give notes and then I will let

21   them do work in class, class work, and then I give

22   homework, and I usually give them time in class to

23   do that. And I go around and I help them and I ask

24   them if they have questions.

25       Q.   Does the sequence of events, does that

1    happen in the same sequence pretty much each time

2    you teach the class? I mean, like, do you do notes

3    first, then -- I forgot what else you said but is

4    there like the same sequence?

5        A.    If I am doing notes that day, yes.

6        Q.    But if you're not doing notes that day?

7        A.    We'll do class work problems together.

8    We'll go over problems on the board and then we'll

9    do homework.

10       Q.    Turning back to the incident the day that

11   J. was suspended, that class, that second period

12   that we were talking about, describe for me what

13   you characterize as the disruption.  What happened?

14       A.    There were a couple of kids -- I can't give

15   you an exact number -- that decided they were going

16   to start talking about it and I asked them to stop

17   and they continued through multiple times of asking

18   them to stop.

19       Q.    Okay.  Going back to the first part, you

20   said they were talking about it.  What do you

21   remember that they were talking about?

22       A.    I can remember them specifically saying,

23   "Mr. McGonigle got what he deserved."  "It's what

24   he deserved to get."  "He can't do anything about

25   it, no one cares."  Things of that nature.

1     Q.  At what point in the class did you first

2  notice this talking?

3     A.  I would say it was during the classroom

4  work time.

5     Q.  And remind me again where that falls into

6  the --

7     A.  After the notes.

8     Q.  So how long is each period?

9     A.  I believe they're 41 minutes.  I'm not

10  exact on that, 43, it's 43.

11     Q.  And how long do you typically spend on

12  notes, approximately?

13     A.  It can't be typical because some days I

14  spend half hour; other days I spend the whole

15  period; some days I spend 15, 20 minutes.

16     Q.  On that particular day, do you remember how

17  far you were into the class?

18     A.  I would say I was about -- it was about 25

19  after, around.

20     Q.  Now, during this classroom work phase of

21  the class, what is happening?

22     A.  I give the students problems and I help

23  them with them.  Some students will come to my desk

24  and then I'll walk around and help other students.

25     Q.  So you give them problems and then they're

1  supposed to be working on them?

2     A.   Yes.

3     Q.   And how long do you normally spend on that

4  if you can say?

5     A.   I can't say because it depends on the

6  students.  I try to vary what the students need.

7     Q.   Do you remember sort of how long you were

8  spending on it that day?

9     A.   No.

10    Q.   So after you heard them say, "Mr. McGonigle

11 got what he deserved," what did you do?

12    A.   I asked them to stop and they continued.

13 They thought they were going to talk about it for

14 the rest of the period from the way they came

15 across to me, they were, "you can't do anything

16 about it," things of that nature.

17    Q.   Okay.  Now when you say, "you asked them to

18 stop," did you mean -- what were your words?

19    A.   I was nice the first two or three times.

20 Then, I became forceful by raising my voice the

21 last time in which finally got them to stop.

22    Q.   So the first time you just asked them to

23 stop.  And did they stop for a period of time?

24    A.   No, they just kept going.

25    Q.   And then how long after the first time you

14

1   asked them to stop did you --

2       A.   Pretty much immediately.

3       Q.   Immediately?

4       A.   Yeah.

5       Q.   And what did you say the second time?

6       A.   I was still very nice about it.  I said,

7   "Guys, we need to get back to work.  We need to be

8   working on the problems that I assigned."

9       Q.   What happened after that?

10      A.   They continued and I finally said, I raised

11  my voice and said, "We need to get back to work

12  right now."

13      Q.   And what did they do after that?

14      A.   They got back to work once I raised my

15  voice.

16      Q.   How much time do you think elapsed from

17  when you first told them to stop until the last

18  time you told them to stop?

19      A.   I would say five, six minutes.

20      Q.   What happened in the class after that?

21      A.   They got back to work.

22      Q.   And so you finished up the classroom work

23  and then was there another phase of the class?

24      A.   I cannot recall if I assigned homework that

25  day or not.

1     Q.   Do you remember what students were involved

2  in the chatter?

3     A.   No.

4     Q.   Do you remember if there was a particular

5  student that sort of started things?

6     A.   No.

7     Q.   Do you have any idea why this class was

8  especially bad that day?

9     A.   I don't see any reason why they were.  I

10  think it was just because it was early in the day.

11     Q.   Have you had to quiet down talking like you

12  did in this case other times previously or

13  afterwards in this second period algebra class,

14  eighth-grade algebra?

15     A.   Yes.

16     Q.   Is it something -- how often would you say

17  you have to do it?

18     A.   Not often.

19     Q.   Daily?

20     A.   No.

21     Q.   Couple times a week?

22     A.   No.

23     Q.   Once a week?

24     A.   Yeah.

25     Q.   Is there a particular -- I mean, if you

1  know, is there a particular reason they usually

2  start talking?  Do you find a pattern with these

3  types of things?

4      A.   No.

5      Q.   Is it normally the same group of people?

6      A.   No, it varies.

7      Q.   Going back to this particular day, how many

8  kids would you say were talking?

9      A.   I would say six or seven.

10     Q.   Were they sitting next to each other?

11     A.   They were separated across the room.

12     Q.   And when you say "separated across the

13  room," like, could you maybe explain that more?

14  Were they in the back, just really spread out, how

15  was it?

16     A.   Well, I have five rows of desks so they

17  would not have been necessarily right next to each

18  other and they all would have been towards the

19  front.

20     Q.   Besides the second period class that day,

21  were there any other disruptions in any of your

22  classes relating to the MySpace profile of

23  Mr. McGonigle?

24     A.   Could you rephrase that to that day or any

25  previous days?

1    Q.   Well, let's first start with that day.

2    A.   I don't remember any that day.

3    Q.   How about previous days?

4    A.   Yeah.

5    Q.   When?

6    A.   The day before and sixth period.  And I

7    can't remember the student's name specifically, but

8    I heard a student say, "I wonder if we'll get in

9    trouble for being part of" -- I guess, it's friends

10   on the website.

11   Q.   How many students did you hear talking

12   about this?

13   A.   I know there was at least two of them.

14   Q.   Do you know who they were?

15   A.   No.

16   Q.   What class was this?

17   A.   Sixth period college prep.

18   Q.   And what does college prep mean?

19   A.   It's college prep algebra I.  It's a level

20   of our algebra I.

21   Q.   How long were they talking about it?

22   A.   I would say a minute or two.

23   Q.   Did you ask them to stop?

24   A.   Yeah.

25   Q.   Did they stop?

1   A.   Yes.

2   Q.   Where -- in what part of the class did it

3   happen in?  What sequence in the class?

4   A.   Early in the class.

5   Q.   Was this during the notes period?

6   A.   I don't recall.

7   Q.   And these are eighth graders?

8   A.   Yes.

9   Q.   Is J.S. in this -- was she in this class?

10  A.   No.

11  Q.   And how many students are in this class?

12  A.   This was in the mid to upper 20s.

13  Q.   All right.

14       Now besides those two instances that you

15  described for me, can you think of any other

16  discussion relating to or disruptions relating to

17  the MySpace profile?

18  A.   The best way I can put it I heard rumblings

19  but I didn't fully understand what they meant.

20  They were in my class but usually generally when I

21  tell kids to move on, they move on.

22  Q.   Okay.  Can you pinpoint any specific

23  rumblings?

24  A.   Not pinpoint.  I could say there were kids

25  talking about it -- talking about a website in

1    other classes.  I did not fully understand what

2    they meant.  I heard them talk about it but didn't

3    fully understand that -- what website they were

4    talking about.

5        Q.   Okay.  So you think it was related to

6    Mr. -- the profile of Mr. McGonigle?

7        A.   I believe so.

8        Q.   But you don't really know whether or not it

9    was?

10       A.   I cannot be specific about that.

11       Q.   Can you think of any other times where you

12   believe there were disruptions in your class?

13       A.   No, not specifically.

14       Q.   Are you aware of any other teachers having

15   disruptions in their class relating to the MySpace

16   profile of Mr. McGonigle?

17       A.   No, I did not ask.

18       Q.   Did you tell anybody about the -- well, let

19   me start -- did you tell anybody about the

20   disruption with your second period class that we

21   first discussed?

22       A.   Mr. McGonigle.

23       Q.   What did you tell him?

24       A.   I just told him what happened in class.

25       Q.   When did you tell this to him?

1    A.    Later in the day.

2    Q.    And that was the same day that J. was

3    suspended?

4    A.    Yes.

5    Q.    Later in the day was it in between classes

6    or after classes?

7    A.    I can't be specific.

8    Q.    You just don't remember?

9    A.    No, I know I talked to him but I cannot be

10   specific about the time.

11   Q.    Do you remember what you said in the

12   conversation, what happened in the conversation?

13   A.    I just explained to him like I did to you

14   what happened in the class.

15   Q.    What did he say to you?

16   A.    He said okay.

17   Q.    All right.  Did he say he was going to do

18   anything or?

19   A.    I cannot recall.

20   Q.    Besides that one conversation with -- okay.

21   So did you tell Mr. McGonigle about the incident in

22   the 6th period class?

23   A.    No.

24   Q.    Did you tell anybody else about any of the

25   disruptions in your class?

1      A.   No.

2      Q.   When you are conducting a class and you

3  experience some sort of disruption, what do you

4  normally do to stop it?

5      A.   I just ask them to do their work and if I

6  have to I will raise my voice.

7      Q.   Have there been times when -- setting aside

8  the three specific times we're talking about, have

9  there been other times where that hasn't worked for

10  you?

11     A.   No.

12     Q.   So that's the only way you have ever sort

13  of managed disruptions in your class?

14     A.   With me managing them, yes.

15     Q.   And you mean -- I guess I didn't understand

16  when you say when you were managing them.  Has

17  somebody else been in your class and managed a

18  disruption?

19     A.   Can you be more specific?

20     Q.   I'm just getting a sense of how you would

21  handle disruptions in your classroom.  Would you do

22  anything else besides telling them to stop or

23  raising your voice and telling them to stop?

24     A.   I could -- I have used a principal as a

25  resource before.

1     Q.  And what do you mean by using him as a

2  resource?

3     A.  Well, if I'm having a disruption, I can

4  send the student to the principal or I can call the

5  principal down to my room.

6     Q.  Have you ever called the principal down to

7  your room?

8     A.  Yes.

9     Q.  How frequently have you done that?

10    A.  I would say about two times ever.

11    Q.  And what happened?  Just generally what

12  does he do when he came to your classroom?

13    A.  I would have him take the student with him.

14    Q.  And how many times have you ever sent a

15  student to the principal?

16    A.  I can't be certain.

17    Q.  Is it something that you have done

18  frequently?

19    A.  Very infrequently.

20    Q.  Very infrequently.  More than five times?

21    A.  Can you be more specific as, do you mean

22  over my entire teaching career or in one year?

23    Q.  Well, let's -- ever since you worked at

24  Blue Mountain School District, more than ten times?

25    A.  Less than ten, I would say.

1    Q.   Less than ten?

2    A.   Yeah.

3    Q.   Now you said initially that you became

4    aware of the MySpace profile of Mr. McGonigle the

5    day after?

6    A.   To be more specific, I became aware of what

7    it was the day after.

8    Q.   Can you explain the circumstances of that?

9    A.   I just heard the rumblings in the hallway

10   from students that it was a MySpace profile

11   exactly.

12   Q.   Did you talk to anybody else specifically

13   about the MySpace profile?

14   A.   No.

15   Q.   Have you ever seen the MySpace profile?

16   A.   Not entirely.  I haven't actually seen it.

17   I could tell you parts of what is on it.

18   Q.   Did -- during the second period class, did

19   the students have a copy of the MySpace profile?

20   A.   Not that I recall.

21   Q.   During the sixth period class, which was

22   the next day --

23   A.   The previous day.

24        MR. RIBA:  Let her finish asking her

25        question.

1    Q.   Right, it was -- sorry, let me just

2    clarify:  Was the sixth period class the same day

3    as the second period class?

4    A.   No.

5    Q.   It was the day before?

6    A.   Yes.

7    Q.   During the sixth period class, did you see

8    the students having a copy of the MySpace profile?

9    A.   No.

10   Q.   And in any other situations where you heard

11   rumblings, did you see the students with --

12   A.   No.

13   Q.   Did you have any -- once you became aware

14   of what the MySpace profile of Mr. McGonigle was,

15   did you have any conversations with people about

16   that?

17   A.   No.

18   Q.   No.  Were you aware that J.S. was suspended

19   for posting the MySpace profile?

20   A.   Can you be more specific about when?

21   Q.   Well, I guess first I was asking were you

22   aware that she was suspended for doing that?

23   A.   I was aware she was suspended, yes.

24   Q.   When did you first become aware of that?

25   A.   I believe it was the day she was suspended

1    because I had her for homeroom.

2        Q.   Did you have her in your homeroom class

3    that day?  Was she suspended --

4        A.   I cannot recall.

5        Q.   You don't remember.  Okay.

6             How did you become aware that she was

7    suspended?

8        A.   I can't recall exactly how I became aware

9    she was suspended.

10       Q.   And she was a student in one of your

11   classes during that?

12       A.   She was in my homeroom, not in my math

13   classes.

14       Q.   Okay, okay.  What do you do in homeroom, do

15   you give out homework in homeroom?

16       A.   No.

17       Q.   I wanted to find out.

18            Were you told as her homeroom teacher that

19   she was suspended?

20       A.   Yes.

21       Q.   Do you remember who told you?

22       A.   No.

23       Q.   Did you have any conversations with anybody

24   about Jill's suspension?

25       A.   I just asked if it was true that she was

1    suspended.

2        Q.   Who did you ask?

3        A.   I believe it was the office.

4        Q.   Do you remember who you talked to in the

5    office?

6        A.   No.

7        Q.   Do you remember any more details about that

8    conversation?

9        A.   No.

10       Q.   So you asked, "is it true that she was

11   suspended"?

12       A.   Yeah, there were kids saying it in the

13   hallway and I called the office to ask.

14       Q.   So you called on the phone?

15       A.   Yeah.

16       Q.   Do you remember what they said back to you?

17       A.   No.

18       Q.   Do you remember if they said she was

19   suspended?

20       A.   I believe.

21       Q.   But you don't remember anything else?

22       A.   I don't remember the exact conversation,

23   no.

24       Q.   Did you have any involvement with the

25   decision to suspend J.S.?

1    A.   No.

2    Q.   I just have a few more questions for you.

3        Going first to the second period class that

4 we were talking about, you said that you heard the

5 students saying something along the lines of

6 Mr. McGonigle got what he deserved?

7    A.   Yes.

8    Q.   Do you remember anything else that they

9 said?

10    A.   Not specifically.

11    Q.   Do you remember any specific references to

12 the content of the MySpace profile?

13    A.   Not in that class.

14    Q.   Going to the sixth period class, you said

15 that you heard the kids saying, "I wonder if you

16 get in trouble for being friends on the website"?

17    A.   Yes.

18    Q.   Anything else you remember them saying?

19    A.   Not specifically.

20    Q.   And do you remember any specific comments

21 regarding the MySpace profile about Mr. McGonigle?

22    A.   No.

23    Q.   And finally, you said there were some

24 rumblings about websites and you don't remember.

25 Do you remember anything specific about the MySpace

1   profile of Mr. McGonigle in those rumblings.

2      A.   No, nothing specific.

3      Q.   Okay.  And am I understanding it correctly

4   that it wasn't until after the disruption happened

5   that you actually learned of the MySpace profile of

6   Mr. McGonigle?

7      A.   I would say I was not fully aware of what

8   it was.

9      Q.   You were not, okay.  So you didn't know

10   until afterwards that there was a MySpace profile

11   about Mr. McGonigle?

12      A.   No, I did not know exactly what the

13   website was.  I knew there was something about

14   Mr. McGonigle.  I didn't know exactly what it was.

15      Q.   Okay.  In any of these instances, did you

16   hear them talk about J.S.?

17      A.   Yes.

18      Q.   When did you hear that?

19      A.   In the second period class.

20      Q.   Could you explain how you heard them talk

21   about her?

22      A.   They just said that she was suspended for a

23   website.

24      Q.   And this was during the same conversation

25   of "Mr. McGonigle got what he deserved"?

1     A.   Yes.

2     Q.   So do you remember any other things that

3  they said?

4     A.   Actually, yes, I do.  I remember them

5  saying something about his kids and wife being on

6  there.

7     Q.   Do you remember anything more specific than

8  that?

9     A.   No, I'm sorry, I don't.

10     Q.   So you heard the second period class, you

11  heard them talking about J.S. being suspended for

12  website?

13     A.   Yes.

14     Q.   And you heard them say something about

15  Mr. McGonigle's kids and wife?

16     A.   Yes.

17         MS. NISSEN:  That's all I have.

18         MR. RIBA:  I have a couple

19     clarifications.

20                **EXAMINATION**

21  BY MR. RIBA:

22     Q.   Now, you testified that during the second

23  period math class you observed about six or seven

24  kids talking about this, right?

25     A.   Yes.

1     Q.  Now, those six or seven kids did not

2  include either J.S. or Christina Lehman; is that

3  correct?

4     A.  No.

5     Q.  These were -- were these her friends could

6  you tell or do you know?

7     A.  I do not know.

8     Q.  You testified, Randy, that you overheard

9  kids talking about Mr. McGonigle got what he

10  deserved and they thought -- and you testified that

11  the kids thought they were continuing to discuss

12  this throughout the class.  And you also said at

13  the end of your statement that they thought

14  nothing -- he couldn't do anything to them; is that

15  correct?

16     A.  They said nothing -- that Mr. McGonigle

17  couldn't do anything to J., that he had no right to

18  do anything.

19     Q.  And did you interpret that to mean he could

20  not impose discipline on her?

21     A.  Yes.

22     Q.  And do you have a reason as to why they

23  thought that?

24     A.  No.

25           MS. NISSEN:  Objection.

1   MR. RIBA:  That's all questions I
2      have.
3      MS. NISSEN:  I just have a few more
4      follow-up questions.
5                    **EXAMINATION**
6   **BY MS. NISSEN:**
7      Q.   Starting in the second period class, do you
8   have a student name Breanna in your class?
9      A.   I cannot recall the exact names of all the
10  students in my classes.
11     Q.   Can you remember specifically -- okay.  So
12  you can't remember specifically if there was a
13  student named Breanna as part of who was talking?
14     A.   No.
15     Q.   I'll ask the same question again for the
16  sixth period class.  Do you know if there's a
17  student named Breanna in your sixth period class.
18     A.   No.
19     Q.   You don't know.  Okay.  Do you know
20  generally if --
21          Do you want to take a break?
22     A.   Yeah, for a second.
23          MR. RIBA:  Do you have a question?
24          THE WITNESS:  Yeah.
25          (Off the record.)

1           (At this time, the witness and Mr.

2       Riba left the room.)

3           (Resumed on the record.)

4           MR. RIBA:  Randy would like to

5       supplement one of his prior answers about

6       whether Breanna was in one of his classes,

7       in the class, in the second period math

8       class.

9    A.   I'm not sure how I can say this.  I believe

10  the person you are asking me about is definitely

11  not in that class.  I do not want to say names.

12          MR. RIBA:  You can say names.

13    A.   Breanna Shaeffer is not in that class nor

14  in the sixth period class.

15    Q.   And then do you remember -- you also

16  mentioned rumblings.  Was she involved in any of

17  the rumblings?

18    A.   Not that I can recall.

19    Q.   I just have a few more questions.  Do you

20  have to write up any or prepare any sort of

21  statement after there's a disruption in your class?

