## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.S., et al. | ) |
| | ) |
| v. | ) No: 3:07-cv-585 |
| | ) |
| BLUE MOUNTAIN SCHOOL | ) |
| DISTRICT, et al., | ) |
| | ) **ELECTRONICALLY FILED** |
| | ) |

## EXHIBIT LIST TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Exhibit A – Plaintiffs Statement of Undisputed Facts

Exhibit B – Deposition Transcript of J.S.

Exhibit C – Deposition Transcript of James S. McGonigle

Exhibit D – Deposition Transcript of Timothy Nunemacher

Exhibit E – Deposition Transcript of Angela Werner

Exhibit F – MySpace Profile

Exhibit G – Deposition Transcript of Joyce E. Romberger

Exhibit H – Correspondence dated March 23, 2007 from Defendant McGonigle to
  Plaintiffs Terry and Steven Snyder regarding discipline of J.S.

Exhibit I – Disciplinary Notice

Exhibit J – Blue Mountain School District Student-Parent Handbook

Exhibit K – AUP Policy

Exhibit L – Deposition Transcript of Susan Schneider-Morgan

Exhibit M – Deposition Transcript of Terry Snyder

Exhibit N – Deposition Transcript of Steven Snyder


Respectfully submitted,

Dated:     December 10, 2007.     */s/ Meredith W. Nissen*
Mary Catherine Roper (ID No. 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PA
P.O. Box 40008
Philadelphia, PA 19106
(T) 215-592-1513 ext. 116
(F) 215-592-1343
mroper@aclupa.org

Mary E. Kohart (I.D. No. 37191)
Meredith W. Nissen  (I.D. No. 93504)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103-6996
(215) 988-2700

Deborah Gordon (I.D. No. 95071)
EDUCATION LAW CENTER-PA
1315 Walnut St., Suite 400
Philadelphia, PA  19107
(T) (215) 238-6970, ext. 313
(F) (215) 772-3125
dgordon@elc-pa.org

Attorneys for Plaintiffs

## CERTIFICATION OF SERVICE

I, Meredith W. Nissen, hereby certify that, on the date set forth below, I

caused to be served by ECF a true and correct copy of the foregoing upon:

Jonathan P. Riba, Esquire
Sweet, Stevens, Tucker & Katz, LLP
P.O. Box 5069
331 Butler Ave.
New Britain, PA 18901

Dated:     December 10, 2007.     */s/ Meredith W. Nissen*
Meredith W. Nissen

# EXHIBIT K

No. 815.1

SECTION:   OPERATIONS

TITLE:     ACCEPTABLE USE OF THE
           COMPUTERS, NETWORK,
           INTERNET, ELECTRONIC
           COMMUNICATIONS SYSTEMS
           AND INFORMATION

ADOPTED:   September 23, 2004

REVISED:

# BLUE MOUNTAIN SCHOOL DISTRICT

## 815.1. ACCEPTABLE USE OF THE COMPUTERS, NETWORK, INTERNET, ELECTRONIC COMMUNICATIONS SYSTEMS AND INFORMATION

**1. Purpose**

Blue Mountain School District provides employees, students and guests ("users") with access to the school district's electronic communication systems and network, which includes Internet access, whether wired or wireless, or by any other means.

Computers, network, Internet, electronic communications and information systems (collectively "CIS systems") provide vast, diverse and unique resources. The Board will provide access to the school district's CIS systems in order to access information, research, to facilitate learning and teaching, and to foster the educational purpose and mission of the school district.

For users, the school district's CIS systems must be used primarily for education-related purposes and performance of school district job duties. Incidental personal use of school computers is permitted for employees so long as such use does not interfere with the employee's job duties and performance, with system operations or with other system users. Personal use must comply with this policy and all other applicable school district policies, procedures and rules contained in this policy, as well as Internet Service Provider ("ISP") terms, local, state and federal laws and must not damage the school district's CIS systems. Students may only use the CIS systems for educational purposes. At the same time, employees' and students' personal technology devices brought onto the school district's property or suspected to contain school district information may be legally accessed to ensure compliance with this policy and other school district policies to protect the school district's resources, and to comply with the law. Users may not use their personal computers to access the school district's intranet, Internet or any other CIS systems unless approved by the Director of Technology.

The school district intends to strictly protect its CIS systems against numerous outside and internal risks and vulnerabilities. Users are important and critical players in protecting these school district assets and in lessening the risks that can destroy these important and critical assets. Consequently, employees and students are required to fully comply with this policy, and to immediately report any violations or suspicious activities to the Superintendent or Director of Technology. Conduct



otherwise will result in actions further described under Consequences for Inappropriate, Unauthorized and Illegal Use, found in this policy, and provided in relevant school district policies.

| | |
|---|---|
| **2. Definitions**<br>20 U.S.C.<br>Sec. 6777(e)(2) | **Access to the Internet** - A computer shall be considered to have access to the Internet if the computer is equipped with a modem or is connected to a network that has access to the Internet, whether by wire, wireless, cable or any other means. |
| 18 U.S.C.<br>Sec. 2256(8) | **Child Pornography** - Any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: |

1. The production of such visual depiction involves the use of a minor engaging in sexually explicit conduct.

2. Such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct.

3. Such visual depiction has been created, adapted or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

| | |
|---|---|
| 20 U.S.C.<br>Sec. 6777(e)(1) | **Computer** - Includes any school district owned, leased or licensed or employee, student and guest owned personal hardware, software or other technology used on school district premises or at school district events, or connected to the school district network, containing school district programs or school district or student data (including images, files and other information) attached or connected to, installed in, or otherwise used in connection with a computer. Computer includes, but is not limited to, school district, employee, students and guest: desktop, notebook, powerbook, tablet PC or laptop computers, printers, cables, modems and other peripherals; specialized electronic equipment used for students' special educational purposes; Global Positioning Systems (GPS) equipment; Personal Digital Assistants (PDAs); cell phones, with or without Internet access and/or recording and/or camera and other capabilities, mobile phones or wireless devices and two-way radios/telephones; beepers; paging devices; laser pointers and attachments; and any other such technology developed. |

**Electronic Communications Systems** - Any messaging, collaboration, publishing, broadcast or distribution system that depends on electronic communications resources to create, send, forward, reply to, transmit, store, hold, copy, download, display, view, read or print electronic records for purposes of communication across electronic communications network systems between or among individuals or

groups, that is either explicitly denoted as a system for electronic communications or is implicitly used for such purposes. Further, an electronic communications system means any wire, radio, electromagnetic, photo optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. Examples include, but are not limited to, the Internet, intranet, electronic mail services, Global Positioning Systems, Personal Digital Assistants, facsimile machines, cell phones with or without Internet access and/or electronic mail and/or recording devices, cameras and other capabilities.

**Educational Purpose** - Includes use of the CIS systems for classroom activities, professional or career development, and to support the school district's curriculum, policy and mission statement.

20 U.S.C.
Sec. 6777(e)(6),
9134(f)
47 U.S.C.
Sec. 254(h)

**Harmful to Minors** - Any picture, image, graphic image file or other visual depictions that:

1.  Taken as a whole, with respect to minors, appeals to the prurient interest in nudity, sex or excretion.

2.  Depicts, describes or represents in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual content, actual or simulated normal or perverted sexual acts, or lewd exhibition of the genitals.

3.  Taken as a whole lacks serious literary, artistic, political or scientific value as to minors.

**Incidental Personal Use** - Use of school district CIS systems by an individual employee for occasional personal communications. Personal use must comply with this policy and all other school district policies, procedures and rules, as well as ISP, local, state and federal laws and may not interfere with the employee's job duties and performance, with the system operations, or with other system users, and must not damage the school district's CIS systems. Under no circumstances should the employee believe his/her use is private. The school district reserves the right to monitor, track, access and log the use of its CIS systems at any time.

20 U.S.C.
Sec. 6777(e)(4)
47 U.S.C.
Sec. 254(h)

**Minor** - For purposes of compliance with the Children's Internet Protection Act ("CIPA"), an individual who has not yet attained the age of seventeen (17). For other purposes, minor shall mean the age of minority as defined in the relevant law.

**Network** - A system that links two (2) or more computer systems, including all components necessary to effect the operation, including, but not limited to: computers, copper and fiber cabling, wireless communications and links, equipment

|  |  |
|---|---|
|  | closets and enclosures, network electronics, telephone lines, printers and other peripherals, storage media, software and other computers and/or networks to which the network may be connected, such as the Internet, Internet 2 or those of other institutions. |
| 18 U.S.C. Sec. 1460 | **Obscene** - Analysis of the material meets the following elements: |
|  | 1. Whether the average person, applying contemporary community standards, would find that the material, taken as a whole, appeals to the prurient interest. |
|  | 2. Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically designed by the applicable state or federal law to be obscene. |
|  | 3. Whether the work taken as a whole lacks serious literary, artistic, political or scientific value. |
| 18 U.S.C. Sec. 2246(2),(3) 18 Pa. C.S.A. Sec. 5903 | **Sexual Act and Sexual Contact** - As defined at 18 U.S.C. § 2246(2), and at 18 U.S.C. § 2246(3), 18 Pa. C.S.A. § 5903. |
| 20 U.S.C. Sec. 9134(f) 47 U.S.C. Sec. 254 | **Technology Protection Measure(s)** - A specific technology that blocks or filters Internet access to visual depictions that are obscene, child pornography or harmful to minors. |
| 18 U.S.C. Sec. 1460(b), 2256 | **Visual Depictions** - Undeveloped film and videotape and data stored on computer disk or by electronic means which is capable of conversion into a visual image but does not include mere words. |
| 3. Authority | Access to the school district's CIS systems through school resources is a privilege, not a right. These, as well as the user accounts and information, are the property of the school district, which reserves the right to deny access to prevent further unauthorized, inappropriate or illegal activity, and may revoke those privileges and/ or administer appropriate disciplinary action. The school district will cooperate to the extent legally required with the ISP, local, state and federal officials in any investigation concerning or related to the misuse of the CIS systems. |
|  | It is often necessary to access user accounts in order to perform routine maintenance and security tasks; system administrators have the right to access by interception, and the stored communication of user accounts for any reason in order to uphold the policy and to maintain the system. Users have no privacy expectation in the contents |

of their personal files or any of their use of the school district's CIS systems. The school district reserves the right to monitor, track, log and access CIS systems use and to monitor and allocate fileserver space.

**P.L. 106-554**
**Sec. 1711, 1721**

The school district reserves the right to restrict access to any Internet sites or functions it may deem inappropriate through software blocking or general policy. Specifically, the school district operates and enforces technology protection measure(s) that block or filter online activities of minors on its computers used and accessible to adults and students so as to filter or block inappropriate matter on the Internet. **Inappropriate matter** includes, but is not limited to, visual, graphic, text and any other form of obscene, sexually explicit, child pornographic or other material that is harmful to minors, hateful, illegal, defamatory, lewd, vulgar, profane, rude, inflammatory, threatening, harassing, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation, political beliefs, receipt of financial aid or disability), violent, bullying, terroristic and advocates the destruction of property. Measures designed to restrict adults' and minors' access to material harmful to minors may be disabled to enable an adult to access bona fide research or for another lawful purpose.

The school district has the right, but not the duty, to monitor, track, log, access and report all aspects of its computer information technology and related systems of all users and of any employee's, student's and guest's personal computers, network, Internet, electronic communication systems and media brought onto school district premises or at school district events, connected to the school district network, containing school district programs or school district or student data (including images, files and other information) to ensure compliance with this policy and other school district policies, to protect the school district's resources and to comply with the law.

The school district reserves the right to restrict or limit usage of lower priority CIS systems and computer uses when network and computing requirements exceed available capacity according to the following priorities:

1. Highest - uses that directly support the education of the students.

2. Medium - uses that indirectly benefit the education of the student.

3. Lowest - uses that include reasonable and limited educationally-related interpersonal communications and incidental personal communications.

4. Forbidden - all activities in violation of this policy.

The school district additionally reserves the right to:

1. Determine which CIS systems services will be provided through school district resources.

2. View and monitor network traffic, fileserver space, processor and system utilization, and all applications provided through the network and communications systems, including e-mail.

3. Remove excess e-mail or files taking up an inordinate amount of fileserver disk space after a reasonable time.

4. Revoke user privileges, remove user accounts or refer to legal authorities when violation of this and any other applicable school district policies occur or state or federal law is violated, including, but not limited to, those governing network use, copyright, security, privacy, employment and destruction of school district resources and equipment.

Due to the nature of the Internet as a global network connecting thousands of computers around the world, inappropriate materials, including those which may be defamatory, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation, political beliefs, receipt of financi. aid or disability), inaccurate, obscene, sexually explicit, lewd, vulgar, rude, harassing, violent, inflammatory, threatening, terroristic, hateful, bullying, profane, pornographic, offensive and illegal, can be accessed through the network and electronic communications systems. Because of the nature of the technology that allows the Internet to operate, the school district cannot completely block access to these resources. Accessing these and similar types of resources may be considered an unacceptable use of school resources and will result in actions explained further in Consequences for Inappropriate, Unauthorized and Illegal Use, found in this policy, and as provided in relevant school district policies.

Employees must become proficient in the use of the school district's CIS systems and software relevant to the employee's responsibilities, and practice proper etiquette, school district ethics, and agree to the requirements of this policy.

| 4. Delegation of Responsibility | The Director of Technology and/or designee will serve as the coordinator to oversee the school district's CIS systems and will work with other regional or state organizations as necessary, to educate employees, approve activities, provide leadership for proper training for all users in the use of the CIS systems and the requirements of this policy, establish a system to ensure adequate supervision of the CIS systems, maintain executed user agreements and interpret and enforce this policy. |
| --- | --- |

The Director of Technology and/or designee will establish a process for setting up individual and class accounts, set quotas for disk usage on the system, establish a retention schedule and establish the school district virus protection process.

Unless otherwise denied for cause, student access to the CIS systems resources shall be through supervision by the professional staff. Administrators, teachers and staff have the responsibility to work together to help students develop the skills and judgment required to make effective and appropriate use of the resources. All users have the responsibility to respect the rights of all other users within the school district and school district CIS systems, and to abide by the rules established by the school district, its ISP, local, state and federal laws.

5. Guidelines

Access to the CIS Systems

CIS systems user accounts will be used only by authorized owners of the accounts for authorized purposes.

An account will be made available according to a procedure developed by appropriate school district authorities.

CIS Systems –

The school district's Acceptable Use of the Computers, Network, Internet, Electronic Communications Systems and Information Policy, as well as other relevant school district policies, will govern use of the school district's CIS systems for students, employees and guests. Use of the CIS systems will also be governed by other relevant school district policies.

Types of services include, but are not limited to:

1. **World Wide Web** – School district employees, students and guests will have access to the web through the school district's CIS systems as needed.

2. **E-Mail** – School district employees may be provided assigned individual e-mail accounts for work-related and incidental personal use, as needed.

3. **Guest Accounts** – Guests, which include but are not limited to, volunteers, independent contractors and adult education instructors, may receive an individual account with the approval of the Director of Technology and/or designee if there is a specific, school district-related purpose requiring such access. Use of the CIS systems by a guest must be specifically limited to the school district-related purpose. An agreement will be required and parental signature will be required if the guest is a minor.

Access to all data on, taken from or compiled using school district computers is subject to inspection and discipline. Users have no right to expect that school district information placed on users' personal computers, networks, Internet and electronic communications systems is beyond the access of the school district. The school district reserves the right to legally access users' personal equipment for school district information.

## Parental Notification and Responsibility

The school district will notify the parents/guardians about the school district CIS systems and the policies governing their use. This policy contains restrictions on accessing inappropriate material. There is a wide range of material available on the Internet, some of which may not be fitting with the particular values of the families of the students. It is not practically possible for the school district to monitor and enforce a wide range of social values in student use of the Internet. Further, the school district recognizes that parents/guardians bear primary responsibility for transmitting their particular set of family values to their children. The school district will encourage parents/guardians to specify to their child(ren) what material is and is not acceptable for their child(ren) to access through the school district's CIS system. Parents/Guardians are responsible for monitoring their children's use of the school district's CIS systems when they are accessing the systems.

## School District Limitation of Liability

The school district makes no warranties of any kind, either expressed or implied, that the functions or the services provided by or through the school district's CIS systems will be error-free or without defect. The school district does not warrant the effectiveness of Internet filtering. The electronic information available to users does not imply endorsement of the content by the school district, nor is the school district responsible for the accuracy or quality of the information obtained through or stored on the CIS systems. The school district shall not be responsible for any damage users may suffer, including, but not limited to, information that may be lost, damaged, delayed, misdelivered or unavailable when using the computers, network and electronic communications systems. The school district will not be responsible for stolen, damaged or lost personal devices of students, employees, contractors/vendors and guests. The school district shall not be responsible for material that is retrieved through the Internet, or the consequences that may result from them. The school district shall not be responsible for any unauthorized financial obligations, charges or fees resulting from access to the school district's CIS systems. In no event shall the school district be liable to the user for any damages whether direct, indirect, special or consequential, arising out of the use of the CIS systems.

## Prohibitions

The use of the school district's CIS systems for illegal, inappropriate, unacceptable or unethical purposes by users is prohibited. Such activities engaged in by users are strictly prohibited and illustrated below. The school district reserves the right to determine if any activity not appearing in the list below constitutes an acceptable or unacceptable use of the CIS systems.

These prohibitions are in effect any time school district resources are accessed whether on school district property, when using mobile commuting equipment, telecommunication facilities in unprotected areas or environments, directly from home, or indirectly through another ISP, and if relevant, when an employee, student or guest uses their own equipment.

**SC 1317.1
Pol. 237**

Students are prohibited from visibly possessing and using their personal computers, as defined in this policy, on school district premises and property (including, but not limited to, buses and other vehicles), at school district events, or through connection to the school district CIS systems, unless expressed permission has been granted by the school administrator, who will then assume the responsibility to supervise the student in its use, or unless an IEP team determines such use is necessary, in which case, an employee will supervise the student in its use. Students who are performing volunteer fire company, ambulance or rescue squad functions, or need such a computer due to their medical condition, or the medical condition of a member of their family, with notice and the approval of the school administrator may qualify for an exemption of this prohibition.

**General Prohibitions –**

Users are prohibited from using school district CIS systems to:

1. Communicate about non-work or non-school related communications unless the employees' use comports with this policy's definition of incidental personal use.

2. Access or transmit material that is harmful to minors, indecent, obscene, pornographic, child pornographic, terroristic or advocates the destruction of property.

3. Access or transmit material likely to be offensive or objectionable to recipients including, but not limited to, that which may be defamatory, inaccurate, obscene, sexually explicit, lewd, hateful, harassing, discriminatory (as it pertains to race, color, religion, national origin, gender, marital status, age, sexual orientation,

political beliefs, receipt of financial aid or disability), violent, vulgar, rude, inflammatory, threatening, profane, pornographic, offensive, terroristic and/or illegal.

4. Cyberbullying another individual.

5. Access or transmit gambling, pools for money, including, but not limited to, basketball and football, or any other betting or games of chance.

6. Participate in discussion or news groups that cover inappropriate and/or objectionable topics or materials, including those that conform to the definition of inappropriate matter in this policy.

7. Send terroristic threats, hateful mail, harassing communications, discriminatory remarks and offensive or inflammatory communications.

8. Participate in unauthorized Internet Relay Chats, instant messaging communications and Internet voice communications (on-line, real-time conversations) that are not for school-related purposes or required for employees to perform their job duties.

9. Facilitate any illegal activity.

10. Communicate through e-mail for non-educational purposes or activities, unless it is for an incidental personal use as defined in this policy. The use of e-mail to mass mail non-educational or non-work related information is expressly prohibited (for example, the use of the "everyone" distribution list, building level distribution lists or other e-mail distribution lists to offer personal items for sale is prohibited).

