**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| J.S., a minor, by and through her parents, TERRY SNYDER and STEVEN SNYDER, individually and on behalf of their daughter,<br>　　　　　　　　　　**Plaintiffs**<br>　　　v.<br>BLUE MOUNTAIN SCHOOL DISTRICT; DR. JOYCE E. ROMBERGER, Superintendent Blue Mountain School District; and JAMES S. MCGONIGLE, Principal Blue Mountain Middle School, both in their official and individual capacities,<br>　　　　　　　　　　**Defendants** | No. 3:07cv585<br><br>(Judge Munley) |

## **MEMORANDUM**

Before the court for disposition are cross-motions for summary judgment in this civil rights action based upon a school's discipline of a student for creating a false internet profile purporting to be her school principal. The matter has been fully briefed and argued and is ripe for disposition.

**Background**

On March 18, 2007, a personal profile appeared on the website MySpace.com with the picture of James McGonigle, principal of Defendant Blue Mountain Middles School, which indicated, *inter alia,* that he is a pedophile and a sex addict. (Doc. 36, MySpace Profile Page). This imposter profile had been created by Plaintiff J.S., a fourteen-year old eighth grade student at Blue Mountain Middle School and her friend K.L., also a student. (Doc. 33-2, Def. Statement of Facts (hereinafter "Def. Facts") at ¶ 6).[1] The students created the profile from the home computer

---

[1]We will cite to the Plaintiffs' or Defendants' "Statement of

owned by J.S.'s parents during non-school hours. (Doc. 35, Pl. Statement of Facts (hereinafter "Pl. Facts") at ¶ 21). The profile did not identify McGonigle by name, but it identified him as a principal and included his picture which had been taken from the school district's website. (Pl. Facts ¶ 17).

The profile described its subject as a forty year old, married, bisexual man living in Alabama. His interests were described as: "detention, being a tight ass, riding the fraintrain, spending time with my child (who looks like a gorilla), baseball, my golden pen, fucking in my office, hitting on students and their parents." It also indicated that he likes television and mainly watches "the playboy channel on directv, OH YEAH BITCH!" (emphasis in original). (Doc. 36, MySpace Profile Page). A statement on the profile has the heading "HELLO CHILDREN." It reads:

> yes. It's your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick PRINCIPAL I have come to myspace so I can pervert the minds of other principals to be just like me. I know, I know, you're all thrilled. Another reason I came to myspace is because I am keeping an eye on you students who I care for so much) For those who want to be my friend, and aren't in my school, I love children, sex (any kind), dogs, long walks on the beach, tv, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs) MY FRAINTRAIN so please feel free to add me, message me whatever"

(Id.).

The address or "url" for the profile includes the phrase "kids rock my bed." (Id.). Although the students created the profile at J.S.'s home, news of it soon spread to the school. The next day students were already

---

Uncontested Facts" for facts that are not controverted.

discussing the website at school, and K.L. told five to eight students about the profile. (Def. Facts ¶ ¶ 28, 30). Additionally, five to six students approached K.L. and inquired about the profile. (Def. Facts ¶ 29). Discussion of the website continued through the day, and there was a general "buzz" in the school with quite a few people knowing about it. (Def. Facts ¶ ¶ 31-32).

Plaintiff J.S. asserts that approximately a day after the profile was created it was set to "private." A MySpace profile set to "private" may only be viewed by those who receive permission from the profile's creator. (Pl. Facts ¶ 18). After it was made private, J.S. and K.L. granted access to twenty-two individuals to view the profile. (Pl. Facts ¶ 19). Plaintiff asserts that the profile was set to private "approximately" one day after it was created. One day after its creation would have been Monday, March 19, 2007. McGonigle, however was evidently able to access the site on his work computer on Wednesday, March 21, 2008. (McGonigle Dep. At 54-55).

The subject of the imposter profile, McGonigle, heard about it first on Monday, March 19, 2007. (Def. Facts ¶ 33). The next day, he was informed that the profile contained very disturbing comments about him. (Def. Facts ¶ 34). On that same day, at least one teacher approached McGonigle to inform him that students were discussing the profile in class. (Def. Facts ¶ 35).

On the following day, Wednesday, March 20, 2007, a student provided McGonigle with a printout of the profile. (Def. Facts ¶ 37). McGonigle also learned on that day that J.S. and K.L. were involved with the creation of the profile. (Def. Facts ¶ 36).