22  Do you have to record it in some way.

23    A.   No.

24    Q.   Did you -- besides telling Mr. McGonigle,

25  did you take any notes or anything regarding any of

1    the disruptions we have been talking about today?

2    A.    I just kept a note of it to myself.

3    Q.    Did you write it down?

4    A.    No.

5    Q.    But you just remembered it?

6    A.    Yes.

7              MS. NISSEN:    That's all I have.

8        Thank you.

9              (The deposition ended at 1:42 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3    STATE OF PENNSYLVANIA :
                              : §
4    COUNTY OF SCHUYLKILL  :

5          I, Lillian M. Freiler, the undersigned, a

6    Commissioner to Take Depositions within and for

7    said County of Schuylkill and State of

8    Pennsylvania, the officer before whom the foregoing

9    deposition was taken, do hereby certify:

10         That Randy Nunemacher, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true and

13   correct record of the testimony given by such

14   witness.

15         I further certify that I am not related to

16   any party to this action by blood or marriage and

17   that I am in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have hereunto set my

20   hand this 7th day of November, 2007.

21

22

23                    

24                    _____
                          Lillian M. Freiler
25                      Registered Merit Reporter

# EXHIBIT E

IN THE UNITED STATES COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.S., a minor, by and through her parents, TERRY SNYDER and STEVEN SNYDER, individually and on behalf of their daughter, | CIVIL ACTION NO.: 07-CV-585 |
| Plaintiffs, | |
| v. | JUDGE: JAMES M. MUNLEY |
| BLUE MOUNTAIN SCHOOL DISTRICT; DR. JOYCE E. ROMBERGER, Superintendent, Blue Mountain School District; and JAMES S. McGONIGLE, Principal, Blue Mountain School District, both in their official and individual capacities, | |
| Defendants. | |

COPY

---------------

**ORAL DEPOSITION OF**

**ANGELA WERNER**

October 19, 2007

---------------

Taken at the Blue Mountain School District Board Room, 685 Red Dale Road, Orwigsburg, Pennsylvania, on October 19, 2007, commencing at 2:26 p.m. before Candis S. Bradshaw, Notary Public-Court Reporter.

LILLIAN FREILER COURT REPORTING
1733 Breckenridge Road
Orwigsburg, PA 17961
570.366.3804 FAX 570.366.0380
CrtRptr@aol.com

**Page 1**

IN THE UNITED STATES COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

J.S., a minor, by and through : CIVIL ACTION NO.: 07-CV-585
her parents, TERRY SNYDER :
and STEVEN SNYDER, :
individually and on behalf of :
their daughter, :
:
            Plaintiffs, :
:
v. : JUDGE: JAMES M. MUNLEY
:
BLUE MOUNTAIN SCHOOL :
DISTRICT; DR. JOYCE E. :
ROMBERGER, Superintendent, :
Blue Mountain School District; :
and JAMES S. McGONIGLE, :
Principal, Blue Mountain :
School District, both in their :
official and individual :
capacities, :
:
            Defendants. :

----------------

**ORAL DEPOSITION OF**

**ANGELA WERNER**

October 19, 2007

----------------

Taken at the Blue Mountain School District Board Room,
685 Red Dale Road, Orwigsburg, Pennsylvania, on October 19, 2007,
commencing at 2:26 p.m. before Candis S. Bradshaw, Notary
Public-Court Reporter.

LILLIAN FREILER COURT REPORTING
1733 Breckenridge Road
Orwigsburg, PA 17961
570.366.3804  FAX 570.366.0380
CrtRptr@aol.com

---

**Page 2**

APPEARANCES:


DRINKER, BIDDLE & REATH, LLP
BY: MEREDITH W. NISSEN, ESQUIRE
One Logan Square
18th and Cherry Streets
Philadelphia, Pennsylvania 19103-6996
(215) 988-3319
Representing the Plaintiffs


SWEET, STEVENS, KATZ & WILLIAMS, LLP
BY: JONATHAN P. RIBA, ESQUIRE
331 East Butler Avenue
P.O. Box 5069
New Britain, Pennsylvania 18901
(215) 345-9111
Representing the Defendants


ALSO PRESENT:

        Thomas J. Nickels, Esq.
        James S. McGonigle
        Joyce E. Romberger, Ed.D.

---

**Page 3**

INDEX

WITNESS                         PAGE

ANGELA WERNER

By Ms. Nissen                              4

EXHIBITS

NO. DESCRIPTION              PAGE

    (None.)

---

**Page 4**

ANGELA WERNER, called as a witness, was

administered the oath and testified as follows:

==========

EXAMINATION

BY MS. NISSEN:

Q. Good afternoon, Ms. Werner.

A. Good afternoon.

Q. My name is Meredith Nissen. I'm one of the

attorneys that represents the plaintiffs in this

lawsuit. I'm just going to be asking you some

questions.

Before I get into more substantive questions,

I wanted to ask you some introductory questions. Have

you ever been deposed before?

A. No.

Q. Okay. Basically, you were just sworn in. And

so what that means is that your testimony has the

force and effect as if you were testifying in court.

Do you understand that?

A. Yes.

Q. Okay. Just ask that we speak one person at a

time and that you answer orally instead of saying

"uh-huh" or nodding your head. Do you understand

that?

A. Yes.

1    Q.  Okay.  If you don't understand a question I'm
2    asking, just let me know and I'll clarify that.
3        If you want to take a break at any time, just
4    let me know.  The only thing I ask is that if I pose a
5    question, that you answer it before you take a break.
6        Is that all right with you?
7    A.  Yes.
8    Q.  Okay.  Is there any reason that you -- that
9    would impair your ability to testify today?
10   A.  Such as?
11   Q.  Such as you're taking medication; you have
12   some sort of illness.
13   A.  No.
14   Q.  Okay.  Could you state your full name for the
15   record.
16   A.  Angela Fay Werner.
17   Q.  Could you explain your educational background
18   after high school.
19   A.  I have a bachelor's degree in elementary
20   education.  I also am in my graduate program, so I do
21   have master -- I have -- sorry.  Let me rephrase that.
22   I have bachelor's plus 24.  And I have a certification
23   in middle school language arts.
24   Q.  Okay.  And can you explain your employment
25   background starting after you graduated from college.

*Lillian Freiler Court Reporting    570.366.3804*

1    A.  I substituted for three different school
2    districts for a year and a half and then was hired
3    here at Blue Mountain School District for a Skills for
4    Adolescents position as well as a drug and alcohol
5    coordinator for the school district.
6    Q.  Okay.  And when were you hired by Blue
7    Mountain?
8    A.  1999.  December of 1999.
9    Q.  And what is your position currently at Blue
10   Mountain School District?
11   A.  Half day teacher; half day drug and alcohol
12   coordinator for the district.
13   Q.  And what do you teach?
14   A.  I teach Skills for Adolescents and writing
15   skills for Skills For Adolescents.
16   Q.  And you said that there's another thing
17   besides the teaching you do.  What is the other thing
18   that --
19   A.  Student assistance program.
20   Q.  Okay.  And what's that?
21   A.  If you're familiar with that.
22       That is our drug and alcohol program.  It is
23   mandated by the state of Pennsylvania that every
24   school district have a student assistance program in
25   which we help to identify students with issues, either

*Lillian Freiler Court Reporting    570.366.3804*

1    mental health or drug and alcohol.
2    Q.  Okay.  And how many class periods do you teach
3    a day?
4    A.  I teach four periods a day.
5    Q.  Okay.  And what grades do you teach?
6    A.  7th and 8th.
7    Q.  And do you teach 7th and 8th grade for all of
8    those courses, or what do you teach for each --
9    A.  Student -- the Skills For Adolescents is 8th
10   grade.
11   Q.  Okay.
12   A.  And the writing skills for Skills For
13   Adolescents is 7th grade.
14   Q.  Okay.
15       All right.  Could you explain what your
16   classroom was like -- well, let me back up.
17       Are you -- you're familiar with the lawsuit
18   here and the issues that we're here.  I want to ask
19   you about what your classroom was like and what your
20   teaching was like during that time period.
21   A.  Okay.
22   Q.  So could you explain your classroom
23   looked like?  how it was set up; you know, were there
24   desks, people sit at tables.  How does it work.
25   A.  There are rows of desks.

*Lillian Freiler Court Reporting    570.366.3804*

1    Q.  Okay.
2    A.  It's set up -- I don't remember exactly.  I
3    don't have my classroom this year.
4    Q.  Okay.
5    A.  I'm a traveling teacher this year.
6    Q.  Okay.
7    A.  But last year, they were set up in rows.
8    Q.  And how many students would you have in each
9    class?  And let me know if it varies.
10   A.  It does vary.
11   Q.  Okay.
12   A.  Anywhere from 25 to 34.
13   Q.  All right.  Was J.S. one of your students?
14   A.  Yes.
15   Q.  And what class was she in?
16   A.  She would have been in my Skills for
17   Adolescents class.
18   Q.  Okay.  And do you remember how many students
19   were in that class?
20   A.  No.
21   Q.  Okay.  But it would have been somewhere
22   between 25 and 34.
23   A.  Correct.
24   Q.  Okay.  Last year, when you were preparing for
25   your class, did you have to submit a lesson plan in

*Lillian Freiler Court Reporting    570.366.3804*

1 advance?

2    **A.** Yes.

3    **Q. How frequently did you have to do that?**

4    **A.** Every Friday.

   **Q. And that would be for the next week?**

6    **A.** Yes.

7    **Q. Okay. And did your classes have sort of the**

8 **same format each day, in terms of the types of things**

9 **you did each day, or did it vary?**

10    **A.** The 8th grade classes all remained the same.

11    **Q. Okay.**

12    **A.** Because it is a rotation class, if you're

13 familiar with four-day rotation classes.

14    **Q. I am not, no.**

15    **A.** Okay. I see all of 8th grade and I see all of

16 7th grade on a four-day rotation basis.

17    **Q. Okay.**

18    **A.** And it's the same subject for each of those

19 days. So we have Day 1, Day 2, Day 3, and Day 4.

20    **Q. And so you're just teaching the same thing to**

21 **a different group of kids?**

22    **A.** Correct.

23    **Q. Okay. And so for that 8th grade class, did**

24 **you have, like, a typical, you know, sort of format**

25 **for how you would conduct the class?**

1    **A.** Yes.

2    **Q. What was the format?**

3    **A.** Starting -- come in the classroom, we start by

4 talking about what we're going to be dealing with that

5 day, the lesson at hand, give an objective. Sometimes

6 I did an energizer to get them motivated and get them

7 going. And then we'd go into our lesson at hand for

8 that day. And that would carry us through until the

9 end of the period.

10    **Q. Okay. So you sort of start off and then you**

11 **explain what you're going to be talking about that day**

12 **and then you do an energizer. What's that?**

13    **A.** Something to motivate the students. An

14 activity of some sort.

15    **Q. Okay.**

16    **A.** Something to get them up and moving.

17    **Q. Okay. But -- and it's related to what --**

18    **A.** Related to the subject at hand.

19    **Q. Yeah. Okay.**

20    **And then you jump into a lesson, and that's --**

21 **is that the bulk of the class?**

22    **A.** The lesson?

23    **Q. Yes.**

24    **A.** Yes.

25    **Q. Okay. And then do you give homework**

1 afterwards?

2    **A.** No. My class is not a homework class.

3    **Q. Okay. All right.**

4    **And the classes are 41 minutes long?**

5    **A.** 42.

6    **Q. 42. Okay. All right.**

7    **When did you first learn of the MySpace**

8 **profile of Mr. McGonigle?**

9    **A.** I don't know the exact day.

10    **Q. Okay.**

11    **A.** I -- it was during one of my class periods.

12 Some 8th grade girls had come up to me -- there was

13 some time left over at the end of class. They came up

14 to me concerned about a Web site which mentioned

15 Mr. McGonigle and his family.

16    They were upset by what was on the Web site

17 and things that it contained. And they talked to me

18 about this for a little bit, and then I quelched [sic]

19 it. And that's when I first became aware that there

20 was a Web site.

21    **Q. Okay. Now, going specifically to that**

22 **incident, you said it happened at the end of the**

23 **class.**

24    **A.** Uh-huh.

25    **Q. The class was still going on?**

1    **A.** No. At that point, class had wrapped up and

2 there was a few minutes left over.

3    **Q. Okay. So were there other students in the**

4 **room besides these girls?**

5    **A.** Yes.

6    **Q. Okay. And they were just waiting to leave to**

7 **go to the next class?**

8    **A.** Well, th- -- not exactly. They came up to me

9 with a concern. You know, that's what they were

10 concerned about.

11    **Q. Okay.**

12    **A.** Everyone else was, you know, waiting to go to

13 their next class.

14    **Q. Okay. And how many girls were there?**

15    **A.** I don't recall.

16    **Q. Okay. I mean, more than five? less than five?**

17    **A.** I don't recall.

18    **Q. Okay. And -- so you said this is your 8th**

19 **grade class.**

20    **A.** Yes.

21    **Q. Was this a class that J.S. was in?**

22    **A.** No.

23    **Q. Okay. Do you remember any of the girls,**

24 **specifically who they were, that came up to you?**

25    **A.** I recall one specific girl. The rest, I don't

1 recall their names.
2     Q.  Okay.  Who was that?
3     A.  Jillian Bickleman.
4     Q.  Okay.  And -- all right.  Can you tell me
5 again what they said to you?  They came up to you at
6 the end of class.
7     A.  Yeah.  They -- with concerns about the Web
8 site.  They were upset by what had been on there.  And
9 they didn't mention specifics because they weren't
10 comfortable saying exactly what was on the Web site.
11 But they did say it had to do with some terrible
12 things about Mr. McGonigle and his family.
13     Q.  Okay.  And what did you say?
14     A.  I don't recall.
15     Q.  Okay.  Did they have a picture of what they
16 were talking about?
17     A.  No.
18     Q.  How long would you say that the conversation
19 lasted?
20     A.  I can't say for sure.
21     Q.  Okay.  You said -- but you said it was at the
22 end of the class?
23     A.  Yes.
24     Q.  Do you think it was more than five minutes?
25     A.  I don't want to speculate.  I don't --

1     Q.  Okay.
2     A.  I really don't know.
3     Q.  Well, how many minutes do you think were left
4 in class when they came up to you?
5     A.  I don't know.
6     Q.  All right.  So -- but you had finished your
7 lesson plan --
8     A.  Yes --
9     Q.  -- for the day.
10     A.  Yes.
11     Q.  And when you usually finish your lesson plan,
12 do you go --
13     A.  It varies.  It depends upon the class and the
14 interest and the involvement in the students.
15     Q.  Okay.
16     A.  How much involved they get, how much they
17 share with me.
18     Q.  Okay.
19     A.  So it can vary.
20     Q.  Okay.  All right.
21     Do you remember anything else about what the
22 girls told you?
23     A.  No.
24     Q.  Okay.  After your conversation and -- okay.
25 Let me back up.

1     Was this the first time you had learned about
2 anything regarding the MySpace profile?
3     A.  Yes.  Uh-huh.
4     Q.  Okay.  And what did you do after your learned
5 of this, if anything?  Did you -- let me strike that.
6     Did you tell anybody about this conversation?
7     A.  I did.  I spoke with Mr. McGonigle about it.
8     Q.  Okay.  When did you speak with Mr. McGonigle?
9     A.  I spoke to him during his lunch period.
10     Q.  Okay.
11     A.  I believe it would have been 5th period.
12     Q.  And was that the same day?
13     A.  Yes.
14     Q.  And what did you say to him?
15     A.  I shared with him what the girls had shared
16 with me.
17     Q.  And what he say?
18     A.  I don't recall.
19     Q.  Do you remember if he was already aware of the
20 Web site at that time?
21     A.  I'm not sure.
22     Q.  Do you remember -- do you remember anything
23 else regarding that conversation?
24     A.  No.
25     Q.  Okay.  Did you talk with anybody else

1 regarding your conversation with the girls?
2     A.  As in other faculty members?
3     Q.  Sure.  We'll start there.  With any other
4 faculty members?
5     A.  No.
6     Q.  Did any other students talk to you about the
7 Web site?
8     A.  No.
9     Q.  After that, did you have -- how did you come
10 to learn about the My- -- let me strike that.
11     Did you learn anything more about the MySpace
12 profile after that?
13     A.  I'm not quite sure what you're asking.
14     Q.  Okay.  After you had -- after you spoke with
15 Mr. McGonigle --
16     A.  Uh-huh.
17     Q.  -- did you have any conversations with anybody
18 else about the MySpace profile of Mr. McGonigle?
19     A.  As far as what it contained?
20     Q.  As far -- sure.  Starting with as far as what
21 it contained.
22     A.  No.
23     Q.  Did you have any conversations with anyone
24 about the existence of the MySpace profile of
25 Mr. McGonigle?

1    A.  No.

2    Q.  No?

3    Did you know that J.S. was suspended for

4  posting a MySpace profile?

5    A.  That was the day before. She was not in

6  school that day when I learned about it.

7    Q.  Let me just make sure I understand.

8    She was not in school the day that you -- the

9  girls came up to you?

10    A.  Correct.

11    Q.  Okay. And how does that relate in terms -- do

12  you know how that relates in terms of when she was

13  suspended? Was that the day before she was suspended

14  or --

15    A.  I'm not sure.

16    Q.  You're not sure. Okay.

17    A.  It was definitely before she was suspended.

18  No one knew about the Web site --

19    Q.  Okay.

20    A.  -- until that day.

21    Q.  Okay. And when did you learn that she became

22  suspended?

23    A.  I'm not sure.

24    Q.  You're not sure?

25    A.  I'm not sure. Uh-uh.

1    Q.  Did you receive any e-mails regarding her

2  suspension?

3    A.  I don't recall.

4    Q.  Did -- she was in your class at that time; is

5  that -- during the time period, that 8th grade period;

6  right?

7    A.  She was one of my students.

8    Q.  Right. Okay.

9    So when she was suspended, did you have to

10  prepare anything for her to take home while she was

11  missing your class?

12    A.  No. I don't have homework.

13    Q.  Okay. After that conversation with the 8th

14  grade girls, did they ever come up to you again

15  regarding the Web site?

16    A.  No.

17    Q.  No?

18    Did you ever have anybody else in any other

19  class come and talk to you about the Web site?

20    A.  Not specifically, no.

21    Q.  Okay. And then just going back -- sorry to

22  keep honing in on this one day.

23    But could you explain to me again -- I know

24  you've told me a lot about it -- what exactly was

25  happening when the girls came up to you. You had

1  finished the lesson plan for the day; right?

2    A.  Yes.

3    Q.  And so had -- were the kids working on

4  anything, or were they just supposed to sit quietly

5  until the next class?

6    A.  Some kids were sitting quietly. Some were

7  working on things for other classes.

8    Q.  Okay.

9    A.  Some were reading books.

10    Q.  Okay. All right.

11    And when the girls came up to you, was it a

12  private conversation or -- you know, or were other

13  people sort of aware of what you guys were talking

14  about?

15    A.  It was -- they came up to speak to me, I

16  believe, to let me know what happened.

17    Q.  Okay.

18    A.  Whether or not other students heard --

19    Q.  Okay.

20    A.  -- I can't -- I can't say for sure.

21    Q.  Okay.

22    A.  But it was not a publicized conversation.

23    Q.  Okay. During your class, is it appropriate

24  for students to come up and talk to you in that way?

25  I mean, is that something that would be all right for

1  you, or was it somehow disruptive of your class?

2    A.  At that point, it was not a disruption.

3    Q.  Okay.

4    A.  It was at the end of a class period.

5    Q.  Okay.

6    A.  So they did not disrupt my lesson at that

7  point in time.