11. Engage in commercial, for-profit or any business purposes (except where such activities are otherwise permitted or authorized under applicable school district policies); conduct unauthorized fundraising or advertising on behalf of the school district and non-school school district organizations; resell school district computer resources to individuals or organizations who are not related to the school district; or use the school district's name in any unauthorized manner that would reflect negatively on the school district, its employees or students. **Commercial purposes** is defined as offering or providing goods or services or purchasing goods or services for personal use. School district acquisition policies will be followed for school district purchase of goods or supplies through the school district system.

12. Political lobbying.

| | |
|---|---|
| Pol. 814 | 13. Install, distribute, reproduce or use copyrighted software on school district computers, or copy school district software to unauthorized computer systems, intentionally infringing upon the intellectual property rights of others or violating a copyright. See Copyright Infringement in this policy and the school district's copyright policy for additional information. |
| | 14. Install computer hardware, peripheral devices, network hardware or system hardware. The authority to install hardware or devices on school district computers is restricted to the Director of Technology or designee. |
| | 15. Encrypt messages using encryption software that is not authorized by the school district from any access point on school district equipment or school district property. Employees and students must use school district approved encryption to protect the confidentiality of sensitive or critical information in the school district's approved manner. |
| | 16. Access, interfere, possess or distribute confidential or private information, without permission of the school district administration. An example includes accessing other students' accounts to obtain their grades. |
| 18 Pa. C.S.A. Sec. 5703 | 17. Violate the privacy or security of electronic information. |
| | 18. Use the systems to send any school district information to another party, except in the ordinary course of business as necessary or appropriate for the advancement of the school district's business or educational interest. |
| | 19. Sending unsolicited commercial electronic mail messages, also known as spam. |
| | 20. Posting personal or professional web pages without administrative approval. |
| | 21. Posting anonymous messages. |
| | **Access and Security Prohibitions –** |
| | Users must immediately notify the Director of Technology and/or designee if they have identified a possible security problem. Students, employees and guests must read, understand, provide a signed acknowledgement form and comply with this policy that includes network, Internet usage, electronic communications, |

telecommunications, non-disclosure and physical information security policies. The following activities related to access to the school district's CIS systems and information are prohibited:

1. Misrepresentation (including forgery) of the identity of a sender or source of communication.

2. Acquiring or attempting to acquire passwords of others or giving your password to another. Users will be held responsible for the result of any misuse of the users' user name or password while the users' systems access were left unattended and accessible to others, whether intentional or through negligence.

3. Using or attempting to use computer accounts of others; these actions are illegal, even with consent, or if only for the purposes of "browsing."

4. Altering a communication originally received from another person or computer with the intent to deceive.

5. Using school district resources to engage in any illegal act, which may threaten the health, safety or welfare of any person or persons, such as arranging for the promotion of or the sale of drugs, weapons or alcohol; engaging in criminal activity; or being involved in a terroristic threat against any person or property.

6. Disabling or circumventing any school district security, program or device, for example, but not limited to, anti-spyware, anti-spam software and virus protection software or procedures.

7. Transmitting electronic communications anonymously or under an alias unless authorized by the school district.

**Operational Prohibitions –**

The following operational activities and behaviors are prohibited:

1. Interference with or disruption of the CIS systems, network accounts, services or equipment of others, including, but not limited to, the propagation of computer "worms" and "viruses," Trojan Horse and trapdoor program code, the sending of electronic chain mail, distasteful jokes and the inappropriate sending of "broadcast" messages to large numbers of individuals or hosts. The user may not hack or crack the network or others' computers, whether by parasiteware or spyware designed to steal information, or viruses and worms or other hardware

or software designed to damage the CIS systems, or any component of the network, or strip or harvest information, or completely take over a person's computer, or "looking around."

2. Altering or attempting to alter files, system security software or the systems without authorization.

3. Unauthorized scanning of the CIS systems for security vulnerabilities.

4. Attempting to alter any school district computing or networking components (including, but not limited to, fileservers, bridges, routers or hubs) without authorization or beyond one's level of authorization.

5. Unauthorized wiring, including attempts to create unauthorized network connections, or any unauthorized extension or re-transmission of any computer, electronic communications systems or network services, whether wired, wireless, cable or by other means.

6. Connecting unauthorized hardware and devices to the CIS systems.

7. Loading, downloading or use of unauthorized games, programs, files or other electronic media, including, but not limited to, downloading music files.

8. Intentionally damaging or destroying the integrity of the school district's electronic information.

9. Intentionally destroying the school district's computer hardware or software.

10. Intentionally disrupting the use of the CIS systems.

11. Damaging the school district's CIS systems/networking equipment through the users' negligence or deliberate act.

12. Failing to comply with requests from appropriate teachers or school district administrators to discontinue activities that threaten the operation or integrity of the CIS systems.

Pol. 814

## Content Guidelines

Information electronically published on the school district's CIS systems shall be subject to the following guidelines:

1. Published documents, including, but not limited to, audio and video clips or conferences, may not include a child's phone number, street address, or box number, name (other than first name) or the names of other family members without parental consent.

2. Documents, web pages, electronic communications or videoconferences may not include personally identifiable information that indicates the physical location of a student at a given time without parental consent.

3. Documents, web pages, electronic communications or videoconferences may not contain objectionable materials or point directly or indirectly to objectionable materials.

4. Documents, web pages and electronic communications must conform to all school district policies and guidelines, including the copyright policy.

5. Documents to be published on the Internet must be edited and approved according to school district procedures before publication.

## Due Process

The school district will cooperate with the school district's ISP, local, state and federal officials to the extent legally required in investigations concerning or relating to any illegal activities conducted through the school district's CIS systems.

If students or employees possess due process rights for discipline resulting from the violation of this policy, they will be provided such rights.

The school district may terminate the account privileges by providing notice to the user.

## Search and Seizure

Users' violations of this policy, any other school district policy or the law may be discovered by routine maintenance and monitoring of the school district system, or any method stated in this policy, or pursuant to any legal means.

The school district reserves the right to monitor, track, log and access any electronic communications, including, but not limited to, Internet access and e-mails at any time for any reason. Users should not have the expectation of privacy in their use of the school district's CIS systems, and other school district technology, even when used for personal reasons. Further, the school district reserves the right, but not the obligation, to access any personal technology device of users brought onto the school district's premises or at school district events, or connected to the school district network, containing school district programs or school district or student data (including images, files and other information) to ensure compliance with this policy and other school district policies, to protect the school district's resources and to comply with the law.

Everything that users place in their personal files should be written as if a third party will review it.

### Copyright Infringement and Plagiarism

Federal laws, cases and guidelines pertaining to copyright will govern the use of material accessed through the school district resources. Users will make a standard practice of requesting permission from the holder of the work and complying with license agreements. Employees will instruct students to respect copyrights, request permission when appropriate, and comply with license agreements, and employees will respect and comply as well.

Pol. 814

Violations of copyright law can be a felony and the law allows a court to hold individuals personally responsible for infringing the law. The school district does not permit illegal acts pertaining to the copyright law. Therefore, any user violating the copyright law does so at his/her own risk and assumes all liability.

P.L. 94-553
Sec. 107
Pol. 814

Violations of copyright law include, but are not limited to, the making of unauthorized copies of any copyrighted material (such as commercial software, text, graphic images, audio and video recording), distributing copyrighted materials over computer networks and deep-linking and framing into the content of others' web sites. Further, the illegal installation of copyrighted software or files for use on the school district's computers is expressly prohibited. This includes all forms of licensed software – shrink-wrap, clickwrap, browsewrap and electronic software downloaded from the Internet.

School district guidelines on plagiarism will govern use of material accessed through the school district's CIS systems. Users will not plagiarize works that they find. Teachers will instruct students in appropriate research and citation practices.

### Selection of Material

Board policies on the selection of materials will govern use of the school district's CIS systems.

When using the Internet for class activities, teachers will select material that is appropriate in light of the age of the students and that is relevant to the course objectives. Teachers will preview the materials and web sites they require or recommend students access to determine the appropriateness of the material contained on or accessed through the web site. Teachers will provide guidelines and lists of resources to assist their students in channeling their research activities effectively and properly. Teachers will assist their students in developing the critical thinking skills necessary to ascertain the truthfulness of information, distinguish fact from opinion and engage in discussions about controversial issues while demonstrating tolerance and respect for those who hold divergent views.

### School District Web Site

The school district will establish and maintain a web site and will develop and modify its web pages that will present information about the school district under direction of the Director of Technology.

### Safety and Privacy

To the extent legally required, users of the school district's CIS systems will be protected from harassment or commercially unsolicited electronic communication. Any user who receives threatening or unwelcome communications must immediately take them to the Director of Technology and/or designee.

18 Pa. C.S.A. Sec. 5703

Users will not post personal contact information about themselves or other people on the CIS systems. The user may not steal another's identity in any way, may not use spyware, parasiteware, cookies, or use school district or personal employee technology or resources in any way to invade one's privacy. Additionally, the user may not disclose, use or disseminate confidential and personal information about students or employees (examples include, but are not limited to, using a cell phone with camera and Internet access to take pictures of anything, including, but not limited to, persons, places and documents relevant to the school district; saving, storing and sending the image with or without text or disclosing them by any means, including, but not limited to, print and electronic matter; revealing student grades, social security numbers, home addresses, telephone numbers, school addresses, work addresses, credit card numbers, health and financial information, evaluations,

psychological reports, educational records, reports and resumes or other information relevant to seeking employment at the school district unless legitimately authorized to do so).

Student users will agree not to meet with someone they have met online unless they have parental consent.

Consequences for Inappropriate, Unauthorized and Illegal Use

General rules for behavior, ethics and communications apply when using the CIS systems and information, in addition to the stipulations of this policy. Users must be aware that violations of this policy or other policies, or unlawful use of the CIS systems, may result in loss of CIS access and a variety of other disciplinary actions, including, but not limited to, warnings, usage restrictions, loss of privileges, position reassignment, oral or written reprimands, suspensions (with or without pay for employees), dismissal, expulsions and/or legal proceedings on a case-by-case basis. This policy incorporates all other relevant school district policies, such as, but not limited to, the student and professional employee discipline policies, copyright policy, property policy, curriculum policies, terroristic threat policy and harassment policies.

The user is responsible for damages to the network, equipment, electronic communications systems and software resulting from deliberate and willful acts. The user will also be responsible for incidental or unintended damage resulting from willful or deliberate violations of this policy.

Violations as described in this policy may be reported to the school district, appropriate legal authorities, whether the ISP, local, state or federal law enforcement. The school district will cooperate to the extent legally required with authorities in all such investigations.

Vandalism will result in cancellation of access to the school district's CIS systems and resources and is subject to discipline.

P.L. 94-553
Sec. 107
P.L. 106-554
Sec. 1711, 1721,
1732

20 U.S.C.
Sec. 6777

PA Code
Title 22
Sec. 403.1

Board Policy
237, 814

# EXHIBIT L

# IN THE UNITED STATES COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| J.S., a minor, by and through her parents, TERRY SNYDER and STEVEN SNYDER, individually and on behalf of their daughter, | : CIVIL ACTION NO. 07-CV-585 |
| Plaintiff | : |
| vs. | : JUDGE: JAMES M. MUNLEY |
| BLUE MOUNTAIN SCHOOL DISTRICT; DR. JOYCE E. ROMBERGER, Superintendent, Blue Mountain School District; and JAMES S. McGONIGLE, Principal, Blue Mountain School District, both in their official and individual capacities, | : |
| Defendant | : |

## ORAL DEPOSITION OF SUSAN SCHNEIDER-MORGAN

Taken at Blue Mountain School District, 685 Red Dale Road, Orwigsburg, Pennsylvania on October 17, 2007, before Lillian M. Freiler, Registered Merit Reporter.

**LILLIAN FREILER COURT REPORTING**
**1733 Breckenridge Road**
**Orwigsburg, PA 17961**
**570.366.3804**
**FAX 570.366.0380**
**CrtRptr@aol.com**

COPY

**APPEARANCES:**

Meredith W. Nissen, Esquire
**DRINKER BIDDLE & REATH, LLP**
18th and Cherry Streets
One Logan Square
Philadelphia, PA  19103
For the Plaintiff

Jonathan P. Riba, Esquire
**SWEET, STEVENS, KATZ & WILLIAMS, LLP**
331 East Butler Avenue
P.O. Box 5069
New Britain, PA  18901
For the Defendants

Also present:  Thomas J. Nickels, Esquire
James McGonigle
Joyce E. Romberger, Ed.D.

1                    I N D E X

2

3     WITNESS              EXAMINED BY              PAGE

4     Susan Schneider-Morgan
5
                           Ms. Nissen               4
6

7

8

9                    E X H I B I T S

10
      (None marked)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (It was stipulated and agreed by and between

2   counsel for all parties that all objections except

3   to the form of the question shall be waived until

4   the time of trial and that the reading, signing,

5   sealing and inspection of the deposition to be

6   taken shall be waived until the time of trial.)

7

8   **SUSAN SCHNEIDER-MORGAN**, called as a witness, was

9   duly sworn and testified as follows:

10                    **EXAMINATION**

11  **BY MS. NISSEN:**

12      Q.   Good afternoon Miss Morgan, my name is

13  Meredith Nissen.  I'm with the law firm Drinker,

14  Biddle and Reath and we represent the plaintiffs in

15  this action.  I guess first what I'm going to do is

16  just go over some introductory stuff that's sort of

17  routine.  Have you ever been deposed before.

18      A.   No.

19      Q.   This will just sort of go over some of the

20  ground rules.  As you know, your testimony is going

21  to be under oath.  You were just sworn in so it

22  will have the same force and effect as if you were

23  in court of law.  Do you understand that?

24      A.   Yes.

25      Q.   And just to help the court reporter out, I

1    just ask that try to have one speaker at a time and

2    to answer the questions orally instead of using

3    gestures or to say uh-huh.  Is that all right?

4         A.   Yes.

5         Q.   If you don't understand a question that I'm

6    asking, just let me know and I will rephrase it and

7    ask in a different way.  Is that all right?

8         A.   Yes.

9         Q.   Is there any reason that you are impaired

10   or not able to testify today?

11        A.   No.

12        Q.   And if you want to take a break at any

13   time, just let me know.  I would just ask that you

14   let me -- that if I posed a question that you try

15   and finish answering it before we take the break.

16        A.   Okay.

17        Q.   Could you please state your full name for

18   the record.

19        A.   Susan Schneider-Morgan.

20        Q.   Miss Morgan, could you go through your

21   educational background after high school?

22        A.   I have a degree from Bloomsburg University

23   in mathematics.  I have my master's in education

24   from Wilkes University.  I'm certified as an

25   instructional technologist from the State of

1  Pennsylvania, Department of Ed., and I'm currently

2  enrolled in a doctoral program.

3      Q.   What is the doctoral program for?

4      A.   In education.

5      Q.   And could you go through your employment

6  history, starting after you graduated from college?

7  Or is that --

8      A.   Okay hold on.

9          MR. REBA:   For the record, Jim

10     McGonigal entered the room and our school

11     solicitor Tom Nickels.

12     A.   I worked for Morton International as an

13 accounting associate.  I worked for -- prior to

14 that, I worked for Gitronics for a very brief time,

15 and then I worked for Morton International.  I then

16 took off some time to have some children.  I went

17 back to work at as a technology technician at Penn

18 State University.

19     Q.   And how long have you been employed at Blue

20 Mountain middle school?

21     A.   I have more to add to that.

22     Q.   I'm sorry.

23     A.   Then, after Penn State University, I was

24 employed by Berks County intermediate unit.  And in

25 September of 2000, I was hired at Blue Mountain

1    school district.

2        Q.   And what was what position were you hired

3    for in September, 2000?

4        A.   Technology specialist.  I think that was

5    what they had classified it as.

6        Q.   And what have been -- have your roles

7    changed?

8        A.   Yes.

9        Q.   Could you explain?

10       A.   In 2001, I was then promoted to director of

11   technology.

12       Q.   Could you explain sort of what your job

13   entails, the duties of your every day job as a

14   director of technology?

15       A.   I oversee all the computer, computers and

16   technology for the school district.  I make

17   recommendations on instructional proposals

18   regarding technology.

19            I apologize, I haven't ever been asked to

20   describe exactly everything.  I oversee the

21   policies that are in place regarding technology.  I

22   work with grant writing.  I'm responsible for eRate

23   funding.  I'm responsible for professional

24   development for teachers with regards to

25   technology.  That's a brief overview.

1    Q.   Okay, all right.  Now, you -- I think you

2  said one of the things that you do is you oversee

3  policies in place regarding technology?

4    A.   Correct.

5    Q.   Could you explain what policies there are?

6    A.   The policy in question would be policy

7  number 815.1 which is the Acceptable-Use Policy.

8    Q.   How many other policies are there that you

9  oversee?

10    A.   That would be the one.

11    Q.   There aren't any other?

12    A.   Well, there is a copyright policy which is

13  814 which is -- obviously, the copyright policy.

14    Q.   In a nutshell what does that cover,

15  copyright of what?

16    A.   Materials, materials.  It's a general

17  policy on materials.

18    Q.   That are on your website or in general?

19    A.   Just in general.

20    Q.   And who created that policy?

21    A.   That was here prior to my being employed

22  here.

23    Q.   Are you involved in drafting any of these

24  policies?

25    A.   I was involved in the 815.1 version.  The

1   815 was already in place prior to my hiring.

2       Q.   And that's the Acceptable-Use Policy?

3       A.   That's correct.

4       Q.   And what was your role in drafting?

5       A.   As far as in drafting, my role -- my role

6   in it was -- that policy was developed by an

7   attorney in Philadelphia and it was -- I'm trying

8   to think of the way to explain this.  All 12

9   districts in the county have -- were invited by the

10  IU to develop a new version of this Acceptable-Use

11  Policy.  My role was my input as to how it would be

12  utilized within the school district.

13      Q.   Can you characterize what your input was?

14      A.   I don't recall the specifics.

15      Q.   So your role was sort of to see how it

16  would be implemented in the school district?

17      A.   And make sure the policy was going to

18  adhere to our school district's already established

19  workings.

20      Q.   I guess -- can you be possibly more

21  specific of what exactly you mean by that?

22      A.   The policy, it's a general policy.  There

23  are certain things that do not apply to the

24  district or do apply.  Those -- I needed to make

25  sure that those specific items were maintained

1  within the policy.  For an example, would be like

2  cell phone use.  That's an example of items that

3  there were several items.

4      Q.    All right.

5           Now so you mentioned the Acceptable-Use

6  Policy and the Copyright Policy.  Are there other

7  policies that you oversee?

8      A.    Not to my knowledge, no.

9      Q.    So I guess the first thing I want to ask is

10  you're familiar with the lawsuit here, and when did

11  you first learn of the MySpace profile of

12  Mr. McGonigle?

13      A.    Wednesday, March 21st.

14      Q.    And how did you learn about the MySpace

15  profile?

16      A.    Mr. McGonigle brought it to my attention.

17      Q.    How did he bring it to your attention?

18      A.    He had a printout of it and brought it to

19  my office.

20      Q.    Did you have a conversation about the

21  profile?

22      A.    Yes.

23      Q.    What happened?  What was the conversation?

24      A.    He asked if this had violated any policy.

25      Q.    And what did you say?

1    A.   I reviewed the article in front of me and

2  indicated that the picture was taken from our

3  website.

4    Q.   How did you know that the picture was taken

5  from the website?

6    A.   Because I know that's the picture that is

7  up there on that was up there on the website.

8    Q.   Okay.

9    What other -- what else happened in the

10  conversation?  Did you say anything else?

11    A.   Other -- I pointed out specifically in the

12  policy my indication -- what I indicated was a

13  violation of the policy.