3

J.S. was absent from school on March 21, 2007. (Def. Facts ¶ 38). The next day, McGonigle called her to the office and met with her in the presence of the guidance counselor, Michelle Guers. (Def. Fact ¶¶ 39-40). Initially, J.S. denied any involvement with the imposter profile. Eventually, however, she admitted that she had created it with K.L. (Def. Facts ¶¶ 41-42). McGonigle then spoke with the parents of both J.S. and K.L. regarding the profile. (Def. Facts ¶ 43). He also contacted MySpace.com to have the profile removed. (Def. Facts ¶ 44).

Based upon the creation of the imposter profile, McGonigle determined that J.S. had violated the school discipline code which prohibits the making of false accusations against school staff members. (Def. Facts ¶ 51). He found it was also a violation of the district's computer use policy which informs students that they cannot use copyrighted material without permission from the agency or website from where they obtained it. (D.Facts ¶¶ 51, 46).[2] This policy was violated according to the district because the students had obtained the photo of McGonigle from the school's website and the district has the sole permission to use and display photographs contained on that website. (Def. Facts ¶ 53).

Plaintiff received a ten (10) day out-of-school suspension because she had created the website. (Def. Facts ¶ 54).[3] During the suspension, J.S.'s school assignments were brought to her home. (Def. Facts ¶ 57).

---

[2]In fact, in the letter sent to J.S.'s parents regarding the suspension, McGonigle indicated that the discipline was for making false accusations against him and for violating copyright laws. (Pl. Ex. H).

[3]K.L received the same punishment but is not involved in the instant lawsuit. (D.Facts 55).

Prior to this incident, J.S.'s only other discipline had been in December 2006 and February 2007, for dress code violations. (Pl. Facts ¶ 14). Plaintiff had the opportunity to appeal the discipline she received to the school superintendent and the school board. (Def. Facts ¶ 62). She evidently did not take advantage of this opportunity.

Plaintiffs instead instituted the instant case. They aver that the First Amendment precludes the school district from excluding a student from classes for two weeks for the profile which is non-threatening, non-obscene and a parody. They claim that the Constitution prohibits the school district from disciplining a student's out-of-school conduct that does not cause a disruption of classes or school administration. They further allege that the defendants' actions violate Plaintiff Terry and Steven Snyder's rights as parents to determine how best to raise, nurture, discipline and educate their children in violation of their rights under the Fourteenth Amendment to the United States Constitution. The plaintiffs bring suit pursuant to the Civil Rights Statute of 1964, 42 U.S.C. § 1983.

Upon filing the complaint plaintiffs also filed a motion for temporary restraining order and preliminary injunction. We denied the motion for temporary restraining order and preliminary injunction on March 29, 2007, and the case proceeded through discovery. (Doc. 7, Doc. 26). At the close of discovery, both the plaintiffs and the defendants moved for summary judgment, bringing the case to its present posture. During the briefing of the motions for summary judgment, the plaintiffs stipulated to the dismissal of the two individual plaintiffs, McGonigle and Romberger. Thus, the only defendant remaining is the school district. (Doc. 48).
**Jurisdiction**

As this case is brought pursuant to 42 U.S.C. § 1983 for constitutional violations we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Standard of review**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's

burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Discussion**

The parties' arguments fall into the following three general categories:  A) Did the school violate the plaintiff's first amendment rights? B) Are the school district's policies unconstitutionally vague and overbroad? and C) Did the school district violate the Snyders' parental rights?   We will address these issues *in seriatim*.

   **I.  First Amendment issues**

Plaintiffs' argument with regard to the First Amendment issues centers on the United States Supreme Court case of Tinker v. Des Moines Ind. Comm. Sch. Dist., 393 U.S. 503 (1969).  Plaintiffs argue that based upon Tinker, in order to restrain J.S.'s speech, the school must establish that her speech caused, or was likely to cause, a substantial and material disruption at the school.  Because no such disruption occurred, nor was one likely to be caused, plaintiffs argue that defendant erred in restraining J.S.'s speech.  After a careful review, we find plaintiffs' analysis of Tinker and its progeny to be unconvincing.