8    Q.  Okay. Okay.

9    Do kids do that in other circumstances

10  involving other things -- come and talk to you and

11  tell you things at the end of class?

12    A.  At times, yes.

13    Q.  Okay.

14    Okay. I just want to ask you a few more

15  questions.

16    When the girls were talking to you, you said

17  that they were talking about a Web site about the

18  reference to Mr. McGonigle and his family.

19    A.  Uh-huh.

20    Q.  Did they reference specific things that they

21  saw on the Web site or read on the Web site?

22    A.  No. They didn't feel comfortable doing that.

23    Q.  Okay. Did you ask them about what was

24  specifically on there?

25    A.  I didn't feel comfortable doing that.

1  Q.  Okay.  All right.

2     Are you aware of any other teachers that had

3  students disrupting their class because of the MySpace

4  profile of Mr. McGonigle?

5  A.  Yes.

6  Q.  Who was that?

7  A.  Randy Nunemacher.

8  Q.  Okay.  Are you familiar with anybody else?

9  A.  No.

10  Q.  Okay.  Did you -- did you have a conversation

11  with Mr. Nunemacher about the disruption in his class?

12  A.  No.

13  Q.  Okay.  How did you come to learn of the

14  disruption in Mr. Nunemacher's class?

15  A.  Because of this.

16  Q.  Because of the lawsuit?

17  A.  Because of the lawsuit.

18  Q.  Okay.  Okay.

19     Did you have any involvement in the decision

20  to discipline J.S. for putting the MySpace profile?

21  A.  No.

22     MS. NISSEN:  I'm just going to take a

23  few minutes to look over my notes.

24  BY MS. NISSEN:

25  Q.  Okay.  I just have a few more questions.

1  A.  Okay.

2  Q.  When you saw Mr. McGonigle during the 5th

3  period and you told him about the conversation -- you

4  told him about what the girls told you --

5  A.  Uh-huh.

6  Q.  -- did you tell him that this disrupted your

7  class?

8  A.  No.  I did not say specifically it disrupted

9  my class.  I just let him know what they talked to me

10  about.

11  Q.  Okay.  Did he -- do you remember anything else

12  about what he said to you --

13  A.  No.

14  Q.  -- in response?

15  A.  I don't.

16     MS. NISSEN:  Okay.  All right.  That's

17  all I have.

18     MR. RIBA:  Okay.  You're all done.

19     (Deposition concluded at 2:47 p.m.)

20

21

22

23

24

25

1     C E R T I F I C A T I O N

2

3  COMMONWEALTH OF PENNSYLVANIA :
               : §
4  COUNTY OF DAUPHIN         :

5

6     I, Candis S. Bradshaw, the undersigned, a

7  Commissioner to Take Depositions within and for said

8  County of Dauphin and Commonwealth of Pennsylvania,

9  the officer before whom the foregoing depositions were

10  taken, do hereby certify:

11     That **ANGELA WERNER**, the witness whose deposition

12  is hereinbefore set forth, was administered the oath

13  by me and that such deposition is a true and correct

14  record of the testimony given by such witness.

15     I further certify that I am not related to any

16  party to this action by blood or marriage and that I

17  am in no way interested in the outcome of this matter.

18     IN WITNESS WHEREOF, I have hereunto set my hand

19  this 29th day of October, 2007.

20

21

22

23  Candis S. Bradshaw
    Notary Public-Court Reporter

25

1     CERTIFICATE OF DEPONENT
    I, Angela Werner, certify that I have the
2  foregoing transcript of my deposition given on October
    19, 2007, and find it to be a true, correct, and
3  complete transcript of the answers given by me to the
    questions therein propounded, except for corrections
    or changes in form or substance, if any, noted in the
    attached Errata Sheet.

5

6     _____

7     Angela Werner

      DATED: _____

8

9

10

11

12

13  Subscribed and sworn to me this _____ day of
14  _____, 2007.
15  My Commission Expires: _____
16

17

18  _____

19  NOTARY PUBLIC

20

21

22

23

24

25

ERRATA SHEET

| PAGE | LINE | CORRECTION | REASON FOR |
|------|------|------------|------------|
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |
| ____ - | ____ - | _____ | _____ |

*Lillian Freiler Court Reporting    570.366.3804*

# EXHIBIT F



University of Phoenix
Thinking Ahead.

─── Associate's Degrees ───
Your foundation for the future. Earn an Associate of Arts in:

- Accounting
- Business
- Criminal Justice
- General Studies
- Health Administration
- Information Technology
- IT/Networking
- IT/Visual Communication
- Paraprofessional Education

MySpace · [ Search ]

Home | Browse | Search | Invite | Film | Mail | Blog | Favorites | Forum | Groups | Events | Videos | Music | Comedy | Classifieds

m-hoe≡]

"traintrain- it's a slow ride but you'll get there eventually"

Male
40 years old
Alabama
United States

Last Login: 3/21/2007

View My: Pics | Videos

MySpace URL:
http://www.myspace.com/kidsrockmybed

| m-hoe≡]'s Interests | |
|---|---|
| General | detention. being a tight ass. riding the traintrain. spending time with my child (who looks like a profile). baseball.my golden pen. fucking in my office. hitting on students and their parents. |
| Music | I love all kinds. favorite is techno. |
| Television | almost anything. I mainly watch the playboy channel on directv. OH YEAH BITCH! |
| Heroes | myself. ofcourse. |

| m-hoe≡]'s Details | |
|---|---|
| Status: | Married |
| Orientation: | Bi |
| Zodiac Sign: | Virgo |
| Children: | Proud parent |

[Subscribe to this Blog]

[View All Blog Entries]

m-hoe≡]'s Latest Blog Entry

m-hoe≡]'s Blurbs!

About me:

**HELLO CHILDREN**
yes. it's your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick
**PRINCIPAL**
I have come to myspace so i can pervert the minds of other principal's to be just like me. I know, I know, you're all thrilled
Another reason I came to myspace is because- I am keeping an eye on you students
(who I care for so much)
For those who want to be my friend, and aren't in my school
I love children, sex (any kind), dogs, long walks on the beach, ty, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs)
**MY FRAINTRAIN**
so please, feel free to add me, message me whatever
Layout made by Lost in a Jungle at CreateBlog.com.

Who I'd like to meet:

m-hoe≡]'s Friend Space

m-hoe≡] has 22 friends.

Tom    Cassie    billy[bust'a move']    tori [is back]

http://profile.myspace.com/index.cfm?fuseaction=user.viewprofile&friendid=170180344     3/21/2007

PLAINTIFF'S EXHIBIT

# EXHIBIT G

# CONDENSED COPY

1                IN THE UNITED STATES COURT FOR
              THE MIDDLE DISTRICT OF PENNSYLVANIA

2

J.S., a minor, by and through    :
3    her parents, TERRY SNYDER and     :
STEVEN SNYDER, individually      :
4    and on behalf of their daughter,:
                        Plaintiffs,   : CIVIL ACTION - LAW
5                                      : NO.: 07-CV-585
              -vs-                     :
6                                      :
BLUE MOUNTAIN SCHOOL DISTRICT;   :
7    DR. JOYCE E. ROMBERGER,           :
Superintendent Blue Mountain     :
8    School District; and JAMES S.     :
MCGONIGLE, Principal Blue         :
9    Mountain Middle School, both in :
their official and individual    :
10   capacities,                       :
                                       :
11                  Defendants.    :

12

13            Oral deposition of DR. JOYCE E.
14       ROMBERGER, held at Blue Mountain School
15       District Administration Offices, Red Dale
16       Road, Box 188, Orwigsburg, Pennsylvania, on
17       Friday, October 12, 2007, commencing at
18       9:05 a.m., before Lynn Greene, Court
19       Reporter and Notary Public in the
20       Commonwealth of Pennsylvania.

21

22            LOVE COURT REPORTING, INC.
              1500 Market Street
23            12th Floor, East Tower
          Philadelphia, Pennsylvania  19102
24                (215) 568-5599

Page 2

1  APPEARANCES:
2
3  AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
   BY: MARY CATHERINE ROPER, ESQUIRE
4  The Bourse Building
   111 South Independence Mall
5  P.O. Box 40008
   Philadelphia, Pennsylvania 19106
6  (215) 592-1513
   Attorneys for Plaintiffs
7
8
   SWEET, STEVENS, KATZ & WILLIAMS, LLP
9  BY: JONATHAN P. RIBA, ESQUIRE
   331 East Butler Avenue
10 P.O. Box 5069
   New Britain, Pennsylvania 18901
11 (215) 345-9111
   Attorneys for Defendants
12
13
   ALSO PRESENT:
14
       Deborah Gordon Kiehr, Esquire
15     Meredith W. Nissen, Esquire
       Mary E. Kohart, Esquire
16     Terry Snyder
17          * * *
18
19
20
21
22
23
24

Page 4

1
2            I N D E X
3  WITNESS:
4  Dr. Joyce Romberger
5
6  EXAMINATION                    PAGE
7  By Ms. Roper                   5, 75
8  By Mr. Riba                    70
9          * * *
10
11      INDEX TO EXHIBITS
12
13 NUMBER    DESCRIPTION          PAGE
14   1      March of 2007 Blue Mountain   29
15          School District calendar page
16
17          * * *
18
19
20
21
22
23
24

Page 3

1         DEPOSITION SUPPORT INDEX
2
3
4  DIRECTIONS NOT TO ANSWER:
5  PAGES:    None
6
7
8  REQUESTS FOR DOCUMENTS OR INFORMATION
9  PAGES:    None
10
11
12 STIPULATIONS AND/OR STATEMENTS:
13 PAGE:     5
14
15
16 MARKED QUESTIONS:
17 PAGES:    None
18
19
20
21
22
23
24

Page 5

1      (By agreement of Counsel, all
2  objections, except to the form of the
3  question, are reserved to the time of
4  trial.)
5       ___
6      DR. JOYCE ROMBERGER, after having been
7  first duly sworn, was examined and
8  testified as follows:
9        ___
10      E X A M I N A T I O N
11       ___
12 BY MS. ROPER:
13     Q.  Good morning, Dr. Romberger.
14     A.  Good morning.
15     Q.  My name is Mary Catherine Roper.  We've
16 met before.  I'm a lawyer for the Plaintiffs in
17 this matter.  Before we get started, we'll do a
18 little bit of introductory stuff.
19 Have you ever given a deposition before?
20     A.  Yes.  I have given testimony at a
21 hearing.
22     Q.  And you've watched depositions,
23 correct?
24     A.  Yes.

1    Q.  For the record, we always go over the
2  ground rules to begin with.  You know that I'll be
3  asking you questions and you'll be answering them.
4  There's no reason for you to answer a question
5  unless you understand it.  So please ask me to
6  clarify any question that you find confusing or
7  otherwise difficult to understand.  Okay?
8    A.  Yes.
9    Q.  Then we have some rules that are just
10  designed to make it easier for the Court Report and
11  easier for us to read the transcript later.
12      The first, of course, is that you must
13  answer with words and not with uh-huh or with a
14  shake or a nod of head.  Okay?
15    A.  Yes.
16    Q.  Another rule is that, sometimes what
17  I'm going to be asking is going to be painfully
18  obvious and, in a normal conversation, you might
19  interrupt me to give me an answer, but, because the
20  Court Reporter can't take down two people speaking
21  at once, you need to let me finish my boring and
22  obvious question before you give an answer.  Okay?
23    A.  Yes.
24    Q.  Great.  This isn't an endurance test,

1  if you want to take a break, go to the bathroom,
2  get some more water, confirm something with your
3  attorney, you can do any of those things.  The one
4  thing that I would ask is that, if I've asked you a
5  question, that you do your best to answer it and
6  then ask for your break.  Okay?
7    A.  Yes.
8    Q.  And the one exception to that would be,
9  if I ask you a question that has anything to do
10  with -- your concern is that it would require you
11  to give information about conversations you've had
12  with your attorney.  I'm not asking for any
13  conversation you've had with your attorney.
14  Certainly, you can consult with your attorney to
15  make sure that you don't violate that confidence.
16  Okay?
17    A.  Yes.
18    Q.  Could you start by telling me your
19  current position?
20    A.  I am the Superintendent of Blue
21  Mountain School District.
22    Q.  And how long have you been
23  Superintendent of Blue Mountain School District?
24    A.  I was Acting Superintendent from

1  November of 2006 through January 31st of 2007, and,
2  on February 1st of 2007, I became the
3  Superintendent.
4    Q.  Congratulations.
5    A.  Thank you.
6    Q.  And what was your position before you
7  were Acting Superintendent?
8    A.  Assistant Superintendent for Curriculum
9  and Instruction.
10    Q.  Before you were Assistant
11  Superintendent, what was your position?
12    A.  Supervisor of Curriculum and
13  Instruction, K through 12.
14    Q.  And what was the period of time you
15  held that job?
16    A.  I held that from 1992, '93 through
17  July 1st of 2005.
18    Q.  Did you hold a position at Blue
19  Mountain before that?
20    A.  I did.  Supervisor of Elementary
21  Education.
22    Q.  How long were you in that position?
23    A.  From 1989 to, again, 1992, '93.
24    Q.  And what about before that?

1    A.  I was an Elementary Principal in a
2  different school district, in Pine Brook School
3  District, from 1985 to 1989.
4    Q.  In your current position as
5  Superintendent of the school district, what are
6  your responsibilities with respect to student
7  discipline?
8    A.  I only deal with student disciplinary
9  issues that are brought to my attention by other
10  Administrators in the district or by phone calls
11  from parents or outside agencies, but the building
12  Principals are the ones who deal with the
13  discipline.
14    Q.  And would that have been the same thing
15  when you were Acting Superintendent?
16    A.  Correct.
17    Q.  And what about as Assistant
18  Superintendent?
19    A.  Some situations would have come to my
20  attention and other situations would have gone to
21  the Superintendent, who, at that time, would have
22  been dependant on who was the Superintendent.
23    Q.  Sure.  And when you were Supervisor,
24  and I don't remember the exact title, from 1992 to

1  2005, did you have any responsibilities with
2  respect to discipline at that time?
3      A. I was a Supervisor of Curriculum and
4  Instruction, K through 12. So sometimes Principals
5  would call me for my opinion on an issue, if they
6  didn't want to go straight to the Superintendent.
7      I was also the Title 9 Coordinator, at
8  that time, and also if there were any issues of
9  sexual harassment on the part of a student or
10  others, I was the person to whom those referrals
11  were made. So if it had been of that nature, I
12  would have been contacted or at the same time as
13  the Superintendent.
14      Q. Now, if a building Principal or other
15  Administrator brings a discipline matter to your
16  attention, what is your role; what are your
17  responsibilities with respect to that matter?
18      A. If the Principal or the Administrator
19  feels it is of such a nature, sometimes they call
20  me just to inform me of what has happened in their
21  building and what they've done with that situation
22  and they just call me to inform me because
23  sometimes I need to share some of that information
24  with the School Board because there may be concerns

1  in the community and I give them the information
2  first. I don't give out students' names.
3  I just tell them, we had an incident in a certain
4  school and this is what happened and this is what
5  really happened, in case you hear rumors. That is
6  one thing where I am just receiving the
7  information.
8      The other thing that may happen,
9  depending on the nature of the disciplinary action,
10  a Principal may just call to tell me the incident,
11  tell me what they've done and just to have their
12  affirmation of what they've done or just to ask my
13  opinion. To ask my opinion is in terms of, do I
14  think what they're suggesting is appropriate or is
15  there some other avenue that perhaps we're going to
16  pursue.
17      Q. And what about when a parent brings a
18  disciplinary matter to your attention, what is your
19  role; what is your response then?
20      A. Depending, again, on the nature of the
21  parent's phone call to me, I will generally ask
22  that parent if they've contacted the Principal.
23  Depending on the nature, if it's a bus incident or
24  something fairly minor, I will tell them that they

1  need to first speak to the Principal. Depending on
2  the seriousness of the allegation from the parent,
3  it may be that I go directly to the Principal to
4  discuss the situation.
5      Q. And in that instance, would you ever
6  overrule the Principal or tell the Principal to
7  change the discipline or rescind the discipline?
8      A. I have the authority to do that.
9      Q. Have you ever done that?
10      A. Have I ever directed the Principal to
11  change something -- do you mean, have I dictated to
12  the Principal to change something?
13      Q. To change a discipline that has been
14  imposed, yes, that's the question.
15      A. No. I have sometimes counseled
16  Principals as to other avenues to pursue, but I
17  have never said to a Principal, this is not the
18  correct action. This is what has to be done, not
19  since February and since I've been in the
20  Superintendent's job.
21      Q. What about as Acting Superintendent?
22      A. No. Because while I might Counsel
23  them, I was not -- they have the right to go over
24  my head to the Superintendent.