14    Q.   I want to take a look at the policy this

15  has already been marked as Defendant's Exhibit 3:

16  I placed before you what's been marked as

17  Defendant's Exhibit 3.  Are you familiar with this

18  document.

19    A.   Yes.

20    Q.   What is this?

21    A.   This is the Acceptable-Use Policy that I've

22  been referring to.

23    Q.   Can you point out to me what provision in

24  here that you believe was violated by the picture

25  on the MySpace profile?

1     A.   On page 15.

2     Q.   All right.

3     A.   Under copyright infringement.

4     Q.   Okay.  So why do you believe the picture on

5  the MySpace profile violated this provision?

6     A.   My interpretation of paragraph three is the

7  violation of the copyright law including but not

8  limited to the making of unauthorized copies of

9  copyright material which include graphic images.

10     Q.   Okay.  Now, when we were talking about you

11  looking at the photo of the MySpace, looking at the

12  printout of the MySpace page and I asked you how

13  did you know it was the picture, did you do any

14  other follow-up or investigation to determine if

15  that was, indeed, the same picture?

16     A.   I'm familiar with the picture because it is

17  on the middle school website and it's the picture I

18  placed up there.

19     Q.   Okay.  Is there a way to technically tell

20  when you're on if you were looking at the website

21  electronically whether it was the same picture from

22  a technical point of view?

23          MR. REBA:  Are you talking about the

24        same picture from the printout from the

25        MySpace compared to the printout --

1              compared to the website page.

2      Q.  I'm asking if you were looking at the

3 actual MySpace page, would you be able to tell if

4 that image was the same one taken from your

5 website?

6           MR. REBA:  Other than what she

7           testified to as she knew it from personal

8           experience?

9           MS. NISSEN:  Right.

10     Q.  I'm just curious from a technical

11 standpoint whether you could figure that out?

12     A.  I personally could not tell if -- I mean,

13 there are ways to do that.  I do not have the means

14 to do that.

15     Q.  Did you ever look at it electronically, the

16 MySpace image, the profile?

17     A.  No.

18     Q.  So, all right.  Going back to the

19 conversation, after you referenced the

20 Acceptable-Use Policy, what else happened in the

21 conversation?

22     A.  I indicated to him that, just that it was a

23 violation of that.  And he had then left my office

24 and proceeded to go upstairs.

25     Q.  Was there anybody else there?

1    A.   Dr. Romberger was in my office at the time.

2    Q.   Did you have a conversation with her about

3    the profile?

4    A.   I don't recall.

5    Q.   Now, you were saying that you found it to

6    be a violation of paragraph three on page 15

7    underneath -- sorry it's under Copyright

8    Infringement and Plagiarism on page 15, it's the

9    third paragraph under there.  Do you have any

10   expertise in copyright law?

11   A.   Expertise?  Can you define that?

12   Q.   Sure.  Have you taken any courses or

13   certification -- have you taken any courses in

14   copyright law?

15   A.   No, I haven't taken any courses in

16   copyright law.

17   Q.   Do you have -- you don't have any degrees

18   in copyright law?

19   A.   No.

20   Q.   After that conversation on March 21st with

21   Mr. McGonigle, did you ever speak to Mr. McGonigle

22   again about the profile?

23   A.   Not until the following week.

24   Q.   Okay.  And when was that?

25   A.   When we were notified about going to

1   Federal Court.

2       Q.   Did you ever, after the conversation with

3   Mr. McGonigle on the 21st, ever have any

4   conversations with anybody else about the profile?

5       A.   I don't recall.

6       Q.   Now, do you know that the profile was

7   eventually taken down from the MySpace website?

8       A.   Yes.

9       Q.   Did you have any involvement with that?

10      A.   No.

11      Q.   Do you know anything about the profile

12  being taken down?

13      A.   Just that it had been taken down.

14      Q.   After you had come to the conclusion that

15  this photo was a violation of the Acceptable-Use

16  Policy, did you take any steps to pursue that?

17      A.   Can you clarify more?

18      Q.   Did you do anything once you realized there

19  was -- that the photo was a violation, according to

20  you, of the Acceptable-Use Policy?  Did you tell

21  anyone about it.

22      A.   I'm still not grasping what you're asking.

23      Q.   I'm just trying -- was there any follow-up

24  with either the website in the effort to take the

25  photo down?

1    A.   Yes, the photo was removed.

2    Q.   And what were those efforts?

3    A.   I removed all the administrative photos

4    from the website.

5    Q.   And when you're talking about the website

6    you're talking about the school website?

7    A.   That's www.bmsd.org.

8    Q.   And why did you do that?

9    A.   I really don't recall why.

10    Q.   Did you talk with anybody about your

11    decision to take them down?

12    A.   Yes, I indicated to Dr. Romberger that I

13    was going to remove them.

14    Q.   Did you tell her a reason why you were

15    going to remove them?

16    A.   Just so that they just needed to be removed

17    so that they weren't on the website any more.  We

18    just didn't want any more violations.

19    Q.   Am I correct that there is an outside

20    company that licenses the photos to you?

21    A.   Correct.

22    Q.   Did you have any conversations with them

23    about this photo?

24    A.   No.

25    Q.   Did you have any conversations with them

1   about taking down the photos from the website?

2       A.   No.

3       Q.   Now you mentioned a second conversation

4   with Mr. McGonigle?

5       A.   Okay.

6       Q.   And was that after the lawsuit had been

7   filed?

8       A.   Yes.

9       Q.   And what was that regarding?

10      A.   Just that we were to be at Federal Court

11  that Thursday.

12      Q.   Now, are you aware that J.S. was

13  disciplined for the posting of the MySpace profile?

14      A.   Yes.

15      Q.   Were you involved with the decision to

16  discipline her?

17      A.   No.

18      Q.   Did you have any conversations with anybody

19  regarding her discipline?  Let me back up.  Sorry.

20  Okay so you said you weren't involved in actually

21  disciplining her?

22      A.   No.

23      Q.   When did you become aware that she was

24  going to be disciplined for posting the MySpace

25  profile?

1    A.   Mr. McGonigle on that following week after

2    the Federal Court we were notified of the Federal

3    Court.

4    Q.   And what did he tell you?

5    A.   Just that he had suspended the young lady.

6    Q.   Did he tell you anything else?

7    A.   I don't recall.

8    Q.   Did you have any conversations with anybody

9    else regarding her discipline?

10   A.   Not to my knowledge, no.

11   Q.   Did you, besides the conversation with

12   Mr. McGonigle -- now, sorry, let me strike that.

13        The second time you talked to Mr. McGonigle

14   do you know the date of that, was that the 28th?

15   Do you happen to know?

16   A.   No.

17   Q.   But it was approximately a week after the

18   21st, about a week after that?

19   A.   Mm-hmm.

20             MR. REBA:  Yes?

21   A.   Yes.

22   Q.   Did you receive any e-mails regarding J.'s

23   suspension?

24   A.   I don't think so.  Not to my knowledge.

25   Q.   Did you, besides speaking with

1    Mr. McGonigle, did you talk with anybody else about
2    her suspension?

3        A.    No.

4        Q.    Going back to when your initial
5    conversation with Mr. McGonigle, how long was the
6    conversation?

7        A.    Approximately ten minutes, 10, 15 minutes.

8        Q.    And during that period of time is when you
9    determined that the posting of the photo was a
10   violation of the Acceptable-Use Policy?

11       A.    Correct.

12       Q.    Did you spend any time after that thinking
13   about the issue further or taking any further
14   steps?

15       A.    Not to my knowledge.

16       Q.    And I just have a few more questions.

17             Besides the initial conversation with
18   Mr. McGonigle, did you spend any more time thinking
19   about the or — strike that.

20             Besides the initial conversation with
21   Mr. McGonigle, did you spend any more time either
22   investigating or considering the issues involving
23   the acceptable -- the posting of Mr. McGonigle's
24   photo as a violation of the Acceptable-Use Policy?

25       A.    I'm sorry, I didn't understand that

1  question.

2    Q.   Okay.  I'm just trying to determine how

3  much time you spent considering the issue of the

4  Acceptable-Use Policy and the posting of the photo

5  of Mr. McGonigle.  Besides the initial meeting with

6  him did you do anything else?

7    A.   Only to the afterthought of taking the

8  photos off the website.

9    Q.   And that's something that you decided to do

10 later on?

11   A.   I did that later on afterwards.

12   Q.   And how long approximately did that take?

13   A.   To take them off?

14   Q.   Mm-hmm, yes.

15   A.   I can't give a time.

16   Q.   Half hour?

17   A.   Half hour.

18        MS. NISSEN:  I just want to look at

19     my notes for a minute but I think I'm

20     pretty much done.

21             (Off the record.)

22        MS. NISSAN:  I have no further

23     questions, thank you.

24        MR. REBA:  I have no questions.

25             (The deposition ended at 12:24 p.m.)

# C E R T I F I C A T I O N

STATE OF PENNSYLVANIA :
                : §
COUNTY OF SCHUYLKILL :

I, Lillian M. Freiler, the undersigned, a Commissioner to Take Depositions within and for said County of Schuylkill and State of Pennsylvania, the officer before whom the foregoing deposition was taken, do hereby certify:

That Susan Schneider-Morgan, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and correct record of the testimony given by such witness.

I further certify that I am not related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of November, 2007.

Lillian M. Freiler, RMR
_____
Lillian M. Freiler
Registered Merit Reporter

# EXHIBIT M

1    IN THE UNITED STATES COURT FOR
     THE MIDDLE DISTRICT OF PENNSYLVANIA
2
     J.S., a minor, by and          : CIVIL ACTION NO.:
3    through her parents, TERRY     : 07-CV-585
     SNYDER and STEVEN SNYDER,      :
4    individually and on behalf     :
     of their daughter,             :
5                                   : .
              Plaintiffs,           :
6                                   :
              vs.                   : JUDGE:  JAMES M.
7                                   : MUNLEY
     BLUE MOUNTAIN SCHOOL           :
8    DISTRICT; DR. JOYCE E.         :
     ROMBERGER, Superintendent,     :
9    Blue Mountain School           :
     District; and JAMES S.         :
10   McGONIGLE, Principal, Blue     :
     Mountain School District,      :
11   both in their official and     :
     individual capacities,         :
12                                  :
              Defendants.           :
13
                   ---------------
14
                ORAL DEPOSITION OF
15
                  TERRY SNYDER
16
                September 13, 2007
17
                   ---------------
18
              Taken at the Blue Mountain School
19   District Board Room, 685 Red Dale Road, Orwigsburg,
     Pennsylvania, on September 13, 2007, commencing at
20   1:13 p.m. before Candis S. Bradshaw, Notary
     Public-Court Reporter.
21
22            LOVE COURT REPORTING, INC.
                  1500 Market Street
23               12th Floor, East Tower
              Philadelphia, Pennsylvania  19102
24                 (215) 568-5599

Page 2

1 APPEARANCES:
2
    AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
3 BY: MARY CATHERINE ROPER, ESQUIRE
    The Bourse Building, Suite 570
4 111 S. Independence Mall East
    Philadelphia, Pennsylvania 19106
5 (215) 592-1513 x 116
6 Representing the Plaintiffs
7
    SWEET, STEVENS, KATZ & WILLIAMS, LLP
8 BY: JONATHAN P. RIBA, ESQUIRE
    331 East Butler Avenue
9 P.O. Box 5069
    New Britain, Pennsylvania 18901
10 (215) 345-9111
11 Representing the Defendants
12
13 ALSO PRESENT:
        James S. McGonigle
14      Joyce E. Romberger, Ed.D.
15      Susan Schneider-Morgan
16
17
18
19
20
21
22
23
24

Page 3

1                INDEX
2 WITNESS                        PAGE
3 TERRY SNYDER
4   By Mr. Riba              3, 43
5   By Ms. Roper               42
6
7
8          EXHIBITS MARKED
9
10 NO. DESCRIPTION             PAGE
11 D-5  Blue Mountain Middle School      36
        Student-Parent Handbook, 2006-2007
12
13
14
15    EXHIBITS PREVIOUSLY MARKED AND REFERENCED
16 NO. DESCRIPTION             PAGE
17 D-1  MySpace page and enlarged copy of      29
        same
18
    D-2  CIS Acknowledgment and Consent Form    35
19
    D-3  Blue Mountain School District     35
20      "Acceptable Use of the Computers,
        Network, Internet, Electronic
21      Communications Systems, and
        Information"
22
    D-4  Letter written by J.S. on Hershey     35
23      Lodge letterhead
24

Page 4

1        TERRY SNYDER, called as a witness, was
2 administered the oath and testified as follows:
3        ===========
4            EXAMINATION
5 BY MR. RIBA:
6    Q.  Good afternoon, Mrs. Snyder.  Is it okay if
7 I call you Terry?
8    A.  Sure.
9    Q.  Okay.  You can call me John.
10       We met briefly before this began, and I
11 just want to go over a few instructions with you.
12 I'm sure your counsel has already told you
13 basically why you're here today and what to expect,
14 but I just want to put it on the record.  Okay?
15       I'll be asking you a series of questions
16 about what -- about your knowledge of some of the
17 facts in this case, and it's a time for me to find
18 out what you know.  And that's all I really am
19 interested in.  I'm not trying to trick you or play
20 games or, you know, create undue hardship for you.
21 I'm just trying to get the facts as you know so I
22 know them.
23       That being said, I don't want you to just
24 guess at an answer to a question I pose to you.  If

Page 5

1 I ask you a question and you don't know the answer,
2 it's fine to say "I don't know" or "I don't
3 recall."
4        If you do offer an answer, I'm going to
5 assume that you've understood my question, and
6 you're testifying to the best of your recollection.
7 Okay?
8        All your answers need to be verbal.  This
9 lady right here -- this woman right here is taking
10 down your -- all your testimony today.  Everything
11 that's said in this room is being transcribed onto
12 paper which can be used at a later date.  And
13 although everyone here sees what you're doing with
14 your head or your hands, all your answers need to
15 be verbal.
16       Also, try to avoid the "uh-huhs" and the
17 "uh-uhs" because that gets confusing on the
18 transcript.  So if you want to say "yes" or "no,"
19 try to remember to say "yes" or "no."  And you
20 won't be the first witness to do that, and we'll
21 try to catch you and clarify the record for you.
22 Okay?
23       If you'd like to take a break or consult
24 with your attorney, that is fine.  As I told your

2 (Pages 2 to 5)

1 daughter, this is not an endurance session. I
2 don't anticipate us being here longer than an hour,
3 maybe a little bit over. But if you'd like to take
4 a break and go to the bathroom, just tell us, and
5 we'll be happy to take a break. Okay?
6    A. Sure.
7    Q. Okay. Could you please state and spell
8 your whole name for the record.
9    A. My name is Terry Lynn Snyder. T-E-R-R-Y,
10 L-Y-N-N, S-N-Y-D-E-R.
11    Q. And Terry, where do you live?
12    A. 209 Summer Valley Road, Orwigsburg,
13 Pennsylvania.
14    Q. And were you living there in March of 2007?
15    A. Yes.
16    Q. And you're married?
17    A. Yes.
18    Q. How long have you been married?
19    A. Seventeen plus years.
20    Q. Congratulations.
21       And you have two children, I understand?
22    A. Yes, I do.
23    Q. And I've met J.
24       And what's the name of your other child?

1    A. Scott.
2    Q. Okay. And how old's Scott?
3    A. Scotty is 12.
4    Q. And he's a student here at Blue Mountain?
5    A. Yes.
6    Q. And what grade is he in?
7    A. Seventh.
8    Q. Okay. Terry, did — does your house — in
9 March of 2007, did your house have a computer?
10    A. Yes.
11    Q. And where is the computer located?
12    A. In the rec room downstairs, at the time.
13    Q. Okay. And J., would she use the computer
14 on a frequent basis?
15    A. Yes.
16    Q. Okay. Could you give us an estimate or a
17 timeframe of how many hours a day she would go on
18 the computer.
19    A. Well, not every day. One or two hours at a
20 time.
21    Q. Per day?
22    A. Every other day.
23    Q. Okay. Did you monitor her computer use?
24    A. I have -- I had -- well, not that I stood

1 over her shoulder. But I had both of my children
2 give me their passwords for anything. If they
3 change their password without my knowledge, they
4 lose their privilege. So --
5    Q. Okay.
6    A. -- I could search their histories, things
7 like that.
8    Q. Passwords to get on the computer or
9 passwords to particular sites or —
10    A. Passwords to their AIM . . .
11    Q. The AOL account?
12    A. Yes.
13    Q. Okay. Did you know your daughter had a
14 MySpace profile in March of 2007?
15    A. Yes.
16    Q. Do you know when she first created that
17 profile?
18    A. About -- I'm guessing six months before
19 that, maybe.
20    Q. Okay. Did you know the password to your
21 daughter's MySpace account?
22    A. I did. I -- at the time.
23    Q. Okay.
24    A. I believe.

1    Q. Okay. Did you ever go on there and see
2 what — see what was going on?
3    A. Yes.
4    Q. Okay. How often would you do that?
5    A. Not very often.
6    Q. Okay. Did you have your own MySpace
7 account?
8    A. No.
9    Q. Do you know how the — did you know how the
10 program or the site worked? Do you know about
11 MySpace?
12    A. Yes.
13    Q. I mean, it's been — it's in the news, I
14 guess, a lot.
15    A. Yes.
16    Q. And it's — I guess it's a way to meet some
17 people and interact with other individuals. Would
18 you agree with that?
19       I mean, what's your definition of MySpace?
20 Do you have one?
21    A. It's --
22    Q. Of the site. How would you describe the
23 site?
24    A. It's a communication network.

1    Q.  Used for social reasons or meeting other
2  people and so on and so forth.  Right?
3    A.  Could be.  Right.
4    Q.  Yeah.  Okay.
5    A.  Sure.
6    Q.  And it shares information about your
7  interests and hobbies, and you can share pictures
8  on it and stuff like that; right?
9    A.  Yes.
10    Q.  Okay.  Do you know a Kristina Lehman?
11    A.  Yes.
12    Q.  Who's Kristina Lehman?
13    A.  She's one of J.'s classmates.
14    Q.  How long have -- are they friends?
15    A.  Yes.
16    Q.  How long have Kristina and J. been friends?
17    A.  I'm not certain.
18    Q.  Okay.  Well, were they friends in -- prior
19  to 8th grade?
20    A.  Yes.
21    Q.  Okay.  They were friends during the middle
22  school years, 6 through 8?  You don't know?
23    A.  I don't know.
24    Q.  Okay.  Did Kristina ever come over to your

1  house to play or to hang out with --
2    A.  No.
3    Q.  -- J.?
4    Okay.  Did you ever meet Kristina in
5  person?
6    A.  Yes.
7    Q.  Okay.  Did you meet her prior to March
8  of 2007?
9    A.  Yes.
10    Q.  Okay.  And where did you meet her?  Just at
11  school or run into her?
12    A.  Activities: football games, dance.
13    Q.  How would you -- did you ever hear -- did
14  you ever hear J. describe Kristina as her best
15  friend?
16    A.  No.
17    Q.  Okay.  Who was J.'s best friend, to your
18  knowledge, in March of 2007?
19    A.  Kristin.
20    Q.  Okay.  What's Kristin's last name?
21    A.  Abernathy.
22    Q.  Okay.  Do you know if Kristin Abernathy
23  viewed this site that we're here for today?
24    A.  Do I know?