The seminal case concerning freedom of speech in a public school setting is indeed Tinker.  In Tinker, a group of students decided to wear black armbands to school to protest the Viet Nam war.  Id. at 504.  The school administration learned of the plan and adopted a policy that indicated that student's wearing such armbands would be asked to remove

them. If the students refused, they would be suspended until they returned to school without the armbands. Id. Several of the students brought suit to restrain the school district from disciplining them for wearing the armbands. Id. The Supreme Court indicated that students and teachers do have First Amendment rights in school. Id. at 506. It explained that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id.

The Court held that a student may express his opinions during school hours, "if he does so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. . . . But conduct by the student, in class or out of it, which for any reason-whether it stems from time, place, or type of behavior - materially disrupts class-work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513 (internal citation, quotation marks and parenthesis omitted).

To prohibit political speech of the kind addressed in Tinker, thus, the school had to demonstrate more justification than merely a desire to "avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Id. at 738. The school district had not established facts that would lead to a "forecast" of "substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." Id. 514. The plaintiffs did not interfere with work, cause disorder or interfere with the rights of others. Id. Thus, the prohibition of their speech was unconstitutional. Id. The type of speech involved in Tinker is political speech. In the instant case, the

speech is not political; rather, it was vulgar and offensive statement ascribed to the school principal.  Therefore, we must look further into the case law to determine the standard we must use.

Tinker was not the United States Supreme Court final discussion of free speech in the school setting.  In Bethel School Dist v. Fraser, (hereinafter"Fraser") the Court once again addressed this issue. 478 U.S. 675 (1986).  In Fraser, a student gave a speech at a school assembly nominating another student for student elective office.  Id. at 677. The speech referred to the candidate "in terms of an elaborate, graphic, and explicit sexual metaphor."  Id. at 678.  The student received a suspension from school for several days and was removed from the list of candidates to be a speaker at graduation because school officials found the speech to be a violation of the school's rule against "obscene, profane language or gestures."  Id.  The student brought a civil rights action asserting that the school had violated his First Amendment Freedom of Speech rights.  Id. at 679.  Without applying the analysis found in Tinker, the court upheld the school's decision.  Instead of the Tinker analysis, the court focused on the speech itself, that is its vulgar and lewd nature.

The Court indicated that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. . . . Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions.  The inculcation of these values is truly the work of the schools." Id. at 683 (internal quotation marks and citation omitted).  The court further noted that limits on sexually explicit, indecent or lewd speech can be appropriate where the audience includes children.  Id. at 684.  The Court

9

emphasized that unlike Tinker, the speech in Fraser was unrelated to any political viewpoint.  Id. at 685.   The school acted appropriately "to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the fundamental values of public school education.  Id. at 686.  The Fraser Court quoted favorably from Justice Black's dissent in Tinker that the federal Constitution does not "compel the teachers, parents, and elected school officials to surrender control of the American public school system to public school students."  Id. (quoting Tinker, 393 U.S. at 526 (Black, J., dissenting)).   The Third Circuit Court of Appeals has acknowledged that Fraser  establishes that "there is no First Amendment protection for 'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech in school."  Saxe v. State College Area School Dist., 240 F.3d 200, 213 (3d Cir. 2001).

      The Supreme Court next addressed freedom of speech in public schools in Hazlewood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988).  The issue in this case was whether the school district censoring of the school newspaper violated the First Amendment rights of student staff members of the newspaper.  The Court distinguished this case from Tinker in that Tinker addressed whether a school should tolerate particular student speech and this case deals with whether the school must affirmatively promote particular student expression in school-sponsored publications.  Id. at 270-271.  The Court concluded that the Tinker analysis was not applicable in this situation.  The Court held that the standard is: "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech so long as their actions are reasonably related to legitimate pedagogical concerns."  Id. at

273 (footnote omitted).

 The most recent Supreme Court to address freedom of speech in the public school setting is Morse v. Frederick, - - U.S. - - ; 127 S.Ct. 2618 (2007). Morse involves a school sponsored social event/class trip to view the Olympic torch relay. Id. at 2622. As the torchbearer and television cameras covering the event approached, several students unfurled a banner that read "BONG HiTS 4JESUS." Id. "Bong hits" is a reference to a manner of smoking marijuana. Id. at 2623. Morse, the school principal, instructed the students to take the banner down. They did, except for Frederick. She later suspended him for ten days from school. Id. at 2622. She explained that she ordered the banner taken down because she felt it encouraged illegal drug use. Id. at 2622-23. The school prohibits public expression that advocates the use of substances that are illegal to minors. Id. at 2623. Frederick brought suit alleging that the school's action violated his First Amendment rights. The Court framed the issue of the case as "whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." Id. at 2625. The court held that she may. Id. The Court again emphasized the facts of Tinker, that the political speech in that case implicated "concerns at the heart of the First Amendment." Id. at 2626. The Court further indicated that Fraser established that the Tinker analysis is not "absolute" because in that case, there was no "substantial disruption" analysis. Id. at 2627. The Court found that the banner was reasonably viewed as promoting illegal drug use. The promotion of illegal drug use was against the school's policy. The Court held that "[t]he First Amendment does not require schools to