1      Q. When you were Acting Superintendent?
2      A. I'm sorry. I was thinking Assistant
3  Superintendent. When I was Acting Superintendent,
4  I did have that authority. No. To be honest, I do
5  not recall any situations really coming to my
6  attention that were of a serious nature.
7      We had one bus complaint. I had some
8  issues where maybe someone was concerned about
9  situations with their children in the school, but
10  it was always resolved because parents also have
11  the right to go over, if they don't like my
12  decision, to go to a School Board member and that
13  has not happened to my knowledge.
14      Q. Okay.
15      A. I would also like to add, you had asked
16  me prior to me being the Acting Superintendent,
17  there was a time period, in 2001, when I was also
18  Acting Superintendent for a period of five months
19  and, at that time, I don't recall my having to
20  dictate to a Principal that their decision was not
21  the correct decision and something else should be
22  done.
23      Q. I'm going to try to remember to say so,
24  but my questions are about your role as

1 Superintendent. So when I asked you those
2 questions, I would like you to answer me for both
3 the period of time when you are actually
4 Superintendent and for any period of time that you
5 were Acting Superintendent. Okay?
6    A. I will.
7    Q. Because what I'm really asking about is
8 the point at which you are the highest
9 administrative decision maker in the school
10 district.
11    A. Okay.
12    Q. And that's what you are as either the
13 Superintendent or the Acting Superintendent,
14 correct?
15    A. Correct.
16    Q. Now, as either Superintendent or Acting
17 Superintendent, what is your role and what are your
18 responsibilities if you were to hear any accusation
19 against a teacher about inappropriate conduct with
20 students?
21    A. You're asking about a teacher?
22    Q. Yes.
23    A. If something came to -- if some
24 information was shared with me that there was

1 inappropriate conduct with a teacher, I would
2 immediately contact the Principal of that school
3 and I would share the allegation. Now, I would
4 make sure that when I was contacted -- did you say
5 whom I was contacted by?
6    Q. I didn't. If you want to go ahead and
7 break down your answer in terms of who, that's
8 fine.
9    A. If I had a phone call from a parent or
10 -- if I had a phone call from a parent stating that
11 a teacher had done something inappropriate, I would
12 contact the Principal -- first, I would make sure
13 from the parent that I had all the information as
14 to the incident, what the inappropriate behavior
15 was, talk to the Principal and I would ask to have
16 a meeting with the Principal, the teacher and a
17 union representative to discuss the issues.
18        If the information that was given to me
19 was in such a manner that I believe other students
20 might know about whatever the incident was, I would
21 have the Principal independently speak to those
22 students. I would have someone within the school
23 with whom the children were comfortable speaking
24 to, the students. I would also ask the Principal

1 to either have his or her Assistant Principal with
2 them and, if there's no Assistant Principal in the
3 building, to have another Administrator present
4 and/or have a Guidance Counselor present.
5    Q. And the purpose of that meeting would
6 be what?
7    A. The meeting with the students?
8    Q. With the students, yes.
9    A. To see if they have any information as
10 to the accuracy of the charge.
11    Q. Could you give me an example of what an
12 allegation might be?
13    A. Sure.
14    Q. Let's start with a parent. If a parent
15 called you and said a teacher had had some sort of
16 a sexual relationship with a student, what would
17 you do under those circumstances?
18    A. I would speak to the Principal about
19 the allegation. If it's that specific, I
20 personally, in terms of a sexual allegation, I
21 personally would probably interview the student too
22 with either the Principal present or with a
23 Guidance Counselor present. That's a very serious
24 allegation because that allegation means, if it's a

1 founded situation, that that teacher would come
2 before the School Board possibly for disciplinary
3 action and, if it's founded, that teacher could
4 then lose their certification through the
5 Department of Education and we would have to file a
6 suit with the Department of Education for that
7 professional Administrator to lose their
8 certification in the State of Pennsylvania.
9        It also means, depending on the age of
10 the child, that there may be unlawful conduct being
11 done and it may involved the police and referring
12 that situation to the police. So, in that
13 situation, I would speak to the student.
14    Q. And in fact, would you be subject to
15 mandatory child abuse reporting laws with respect
16 to, in some circumstances, with respect to sexual
17 conduct between a teacher and a student?
18    A. Yes. The school district is a mandated
19 reporter. Generally, it is the building Principal
20 who is the mandated reporter.
21    Q. Okay. And under what circumstances is
22 that report mandated?
23    A. If the school district hears of
24 allegations and we believe that there is some

1 validity to it. Now, when I say we believe there
2 is some validity to it, we could have two students
3 tell us that they've heard the rumor and, again, if
4 we find that there's probably some cause to it, we
5 report it. We are not required -- I take that
6 back. I'm thinking of a kindergarten child. If a
7 kindergarten child said something has occurred, we
8 might do more investigation and just automatically
9 call children in.
10     Q. Why is that?
11     A. Because we look at the age of the
12 children and the adults that work with that child
13 determine if this is something which should be
14 reported or not reported. We are mandated
15 reporters.
16     Let me give you another example. If we
17 have a child who comes to school with a black and
18 blue mark on her face and if the child tells us
19 their parent hit them, we will report it. If a
20 child says, I was out playing in the snow and I got
21 hit with a snowball and we find out from another
22 child that they were out playing in the snow, we
23 will not report it.
24     Q. But in terms of an allegation of sexual

1 conduct, is it fair to say that your understanding
2 of your obligation is that you must report any
3 credible allegation of sexual contact between a
4 teacher and a student?
5     A. Yes.
6     Q. But you are not required to report any
7 allegation that you don't find credible for
8 whatever reason?
9     A. Correct.
10     Q. And would you follow any different
11 procedure if the accusation that came to you came
12 directly from a student rather than through a
13 parent?
14     A. I have had no cases where students have
15 contacted me directly. Generally, the students go
16 to their Guidance Counselor or to their Principal
17 to share that information. That information would
18 come to me via a Principal because, even if it's
19 shared with a Guidance Counselor, it would go to
20 the building Principal and then it would come to
21 me.
22     Q. So I had asked you what procedure you
23 would follow if a parent made an allegation to you
24 of sexual contact. What procedure would you follow

1 if a Principal made a report to you about such an
2 allegation?
3     A. The Principal would do the
4 investigating with the children and check with
5 other children, talk to other children in the
6 school, if there are other children who may have
7 information regarding the situation, and that
8 information would be shared with me.
9     Q. And would you question the Principal to
10 make sure that he or she had done a full
11 investigation?
12     A. Yes.
13     Q. Now, these questions have all been
14 about an allegation of conduct between a teacher
15 and a student.
16     What would be your role and your
17 procedure if you received an allegation about a
18 Principal having sexual contact with a student?
19     A. Are you asking from a parent; what is
20 the source?
21     Q. From a parent or a student -- I guess,
22 if it's different, let's start with a parent.
23     A. If a parent called me, depending on the
24 nature of the allegation of a sexual nature, it

1 would be dependant on the information the parent
2 gives me. Generally speaking, I would take the
3 information. If there's some research and there's
4 some information I can gather, outside of speaking
5 to the Principal, if there are avenues within the
6 school district that I can find out if it's true or
7 not, I would investigate first before speaking to
8 the Principal. However, I would speak to the
9 Principal.
10     To be more specific, if that allegation
11 is about the Principal and a teacher, I might speak
12 to the teacher first before speaking to the
13 Principal.
14     If it's an allegation of the Principal
15 doing something sexually inappropriate to the
16 teacher, I'd speak to the teacher first.
17     If it's the Principal having done
18 something inappropriate with a parent, it would be
19 another situation.
20     Did you ask me if it was a Principal
21 and a student?
22     Q. I just wanted to ask you about a
23 Principal and a student.
24     A. Okay. Then I would speak to the

Page 22

1  Principal first.
2      Q. If you had been given information that
3  suggests that other people had information, would
4  you follow-up with them as well?
5      A. Within the school?
6      Q. Yes. Let's start with within the
7  school.
8      A. It would depend on the situation.
9      Q. What would be -- when you say you would
10 speak to the Principal first, what would be the
11 purpose of that conversation with the Principal?
12     A. Remind me, how did I find this out?
13     Q. A parent contacts you and makes an
14 allegation about a Principal having sexual contact
15 with a student?
16     A. I would sit down with the Principal and
17 inform that Principal that I've had an allegation
18 against that person and discuss it.
19     Q. And would the purpose of that
20 conversation be to determine whether or not it was
21 a credible allegation?
22     A. No. It would be to inform the
23 Principal. Then, during the discussion, to find
24 out if there may be some validity to it.

Page 23

1      Q. Would you take other steps to determine
2  whether this was a credible allegation?
3      A. It would be dependant on what my
4  conversation is with that Principal.
5      Q. What would determine whether or not you
6  would investigate further to see whether the
7  allegation against the Principal was a credible
8  one?
9      A. I can only speak generally. If you
10 give me specifics, I could answer that more
11 clearly. I can't answer that without having
12 specifics.
13     Q. Okay. Is it fair to say that you would
14 take whatever steps you needed to come to a
15 conclusion in your mind as to whether or not the
16 allegation was credible?
17     A. Absolutely. I would not just take the
18 word of a Principal. I would investigate.
19     Q. Okay. Would that investigation include
20 either you or someone else speaking to the student
21 that is allegedly involved?
22     A. Yes. It could even be the Principal.
23     Q. You would ask the Principal to speak to
24 a student who was making an accusation that the

Page 24

1  Principal had inappropriate contact with that
2  student?
3      A. Perhaps not alone, but the Principal
4  could be there.
5      Q. If you concluded that an accusation of
6  a Principal having sexual contact with a student
7  was credible, not necessarily true, but, at least
8  credible, what would your next step be; what would
9  you be obligated to do?
10     A. To report it to -- well, actually,
11 there would likely be a disciplinary action in the
12 school district.
13     When I was answering your question, I
14 was not thinking of a sexual allegation from a
15 student against the Principal. If there's an
16 allegation of a student against a Principal, I
17 would inform the Principal that an allegation had
18 been made, but I would investigate that through
19 other avenues, which could include the Guidance
20 Counselor. I do not believe a student would call
21 me directly to me inform me.
22     Are we still on a student informing me
23 or are we back to a parent informing me?
24     Q. We were back to the parent informing

Page 25

1  you.
2      A. I'm sorry, you're meandering.
3      Q. Okay. Let me clarify. I'm assuming
4  that an allegation of this nature would be a report
5  by a student probably to a parent and then coming
6  to you. So that's the scenario that I'm talking
7  about here. Now, if you want to clarify anything
8  you've told me about what you would do upon
9  receiving that report from a parent, go ahead.
10     A. Okay. And I would not automatically
11 assume it would come from a parent. It could come
12 from a student talking to a school Counselor, which
13 is why I'm giving you different answers.
14     Q. Okay. Then let's start with the parent
15 and then I'll ask you to tell me about the school
16 Counselor.
17     A. Okay. If a parent informs -- has an
18 allegation against any -- is it a Principal?
19     Q. It's a Principal at this point.
20     A. If a parent calls me, then I would
21 investigate. I would probably contact the Guidance
22 Department to see if the student had given them any
23 information. I would investigate with the student
24 or I would have an Assistant Principal investigate

1 with the student, if there's an Assistant in the
2 building. So between the Guidance Counselor and
3 the Assistant Principal, I would investigate.
4 Again, this is after I have informed the Principal
5 of the allegation.
6       And then, at some point, depending on
7 the information I have gleaned, I may or may not
8 meet with the student to determine if it's true.
9 In any event, I would speak with the parent again.
10     Q. Now, what if this allegation came to
11 you through a Guidance Counselor or another member
12 of the administration?
13     A. If it came to me that way, again, they
14 would have facts. Again, depending on which
15 Administrator -- if, again, you're saying the
16 Principal, then I would ask if they've spoken to
17 the Assistant Principal, what information they've
18 gathered. If I read the information, or as I go
19 through the discussion, I decide, if there's
20 adequate information there, that I might meet with
21 the student or I might not.
22       One of the things we do is, when
23 students have concerns and they meet with a
24 Guidance Counselor or an Administrator, we

1 generally have them write out what the incident is
2 and we have them sign it.
3     Q. I want to try to capture something that
4 you said in one summarizing statement. If this is
5 not accurate, please tell me. My understanding,
6 from your testimony, is that while you've laid out
7 a number of steps you might take, you would not
8 pursue any more of those steps than you needed to
9 pursue to determine whether or not the allegation
10 is credible; is that correct?
11     A. No. It's not that I wouldn't pursue
12 any more than I needed. I would pursue steps until
13 I feel I have information regarding the situation.
14 I don't want to give the impression that I'm just
15 going to speak to the Principal and it ends there.
16 I would keep investigating until I feel I have
17 enough information to make a decision.
18     Q. And what if, upon speaking to the
19 Principal, you believe that you had enough
20 information to determine that this was just not a
21 credible allegation?
22     A. Again, not taking lightly the research
23 that I had done, if it's not a credible allegation,
24 then -- again, we're talking about a student making

1 a referral?
2     Q. Yes.
3     A. Then I would go back to the Guidance
4 people or have administration and Guidance speak
5 together and talk to the student as to what the
6 next step would be, whether we're going to -- let
7 me backup. We would also have the parent involved
8 in this process. It wouldn't be just the student
9 we were dealing with. We would investigate until
10 we feel we have the information we need.
11     Q. Thank you. I know that these are a lot
12 of hypothetical questions.
13     A. Hypotheticals are difficult questions.
14 Specifics are much easier to deal with.
15     Q. I understand. Now, we've just
16 characterized these questions as hypotheticals, but
17 without giving any sort of specifics, have you, in
18 fact, had to pursue some of these procedures at any
19 point while you were Superintendent or Acting
20 Superintendent because of an accusation against a
21 teacher or a Principal?
22     A. I have, and I have done that since
23 February in a case other than this.
24     Q. Dr. Romberger, you are, of course,

1 familiar with the case that we're here to talk
2 about?
3     A. I am.
4     Q. I see you have a page from your
5 calendar in front of you. Can you tell me what
6 that is?
7     A. I'll be happy to share it with you.
8     Q. Thank you.
9       MR. RIBA: Do you want to mark that as
10 an exhibit?
11       MS. ROPER: Yes.
12       (Plaintiff's Romberger Exhibit 1, March
13 of 2007 Blue Mountain School District
14 calendar page, was marked for
15 identification.)
16     Q. Dr. Romberger, could you explain for me
17 what we have marked as Romberger Exhibit 1?
18     A. Yes. This is a copy of the March 2007
19 Blue Mountain calendar and I marked on here the
20 date of March 21st, when Mr. McGonigle came to me
21 for the first time to inform me of the incident
22 we'll be discussing today, that Jill Snyder was
23 involved in the MySpace page.
24       Thursday, March 22nd is when

1 Mr. McGonigle met with the parents.

2 The following week, March 28th, is when

3 I was informed that a Temporary Restraining Order

4 was filed with the Federal Court.

5 March 29th is the day I went to

6 Scranton to the Federal Court.

7 I want to have the exact dates in front

8 of me rather than discussing just a Wednesday or a

9 Thursday.

10 **Q. This is very helpful. Thank you for**

11 **doing that. It makes things much easier.**

12 **Was March 21st the first day that you**

13 **heard that there was a MySpace page about Principal**

14 **McGonigle?**

15 A. Yes.

16 **Q. Can you tell me how you learned of**

17 **that?**

18 A. Yes. I was in a meeting with my

19 Technology Coordinator, in the morning, and

20 Mr. McGonigle came into that meeting and shared

21 with the two of us a copy of --

22 MS. ROPER: Let's go off the record for

23 a second.

24 (A discussion was held off the record

1 and, at this time, Mary E. Kohart, Esq.

2 entered the deposition room.)

3 A. I was in a meeting with my Technology

4 Coordinator, Susan Snyder Morgan, and Mr. McGonigle

5 came into the meeting and said he had something he

6 needed to show us. He showed us the MySpace -- he

7 showed us a page from MySpace.

8 **Q. And what did he tell you?**

9 A. He told us, as I recall, that one of

10 the students in the middle school had put the

11 MySpace account on the Internet.

12 **Q. And what time of day was this meeting?**

13 A. It was in the morning, somewhere

14 between nine and eleven.

15 **Q. Did Mr. McGonigle tell you how he had**

16 **learned of the MySpace page?**

17 A. He said students had informed him of

18 it.

19 **Q. Did he tell you how he had gotten a**

20 **copy of it?**

21 A. I believe he said a student gave him a

22 copy.

23 **Q. Did he say what student?**

24 A. No; a middle school student.

1 **Q. Okay. Did he show you the page?**

2 A. Yes.

3 **Q. Was he making a request of you**

4 **regarding the page or just informing you; what was**

5 **the content of the discussion?**

6 A. I believe he told us he was informing

7 us, but he was also investigating the case.

8 **Q. What do you mean investigating?**

9 A. Trying to gather information as to who

10 the student was who had the account out. I don't

11 recall the exact details.

12 **Q. At that point, to your recollection,**

13 **did he have the name or names of the students he**

14 **believed to have been involved?**

15 A. I do not recall him mentioning names at

16 that point.

17 **Q. Did he ask you to do anything?**

18 A. No.

19 **Q. Did he ask Ms. Snyder Morgan to do**

20 **anything?**

21 A. I don't recall.

22 **Q. How long did this discussion last?**

23 A. Maybe 10 minutes. I looked --

24 maybe 10 minutes.

1 **Q. How do you know it was 10 minutes?**

2 A. It was, approximately, 10 or 15

3 minutes. I looked at the MySpace. I read it. I

4 saw his photograph. It said Principal. I read

5 what was on the paper. Mrs. Snyder Morgan read

6 what was on the paper. We realized it was a

7 photograph from our website. We realized the fact

8 that he was a Principal. It was true. There were

9 other allegations on the paper. We did not discuss

10 if they were true or not true and we discussed that

11 it was a violation of our A-U-P policy, our

12 Acceptable Use Policy.

13 **Q. What is the Acceptable Use Policy?**

14 A. We have an Acceptable Use Policy that

15 is Board approved. I don't know the exact number.

16 I believe it's in the 800's and it is a policy that

17 governs our students, our facility, our custodians,

18 anyone, School Board members, anyone who uses

19 computers, Internet, I believe cell phones may even

20 be on that, in terms of what is acceptable use for

21 that electronic and communication system regarding

22 our school district or associated with our school

23 district.

24 **Q. And why did you believe that this was a**

Page 34

1 violation of the Acceptable Use Policy?
2     A. Because Mr. McGonigle's photograph was
3 from our website. I recall Mrs. Snyder Morgan
4 saying that the photograph that was on the MySpace
5 looked like the one that was on our website and I
6 remember her checking and it was on our website.
7     Q. And why would that be a violation of
8 the Acceptable Use Policy?
9     A. Copyright.
10     Q. Can you explain that answer?
11     A. Yes. One of the things -- we have an
12 Acceptable Use Policy, which we do discuss with our
13 students. We discuss with students that they
14 cannot get copyrighted material without permission
15 from the agency or the website, that they cannot
16 use plagiarized writings from websites, books,
17 copyright, etcetera, any textbook, any printed
18 material, and that is information we repeatedly
19 discuss with our students and we're teaching in our
20 schools and the fact that this was something that
21 was on our website and taken from our website, we
22 believe it's a violation of our Acceptable Use
23 Policy.
24     Q. Because it violates a copyright; is

Page 35

1 that what you mean?
2     A. Because it's on our website and copied
3 from our website and it was used without our
4 permission.
5     Q. Does the school have a copyright on the
6 photograph?
7     A. We have sole permission to use it. We
8 were not asked by -- at that point, I didn't know
9 who the student was, but I had no knowledge that
10 anyone had been given permission to copy that
11 photograph from our website. It's our website. We
12 created it.
13     Q. Apart from the use of the photo, did
14 you believe that the MySpace page violated the
15 Acceptable Use Policy in any other way?
16     A. No; not that I can think of or that I
17 recall us discussing.
18     Q. Did you discuss any of the written
19 content of the website at that meeting?
20     A. I don't recall us discussing the actual
21 words that were on the page, except, having read
22 it -- I don't remember us discussing the wording.
23     Q. Now, when Mr. McGonigle brought this to
24 you, did he tell you it had been done by his

Page 36

1 student?
2     A. As I recall, he said a student told him
3 it was done by a student, but I don't recall
4 exactly.
5     Q. Okay. Did you, at any point, suspect
6 or worry or think that it had been done by someone
7 other than a student?
8     A. No, because Mr. McGonigle was
9 investigating it.
10     Q. And you said you read the content of
11- the MySpace page that morning, when you were first
12 given a copy. What was your reaction to the
13 content?
14     A. Very inappropriate language.
15     Q. What do you mean by that
16 specifically -- if you want me to narrow that down,
17 I can?
18     A. Yes.
19     Q. Are you talking about the use of
20 profanity on the website as being inappropriate
21 language?
22     A. The comments that were made, that
23 Mr. McGonigle had sexual relation with students, I
24 think there were comments that he had inappropriate

Page 37

1 interactions with parents. I saw it, I guess, as
2 lies.
3     Q. Did you have any other reaction?
4     A. Disgust, if it was a student who had
5 done it.
6     Q. Disgust because they had written those
7 things; is that what you mean?
8     A. Right. If a student had written those
9 things, I thought it was very inappropriate for a
10 student and I was disgusted that one of our
11 students would do that.
12     Q. After your conversation with
13 Mr. McGonigle, am I correct that that conversation
14 ended with him saying he was going to do further
15 investigation?
16     A. That's what I recall.
17     Q. Did you plan any personal investigation
18 as a follow-up to that meeting?
19     A. No.
20     Q. Did you direct or did you understand
21 that Ms. Snyder Morgan was going to do any
22 follow-up investigation as a result of that
23 meeting?
24     A. As I recall, Mr. McGonigle and Ms.