1    Q.  Yeah.
2    A.  No.
3    Q.  Okay.  Terry, why did you sue the school
4  district?
5    A.  Pardon me?
6    Q.  Why did you sue the school district?
7    A.  Because although what J. did was offensive,
8  she did not do anything in school to be punished by
9  the school.  She did not do anything on school
10  property to be punished by the school.  I'm her
11  mother; Steve is her father.  The punishment should
12  have been left to us.
13    Q.  Did you consult your daughter, J., before
14  filing suit against the school district and the
15  superintendent and principal?
16    A.  Did I consult her?
17    Q.  Yeah.
18    A.  No.
19    Q.  You didn't take into account what she
20  wanted?
21    A.  I -- no.  I don't know.
22    Q.  Why is that?
23    A.  I was more concerned about my son, his
24  feelings, because J. would be leaving the middle

1  school and going on to the high school.
2    Q.  Okay.
3    A.  I wanted to make sure my son was okay with
4  it.
5    Q.  Well, I'm just a little confused as to
6  how -- why filing suit against the school district,
7  the superintendent, and the principal deals with
8  your son.  That -- could you elaborate on that or
9  clarify that for me.  I don't understand that.
10    A.  Because persons told me that Mr. McGonigle
11  would be retaliatory towards my son.
12    Q.  What grade is your son in now?
13    A.  Seventh.
14    Q.  He was in 6th grade when this incident
15  happened?
16    A.  Yes.
17    Q.  Okay.  From the time of this incident up
18  until, I guess, today, has Mr. McGonigle retaliated
19  in any way against your son?
20    A.  No.
21    Q.  Is there any other reason why you sued the
22  school district other than what you testified to?
23    Any other reason why you sued the school
24  district?

1    A.  No.
2    Q.  You admit, ma'am, that the -- that this Web
3  site is offensive, the MySpace account?
4    A.  Yes.
5    Q.  Let me hand you a copy of it.  This is --
6  it's already been marked during your daughter's
7  deposition as Defense Exhibit No. 1.  There's two
8  pages.
9        You said it was -- what was the question I
10  asked?  Offensive.  You said it was offensive --
11    A.  Yes.
12    Q.  -- right?  Okay.
13        Do you think it was vulgar?
14    A.  Yes.
15    Q.  Lewd?
16    A.  Yes.
17    Q.  Did you feel this -- your daughter
18  testified previously that an individual -- a
19  reasonable person or an individual pulling this
20  site up, reading this with no knowledge of the
21  background, would view this -- would view
22  Mr. McGonigle as a sexual predator.  Would you
23  agree with that?
24        MS. ROPER:  Objection.

1        Mischaracterizes the testimony.
2  BY MR. RIBA:
3    Q.  Okay.  Let me ask you:  In regards to what
4  your daughter testified to, reading this Web site
5  and what's contained on this Web site, do you think
6  this portrays Mr. McGonigle as a sexual predator of
7  young students?
8    A.  If anyone would take it seriously.  I can't
9  see how anyone would take this seriously.
10    Q.  Ma'am, how can you -- how can you say that
11  no one could take this seriously?  Why do you feel
12  that way?
13    A.  Because it looks like a juvenile attempt at
14  humor.
15    Q.  Can you show me on here anything that would
16  indicate that it's an attempt at humor or a parody?
17    A.  Where does it say he loves his . . .
18        It's just -- this is not something someone
19  would write about themselves.  I . . .
20    Q.  Ma'am, do you watch the news?  Do you --
21    A.  Yes.
22    Q.  -- do you watch the news?
23    A.  Mostly.
24    Q.  Do you --

1    A.  Most days.
2    Q.  Do you keep up with -- do you keep up with
3  you know, the headlines of the day, so to speak?
4    A.  Yes.
5    Q.  Okay.  Would you agree with me that
6  recently, with the advent of the -- you know, the
7  advent of the Internet, that a major issue nowadays
8  is sexual predators on the Internet?
9    A.  Yes.
10    Q.  People luring -- adults luring young
11  children to certain places and trying to pick up
12  students or young individuals over the Internet?
13    A.  Yes.
14    Q.  That's a common problem today?
15    A.  Yes.
16    Q.  Do you think this is representative of that
17  problem?
18        MS. ROPER:  Objection.
19  BY MR. RIBA:
20    Q.  Do you understand the question?
21        MS. ROPER:  Calls for speculation.
22    Q.  Do you understand the question?
23    A.  I understand the -- I believe I understand
24  the question.

1        But I would not think that this would be
2  luring children to this person's Web site.  It's --
3  I don't believe it's a solicitation for contact.
4  BY MR. RIBA:
5    Q.  Well, do you see the section under URL
6  where it says "www.MySpace.com/kidsrockmybed"?
7        Does that -- as a parent of two young
8  children --
9    A.  I know --
10    Q.  -- does that bother you?
11    A.  -- it's on here, but -- pardon me?
12    Q.  And as parent to two young children, does
13  that bother you that there's a URL site from a
14  supposed principal that says "kids rock my bed"?
15    A.  It bothers me as a parent that J. would
16  write that.  But I would not think -- I don't -- I
17  could not imagine either one of my children
18  thinking that this was someone who was looking for
19  a relationship.
20    Q.  When was the first time that you found out
21  about this Web site?
22    A.  When Mr. McGonigle -- when I was in
23  Mr. McGonigle's office.
24    Q.  And what was your reaction when he

Page 18

1 presented you with this Web site?
2 A. I was stunned. I asked J. did she do this.
3 Q. And what was her answer?
4 A. She said yes.
5 Q. And what was your reaction?
6 A. I was still a little stunned, to say the
7 least.
8 Q. Okay. Did you say anything to
9 Mr. McGonigle at that time?
10 A. I don't remember.
11 Q. Okay. Do you recall if J. apologized?
12 A. Yes.
13 Q. Okay. Do you recall if you apologized?
14 A. Yes.
15 Q. Okay. Do you recall if there was a --
16 discipline handed out at that time?
17 A. Yes.
18 Q. Okay. What was that?
19 A. A ten-day suspension from school, and J.
20 was not allowed to participate in any activities.
21 Q. Now, did you voice objection to the
22 suspension at that time?
23 A. No.
24 Q. Okay. Why not?

Page 19

1 A. I was still kind of shocked.
2 Q. Do you think it was appropriate?
3 A. No.
4 Q. Okay. Why not?
5 A. Because she did not do anything in school.
6 Q. Okay. Well, when was the first time you
7 voiced your objections to the suspension?
8 A. The next day, I called Dr. Romberger.
9 Q. Okay. And what happened during that
10 conversation? What was said?
11 A. That they were standing by the suspension.
12 I don't remember exactly what was said.
13 Q. Did you call anyone else besides
14 Dr. Romberger?
15 MS. ROPER: And let me just
16 interpose an objection to the extent that
17 it would ask her to reveal any
18 conversations with attorneys.
19 BY MR. RIBA:
20 Q. Yeah. Don't tell me any -- don't tell me
21 any conversations you had with any of your
22 attorneys. I don't want to know that.
23 I want to know any conversations you had
24 with my clients, that being anyone that works at

Page 20

1 the district, with regards to your objections to
2 the suspension given to J.
3 A. No. No one else.
4 Q. Okay. And I don't want to know what you
5 said, but I do want to know: When was the first
6 time you contacted an attorney with regards to your
7 worries about -- or concerns about the suspension?
8 A. I may have inquired later that same day.
9 I'm not sure.
10 Q. When you say "that same day," is that --
11 you just testified it was a couple days later that
12 you called Dr. Romberger, or was it the day after?
13 A. The following day.
14 Q. The next day.
15 A. Yes.
16 Q. And to your recollection, you might have
17 contacted counsel at that time?
18 A. I may have sent an inquiry. I'm not
19 certain. It could have been two days later.
20 I know it was the day I got the phone call
21 from the state police, whichever day that was.
22 Q. Okay. Tell me about that. What did the
23 state police say?
24 A. They asked me to report to the state police

Page 21

1 barracks with J. that evening.
2 Q. Okay. And what happened when you reported
3 to the state barracks?
4 A. They basically scared J. --
5 Q. Uh-huh.
6 A. -- basically, is what happened.
7 Q. Were you present for when they talked
8 to J.?
9 A. Yes.
10 Q. Okay. And what did they say? Do you
11 recall?
12 Do you mind if we -- let me back up one
13 second. Did you -- do you remember the name of the
14 officer that spoke to J.?
15 A. RAS-mooth (phonetic) or RAS-muth
16 (phonetic), something like that.
17 Q. Okay. And what -- do you recall what he
18 said?
19 A. Just -- I -- he talked about the attire
20 kids wear in school these days. He talked about
21 that -- a progression of discipline kind of thing.
22 I don't remember.
23 Q. Uh-huh.
24 A. You know, that things could become quite

1  serious. He did say that Mr. McGonigle was not
2  pressing charges.
3      Q. Have you ever had any other contact with
4  the state police other than that one time you went
5  to the barracks?
6      A. I called to ask if I could have a copy of
7  the MySpace page.
8      Q. And did they give it to you?
9      A. No.
10     Q. Do you know if there's any other paperwork
11 that was prepared by the state police?
12     A. Do I know -- no.
13     Q. Do you know if there was a file opened on
14 this matter or incident -- a number from this
15 matter?
16     A. He said he had a file, but I don't know if
17 there's a file.
18     Q. Okay. Do you recall when he was talking
19 to J. or -- did he ask J. what happened? Did --
20 when -- in his conversations with J., did he ask J.
21 for her side of the story, what she did and --
22     A. No.
23     Q. -- in the creation of this MySpace?
24     A. Not that I remember, no.

1      Q. Okay. Do you recall if he was taking
2  notes?
3      A. He had notes, but I don't think he was
4  taking notes.
5         I don't know. I don't know. I can't
6  remember.
7      Q. Okay. What barracks was this?
8      A. Reedsville.
9      Q. Reedsville?
10        And this was the state police; correct?
11     A. Yes.
12     Q. Okay. Have you seen any other copies of
13 this MySpace page other than what's before you?
14     A. In Mr. McGonigle's office.
15     Q. Right. It's the same -- it's the same
16 handout or the same printout.
17        Did you see any other -- different
18 printouts than this one?
19     A. No.
20     Q. Okay. Did you see the actual MySpace
21 account on the computer at any time?
22     A. This?
23     Q. Yes.
24     A. No.

1      Q. You never saw it on the computer?
2      A. No.
3      Q. Do you know when it was removed?
4      A. Thursday -- no. Not exactly. I think it
5  was Thursday, because J. tried to remove it herself
6  and couldn't.
7      Q. Okay. Do you know who ended up removing
8  it?
9      A. No --
10     Q. Okay.
11     A. -- really. MySpace, I assumed.
12     Q. You said that one of the reasons you
13 brought this lawsuit was because you thought you
14 should be the one disciplining your daughter.
15     A. Yes.
16     Q. Isn't it true that you did discipline your
17 daughter?
18     A. Yes.
19     Q. Okay. What did -- how did you discipline
20 her?
21     A. She was grounded. She was restricted from
22 the phone and the computer.
23     Q. How long was she grounded for?
24     A. She was grounded indefinitely at the time.

1  I don't know how long she ended up being grounded
2  for. I know -- more than a month. But I don't
3  remember.
4      Q. Okay. How long was her phone restrictions
5  in place for?
6      A. I don't remember.
7      Q. How about her computer privileges?
8      A. I don't remember that either. She was
9  allowed to use the computer for school work only at
10 that time. And I just don't remember.
11     Q. Okay. Do you know if your daughter still
12 has a MySpace account?
13     A. Yes, she does.
14     Q. Your daughter received a ten-day
15 suspension?
16     A. Yes.
17     Q. During that time, your daughter received
18 work at school -- her homework at school? I mean,
19 the work assigned at school was brought home?
20     A. Yes.
21     Q. Right?
22        Did you observe her doing it?
23     A. Yes.
24     Q. Okay. Did she do it every day?

1  A.  Yes.

2  Q.  Okay. Was work brought home with her every

3  day, or was it given to her at the beginning of the

4  suspension? Or how did it work?

5  A.  She got the majority of it at the beginning

6  of her suspension.

7  Q.  Okay. And your daughter testified that

8  when she returned to school throughout the end of

9  the year, there was no drop-off in her performance

10  at school in terms of grades. Would you agree with

11  that?

12  A.  Yes.

13  Q.  And your daughter testified that as a

14  result of this suspension, she suffered no

15  emotional damages -- emotional injuries, that she

16  didn't seek professional help from anybody?

17      MS. ROPER: Objection of it being

18      compound and mischaracterizing the

19      testimony.

20  BY MR. RIBA:

21  Q.  Okay. Did your daughter receive any

22  professional help as a result of the suspension?

23  A.  No.

24  Q.  Okay. Did your daughter complain about any

1  emotional feelings she was having as a result of

2  the suspension?

3  A.  At the time, yes.

4  Q.  Okay. She was upset about it?

5  A.  Yes.

6  Q.  Did you ask your daughter if she felt she

7  should be suspended?

8  A.  Not exactly that. I asked her what she

9  thought her punishment should be, although I don't

10  recall what she said.

11  Q.  You don't recall what she said?

12  A.  No.

13  Q.  Did -- do you recall that -- J. saying that

14  she shouldn't be punished at all by the school for

15  what she did?

16  A.  No, I don't . . .

17  Q.  Do you recall -- I recall you testifying

18  when you first started this that one of the reasons

19  you felt that you brought this lawsuit was because

20  everything happened off school grounds. In other

21  words, the Web site was created at your house on

22  the -- on your own computer?

23  A.  Not during school hours.

24  Q.  -- not during school hours.

1      Did you ever hear -- did J. ever say that?

2  A.  Pardon me?

3  Q.  Did J. ever say that?

4  A.  Did she ever say what?

5  Q.  That she shouldn't be disciplined because

6  of the reasons you just articulated.

7  A.  No. J. never said that she shouldn't be

8  disciplined.

9  Q.  Your husband is a plaintiff in this

10  lawsuit; correct?

11  A.  Yes.

12  Q.  Was he involved at all in this incident?

13  A.  No.

14  Q.  Did he participate in any meetings you

15  might have had with any of the defendants or any

16  employee of the district?

17  A.  No.

18  Q.  Okay. Did he have any conversations

19  with J. regarding her actions that you know of?

20  A.  Yes.

21  Q.  Okay. And what did -- what was his

22  reaction to this Web site?

23  A.  What was his reaction?

24  Q.  Yeah.

1  A.  Other than that he was disappointed, I'm

2  not sure exactly what his reaction was.

3  Q.  Did you consult with your husband in

4  bringing this lawsuit?

5  A.  Yes.

6  Q.  Okay. And what was his -- what was his

7  ration- -- to your knowledge, what was his

8  rationale as to why this lawsuit should be brought?

9  A.  Because we're her parents.

10  Q.  Okay.

11  A.  We're responsible for her when she's not in

12  school.

13  Q.  Okay. Ma'am, do you have any knowledge as

14  to the effect that this had -- this Web site had on

15  the inner workings of the school?

16  A.  No.

17  Q.  Do you have any knowledge as to disruptions

18  it caused in class?

19  A.  No.

20  Q.  Okay.

21  A.  Other than I know kids were talking about

22  it with their teachers once J. was suspended. I

23  don't -- other than that, I don't --

24  Q.  Talk to me a little bit about that. Who

1 was -- tell me more about the kid talking to his
2 teacher about it?
3    A. I just know that they were because my son
4 came home and told me.
5    Q. Okay. What did your son tell you?
6    A. That everybody in the school was talking
7 about J. and Kristina.
8    Q. And at the time, your son was in 6th grade?
9    A. Yes.
10    Q. Okay. And this was -- was this -- when was
11 this that your son came back and told you everyone
12 in the school was talking about it?
13    A. The day J. was suspended.
14    Q. Did you talk to any of her friends about
15 the suspension?
16    A. I inquired from a few of her friends what
17 they had heard.
18    Q. Okay. Do you know if people were talking
19 about this before she was suspended? This Web
20 site --
21    A. The --
22    Q. This Web site right here, D-1?
23       Do you know if people were talking about it
24 in school prior to her being called down to the

1 office?
2    A. Just from what J. told me, because J. tried
3 to take it down because people were asking her
4 about it.
5    Q. A lot of people?
6    A. I don't know.
7    Q. Well, did she tell you what they were
8 asking about it?
9    A. No.
10    Q. Did J. come to you before she was called
11 down to the office and she received her discipline
12 about this Web site?
13    A. No.
14    Q. You do recall her, though, telling
15 her [sic] at some point thereafter, after she was
16 disciplined, that people were coming up to her and
17 telling her about this Web site, and she tried
18 taking it down?
19    A. Yes.
20    Q. Did you talk to her teachers about this Web
21 site at all?
22    A. No.
23    Q. Okay. Other than Mr. McGonigle and the
24 phone call to the superintendent, did you have any

1 other conversations with anyone from the district
2 with regards to this incident?
3    A. Dr. Romberger. And I . . .
4    Q. Right. That one time, the day after you
5 called --
6    A. No. I came in to talk to her --
7    Q. Okay.
8    A. -- after that.
9    Q. Okay. It's -- after you had the phone
10 call, you came in?
11    A. Yes.
12    Q. Okay. How many days after the phone call
13 did you come in?
14    A. I don't know.
15    Q. Okay. What happened at the -- what
16 happened at the meeting?
17    A. I again tried to see if I could get J. back
18 into school while -- maybe it could be resolved
19 without her spending -- she was already out of
20 school a few days at that point in time.
21    Q. J. didn't -- did she participate in any
22 extracurricular activities at that time in March
23 of 2007?
24    A. Did she participate in any --

1    Q. Yeah. In 8th grade -- I mean, I don't
2 know. In 8th grade, is there, like, sports teams
3 or anything that meet after school?
4    A. In March, she was not in any sports. She
5 had no organized activities like that.
6    Q. Okay. It wasn't like in the -- some type
7 of club or -- you know, like, a drama club or a --
8 whatever clubs are out there. She wasn't
9 participating in any of that?
10    A. No.
11    Q. Okay. So it was the -- the suspension,
12 what she missed was the classroom -- the regular
13 classroom activities. She didn't miss any
14 extracurricular activities because of the
15 suspension.
16    A. Well, her class trip.
17    Q. Okay. And when was the class trip?
18    A. I don't remember. It was after the
19 suspension was over.
20    Q. She wasn't allowed to participate in the
21 class trip?
22    A. (Nodding head.)
23    Q. Do you know where the class trip went or --
24    A. Washington.

Page 34

1  She was also not allowed to go to her --
2  the 8th grade dance.
3  Q. Okay. Is the class trip a school function,
4  to your knowledge?
5  A. I'm told it's not a school function.
6  Q. Okay. It's something provided by a private
7  entity or donations or -- you know, donations are
8  made or it's funded through fundraising? Is that
9  how it works?
10  A. I don't know. I paid money for it.
11  Q. Okay. You paid, though, for her to go?
12  A. Yes.
13  Q. Okay.
14  A. Although, when the school is in supervision
15  of my child, then I think it's still a school
16  function.
17  Q. When is the class trip? Is it after school
18  ends?
19  A. No.
20  Q. Okay. It's during school?
21  A. Yes.
22  Q. As a result of the meeting with the
23  superintendent, everything still stayed the same in
24  terms of the suspension?

Page 35

1  A. Yes.
2  Q. Okay. Any other conversations with any
3  district representatives after that meeting with
4  the superintendent?
5  A. No.
6  Q. Did you know Mr. McGonigle prior to this
7  encounter, this incident?
8  A. Personally, no.
9  Q. Okay. Did you hear anything about him
10  prior to -- prior to this?
11  A. Did I hear anything about --
12  Q. Yeah. Did you have an opinion about him as
13  a principal? I mean, your daughter went there for
14  two years prior to this incident. Did you think
15  you -- did you have any opinion of him?
16  A. I thought he was okay.
17  Q. Okay. Did you know your daughter wanted to
18  dress like him during Halloween in --
19  A. I took her --
20  Q. -- the 7th grade?
21  A. -- trick-or-treating, yes.
22  Q. Okay. Were you present when your daughter
23  wrote the apology statement?
24  A. Was I present when she wrote it?