11

tolerate at school events student expression that contributes to [the dangers of illegal drug use]." Id. at 2629.

These cases inform us that the Tinker analysis  - -the standard that the plaintiff asserts we should apply - - is not always applicable to freedom of speech in public school settings.  A school can validly restrict speech that is vulgar and lewd and also it can restrict speech that promotes unlawful behavior.  In the instant case, there can be no doubt that the speech used is vulgar and lewd.  The profile contains words such as "fucking," "bitch," "fagass," "dick," "tight ass," and "dick head."  The speech does not make any type of political statement.  It is merely an attack on the school's principal. It makes him out to be a pedophile and sex addict.  This speech is not the Tinker silent political protest.  It is more akin to the lewd and vulgar speech addressed in Fraser.  It is also akin to the speech that promoted illegal actions in the Morse case.  The speech at issue here could have been the basis for criminal charges against J.S. Additionally, the state police indicated to McGonigle that he could press harassment charges based upon the imposter profile.  (Dep. McG, 98- 99). McGonigle indicated that he would not press charges, but asked the police officer to contact the students involved and their parents to inform them of the seriousness of the situation. (Dep. McG at 99,  163-64). The officer summoned the students and their parents to the state police station and discussed the seriousness of the profile and that McGonigle would not press charges.  (Terry Snyder dep at 20-22).  Thus, as vulgar, lewd, and potentially illegal speech that had an effect on campus, we find that the school did not violate the plaintiff's rights in punishing her for it even though

it arguably did not cause a substantial disruption of the school.[4]

The plaintiff discusses whether she can be punished for the website at school although she created it off campus.[5] We find that she can. In Fenton v. Stear, 423 F. Supp. 767 (W.D. Pa. 1976), on a Sunday afternoon, a student was seated in a car with some friends parked at a shopping center. One of his teachers drove by. One of the students friends said "There's Stear." Plaintiff replied, "He's a prick." Id. at 769. 769. The court held that: "It is our opinion that when a high school student refers to a high school teacher in a public place on a Sunday by a lewd and obscene name in such a loud voice that the teacher and others hear the insult it may be deemed a matter for discipline in the discretion of the school authorities." Id. at 772.[6]

---

[4]Moreover, the protections provided under Tinker do not apply to speech that invades the rights of others. Tinker, 393 U.S. at 513. In the instant case, the speech at issue affected McGonigle's rights. As a principal of a school, it could be very damaging to have a profile on the internet indicating that he engages in inappropriate sexual behaviors.

[5]We acknowledge that the line between on-campus and off-campus speech is blurred with increased use of the internet and the ability of students to access the internet at school, on their own personal computers, school computers and even cellular telephones. As technology allows such access, it requires school administrators to be more concerned about speech created off campus - - which almost inevitably leaks onto campus- - than they would have been in years past.

[6]On similar facts the United States District Court for the District of Maine made the opposite conclusion. In Klein v. Smith, 635 F. Supp. 1440 (D.Me. 1986), the plaintiff sued under the First Amendment after he received punishment at school for making a vulgar gesture at a teacher off school grounds and after school hours. The court reasoned that: " The conduct in question occurred in a restaurant parking lot, far removed from

13

The facts that we are presented with establish much more of a connection between the off-campus action and on-campus effect. The website addresses the principal of the school. Its intended audience is students at the school. A paper copy of the website was brought into school, and the website was discussed in school. The picture on the profile was appropriated from the school district's website. Plaintiff crafted the profile out of anger at the principal for punishment the plaintiff had received at school for violating the dress code. (Def. Ex. G., Notes of Testimony of Preliminary Injunction Hearing at 12).  J.S. lied in school to the principal about the creation of the imposter profile. Moreover, although a substantial disruption so as to fall under Tinker did not occur, as discussed above, there was in fact some disruption during school hours. Additionally, the profile was viewed at least by the principal at school and a paper copy of the profile was brought into school. On these facts, and because the lewd and vulgar off-campus speech had an effect on-campus, we find no error in the school administering discipline to J.S.