1 Snyder Morgan were working together through MySpace
2 to see if they could determine who had done it. I
3 know that they were discussing it as they were
4 investigating.
5     Q.  Was it your understanding that
6 Ms. Snyder Morgan had known about it before that
7 meeting?
8     A.  My impression was she did not. My
9 impression was that that was the first time we both
10 found out about it.
11     Q.  What was the next communication you had
12 with anyone about the MySpace page?
13     A.  I'm trying to remember. I can't recall
14 if Mr. McGonigle, at that point, had told us who
15 the students were whom he thought had done it. At
16 some point, during that day or the next day, I was
17 informed that it was no longer on MySpace and I
18 know that Mr. McGonigle was going to be talking to
19 the students. That's all I know, that that was the
20 next step. Mr. McGonigle was investigating and he
21 was going to be speaking to the students involved.
22     Q.  And that was either later on the 21st
23 or on the 22nd; is that correct?
24     A.  Yes.  My understanding is that he was

1 investigating on the 21st. The next time I heard
2 about it, I believe it was the morning of the 22nd
3 and he informed me that he knew who the two
4 students were and he was going to be talking to the
5 parents.
6     Q.  Did he tell you, at that point, if he
7 had determined a discipline that he intended to
8 impose?
9     A.  By the 22nd, yes, he did.
10     Q.  And what did he tell?
11     A.  He was planning to give 10 days
12 out-of-school suspension.
13     Q.  And did you have any discussion with
14 him about the appropriateness of that punishment?
15     A.  I concurred.
16     Q.  Why?
17     A.  Well, because, first of all, a breach
18 of our A-U-P policy can be anything from a
19 disciplinary within the school to, actually,
20 expulsion. He was going with a 10 day
21 out-of-school suspension, all student work was
22 allowed to be completed, and I felt it was
23 appropriate.
24     Q.  Why did you feel it was appropriate?

1     A.  Because it was a violation of our A-U-P
2 policy. I felt that the student had taken
3 something from our Internet website that was
4 inappropriate and the student, of course, had told
5 lies about Mr. McGonigle.
6     Q.  So in your mind then, the punishment
7 was, in part, for the use of the photograph, but
8 also for the content of the website?
9         MR. RIBA:  Objection.
10     Q.  You can answer that if you understand
11 that.
12     A.  I do understand the question. As I
13 said, the A-U-P policy itself was everything from
14 in school discipline to expulsion and, I believe,
15 that was an issue and, I believe, in part, the lies
16 that were involved and that was another issue I was
17 very concerned about with this.
18         When I talked to Mr. McGonigle on
19 the 21st, as I recall now, he and Susan Snyder
20 Morgan were discussing the fact that this was on
21 the Internet and it was out there, I don't recall
22 what period of time, but it was out there for the
23 public and anyone had access to it. If you read
24 the MySpace, it was an allegation against

1 Mr. McGonigle of having sexual relations with
2 students.
3         I had heard, within the prior few
4 months to this, I only heard of MySpace one time.
5 The time I had heard of MySpace was either on the
6 T-V news or it was in Time Magazine or one of the
7 news magazines, and there was a photograph of a
8 young man, who appeared to be nude, it was actually
9 blacked out, and he was standing in front of a
10 refrigerator holding a beer bottle and the comment
11 was that employers are checking the Internet for
12 information regarding students and what it was is
13 that this student had not gotten a job because of
14 this photograph on MySpace. Knowing the fact that
15 school Administrators and teachers have to abide by
16 the code of professional conduct, I also felt that
17 the student, by what she had written and the fact
18 that it was out there for the entire world to see
19 for a certain period of time, had actually impugned
20 his reputation. The fact that the code of
21 professional conduct is something we have to abide
22 by and the student had written these things and it
23 was out there for anyone might also jeopardize his
24 current position or possible future positions. So

11 (Pages 38 to 41)

1 I also felt that lies were told and that was on
2 the 21st.
3     Q. The MySpace page does not use
4 Mr. McGonigle's name; is that correct?
5     A. I don't recall. I'd have to see the
6 MySpace. I know it says Principal.
7     Q. Let me give you --
8     MS. ROPER: We'll just use the same
9 designation, Defendant's Exhibit 1.
10     MR. RIBA: Sure.
11     Q. This is a two page exhibit. The second
12 page, which is blown up and easier to read, it's
13 the same content I'll represent to you.
14         Is it correct that Mr. McGonigle's name
15 does not appear on this page anywhere?
16     A. It does not. It simply says Principal.
17     Q. It also does not identify him with Blue
18 Mountain School District, correct?
19     A. I do not see Blue Mountain School
20 District.
21     Q. Why do you say that you were concerned
22 that this page could jeopardize his current
23 position?
24     A. He informed me that students had come

1 to him and told him that there was something on
2 MySpace about him and there were terms in this that
3 I -- there are statements on this page that if
4 other students are reading it and they think he may
5 have had anything to do with it or that someone
6 else would write about him -- such as, fucking in
7 my office, hitting the students -- or hitting on
8 students. The fact that someone wrote this about
9 him could even plant a seed that there may be some
10 truth to it.
11     Q. But why would that jeopardize his
12 position, his current position?
13     A. Because he has to enforce discipline
14 and it doesn't allow students to use this kind of
15 language. Now someone is using it about him.
16 Children came to him and told him that -- the
17 student who approached him about this and said that
18 there was something about him on MySpace and, as I
19 recall, the student said it was not very nice, I
20 think that's what he told me at some point during
21 the investigation. The fact that this is out there
22 about him could cause children to look at him in a
23 different manner. Someone might read something on
24 here and possibly repeat it to him or view him in a

1 different role, certainly, less than totally
2 respectful.
3     Q. And why did you say that it could
4 jeopardize his future employment?
5     A. There are people within our County and
6 there are people within the State who do know
7 Mr. McGonigle. They do know him by sight and the
8 photograph alone would have been enough. They
9 would have recognized his photograph on the page.
10     Q. What consequence did you think would
11 follow from this?
12     A. The fact that it's out there, it could,
13 number 1, the children would see that somebody did
14 not respect him enough that they would chose to put
15 something like this out on MySpace regarding him.
16         Number 2, the fact that some might view
17 him as not having discipline of his building
18 enough. That children would chose to do something
19 like this, that means that he may not be respected
20 enough by his students.
21         Number 3, people who might be
22 considering him for employment, at some point,
23 might find this or might just be aware of it.
24         I do not know all the things that are

1 out on the Internet, but I do know that if you put
2 in different information you can find things now
3 that you couldn't have found five years ago.
4     Q. With respect to people who may be
5 considering Mr. McGonigle for future employment,
6 what was your concern -- I assume that you're
7 talking about being worried about what their
8 reaction might be to seeing this page; is that
9 correct?
10     A. Yes. Because someone who does not know
11 Mr. McGonigle would not know if it was accurate or
12 not accurate. Even if they think it's not
13 accurate, they might question why anyone would even
14 put this out about him and there might be a flaw in
15 his character.
16         Again, going back to the code of
17 professional conduct, which is mandated by the
18 Department of Education, and the comments that are
19 in here are a violation if taken seriously.
20 There's a saying, where there's smoke, there's
21 fire, and some people believe that and if somebody
22 reads this, they might think that there's something
23 to it, some truth to it.
24     Q. You've now told me about a conversation

1  with Mr. McGonigle the morning of the 21st
2  regarding this MySpace page and I think you said,
3  later on the 21st, he told you that he had
4  identified the students involved and had intended
5  to discipline them?
6      A.  Right.  I don't recall exactly if it
7  was on the 21st or 22nd.  I mean, he may have
8  mentioned it the morning of the 21st, but I just
9  don't recall.
10     Q.  But by the morning of the 22nd, you
11 believe you had two conversations with
12 Mr. McGonigle about this; is that correct?
13     A.  Yes.  He told me what the discipline
14 was going to be.
15     Q.  What was your next conversation with
16 Mr. McGonigle about this?
17     A.  As I recall, it was after he met with
18 the parents.  He told me he had met with the
19 parents.
20     Q.  And what did he tell you about that?
21     A.  That he had discussed the MySpace and
22 told them what the discipline was going to be,
23 the 10 day suspension.
24     Q.  What else did he tell you?

1      A.  As I recall, he said -- that's all I
2  recall.  I can't remember exactly.
3      Q.  Do you believe that conversation was
4  sometime on the 22nd?
5      A.  I do.
6      Q.  When was your next conversation with
7  Mr. McGonigle about this MySpace page?
8      A.  I don't recall specifics.  I know we
9  had numerous conversations between the 22nd and
10 the 28th.  At one point, I believe he told me that
11 Mrs. Snyder Morgan did not agree with the
12 punishment, but the specific details, I do not
13 recall.
14     Q.  Did you have any further conversations
15 with Ms. Snyder Morgan about this MySpace page
16 after that first meeting?
17     A.  Yes.  I know we had more conversations
18 again, but it was in getting ready for the Court
19 case on the 29th.  Generally speaking, it was about
20 the A-U-P policy, the photograph.
21     Q.  Please tell me the content of your
22 conversations with Ms. Snyder Morgan before the
23 Court hearing, excluding any conversations that
24 included your Counsel?

1      MR. RIBA:  Do you understand that?  If
2  the attorney was there, don't share what was
3  talked about during that conversation.
4      THE WITNESS:  Yes.
5      MR. RIBA:  If he wasn't there, go ahead
6  and share.
7      A.  It involved the fact that I did not
8  have the general knowledge of MySpace that our
9  Technology Coordinator had.  So it was -- some of
10 that conversation was her informing me as to what
11 MySpace is, who had access to MySpace.  I learned
12 that there was a time period it was open to anyone
13 and there was a time period it was closed.
14     We discussed the A-U-P policy.
15     We discussed whether -- am I allowed to
16 mention the children?
17     Q.  Yes.
18     A.  After I knew who the children were, I
19 asked her to go back and check our records and see
20 if the children had received an A-U-P, an
21 Acceptable Use Policy, if the children had signed
22 it, if the parents had signed it for both students,
23 and they did.
24     We discussed the curriculum in our

1  school.  They were both -- again, this is after
2  the 21st.  They were both 8th grade students.  We
3  discussed the fact that the Acceptable Use Policy
4  is discussed in our middle school, in 8th grade, in
5  the library research project the Acceptable Use
6  Policy is reviewed, the copyright laws, the
7  plagiarizing, and those things were discussed by
8  the librarian.
9      At some point, I asked her to go back
10 and see, as we were preparing for the Temporary
11 Restraining Order, if Jill Snyder had been in
12 school and, because it was a rotation subject, if
13 Jill Snyder had received that instruction and she
14 had received it for the marking period before and
15 had received a satisfactory grade in that,
16 Acceptable Use Policy -- she had passed the course
17 for the research project and that the Acceptable
18 Use Policy and some of the content of that was
19 discussed in class, which dealt with this
20 photograph, which was taken off our website and put
21 out on MySpace.
22     MR. RIBA:  Can we take a five minute
23 break?
24     MS. ROPER:  Absolutely.

Page 50

1    (At this point, a recess was taken.)
2    BY MS. ROPER:
3    Q. Dr. Romberger, you were telling me the
4    things that you and Ms. Snyder Morgan discussed
5    between the time you learned of the MySpace account
6    and the Court hearing in this case.
7    Would you please continue with that
8    description?
9    A. Can you tell me specifically what I was
10   saying?
11   Q. Absolutely. You said you learned a bit
12   about MySpace and how it works -- and if you think
13   my characterization of your testimony is
14   inaccurate, please correct me. You learned
15   something about when the profile was, as you said,
16   open and when it was closed, that you and Ms.
17   Snyder Morgan discussed the A-U-P policy and you
18   confirmed that Jill Snyder had taken it and passed
19   a class in which that policy was specifically
20   discussed with 8th grade students. I think that's
21   where you finished.
22   Can you tell me anything else you
23   discussed with Ms. Snyder Morgan outside the
24   presence of your Counsel between the 21st and

Page 51

1    the 28th of March?
2    A. I cannot remember. There were many
3    discussions on these topics.
4    Q. When you say there was a time when the
5    profile was open and a time when the profile was
6    closed, could you explain to me your understanding
7    of what that means?
8    A. My understanding is when it's open,
9    anyone, anywhere has access to it. My
10   understanding is when it was closed, that only
11   people who know a specific U-R-L have access to it.
12   Q. And when it is open, do you have any
13   understanding of how someone could find the page?
14   A. No.
15   Q. When it is closed, did you understand
16   that a person had to have permission in order to
17   view the page?
18   A. Permission would not be the word I
19   would use. I believe they needed to have a
20   specific address or some type of specific
21   information to access it, but I don't know what
22   that is called.
23   Q. Now, I'm going to switch between
24   discussions between you and Ms. Snyder Morgan to

Page 52

1    discussions between you and Mr. McGonigle that you
2    have not previously discussed in this testimony and
3    did not include your Counsel. You said there were
4    a number of discussions. Could you tell me the
5    content of those discussions?
6    A. At some point, again, it may have been
7    the 21st or the 22nd, he informed me of the
8    students' names. He informed me of the discipline
9    that he was going -- the disciplinary procedures he
10   was going to use for the two students. They were
11   both going to get exactly the same discipline. He
12   informed me, I believe it was Mr. McGonigle who
13   informed me, that the MySpace was opened, at one
14   point, and it was closed at another and then, at
15   some point, I was informed it was taken off
16   MySpace. I believe that was Mr. McGonigle who told
17   me that it was closed down.
18   As I recall, I had also spoken to
19   Mrs. Snyder. She had asked me to research
20   Mr. McGonigle's decision. I shared with
21   Mr. McGonigle that, after discussing it with
22   Mrs. Snyder, that I was going to uphold the 10 day
23   suspension. I also, during one of our discussions,
24   I informed Mr. McGonigle that I had shared the

Page 53

1    incident and a copy of MySpace with the School
2    Board.
3    Q. Can you remember anything else that you
4    and Mr. McGonigle talked about with respect to this
5    MySpace page between March 21st and March 28th?
6    A. It would have been getting things ready
7    for the Federal case on the 29th, as to who was
8    sending what to the attorney, information of that
9    nature, who was driving to the hearing up in
10   Scranton.
11   Q. By the way, would you agree with me
12   that a 10 day suspension is a very serious
13   disciplinary measure?
14   MR. RIBA: Objection to the form of the
15   question. You can answer.
16   A. It's serious, but we do make out 10 day
17   suspensions.
18   Q. But a 10 day suspension is the longest
19   suspension the school district can give without
20   expelling a student; is that right?
21   A. I would have to check our official
22   policy. I know we -- I would have to check the
23   policy.
24   Q. Are you aware of any instances in which

14 (Pages 50 to 53)

1  the school district has suspended a student for
2  longer than 10 days?
3      A. At one time?
4      Q. Yes.
5      A. No. I would say though, the fact that
6  this is a level four of the disciplinary code, that
7  we have given other 10 day suspensions for a level
8  four violation.
9      Q. And a level four is your highest, most
10 serious level of disciplinary infraction; is that
11 correct?
12     A. I would have to check. There may be a
13 level five. I'm not sure.
14     Q. But it's up there?
15     A. It's up there. This was up there.
16     Q. You mentioned that you shared the
17 MySpace page and discussed it with the School
18 Board. Can you tell me about those communications?
19     A. They were in executive session.
20        Am I allowed to discuss that with my
21 Counsel?
22        MR. RIBA: Can we confer on this?
23        MS. ROPER: Go ahead.
24        (At this point, a recess was taken.)

1        MR. RIBA: I'm going to instruct my
2        client not to answer on the basis of
3        attorney client privilege. It was during a
4        portion of the executive session during
5        pending legal matters. Counsel was present.
6        So I'm instructing my client not to answer
7        that question.
8        MS. ROPER: Okay.
9  BY MS. ROPER:
10     Q. Did you have any discussions about the
11 MySpace page with any School Board members outside
12 of that executive session that your Counsel has
13 just talked about?
14     A. They weren't discussions. I only
15 informed the School Board when the Temporary
16 Restraining Order was filed and I informed them
17 that we were going to Court on the 29th. When we
18 came back from Court, I informed them that we had
19 been to Court and I informed them the student would
20 serve her 10 day out-of-school suspension. Other
21 than that, I have not.
22     Q. You also mentioned speaking to Ms.
23 Snyder about the suspension. Would you tell me
24 about those discussions?

1      A. I met with Mrs. Snyder and I was trying
2  to recall, in the back of my mind -- I think she
3  telephoned me and asked me to change the 10 day
4  out-of-school suspension and, I believe, I told
5  her, on the telephone, that I will not do that.
6  However, she and I also did meet and I believe we
7  met sometime during March 26th or the 27th. The
8  reason I believe it was then is because she asked
9  to meet with me to discuss the situation, again,
10 hoping I would override Mr. McGonigle's discipline,
11 or overrule, and I said I would not and, as I
12 recall, she said that she was hoping she could
13 resolve it once without having to go any farther
14 with it. That's my recollection.
15     Q. And when you say not go any farther
16 with it, what was your understanding of that?
17     A. My understanding was legal proceedings.
18 She did not mention legal proceedings, but she
19 implied that and then it was a day or two that I
20 heard about the Temporary Restraining Order.
21     Q. So you mentioned discussing this
22 MySpace page with Ms. Snyder Morgan, Mr. McGonigle,
23 the School Board, we won't delve any further into
24 those discussions, and Mrs. Snyder. Is there

1  anyone else that you showed the MySpace page to or
2  discussed it with?
3      A. Yes; Mrs. Lehman.
4      Q. Can you tell me about those
5  discussions?
6      A. Yes. Mrs. Lehman also asked to meet
7  with me. I don't have an exact date. It was
8  sometime between March 23rd and the 30th, I
9  believe. She asked to meet with me because she
10 heard -- she had met with Mr. McGonigle and she was
11 concerned about the statement on the conduct report
12 about false accusations against Mr. McGonigle.
13 Somewhere on his conduct form he must have wrote
14 false accusations against the Principal or against
15 Mr. McGonigle. She said, why was this, and she
16 said, I know my daughter took the photograph, but I
17 don't understand the false accusations. So I had a
18 copy of the MySpace and took it and I read certain
19 things from it. Do you want me to --
20     Q. No. That's okay.
21     A. I read certain wording from the MySpace
22 that had been printed and, after I read two or
23 three statements, she said, you don't have to read
24 anymore. She said, I accept the punishment.

1    She also informed me that she had been
2  contacted by the Snyder family to see if she wished
3  to pursue litigation and she did not.
4    Q.  Actually, I'm going to retract what I
5  said before.
6      Would you tell me what statements on
7  the MySpace page you identified to Mrs. Lehman as
8  being false?
9    A.  First of all, as I recall, I said, it's
10  Mr. McGonigle's photograph and it states he's the
11  Principal.  Then I read the statements -- I was not
12  trying to be crude, but I was trying to show her
13  the seriousness of the wording and I used the
14  terms, fucking in my office, hitting on students
15  and their parents.  I remember those two.  I don't
16  recall what the others would have been, but I
17  remember I only said two or three sentences and she
18  just stopped me and she said, you don't have to say
19  anymore.
20      The only thing she mentioned to me is,
21  she said that she talked to her daughter and she
22  said that when her daughter returns to school, she
23  said you may have some friends that are going to be
24  giving you a high five, good job, well done, and

1  she said, you need to think about if those are
2  people you want to be your friends.  She was trying
3  to counsel her daughter.
4    Q.  Did she tell you that her daughter had
5  not written any of the words on the MySpace page,
6  that she only did the photograph?
7    A.  She told me her daughter did the
8  photograph.  We didn't discuss the words.  She did
9  tell me her daughter took the photograph.
10    Q.  Was there anyone else that you showed
11  this MySpace page to or discussed its contents with
12  besides Ms. Snyder Morgan, Mr. McGonigle, Mrs.
13  Snyder and Mrs. Lehman and the Board?
14    A.  I don't think so.
15    Q.  Did you discuss it with a Guidance
16  Counselor at the middle school?
17    A.  No.  I did not, that I recall.
18    Q.  Do you recall discussing the
19  allegations in the MySpace page with any other
20  Administrator at the middle school?
21    A.  No.  I did not.
22    Q.  Did you ever speak with either Jill
23  Snyder or Kristina Lehman about what was written on
24  the MySpace page?