Page 36

1  Q. Yeah.
2  A. I was in the house, but I didn't stand over
3  her while she --
4  Q. Okay.
5  A. -- wrote it.
6  Q. Just for the record, it's D-4.
7  Terry, do you recall signing a -- what's
8  called a CIS Acknowledgement and Consent form?
9  It's about the computer policy of the school
10  district.
11  A. Yes.
12  Q. Okay. We marked this at your daughter's
13  deposition as D-2. Is that your signature on it?
14  A. Yes.
15  Q. Okay. And that's at the beginning of the
16  2006/2007 school year, August of 2006?
17  A. Yes.
18  Q. Okay. And associated with that is the
19  actual policy of the school district regarding the
20  use of computers; correct?
21  A. Yes.
22  Q. Okay. And we marked this as D-3. Do you
23  recall seeing a copy of that?
24  A. We receive something like this --

Page 37

1  Q. Yeah.
2  A. -- every year.
3  Q. Yeah.
4  And, likewise, you also received a copy of
5  the Blue Mountain Middle School Student/Parent
6  Handbook?
7  A. Yes.
8  MR. RIBA: Okay. And we can mark
9  this as D-5.
10  (Exhibit No. D-5 was marked.)
11  BY MR. RIBA:
12  Q. Terry, you testified you received a copy of
13  that?
14  A. Yes.
15  Q. Okay. And that's the -- one of the middle
16  school disciplinary policy manuals, I guess, Blue
17  Mountain Middle School -- for Blue Mountain Middle
18  School?
19  A. Yeah. It has all kinds of things in there.
20  Q. Right. Right.
21  A. Yes.
22  Q. Right.
23  One of your allegations in your complaint
24  is that the policy of the school district was

1  overbroad or vague with regard to the punishment
2  handed out to J. Correct?
3      You've seen a copy of your complaint;
4  right?
5      A. Yes.
6      Q. Okay. Well, one of the claims that you
7  made against the district and the other defendants
8  is that the policy against -- the policy which was
9  enforced against your daughter was either overly
10 broad or vague.
11     Have you had a chance to look at that --
12 that policy manual, the handbook that's been marked
13 as D-5?
14     A. Yes.
15     Q. Okay. Could you -- can you tell me what
16 policy you believe is overbroad or vague?
17     MS. ROPER: Objection to the extent
18     it calls for a legal conclusion.
19 BY MR. RIBA:
20     Q. Well, just -- there's something that you
21 believe is vague or overbroad which you allege in
22 your complaint. And I'd like you to tell me what
23 that policy or language in the policy is, if you
24 could.

1      MS. ROPER: Same objection.
2  BY MR. RIBA:
3      Q. Can you do that? You can answer the
4  question.
5      A. I looked at the handbook when J. was
6  suspended to see what infraction she could have
7  received a ten-day suspension for. And to be
8  honest, it didn't jump out at me from this book.
9      Q. Okay. So you don't see anything in there
10 that relates to this incident?
11     A. Not really.
12     Q. Would you agree, ma'am, that the
13 information contained on this Web site, on D-1,
14 contains false accusations against Mr. McGonigle?
15     A. I don't think the Web site is accusing him
16 of any -- I don't know.
17     Q. Okay. You don't know if it contains false
18 accusations against Mr. McGonigle?
19     A. It's fiction, whatever this is. But I
20 guess it's false. I don't -- I don't know.
21     I guess you could say it's accusing him of
22 something, but I don't . . .
23     Q. You don't what?
24     A. I don't think it's making an accusation.

1      Q. "I have come to MySpace so I can pervert
2  the minds of other principals to be just like me."
3  You don't think that's a false accusation?
4      A. Well, I guess it's false because he didn't
5  write it.
6      Q. He didn't do anything on this Web site;
7  right?
8      A. Right.
9      Q. That's his picture, though.
10     There's a couple things that are true on
11 this Web site; right? That's his picture from the
12 school Web site.
13     A. Yes.
14     Q. And he is a principal.
15     A. Yes.
16     Q. Would you want your daughter or son going
17 to a school with a principal that comes to MySpace
18 so he can pervert the minds of other principals,
19 who likes to have sex with kids in his bed -- sex
20 of any kind?
21     A. Would I want my kids going to a school with
22 a principal like that?
23     Q. Yeah.
24     A. No.

1      Q. Right.
2      You think something like this could cause
3  disruptions in the school, the way a school
4  functions?
5      MS. ROPER: Objection. It calls for
6     speculation.
7  BY MR. RIBA:
8      Q. You can answer the question.
9      A. I would imagine it could get out of
10 control.
11     Q. How so?
12     A. Just because kids are kids.
13     Q. Is it possible that with this Web site
14 being out there available to the whole world
15 that -- and especially, you know, parents and
16 students of Blue Mountain, that people will look at
17 Mr. McGonigle as a sexual predator and not --
18     A. I don't think so.
19     Q. -- not do anything -- not do anything --
20 not listen to him as the administrator of a middle
21 school?
22     MS. ROPER: Objection. Calls for
23     speculation and lacks of foundation.
24     Q. You can answer the question.

11 (Pages 38 to 41)

1    A.  I would not think that any reasonable
2  person would believe that this was any valid
3  article.
4    **Q.  But my question, though, is:  This Web**
5  **site, as it appears in D-1 -- with no mention of**
6  **any, you know, parody disclaimer or notice to**
7  **anybody that this is anything other than true --**
8  **this could affect Mr. McGonigle's ability to**
9  **administer education at the middle school.  Isn't**
10  **that true?**
11    MS. ROPER:  Objection.  Calls for
12    speculation.
13    Go ahead.
14    A.  It was not out there for everybody to see,
15  for one.
16  BY MR. RIBA:
17    **Q.  Okay.  Well, your daughter testified it was**
18  **available for at least 24 hours to the entire**
19  **world.  You disagree with that?**
20    A.  To my knowledge, it was not.
21    **Q.  Okay.  And what knowledge is that?**
22    A.  J. could not say specifically how long it
23  was not password protected.  It was not password
24  protected while they collaborated on it.

1    **Q.  Okay.  Did he tell you about any**
2  **discussions about the Web site apart -- that --**
3  **other than discussions about the suspension?**
4    A.  No.
5    MS. ROPER:  Those are all the
6    questions I have.
7    EXAMINATION
8  BY MR. RIBA:
9    **Q.  Did you ask your son if there were**
10  **conversations about the Web site prior to the**
11  **suspensions?**
12    A.  Did I ask him?
13    **Q.  Yes.**
14    A.  No.
15    MR. RIBA:  That's all the question I
16    have.
17    MS. ROPER:  Okay.  Thank you.
18    So we're off the record?
19    MR. RIBA:  Yup.
20    (Deposition concluded at 2:07 p.m.)
21
22
23
24

1    MR. RIBA:  I'd just like a minute to
2    talk to my clients.
3    MS. ROPER:  Okay.
4    (Break from 1:59 p.m. to 2:06 p.m.)
5    MR. RIBA:  No further questions.
6    EXAMINATION
7  BY MS. ROPER:
8    **Q.  I just have a couple things I wanted to**
9  **clarify.**
10    **Mrs. Snyder, I believe you testified that**
11  **you believed the MySpace was removed on Thursday.**
12  **And what I wanted to ask you was:  What did you**
13  **mean by "Thursday"?**
14    A.  The day J. was suspended.
15    **Q.  Okay.  And you testified that your son told**
16  **you people were talking in school.  What did he**
17  **tell you they were talking about?**
18    A.  They were talking about J. and Kristina
19  being suspended.  There were classrooms having
20  discussions about it.
21    **Q.  When you say "classrooms having**
22  **discussions," who in the classrooms were involved**
23  **in the discussions?**
24    A.  The teachers and the children.

1    C E R T I F I C A T I O N
2
3  COMMONWEALTH OF PENNSYLVANIA  :
                                                  : §
4  COUNTY OF DAUPHIN          :
5    I, Candis S. Bradshaw, the undersigned, a
6  Commissioner to Take Depositions within and for
7  said County of Dauphin and Commonwealth of
8  Pennsylvania, the officer before whom the foregoing
9  depositions were taken, do hereby certify:
10    That TERRY SNYDER, the witness whose
11  deposition is hereinbefore set forth, was
12  administered the oath by me and that such
13  deposition is a true and correct record of the
14  testimony given by such witness.
15    I further certify that I am not related to
16  any party to this action by blood or marriage and
17  that I am in no way interested in the outcome of
18  this matter.
19    IN WITNESS WHEREOF, I have hereunto set my
20  hand this 25th day of September, 2007.
21
22    *Candis S. Bradshaw*
23    Candis S. Bradshaw
24    Notary Public, Court Reporter

Page 46

1         CERTIFICATE OF DEPONENT
2      I, Terry Snyder, certify that I have the
3 foregoing transcript of my deposition given on
4 September 13, 2007, and find it to be a true,
5 correct, and complete transcript of the answers
6 given by me to the questions therein propounded,
7 except for corrections or changes in form or
8 substance, if any, noted in the attached Errata
9 Sheet.
10
11
12           _____
13         Terry Snyder
14
         DATED: _____
15
16
17 Subscribed and sworn to me this _____ day of
18 _____, 2007.
19 My Commission Expires: _____
20
21
22 _____
23 NOTARY PUBLIC
24

Page 47

1         ERRATA SHEET
2 PAGE LINE    CORRECTION    REASON FOR
3 ____ - ____ - _____
4 ____ - ____ - _____
5 ____ - ____ - _____
6 ____ - ____ - _____
7 ____ - ____ - _____
8 ____ - ____ - _____
9 ____ - ____ - _____
10 ____ - ____ - _____
11 ____ - ____ - _____
12 ____ - ____ - _____
13 ____ - ____ - _____
14 ____ - ____ - _____
15 ____ - ____ - _____
16 ____ - ____ - _____
17 ____ - ____ - _____
18 ____ - ____ - _____
19 ____ - ____ - _____
20 ____ - ____ - _____
21 ____ - ____ - _____
22 ____ - ____ - _____
23 ____ - ____ - _____
24 ____ - ____ - _____

Love Court Reporting, Inc.

## A

Abernathy 11:21,22
ability 42:8
about 4:16,16 8:18 9:10
  10:6 12:23 15:19 17:21
  20:7,7,22 21:19,20 25:7
  26:24 27:4 29:21,24
  30:1,2,7,12,14,19,23
  31:4,8,12,17,20 35:9,11
  35:12 36:9 43:17,18,20
  44:1,2,3,10
Acceptable 3:20
account 8:11,21 9:7 12:19
  14:3 23:21 25:12
accusation 39:24 40:3
accusations 39:14,18
accusing 39:15,21
Acknowledgement 36:8
Acknowledgment 3:18
action 1:2 45:16
actions 28:19
activities 11:12 18:20
  32:22 33:5,13,14
actual 23:20 36:19
administer 42:9
administered 4:2 45:12
administrator 41:20
admit 14:2
adults 16:10
advent 16:6,7
affect 42:8
after 20:12 31:15 32:4,8,9
  32:12 33:3,18 34:17
  35:3
afternoon 4:6
again 32:17
against 12:14 13:6,19
  38:7,8,9 39:14,18
agree 9:18 14:23 16:5
  26:10 39:12
ahead 42:13
AIM 8:10
allegations 37:23
allege 38:21
allowed 18:20 25:9 33:20
  34:1
already 4:12 14:6 32:19
although 5:13 12:7 27:9
  34:14
AMERICAN 2:2
answer 4:24 5:1,4 18:3
  39:3 41:8,24
answers 5:8,14 46:5
anticipate 6:2
anybody 26:16 42:7
anyone 15:8,9 19:13,24
  32:1
anything 8:2 12:8,9 15:15

18:8 19:5 33:3 35:9,11
  39:9 40:6 41:19,19 42:7
AOL 8:11
apart 44:2
apologized 18:11,13
apology 35:23
APPEARANCES 2:1
appears 42:5
appropriate 19:2
article 42:3
articulated 28:6
asked 14:10 18:2 20:24
  27:8
asking 4:15 31:3,8
assigned 25:19
associated 36:18
assume 5:5
assumed 24:11
attached 46:8
attempt 15:13,16
attire 21:19
attorney 5:24 20:6
attorneys 19:18,22
August 36:16
available 41:14 42:18
Avenue 2:8
avoid 5:16

## B

back 21:12 30:11 32:17
background 14:21
barracks 21:1,3 22:5 23:7
basically 4:13 21:4,6
basis 7:14
bathroom 6:4
become 21:24
bed 17:14 40:19
before 1:20 4:10 8:18
  12:13 23:13 30:19
  31:10 45:8
began 4:10
beginning 26:3,5 36:15
behalf 1:4
being 4:23 5:11 6:2 19:24
  25:1 26:17 30:24 41:14
  43:19
believe 8:24 16:23 17:3
  38:16,21 42:2 43:10
believed 43:11
besides 19:13
best 5:6 11:14,17
bit 6:3 29:24
blood 45:16
Blue 1:7,9,10,18 3:11,19
  7:4 37:5,16,17 41:16
Board 1:19
book 39:8
both 1:11 8:1

bother 17:10,13
bothers 17:15
Bourse 2:3
Box 2:9
Bradshaw 1:20 45:5,23
break 5:23 6:4,5 43:4
briefly 4:10
bringing 29:4
Britain 2:9
broad 38:10
brought 24:13 25:19 26:2
  27:19 29:8
Building 2:3
Butler 2:8

## C

C 45:1,1
call 4:7,9 19:13 20:20
  31:24 32:10,12
called 4:1 19:8 20:12 22:6
  30:24 31:10 32:5 36:8
calls 16:21 38:18 41:5,22
  42:11
came 30:4,11 32:6,10
Candis 1:20 45:5,23
capacities 1:11
case 4:17
catch 5:21
CATHERINE 2:3
cause 41:2
caused 29:18
certain 10:17 16:11 20:19
CERTIFICATE 46:1
certify 45:9,15 46:2
chance 38:11
change 8:3
changes 46:7
charges 22:2
child 6:24 34:15
children 6:21 8:1 16:11
  17:2,8,12,17 43:24
CIS 3:18 36:8
CIVIL 1:2 2:2
claims 38:6
clarify 5:21 13:9 43:9
class 29:18 33:16,17,21
  33:23 34:3,17
classmates 10:13
classroom 33:12,13
classrooms 43:19,21,22
clients 19:24 43:2
club 33:7,7
clubs 33:8
collaborated 42:24
come 10:24 31:10 32:13
  40:1
comes 40:17
coming 31:16

commencing 1:19
Commission 46:19
Commissioner 45:6
common 16:14
Commonwealth 45:3,7
communication 9:24
Communications 3:21
complain 26:24
complaint 37:23 38:3,22
complete 46:5
compound 26:18
computer 7:9,11,13,18,23
  8:8 23:21 24:1,22 25:7
  25:9 27:22 36:9
computers 3:20 36:20
concerned 12:23
concerns 20:7
concluded 44:20
conclusion 38:18
confused 13:5
confusing 5:17
Congratulations 6:20
Consent 3:18 36:8
consult 5:23 12:13,16
  29:3
contact 17:3 22:3
contacted 20:6,17
contained 15:5 39:13
contains 39:14,17
control 41:10
conversation 19:10
conversations 19:18,21
  19:23 22:20 28:18 32:1
  35:2 44:10
copies 23:12
copy 3:17 14:5 22:6 36:23
  37:4,12 38:3
correct 23:10 28:10 36:20
  38:2 45:13 46:5
CORRECTION 47:2
corrections 46:7
counsel 4:12 20:17
County 45:4,7
couple 20:11 40:10 43:8
Court 1:22 45:24
create 4:20
created 8:16 27:21
creation 22:23

## D

Dale 1:19
damages 26:15
dance 11:12 34:2
date 5:12
DATED 46:14
daughter 1:4 6:1 8:13
  12:13 14:17 15:4 24:14
  24:17 25:11,14,17 26:7

26:13,21,24 27:6 35:13
35:17,22 38:9 40:16
42:17
**daughter's** 8:21 14:6
36:12
**Dauphin** 45:4,7
**day** 7:17,19,21,22 16:3
19:8 20:8,10,12,13,14
20:20,21 25:24 26:3
30:13 32:4 43:14 45:20
46:17
**days** 16:1 20:11,19 21:20
32:12,20
**deals** 13:7
**defendants** 1:12 2:11
28:15 38:7
**Defense** 14:7
**definition** 9:19
**DEPONENT** 46:1
**deposition** 1:14 14:7
36:13 44:20 45:11,13
46:3
**depositions** 45:6,9
**describe** 9:22 11:14
**DESCRIPTION** 3:10,16
**different** 23:17
**disagree** 42:19
**disappointed** 29:1
**disciplinary** 37:16
**discipline** 18:16 21:21
24:16,19 31:11
**disciplined** 28:5,8 31:16
**disciplining** 24:14
**disclaimer** 42:6
**discussions** 43:20,22,23
44:2,3
**disruptions** 29:17 41:3
**district** 1:1,8,9,10,19 3:19
12:4,6,14 13:6,22,24
20:1 28:16 32:1 35:3
36:10,19 37:24 38:7
**doing** 5:13 25:22
**donations** 34:7,7
**down** 5:10 30:24 31:3,11
31:18
**downstairs** 7:12
**Dr** 1:8 19:8,14 20:12 32:3
**drama** 33:7
**dress** 35:18
**drop-off** 26:9
**during** 10:21 14:6 19:9
25:17 27:23,24 34:20
35:18
**D-1** 3:17 30:22 39:13 42:5
**D-2** 3:18 36:13
**D-3** 3:19 36:22
**D-4** 3:22 36:6
**D-5** 3:11 37:9,10 38:13

**E**
**E** 1:8 2:14 45:1
**East** 1:23 2:4,8
**education** 42:9
**Ed.D** 2:14
**effect** 29:14
**either** 17:17 25:8 38:9
**elaborate** 13:8
**Electronic** 3:20
**emotional** 26:15,15 27:1
**employee** 28:16
**encounter** 35:7
**end** 26:8
**ended** 24:7 25:1
**ends** 34:18
**endurance** 6:1
**enforced** 38:9
**enlarged** 3:17
**entire** 42:18
**entity** 34:7
**Errata** 46:8 47:1
**especially** 41:15
**ESQUIRE** 2:3,8
**estimate** 7:16
**evening** 21:1
**ever** 9:1 10:24 11:4,13,14
22:3 28:1,1,3,4
**every** 7:19,22 25:24 26:2
37:2
**everybody** 30:6 42:14
**everyone** 5:13 30:11
**everything** 5:10 27:20
34:23
**exactly** 19:12 24:4 27:8
29:2
**EXAMINATION** 4:4
43:6 44:7
**except** 46:7
**Exhibit** 14:7 37:10
**EXHIBITS** 3:8,15
**expect** 4:13
**Expires** 46:19
**extent** 19:16 38:17
**extracurricular** 32:22
33:14

**F**
**F** 45:1
**facts** 4:17,21
**false** 39:14,17,20 40:3,4
**father** 12:11
**feel** 14:17 15:11
**feelings** 12:24 27:1
**felt** 27:6,19
**few** 4:11 30:16 32:20
**fiction** 39:19
**file** 22:13,16,17
**filing** 12:14 13:6

**find** 4:17 46:4
**fine** 5:2,24
**first** 5:20 8:16 17:20 19:6
20:5 27:18
**Floor** 1:23
**following** 20:13
**follows** 4:2
**football** 11:12
**foregoing** 45:8 46:3
**form** 3:18 36:8 46:7
**forth** 10:2 45:11
**found** 17:20
**foundation** 41:23
**frequent** 7:14
**friend** 11:15,17
**friends** 10:14,16,18,21
30:14,16
**from** 13:17 17:13 18:19
20:21 22:14 24:21
26:16 30:16 31:2 32:1
39:8 40:11 43:4
**function** 34:3,5,16
**functions** 41:4
**funded** 34:8
**fundraising** 34:8
**further** 43:5 45:15