---

any school premises or facilities at a time when teacher Clark was not associated in any way with his duties as a teacher. The student was not engaged in any school activity or associated in any way with school premises or his role as a student. Any possible connection between his act of "giving the finger" to a person who happens to be one of his teachers and the proper and orderly operation of the school's activities is, on the record here made, far too attenuated to support discipline against Klein for violating the rule prohibiting vulgar or discourteous conduct toward a teacher. " Id. at 1441 (internal footnotes omitted).  Admittedly, neither Klein nor Fenton are directly on-point with our case, and neither applies a rule of law set down from a higher court. Although, Klein does discuss Tinker in a footnote addressing the defendant's argument that the gesture had an "in school" effect. Id. at 1442 n.4.  4

14

Plaintiffs cite several district court cases from within the Third Circuit in support of their position.  We are unpersuaded by any of these cases.  Plaintiffs cite <u>Flaherty v. Keystone Oaks Sch. Dist.</u>, 247 F. Supp. 698 (W.D. Pa. 2003).  In this case, the defendant school district punished the plaintiff student for posting internet messages on a website message board regarding an upcoming volleyball game.  <u>Id.</u> at 700.  The comments cast aspersions on volleyball team players and the school art teacher who was the mother of a volleyball player.  The messages indicated that she is a bad art teacher and that a "dog" could teach art better.  <u>Id.</u> at 701.  This speech is simply not of the same type as is present in this case.  The statements are rather innocuous compared to the offensive and vulgar statements made by J.S. in the present case.  We thus find this case inapplicable to our analysis.

Plaintiffs also cite to <u>Latour v. Riverside Beaver Sch. Dist.</u>, No. Civ.A. 05-1076, 2005 WL 2106552 (Aug. 24, 2005).   In this case, a student was punished for four rap songs he wrote and recorded in his home over a two-year period.  The school found the songs threatening to other students at the school.  He was expelled from school for a two-year period.  <u>Id.</u> at *1.  In this case, the issue was whether the songs at issue constituted true threats or caused a material substantial disruption at the school.  <u>Id.</u> at * 2 - 3.   The court found that although rap songs may include violent imagery/language, no actual violence is necessarily intended.  <u>Id.</u> at 2.  This case, therefore, deals with threatening speech, not vulgar and offensive speech, which as set forth above is provided a separate analysis.

<u>Killion v. Franklin Regaional Sch. Dist.</u>, 136 F. Supp. 2d 446 (W.D. Pa. 2001).  In this case, the speech at issue was a "Top Ten" list regarding

the school's athletic director that remarked upon his appearance including the size of his genitalia.  Id. at 448.  The plaintiff student e-mailed the list to his friends from his home computer but did not bring it on school premises.  Id.  Another student, however, printed the list and distributed it at the school.  Id. at 449.  The student received a ten-day suspension and was precluded from participating in school-related activities.  Id.  In this case, the court applied the Tinker substantial disruption test to find that the school overstepped constitutional bounds.  Id. at 455.  As noted above, we find that while Tinker is the seminal United States Supreme Court case in this area, its standard is not a good fit for every school speech situation.  This conclusion is bolstered by the findings of the three school free speech cases that the Supreme Court has decided since Tinker, none of which apply the Tinker standard.  Thus, we are not convinced by plaintiff's reliance on Killion.

      Killion  also addresses whether the school could discipline for the speech because it was "lewd and vulgar."  The court concluded that the school could not punish for speech that occurred within the confines of the student's home far from any school premises or facilities and he was not engaged in any school activity or associated in any way with his role as a student when he complied the list.  Id. 457.  The speech in the instant case, however, is distinguishable with the level of vulgarity that was present, the effect that it did have on the school and the fact that the speech could have supported criminal charges against the plaintiff.  To the extent that Killion stands for the proposition that a school can never discipline a student for lewd and vulgar speech made off of the school campus, we simply disagree, and Killion is not binding on this court.