1    A.  I did not.
2    Q.  By the way, were you aware whether
3  Principal McGonigle imposed additional punishment,
4  besides the 10 day suspension, on the two girls?
5    A.  Yes.  They were not allowed to attend
6  school dances, and that goes for any student that
7  has a certain number of days of out-of-school
8  suspension.  Each Principal makes their own rules.
9  Middle school, 10 days out-of-school, I know they
10  cannot attend school dances.
11    Q.  Were you aware that they had been told
12  that they could not attend the class trip?
13    A.  There is no 8th grade class trip
14  sponsored by the school.
15    Q.  There is, however, a class trip that
16  the 8th graders go on; is that correct?
17    A.  There is a trip that 8th grade students
18  go on, sometimes parents -- I know sometimes that
19  the children of other parents go to Washington.  It
20  is run by a group of teachers in the school.
21  However, parents are informed, when that letter
22  goes out, that it is not a Blue Mountain sponsored
23  trip.
24    Q.  Who organizes it?

1    A.  A teacher in our middle school.
2    Q.  And students are excused from school
3  for that trip?
4    A.  No.
5    Q.  Does it happen on a weekday?
6    A.  It happens on a Friday after school is
7  over and they go to Washington and they're back
8  Monday.
9    Q.  Do you know whether Mr. McGonigle
10  informed the students that they would not be
11  permitted to go on that trip?
12    A.  I don't know if Mr. McGonigle did that
13  or if the teacher who organizes the trip did that.
14    Q.  Would Mr. McGonigle have the authority
15  to tell them they couldn't go on that trip?
16    A.  I have no answer for that because I'm
17  not involved in the trip.  So I don't know.
18    Q.  In my previous question you answered
19  that you did not know if Mr. McGonigle or the
20  organizing teacher told them that they couldn't go
21  on that trip.  Did you, in fact, know that they
22  were told by someone that they couldn't go on the
23  trip?
24    A.  I heard, during the course of

16 (Pages 58 to 61)

1  conversations, I don't recall if it was here or if
2  it was in Scranton, that they weren't going to go,
3  but I did know that they were not going to be going
4  on the trip and I knew that they were not going to
5  go to the dances and I know that the 8th grade
6  girls like to go to 8th grade dances and they were
7  not allowed to do that. I did know that.
8      I would like to just add that, the fact
9  that this was not a school sponsored trip, we also
10  have other teachers in our high school, foreign
11  language teachers, who, in the summer, not in
12  school, would take students to Spain and other
13  European Countries and they are not school
14  sponsored trips and we have no jurisdiction over
15  them.
16      Q.  To your understanding, what's the
17  purpose of the 8th grade trip to Washington?
18      A.  I have no information.
19      Q.  Do you know where they go or what they
20  do?
21      A.  I know they go to Washington D-C.  I
22  know students who have gone on the trip. I don't
23  know which buildings they go to in Washington.
24  This goes back years ago to when students, in rural

1  areas, didn't get away to a City. The teacher who
2  organizes it is the social studies teacher.  I
3  assume they go to Washington to see some of the
4  historic landmarks, but I do not know exactly where
5  they go.
6      Q.  Dr. Romberger, did you ever ask
7  Mr. McGonigle whether he had been hitting on
8  students or having sexual contact with students?
9      A.  No. I did not. When I saw this, I did
10  not ask him that question. I did not think it was
11  true.
12      Q.  Why didn't you?
13      A.  Because of the nature in which it was
14  written. I felt it was vindictive.
15      Q.  You did not consider these credible
16  accusations; is that correct?
17      A.  I did not. I felt it was malicious.
18  They were malicious comments.
19      There may have been a point in between
20  when I first saw this and, at some point, I think
21  Mr. McGonigle told me that there may have been one
22  or two other minor disciplinary issues, but I don't
23  remember the exact time you asked about. You asked
24  about conversations.

1      Q.  Yes.
2      A.  I think he told me that there had been,
3  at some point, a violation of the dress code.
4  Again, I don't remember the timing of that.
5      Q.  Are you referring to other disciplinary
6  issues with these two students?
7      A.  Yes.  Maybe that is why, later on, I
8  interpreted it as being malicious.
9      Q.  Oh, okay.  You mean that you thought
10  the students might have been angry at Mr. McGonigle
11  because of prior discipline and that was the reason
12  for creating the MySpace page?
13      A.  It could have been.
14      Q.  When Mr. McGonigle came to you on
15  March 21st and first informed you of the MySpace
16  page, did he tell you that there had been any
17  disruption in the school as a result of the MySpace
18  page?
19      A.  No.  We were speaking in the morning.
20  What he told me was that he had students come to
21  tell him about this.  We didn't discuss if there
22  were any disruptions.
23      Q.  Was there any point in time between
24  the 21st and the 29th, when you went to Court, that

1  you and Mr. McGonigle discussed whether or not
2  there had been disruptions as a result of this
3  MySpace page?
4      A.  He mentioned to me that the students
5  were talking about it, bringing it up in class.
6      Q.  When?
7      A.  What do you mean when; which day did he
8  tell me or when in the school day?
9      Q.  Both.  When did he tell you about that
10  and what was your understanding as to when students
11  were talking about it in class?
12      A.  Again, it was the 21st, 22nd. Students
13  were talking about it during class and it was
14  during the school day and the students were
15  bringing it up.
16      Q.  To whom?
17      A.  To their teachers or teachers overheard
18  it.  He just mentioned to me that students were
19  discussing it in class during the school day.
20      Q.  Did he mention any teachers who had
21  spoken to him about it?
22      A.  He did not.
23      Q.  Did he mention to you any discussion of
24  the discipline imposed on the girls by students

1  and/or teachers in the school?
2      A.  I'm not sure what discipline you're
3  referring to.
4      Q.  In other words, were students talking
5  about the suspension after it was given?
6      A.  He just told me that students were
7  talking about the MySpace account.  That was it.
8      Q.  How many times did you have a
9  discussion with Mr. McGonigle about students
10  talking about the MySpace page?
11      A.  He informed me, on that day, and he may
12  have mentioned it once or twice thereafter, as we
13  were getting ready for the Court case.  We never
14  sat down and discussed particular details.
15      Q.  Is it correct to say that your sole
16  knowledge of disruptions in the school as a result
17  of this is the statement, there were students
18  discussing this in class?
19      A.  Yes.
20      Q.  Did he tell you any more details, like,
21  how many classes, how many students, whether
22  teachers had complained that it was a problem or
23  anything like that?
24      A.  No.  Mr. McGonigle is the Principal.

1  He deals with his building.
2      MS. ROPER:  I'd like to take a short
3  break.  We're very close to the end.
4      MR. RIBA:  Sure.
5      (At this point, a recess was taken.)
6  BY MS. ROPER:
7      Q.  Dr. Romberger, are you aware of any
8  other incidents or complaints in Blue Mountain
9  Middle School or High School about things posted on
10  MySpace by students?
11      A.  Any other complaints?
12      Q.  Yes.
13      A.  No.
14      Q.  So you've not heard any complaints
15  about students posting things about other students
16  or about things being posted about teachers or
17  other Administrators, apart from this one incident?
18      A.  Not on MySpace.
19      Q.  Have you had complaints about postings
20  on other Internet venues?
21      A.  Yes; You-Tube.
22      Q.  How many incidents are we talking
23  about?
24      A.  Two.

1      Q.  Any other Internet venues?
2      A.  We've had issues, not on MySpace or --
3  repeat your question.
4      Q.  Besides MySpace and You-Tube, any other
5  Internet posting issues that have come up in Blue
6  Mountain School District?
7      A.  Inappropriate use of some of the
8  information from websites, yes.
9      Q.  What do you mean by that?
10      A.  During the school day.
11      Q.  Can you explain to me what you mean by
12  that?
13      A.  No.  Something was taken off that was
14  inappropriate and used for educational purposes and
15  the student was disciplined.
16      Q.  What were the You-Tube incidents, just
17  generally?
18      A.  They involved two teachers, nothing of
19  a sexual nature.
20      Q.  Students posting things on You-Tube?
21      A.  Yes.  The one teacher was dealt with
22  through a meeting and the other teacher already was
23  no longer working for us.
24      Q.  So these were actions taken against the

1  teachers because of what was posted on You-Tube
2  about him or her?
3      A.  No.  We had a discussion.
4      Q.  Was there any discipline against the
5  student because of anything posted on You-Tube?
6      A.  No, because we did not know who posted
7  them.
8      Q.  Do you know whether, at the time of
9  this incident, MySpace could be reached
10  from computers to which middle school students had
11  access?
12      A.  I don't know.
13      Q.  Are you aware that, in fact, some sites
14  are blocked on the computer?
15      A.  That I do know, yes.  During the school
16  day?
17      Q.  Yes.
18      A.  Yes.
19      Q.  The Acceptable Use Policy, does that
20  govern what students may do from their home
21  computers or other computers outside the school?
22      A.  It governs in two ways.  If they're
23  doing an assignment and they give us something
24  plagiarized, our staff does run plagiarism software

1  to see if it's taken from a website. It also
2  indicates that they cannot take anything from a
3  website without authorization and that's what I
4  felt, that these students took it from our website
5  without permission and posted it and used it. It
6  is our website.
7      Q.  Whose permission would the students
8  need in order to use that photograph?
9      A.  It would have had to go through an
10 Administrator and, at this point -- the first line
11 would have been Mr. McGonigle, since it was a
12 middle school student, but we probably would have
13 discussed it with Mrs. Snyder Morgan, our
14 Technology Coordinator for K through 12.
15     MS. ROPER:  Thank you. Those are all
16 the questions I have for you unless your
17 attorney asks you some questions, then I may
18 have a few more.
19     MR. RIBA:  I just have a few questions.
20         - - -
21     E X A M I N A T I O N
22         - - -
23 BY MR. RIBA:
24     Q.  Just to clarify, the punishment that's

1  handed out at the middle school level, the
2  Principal is charge of that?
3      A.  Yes.
4      Q.  How long have you known Mr. McGonigle?
5      A.  Since he first came to work for us in,
6  I would say the early 90's, between '92 and '95, in
7  there.
8      Q.  So at the time of this, in March of
9  2007, you'd known him for about 12 years
10 professionally?
11     A.  Yes.
12     Q.  And Counsel asked you questions about
13 how you felt when you first read this MySpace
14 account and I believe you said you were disgusted,
15 it was inappropriate; is that correct?
16     A.  Yes.
17     Q.  I didn't hear you say that it was
18 funny. Do you think this was funny at all?
19     A.  Absolutely not.
20     Q.  Do you think this was a parody of
21 Mr. McGonigle?
22     A.  Absolutely not.
23     Q.  You talked about the reasons why Jill
24 Snyder was suspended for 10 days; do you remember

1  that?
2      A.  And the other student.
3      Q.  Both students received the exact same
4  punishment, correct?
5      A.  Correct.
6      Q.  And you indicated two reasons; one was
7  the Acceptable Use Policy?
8      A.  Correct.
9      Q.  And Counsel asked you a number of
10 questions about that. There was another reason
11 which you indicated, which was false accusations or
12 lies?
13     A.  Yes.
14     Q.  Are you familiar with the Blue Mountain
15 Middle School Student Parent Handbook in 2006,
16 2007?
17     A.  I'm aware there is one. I know that
18 the different levels of discipline are written in
19 the handbook.
20     Q.  We previously marked this as D-5 at a
21 prior deposition. You indicated, in your
22 testimony, Joyce, that this was a level four
23 infraction?
24     A.  Yes.

1      Q.  A high level infraction?
2      A.  Yes.
3      Q.  And according D-5, the Student Parent
4  Handbook of 2006, 2007, making false accusations
5  about school staff members slash another student is
6  a level four violation; is that correct?
7      A.  If that's what the handbook says, yes.
8      Q.  We'll give you a copy. I don't want to
9  testify for you. I've tabbed the page.
10     A.  I don't have them memorized.
11     Q.  You may have to flip back a page to see
12 a level four violation.
13     A.  Yes; a level four.
14     Q.  And I'm correct that making false
15 accusations about a staff member or another student
16 is a level four violation?
17     A.  Yes.
18     Q.  And to your knowledge, do you know if
19 Jill Snyder admitted that the information that she
20 put on this website about Mr. McGonigle were lies,
21 were false accusations about him?
22     A.  I don't recall her saying that -- well,
23 what I recall is that, in the Court in Scranton,
24 she stated they were false.

19 (Pages 70 to 73)

1  Q. And you were here for her deposition
2  when I took her deposition, right?
3  A. Yes.
4  Q. And do you recall her testifying that
5  she knew what she was putting on the website was
6  not true?
7  A. I don't recall her saying that.
8  Q. What do you recall about her testimony
9  with regards to what she knew about the information
10 about Mr. McGonigle that she put on the website?
11 A. That she was doing it for fun, that it
12 wasn't true.
13 Q. It wasn't true?
14 A. It wasn't true.
15 Q. You talked about the professional
16 conduct of teachers?
17 A. The code of professional conduct.
18 Q. Are you aware of other educational
19 statutes involving morality of teachers?
20 A. I'm sure it's in the school code, but I
21 can't quote you. We certainly have policies
22 regarding the conduct of our own professionals,
23 both teachers and students. We have harassment
24 policies, more specifically sexual harassment.

1  MR. RIBA: That's all the questions I
2  have.
3  MS. ROPER: I have a couple of
4  follow-up questions.
5  - - -
6  FURTHER EXAMINATION
7  - - -
8  BY MS. ROPER:
9  Q. Your Counsel has pointed out to you, in
10 D-5, the disciplinary code for the school, that a
11 level four violation, among the things that can be
12 a level four violation is making false accusations.
13 Do you understand that to allow the school to
14 discipline students for false accusations about a
15 staff member that are made outside the school?
16 A. It's never been an issue before, to my
17 knowledge. My interpretation of that is, because
18 of that being posted on MySpace and the fact that
19 this was spread through the school district during
20 the school day, that it was false accusations
21 against Mr. McGonigle. The fact that the students
22 were talking about MySpace during the school day.
23 It was posted on MySpace. My interpretation is
24 that it was false accusations against

1  Mr. McGonigle.
2  Q. Your Counsel also asked whether you
3  viewed this MySpace page as a parody and you said
4  no. Would you explain why you don't believe it's a
5  parody?
6  A. A parody is, to me, is when someone is
7  trying to take something and make it sort of a
8  mockery or something funny. I did not, in any way,
9  take this to be viewed, in any manner whatsoever,
10 as a parody of another situation or to make fun of
11 Mr. McGonigle or to suggest he was someone else.
12 Q. Are you saying that you didn't think
13 the students thought they were making fun of
14 Mr. McGonigle?
15 A. Do I think -- please repeat your
16 question?
17 Q. Do you believe the students intended
18 this to be making fun of Mr. McGonigle?
19 MR. RIBA: Objection.
20 A. I don't know what the students thought.
21 I didn't take it as it was funny at all.
22 Q. I understand you didn't think it was
23 funny.
24 A. Or that there was, in any way, that

1  this could be compared to anyone else.
2  Q. Did you understand it as an attempt,
3  whether successful or not, at humor?
4  A. I did not -- not in this community.
5  Not in this community with this language.
6  Q. Is there any other reason why you
7  believe this is not parody?
8  A. Because -- it would be conjecture. No.
9  I do not.
10 MS. ROPER: Those are all the questions
11 I have. Thank you.
12 MR. RIBA: You're all done.
13 (The deposition concluded at 11:05 a.m.)
14 * * *
15
16
17
18
19
20
21
22
23
24

1  CERTIFICATE OF DEPONENT
2
3
4  I, DR. JOYCE ROMBERGER, have read the
5  foregoing transcript of my testimony taken on
6  October 12, 2007, contained within pages 1 to 77,
7  and it is true, correct and complete to the best of
8  my knowledge, recollection and belief, except for
9  the list of corrections, if any, attached on a
10  separate sheet herewith.
11
12
13  _____
14  DATE          DR. JOYCE ROMBERGER
15
16
17
18
19
20
21
22
23
24

1  C E R T I F I C A T I O N
2
3  I HEREBY CERTIFY that I am a Court
4  Reporter and Notary Public.
5  I FURTHER CERTIFY that the witness was
6  sworn to testify to the truth.
7  I FURTHER CERTIFY that the foregoing
8  is, to the best of my ability, a true and accurate
9  transcript of the testimony taken stenographically
10  by me at the time, place and date hereinbefore set
11  forth.
12  I FURTHER CERTIFY that I am neither a
13  relative, employee, attorney nor counsel to any of
14  the parties to the action, and that I am neither a
15  relative nor employee of such attorney or counsel
16  and that I am not financially interested in the
17  action.
18
19  _____
20  LYNN GREENE
21
22  (The foregoing certification of this transcript
    does not apply to any production of the same by any
23  means, unless under the direction, control and/or
24  supervision of the certifying reporter.)

1  ERRATA SHEET
2  Page Line   Correction
3  ____ ____   _____
4  ____ ____   _____
5  ____ ____   _____
6  ____ ____   _____
7  ____ ____   _____
8  ____ ____   _____
9  ____ ____   _____
10  ____ ____   _____
11  ____ ____   _____
12  ____ ____   _____
13  ____ ____   _____
14  ____ ____   _____
15  ____ ____   _____
16  ____ ____   _____
17  ____ ____   _____
18  ____ ____   _____
19  ____ ____   _____
20  ____ ____   _____
21  ____ ____   _____
22  ____ ____   _____
23  ____ ____   _____
24  ____ ____   _____

# EXHIBIT H



# BLUE MOUNTAIN
## MIDDLE SCHOOL

James S. McGonigle
*Principal*

Debra L. Frain
*Counselor*

James R. Ketner
*Assistant Principal*

Michelle S. Guers
*Counselor*

"DEDICATED TO EXCELLENCE"

March 23, 2007

Mr. and Mrs. Steven Snyder
209 Summer Valley Road
Orwigsburg, PA 17961

Dear Mr. and Mrs. Snyder:

I regret to inform you that your daughter, ▓▓▓▓▓ as been given 10 days out of school suspension effective Thursday, March 22nd through and including Wednesday, April 4, 2007. This out of school suspension is for making false accusations against Mr. McGonigle, Middle School Principal and copyright laws in using a photograph of Mr. McGonigle that was property of the Blue Mountain School District. These violations of the Blue Mountain Middle School Discipline Code and Blue Mountain School District Policy were presented at a meeting in Mr. McGonigle's office on Thursday, March 22, 2007 at 9:55 a.m. Present at this meeting were Mrs. Snyder, ▓▓▓▓▓ Mrs. Guers, and Mr. McGonigle. As you are aware, the Pennsylvania State Police have been informed of this incident so that criminal charges may be filed.

During the time of suspension, ▓▓▓▓ s not permitted on School District property without permission. She will not be allowed to attend school dances for the remaining of the 2006-2007 school year.

Mrs. Snyder has informed me that the earliest she is available for an informal hearing was Wednesday, March 28, 2007. Therefore, and informal hearing is scheduled for Wednesday, March 28, 2007 at 8:30 in the Middle School Office.

I have taken this action in accordance with the discipline policy, as published in the Parent/Student Handbook and as fully described in School District policy. If you have any further concerns, please contact me.