**G**
**games** 4:20 11:12
**gets** 5:17
**give** 7:16 8:2 22:8
**given** 20:2 26:3 45:14
46:3,6
**go** 4:11 6:4 7:17 9:1 34:1
34:11 42:13
**going** 5:4 9:2 13:1 40:16
40:21
**Good** 4:6
**grade** 7:6 10:19 13:12,14
30:8 33:1,2 34:2 35:20
**grades** 26:10
**grounded** 24:21,23,24
25:1
**grounds** 27:20
**guess** 4:24 9:14,16 13:18
37:16 39:20,21 40:4
**guessing** 8:18

**H**
**Halloween** 35:18
**hand** 14:5 45:20
**handbook** 3:11 37:6
38:12 39:5
**handed** 18:16 38:2
**handout** 23:16
**hands** 5:14
**hang** 11:1
**happened** 13:15 19:9

21:2,6 22:19 27:20
32:15,16
**happy** 6:5
**hardship** 4:20
**having** 27:1 43:19,21
**head** 5:14 33:22
**headlines** 16:3
**hear** 11:13,14 28:1 35:9
35:11
**heard** 30:17
**help** 26:16,22
**her** 1:3 7:23 8:1 11:7,10
11:11,14 12:10,11,16
18:3 19:17 22:21 24:20
25:4,7,18,22 26:2,3,6,9
27:8,9 28:19 29:9,11
30:14,16,24 31:3,11,14
31:15,16,17,20 32:6,19
33:16 34:1,11 35:19
36:3
**hereinbefore** 45:11
**hereunto** 45:19
**herself** 24:5
**Hershey** 3:22
**high** 13:1
**him** 35:9,12,15,18 39:15
39:21 41:20 44:12
**histories** 8:6
**hobbies** 10:7
**home** 25:19 26:2 30:4
**homework** 25:18
**honest** 39:8
**hour** 6:2
**hours** 7:17,19 27:23,24
42:18
**house** 7:8,9 11:1 27:21
36:2
**humor** 15:14,16
**husband** 28:9 29:3

**I**
**imagine** 17:17 41:9
**INC** 1:22
**incident** 13:14,17 22:14
28:12 32:2 35:7,14
39:10
**indefinitely** 24:24
**Independence** 2:4
**INDEX** 3:1
**indicate** 15:16
**individual** 1:11 14:18,19
**individually** 1:4
**individuals** 9:17 16:12
**information** 3:21 10:6
39:13
**infraction** 39:6
**injuries** 26:15
**inner** 29:15

inquired 20:8 30:16
inquiry 20:18
instructions 4:11
interact 9:17
interested 4:19 45:17
interests 10:7
Internet 3:20 16:7,8,12
interpose 19:16
involved 28:12 43:22
issue 16:7

**J**

J 6:23 7:13 10:13,16 11:3
  11:14,17 12:7,13,24
  17:15 18:2,11,19 20:2
  21:1,4,8,14 22:19,19,20
  22:20 24:5 27:13 28:1,3
  28:7,19 29:22 30:7,13
  31:2,2,10 32:17,21 38:2
  39:5 42:22 43:14,18
James 1:6,9 2:13
John 4:9
JONATHAN 2:8
Joyce 1:8 2:14
JUDGE 1:6
jump 39:8
just 4:11,14,21,23 6:4
  11:10 13:5 15:18 19:15
  20:11 21:19 25:10 28:6
  30:3 31:2 36:6 38:20
  40:2 41:12 43:1,8
juvenile 15:13
J.S 1:2 3:22

**K**

KATZ 2:7
keep 16:2,2
kid 30:1
kids 17:14 21:20 29:21
  40:19,21 41:12,12
kind 19:1 21:21 40:20
kinds 37:19
know 4:18,20,21,22 5:1,2
  8:13,16,20 9:9,9,10
  10:10,22,23 11:22,24
  12:21 16:3,6 17:9 19:22
  19:23 20:4,5,20 21:24
  22:10,12,13,16 23:5,5
  24:3,7 25:1,2,11 28:19
  29:21 30:3,18,23 31:6
  32:14 33:2,7,23 34:7,10
  35:6,17 39:16,17,20
  41:15 42:6
knowledge 4:16 8:3 11:18
  14:20 29:7,13,17 34:4
  42:20,21
Kristin 11:19,22
Kristina 10:10,12,16,24

11:4,14 30:7 43:18
Kristin's 11:20

**L**

lacks 41:23
lady 5:9
language 38:23
last 11:20
later 5:12 20:8,11,19
lawsuit 24:13 27:19 28:10
  29:4,8
least 18:7 42:18
leaving 12:24
left 12:12
legal 38:18
Lehman 10:10,12
let 14:5 15:3 19:15 21:12
Letter 3:22
letterhead 3:23
Lewd 14:15
LIBERTIES 2:2
like 5:23 6:3 8:7 10:8
  15:13 21:16 33:2,5,6,7
  35:18 36:24 38:22 40:2
  40:22 41:2 43:1
likes 40:19
likewise 37:4
LINE 47:2
listen 41:20
little 6:3 13:5 18:6 29:24
live 6:11
living 6:14
LLP 2:7
located 7:11
Lodge 3:23
long 6:18 10:14,16 24:23
  25:1,4 42:22
longer 6:2
look 38:11 41:16
looked 39:5
looking 17:18
looks 15:13
lose 8:4
lot 9:14 31:5
LOVE 1:22
loves 15:17
luring 16:10,10 17:2
Lynn 6:9
L-Y-N-N 6:10

**M**

M 1:6
made 34:8 38:7
major 16:7
majority 26:5
make 13:3
making 39:24
Mall 2:4

manual 38:12
manuals 37:16
many 7:17 32:12
March 6:14 7:9 8:14 11:7
  11:18 32:22 33:4
mark 37:8
marked 3:8,15 14:6 36:12
  36:22 37:10 38:12
Market 1:22
marriage 45:16
married 6:16,18
MARY 2:3
matter 22:14,15 45:18
may 20:8,18
maybe 6:3 8:19 32:18
ma'am 14:2 15:10,20
  29:13 39:12
McGONIGLE 1:10 2:13
  13:10,18 14:22 15:6
  17:22 18:9 22:1 31:23
  35:6 39:14,18 41:17
McGonigle's 17:23 23:14
  42:8
mean 9:13,19 25:18 33:1
  35:13 43:13
meet 9:16 11:4,7,10 33:3
meeting 10:1 32:16 34:22
  35:3
meetings 28:14
mention 42:5
met 4:10 6:23
middle 1:1 3:11 10:21
  12:24 37:5,15,17,17
  41:20 42:9
might 20:16 28:15
mind 21:12
minds 40:2,18
minor 1:2
minute 43:1
Mischaracterizes 15:1
mischaracterizing 26:18
miss 33:13
missed 33:12
money 34:10
monitor 7:23
month 25:2
months 8:18
more 12:23 25:2 30:1
Most 16:1
Mostly 15:23
mother 12:11
Mountain 1:7,9,10,18
  3:11,19 7:4 37:5,17,17
  41:16
MUNLEY 1:7
MySpace 3:17 8:14,21
  9:6,11,19 14:3 22:7,23
  23:13,20 24:11 25:12

40:1,17 43:11

**N**

N 45:1
name 6:8,9,24 11:20
  21:13
need 5:8,14
network 3:20 9:24
never 24:1 28:7
New 2:9
news 9:13 15:20,22
next 19:8 20:14
Nodding 33:22
Notary 1:20 45:24 46:23
noted 46:8
notes 23:2,3,4
notice 42:6
nowadays 16:7
number 22:14

**O**

O 45:1
oath 4:2 45:12
objection 14:24 16:18
  18:21 19:16 26:17
  38:17 39:1 41:5,22
  42:11
objections 19:7 20:1
observe 25:22
off 27:20 44:18
offensive 12:7 14:3,10,10
offer 5:4
office 17:23 23:14 31:1,11
officer 21:14 45:8
official 1:11
often 9:4,5
okay 4:6,9,14 5:7,22 6:5,7
  7:2,8,13,16,23 8:5,13
  8:20,23 9:1,4,6 10:4,10
  10:18,21,24 11:4,7,10
  11:17,20,22 12:3 13:2,3
  13:17 14:12 15:3 16:5
  18:8,11,13,15,18,24
  19:4,6,9 20:4,22 21:2
  21:10,17 22:18 23:1,7
  23:12,20 24:7,10,19
  25:4,11,24 26:2,7,21,24
  27:4 28:18,21 29:6,10
  29:13,20 30:5,10,18
  31:23 32:7,9,12,15 33:6
  33:11,17 34:3,6,11,13
  34:20 35:2,9,16,17,22
  36:4,12,15,18,22 37:8
  37:15 38:6,15 39:9,17
  42:17,21 43:3,15 44:1
  44:17
old's 7:2
once 29:22

one 7:19 9:20 10:13 15:11
    17:17 20:3 21:12 22:4
    23:18 24:12,14 27:18
    32:4 37:15,23 38:6
    42:15
only 25:9
onto 5:11
opened 22:13
opinion 35:12,15
ORAL 1:14
organized 33:5
Orwigsburg 1:19 6:12
other 6:24 7:22 9:17 10:1
    13:21,22,23 22:3,4,10
    23:12,13,17 27:20 29:1
    29:21,23 31:23 32:1
    35:2 38:7 40:2,18 42:7
    44:3
out 4:18 11:1 17:20 18:16
    32:19 33:8 38:2 39:8
    41:9,14 42:14
outcome 45:17
over 4:11 6:3 8:1 10:24
    16:12 33:19 36:2
overbroad 38:1,16,21
overly 38:9
own 9:6 27:22

                P
P 2:8
page 3:2,10,16,17 22:7
    23:13 47:2
pages 14:8
paid 34:10,11
paper 5:12
paperwork 22:10
pardon 12:5 17:11 28:2
parent 17:7,12,15
parents 1:3 29:9 41:15
parody 15:16 42:6
participate 18:20 28:14
    32:21,24 33:20
participating 33:9
particular 8:9
party 45:16
password 8:3,20 42:23,23
passwords 8:2,8,9,10
Pennsylvania 1:1,19,23
    2:2,4,9 6:13 45:3,8
people 9:17 10:2 16:10
    30:18,23 31:3,5,16
    41:16 43:16
Per 7:21
performance 26:9
person 11:5 14:19 42:2
Personally 35:8
persons 13:10
person's 17:2

pervert 40:1,18
Philadelphia 1:23 2:4
phone 20:20 24:22 25:4
    31:24 32:9,12
phonetic 21:15,16
pick 16:11
picture 40:9,11
pictures 10:7
place 25:5
places 16:11
plaintiff 28:9
Plaintiffs 1:5 2:6
play 4:19 11:1
please 6:7
plus 6:11
point 31:15 32:20
police 20:21,23,24 22:4
    22:11 23:10
policy 36:9,19 37:16,24
    38:8,8,12,16,23,23
portrays 15:6
pose 4:24
possible 41:13
predator 14:22 15:6
    41:17
predators 16:8
prepared 22:11
present 2:13 21:7 35:22
    35:24
presented 18:1
pressing 22:2
previously 3:15 14:18
principal 1:10 12:15 13:7
    17:14 35:13 40:14,17
    40:22
principals 40:2,18
printout 23:16
printouts 23:18
prior 10:18 11:7 30:24
    35:6,10,10,14 44:10
private 34:6
privilege 8:4
privileges 25:7
problem 16:14,17
professional 26:16,22
profile 8:14,17
program 9:10
progression 21:21
property 12:10
propounded 46:6
protected 42:23,24
provided 34:6
Public 45:24 46:23
Public-Court 1:20
pulling 14:19
punished 12:8,10 27:14
punishment 12:11 27:9
    38:1

put 4:14
p.m 1:20 43:4,4 44:20
P.O 2:9

                Q
question 4:24 5:1,5 14:9
    16:20,22,24 39:4 41:8
    41:24 42:4 44:15
questions 4:15 43:5 44:6
    46:6
quite 21:24

                R
R 45:1
RAS-mooth 21:15
RAS-muth 21:15
ration 29:7
rationale 29:8
reaction 17:24 18:5 28:22
    28:23 29:2
reading 14:20 15:4
really 4:18 24:11 39:11
reason 13:21,23 47:2
reasonable 14:19 42:1
reasons 10:1 24:12 27:18
    28:6
rec 7:12
recall 5:3 18:11,13,15
    21:11,17 22:18 23:1
    27:10,11,13,17,17
    31:14 36:7,23
receive 26:21 36:24
received 25:14,17 31:11
    37:4,12 39:7
recently 16:6
recollection 5:6 20:16
record 4:14 5:21 6:8 36:6
    44:18 45:13
Red 1:19
Reedsville 23:8,9
REFERENCED 3:15
regard 38:1
regarding 28:19 36:19
regards 15:3 20:1,6 32:2
regular 33:12
related 45:15
relates 39:10
relationship 17:19
remember 5:19 18:10
    19:12 21:13,22 22:24
    23:6 25:3,6,8,10 33:18
remove 24:5
removed 24:3 43:11
removing 24:7
report 20:24
reported 21:2
Reporter 1:20 45:24
REPORTING 1:22

representative 16:16
representatives 35:3
Representing 2:6,11
resolved 32:18
responsible 29:11
restricted 24:21
restrictions 25:4
result 26:14,22 27:1
    34:22
retaliated 13:18
retaliatory 13:11
returned 26:8
reveal 19:17
Riba 2:8 3:4 4:5 15:2
    16:19 17:4 19:19 26:20
    37:8,11 38:19 39:2 41:7
    42:16 43:1,5 44:8,15,19
    right 5:9,9 10:2,3,8 14:12
    23:15 25:21 30:22 32:4
    37:20,20,22 38:4 40:7,8
    40:11 41:1
Road 1:19 6:12
rock 17:14
Romberger 1:8 2:14 19:8
    19:14 20:12 32:3
room 1:19 5:11 7:12
Roper 2:3 3:5 14:24
    16:18,21 19:15 26:17
    38:17 39:1 41:5,22
    42:11 43:3,7 44:5,17
run 11:11

                S
s 1:9,20 2:4,13 10:13
    11:17 45:5,23
same 3:17 20:8,10 23:15
    23:15,16 34:23 39:1
saw 24:1
saying 27:13
says 17:6,14
scared 21:4
Schneider-Morgan 2:15
school 1:7,9,10,18 3:11
    3:19 10:22 11:11 12:3,6
    12:8,9,9,10,14 13:1,1,6
    13:22,23 18:19 19:5
    21:20 25:9,18,18,19
    26:8,10 27:14,20,23,24
    29:12,15 30:6,12,24
    32:18,20 33:3 34:3,5,14
    34:15,17,20 36:9,16,19
    37:5,16,17,18,24 40:12
    40:17,21 41:3,3,21 42:9
    43:16
Scott 7:1,2
Scotty 7:3
search 8:6
second 21:13

section 17:5
see 9:1,2 15:9 17:5 23:17
  23:20 32:17 39:6,9
  42:14
seeing 36:23
seek 26:16
seen 23:12 38:3
sees 5:13
sent 20:18
September 1:16,19 45:20
  46:4
series 4:15
serious 22:1
seriously 15:8,9,11
session 6:1
set 45:11,19
Seventeen 6:19
Seventh 7:7 13:13
sex 40:19,19
sexual 14:22 15:6 16:8
  41:17
share 10:7
shares 10:6
Sheet 46:9 47:1
shocked 19:1
shoulder 8:1
show 15:15
sic 31:15
side 22:21
signature 36:13
signing 36:7
site 9:10,22,23 11:23 14:3
  14:20 15:4,5 17:2,13,21
  18:1 27:21 28:22 29:14
  30:20,22 31:12,17,21
  39:13,15 40:6,11,12
  41:13 42:5 44:2,10
sites 8:9
six 8:18
Snyder 1:3,3,15 3:3 4:1,6
  6:9 43:10 45:10 46:2,13
social 10:1
solicitation 17:3
some 4:16 9:16 31:15
  33:6
someone 15:18 17:18
something 15:18 21:16
  34:6 36:24 38:20 39:22
  41:2
son 12:23 13:3,8,11,12,19
  30:3,5,8,11 40:16 43:15
  44:9
speak 16:3
specifically 42:22
speculation 16:21 41:6,23
  42:12
spell 6:7
spending 32:19

spoke 21:14
sports 33:2,4
stand 36:2
standing 19:11
started 27:18
state 6:7 20:21,23,24 21:3
  22:4,11 23:10
statement 35:23
STATES 1:1
stayed 34:23
Steve 12:11
STEVEN 1:3
STEVENS 2:7
still 18:6 19:1 25:11 34:15
  34:23
stood 7:24
story 22:21
Street 1:22
student 7:4
students 15:7 16:12 41:16
Student-Parent 3:11
Student/Parent 37:5
stuff 10:8
stunned 18:2,6
Subscribed 46:17
substance 46:8
sue 12:3,6
sued 13:21,23
suffered 26:14
suit 12:14 13:6
Suite 2:3
Summer 6:12
superintendent 1:8 12:15
  13:7 31:24 34:23 35:4
supervision 34:14
supposed 17:14
sure 4:8,12 6:6 10:5 13:3
  20:9 29:2
Susan 2:15
suspended 27:7 29:22
  30:13,19 39:6 43:14,19
suspension 18:19,22 19:7
  19:11 20:2,7 25:15 26:4
  26:6,14,22 27:2 30:15
  33:11,15,19 34:24 39:7
  44:3
suspensions 44:11
SWEET 2:7
sworn 46:17
Systems 3:21
S-N-Y-D-E-R 6:10

### T

T 45:1,1
take 5:23 6:3,5 12:19
  15:8,9,11 31:3 45:6
taken 1:18 45:9
taking 5:9 23:1,4 31:18

talk 29:24 30:14 31:20
  32:6 43:2
talked 21:7,19,20
talking 22:18 29:21 30:1
  30:6,12,18,23 43:16,17
  43:18
teacher 30:2
teachers 29:22 31:20
  43:24
teams 33:2
tell 6:4 19:20,20 20:22
  30:1,5 31:7 38:15,22
  43:17 44:1
telling 31:14,17
ten-day 18:19 25:14 39:7
terms 26:10 34:24
Terry 1:3,15 3:3 4:1,7 6:9
  6:11 7:8 12:3 36:7
  37:12 45:10 46:2,13
testified 4:2 13:22 14:18
  15:4 20:11 26:7,13
  37:12 42:17 43:10,15
testifying 5:6 27:17
testimony 5:10 15:1
  26:19 45:14
Thank 44:17
their 1:4,11 8:2,3,4,6,10
  29:22
themselves 15:19
thing 21:21
things 8:6 21:24 37:19
  40:10 43:8
think 14:13 15:5 16:16
  17:1,16 19:2 23:3 24:4
  34:15 35:14 39:15,24
  40:3 41:2,18 42:1
thinking 17:18
though 31:14 34:11 40:9
  42:4
thought 24:13 27:9 35:16
through 1:3 10:22 34:8
throughout 26:8
Thursday 24:4,5 43:11
  43:13
time 4:17 7:12,20 8:22
  13:17 17:20 18:9,16,22
  19:6 20:6,17 22:4 23:21
  24:24 25:10,17 27:3
  30:8 32:4,20,22
timeframe 7:17
today 4:13 5:10 11:23
  13:18 16:14
told 4:12 5:24 13:10 30:4
  30:11 31:2 34:5 43:15
towards 13:11
Tower 1:23
transcribed 5:11
transcript 5:18 46:3,5

trick 4:19
trick-or-treating 35:21
tried 24:5 31:2,17 32:17
trip 33:16,17,21,23 34:3
  34:17
true 24:16 40:10 42:7,10
  45:13 46:4
try 5:16,19,21
trying 4:19,21 16:11
two 6:21 7:19 14:7 17:7
  17:12 20:19 35:14
type 33:6
T-E-R-R-Y 6:9