Lastly, the plaintiff cites, Layshock v. Hermitage Sch. Dist., 496 F. Supp. 2d 587 (W.D. Pa. 2007).  The facts of this case are perhaps more similar to the facts of the instant case than in the other three district court cases discussed above.  In Layshock, the student created an imposter profile of the school's principal and utilized a picture of the principal obtained from the school profile.  Id. at 591.  The profile included "nonsensical answers to silly questions . . . [and] crude juvenile language."  Id.  The court found that the school district did not have authority to punish the plaintiff for creating the profile.  In making this decision, however, the court indicated that it was a "close call."  Id. at 601.  We find that the facts of our case include a much more vulgar and offensive profile, and we come out on the other side of what the court deemed to be a "close call."

Accordingly, we find that plaintiff cannot establish a First Amendment violation, and summary judgment will be granted to the defendant.

2) Defamation/parody

Defendant argues that the speech at issue is not protected by the First Amendment because it is defamatory.  Plaintiffs assert that it is not defamatory because it is parody.   We need not address the parties' arguments on these points because we have found above that the J.S.'s discipline was appropriate and this holding applies whether the material was defamatory or parody.

   **II.  Vague and Overbroad policy**

Plaintiffs also argue that the policies that J.S. was charged with violating –the Blue Mountain Student/Parent Handbook ("Handbook") and the Acceptable Use of the Computers, Network, Internet, Electronic Communications Systems and Information Policy – are vague and

17

overbroad because they can be read to allow punishment for out of school conduct.  As we have found that J.S.'s discipline was appropriate, we cannot find that the policies that plaintiff was found in violation of are vague and overbroad.  Accordingly, judgment will be granted to the defendant on this issue.

Even if we were to address the issue, the language of the Handbook is sufficiently narrow.  Plaintiffs' argument is that the policies lack limiting language to  confine the policy to school grounds and school-related activities.  We disagree.  The Handbook provides that "Maintenance of order applies during those times when students are under the direct control and supervision of school district officials." (Def. Ex. J, p. 39).   The other policy at issue, the Acceptable Use of the Computers, Network, Internet, Electronic Communications Systems and Information Policy -  incorporates the handbook.  (Def. Ex. D, pg.  17 "This policy incorporates all other relevant School District policies, such as, but not limited to, the student and professional employee discipline policies . . .").  Thus, both are limited to situations where the school has direct control and supervision of students – regardless of whether they were applied correctly in the present case.[7]

**III.  Parental rights**

Parents have a fundamental right "to make decisions concerning the care, custody, and control of their children."  Troxel v. Granville, 530 U.S. 57, 66 (2000).  The plaintiffs argue that when school officials insert

---

[7]Plaintiffs also argue that the policies are vague and overbroad because they do not limit punishment of speech to that speech which creates a substantial and material disruption.  As set forth above, however, this standard is not necessarily the standard applicable to all student speech.

18

themselves into a student's home or personal life, the action intrudes on this fundamental right of parents to direct the upbringing of their children.

Under Pennsylvania law, school districts can punish students only "during such times as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school." 24 PENN. STAT. § 5-510.  Plaintiffs cast J.S.'s actions as occurring at home; and therefore, the school could not properly punish her for them.  We have found above, however, that the school did not err in disciplining J.S., and her actions were not merely personal home activities.  Discipline that was appropriately applied cannot support plaintiffs' claim that their parental rights were violated.  Thus, summary judgment will be granted to the defendant on this point.

**Conclusion**

For the reasons set forth above, summary judgment will be denied to the plaintiffs and granted to the defendant.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| J.S., a minor, by and through her parents, TERRY SNYDER and STEVEN SNYDER, individually and on behalf of their daughter,<br>**Plaintiffs**<br>v.<br>BLUE MOUNTAIN SCHOOL DISTRICT; DR. JOYCE E. ROMBERGER, Superintendent Blue Mountain School District; and JAMES S. MCGONIGLE, Principal Blue Mountain Middle School, both in their official and individual capacities,<br>**Defendants** | No. 3:07cv585<br><br>(Judge Munley) |

## ORDER

    **AND NOW**, to wit, this 11th day of September 2008, the plaintiffs' motion for summary judgment (Doc. 34) is **DENIED**, and the defendants' motion for summary judgment (Doc. 33) is **GRANTED**. The clerk of court is directed to close this case.

                                  **BY THE COURT:**

                                  **s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court**