Sincerely,

James S. McGonigle
Principal

cc. Dr. Romberger



# EXHIBIT I

```
************************************************
```
**Blue Mountain School District**
**Disciplinary Notice**
```
************************************************
```

Student's Name: ▓▓▓▓▓▓▓▓▓▓▓▓  Date: 3/22/07

Student's Address: 209 Summer Valley Road Orwigsburg PA. 17961

Phone #: 943-2307  Grade: 8

Level of Infraction: 4  Referrals to Date: _____  HmRm: 816

**Note: Student is/is not involved in extracurricular or co-curricular activities.**
List activity(s): _____

| | | |
|---|---|---|
| 1. ( ) tardy to school | 12. ( ) disruption/inappropriate behavior | 23. ( ) defiance/insubordination |
| 2. ( ) obscenity or profanity | 13. ( ) disrespect | 24. ( ) truancy/unexcused absences |
| 3. ( ) cutting class | 14. ( ) cutting detention/suspension | 25. ( ) late to class/assigned area |
| 4. ( ) out of assigned area | 15. ( ) hall violation | 26. ( ) leaving school without permission |
| 5. ( ) fighting | 16. ( ) tobacco violation | 27. ( ) drug/alcohol violation |
| 6. ( ) failure to return forms | 17. ( ) failure to be prepared for class | 28. ( ) public affection |
| 7. ( ) cheating | 18. ( ) forgery | 29. ( ) theft |
| 8. ( ) vandalism | 19. ( ) cafeteria violation | 30. ( ) electronic equipment violation |
| 9. ( ) dress code violation | 20. ( ) sexual harassment | 31. ( ) driving/parking violation |
| 10. ( ) merit pass violation | 21. ( ) work study/release violation | 32. ( ) weapons |
| 11. ( ) food/drink violation | 22. ( ) threats to others | 33. (✓) other: MAKING FALSE |

ACCUSATIONS ABOUT
THE SCHOOL PRINCIPAL
COPYRIGHT LAWS

Comments: _____
_____
_____

Action Taken By Teacher Prior To Referral:
1. ( ) Checked Student's Folder      5. ( ) Telephoned Parent
2. ( ) Held Conference with Student  6. ( ) Held Conference with Parent
3. ( ) Consulted Counselor           7. ( ) _____
4. ( ) Changed Student's Seat

Teacher's Signature _____

Action Taken By Administrator: W/ STUDENT &
(✓) Administrative Conference MOTHER IS OFFICE  ( ) In School Suspension _____
( ) Detention _____  (✓) Out of School Suspension 3/22/07 – 4/4/07
( ) Saturday Detention _____  ( ) Other _____
Comments ▓▓▓ WILL SERVE 10 DAYS OUT OF SCHOOL SUSPENSION
DURING THIS TIME SHE IS NOT PERMITTED ON SCHOOL
DISTRICT PROPERTY. ARRANGEMENTS WILL BE MADE FOR
HER SCHOOLWORK

Administrator's Signature _____  Date 3/22/07

Dear Parent/Guardian:
   The purpose of this notice is to inform you of the infraction(s) involving your child and the corrective action taken in
accordance with the Blue Mountain School District STUDENT DISCIPLINE CODE. In order that there will not be any
further occurrences of this nature, you are urged to both support and cooperate with the action. Together we must strive
to provide the best educational environment in which our students will learn and grow.

Copies:  White—Parent      Pink—Teacher
         Yellow—Office

BMSD Discipline Form (6/98)

# EXHIBIT J

# BLUE MOUNTAIN MIDDLE SCHOOL

## Student - Parent Handbook
### 2006 - 2007



PLAINTIFF'S
EXHIBIT
4

## Promotion

Students must earn 5 units to be promoted to the next grade. While two units may be earned in rotational courses, 4 of the 5 units must be earned in major subjects.

Assignment to grade level is also considered in the grade level promotion process. The principal evaluates such factors as chronological age, and social/physical development in determining what grade level is most appropriate for the student.

## Class Attendance

If students are absent for thirty days during the school year, they may be subject to failure for the course(s) in which they are enrolled during that period. For semester courses, fifteen days will apply, and all other courses meeting less than a full year will use the same fractional time (1/6) for this policy. A review committee appointed by the principal will review each case individually and will make recommendations to the principal for the disposition of each case.

## Summer School

Failure of three or more major subjects would prevent a student from being promoted. Students failing two subjects may be able to repeat those subjects in summer school and be eligible for promotion.

## Records Policy - Parental Notification

The Blue Mountain School District records policy allows a student's school records to be forwarded to another school, Intermediate Unit, or State educational agency either with parental permission or without such permission if the student is enrolled in another educational setting and is no longer a student in the Blue Mountain Schools.

Parents are hereby notified that necessary student records will be forwarded to the school where the child is enrolled upon request of the receiving school. Parents have the right to examine student records and be given a copy if desired. Written parental permission to forward records will be obtained whenever possible.

# Student Behavior

## SECTION ONE

In this Section You Will Find:
- Statement of Purpose
- Statement of Authority
- Student Rights
- Student Responsibilities
- Student Rules
- School District Rules

## STATEMENT OF PURPOSE

Student behavior is not merely convenient conformity by the students to the wishes of adults, but the conscious development of self-discipline and self-direction toward socially desirable ends. Schools, to be effective, must give all students the opportunity to learn; disciplined behavior is an outcome of education. Students must be taught that the advantages of group living demand that individual actions be tempered and limited.

If a pupil elects to evade his/her responsibility for good citizenship, he/she may be referred to the principal. The principal takes into consideration the individual and his/her personal adjustment as well as the impact of the pupil's behavior will have on the school community. The great majority of pupils meet their responsibility and never become involved in any disciplinary action. All things considered, the principal's action may range from friendly discussion to suspension. In extreme disciplinary cases, a student may be expelled by the Board of School Directors.

In each discipline situation, it is a primary aim of school officials to impress each student, by effective faculty counseling and guidance, of the need, value and advantage of good conduct.

## STATEMENT OF AUTHORITY

All the students enrolled in the Blue Mountain School District are expected to conduct themselves in accordance with the rules of the system and individual schools.

Principals and teachers are directed to maintain order in the schools so that learning can occur. Maintenance of order applies during those times when students are under the direct control and supervision of school district officials. This authority is granted in Section 1317 of the Pennsylvania Public School Code. It states:

E... teacher, vice-principal and principal in the public schools shall have the right to exercise the same authority as to conduct the behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them." (In loco parentis)

The Board of School Directors has granted authority to its principals and teachers to exercise necessary authority to maintain appropriate decorum within the buildings and classrooms. Building level principals and their designees will act in a loco parentis manner to ensure the safety an welfare of all students. Teachers shall have the authority, and it shall be their duty to make and enforce by reasonable means rules and regulations to govern the behavior and promote learning in their respective classes. Principals and teachers of the Blue Mountain School District are directed to maintain such order in the schools as will facilitate learning by the pupils.

In the event that any provision of this Behavior Code is found to be in conflict with the Public School Code of 1949, as amended or PA Code Title 22, PDE Regulations, school district policy, administrative procedures, or any other applicable constitutional, statutory or regulatory provision, such statute or provision shall govern, and the conflicting portion of this Behavior Code shall be considered null and void, but the remainder of the Behavior Code shall remain in full force and effect.

School principals are authorized, subject to approval of the Superintendent, to summarize or restate the provisions of this Behavior Code when publishing school handbooks in an effort to concisely convey to students and parents the Behavior Code. This authority is not, nor should it be, construed as any attempt to withhold information, for the provision of this Behavior Code prevails over statements published in school handbooks.

## STUDENT RIGHTS

This section summarizes the basic principles of student rights. With each right comes a responsibility, and that right must be viewed in relationship to the health, safety, and welfare of the majority of students within each school. The principal, under the supervision of the Superintendent and within School Board policies, shall assume administrative responsibility and instructional leadership of the school to which he or she is assigned. The faculty and staff shall assist in the orderly operation of the school and ensure the following rights of students.

- To be informed of School Board policies and individual school rules.
- To appeal a decision in an orderly manner.

- To be treated with respect by other students, school personnel, visitors.
- To expect that their property will be respected by other students and school personnel.
- To have a safe and orderly school
- To expect the rules to be enforced without discrimination.
- To receive district curriculum descriptions that will help one make informed choices.
- To have equal opportunity with regard to academic programs and extracurricular activities.
- To have privacy of one's personal possessions unless appropriate school personnel have reasonable cause to believe a student has any object or material which is prohibited by law or school board.
- To expect that schools will keep student records safe and confidential.
- To wear clothes of one's choice, or the school uniform, as long as clothes are appropriate for school. Clothing should adhere to the school dress code. Clothing should not disrupt the learning environment or pose any threat to the health and safety of students.
- To attend school and learn in an environment free of sexual harassment or malicious harassment

## STUDENT RESPONSIBILITIES

*Every student shall:*

- Attend school regularly and be on time for class.
- Be diligent in his or her studies.
- Conform to the rules of the school approved by the Board of Education and submit to such discipline as would be exercised by a kind, firm and judicious parent.
- Provide the school with adequate explanation and appropriate documentation to explain an absence.
- Request makeup assignments from teachers upon return to school and complete them within an appropriate length of time.
- Treat other students, school personnel, and visitors with respect.
- Respect others' property by not damaging, or taking it.
- Treat school property with respect and to act in a way that does not interfere with the rights of others and is not harmful to health and/or safety of others.
- Seek help first, to avoid a fight.
- Become familiar with the Code of Student Conduct, all school rules, and all classroom rules.
- Ask for assistance from school personnel in selecting courses
- Request participation in academic programs and extracurricular activities that match with your abilities.
- Cooperate with the teacher and contribute to a free unprejudiced atmosphere.

- Cooperate...fully and exert every effort to achieve mastery of the curriculum
- Come to school an wear clothes which are not dangerous to health or safety, do not disrupt the learning process, and stay within school dress code.
- Not carry or conceal any such material prohibited by law or that would detract from the educational process and to accept the consequences for any contents stored within the lockers.
- Treat others equitably and fairly.
- Conduct yourself and your activities so as not to harass others and to report harassment or discrimination situations to school administrators.

## STUDENT RULES

## Attendance * Please call 628-6000 ext. 7503 to report an absence

The school law of Pennsylvania requires the regular attendance of all pupils between ages eight and seventeen years of age. Once a student has enrolled, his/her school attendance is governed by the following guidelines:

- The parents of any pupil who is under seventeen years of age and who has been absent illegally for a total of three days or six half days, are guilty of truancy from school which is a violation of the state attendance law. Any pupil aged seventeen or older who is absent for five days for inexcusable reasons may be suspended up to 10 days. If a student does not return to school, expulsion procedures may be recommended.

- Students are expected to be in school on time every day and to be on time to all classes. All students arriving tardy to school must report to the office immediately and sign in the tardy book. Excessive (four or more per year) unexcused tardiness to school is a punishable offense.

- Students who are truant (e.g., absent from school without permission of the parents and school authorities) will be disciplined. A telephone contact may be made to verify students' absences.

- Students arriving after 10:00 a.m. (high school/middle school) 10:50 a.m. (elementary school) will be considered absent 1/2 day; moreover, students leaving prior to 1:00 p.m. (high school/middle school)/1:35 p.m. (elementary school) will be considered absent 1/2 day.

- When students return to school after an absence, they will bring a signed statement from their parent or guardian stating the date and reason for the absence. If an excuse is not brought in for classification within three days, it will automatically be classified as unexcused. If students have been absent three or more consecutive days or an excessive amount of days, they may be required to bring along a physician's note stating the reason for the absence. If an examination is to be made up because of absence, the students must make arrangements with the teacher concerned within two days after they return to school.

- After an excessive number of absence (i.e., excused or unexcused), a phone call shall be made to the parents to make them aware of the total days

absent. If there is no improvement in the attendance, a letter sh....... sent to the parent requiring a doctor's cause for all future absences. Failure to present a doctor's excuse will result in unexcused absence procedures.

- The fact that a parent has sent a written explanation to the school does not excuse the absence. An absence becomes excused only when the administration has classified the absence as such. **Under no circumstance is a student permitted to sign a parent's name.**
- **NOTE: Each excuse must have the student's full legal name or it can not be credited to the right file. Each excuse must have the CORRECT dates of absence or it can not be credited to the right dates. Each excuse must show a reason for the absence. Each excuse must be signed by the parent/guardian. Please put your child's homeroom number and grade on the excuse.**

**Excused Absences:** Reasons for excused absences include:
- Sickness, injury, death in the family, or some other insurmountable condition.
- Documented appointments with health care professionals.
- Documented absence for religious instruction or religious holiday.
- Participation in an academic class or school-sponsored activity approved by the principal.
- Court appearances (copy of subpoena required).
- Prior approved non-school sponsored educational field trips (one per year).
- Unavoidable emergencies (reviewed by principal).
- Out of School Suspension (OSS).

## Unexcused Absences:
- Oversleeping.
- Missing the bus.
- Routine baby-sitting.
- Refusing to come to school.
- Hunting.
- Take a trip (vacation) without an approved educational field trip form by administration.
- Failure to turn in an excuse within three (3) school days, when required
- Failure to provide a doctor's excuse within three (3) school days, when required
- Any other circumstances deemed unexcused by the principal.

**Educational Leave Policies and Procedures:** Parents/guardians may request an educational field trip for their child(ren) during the school year. Parents/guardians should consider a request on the following conditions:
- Trips may not exceed the maximum of five (5) days per school year.
- All days beyond the maximum of five (5) days will be considered unexcused and/or unlawful for students.
- Parents are encouraged not to plan trips the first ten (10) days of school or the last ten (10) days of school.
- The purpose of the trip must be stated and how it supplements district's curriculum.

- The [req]... must be made by the parent/guardian five (5) days prior to the student's requested leave. Forms are available at building offices. Administrative responses to submitted forms by parents/guardians will be made within 48 hours of submission.
- Each request will be reviewed by the principal prior to approval. The following will be taken into consideration by the principal in granting permission for the trip.
- Student's academic standing.
- Student's attendance record.
- Student's disciplinary record.
- If approval is given prior to the trip, the student's absence will be listed as excused. If prior approval is not received, the absence will be classified as unexcused/unlawful. Should the student's absence extend beyond the approved time, those days will be classified as unexcused/unlawful.
- The student is expected to complete all school work that is assigned during the school absence. Such assignments will be provided to the student by the teacher prior to the trip. It will be the student's responsibility to contact teachers and make up, any missed assignments.
- Permission will not be granted for trips/tours during the district's standardized testing periods, the state's testing periods and the secondary school examination periods at the end of the first and second semester.

**School Bus Rules:** It is a privilege to ride a school bus.
Students must:
- Obey the driver.
- Stand off the roadway while waiting for the bus.
- Be at the bus stop on time.
- Sit according to the seating chart assigned by the bus driver.
- Remain seated when bus is in motion.
- Keep arms, legs and head inside the windows.
- Remain quiet. Unnecessary conversation with the driver is dangerous.
- Observe classroom conduct at all times while aboard the bus.
- Not eat or drink while on the bus.
- Whenever boarding or departing, cross the road 10 feet in front of the bus when the driver signals that it is clear to cross. Always check traffic when getting on or off the bus.
- Pay for damage to school buses or property
- Follow discipline code.

**Students and Parents please note:**
- From time to time the Blue Mountain School District may place a video camera on selected school buses. The placement of the camera(s) will be determined by administration as needed.
- The camera may record a video of activity on the bus. The video may be used for investigative and/or disciplinary purposes.
- The camera will not record audio. The audio component on the camera will be disabled at all times.

- Students will ride only their assigned bus to and from school. W... parental permission, with principal approval, is required to get o... a different bus stop.
- **Except in an emergency situation, students are not permitted to ride a different bus. All such requests must be approved by the principal.**

**General Computer Usage:** Students are responsible for good behavior on school computers, both in school and at home (sign-out equipment). Computer files, including email, are not private. The use of the school's computer and computer networks, computer software, data files, and intellectual property is a privilege. It may be revoked or other action may be taken for violations of any of the following rules:

- School Classroom and Lab Computers should be used for educational purposes; that is, report writing, information retrieval, research, and Internet access. They may not be used for personal objectives.
- Only authorized software should be used on school computers. Authorized software refers to those applications and packages that have been placed in the classroom or on the hard drives by school officials. Students may not load other software that has been placed there by school officials.
- Students are not permitted to change titles of folders, the names of hard drives or printers, desktop patterns, or any other setting that has been configured by school officials.
- Students are not permitted to change the configurations of the hard drives, or to move folders or applications in or out of any folders, including System Folders and Preferences Folders. Students should not access, change or delete files or other intellectual property belonging to others, including programs and/or data files not owned by the user, without their expressed permission.
- Students are not permitted to add, delete, or change passwords to any application folder, except when authorized to do so by the school adminis tration.
- Students may not create, copy, receive, or use data, language or graphics which are obscene, threatening, abusive, or otherwise inappropriate at school or on sign out equipment at home.
- Students may not violate or attempt to violate the security of any computer (including sign-out equipment) or the computer networks.
- Students may not steal or destroy any of the school's computer hardware or peripherals, or steal or destroy computer software, data files, or intellectual property owned by the school or other persons.
- Students may not take any unauthorized actions which deny access to, disrupt or destroy the service of a computer or the computer networks.
- Students may not use computers, computer software, data files, e-mail systems, computer software, data files, or other intellectual property in any unautho rized way.

**Internet ... age** The use of the Internet computer network for illegal, inappropriate, unacceptable, or unethical purposes by students or employees is prohibited. The activities listed below are strictly prohibited by all users of the network. The Blue Mountain School District reserves the right to determine if any activity not appearing on the list below constitutes an acceptable or unacceptable use of the network. These prohibitions are in effect any time school district resources are accessed in any way whether in school, indirectly through another internet service provider. **Each student and parent will be required to sign a CSI Acknowledgement and consent form prior to internet usage.**

- Allowing an unauthorized person to use an assigned account.
- Use of the network for non-work or non-school related purposes.
- Use of network to access or transmit obscene or pornographic materials.
- Use of the network to access or transmit material likely to be offensive or objection able to recipients.
- Use of the network to participate through e-mail for non-educational purposes or activities.
- Use of the network to participate in inappropriate and/or objectionable discussions or news groups.
- Use of the network to transmit hate mail, harassment, discriminatory remarks, and other anti-social communications.
- Use of the network to order or purchase in the name of the school district or in the name of any individual any type of merchandise or service. All costs to the district or any individuals incurred because of this type of violation will be the responsibility of the user.
- Use of the network to access any fee-based on-line/internet service. All costs in curred to the district or any individual because of the type of violation will be the responsibility of the user.
- Use of the network which results in any copyright violation.
- The illegal installation, distribution, reproduction or use of copyrighted software on district computers.
- Use of the network to intentionally obtain or modify files, passwords or data belonging to other users.
- Use of school technology or the network for fraudulent copying, communications or modifications of materials in violation of local, state and federal laws.
- Loading, downloading, or use of unauthorized games, programs, files, or other electronic media.
- Malicious use of the network to develop programs that harass other users or infiltrate a computer system and/or damage the software components of a computer system.
- Destruction of district computer hardware or software.
- Use of the network to participate in unauthorized Internet Relay chats (online real-time conversations).
- Use of the network to facilitate any illegal activity.

46

- Use of the network to misrepresent others using the network.
- Use of the network for commercial or for-profit purposes.