### U

Uh-huh 21:5,23
uh-huhs 5:16
uh-uhs 5:17
under 17:5
undersigned 45:5
understand 6:21 13:9
  16:20,22,23,23
understood 5:5
undue 4:20
UNION 2:2
UNITED 1:1
until 13:18
upset 27:4
URL 17:5,13
use 3:20 7:13,23 25:9
  36:20
used 5:12 10:1

### V

vague 38:1,10,16,21
valid 42:2
Valley 6:12
verbal 5:8,15
very 9:5
view 14:21,21
viewed 11:23
voice 18:21
voiced 19:7
vs 1:6
vulgar 14:13

### W

want 4:11,14,23 5:18
  19:22,23 20:4,5 40:16
  40:21
wanted 12:20 13:3 35:17
  43:8,12
Washington 33:24
wasn't 33:6,8,20
watch 15:20,22
way 9:16 13:19 15:12
  41:3 45:17
wear 21:20

Web 14:2 15:4,5 17:2,21
    18:1 27:21 28:22 29:14
    30:19,22 31:12,17,20
    39:13,15 40:6,11,12
    41:13 42:4 44:2,10
well 7:19,24 10:18 13:5
    17:5 19:6 31:7 33:16
    38:6,20 40:4 42:17
went 22:4 33:23 35:13
were 6:14 10:18,21 19:11
    21:7 29:21 30:3,18,23
    31:3,7,16 35:22 43:16
    43:17,18,19,22 44:9
    45:9
we'll 5:20 6:5
we're 11:23 29:9,11 44:18
WHEREOF 45:19
whichever 20:21
while 32:18 36:3 42:24
whole 6:8 41:14
WILLIAMS 2:7
witness 3:2 4:1 5:20
    45:10,14,19
woman 5:9
words 27:21
work 25:9,18,19 26:2,4
worked 9:10
workings 29:15
works 19:24 34:9
world 41:14 42:19
worries 20:7
write 15:19 17:16 40:5
written 3:22
wrote 35:23,24 36:5
www.MySpace.com/ki...
    17:6

### X

x 2:5

### Y

Yeah 10:4 12:1,17 19:20
    28:24 33:1 35:12 36:1
    37:1,3,19 40:23
year 26:9 36:16 37:2
years 6:19 10:22 35:14
young 15:7 16:10,12 17:7
    17:12
Yup 44:19

### 0

07-CV-585 1:3

### 1

1 14:7
1:13 1:20
1:59 43:4
111 2:4

116 2:5
12 7:3
12th 1:23
13 1:16,19 46:4
1500 1:22
18901 2:9
19102 1:23
19106 2:4

### 2

2:06 43:4
2:07 44:20
2006 36:16
2006-2007 3:11
2006/2007 36:16
2007 1:16,19 6:14 7:9
    8:14 11:8,18 32:23
    45:20 46:4,18
209 6:12
215 1:24 2:5,10
24 42:18
25th 45:20
29 3:17

### 3

3 3:4
331 2:8
345-9111 2:10
35 3:18,19,22
36 3:11

### 4

42 3:5
43 3:4

### 5

5069 2:9
568-5599 1:24
570 2:3
592-1513 2:5

### 6

6 10:22
6th 13:14 30:8
685 1:19

### 7

7th 35:20

### 8

8 10:22
8th 10:19 33:1,2 34:2

```
1                        ERRATA SHEET

2     PAGE   LINE          CORRECTION              REASON FOR

3     ____ - ____ - _____

4     ____ - ____ - _____

5     ____ - ____ - _____

6     ____ - ____ - _____

7     ____ - ____ - _____

8     ____ - ____ - _____

9     ____ - ____ - _____

10    ____ - ____ - _____

11    ____ - ____ - _____

12    ____ - ____ - _____

13    ____ - ____ - _____

14    ____ - ____ - _____

15    ____ - ____ - _____

16    ____ - ____ - _____

17    ____ - ____ - _____

18    ____ - ____ - _____

19    ____ - ____ - _____

20    ____ - ____ - _____

21    ____ - ____ - _____

22    ____ - ____ - _____

23    ____ - ____ - _____

24    ____ - ____ - _____
```

# EXHIBIT N

# CONDENSED COPY

<pre>
 1              IN THE UNITED STATES COURT FOR
             THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   J.S., a minor, by and    : CIVIL ACTION NO.:
 3 through her parents,      : 07-CV-585
   TERRY SNYDER and STEVEN   :
 4 SNYDER, individually and  :
   on behalf of their        :
 5 daughter,                 :
                             :
 6         Plaintiffs,        :
                             :
 7         vs.               : JUDGE: JAMES M.
                             : MUNLEY
 8 BLUE MOUNTAIN SCHOOL       :
   DISTRICT; DR. JOYCE E.    :
 9 ROMBERGER,                :
   Superintendent, Blue      :
10 Mountain School District; :
   and JAMES S. McGONIGLE,   :
11 Principal, Blue Mountain   :
   School District, both in  :
12 their official and        :
   individual capacities,    :
13                           :
           Defendants.       :
14
                   ---------------
15
                 ORAL DEPOSITION OF
16
                   STEVEN SNYDER
17
                 September 13, 2007
18
                   ---------------
19
           Taken at the Blue Mountain School
20 District Board Room, 685 Red Dale Road, Orwigsburg,
   Pennsylvania, on September 13, 2007, commencing at
21 3:27 p.m. before Candis S. Bradshaw, Notary
   Public-Court Reporter.
22         LOVE COURT REPORTING, INC.
                1500 Market Street
23            12th Floor, East Tower
         Philadelphia, Pennsylvania  19102
24                (215) 568-5599
</pre>

Page 2

1    APPEARANCES:
2
3    AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
     BY: MARY CATHERINE ROPER, ESQUIRE
4    The Bourse Building, Suite 570
     111 S. Independence Mall East
5    Philadelphia, Pennsylvania 19106
6    (215) 592-1513 x 116
7    Representing the Plaintiffs

8    SWEET, STEVENS, KATZ & WILLIAMS, LLP
     BY: JONATHAN P. RIBA, ESQUIRE
9    331 East Butler Avenue
     P.O. Box 5069
10   New Britain, Pennsylvania 18901
11   (215) 345-9111
12   Representing the Defendants

13
     ALSO PRESENT:
14      James S. McGonigle
        Joyce E. Romberger, Ed.D.
15      Susan Schneider-Morgan
16
17
18
19
20
21
22
23
24

Page 3

1            INDEX
2    WITNESS                    PAGE
3    STEVEN SNYDER
4      By Mr. Riba              4
5
6
7
8
9         EXHIBITS PREVIOUSLY MARKED AND REFERENCED
10
11   NO.   DESCRIPTION          PAGE
12   D-1   MySpace page and enlarged copy of   9
13         same
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         STEVEN SNYDER, called as a witness, was
2    administered the oath and testified as follows:
3         ================
4              EXAMINATION
5    BY MR. RIBA:
6         Q.  Good morning, sir.  My name is John Riba.
7    I'll be taking your deposition today.  I don't
8    anticipate us being here very long this afternoon.
9    But before we begin, I'd like to give you some
10   understood the question and are testifying to the
11   best of your recollection.  Do you understand that?
12        A.  Yup.
13        Q.  Okay.  This lady right here is taking down
14   everything anyone says in the room today.  It's
15   being compiled into a transcript which will be used
16   by the lawyers in later proceedings.
17        That being said, all your answers need to
18   be verbal.  We see what you do with your head or
19   your hands, but that doesn't translate onto paper.
20        Also, try to avoid the "uh-huhs" and the
21   "uh-uhs," because, again, that doesn't translate
22   onto paper.  So "yes" and "no" would be great.  And
23   we'll try to catch you if we -- if you do slip one
24   of those in there.

Page 5

1         If you'd like to take a break or consult
2    with your attorney, please just tell us.  Okay?
3         A.  (Nodding head.)
4         Q.  Can you please state and spell your entire
5    name for the record.
6         A.  Steven Snyder.  S-T-E-V-E-N, S-N-Y-D-E-R.
7         Q.  Mr. Snyder, and you're married to
8    Terry Snyder?
9         A.  Yes.
10        Q.  And you live at -- where do you live?
11        A.  209 Summer Valley Road.
12        Q.  Okay.  And you have two children?
13        A.  Yes.
14        Q.  Okay.  And your daughter is J.?
15        A.  Yes.
16        Q.  And in March of 2007, she was an 8th grade
17   student at the middle school here in Blue Mountain?
18        A.  Yes.
19        Q.  Okay.  Why did you sue the school district,
20   sir?
21        A.  My wife thought it would be in the best
22   interests.
23        Q.  Best interests of who?
24        A.  My daughter and my wife and me.

2 (Pages 2 to 5)

1    Q.  Okay.  Did you want to sue the school
2 district?
3    A.  Yes.
4    Q.  Why?
5    A.  Because I thought it was wrong.
6    Q.  What was wrong?
7    A.  That we didn't get a chance to discipline
8 my daughter --
9    Q.  Okay.
10    A.  -- ourselves.
11    Q.  Okay.  Isn't it true you did discipline
12 your daughter?
13    A.  Pardon?
14    Q.  You did discipline your daughter; is not --
15 is that --
16    A.  Yes.
17    Q.  -- not correct?
18        You grounded her for a significant amount
19 of time?
20    A.  Yes.
21    Q.  And do you recall how long that was?
22    A.  I think it was, like, two to three weeks.
23    Q.  Okay.  Any other actions that you -- any
24 other disciplinary actions you took against J.?

1    A.  I told her she was only allowed to use the
2 computer for her school work.  And I piled a whole
3 lot of other chores on her.
4    Q.  So you would agree you did discipline her?
5    A.  Yes.
6    Q.  Okay.  The school didn't prevent you from
7 taking discipline against her.  The school didn't
8 prevent you from cutting off her computer hours or
9 going on the phone, so on and so forth.  Right?
10    A.  Can you say that again?
11    Q.  The school didn't -- did not prevent you
12 from disciplining your daughter in the sense they
13 didn't prevent you from cutting back her -- the
14 time that she could be on the computer or the
15 amount of time that she could be on the computer or
16 her phone privileges or stuff like that.  Right?
17    A.  At home, yes.
18    Q.  Okay.  Is there any other reason why you
19 sued the school district?
20        (Cell phone ringing.)
21        MR. RIBA:  Off the record.
22        (Off the record.)
23 BY MR. RIBA:
24    Q.  All right.  Is there any other reason why

1 you sued the school district?
2    A.  My wife said that it would be the best
3 thing to do.
4    Q.  Okay.  Did you see a copy of the MySpace
5 Web site that's the basis of this lawsuit?
6        Have you seen a copy of it?
7    A.  Two minutes ago, yes.
8    Q.  That was the first time you've ever seen
9 it?
10    A.  Yes.
11    Q.  And what was your reaction to it?
12    A.  To be honest with you, I thought it was a
13 joke.
14    Q.  Okay.  Let's give you a copy of it.  That's
15 already been marked.
16        You think this is a joke, sir?
17    A.  Personally, do I think it's a joke --
18    Q.  Yes.
19    A.  -- that my daughter put this on there?  No.
20    Q.  Okay.  You said it was -- I believe I asked
21 you what your initial reaction to this Web site was
22 moments after seeing it for the first time, and I
23 believe you testified you thought it was funny.
24        I don't want to put words in your mouth,

1 but is that what you testified to?  You thought it
2 was a joke or funny or something to that effect?
3    A.  At first, when I first glanced at it, yes.
4    Q.  Okay.
5    A.  I mean, it . . .
6    Q.  And my question is:  Why was that your
7 first impression?
8    A.  It just doesn't look real.
9    Q.  Is there -- do you see anything on this,
10 sir, that indicates that it's a joke?
11    A.  It's just -- like I said, it just doesn't
12 look real to me.  I mean, if I would -- I don't use
13 the computer that much.  But if I would pull
14 something like this up, I would laugh at it.
15    Q.  Well, I'm just saying, what's funny about
16 it?  It calls someone -- it indicates people -- an
17 adult individual who's 40 years old likes to have
18 kids rock my bed.  It says that "I've come to
19 MySpace so I can pervert the minds of other
20 principals just like me . . . I like sex of any
21 kind."
22        I'm just trying to figure out why that's
23 funny to you.
24    A.  Well, if you could actually believe it.  I

1 actually don't believe this to be true. You know
2 what I mean?
3    **Q. So if something's not true, it's funny?**
4      **(Cell phone ringing.)**
5    A. I actually think -- when I first saw this,
6 it's like, it's -- I thought it was a joke. That's
7 what -- to me, this looks like this is a prank, a
8 joke.
9    **Q. And what gives you that impression?**
10    A. Well, how could somebody do something like
11 this? I mean, we're -- I -- I mean, I'm sure
12 there's people out in the world that would do stuff
13 like this, but I just can't believe somebody would
14 do it.
15    **Q. Do you think this is appropriate, this Web**
16 **site?**
17    A. The Web site itself?
18    **Q. Yes. The contents of the handout, of that**
19 **Web site page. Do you think it's appropriate?**
20    A. No.
21    **Q. Why not?**
22    A. Well, if stuff like this isn't true, they
23 shouldn't be allowed to do stuff like this.
24    **Q. Do you think something like this deserves**

1 punishment?
2    A. Being my daughter did it, yes.
3    **Q. Okay. Do you -- can you see how something**
4 **like this would affect someone's professional**
5 **career?**
6      MS. ROPER: Objection. Calls for
7     speculation.
8 BY MR. RIBA:
9    **Q. You can answer the question.**
10    A. Do what?
11    **Q. You can answer the question.**
12    A. Who -- who --
13    **Q. Do you see how something like this could**
14 **affect someone's career?**
15      MS. ROPER: Same objection.
16    **Q. You can -- she's preserving the right --**
17 **she's doing what she needs to do. You can answer,**
18 **unless she tells you not to answer --**
19    A. Oh.
20    **Q. -- the question, you can --**
21      MS. ROPER: Yeah. I --
22    **Q. -- answer the question.**
23      MS. ROPER: I'm sorry. You -- he's
24    permitted to answer. Ask the question.

1    A. Oh, okay.
2      Who -- he's a teacher. Who would believe
3 this?
4 BY MR. RIBA:
5    **Q. Okay. Well, sir, I don't know who would**
6 **believe it.**
7     **But it would -- my question is: Do you**
8 **think something like this could affect this man's**
9 **profession?**
10      MS. ROPER: Same objection.
11    A. I'm not really sure. If somebody would
12 believe it, I guess it could.
13 BY MR. RIBA:
14    **Q. And that would affect his reputation?**
15    A. I guess it could, yes.
16    **Q. Do you think taking this picture from a**
17 **school Web site and placing it on a MySpace account**
18 **and writing this information is an invasion of his**
19 **rights?**
20      MS. ROPER: Objection. Calls for
21     legal conclusion.
22 BY MR. RIBA:
23    **Q. You can answer the question.**
24    A. I don't know.

1    **Q. Okay. What do you -- what's your**
2 **profession, sir?**
3    A. I'm a laborer at Reading Alloys.
4    **Q. You what?**
5    A. I'm a laborer.
6    **Q. Okay.**
7      **(Cell phone ringing.)**
8    A. Foreman. Put it that way.
9    **Q. Do you have -- you own your own company?**
10    A. No.
11    **Q. What's your wife do?**
12    A. She works for the state.
13    **Q. In what capacity?**
14    A. I believe she writes the standards for
15 different stuff.
16    **Q. For what stuff?**
17    A. For the state budget and stuff like that.
18    **Q. She's an employee --**
19    A. I believe that's what she does.
20    **Q. She's an employee of the state?**
21    A. She is, yes.
22    **Q. Did you have any communication with anyone**
23 **from this district regarding this case?**
24    A. No, I don't believe so.

Page 14

1    Q.  It was all done through your wife?
2    A.  Pardon?
3    Q.  It was all done through your wife?
4    A.  Yes.
5    Q.  The communication your family had with the
6  district was done through your wife?
7    A.  Yes.
8    Q.  Did you ask J. about this MySpace account?
9    A.  Yes.
10    Q.  And what did she say?  What was her -- when
11  you asked her about it, what did she tell you?
12    A.  She started crying and she says -- just
13  said she was sorry.
14    Q.  And when was the -- do you recall when the
15  first time you heard about this?
16    A.  It was after the fact.  I know that.
17    Q.  Uh-huh.  And did you ask her if she did it?
18    A.  Yes.
19    Q.  And she said she did?
20    A.  Her and her friend.
21    Q.  Did you ask her why she did it?
22    A.  No.  I -- no, I don't think I did.
23    Q.  Okay.  Did she tell you why?
24    A.  She says -- I think her and her friend were

Page 15

1  just fooling around.  I believe that's what she
2  said.
3    Q.  Did you take any action in contesting the
4  suspension?  Did you personally take any action?
5  Did you go with your wife or anything to any
6  meetings or hearings or anything?
7    A.  My wife did all that.
8    Q.  Okay.  Do you have any other knowledge
9  about the MySpace incident or this MySpace account?
10    A.  About this one?
11    Q.  Yeah.
12    A.  No.
13    Q.  Okay.  How about the creation of it?  Do
14  you have any knowledge as to that?
15    A.  What do you mean, "the creation"?
16    Q.  Well, when, where, or how your daughter
17  created this account.
18    A.  No, I . . .
19    Q.  Are you aware that she created the account
20  in your -- at your computer at your house?
21    A.  I believe that's what I was told, yeah.
22    Q.  Okay.
23        (Cell phone ringing.)
24  BY MR. RIBA:

Page 16

1    Q.  Has your daughter gotten in trouble in
2  school at any other time besides this, that you're
3  aware of?
4    A.  I believe she was -- nothing like this, no.
5    Q.  Uh-huh.  She was never suspended before for
6  anything?
7    A.  Not that -- I think she had detention a few
8  times, but nothing -- no suspensions, no.
9    Q.  Okay.  Were you affected at all by this --
10  by the suspension?
11    A.  Was I affected?
12    Q.  Yeah.
13    A.  I was hurt that they kicked her out of
14  school.
15    Q.  You were upset about that?
16    A.  Yes.
17    Q.  Any -- and other than being upset, any
18  other --
19    A.  Well, she couldn't go on her class trip or
20  nothing like that.
21    Q.  Okay.  And that --
22    A.  And that we already paid for it.
23    Q.  And this was at the end of the -- end of
24  the school year?