**Dress Code.** The following items are prohibited during the school day:
- Excessively large, sagging, or improperly fitting clothing.
- Muscle shirts, half shirts, bare midriff clothing.
- Tank tops (Blue Mountain Middle School).
- Undergarments worn as outer garments.
- See through, provocative or excessively tight clothing.
- Halter tops, strapless shirts or spaghetti strap garments.
- Shorts will not be permitted from the beginning of November to the end of March.
- Jewelry such as earring, studs or rings worn in areas other than the ears.
- Clothing which bears offensive, disruptive logos or messages, pictures, drawings which are drug, alcohol or sexual in nature or relative to violence.
- Hats, hoods, bandannas or sunglasses in the building.
- Torn or unsafe clothing.
- Chains, chain wallets, straps or any other item which may cause harm to another person.
- Studs, rivets on clothing.
- Clothing not worn as designed/intended.
- Unsafe footwear such as flip/flops, sandals without support straps, clogs, etc.
- Clothing of unacceptable length.
  Administrators on a building level have the authority to judge the appropriate ness and safety of apparel, and/or appearance.

## SCHOOL DISTRICT RULES

### Search and Seizure
- Lockers and desks are school property and are provided for the convenience of the student. Students may use the lockers and/or desks to store their school supplies and personal belongings.
- School authorities may search a student's locker or desk and seize any illegal/ prohibited materials. Such material may be used as evidence against the student in disciplinary proceeding. Prior to the search students shall be notified and given an opportunity to be present. However, where school authorities have a reasonable suspicion that the locker or desk contains materials which pose a threat to the health, welfare and safety of students and/or other school personnel, student lockers or desks may be searched without prior warning.

### Search of Individual. A search must be justified at its inception on the basis of reasonable suspicion, and it must be reasonable in scope. If a principal or desig-nee has reasonable suspicion to believe that a student is in possession of illegal/ prohibited materials, he or she may conduct a search.

47

**Corporal Punishment** Corporal punishment as a response to a rule infraction is not used in the Blue Mountain School District, however, reasonable force may be used by teacher and school authorities under the following circumstances:

- To quell a disturbance.
- To obtain possession of weapons or other dangerous objects.
- For the purpose of self-defense.
- For the protection of persons or property.

**Academic Restriction**

- If students receive two failing grades (high school/middle school) in a marking period, in major subjects, they will be placed on Academic Restriction.
- Students whose names appear on the restriction list are restricted from all ninth period non-graded activities. They will report to homeroom to work on their academic deficiencies. Students may report to a teacher for work or help with a pass issued by that teacher.
- Progress will be re-evaluated every three weeks. Students, who have improved to the administrator's satisfaction, will be released from restriction and have full privileges restored.

**Middle School/High School Detention**

- Daily detention, if needed, may be held at the high school or the middle school. IT shall begin at 3:00 p.m. (or earlier), when needed, and end at 4:30 p.m. (or earlier). One (1) calendar day notice may be given to the student prior to beginning of serving detention.
- Saturday detention, if needed, may be held at the high school or middle school from 8 a.m. to 11 a.m. A two (2) days notice may be given to the student prior to serving Saturday detention.
- Students assigned will bring work to do if not, they will be given work. Free reading is not acceptable work. No talking and sleeping. Detention may be rescheduled only for cases of extreme emergency or previously scheduled doctor's appointments. Work, athletic practices and games, hand practices, etc., are not considered emergencies.
- If a student is absent the day of his/her detention, he must serve the next scheduled detention after his/her return to school.

**Elementary School Detention**

- Detention may be assigned in the elementary school to students in grades three through five.
- Detention will be considered only after other disciplinary actions have been taken and deemed as ineffective in changing undesirable behavior. Detention may also be issued to a student with no prior discipline problems as a response to an extreme disciplinary infraction.
- Detention may only be assigned by the principal or assistant principal

Detention will be scheduled by the principal/assistant principal wi... student's parents/guardians.

- Detention will be held in the child's school building from 3:30 - 4:30 p.m.
- Parents are responsible for transporting their children home after their detention time has been served.
- Parents will be given a written confirmation of their child's detention assignment in the form of a written letter from the principal's/assistant principal's office.

**Flag Salute and Pledge of Allegiance**

- It is the responsibility of every student to show proper respect for his/her country and its flag. Students may decline to recite the Pledge of Allegiance and may refrain from saluting the flag on the basis of personal belief or religious convictions.
- Students who choose to refrain from such participation shall respect the rights an interest of classmates who do wish to participate.

* **Bookbags or backpacks will not be permitted to be carried between classes. However, they will be permitted to be brought to school and taken home. Students will be given additional time to go to their lockers during the school day. Gym bags may be used for physical education classes.**

In This Section You Will Find:

## SECTION TWO

- Discipline Codes by Levels
- Level I
- Level II
- Level III
- Level IV

## DISCIPLINE CODES BY LEVELS

To establish reasonable consistency in the schools, a uniform Discipline Code has been developed. Definitions of terms used can be found in the Glossary of Terms. School and teachers may develop individual rules and disciplinary practices which supplement the Code but do not conflict with it. The Code applies to all students enrolled in the Blue Mountain Schools in kindergarten through grade 12 and adult education.

Infractions and the responses to them are divided into four levels. Each level represents progressively more serious behavior and consequences. One of any combination of responses may be applied to any infraction. This section

of the Code of Student Conduct identifies example infractions for which a student may be disciplined and sets forth example responses. Note, however, that this list is not all-inclusive and a student committing an act of misconduct not listed will be subject to discretionary authority of the principal or designee. **Consistent with this Code, it is the responsibility of the principal or designee to determine the level of the offense and its appropriate response.** The principal, assistant principal, teachers, bus drives, and other supervisory personnel are responsible for student discipline. Discipline should be applied after consideration of the eventual effect on the behavior of the student and it should promote improved conduct.

It is the policy of the School Board that there shall be zero tolerance of misbehavior of all kinds.

## LEVEL I - DISCIPLINE CODE

Level I offenders are acts of misconduct which interfere with orderly classroom procedures, school functions, extracurricular programs, approved transportation, or a student's own learning process.

Level I offenses will be handled first by the teacher or other staff member involved. When the teacher or other staff member involved determines that additional action is necessary because of continued violation or other concerns, the student will then be referred to the principal or designee for appropriate disciplinary action. The teacher or school administrator/designee, after review of the student's explanation, consultation with school personnel involved, and further investigation (when needed) will determine the appropriate disciplinary action, consistent with this code.

**Example Infractions**

- Hall pass violation.
- Lunch room infractions.
- Cheating (elementary school).
- Classroom/school disruption. ✓
- Dress code violation.
- Harassment/Intimidation.
- Playground violation.
- Late to class.
- Electronic devices.
- Failure to follow classroom management rules.
- Failure to bring in notes/excuses.
- Public affection.
- Out of assigned area.
- Eating, drinking, outside of designated area.
- Bookbag violation.

- Teacher's educational assignments.
- Mandatory tutoring/peer counseling.
- Parental contact by teacher.
- Verbal reprimand.
- Counseling.
- Return of property or restitution.
- Withdrawal of privileges.
- Behavioral contracts.
- Grade point deduction (cheating).
- Classroom management plan.
- School Service Work (SSW).
- Detention.
- Instructional Support Team (IST).
- Warning of referral to Level II.

## LEVEL II - DISCIPLINE CODE

Level II offensed or intermediate acts of misconduct may include acts of misconduct previously identified which require administrative intervention. It may also include repeated acts of misconduct and acts directed against persons or property but which do not seriously endancer the health and safety of others. Level II offenses must be reported to the school administrator/designee (e.g. dean, behavioral resource teacher) because the seriousness or frequency of misconduct requires another level on intervention. School support staff and/or community resource agencies may be involved. The school administrator/designee, after review of the student's explanation, consultation with school personnel involved, and further investigation (when needed), will determine the appropriate disciplinary action, consistent with this Code, and attempt to contact parents.

**Example Infractions**

- Repeated Level I Offenses.
- Truancy.
- Failure to follow driver/rider procedure.
- Destruction of property.
- Disruptive behavior.
- Cheating/plagiarism (middle school/high school).
- Forgery.
- Gambling.
- Misconduct on school bus or at bus stop.
- Stealing/theft (less than $20).
- Unauthorized assembly, publication, etc.
- Unsafe acts/actions.
- Cutting Classes.

- Tardy to school.
- Computer misuse.
- Cutting detention.
- Merit work pass, work study or work release violation.
- Written derogatory comments about students/teachers/staff.
- Insubordination.
- Inappropriate behavior.
- Deriving school personnel.

## Example Responses

- Level 1 response.
- Parental contact (by teacher or administrator).
- Verbal reprimand.
- Assigned bus seat.
- Behavior contract.
- Withdrawal of privileges.
- Confiscation of unauthorized material.
- Return of property or restitution for damages.
- Referral to student services.
- School Service Work.
- Suspension from bus.
- Suspension from extra curricular-activities.
- Detention.
- Saturday detention.
- Fines/Citations.
- Suspension of driving privilege.
- Assigned/reassigned bus seats.
- Warning of referral to Level III.

## LEVEL III - DISCIPLINE CODE

Level III offenses are serious acts of misconduct. They include but are not limited to : repeated acts of misconduct, those acts with prior warning of referral to Level III Action, serious disruptions of the orderly conduct of school, threats to the health, safety, and property of self or others, and other acts of serious misconduct.

Level III offenses must be reported immediately to the school administrator/designee and will follow the established investigative procedure and the assignment of disciplinary action. When an emergency exists, procedures for handling it shall be put into effect immediately to protect the safety of all students. The school district must immediately initiate prosecution for Level III offenses.

**NOTICE: Use, possession, distribution, and sale of tobacco products are prohibited on school property and on school buses. School district must initiate prosecution.**

## Example Infractions

- Repeated Level II Offenses.
- Unsafe Driving Acts.
- Abusive Language or gestures to school personnel.
- Assault.
- Breaking and entering.
- Defiance.
- Disorderly conduct.
- Destruction of property/vandalism.
- Extortion/threats.
- Fighting.
- Harassment/Intimidation of a more serious nature.
- Repeated misconduct of a more serious nature.
- Sexual Harassment.
- Smoking/Tobacco possession or use.
- Theft (more than $20).
- Trespassing.
- Leaving school without permission.
- Student hazing.
- Abusive language or gestures.

## Example Responses

- Parental contact by administration.
- Behavioral contract (written).
- Referral to Support Services.
- Return of property or restitution for damages.
- In-school suspension.
- Long-term bus suspension.
- Out-of-school suspension.
- Referral to alternative discipline programs.
- Temporary removal from participation extra-curricular/co-curricular activities.
- Referral to appropriate prevention or treatment program.
- Referral to law enforcement.
- Saturday detention.
- School Service Work.
- Fines/Citations.
- Referral for student assessment.
- Warning of referral to Level IV.

## LEVEL IV - DISCIPLINE CODE

The most serious acts of misconduct are included in this level. Committing any of these acts may be sufficient grounds for out-of-school suspension and/or consideration for expulsion. Major acts of misconduct must be reported immediately to the school administrator/designee. These violations

are so se... that they may require district administrators, outside agencies, and/or fines. **Such acts may also result in criminal penalties.** The principal/designee may recommend the expulsion of any student who has committed a **serious breach of conduct.**

## NOTICE. ZERO TOLERANCE OF VIOLENCE IN SCHOOL INCLUDING PROHIBITION OF VIOLENCE AGAINST SCHOOL DISTRICT PERSONNEL - Violence in schools or on school buses will not be tolerated. Battery against any school personnel by a student is a Level IV violation of the Code of Student Conduct. A student who deliberately and knowingly commits an act of battery against school personnel will be suspended from school up to ten (10) days. The principal may recommend expulsion and will offer to assist the staff member in pressing such charges as are appropriate. Subject to federal and state mandates, any student charged with a violation such as bomb threat, aggravated assault, battery or aggravated battery upon a school employee will be removed from the classroom immediately and may be placed in an alternative school setting pending disposition. Any student found to have committed a violation of Act 26 of Pennsylvania (i.e., weapons prohibited policy) may be expelled or may be placed in an alternative school setting.

## NOTICE. PROHIBITION OF WEAPONS- Violation of weapons is a Level IV violation of the Code of Student Conduct. Weapons and the use of weapons are prohibited on school property, including buses.

A student who possesses, sells, intends to sell, distributes, intends to distribute, displays, intends to display, transfers, intends to transfer, or uses any firearm/explosive, or weapons of any type, or any article or substance not normally considered to be a weapon, including a look-alike will be suspended up to ten (10) days, and the principal will request a formal hearing by the Board of Education to determine the term of expulsion. In addition, the principal will refer the matter to the local police for criminal prosecution.

"A weapon does not include any device which is authorized by the school for legitimate educational purposes, such as tools, scissors, compasses, pencils, implements for art class, and the like. Any student, however, using any such common item in an aggressive, threatening and/or intimidating manner shall be considered in possession of a weapon, unless the student can demonstrate that the item was/is used in a manner reasonably understood to be its common purpose. The Principal shall be given considerable latitude to determine the intent of the student in such matters."

## NOTICE. PROHIBITION OF ALCOHOL AND DRUGS- The use, possession, sale, intending to sell, transferring, intent to transfer, distributing or intending to distribute illicit drugs and alcohol is not permitted and is a Level IV violation of the Code of Student Conduct. Board Policy prohibits use, possession, sale, intending to sell, transferring, intent to transfer,

54

distribution or intending to distribute alcohol or controlled substances, which require a physician's prescription or the possession of which is prohibited by law, or those classified as "Designer Drugs" under Pennsylvania statutes. Also prohibited are the use, possession, sale, intending to sell, transferring, intent to transfer, distribution or intending to distribute any substance to attain a mood-altering effect, and the possession of any equipment or device for preparing or taking drugs.

A student using, possessing, selling, intending to sell, transferring, intending to transfer, distribution, or intent to distribute under the influence of any item listed above, will be immediately suspended from school for up to ten (10) days. Following an informal administration hearing, the principal will request a formal hearing by the Board of Education to determine the term of expulsion. In addition, the principal will refer the matter to the local police for criminal prosecution.

## NOTICE. PROHIBITION OF MISCONDUCT ON SCHOOL, BUS/AT BUS STOP - Violation of Board transportation policies, including disruptive behavior on a school bus, may be Level IV violation of the Code of Student Conduct.

## NOTICE. PROHIBITION OF SEXUAL HARASSMENT/INDECENT EXPOSURE - Violation of sexual harassment policy may be a Level IV violation of the Code of Student Conduct.

### Example Infractions

• Repeated Level III Offenses.
• Aggravated battery.
• Alcohol.
• Arson.
• Assault.
• Battery.
• Breaking and entering.
• Drugs.
• Firearms/explosive.
• Homicide.
• Inciting, leading, or participating in acts that substantially disrupt orderly conduct at a school or school function.
• Kidnapping.
• Making false accusations about school staff member/another student.
• Robbery.
• Serious breach of conduct.
• Serious misconduct on school bus or at bus stop.
• Sex offenses.
• Sexual Battery.

55

- Sexual ha...sment of a more serious nature.
- Stolen property: possession, use, distribution, or sale.
- Grand larceny.
- Unsafe act/actions.
- Weapons (other than firearms).
- Bomb threat.
- Fire Alarms.

## Example Responses

- Parental contact (mandatory).
- Return of property or restitution for damages.
- Referral to student support services.
- In-school suspension.
- Out of school suspension.
- Referral to law enforcement.
- Recommendation for expulsion.
- Long-term bus suspension.
- Referral of students to alternative placement.
- Referral for student assessment.
- Fines/Citations.

## SECTION THREE

### In This Section You Will Find:
- Grievance Procedure for Students and Parents.

## GRIEVANCE PROCEDURES FOR STUDENTS AND PARENTS

### Student Rights
- Students have the right to present a complaint regarding unfair treatment.

### Student Responsibility
- Students have a responsibility to learn and follow procedures for filing complaints.

Grievance procedures are used to handle serious problems when students believe there has been a violation of the code of Student Conduct, including due process. Except in instances where there is a clearly defined procedure other than the one described here, a student grievance should be pursued sequentially through four levels.

**Level I - Informal Discussion:** The student should discuss the problem with the person who is responsible for what the student believes to be a violation of the Code of Student Conduct.

**Level II - School Principal:** If the problem has not been resolved at the informal level, the parent and/or student should discuss it with the principal or the ...uncipal's designee within five school days of the Level I discussion.

**Level III - Superintendent's Office:** If the problem has not bee...solved at Level II, the parent and/or student may within ten (10) school days, present the grievance to the Superintendent or designee. The student and principal will submit summary positions to the Superintendent. The Superintendent or designee will respond to both parties within fifteen (15) school days after receiving the written statements.

**Level IV - School Board:** If the problem has not been resolved at Level III, the parent and/or student may request, in writing, a meeting with a Committee of the Board of School Directors. The student, principal, and Superintendent will submit summary positions to this School Board Committee. The Committee of the School Board will respond to all parties by arranging a meeting within fifteen (15) days of the written request.

## SECTION FOUR

### In This Section You Will Find:
- Exclusion from School.
- Procedures for Suspensions (Exclusions from school).
- Procedures for Expulsion.
- Procedures for Hearings.

## Exclusions From School

Suspension, which is a function of the school administrator, and expulsion, which is a function of the board of directors, are serious disciplinary sanctions which may be imposed against students under procedures conforming with due process of law. Suspensions may be either in school or out-of-school. The administration will determine which is best for not only the student but also the rest of the student body.

Students are not permitted to attend school activities (co-curricular or extra-curricular) during their term of ISS/OSS. Students serving OSS are not permitted on school district property.

## Procedures for Suspension
(Exclusion from school)

The principal or teacher in charge of a public school may suspend any pupil for disobedience or misconduct for a period of one (1) to ten (10) consecutive school days and shall report to the suspension to the Superintendent as soon as possible thereafter.

No student may be suspended without notice of the reasons for which he/she is suspended. The student and parent(s)/guardian will be given the opportunity for an informal hearing with the designated school official.

A student may be suspended up to ten (10) school days following a hearing by the principal or designee.

N...dudent may receive an in-school suspension without notice for which she/he is suspended and an opportunity to be heard prior to the time the suspension becomes effective. The parent(s)/guardian shall be informed of the suspension action taken by the school.

Should the in-school suspension exceed ten (10) consecutive school days, the student and his/her parent(s)/guardian shall be offered an informal hearing with the designated school official. Such hearing shall take place prior to the 11th day of the school suspension.

## PROCEDURES FOR EXPULSION

The Board may either expel for a period exceeding ten (10) school days or may permanently expel from the rolls of this district any student whose misconduct and disobedience is such as to warrant this sanction. No student shall be expelled without an opportunity for a formal hearing before the Board of School Directors.

The student under 17 years of age who is expelled forfeits his/her right to an education in the school of this district, but has not been excused from compliance with the compulsory attendance statutes.

Parents or guardians who are unable to provide an education for their child shall submit a written statement within thirty (30) days that they are unable to do so. The district shall then make provisions for the student's education. If thirty (30) days pass without satisfactory evidence that the required education is being provided to the student, the district shall re-contact the parent and make provisions for the student's education. The Board shall continue to be responsible for the education of the student expelled, and shall provide an alternate education for any student suspended for more than ten (10) days.

## PROCEDURE FOR HEARINGS

Education is a statutory right, and students must be afforded all appropriate elements of due process if they are to be excluded from school. In a case involving a possible expulsion, the student is entitled to a formal hearing, which is a fundamental element of due process.

A formal hearing is required in all expulsion actions. This hearing may be held before the Board of School Directors or a duly authorized committee of the Board, or a qualified hearing examiner appointed by the Board. When the hearing is conducted by a committee of the Board or a hearing examiner, a majority vote of the entire School Board is required to expel a student.

The purpose of the informal hearing is to enable the student to meet with the appropriate school official to explain the circumstances surrounding the event for which the student is being suspended or to show why the student should not be suspended.