Page 17

1    A.  Yes.
2    Q.  Okay.  Was that -- do you know if that's on
3  the weekend -- that class trip's on the weekend?
4  Do you know if that's the case or not?
5    A.  I'm not really sure about that.
6    Q.  Okay.  Have you ever met Mr. McGonigle
7  before?
8    A.  Personally met, no.  I've seen him.
9    Q.  Okay.  When did you see him before?
10    A.  Probably at some recitals or at school.
11    Q.  Okay.
12    A.  I mean, just to know who he was.
13    Q.  Okay.
14    A.  I personally never met him, no.
15    Q.  Okay.  Do you know if he's a good, bad, or
16  you're indifferent to his skills as a principal?
17    A.  His skills as a --
18    Q.  -- principal of the school.
19        The way he performs his job, do you have
20  any opinion as to whether it's good, bad, or
21  indifferent?
22    A.  Well, he must be a good principal.  He's
23  still here.
24    Q.  Okay.  Did you ever hear your daughter

5 (Pages 14 to 17)

## Page 18

1 complain about him to you, other than this
2 incident?
3    A. I've heard my daughter and other people say
4 that he can be very hard.
5    Q. When did you hear that?
6    A. Well, when she had friends over and that.
7    Q. Uh-huh. She enjoyed going to school?
8    A. Pardon?
9    Q. Your daughter enjoyed -- enjoys going to
10 school? Do you know?
11    A. I believe that she does, yeah.
12    Q. Okay. She still does --
13    A. Yes.
14    Q. -- to your knowledge?
15      How would you feel, sir, if this picture
16 was -- had you next to it? How would that make you
17 feel?
18    A. Well, I don't think nobody would believe it
19 if they knew me.
20    Q. Well, I never met you, sir. I have no idea
21 if it's -- for someone who's pulling this site up,
22 how would I know if it's true or not about you?
23    A. Well, that's an opinion you'd have to form.
24      MR. RIBA: Okay. I think that's all

## Page 19

1    I have. Let me just take a quick break
2    and --
3      MS. ROPER: Okay.
4      (Break from 3:44 p.m. to 3:48 p.m.)
5      MR. RIBA: I have no further
6    questions.
7      MS. ROPER: I have no questions.
8      MR. RIBA: Okay. Great.
9      (Deposition concluded at 3:48 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 20

1      C E R T I F I C A T I O N
2
3 COMMONWEALTH OF PENNSYLVANIA  :
4         : §
5 COUNTY OF DAUPHIN       :
6    I, Candis S. Bradshaw, the undersigned, a
7 Commissioner to Take Depositions within and for
8 said County of Dauphin and Commonwealth of
9 Pennsylvania, the officer before whom the foregoing
10 depositions were taken, do hereby certify:
11    That STEVEN SNYDER, the witness whose
12 deposition is hereinbefore set forth, was
13 administered the oath by me and that such
14 deposition is a true and correct record of the
15 testimony given by such witness.
16    I further certify that I am not related to
17 any party to this action by blood or marriage and
18 that I am in no way interested in the outcome of
19 this matter.
20    IN WITNESS WHEREOF, I have hereunto set my
21 hand this 25th day of September, 2007.
22      Candis S. Bradshaw
23      Candis S. Bradshaw
24      Notary Public-Court Reporter

## Page 21

1      CERTIFICATE OF DEPONENT
2    I, Steven Snyder, certify that I have the
3 foregoing transcript of my deposition given on
4 September 13, 2007, and find it to be a true,
5 correct, and complete transcript of the answers
6 given by me to the questions therein propounded,
7 except for corrections or changes in form or
8 substance, if any, noted in the attached Errata
9 Sheet.
10
11
12    _____
13      Steven Snyder
14
15    DATED: _____
16
17
18 Subscribed and sworn to me this _____ day of
19 _____, 2007.
20 My Commission Expires: _____
21
22 _____
23 NOTARY PUBLIC
24

```
1           ERRATA SHEET
2   PAGE LINE      CORRECTION      REASON FOR
3   ___ - ___ - _____
4   ___ - ___ - _____
5   ___ - ___ - _____
6   ___ - ___ - _____
7   ___ - ___ - _____
8   ___ - ___ - _____
9   ___ - ___ - _____
10  ___ - ___ - _____
11  ___ - ___ - _____
12  ___ - ___ - _____
13  ___ - ___ - _____
14  ___ - ___ - _____
15  ___ - ___ - _____
16  ___ - ___ - _____
17  ___ - ___ - _____
18  ___ - ___ - _____
19  ___ - ___ - _____
20  ___ - ___ - _____
21  ___ - ___ - _____
22  ___ - ___ - _____
23  ___ - ___ - _____
24  ___ - ___ - _____
```

**A**

about 9:15 14:8,11,15
  15:9,10,13 16:15 17:5
  18:1,22
account 12:17 14:8 15:9
  15:17,19
action 1:2 15:3,4 20:17
actions 6:23,24
actually 9:24 10:1,5
administered 4:2 20:13
adult 9:17
affect 11:4,14 12:8,14
affected 16:9,11
after 8:22 14:16
afternoon 4:8
again 4:21 7:10
against 6:24 7:7
ago 8:7
agree 7:4
allowed 7:1 10:23
Alloys 13:3
already 8:15 16:22
AMERICAN 2:3
amount 6:18 7:15
answer 11:9,11,17,18,22
  11:24 12:23
answers 4:17 21:5
anticipate 4:8
anyone 4:14 13:22
anything 9:9 15:5,6 16:6
APPEARANCES 2:1
appropriate 10:15,19
around 15:1
asked 8:20 14:11
attached 21:8
attorney 5:2
Avenue 2:9
avoid 4:20
aware 15:19 16:3

**B**

back 7:13
bad 17:15,20
basis 8:5
bed 9:18
before 1:21 4:9 16:5 17:7
  17:9 20:9
begin 4:9
behalf 1:4
being 4:8,15,17 11:2
  16:17
believe 8:20,23 9:24 10:1
  10:13 12:2,6,12 13:14
  · 13:19,24 15:1,21 16:4
  18:11,18
besides 16:2
best 4:11 5:21,23 8:2
blood 20:17

Blue 1:8,9,11,19 5:17
Board 1:20
both 1:11
Bourse 2:4
Box 2:9
Bradshaw 1:21 20:6,23
break 5:1 19:1,4
Britain 2:10
budget 13:17
Building 2:4
Butler 2:9

**C**

C 20:1,1
called 4:1
calls 9:16 11:6 12:20
Candis 1:21 20:6,23
capacities 1:12
capacity 13:13
career 11:5,14
case 13:23 17:4
catch 4:23
CATHERINE 2:3
Cell 7:20 10:4 13:7 15:23
CERTIFICATE 21:1
certify 20:10,16 21:2
chance 6:7
changes 21:7
children 5:12
chores 7:3
CIVIL 1:2 2:3
class 16:19 17:3
come 9:18
commencing 1:20
Commission 21:20
Commissioner 20:7
Commonwealth 20:3,8
communication 13:22
  14:5
company 13:9
compiled 4:15
complain 18:1
complete 21:5
computer 7:2,8,14,15
  9:13 15:20
concluded 19:9
conclusion 12:21
consult 5:1
contents 10:18
contesting 15:3
copy 3:12 8:4,6,14
correct 6:17 20:14 21:5
CORRECTION 22:2
corrections 21:7
County 20:5,8
COURT 1:1,22
created 15:17,19
creation 15:13,15

crying 14:12
cutting 7:8,13

**D**

Dale 1:20
DATED 21:15
daughter 1:5 5:14,24 6:8
  6:12,14 7:12 8:19 11:2
  15:16 16:1 17:24 18:3,9
Dauphin 20:5,8
day 20:21 21:18
Defendants 1:13 2:12
DEPONENT 21:1
deposition 1:15 4:7 19:9
  20:12,14 21:3
depositions 20:7,10
DESCRIPTION 3:11
deserves 10:24
detention 16:7
different 13:15
disciplinary 6:24
discipline 6:7,11,14 7:4,7
disciplining 7:12
district 1:1,8,10,11,20
  5:19 6:2 7:19 8:1 13:23
  14:6
doing 11:17
done 14:1,3,6
down 4:13
DR 1:8
D-1 3:12

**E**

E 1:8 2:14 20:1
East 1:23 2:4,9
Ed.D 2:14
effect 9:2
employee 13:18,20
end 16:23,23
enjoyed 18:7,9
enjoys 18:9
enlarged 3:12
entire 5:4
Errata 21:8 22:1
ESQUIRE 2:3,8
ever 8:8 17:6,24
everything 4:14
EXAMINATION 4:4
except 21:7
EXHIBITS 3:9
Expires 21:20

**F**

F 20:1
fact 14:16
family 14:5
feel 18:15,17
few 16:7

figure 9:22
find 21:4
first 8:8,22 9:3,3,7 10:5
  14:15
Floor 1:23
follows 4:2
fooling 15:1
foregoing 20:9 21:3
Foreman 13:8
form 18:23 21:7
forth 7:9 20:12
friend 14:20,24
friends 18:6
from 7:6,8,12,13 12:16
  13:23 19:4
funny 8:23 9:2,15,23 10:3
further 19:5 20:16

**G**

give 4:9 8:14
given 20:15 21:3,6
gives 10:9
glanced 9:3
go 15:5 16:19
going 7:9 18:7,9
good 4:6 17:15,20,22
gotten 16:1
grade 5:16
great 4:22 19:8
grounded 6:18
guess 12:12,15

**H**

hand 20:21
handout 10:18
hands 4:19
hard 18:4
head 4:18 5:3
hear 17:24 18:5
heard 14:15 18:3
hearings 15:6
her 1:3 6:18 7:1,2,3,4,7,8
  7:13,16 14:10,11,17,20
  14:20,21,24,24 16:13
  16:19
hereinbefore 20:12
hereunto 20:20
him 17:8,9,14 18:1
home 7:17
honest 8:12
hours 7:8
house 15:20
hurt 16:13

**I**

idea 18:20
impression 9:7 10:9
INC 1:22

incident 15:9 18:2
Independence 2:4
**INDEX** 3:1
indicates 9:10,16
indifferent 17:16,21
individual 1:12 9:17
individually 1:4
information 12:18
initial 8:21
interested 20:18
interests 5:22,23
invasion 12:18

**J**

J 5:14 6:24 14:8
**James** 1:7,10 2:14
job 17:19
**John** 4:6
joke 8:13,16,17 9:2,10
  10:6,8
**JONATHAN** 2:8
**Joyce** 1:8 2:14
**JUDGE** 1:7
just 5:2 9:8,11,11,15,20
  9:22 10:13 14:12 15:1
  17:12 19:1
**J.S** 1:2

**K**

**KATZ** 2:8
kicked 16:13
kids 9:18
kind 9:21
knew 18:19
know 10:1 12:5,24 14:16
  17:2,4,12,15 18:10,22
knowledge 15:8,14 18:14

**L**

laborer 13:3,5
lady 4:13
later 4:16
laugh 9:14
lawsuit 8:5
lawyers 4:16
legal 12:21
Let 19:1
Let's 8:14
**LIBERTIES** 2:3
like 4:9 5:1 6:22 7:16 9:11
  9:14,20,20 10:6,7,10,13
  10:22,23,24 11:4,13
  12:8 13:17 16:4,20
likes 9:17
**LINE** 22:2
live 5:10,10
**LLP** 2:8
long 4:8 6:21

look 9:8,12
looks 10:7
lot 7:3
**LOVE** 1:22

**M**

M 1:7
make 18:16
**Mall** 2:4
man's 12:8
**March** 5:16
marked 3:9 8:15
**Market** 1:22
marriage 20:17
married 5:7
**MARY** 2:3
matter 20:19
**McGONIGLE** 1:10 2:14
  17:6
mean 9:5,12 10:2,11,11
  15:15 17:12
meetings 15:6
met 17:6,8,14 18:20
middle 1:1 5:17
minds 9:19
minor 1:2
minutes 8:7
moments 8:22
morning 4:6
**Mountain** 1:8,10,11,19
  5:17
mouth 8:24
much 9:13
**MUNLEY** 1:7
must 17:22
MySpace 3:12 8:4 9:19
  12:17 14:8 15:9,9

**N**

N 20:1
name 4:6 5:5
need 4:17
needs 11:17
never 16:5 17:14 18:20
New 2:10
next 18:16
nobody 18:18
Nodding 5:3
Notary 1:21 20:24 21:23
noted 21:8
nothing 16:4,8,20

**O**

O 20:1
oath 4:2 20:13
objection 11:6,15 12:10
  12:20
off 7:8,21,22

officer 20:9
official 1:12
Oh 11:19 12:1
okay 4:13 5:2,12,14,19
  6:1,9,11,23 7:6,18 8:4
  8:14,20 9:4 11:3 12:1,5
  13:1,6 14:23 15:8,13,22
  16:9,21 17:2,6,9,11,13
  17:15,24 18:12,24 19:3
  19:8
old 9:17
one 4:23 15:10
only 7:1
onto 4:19,22
opinion 17:20 18:23
**ORAL** 1:15
Orwigsburg 1:20
other 6:23,24 7:3,18,24
  9:19 15:8 16:2,17,18
  18:1,3
ourselves 6:10
out 9:22 10:12 16:13
outcome 20:18
over 18:6
own 13:9,9

**P**

P 2:8
page 3:2,11,12 10:19 22:2
paid 16:22
paper 4:19,22
Pardon 6:13 14:2 18:8
parents 1:3
party 20:17
Pennsylvania 1:1,20,23
  2:3,5,10 20:3,9
people 9:16 10:12 18:3
performs 17:19
permitted 11:24
personally 8:17 15:4 17:8
  17:14
pervert 9:19
Philadelphia 1:23 2:5
phone 7:9,16,20 10:4
  13:7 15:23
picture 12:16 18:15
piled 7:2
placing 12:17
Plaintiffs 1:6 2:7
please 5:2,4
prank 10:7
**PRESENT** 2:13
preserving 11:16
prevent 7:6,8,11,13
**PREVIOUSLY** 3:9
principal 1:11 17:16,18
  17:22
principals 9:20

privileges 7:16
Probably 17:10
proceedings 4:16
profession 12:9 13:2
professional 11:4
propounded 21:6
**PUBLIC** 21:23
**Public-Court** 1:21 20:24
pull 9:13
pulling 18:21
punishment 11:1
put 8:19,24 13:8
p.m 1:21 19:4,4,9
**P.O** 2:9

**Q**

question 4:10 9:6 11:9,11
  11:20,22,24 12:7,23
questions 19:6,7 21:6
quick 19:1

**R**

R 20:1
reaction 8:11,21
Reading 13:3
real 9:8,12
really 12:11 17:5
reason 7:18,24 22:2
recall 6:21 14:14
recitals 17:10
recollection 4:11
record 5:5 7:21,22 20:14
Red 1:20
**REFERENCED** 3:9
regarding 13:23
related 20:16
Reporter 1:21 20:24
**REPORTING** 1:22
Representing 2:7,12
reputation 12:14
Riba 2:8 3:4 4:5,6 7:21,23
  11:8 12:4,13,22 15:24
  18:24 19:5,8
right 4:13 7:9,16,24
  11:16
rights 12:19
ringing 7:20 10:4 13:7
  15:23
Road 1:20 5:11
rock 9:18
Romberger 1:9 2:14
room 1:20 4:14
**ROPER** 2:3 11:6,15,21
  11:23 12:10,20 19:3,7

**S**

S 1:10,21 2:4,14 20:6,23
same 3:13 11:15 12:10

saw 10:5
saying 9:15
says 4:14 9:18 14:12,24
Schneider-Morgan 2:15
school 1:8,10,11,19 5:17
  5:19 6:1 7:2,6,7,11,19
  8:1 12:17 16:2,14,24
  17:10,18 18:7,10
see 4:18 8:4 9:9 11:3,13
  17:9
seeing 8:22
seen 8:6,8 17:8
sense 7:12
September 1:17,20 20:21
  21:4
set 20:12,20
sex 9:20
Sheet 21:9 22:1
significant 6:18
sir 4:6 5:20 8:16 9:10
  12:5 13:2 18:15,20
site 8:5,21 10:16,17,19
  12:17 18:21
skills 17:16,17
slip 4:23
Snyder 1:3,4,16 3:3 4:1
  5:6,7,8 20:11 21:2,13
some 4:9 17:10
somebody 10:10,13 12:11
someone 9:16 18:21
someone's 11:4,14
something 9:2,14 10:10
  10:24 11:3,13 12:8
something's 10:3
sorry 11:23 14:13
speculation 11:7
spell 5:4
standards 13:14
started 14:12
state 5:4 13:12,17,20
STATES 1:1
Steven 1:3,16 3:3 4:1 5:6
  20:11 21:2,13
STEVENS 2:8
still 17:23 18:12
Street 1:22
student 5:17
stuff 7:16 10:12,22,23
  13:15,16,17
Subscribed 21:18
substance 21:8
sue 5:19 6:1
sued 7:19 8:1
Suite 2:4
Summer 5:11
Superintendent 1:9
sure 10:11 12:11 17:5
Susan 2:15

suspended 16:5
suspension 15:4 16:10
suspensions 16:8
SWEET 2:8
sworn 21:18
S-N-Y-D-E-R 5:6
S-T-E-V-E-N 5:6

**T**

T 20:1,1
take 5:1 15:3,4 19:1 20:7
taken 1:19 20:10
taking 4:7,13 7:7 12:16
teacher 12:2
tell 5:2 14:11,23
tells 11:18
Terry 1:3 5:8
testified 4:2 8:23 9:1
testifying 4:10
testimony 20:15
their 1:4,12
thing 8:3
think 6:22 8:16,17 10:5
  10:15,19,24 12:8,16
  14:22,24 16:7 18:18,24
thought 5:21 6:5 8:12,23
  9:1 10:6
three 6:22
through 1:3 14:1,3,6
time 6:19 7:14,15 8:8,22
  14:15 16:2
times 16:8
today 4:7,14
told 7:1 15:21
Tower 1:23
transcript 4:15 21:3,5
translate 4:19,21
trip 16:19
trip's 17:3
trouble 16:1
true 6:11 10:1,3,22 18:22
  20:14 21:4
try 4:20,23
trying 9:22
two 5:12 6:22 8:7

**U**

Uh-huh 14:17 16:5 18:7
uh-huhs 4:20
uh-uhs 4:21
undersigned 20:6
understand 4:11
understood 4:10
UNION 2:3
UNITED 1:1
unless 11:18
upset 16:15,17
use 7:1 9:12

used 4:15

**V**

Valley 5:11
verbal 4:18
very 4:8 18:4
vs 1:7

**W**

want 6:1 8:24
way 13:8 17:19 20:18
Web 8:5,21 10:15,17,19
  12:17
weekend 17:3,3
weeks 6:22
Well 9:15,24 10:10,22
  12:5 15:16 16:19 17:22
  18:6,18,20,23
were 14:24 16:9,15 20:10
we'll 4:23
we're 10:11
WHEREOF 20:20
whole 7:2
wife 5:21,24 8:2 13:11
  14:1,3,6 15:5,7
WILLIAMS 2:8
witness 3:2 4:1 20:11,15
  20:20
words 8:24
work 7:2
works 13:12
world 10:12
writes 13:14
writing 12:18
wrong 6:5,6

**X**

x 2:6

**Y**

yeah 11:21 15:11,21
  16:12 18:11
year 16:24
years 9:17
Yup 4:12

**0**

07-CV-585 1:3

**1**

111 2:4
116 2:6
12th 1:23
13 1:17,20 21:4
1500 1:22
18901 2:10
19102 1:23
19106 2:5

**2**

2007 1:17,20 5:16 20:21
  21:4,19
209 5:11
215 1:24 2:6,11
25th 20:21

**3**

3:27 1:21
3:44 19:4
3:48 19:4,9
331 2:9
345-9111 2:11

**4**

4 3:4
40 9:17

**5**

5069 2:9
568-5599 1:24
570 2:4
592-1513 2:6

**6**

685 1:20

**8**

8th 5:16

**9**

9 3:12

Steven Snyder

```
1                    ERRATA SHEET

2   PAGE   LINE        CORRECTION        REASON FOR

3   ____ - ____ - _____

4   ____ - ____ - _____

5   ____ - ____ - _____

6   ____ - ____ - _____

7   ____ - ____ - _____

8   ____ - ____ - _____

9   ____ - ____ - _____

10  ____ - ____ - _____

11  ____ - ____ - _____

12  ____ - ____ - _____

13  ____ - ____ - _____

14  ____ - ____ - _____

15  ____ - ____ - _____

16  ____ - ____ - _____

17  ____ - ____ - _____

18  ____ - ____ - _____

19  ____ - ____ - _____

20  ____ - ____ - _____

21  ____ - ____ - _____

22  ____ - ____ - _____

23  ____ - ____ - _____

24  ____ - ____ - _____
```